IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **INSTANT BRANDS ACQUISITION** | § | **Case No. 23-90716 (DRJ)** |
| **HOLDINGS INC.**, *et al.*, | § | |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING DEBTORS TO PAY PREPETITION CRITICAL
VENDOR CLAIMS, FOREIGN VENDOR CLAIMS, AND 503(B)(9) CLAIMS IN THE
ORDINARY COURSE OF BUSINESS, (II) GRANTING ADMINISTRATIVE EXPENSE
STATUS TO DEBTORS' UNDISPUTED OBLIGATIONS TO VENDORS ARISING
FROM THE POST-PETITION DELIVERY OF GOODS ORDERED PREPETITION
AND AUTHORIZING DEBTORS TO PAY THOSE OBLIGATIONS IN THE
ORDINARY COURSE OF BUSINESS, (III) AUTHORIZING DEBTORS TO RETURN
GOODS, (IV) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS
OF LIEN CLAIMANTS, AND (V) AUTHORIZING FINANCIAL INSTITUTIONS TO
HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

---

**Emergency relief has been requested. Relief is requested not later than June 13, 2023.
If you object to the relief requested or you believe that emergency consideration is not
warranted, you must appear at the hearing if one is set, or file a written response
prior to the date that relief is requested in the preceding paragraph. Otherwise, the
Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 13, 2023 at 3:00 p.m. (prevailing
Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.
Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access
the facility at (832) 917-1510. Once connected, you will be asked to enter the
conference room number. Judge Jones's conference room number is 205691. Video
communication will be by use of the GoToMeeting platform. Connect via the free
GoToMeeting application or click the link on Judge Jones's homepage. The meeting
code is "Judge Jones". Click the settings icon in the upper right corner and enter**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

> **your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jones's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

Instant Brands Acquisition Holdings Inc. and certain of its affiliates (collectively, the "**Debtors**"),[2] each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From the Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers* (this "**Motion**").  This Motion is supported by the *Declaration of Adam Hollerbach as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "**Hollerbach Declaration**") filed contemporaneously herewith and incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

### Relief Requested

1.      By this Motion, and pursuant to sections 105(a), 363, 503(b), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal

---

[2]   The Debtors and their direct and indirect non-Debtor subsidiaries are collectively referred to herein as "**Instant Brands.**"

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto (the "**Proposed Orders**" and, if entered, the "**Orders**"), (a) establishing procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors (as defined below) or Foreign Vendors (as defined below) regarding the validity and amount of their respective claims and to determine, in the Debtors' reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)[3]), whether such parties so qualify for the relief requested herein, (b) authorizing, but not directing, the Debtors to pay in the ordinary course of business, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)) and business judgment, prepetition obligations related to Critical Vendors and Foreign Vendors, as well as valid claims of Vendors (as defined below) under section 503(b)(9) of the Bankruptcy Code, (c) granting Prepetition Order Vendors (as defined below) administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed obligations arising from the Debtors' outstanding prepetition purchase orders and other short and longer term contracts (collectively, the "**Prepetition Orders**") for certain Goods (as defined below) received and accepted by the Debtors on or after the Petition Date, and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the

---

[3]   As used herein, the terms "**Term DIP Agent**," "**ABL DIP Agent**," "**Term DIP Lenders**," and "**ABL DIP Lenders**" shall have the meaning ascribed to each in the DIP Orders (as defined in the Proposed Orders).

direction of the requisite ABL DIP Lenders)), under section 363 of the Bankruptcy Code,
(d) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code,
to return Goods purchased from Vendors by the Debtors prior to the Petition Date for credit against
such Vendors' prepetition claims, (e) authorizing, but not directing, the Debtors to pay, in their
reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the
requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the
requisite ABL DIP Lenders)), all or a portion of the Lienholder Claims (as defined below), and
(f) authorizing the applicable financial institutions to receive, process, honor, and pay all checks
or wire transfers used by the Debtors to pay the foregoing.

## Jurisdiction, Venue, and Authority

2.      The United States Bankruptcy Court for the Southern District of Texas (the
"**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order
of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa,
C.J.).

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In
addition, the Debtors confirm their consent to the entry of a final order by the Court in connection
with this Motion to the extent that it is later determined that the Court, absent consent of the parties,
cannot enter a final order or judgment in connection herewith consistent with Article III of the
United States Constitution.

4.      Venue of the Chapter 11 Cases and related proceedings is proper in this district
pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.    General Background

5.     On June 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

6.     Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

7.     Instant Brands is a company that designs, manufactures, and markets a global portfolio of innovative and iconic consumer lifestyle brands, including Instant®, Pyrex®, Corelle®, Corningware®, Snapware®, Chicago Cutlery®, and Visions®.  With people-first and purpose-driven solutions in mind, Instant Brands is reimagining how people live, eat, connect, and play inside the home—and in the spaces where people gather.  Headquartered in Downers Grove, Illinois, Instant Brands sells its products worldwide, employs more than 2,000 people, and operates in several countries outside the United States, including Canada, Singapore, England, South Korea, Australia, Taiwan, and China.

8.     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Hollerbach Declaration.

B.   **Request for Authority To Pay Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, and Lienholder Claims**

9.      In connection with the normal operation of their businesses, the Debtors purchase goods (including finished goods (*e.g.*, appliances)) and various goods utilized to manufacture glass housewares (*e.g.,* silica, resins, and other commodities and raw materials) (collectively, the "**Goods**") and various services (collectively, the "**Services**") from vendors, suppliers, manufacturers, and independent contractors that are unaffiliated with the Debtors (collectively, the "**Vendors**") and are, by and large, the sole source or limited source for unique or customized materials or services, or services needed for compliance with certain laws and regulations, and provide material economic or operational advantages when compared to other available vendors. Without these Vendors, the Debtors could not operate (the Vendors for such critical Goods and Services, collectively, the "**Critical Vendors**").  As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular Goods or Services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill, market share, and estates.

10.      In addition, the Debtors purchase a significant portion of their Goods and Services in the ordinary course of business from certain Vendors that operate in foreign jurisdictions and have little to no connection to the United States (such Vendors and independent contractors, collectively, the "**Foreign Vendors**").  If the Foreign Vendors are not paid, they may withhold vital Goods and Services, thereby interrupting the Debtors' operations.  Such an interruption could have a drastic impact on the Debtors' businesses due to the Debtors' dependence on such Goods and Services, the lack of alternative suppliers, and the time necessary to replace the Foreign Vendors.  Therefore, the Debtors' ability to maintain their businesses depends, in part, on their ability to preserve key relationships with the Foreign Vendors.

11.     Despite the global reach of the automatic stay, it is possible that certain Foreign Vendors may seek to enforce claims against the Debtors in foreign jurisdictions or otherwise interfere with the Debtors' operations outside the United States, thereby threatening the Debtors' ability to operate and to attract new business and imperiling the success of the Chapter 11 Cases. Furthermore, some of the Foreign Vendors, who are unfamiliar with United States bankruptcy law and who may be beyond the jurisdiction of the Court, may not be willing to do business with a "Chapter 11 Debtor" absent payment of claims, including accrued prepetition claims, in the ordinary course.

12.     While the Debtors hope and expect to ensure a continuing post-petition supply of Goods and Services by consensual negotiation with their Vendors, the Debtors recognize that their fiduciary duties require them to consider and plan for the Vendors that may refuse to provide future Goods or Services unless their prepetition claims are paid.  Replacement vendors and contractors, even where available, would likely result in substantially higher costs for the Debtors and severe operational disruption.  Moreover, replacement vendors or contractors may lack knowledge of the Debtors' operations or fail to match the Debtors' high standards, thereby placing the safety of the Debtors' employees and the reputation of the Debtors' businesses and services at risk.

13.     A significant portion of the Goods and Services purchased by the Debtors are generally shipped directly to and received by the Debtors on an as-needed basis for the Debtors' operations, all as directed by the Debtors.  As a consequence of the commencement of the Chapter 11 Cases, the Debtors believe that many of the Vendors may be particularly concerned that they will not be paid for the delivery or shipment of Goods or the provision of Services after the Petition Date if such delivery, shipment, or provision was based on a Prepetition Order, or that their claims arising from the Prepetition Orders (such claims, "**Prepetition Order Claims**") would be treated

as general unsecured claims.  Accordingly, the Vendors holding such Prepetition Order Claims (such vendors, the "**Prepetition Order Vendors**") may refuse to provide Goods or Services to the Debtors (or may recall shipments of Goods) unless the Debtors issue substitute purchase orders post-petition or obtain an order of the Court (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed Prepetition Orders or (b) authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

14.     If the Debtors can pay Critical Vendors and Foreign Vendors their prepetition claims (such claims, collectively, the "**Critical Vendor Claims**" and "**Foreign Vendor Claims**," respectively) and pay the Prepetition Order Vendors their Prepetition Order Claims, and thereby (a) maintain lower costs of Goods and Services purchased during the post-petition period, (b) ensure delivery of Goods ordered prepetition but not yet delivered, (c) ensure the provision of critical Services, and (d) avoid the severe disruption and safety risks to the Debtors' employees and the disruption and reputation risks to the Debtors' businesses that might result from the cessation of such essential Goods or Services, it is prudent for the Debtors to do so.  Failure to pay the Critical Vendors, the Foreign Vendors, or the Prepetition Order Vendors, and the consequent discontinuity of the Goods or Services rendered by these Vendors, may disrupt the Debtors' businesses.  This would cause significant and irreparable harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the Critical Vendor Claims, the Foreign Vendor Claims, and the Prepetition Order Claims.

*Critical Vendors, Foreign Vendors, and Prepetition Order Vendors*

15.     The Debtors' Critical Vendors and Foreign Vendors include the following:

(a)     Sourced Finished Goods Vendors.  The Debtors purchase from certain Vendors (collectively, the "**Sourced Finished Goods Vendors**") various finished

goods. These finished goods include, among other things, electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers, other multi-feature appliances, and housewares.  The success of the Debtors' appliance sector of their businesses requires the Debtors keeping shelves stocked with a variety of their products to meet a diverse range of customer needs and demands.  In doing so, the Debtors rely on a steady supply of merchandise manufactured abroad by Sourced Finished Goods Vendors.  Without a continuous supply of merchandise from the Sourced Finished Goods Vendors, the Debtors risk losing their core identity and damaging customer and brand loyalty that the Debtors worked to cultivate.  Thus, the benefits of paying these Sourced Finished Goods Vendors substantially outweigh any associated costs given the critical and ongoing need for the merchandise.  As of the Petition Date, the Debtors estimate that they owe the Sourced Finished Goods Vendors, in the aggregate, approximately $41.3 million on account of their prepetition claims.

(b)      Specialty Material Vendors.  The Debtors purchase or lease from certain Vendors (collectively, the "**Specialty Material Vendors**") various specialty materials required for the manufacturing and packaging of the Debtors' glass products. These materials include, among other things, silica, soda ash, potassium, cullet, oxygen, natural gas, other minerals, precious metals,[4] components, and customized corrugated packaging.  Many of these Specialty Material Vendors provide specialty materials utilized

---

[4] As part of their manufacturing processes, the Debtors use precious metals, such as platinum and rhodium, to coat high wear areas of its glass furnaces and parts used in the glass melting process.  These metals essentially comprise a working component of the Debtors' machinery and are not part of the finished products.  Given the significant costs of such precious metals, the Debtors lease platinum from Bank of Montreal and rhodium from SCMI US Inc.  As part of these arrangements, the Debtors could be required to purchase these precious metals at a given day's spot rate, thereby resulting in potential obligations in the amount of approximately $35 million to $38 million. The Debtors are negotiating revised terms with their lessors of precious metals and would file a motion with the Court seeking approval of any resolved terms.

in the production and packaging processes that cannot be easily replaced and are sole source providers.  Attempting to find replacement sources of these materials would result in significant additional expenses, and such replacement sources may very well not be available in the volumes required.  Additionally, certain Specialty Material Vendors and the materials themselves are dictated by the customer in order to meet certain specifications.  Thus, the benefits of paying these Specialty Material Vendors substantially outweigh any associated costs given the crucial roles that these materials play in the ongoing viability of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that they owe the Specialty Material Vendors, in the aggregate, approximately $8.4 million on account of their prepetition claims.

(c)       Logistics Providers.  The Debtors employ the services of certain third-party logistics providers (the "**Logistics Providers**") that provide to the Debtors a range of supply chain services, including highly engineered solutions, customized products used during the shipping and transportation process, and high-value-add contract logistics. The Logistics Providers arrange for the transportation and delivery of goods from the Debtors' manufacturing facilities to their customers and from the Debtors' suppliers (particularly the kitchen appliance manufacturers) to the Debtors' facilities.  The Debtors would risk disruption in their supply and delivery chain and would be unable to transport their products in a timely and cost-effective manner absent the continued services provided by the Logistics Providers.  As of the Petition Date, the Debtors estimate that they owe the Logistics Providers, in the aggregate, approximately $320,000 on account of their prepetition claims.

(d)     <u>Service Providers</u>.   The Debtors employ other various skilled Vendors (collectively, the "**Service Providers**") to ensure that the Debtors' operations run as efficiently as possible.  These services are vital to ensuring continuing operations of manufacturing and distribution facilities and administrative operations utilized by the Debtors on a daily basis.  The Service Providers largely perform maintenance, repair, and operational services, supply the goods (*e.g.,* lubricants, component parts, molds, and other crucial components) necessary for the continued manufacturing operations for the U.S. housewares business, and provide outsourced information technology services and administrative support, including processing functions, document review, and daily transaction coding.  As of the Petition Date, the Debtors estimate that they owe Service Providers, in the aggregate, approximately $4.1 million on account of their prepetition claims.

(e)     <u>Safety and Regulatory Compliance Vendors</u>.  The Debtors employ various skilled Vendors (collectively, the "**Safety and Regulatory Compliance Vendors**") to ensure that the Debtors' operations fully comply with the safety and regulatory requirements, provide the Debtors' employees with a safe work environment, and provide the Debtor's customers and consumers products that are safe for use. Specifically, the Safety and Regulatory Compliance Vendors provide Goods and Services that include, among other things, facility security, medical supplies, safety training, employee safety equipment, and products and materials testing.  Failure to comply with such regulations could result in injuries, fines, and potential interruption of operations. Accordingly, the benefits of paying the Safety and Regulatory Compliance Vendors significantly outweigh any associated costs given the critical roles that the Safety and

Regulatory Compliance Vendors play in the safety of the Debtors' employees and the ongoing viability of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that they owe Safety and Regulatory Compliance Vendors, in the aggregate, approximately $320,000 on account of their prepetition claims.

(f)    Foreign Vendors.  In order to maintain and service their operations, the Debtors purchase many of the same goods and services described in the foregoing subparagraphs (a)-(d) outside of the United States from Foreign Vendors, including, among others, Sourced Finished Goods Vendors.  Importantly, a substantial percentage of the Goods described above in paragraph (a) consist of Foreign Vendors, including numerous manufacturers in China.  As of the Petition Date, the Debtors estimate that they owe Foreign Vendors, in the aggregate, approximately $45.3 million on account of their prepetition claims.

16.    The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to Critical Vendors and Foreign Vendors, would be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims are on account of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date (the "**503(b)(9) Claims**").  As of the Petition Date, the Debtors estimate that, in the aggregate, approximately $9.1 million of the $74.3 million of total outstanding accounts payables would be entitled to administrative expense status as 503(b)(9) Claims.  As they are administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors believe that they are authorized to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the Bankruptcy Code.

17.     The Debtors estimate that the maximum amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims during the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $17.3 million (the "**Interim Period Vendor Claims Cap**").  Similarly, the Debtors estimate that the maximum amount of claims that the Debtors believe would be entitled to administrative expense status as 503(b)(9) Claims during the first 30 days of the Chapter 11 Cases totals, in the aggregate, approximately $4.73 million.

18.     Finally, the Debtors estimate that the amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims after the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $40.2 million.  The Debtors also estimate that the amount of claims entitled to administrative expense status as 503(b)(9) Claims after the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $4.37 million.[5]

19.     A summary of the relief that the Debtors are seeking related to the Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims, on both interim and final basis, is set forth below:

| Categories | Total | Critical and Foreign Vendor Claims | 503(b)(9) Claims |
| --- | --- | --- | --- |
| Interim Relief in Total | $22,000,000 | $17,270,000 | $4,730,000 |
| Final Relief in Total | $66,540,000 | $57,440,000 | $9,100,000 |

20.     The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of

---

[5] Neither the Interim Period Vendor Claims Cap nor the amounts requested to be authorized thereafter include any prepetition claims that the Debtors seek to pay pursuant to other orders requested to be entered by the Court in the Chapter 11 Cases.

the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), as they become due and payable in the ordinary course of business operations. The Debtors' cash on hand, the cash generated by the Debtors' businesses, and the proceeds of the post-petition credit facilities would provide ample liquidity for payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, and 503(b)(9) Claims, as well as the ongoing obligations of the Debtors' continued operations in the ordinary course during the pendency of the Chapter 11 Cases.

*Lien Claimants*

21.    In operating their businesses, the Debtors use and make payments to shippers, contractors, mechanics, warehousemen, and technical engineers (collectively, the "**Lien Claimants**") that repair, maintain, equip, supply, transport, store products, and otherwise service necessary equipment and machinery. As of the Petition Date, the Debtors estimate that they owe approximately $1.7 million to Lien Claimants for prepetition goods, labor, shipping, delivery, and other charges (collectively, the "**Lienholder Claims**").

22.    The Debtors seek authority to pay the prepetition charges of the Lien Claimants who, under applicable law, have the potential to assert statutory liens against property of the Debtors or their customers if the Debtors fail to pay for Goods provided or Services rendered before the Petition Date. Failure to pay for such Goods and Services may result in material disruption to the Debtors operations, as set forth below.

23.    In order to ensure efficient operations, maintain safe and orderly working conditions at their operating locations, and satisfy contractual arrangements with their customers, the Debtors, at times, hire third-party service providers or purchase Goods to use to care for the manufacturing facilities. These purchased Goods and Services include, among others, (a) common carrier and freight transport, (b) construction and general contractor service and related materials, (c) equipment procurement, service, and repair, (d) mechanical work, and (e) storage. If these

costs are not paid, then there could be significant negative repercussions affecting the Debtors'
ability to operate their businesses in an effective and safe manner.  Any disruption in the flow of
the aforementioned Goods, Services, parts, equipment, shipping, or supplies would immediately
impact on-time delivery, production of products, and operation of the Debtors' businesses.  Further,
any disruption in the flow of parts or Services would cause the Debtors immediate and substantial
economic harm and erode their ability to meet delivery obligations.

24.     Much of the production equipment in use by the Debtors is highly customized and
both industry and site specific, and the available pool of experienced Lien Claimants is therefore
limited.  Furthermore, the technical knowledge of the Debtors' engineers and contractors is, in
many cases, specially tailored or unique to the Debtors' businesses.  For example, the Debtors
manufacture Corelle® products in Corning, New York utilizing a one-of-a-kind manufacturing
process for which only a limited number of third parties have the knowledge and skills to furnish,
operate, and repair the necessary equipment used in such manufacturing process.  Although
equipment, engineers, and contractors can in theory be obtained or sourced elsewhere, doing so
economically and with new providers represents a significant logistical and financial hurdle.  The
benefits of paying these equipment providers significantly outweigh the long-term costs of failing
to pay them for prepetition debts owed by the Debtors.

25.     While the Debtors themselves employ on-site mechanics and engineers at many of
their properties, the Debtors cannot afford to employ sufficient mechanics to repair and maintain
all the specialized equipment the Debtors operate in all possible locations at which service might
be required.  Accordingly, in many cases, the Debtors have service agreements or longstanding
business relationships with third-party maintenance Lien Claimants and even individuals trained
and licensed to provide maintenance services at the various sites.  The Debtors have, over the years,

nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive.  In addition, these Lien Claimants have developed in depth knowledge of the specific mechanical and engineering requirements of the facilities and/or other equipment.  It is essential to the continuity of the Debtors' operations, and the preservation of value of the Debtors' estates, that the Debtors maintain their relationships with these Lien Claimants.

26.     In sum, because the Debtors are dependent on many third-party Lien Claimants, it is essential that commencement of the Chapter 11 Cases not give any third-party Lien Claimants reason or excuse to cease performing Services or to retain products, equipment, or other Goods.

*Conditions to Payment of Critical Vendor Claims, Foreign Vendor Claims,*
*Prepetition Order Claims, 503(b)(9) Claims and Prepetition Lienholder Claims*

27.     The Debtors seek the authority to pay, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims in the ordinary course of business.  The Debtors propose that they may, in their sole discretion, condition payment of any such Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim upon an agreement to continue to supply Goods or Services to the Debtors on such Vendor's or Lien Claimant's "Customary Trade Terms"[6] during the pendency of the Chapter 11 Cases, or on other such terms and conditions as

---

[6] As used herein, "Customary Trade Terms" means, with respect to a Vendor or a Lien Claimant, (a) the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and applicable terms and programs), that were most favorable to the Debtors and in effect between such creditor and the Debtors in the one-year period prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such creditor.

are acceptable to the Debtors.  However, in certain circumstances, a Vendor or Lien Claimant may refuse to provide Goods or Services to the Debtors on its Customary Trade Terms even after payment of its claim.  To accommodate these circumstances, the Debtors seek approval to enter into other agreements, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), with each such Vendor or Lien Claimant on a case-by-case basis.

28.     To ensure that such Vendors or Lien Claimants transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims:  (a) a letter or contract substantially in the form of the letter attached hereto as **Exhibit A** (a "**Vendor Agreement**") to be delivered to, and executed by, the Critical Vendors, Foreign Vendors, Prepetition Order Vendors, holders of 503(b)(9) Claims, or Lien Claimants, along with a copy of the order granting the relief sought herein; *provided*, *however*, that the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim, when, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), such payment is necessary to the Debtors' operations, and (b) payment of the Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim, as applicable, to be accompanied by a statement substantially similar to the below:

By accepting this payment, the payee agrees to the terms of the Order of the United States Bankruptcy Court for the Southern District of Texas, dated [●], 2023, in the jointly administered chapter 11 cases of Instant Brands Acquisition Holdings Inc., *et al.* (Case No. 23-90716), entitled "*[Interim] [Final] Order (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From the Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers,*" a copy of which can be found at https://dm.epiq11.com/InstantBrands, and submits to the jurisdiction of that Court for enforcement thereof.

29.     As a further condition of receiving payment on a Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim, the Debtors also request authority to require, in their sole discretion, that the applicable Vendor or Lien Claimant agree to take whatever action is necessary to remove any existing Liens (as defined below) at such Vendor's or Lien Claimant's sole cost and expense and waive any right to assert a Lien on account of the paid claim of such Vendor or Lien Claimant.

30.     The Debtors further propose that if a Vendor or Lien Claimant accepts payment for a Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim, and, thereafter, refuses to continue to supply Goods or Services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such creditor, then the Debtors may, in their sole discretion, and without further order of the Court (a) declare that the payment of such Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Vendor or Lien Claimant in cash or in goods (including by setoff against post-petition obligations) and (b) demand that such creditor immediately return such payments in

respect of its Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever.  Upon recovery of such payment by the Debtors, such creditor's Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim shall be reinstated in such an amount as to restore the Debtors and the applicable Vendor or Lien Claimant to their original positions, as if the agreement had never been entered into and the payment of the creditor's Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim had not been made.  In sum, the Debtors would return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

31.     To the extent that an agreement relating to a Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or Lienholder Claim is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute post-petition assumption, reaffirmation, or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code, and the Debtors reserve all of their rights under the Bankruptcy Code in connection therewith.  In addition, nothing in this Motion shall be an admission as to any lien or interest, including any possessory lien.

**Basis for Relief**

A.   **Payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims Constitutes a Sound Exercise of the Debtors' Business Judgment and Is Necessary for the Preservation of the Debtors' Estates**

32.     Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"). Courts emphasize that the business judgment standard is not an onerous standard; rather it "is flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Perez*, 339 B.R. 385, 399, n. 14 (Bankr. S.D. Tex. 2006), *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with substantial freedom to tailor his orders to meet differing circumstances and to avoid shackling the judge with unnecessary rigid rules." (cleaned up)). As such, courts exhibit "[g]reat judicial deference . . . to [a debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005). Indeed, as long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (cleaned up).

33.     The Debtors submit that the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is within the Debtors' ordinary course of business, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.  Indeed, the relief sought herein is amply justified by the critical need for the continued receipt and/or distribution of Goods and Services.  The prompt payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims, which may be necessary to obtain the delivery and/or provision of the related Goods and Services, is within the Debtors' ordinary course of business and crucial for orderly and efficient operation of the Debtors' businesses.  Unless the Debtors have the authority to pay for these essential Goods and Services, their businesses will suffer irreparable harm.

34.     In fact, courts in this jurisdiction routinely grant relief similar to that requested herein.  *See, e.g.*, *In re Monitronics Int'l, Inc.*, No. 23-90332 (CML) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 67] (authorizing payment in the ordinary course of business prepetition claims of certain trade creditors); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 102] (authorizing payment of 503(b)(9) claims, lien claims, critical vendor claims and foreign claims); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 112] (authorizing payment of certain essential vendor obligations, marketing expenses and outstanding orders); *In re Athenex, Inc.*, No. 23-90295 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 66] (authorizing payment of claims by shippers, warehousemen and similar lien claimants).  The Debtors submit that the circumstances described herein warrant similar relief.

35.     Finally, the Debtors submit that payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims is necessary

and appropriate and, therefore, may be authorized by this Court under section 105(a) of the Bankruptcy Code, pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule."   The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable powers to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that a court may authorize payment of prepetition claims when payment is essential to continued operation of the debtor, such as where there is a "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for the payment of pre-petition claims" under the doctrine of necessity).

36.     The United States Supreme Court first articulated the doctrine of necessity 140 years ago, in *Miltenberger v. Logansport Ry. Co.*, in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 311–12 (1882); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989). This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger*.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175–76; *In re Equalnet Commun. Corp.*, 258 B.R. 368, 369

(Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

37.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (section 105(a) of the Bankruptcy Code is "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships").   "The debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provides the bridge that makes application to the Doctrine of Necessity necessary or appropriate to carry out the provisions of the Bankruptcy Code."  *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (cleaned up).

38.     The doctrine of necessity is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.  For instance, courts have acknowledged "the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'"  *In re StructureLite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (citations omitted).  In some situations, a "*per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."  *Id.* at 932.  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

39.     Here, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  The Debtors believe that payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims will be necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with the Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants, and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.   During this period, the Debtors, their attorneys and financial advisors, and other professionals will be focusing on stabilizing operations in chapter 11.  At the same time, while the Debtors are distracted with stabilizing their businesses and strategic planning, Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants may attempt to assert their considerable leverage and deny provision of Goods and Services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment.  Furthermore, if the relief sought herein is not granted, such Vendors or Lien Claimants would have no incentive to continue to supply Goods or Services to the Debtors on Customary Trade Terms.

40.     The Debtors strongly believe that the uninterrupted supply of Goods and Services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.  The continued availability of trade credit, in amounts and on terms consistent with those that the Debtors have worked hard to obtain over the years, is also clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and to focus on returning to profitability.  The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit

terms would enable the Debtors to maintain stable business operations at this critical time, to maintain their competitiveness, and to maximize the value of their businesses for the benefit of all interested parties.  Conversely, any disruption or cancellation of deliveries of Goods or provision of essential Services, and any concurrent deterioration of trade credit, could spell disaster for the Debtors' restructuring efforts.

41.     In addition, the Debtors believe that, if the Lienholder Claims are not paid, there could be significant negative repercussions.  The Lien Claimants could assert Liens that could, at the very least, result in the disruption in the flow of the services, parts, equipment, shipping, or supplies of the Debtors' businesses.  For example, the Lien Claimants could potentially assert Liens against or maintain possession of the Debtors' materials and equipment necessary for the performance of their business segments and delivery obligations.  The Lien Claimants could also withhold services and equipment that are necessary to maintain an efficient, orderly, and safe working environment at Debtors' operating locations.  This would no doubt jeopardize the Debtors' relationship with its customer base.  Although the Debtors can, in theory, obtain equipment and services elsewhere, due to the highly customized and industry-specific nature of these equipment or services, doing so represents a significant financial and logistic hurdle.  Based on these potentially value-destroying consequences, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  Absent this relief, the value of the Debtors' estates would suffer, possibly precipitously.  Consequently, the Debtors' stakeholders would benefit if the requested relief is granted.

42.     After carefully vetting all Critical Vendors and Foreign Vendors, the Debtors designed the Interim Period Vendor Claims Cap as an estimate of how much must be paid in the

first 30 days of the Chapter 11 Cases (excluding 503(b)(9) Claims) to such Critical Vendors and Foreign Vendors to continue the supply of critical Goods and Services.

43.     Based on the foregoing, the Debtors' ability to pay the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims is critical to the ongoing operations of their businesses, as discussed above, and therefore necessary to their successful reorganization.   Accordingly, the Debtors seek the authority to pay all or a portion of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims as they determine, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), are necessary or appropriate to avoid disruption in operations and to support the ongoing viability of the Debtors and their successful reorganization.

**B.     The 503(b)(9) Claims Would Give Rise to Priority Claims Under Section 507(a)(2) of the Bankruptcy Code**

44.     Under section 507(a)(2) of the Bankruptcy Code, the 503(b)(9) Claims would be afforded priority status.   As priority claims, the 503(b)(9) Claims must be paid in full before any general unsecured obligations of the Debtors can be satisfied.   The Debtors believe that sufficient assets should exist to pay all 503(b)(9) Claims in full under a proposed plan of reorganization. Accordingly, to the extent that the 503(b)(9) Claims give rise to priority claims, the relief requested herein would only affect the timing of the payment of these priority 503(b)(9) Claims and would not prejudice the rights of general unsecured creditors.

C.   **Goods Ordered Prepetition and Delivered to the Debtors Post-Petition Are Entitled to Administrative Expense Status Under Section 503(b)(1) of the Bankruptcy Code, and Payment of the Prepetition Order Claims is within the Ordinary Course of Business**

45.      Vendor claims for certain prepetition Goods would likely be administrative in nature.  Under section 503(b)(1) of the Bankruptcy Code, claims are accorded administrative expense priority where such claims are for the actual, necessary costs and expenses of preserving the bankruptcy estate.  *See* 11 U.S.C. § 503(b)(1).  In order to be awarded an administrative expense claim, a claimant must demonstrate that it conducted a transaction with a debtor in possession that, in turn, provided a benefit to such debtor's estate.  *See Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 440 (5th Cir. 2019) (noting that section 503(b)(1)(A) of the Bankruptcy Code "grants priority status to certain necessary expenses incurred after the filing of a bankruptcy petition that benefit the bankruptcy estate")*; Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999).

46.      The Debtors submit that, pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the post-petition delivery of desired and necessary Goods, including Goods ordered prepetition, are in fact administrative expense priority claims in virtually all instances.  Indeed, even if the Goods had been received in the ordinary course of the Debtors' businesses 20 days *before* the Petition Date, the related claims would receive administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  *See In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d Cir. 1993) (holding that an obligation from post-petition performance related to a prepetition transaction is entitled to administrative expense priority); *In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered post-petition are entitled to administrative priority).  Further, where transactions involve both the delivery of goods and associated services, courts have granted priority under section 503(b)(9) of

the Bankruptcy Code to the portion of the claim relating to the sale of goods. *See In re NE Opco, Inc.*, 501 B.R. 233, 257 (Bankr. D. Del. 2013). Thus, the granting of the relief requested herein would likely not provide the Prepetition Order Vendors with any greater priority than they would otherwise have if the relief herein is not granted.

47.     The relief requested herein to pay Prepetition Order Claims in the ordinary course would merely confirm the treatment of such obligations under the Bankruptcy Code and assure the Prepetition Order Vendors that they would be paid for Goods received and accepted by the Debtors post-petition in the ordinary course of business. The relief would also help ensure a continuous supply of materials that add value to the Debtors' operations. Absent the relief requested in this Motion, however, the Debtors would be required to expend substantial time and resources convincing many Prepetition Order Vendors of the Debtors' authority to make certain payments, reissuing Prepetition Orders, or even obtaining further relief from the Court to provide the Prepetition Order Vendors with the assurance of such administrative priority, causing disruption to the Debtors' businesses. Without the Goods, the Debtors' businesses would be harmed, and their opportunity to preserve and enhance the value of their assets would be jeopardized. The authorization sought in this Motion would not prejudice the Debtors' ability to contest the validity of any invoices, and it would not extend to any amounts that are disputed by the Debtors or that are in respect of Goods that are not received and accepted by the Debtors subsequent to the Petition Date.

48.     Accordingly, in light of the importance and necessity of the Goods to the Debtors' businesses, especially compared to the amount owed, the Debtors submit that the Court should grant the relief requested herein.

### D. The Debtors Are Authorized To Return Goods Under Section 546(h) of the Bankruptcy Code

49.     The Debtors also occasionally receive various Goods that may be defective, not up to standards, or otherwise not suitable or necessary for their operations.  In some cases, the Debtors return such Goods to Vendors (critical or otherwise).  Notwithstanding the filing of the Chapter 11 Cases and the distinction between prepetition and post-petition claims, the Debtors request that they be authorized, in their sole discretion, to return Goods that were delivered after the Petition Date based on prepetition orders for credit against such prepetition orders if the Debtors determine that such Goods are of little or no value to the Debtors' estates.

50.     Section 546(h) of the Bankruptcy Code permits a debtor, with the consent of a creditor and subject to the prior rights of holders of security interests in such goods or the proceeds of such goods, to return goods shipped to the debtor by the creditor before the commencement of the case for credit against the creditor's prepetition claim, provided that the court determines (on a motion made no later than 120 days after the order for relief and after notice and a hearing) that such return is in the best interests of the estate.  *See* 11 U.S.C. § 546(h).

51.     The Debtors submit that an order authorizing, but not directing, returns of Goods to Vendors for credit against their prepetition claims, subject to the prior rights of holders of security interests in such Goods or the proceeds of such Goods, to the extent of such interests, is in the best interests of the Debtors' estates.  Such relief would enable the Debtors to (a) obtain proper credit for otherwise unusable Goods, cost-effectively and without undue financial risk, and (b) effectively manage inventory and enhance the Debtors' financial performance and the value of the assets of their estates.

52.     Through this Motion, the Debtors seek only the relief that is contemplated by section 546(h) of the Bankruptcy Code.  Accordingly, the Debtors should be permitted to return Goods, in their discretion, as permitted by the Bankruptcy Code and as set forth herein.

**E.  Failure To Pay Lienholder Claims Could Subject the Debtors' Assets to the Perfection of Statutory Liens**

53.     Many of the Lien Claimants who have provided prepetition Goods or Services to the Debtors may hold liens against the Debtors' property under applicable producer's, mechanic's, repairman's, materialman's, warehousemen's, and shipping lien statutes, and their foreign equivalents (the "**Liens**" and, interests arising from the Liens, the "**Interests**").  The Lien Claimants' Liens and/or Interests may be perfected notwithstanding the automatic stay established by section 362(a) of the Bankruptcy Code.  Although the Liens and Interests of the Lien Claimants may not be perfected presently, applicable law generally provides that they may be perfected in the future, which perfection may relate back to the creation of the relevant Liens and Interests. Section 546(b) of the Bankruptcy Code explicitly respects such relation back, and section 362(b)(3) of the Bankruptcy Code exempts post-petition actions to perfect liens from the automatic stay otherwise established by section 362(a) of the Bankruptcy Code, so long as such perfection would relate back to before the petition date under the applicable law respected by section 546(b) of the Bankruptcy Code.[7]

54.     Therefore, to the extent that such Liens and/or Interests are perfected or may be perfected, paying the Lienholder Claims would not reduce unsecured creditor recoveries in the Chapter 11 Cases.  Indeed, payment now only provides such parties with what they would be entitled to receive eventually upon consummation of a chapter 11 plan, without any interest costs

---

[7]  The Debtors reserve the right to contest any Lien or Interest and efforts to exercise associated remedies during the Chapter 11 Cases.

that might otherwise accrue during the Chapter 11 Cases.  Far from being harmed, the Debtors'

unsecured creditors would benefit from the Debtors' smooth operation transition into chapter 11

bankruptcy.

55.     Accordingly, the Debtors seek the authority to pay all or a portion of the Lienholder

Claims as they determine, in their reasonable discretion (with the consent of the Term DIP Agent

(acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent

(acting at the direction of the requisite ABL DIP Lenders)), are necessary or appropriate to avoid

disruption in operations and to support the ongoing viability of the Debtors.

**F.    The Court Should Authorize Applicable Financial Institutions To Honor and Process Related Checks and Transfers**

56.     The Debtors also request that all applicable financial institutions be authorized to

(a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund

transfer requests made by the Debtors related to, the claims that the Debtors request authority to

pay in this Motion, regardless of whether the checks were presented or fund transfer requests were

submitted before, on, or after the Petition Date and (b) rely on the Debtors' designation of any

particular check as approved by the Proposed Orders.

**<u>Debtors' Reservation of Rights</u>**

57.     Nothing contained herein is intended or should be construed as, or deemed to

constitute, an agreement or admission as to the amount, priority, character, or validity of any claim

against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any

claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under

section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any

Critical Vendor Claim, Foreign Vendor Claim, Prepetition Order Claim, 503(b)(9) Claim, or

Lienholder Claim, or any other claim related thereto, under applicable bankruptcy and non-

bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the amount, priority, character, or validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **Emergency Consideration**

58.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  As set forth in this Motion and the Hollerbach Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of the Debtors' businesses, operations, and estates and that any delay in granting the relief requested herein could cause immediate and irreparable harm by damaging the Debtors' ability to sustain their day-to-day operations and meet their various obligations, likely resulting in the substantial loss of business. If the Debtors are not permitted to continue their ordinary business operations by continuing to pay the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims as they become due, and to reassure the Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants that authority has been granted to honor all such claims, the Debtors could suffer immediate and irreparable harm. Accordingly, the Debtors submit that the relief requested herein satisfies Bankruptcy Rule 6003.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

59.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates and economic stakeholders.  Accordingly, the Debtors respectfully submit that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

60.     Notice of this Motion will be provided to the following parties: (a) the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"); (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of Texas; (f) the state attorneys general for states in which the Debtors conduct business; (g) any entity believed to have a particularized interest in the subject matter of this Motion; (h) Ropes & Gray LLP, as counsel to the agent under, and an ad hoc group of lenders of, the Debtors' prepetition term loan; (i) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the administrative agent under the Debtors' prepetition asset-based lending facility; (j) Kramer Levin Naftalis & Frankel LLP, as counsel to Cornell Capital Partners

LP; and (k) any party identified in section E of the *Procedures for Complex Cases In the Southern District of Texas* (collectively, the "**Notice Parties**").  A copy of this Motion and any Order approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/InstantBrands.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders, substantially in the forms attached hereto, respectively, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   June 12, 2023
         Houston, Texas

HAYNES AND BOONE, LLP
*/s/ Arsalan Muhammad*
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.:    (713) 547-2000
Email: charles.beckham@haynesboone.com
           arsalan.muhammad@haynesboone.com
           david.trausch@haynesboone.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (*pro hac vice* pending)
Steven Z. Szanzer (*pro hac vice* pending)
Joanna McDonald (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Tel.:    (212) 450-4000
Email: brian.resnick@davispolk.com
           steven.szanzer@davispolk.com
           joanna.mcdonald@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## <u>Certificate of Accuracy</u>

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

*/s/ Arsalan Muhammad*
Arsalan Muhammad

## <u>Certificate of Service</u>

I certify that, on June 12, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Arsalan Muhammad*
Arsalan Muhammad
