IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **INSTANT BRANDS ACQUISITION** | § | **Case No. 23-90716 (DRJ)** |
| **HOLDINGS INC.,** *et al.,* | § | |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |

### DECLARATION OF ADAM HOLLERBACH
### AS CHIEF RESTRUCTURING OFFICER OF THE DEBTORS IN SUPPORT
### OF DEBTORS' CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS

**ADAM HOLLERBACH** declares and says:

1.      I am the Chief Restructuring Officer ("**CRO**") of each of the above-captioned debtors (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Instant Brands**" or the "**Company**").  I have served as the Debtors' CRO since June 11, 2023.

2.      I am Partner and Managing Director of AlixPartners, LLP ("**Alix**") and have more than 20 years of experience working on many large restructurings and bankruptcies.  I have served in interim management roles (out-of-court) and as a financial and restructuring advisor to clients in a variety of industries, such as automotive, industrial, retail, business services, and consumer products.  I also have extensive experience in treasury operations, liquidity management, financial accounting and reporting, operational and debt reorganization, key stakeholder management, and

---

[1]   The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2625); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (2872); and Corelle Brands (GHC) LLC (9722).  The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

business plan development, as well as cost-reduction initiatives.  I have worked on numerous chapter 11 restructurings, including *In re LSC Commc'ns, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del. Apr. 22, 2016); *In re Eastman Kodak Co.*, No. 12-10202 (MEW) (Bankr. S.D.N.Y. Feb. 28, 2012); *In re Borders Group, Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 16, 2011); *In re Dura Automotive Systems, Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 30, 2006); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 20, 2005); *In re Intermet Corp.*, 04-67597 (MBM) (Bankr. E.D. Mich. Sep. 29, 2004).  I am familiar with Instant Brands' day-to-day operations, businesses, and financial affairs.

3.      I am over the age of 18 and authorized to submit this declaration (the "**Declaration**") on behalf of each of the Debtors in support of their petitions and requests for relief in the form of motions and applications (the "**First Day Pleadings**"), each filed contemporaneously herewith.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and professional advisors to the Company, information prepared or provided to me by employees of Alix (the Company's proposed financial advisors), or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors.  I have reviewed the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and to the success of the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  If called upon to testify, I would testify competently

to the facts set forth in this Declaration.  Unless otherwise indicated, the financial information

contained herein is unaudited and provided on a consolidated basis.

## COMMENCEMENT OF BANKRUPTCY PROCEEDINGS

4.      On June 12, 2023 (the "**Petition Date**"), Instant Brands Acquisition Holdings Inc.

("**Holdings**") and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title

11 of the United States Code (the "**Bankruptcy Code**").  The Debtors remain in possession of

their property and continue to operate and manage their businesses as debtors in possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Instant Brands is a company that designs, manufactures, and markets a global

portfolio of innovative and iconic consumer lifestyle brands, including Instant®, Pyrex®,

Corelle®, Corningware®, Snapware®, Chicago Cutlery®, and Visions®.  With people-first and

purpose-driven solutions in mind, Instant Brands is reimagining how people live, eat, connect, and

play inside the home—and in the spaces where people gather.  Headquartered in Downers Grove,

Illinois, Instant Brands sells its products worldwide, employs more than 2,000 people, and operates

in several countries outside the United States, including Canada, Singapore, England, South Korea,

Australia, Taiwan, and China.

6.      Instant Brands sells its consumer dinnerware, bakeware, kitchen and household

appliances, cutlery, food storage, and other storage products on an omnichannel basis, both directly

to consumers and on a wholesale basis.  Instant Brands' products are sold at more than 30 global

retailers, including Walmart, Target, and Costco, as well as on eCommerce platforms, such as

Amazon and Alibaba.  While North America accounted for approximately 74% of Instant Brands'

total net sales in 2022, Instant Brands also achieved significant presence in certain international

markets, primarily Asia, the United Kingdom, and Australia.  Instant Brands' strategy involves

driving growth by innovating its core brands and products to meet consumer needs, entering new

categories to leverage a portfolio of iconic brands, expanding its global footprint, and leveraging its global infrastructure to do it.  Its growth strategy is also focused on creating best-in class consumer connection with Instant Brands engaging more than 30 million consumers worldwide through a variety of social and digital mediums, including the Instant Brands Connect App.

7.      As described in Part II below, the Debtors have been significantly impacted by a series of uncontrollable macroeconomic events over the last three years, including the COVID-19 pandemic, the Russia-Ukraine war, supply chain disruptions, changing consumer preferences, increased freight and transportation costs, and rising inflation.  The Debtors have proactively and resiliently navigated these challenges, continuously reducing operational costs, and raising their own prices to meet the turbulent economic landscape.  However, the Debtors recently experienced unprecedented liquidity challenges, which have accelerated dramatically over the past months driven by severely tightened credit terms with suppliers, rising interest rates, continued inflation, and a shifting in Instant Brands' historical distribution channels in North America, while supply chain issues persisted.  It became clear for some time that the Debtors' capital structure was, and is, unsustainable and that the Debtors needed to move with urgency to protect their going concern value and gather support from their lenders and other stakeholders for a restructuring plan that would secure necessary short-term liquidity, reduce their funded indebtedness to offset high interest rates, and maximize long-term value.

8.      In 2022, Instant Brands began exploring opportunities to improve its liquidity position.  Beginning in January 2023, the Debtors engaged advisors to explore strategic alternatives, first focused on raising incremental liquidity, later shifting to a comprehensive restructuring, and, as liquidity worsened, pivoting to the negotiation of bridge financing.  The Debtors engaged Guggenheim Securities, LLC ("**Guggenheim Securities**") and worked with their

legal counsel, Davis Polk & Wardwell LLP ("**Davis Polk**"), to explore such strategic alternatives. The Debtors subsequently engaged Alix (together with Guggenheim Securities and Davis Polk, the "**Advisors**") in May 2023 to help with the restructuring efforts and to facilitate the commencement of the Chapter 11 Cases.  The Debtors, with the assistance of the Advisors, have aggressively pursued various restructuring alternatives and engaged in extensive arm's-length negotiations with various key stakeholders, including (a) an ad hoc group of Prepetition Term Loan Lenders (the "**Ad Hoc Group of Term Loan Lenders**") holding more than half of the term loans under the Prepetition Term Loan Credit Facility (as defined below), (b) the Prepetition ABL Lenders (as defined below), and (c) Cornell Capital LLC, Cornell Capital Partners LP, and any of their respective controlled affiliates (collectively, "**Cornell**").  As diligence and negotiations progressed, the Debtors' faced increasingly tightened supplier credit terms and it became clear that the Debtors' liquidity runway did not afford the parties sufficient time to negotiate a comprehensive restructuring.  As a result, the Debtors first attempted to raise out-of-court bridge financing from the Ad Hoc Group of Term Loan Lenders to continue restructuring negotiations, but then (a) pivoted to negotiating debtor-in-possession financing with the Ad Hoc Group of Term Loan Lenders and Prepetition ABL Lenders and soliciting debtor-in-possession financing from third-party capital sources to fund an in-court process and (b) commenced the Chapter 11 Cases to preserve Instant Brands' value.

9.     To better familiarize the Court with the Debtors, their businesses, the circumstances leading up to the Chapter 11 Cases, and the relief that the Debtors are seeking in the First Day Pleadings, I have organized this Declaration into three sections.  Section I of this Declaration describes Instant Brands' businesses; Section II describes the circumstances giving rise to the need

for chapter 11 relief and the Debtors' various prepetition restructuring initiatives; and Section III sets forth the relevant facts in support of the First Day Pleadings.

## I.

## THE DEBTORS' BUSINESSES

**A.      Operations**

> *i.      Operations and Activities*

10.      Instant Brands resulted from the March 2019 acquisition (the "**2019 Acquisition**") of Instant Brands Inc. ("**IB Inc.**"), the maker of the best-selling Instant Pot®, by Corelle Brands (formerly known as World Kitchen and since relabeled Instant Brands), the manufacturer and marketer of a portfolio of well-recognized and respected brands, including Pyrex®, Corelle®, Corningware®, Snapware®, Chicago Cutlery®, and Visions®.  Cornell acquired World Kitchen in April 2017 and, since the 2019 Acquisition, has controlled and currently controls the majority of the voting equity interests in Instant Brands.

11.      Instant Brands enjoys a broad customer base and a diversified lineup of products, with major manufacturing and distribution operations in North America and Asia.  The products of Instant Brands include well-known best sellers that employ innovative technology that are generally divided into two categories:  appliances and housewares.  The appliance sector includes, among other things, electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers, and other multi-feature appliances.  The houseware division includes various consumer dinnerware, bakeware, cookware, cutlery, and plastic storage containers under the Pyrex®, Corelle®, CorningWare®, Snapware®, and ChicagoCutlery® brands.

12.      Under the existing management team, Instant Brands developed its business plan based on five strategic principles:

(a) **Driving innovation in its core business**. The Company strives to deliver great solutions and experiences at the right value based on a deep understanding of its consumer base.

(b) **Entering new categories leveraging its brands**. The Company expands into new categories by leveraging its brands, including taking advantage of new materials, technology, and consumer trends, and making strategic acquisitions. From 2018 to date, the Company has achieved significant diversification among its appliances and houseware products.

(c) **Expanding its global footprint**. Instant Brands conscientiously leverages its brands to expands its global footprint. For example, the Company is in the process of creating a European distribution strategy, team, and plan to expand its presence there.

(d) **Leveraging its global infrastructure**. The Company leverages its global infrastructure by, among other things, improving consolidation of overhead costs and support functions and eliminating unnecessary expenses.

(e) **Creating best-in-class global consumer engagement**. The Company looks to create the best-in-class global consumer engagement by executing creative and engaging content for delivery through all of the popular digital platforms, including its proprietary "app," the Instant Brands Connect App.

13. Instant Brands' go-to-market approach differs depending upon the maturity of the retail distribution and customer concentration in each country. Instant Brands has positions in major channels of distribution for its products in North America and has also achieved significant presence in certain international markets, including South Korea, Australia, and China. The Company's EMEA business based in the United Kingdom is growing at an annual rate of more than 30 percent. Instant Brands has also established sales subsidiaries in South Korea, Australia, China, and Singapore and also relies on third-party distributor relationships in such jurisdictions.

14. In North America, Instant Brands distributes its products to retailers through two distribution models: direct import and domestic warehouse. Under the direct import model, North American retailers issue purchase orders to import Instant Brands' products directly from a non-U.S. port and remit payment to Instant Brands after the inventory ships from such non-U.S. port. Under the domestic warehouse model, Instant Brands manages and carries the inventory in transit

to one of its distribution warehouses in the United States, based on forecasts from retailers, and receives payment from the retailers only after Instant Brands ships ordered inventory from its domestic warehouse(s) to the retailers' desired location(s).  As a result, Instant Brands incurs substantially greater inventory risk and cashflow constraints associated with the domestic warehouse model.

15.     Instant Brands also operates four manufacturing facilities, three of which are owned by the Company.  The Corning, New York manufacturing facility is owned by the Company and is the world's only producer of the three-layer Vitrelle® glass dinnerware, which is sold under the Corelle® brand.  The Charleroi, Pennsylvania manufacturing operation is also owned by the Company and produces Pyrex® products.  The Byhalia, Mississippi location produces the Company's Snapware® products.  The Company-owned Malaysian location decorates Vitrelle® glass product for distribution in Asia.  The Company's Corelle®, Pyrex®, and Snapware® products represent a significant portion of the Company's net sales.  In addition to its manufacturing facilities, Instant Brands also operates three distribution facilities in the United States.

16.     Instant Brands also owns almost 1,300 trademarks and patents around the world, and licenses trademarks from many globally recognized companies, including Disney and Sanrio.

17.     In 2022, Instant Brands generated operating cash flows of $9.2 million, gross profit of $138.8 million, and earnings before interest, tax, depreciation, and amortization of $57.2 million.  Through the first three months of 2023, Instant Brands generated operating cash flows of $17.9 million, gross profit of $21.7 million, and earnings before interest, tax, depreciation, and amortization of $5.9 million.

*ii.     Employees*

18.     Crucial to their businesses, the Debtors employ a talented and dedicated workforce that enables the Debtors to maintain their high standards of quality, safety, and sustainability.  The

Debtors employ over 1,800 people consisting of a combination of full-time, part-time, temporary, and unionized employees, as well as individuals employed by, and provided through, staffing and consulting agencies and individuals providing personal services directly as independent contractors (collectively, including the current members of the Debtors' boards of directors or similar governing bodies, the "**Employees**").  As detailed below in connection with the "Wages Motion" (see Part III of this Declaration), the Employees are located in multiple sites throughout North America and more than 1,000 of the Employees are represented by one or more unions.

**B.      Corporate Structure**

19.      Holdings is a privately owned company that is the ultimate parent of 25 direct or indirect subsidiaries.  Instant Brands Holdings Inc. ("**IB Holdings**"), Instant Brands LLC ("**IB LLC**"), and IB Inc. are the primary operating companies among the Debtor entities and, as a result, substantially all of the Debtors' unsecured creditors hold their claims against one or more of these entities.  IB Holdings is a wholly-owned subsidiary of Instant Brands Acquisition Intermediate Holdings Inc. ("**Intermediate Holdings**"), which in turn is a wholly-owned subsidiary of Holdings.  Holdings is the direct or indirect parent of the remaining Debtors as well as eleven non-Debtor subsidiaries that are organized under foreign law and do not guarantee any of the Debtors' debt obligations.  A chart illustrating the Company's corporate structure is attached hereto as **Exhibit A**.

## C.     Capital Structure[2]

20.     As of the Petition Date, Instant Brands has approximately $512.3 million in the aggregate of outstanding principal funded debt obligations, as reflected below:[3]

| Funded Debt | Approximate Outstanding Principal Amount |
|---|---|
| Prepetition Term Loan Credit Facility | $390.9 million |
| Prepetition ABL Credit Facility | $121.4 million |

### i.     Prepetition Term Loan Credit Facility

21.     On April 12, 2021, IB Holdings, as borrower, and Intermediate Holdings entered into the Prepetition Term Loan Credit Agreement[4] with the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, pursuant to which the Prepetition Term Loan Lenders provided the Debtors with term loans in an initial aggregate principal amount of $450 million under the senior secured Prepetition Term Loan Credit Facility.  As of the Petition Date, approximately $390.9 million of the term loans remains outstanding under the Prepetition Term Loan Credit Facility.   Obligations under the Prepetition Term Loan Credit Facility are guaranteed by Intermediate Holdings and each of its direct and indirect wholly-owned U.S. and Canadian subsidiaries (other than the UnSubs (as defined below) and other limited exceptions) and secured by substantially all of the assets of such entities, including on a first-priority basis with respect to

---

[2]  The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.  Capitalized terms used but not defined in section C of this Declaration shall have the meanings ascribed to them in the Prepetition Credit Agreements (as defined below), as applicable.

[3]  The table is for illustrative and summary purposes only.  The Debtors do not admit to the validity, priority and/or allowance of any claim, lien, or interest in property and reserve their rights in relation to such issues.

[4]  The "**Prepetition Term Loan Credit Agreement**" herein refers to that certain senior secured credit agreement, dated as of April 12, 2021 (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date), among IB Holdings, Intermediate Holdings, each lender from time to time party thereto (the "**Prepetition Term Loan Lenders**"), and Wilmington Trust, National Association ("**Wilmington Trust**"), as successor administrative agent and successor collateral agent to Jefferies Finance LLC in such capacities (Wilmington Trust in such capacities, the "**Prepetition Term Loan Agent**"), pursuant to which the Prepetition Term Loan Lenders provided the Debtors with a senior secured term loan credit facility (the "**Prepetition Term Loan Credit Facility**").

machinery, equipment, real property, and other assets constituting collateral and not constituting ABL Priority Collateral, and on a second-priority basis with respect to the ABL Priority Collateral.

22.     The term loans outstanding under the Prepetition Term Loan Credit Facility bear interest at either (a) the Eurocurrency Rate *plus* 5.00% or (b) the Base Rate *plus* 4.00% (in each case excluding any interest accruing at the Default Rate).  Overdue amounts under the Prepetition Term Loan Credit Facility accrue interest at the Default Rate.  The Prepetition Term Loan Credit Facility has a stated maturity date of April 12, 2028.

      *ii.*     *Prepetition ABL Credit Facility*

23.     On June 30, 2021, IB Holdings, as lead borrower, IB Inc., as the Canadian borrower, and Intermediate Holdings entered into the Prepetition ABL Credit Agreement[5] with the Prepetition ABL Agent and the Prepetition ABL Lenders, pursuant to which the Prepetition ABL Lenders provided the Debtors with credit commitments in an initial aggregate principal amount of $250 million under the Prepetition ABL Credit Facility.  Revolving availability under the Prepetition ABL Credit Facility is subject to the lesser of the credit commitments thereunder and the value of the borrowing base from time to time.  As of the Petition Date, (a) the Debtors had outstanding borrowings under the Prepetition ABL Credit Facility of approximately $121.4 million and (b) approximately $22.3 million of undrawn letters of credit were issued and outstanding.

---

[5]   The "**Prepetition ABL Credit Agreement**" herein refers to that certain asset-based revolving credit agreement, dated as of June 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date), among IB Holdings, IB Inc., Intermediate Holdings, each lender from time to time party thereto (the "**Prepetition ABL Lenders**"), and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "**Prepetition ABL Agent**"), pursuant to which the Prepetition ABL Lenders provided the Debtors with an asset-based revolving credit facility (the "**Prepetition ABL Credit Facility**").  The Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement are collectively referred to herein as the "**Prepetition Credit Agreements**."  The Prepetition ABL Credit Facility and the Prepetition Term Loan Credit Facility are collectively referred to herein as the "**Prepetition Credit Facilities**."

24.     The Prepetition ABL Credit Facility is subject to the same guarantees and security as the Prepetition Term Loan Credit Facility, except that the obligations under the Prepetition ABL Credit Facility are secured on a first-priority basis with respect to the ABL Priority Collateral and on a second lien basis with respect to all other collateral (other than any real property) securing the Prepetition Term Loan Credit Facility.

25.     The Prepetition ABL Credit Agreement was amended, on May 13, 2022, to include two new "first in, last out" incremental tranches of debt within the Prepetition ABL Credit Facility. These incremental "Tranche B Revolving Loans" allowed the Debtors to increase liquidity and availability under the Prepetition ABL Credit Facility by effectively increasing the aggregate advance rates for borrowings against certain borrowing base assets under the Prepetition ABL Credit Facility. The Prepetition ABL Credit Agreement was amended again, on January 18, 2023, in connection with the UnSub Financing Transaction (as defined below).

26.     The Tranche A Revolving Loans (*i.e.*, the revolving loans other than the "first-in, last-out" Tranche B Revolving Loans) outstanding under the Prepetition ABL Credit Facility bear interest at either (a) for term rate borrowings, the applicable floating term rate based on the currency of the applicable loan *plus* a margin ranging from 1.75% to 2.25% based on the trailing quarter's Average Excess Availability under the Prepetition ABL Credit Facility or (b) for base rate borrowings, the applicable floating prime rate based on the currency of the applicable loan *plus* a margin ranging from 0.75% to 1.25% based on the trailing quarter's Average Excess Availability under the Prepetition ABL Credit Facility (in each case, excluding any interest accruing at the Default Rate). The Tranche B-1 Revolving Loans under the Prepetition ABL Credit Facility bear interest at the rate per annum that would apply pursuant to the immediately preceding sentence *plus* 1.00% per annum. The Tranche B-2 Revolving Loans under the Prepetition ABL

Credit Facility bear interest at the rate per annum that would apply to the Tranche B-1 Revolving Loans *plus* an additional 1.00% per annum. The stated maturity of (x) the Tranche A Revolving Commitments and the Tranche A Revolving Loans is June 30, 2026, (y) the Tranche B-1 Revolving Commitments and the Tranche B-1 Revolving Loans is November 13, 2023, and (z) the Tranche B-2 Revolving Commitments and the Tranche B-2 Revolving Loans is the earlier of (i) August 13, 2023 and (ii) the date on which the ABL Backstop LC Termination Conditions are satisfied and Cornell requests termination and return of the ABL Backstop LC.

       *iii.*    *Precious Metal Leases*

27.    As part of its manufacturing processes, Instant Brands uses precious metals, such as platinum and rhodium, to coat high wear areas of its glass furnaces and parts used in the glass melting process. These metals essentially comprise a working component of the Debtors' machinery and are not part of the finished products. Given the significant costs of such precious metals, Instant Brands leases platinum from Bank of Montreal ("**BMO**") and rhodium from SCMI US Inc. ("**Sumitomo**"). In 2022, Instant Brands paid approximately $2.7 million in the aggregate on account of its precious metal leases.

       *iv.*    *Preferred Equity*

28.    As of the Petition Date, 143,000 shares of Series A preferred stock in Holdings are outstanding (assuming the exchange of all Exchangeable Preferred Shares described below into Series A preferred stock). The aggregate liquidation preference of the Series A preferred stock is approximately $232 million as of the Petition Date. The Series A preferred stock has no stated maturity and is perpetual in nature. In the event of Holding's liquidation, winding-up, dissolution, or change of control, the holders of shares of Series A preferred stock then outstanding are entitled to be paid out of the assets of Holdings available for distribution to its stockholders and before any payment will be made to the holders of common stock, an amount per share of Series A preferred

stock equal to the outstanding liquidation preference of such holder's Series A preferred stock. The Series A preferred stock ranks junior in right of payment, upon liquidation, winding-up, dissolution, or change of control, to Holding's existing and future indebtedness.  For certain tax reasons, certain equityholders hold Exchangeable Preferred Shares (as defined in the Tax Attribute Motion (as defined below)) in a subsidiary of Holdings in lieu of shares of Series A preferred stock.  These Exchangeable Preferred Shares are exchangeable into shares of Series A preferred stock on a one-for-one basis.  The shares of Series A preferred stock or Exchangeable Preferred Shares are held by the founders and former management team of Instant Brands prior to the 2019 Acquisition.

*v.*    *Common Equity*

29. As of the Petition Date, 385,709[6] common shares in Holdings are outstanding. Approximately 70% of the Debtors' outstanding Common Shares are held by Cornell.  The founders and the former management team of Instant Brands prior to the 2019 Acquisition, along with current and former directors and employees, directly or indirectly hold the remainder of the Common Shares, in addition to the Exchangeable Common Shares, the Series A Preferred Shares, the Special Voting Shares, the Exchangeable Preferred Shares, and the Options on Stock (each as defined in the Tax Attribute  Motion).

**D.    Cash Needs**

30. Instant Brands' businesses rely on its ability to use cash to, among other things, (a) satisfy payroll, pay vendors and suppliers, and meet overhead expenses, (b) fund working capital needs and capital expenditures, (c) pay for goods or services critical to the design,

---

[6] This amount assumes the exchange of all exchangeable common equity shares into Common Shares in Holdings.

14

manufacturing, and marketing of its products, (d) cover expenses related to the manufacturing processes, (e) maintain the health and safety of Employees and the communities in which they operate, (f) pay property taxes and other taxes, and (g) finance other general corporate purposes.

31.     It is, therefore, critical that the Debtors have uninterrupted access to sufficient cash. Any limitation on the Debtors' use of cash would have disastrous effects on the Company's businesses and operations, threatening its ability to continue as a going concern, and resulting in the rapid deterioration of the value of the enterprise, as the Company would lack sufficient working capital to make payments to Employees, vendors, suppliers, and other key providers of goods and services on a timely basis.

32.     In order to avoid any business disruption and to ensure a smooth transition into chapter 11, the Debtors must signal to their Employees, constituents, vendors, and counterparties that the Company still has access to sufficient liquidity to, among other things, continue the operation of its businesses, maintain relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy its working capital and operational needs, all of which are required to preserve and maintain its enterprise value.

**E.     Senior Management**

33.     Ben Gadbois has served as Instant Brands' Chief Executive Officer since June 2020.  Mr. Gadbois has more than 30 years of experience in all aspects of operations, including sales, marketing, product development, manufacturing, supply chain, financing, and accounting. Prior to joining Instant Brands, Mr. Gadbois served as the Global President and Chief Executive Officer of Spin Master from 2012 to 2020, where he led the turnaround and the successful initial public offering of the company.  Prior to that, Mr. Gadbois served as the Global President of Sharpie and Rubbermaid at Newell Rubbermaid.  Mr. Gadbois has also held senior-level financial

and operations positions at Stanley Black & Decker, Inc.  Mr. Gadbois earned a B.S. in Accounting from Salem State University.

34.     Nick Hewitt has served as Instant Brands' Chief Financial Officer since February 2020.  Mr. Hewitt has 25 years of global private and public company finance, treasury, operational finance, and accounting experience.  Prior to joining Instant Brands, Mr. Hewitt was the Finance Director (Divisional CFO) of M&S Food, the $7 billion food retail division of Marks and Spencer plc, from 2018 to 2020.  From 2010 to 2018, Mr. Hewitt worked at Ardagh Group, first as Group Chief Accounting Officer and then as CFO of Ardagh Glass North America.  From 1988 to 2010, Mr. Hewitt worked for PricewaterhouseCoopers, with increasing levels of seniority, in both the U.S. and Ireland.  Mr. Hewitt is a chartered accountant with a postgraduate diploma in Accounting from Dublin City University and a BSc in Psychology from The Queen's University of Belfast.

35.     Bill Hess has served as Instant Brands' Chief Operating Officer since June 2020 and has more than 30 years of operational experience.  Prior to joining Instant Brands, Mr. Hess served as the Executive Vice President of Operations and Chief Information Officer to Spin Master from 2013 to 2020.  Prior to that, Mr. Hess served in various roles at Newell Rubbermaid from 1989 to 2001 and from 2006 to 2013, including as the Global Vice President for Product Development and Supply Chain.  Mr. Hess also served as the Vice President for Operations and Product Development at Fiskars from 2001 to 2006.  Mr. Hess holds a B.S. in Computer Science from Northern Illinois University.

36.     Cathy Landman has served as Instant Brands' Chief Legal and Human Resources Officer since November 2018 and has more than 35 years of legal experience.  Ms. Landman previously served in leadership roles in the legal and human resources departments of multiple consumer products companies, including Chief Legal Officer and Senior Vice President of Human

Resources at YA Engage from 2016 to 2018, the General Counsel at Jostens Inc. from 2013 to 2016, the Chief Legal Officer at the Pampered Chef from 2000 to 2012, and a Legal Director at Mary Kay from 1997 to 2000.  Ms. Landman holds a B.S. in Foreign Service from Georgetown University and a J.D. from the University of Wisconsin Law School.

## II.

## EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Recent Macroeconomic Trends and Company-Specific Events

37.    Over the last three years, the Debtors have contended with a parade of significant macroeconomic and company-specific headwinds that have strained their businesses and resources, made their funded debt level unsustainable, and ultimately led the Debtors to seek chapter 11 relief.  This section describes the circumstances and the immediate catalysts motivating the filing of the Chapter 11 Cases.

38.    In early 2020, the onset of the COVID-19 pandemic turned the global economy upside down.  Unlike other companies, Instant Brands benefited initially, in late 2020 and most of the first half of 2021, from an increase in consumer demand for its products when people turned to more home-cooked meals due to governmental stay-at-home orders throughout the world. Furthermore, consumer sentiment was robust, boosted by stimulus checks issued by various governmental authorities.  However, the foregoing generated excessive demand that started to stretch supply chain lead times, thereby creating inflationary pressures on the costs of goods and production.

39.    Instant Brands closely monitored these trends and immediately started taking precautionary steps to de-risk its businesses by ordering raw materials and critical part components more than 60 days in advance to secure supply for its houseware product manufacturing processes. In October 2020, Instant Brands had the foresight to place a large tranche of its 2021 appliance

production orders that, as a result, saved the Company $8 million in inflationary costs. Additionally, by the first quarter of 2021, Instant Brands implemented its first round of price increases to outpace emerging inflationary issues (based on a financial forecast of $40 million in cost increases), thereby allowing the Company to track ahead of its financial plan.

40.     In the second half of 2021, a supply chain perfect storm unfolded.  Just as the peak shipping season started, several Asian ports heavily relied upon by Instant Brands were closed for weeks due to COVID-19 lockdowns and weather issues.  These closures, along with various other issues, created shipping chaos at the Asian ports:  shipping lead times were extended by months; retailer product pickups were at 20-30 percent of their normal rates; and freight rates spiked tenfold.  The ports in the United States similarly experienced historic downtimes, as COVID-19 created labor shortages for truck drivers and logistic workers, further delayed delivery lead times, and drove up costs.  As Instant Brands' production and sale of its products depend on an uninterrupted flow of raw materials, component parts, and finished goods through its supply chain and distribution network, including the purchase, import, storage, and shipment of Instant Brands' merchandise, Instant Brands was forced to absorb increased freight costs to avoid further delays, thereby placing a significant burden on Instant Brands' profit margins and liquidity.

41.     In addition to supply chain disruptions, Instant Brands' appliance business was negatively impacted by a meaningful drop in consumer demand for its multicookers, as consumers switched their preferences to other forms of cooking.  In response, Instant Brands' management team made the difficult, but ultimately correct, decision to negotiate with suppliers and retailers to cancel production orders on most fourth quarter promotional products for the appliances business and defer some of its product innovation launches.  Management based such decision on analyses that demonstrated that products would not have arrived in time for the crucial promotional season

window due to supply chain issues and that the excessive shipping costs would have eliminated any corresponding profits. In addition, Instant Brands implemented a second round of price increases and enacted its first round of operational costs reductions to combat continued inflationary pressures.

42.     In the first half of 2022, Russia's invasion of Ukraine exacerbated supply chain and inflation issues, dramatically increased energy prices, and negatively impacted the Company's growth in Europe, the Middle East, and Africa. At the same time, retailers discovered that, due to the late arrival of products and product supply outpacing consumer demand, they were overstocked with billions of dollars of products and, consequently, cut replenishment orders across the board (even where inventory levels remained healthy). With the sizable cuts in replenishment orders by retailers, Instant Brands further reduced orders and promotional activities on core categories and focused its efforts on selling through the existing inventory to generate cash and free up shelf-space for future new products. In addition, the Company implemented a third round of price increases and executed a second round of operational costs reductions. To further support Instant Brands' balance sheet, in the first quarter of 2022, the Company retained for operational purposes $55 million in settlement proceeds as a capital contribution and, in May 2022, the Debtors also reached an agreement with their Prepetition ABL Lenders to establish the Tranche B Revolving Commitments (as defined in the Prepetition ABL Credit Agreement) to increase their borrowing base by approximately $25 million.

43.     In the second half of 2022, with the U.S. economy reopening, consumer discretionary spending switched from "at home" merchandise purchases to those related to services or experiences. As the year progressed, consumer debt increased to an almost record high and consumer sentiment dropped to recessionary levels. Consequently, Instant Brands and other

consumer goods companies reported deteriorating sales and margins and weaker earnings, thus necessitating downward revisions to market forecasts. To counteract these forces, in August 2022, Instant Brands executed a third round of operational costs reductions by consolidating business units, reducing its corporate headcount, and closing certain offices.

44.     In the first half of 2023, inflation remained at historically high levels, consumer demand for general merchandise continued to fall, interest rates continued to rise, and retailers pushed aggressively to de-risk their inventory levels and increase their margins. In response, Instant Brands executed another round of price increases and operational costs reductions.

45.     While Instant Brands has been able to successfully manage many of the headwinds it has faced, the combination of these challenges over the past three years have put significant pressure on Instant Brands' businesses. High interest rates, combined with the recent softening in consumer demand, coupled with suppliers severely tightening credit terms and more retailers shifting from the direct import distribution model to the domestic warehouse model, has strained Instant Brands' liquidity and made its capital structure untenable. The Debtors have now commenced the Chapter 11 Cases in order to fix the Company's balance sheet and improve its liquidity position.

**B.      Prepetition Restructuring Efforts**

46.     In January 2023, in connection with its restructuring efforts, the board of directors of Holdings appointed two independent directors to review and evaluate a potential debt financing transaction to address the Debtors' liquidity needs. On January 18, 2023, Instant Brands consummated a financing transaction (the "**UnSub Financing Transaction**") whereby Instant Brands' manufacturing facilities located in Corning, New York and Charleroi, Pennsylvania, together with the equipment, unencumbered precious metals, fixtures, and tangible property located at such facilities (the "**Contributed Assets**"), were contributed to two newly-formed

unrestricted subsidiaries (collectively, the "**UnSubs**") and leased back to the Instant Brands entities that previously owned and operated the Contributed Assets.    In conjunction with such contributions and leases, a $55 million letter of credit was issued by Goldman Sachs Bank USA for the benefit of the Prepetition ABL Agent to effectuate an increase in the Prepetition ABL Credit Facility's borrowing base on a dollar-for-dollar basis by the amount of the letter of credit, which could be drawn upon the occurrence of an event of default under the Prepetition ABL Credit Facility (the "**ABL Backstop LC**").    The Debtors arranged to have Cornell procure the ABL Backstop LC on its behalf, which in turn required Cornell to enter into a reimbursement arrangement with certain of the Debtors evidenced by a promissory note in favor of Cornell (the "**Reimbursement Note**").    Upon a drawing under the ABL Backstop LC, Cornell is deemed to have made a loan under the Reimbursement Note to IB Holdings in the amount drawn under the ABL Backstop LC, which loan is secured by a first-priority lien on the Contributed Assets owned by the UnSubs and guaranteed by each of the UnSubs (on a secured basis) and the Loan Parties under the Prepetition Credit Agreements (on an unsecured basis)—thereby resulting in Cornell being the only known creditor of the solvent UnSubs.    The parties to the Prepetition ABL Credit Agreement entered into an amendment to facilitate the UnSub Financing Transaction and extend the maturity of the Tranche B-2 Revolving Loans from January 13, 2023 to the earlier of (a) August 13, 2023 and (b) the date that the ABL Backstop LC is permitted to be released or terminated prior to its stated expiration date.

47.    Although the UnSub Financing Transaction provided much needed additional liquidity to the Company and additional runway for continued operations, the market reacted to the circumstances requiring the financing were negatively perceived by the market.  Trading price for the term loans under the Prepetition Term Loan Credit Facility fell by approximately 16.4

percent in the ensuing two months.  While Moody's also downgraded its rating of the Prepetition Term Loan Credit Facility from B3 to Caa2, the additional liquidity provided by the UnSub Financing Transaction likely prevented further ratings downgrades from other agencies at the time.

48.    In the second quarter of 2023, in the face of (a) upcoming debt service payments in June 2023, (b) approaching maturities under the Tranche B-1 Revolving Loans and the Tranche B-2 Revolving Loans in the second half of 2023, and (c) significant liquidity pressures arising from shortened payment terms from vendors and suppliers, Instant Brands began working with the Advisors to explore a potential comprehensive restructuring to address Instant Brands' liquidity needs and to right-size its balance sheet.  The Debtors engaged with the Ad Hoc Group of Term Loan Lenders and Cornell in arm's-length, good-faith negotiations to ensure that Instant Brands had sufficient liquidity to maintain its operations.  However, before the restructuring negotiations progressed substantially, the Debtors' acute liquidity challenges became unsurmountable.

49.    While the second quarter is historically Instant Brands' lowest point from a cashflow perspective, this year's liquidity reached new lows due to sporadic ordering from retailers, suppliers severely tightening credit terms, and more retailers shifting from the direct import distribution model to the domestic warehouse model.  Furthermore, the precious metals lessors requested further assurances from the Company, thereby further increasing the liquidity need.

50.    On June 1, 2023, the Debtors entered into cash dominion under the Prepetition ABL Credit Agreement.  On June 6, 2023, in an effort to allow the Debtors to operate in the ordinary course while continuing the discussions regarding potential capital structure solutions, the Debtors entered into an amendment to the Prepetition Term Loan Credit Agreement that extended the Debtors' grace period to cure certain defaults thereunder through to 11:59 p.m. (prevailing Eastern

Time) on June 11, 2023, and further extended such grace period to 11:59 p.m. (prevailing Eastern Time) on the date hereof.  While all parties have been making their best efforts to progress the negotiations as quickly as possible, the Debtors simply ran out of time to reach agreement regarding a comprehensive restructuring and filed the Chapter 11 Cases.

51.     Finally, as further described below in connection with the Foreign Representative Motion (as defined below), the Debtors intend to commence ancillary proceedings in Canada for the three Canadian Debtors—Corelle Brands (Canada) Inc., Instant Brands (Canada) Holding Inc., and IB Inc.—seeking recognition of their respective Chapter 11 Cases pursuant to the CCAA (as defined in the Foreign Representative Motion).

## III.

## FIRST DAY PLEADINGS

52.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in the Chapter 11 Cases and has requested that each of the First Day Pleadings be granted, as each is a critical element of a successful and smooth transition into chapter 11.

53.     For a more detailed description of the First Day Pleadings than set forth below, I respectfully refer the Court to the respective First Day Pleadings.  To the extent that this Declaration and the provisions of any of the First Day Pleadings are inconsistent, the terms of the First Day Pleadings shall control.  Capitalized terms that are used in this Part III but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

A.      **Administrative Pleadings**

   i.   *Debtors Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "**Joint Administration Motion**")*

54.      The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of Instant Brands Acquisition Holdings Inc., and that an entry be made on the docket of each of the Chapter 11 Cases of the Debtors to indicate the joint administration of the estates.

55.      In addition, the Debtors request that the Court waive the requirement of section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n) for the inclusion of the Debtors' full tax identification numbers in the captions for the Debtors' filings with the Court and notices sent to creditors.

56.      Given the provisions of the Bankruptcy Rules and the Local Rules and the Debtors' affiliation with one another, joint administration of the Chapter 11 Cases is warranted and would provide significant administrative convenience without harming the substantive rights of any party in interest.  Joint administration would avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources.  The Debtors' financial affairs and business operations are closely related.  Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each Debtor and its respective estate.  The rights of creditors would not be adversely affected, as the Joint Administration Motion requests only administrative, and not substantive, consolidation of the estates.  Moreover, each creditor shall still file its claim against a particular estate.  In fact, all creditors would benefit by the reduced costs that would result from the joint administration of the

24

Chapter 11 Cases.  The Court also would be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of the Chapter 11 Cases by the U.S. Trustee would be simplified.

57.     Furthermore, it is appropriate to waive the requirement of section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n) for the inclusion of the Debtors' full tax identification numbers in the captions for the Debtors' filings with the Court and notices sent to creditors.  This information is available on all of the Debtors' chapter 11 petitions.  Waiver of this requirement is purely procedural in nature and would ease the administrative burden on the Debtors.

58.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and facilitates achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

      ii.    *Debtors' Emergency Motion For Entry of an Order (I) Authorizing Debtors To (A) File a Consolidated List of Debtors' 30 Largest Unsecured Creditors and (B) Redact Certain Personal Identifying Information and (II)Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Consolidated Creditors List Motion")*

59.     The Debtors seek entry of an order (a) authorizing the Debtors to (i) file a consolidated list of the 30 largest general unsecured creditors in lieu of submitting separate creditor lists for each Debtor and (ii) redact personal identifying information from documents filed with the Court in the Chapter 11 Cases (including any Creditor Matrix, Schedule, or Statement) and (b) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases and other information.

60.     Pursuant to Bankruptcy Rule 1007(d), a debtor must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders." Fed. R. Bankr. P. 1007(d).  Here, IB Holdings, IB LLC, and IB Inc. are the primary operating companies among the Debtor entities and, as a result, substantially all of the Debtors' unsecured creditors hold their claims solely against one or more of these entities.  Compiling separate top 20 unsecured creditor lists for each individual Debtor would not be informative and would unnecessarily consume an undue amount of the Debtors' scarce time and resources.  Accordingly, filing a single, consolidated list of their 30 largest general unsecured creditors would alleviate the administrative burdens and costs and the possibility of duplicative service.

61.     Additionally, I respectfully submit that cause exists to authorize the Debtors, pursuant to section 107(c)(1) of the Bankruptcy Code and Local Rule 9037-1(b) and in compliance with any applicable data privacy and protection laws and regulations, to redact from any document filed or to be filed with the Court in the Chapter 11 Cases (including any Creditor Matrix, Schedule, or Statement) the names, home and email addresses, and other personal identifying information of (a) individual creditors, including the Debtors' employees, directors, and officers, as well as individual equity holders, (b) individuals who are customers, vendors (to the extent such vendors have registered business information that constitutes personal identifying information), or other commercial counterparties, (c) individuals where such information has been provided to, and is being processed by, an organization with an establishment located in any other jurisdiction that has data privacy and protection laws and regulations (and with respect to such information processed by an organization with an establishment located in such jurisdictions), and (d) individuals or other natural persons, with unredacted copies to be provided in accordance with the Proposed Order.  I believe such relief is essential, appropriate, and in the best interests of the

Debtors' estates and stakeholders, since denying this relief may cause (w) the Debtors to improperly or illegally disclose personal identifying information, which may subject them to severe monetary penalties, to the detriment of the Debtors' estates and economic stakeholders, (x) individuals to be more easily susceptible to identity theft and cybercrime, (y) individuals who are, unbeknownst to the Debtors, survivors of harassment, stalking, or other forms of violence— or who are being sought for any number of other nefarious reasons—to face danger to their and their family's personal, physical, and mental safety, security, and wellbeing, and (z) a needless waste the Debtors' time and resources to the detriment of the Debtors' estates, creditors, and other stakeholders.

62.     Recognizing the need for transparency, the Debtors propose to file under seal and provide unredacted versions of any Creditor Matrix, Schedule, Statement, or other document filed with the Court and redacted in accordance with the Proposed Order to (a) the Court, the U.S. Trustee, and counsel to any statutory committee appointed in the Chapter 11 Cases and (b) any party in interest upon a request to the Debtors (email being sufficient) or to the Court that sets forth a reasonable basis for the request that is reasonably related to the Chapter 11 Cases.

63.     Additionally, I respectfully submit that the Court should approve the form and manner of the Notice of Commencement of the Chapter 11 Cases.  The Notice of Commencement provides notice of (a) the commencement of the Chapter 11 Cases, (b) the meeting of creditors under section 341 of the Bankruptcy Code once such meeting has been scheduled by the U.S. Trustee, and (c) certain other information.  The Debtors propose to comply with the applicable requirements regarding the Notice of Commencement by instructing Epiq to serve it on all parties listed on the Creditor Matrix.

64.     Accordingly, I believe that the relief requested in the Consolidated Creditors List Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

     *iii.*     *Debtors' Emergency Motion for Entry of an Order Extending Time To File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, (IV) Statements of Financial Affairs, and (V) Bankruptcy Rule 2015.3 Financial Reports (the "**Extension of Schedules Motion**")*

65.     The Debtors seek entry of an order, pursuant to sections 105(a) and 521 of the Bankruptcy Code, Bankruptcy Rules 1007(c), 2015.3, and 9006(b), and Local Rule 2015-3, extending (a) the Schedules and Statements by 45 days, for a total of 59 days from the Petition Date, through and including August 10, 2023, and (b) the deadline by which the Debtors must file their initial 2015.3 Reports, to and including the later of (i) 14 days after the 341 Meeting or (ii) 45 days after the Petition Date (*i.e.*, July 27, 2023) and then every six months thereafter, in each case, without prejudice to the Debtors' ability to request additional extensions or modifications to or waivers of any Disclosure requirements.

66.     Collectively, the Debtors have approximately 3,000 creditors. Moreover, as detailed in the corporate structure chart attached hereto as **Exhibit A**, the Debtors "control[] or own[] at least a 20 percent interest" in at least eleven non-Debtor subsidiaries located outside of North America, each of which would therefore require, absent an order from the Court to the contrary, a 2015.3 Report. *See* Fed. R. Bankr. P. 2015.3(c). Sufficient cause exists here for the requested reporting extensions and modifications, because requiring the Debtors to file the Disclosures with the statutory deadlines proscribed by the Bankruptcy Rules and the frequency of reporting that may be required by the Local Rules would divert management's time and attention from ensuring a smooth transition into chapter 11 and focusing their efforts on quickly emerging from chapter 11.

67.     Due to the complexity and scope of their operations, the number of contracts to which the Company is party, the extent and global scope of the Company's businesses, and the numerous other matters that the Debtors must attend to in connection with filing the Chapter 11 Cases, the Debtors anticipate that (a) they will be unable to complete the Schedules and Statements for the 15 Debtor entities in the 14 days required under Bankruptcy Rule 1007(c) and (b) it will be difficult for them to strictly comply with the statutory deadlines for filing the initial 2015.3 Reports.  To prepare the Disclosures, the Company must compile information from books, records, and documents relating to creditor claims, the Company's many assets, executory contracts, and unexpired leases, and the books, records, and financial statements of each Instant Brands entity. This information is voluminous and located in numerous places throughout the Company's organization—including outside North America.  Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to stabilize and improve the Debtors' business operations.  In addition, employee efforts during the initial post-petition period are critical, and the Debtors must devote their time and attention to business operations to maximize the value of the Debtors' estates during the first critical months.  Finally, with respect to the Schedules and Statement in particular, because not all of the invoices related to prepetition goods and services have yet been received and/or entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the required information to accurately prepare the Schedules and Statements.

68.     I, therefore, respectfully submit that good and sufficient cause exists for granting the requested reporting extensions and modifications.  Unavoidably, the Debtors' primary focus in the days leading up to the Petition Date has been on seeking to finalize DIP financing,

negotiating the terms of a restructuring transaction, stabilizing the business operations, and reacting to the events surrounding the filing.  While the Debtors, with the help of their professional advisors, have mobilized their employees to work diligently and expeditiously on the preparation of the Disclosures, resources are strained.  Not only have the same employees with the expertise to complete the Disclosures been diligently preparing for the chapter 11 filing, but they have also been heavily engaged on numerous other restructuring workstreams, including preservation of relationships with creditors and other parties in interest and ensuring the Debtors' smooth transition into chapter 11 during a sensitive time.  I believe that with the extension requested, the Debtors will be able to focus their attention on business operations to maximize the value of the Debtors' estates during this critical initial post-petition period for the benefit of creditors and all parties in interest.

69.     I believe that the relief requested in the Extension of Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Extension of Schedules Motion should be granted.

    *iv.*    *Debtors' Emergency Motion for Entry of a Standing Order Confirming the Statutory Protections of the Bankruptcy Code (the "**Automatic Stay Motion**")*

70.     The Debtors seek entry of an order (a) confirming the application of (i) the automatic stay provisions of section 362 of the Bankruptcy Code, (ii) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code, and (iv) the anti-transfer provisions of section 541 of the Bankruptcy Code and (b) approving the form and manner of the Notice related thereto.

71.     The Debtors are seeking entry of an order confirming application of the Statutory Protections to facilitate their commercial dealings during the course of the Chapter 11 Cases with parties who may be unfamiliar with, are mistaken regarding, or simply ignore the Statutory Protections.  Notwithstanding the self-executing and global nature of the Statutory Protections, not all parties affected or potentially affected by the commencement of the Chapter 11 Cases are aware of, comprehensively understand, or will abide by the Statutory Protections.  For example, the Debtors own equity interests directly or indirectly in subsidiaries that have operations, assets, and/or employees in, among other countries, Canada, Singapore, England, South Korea, Australia, Taiwan, and China.  Additionally, certain of the Debtors are party to various commercial contracts with counterparties that are non-U.S. entities.  Experience has shown that it is vital to advise third parties—particularly non-U.S. third parties—of the existence, scope, and effect of sections 362, 365, 525, and 541 of the Bankruptcy Code through a separate order.

72.     I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Automatic Stay Motion should be granted.

> *v.*     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Instant Brands Inc. to Act as Foreign Representative and (II) Granting Related Relief (the "**Foreign Representative Motion**")*

73.     The Debtors seek entry of an order authorizing IB Inc. to act as the Foreign Representative  on behalf of the Debtors' estates in any judicial or other proceedings in Canada or any other foreign country, including the authorization, but not direction, to (a) seek recognition of the Chapter 11 Cases in Canada and/or any other foreign jurisdiction in which the Debtors may seek recognition and (b) upon such recognition, seek any other appropriate relief that is just and

proper in furtherance of the protection of the Debtors' estates, including the payment of all costs of the Foreign Representative and its counsel in all jurisdictions where recognition is sought, each without further order of the Court.

74.     Most of the Debtors are obligors under the Debtor's Prepetition Term Loan Credit Facility, and three of the obligor-Debtors are domiciled in Ontario, Canada.  Accordingly, upon entry of the Proposed Order, the Foreign Representative currently intends to commence ancillary proceedings in the Canadian Court for the three Canadian Debtors—Corelle Brands (Canada) Inc., Instant Brands (Canada) Holding Inc., and IB Inc.—with respect to their respective Chapter 11 Cases pursuant to the CCAA.

75.     Authorizing IB Inc. to serve as Foreign Representative and commence the Canadian Proceedings as soon as possible would allow coordination of the Chapter 11 Cases and any other proceedings that may be commenced and would provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates.

76.     I believe that the relief requested in the Foreign Representative Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving an orderly transition to chapter 11.  To facilitate the Debtors' potential need for recognition or other appropriate relief in a non-U.S. court, and to avoid any doubt as to who has appropriate authority to seek recognition of the Chapter 11 Cases in a jurisdiction outside the United States, on behalf of the Debtors, I respectfully submit that the Court enter the Order authorizing IB Inc. to act as the foreign representative for the Debtors

      *vi.*    *Debtor's Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "**Claims Agent Application**")*

77.     The Debtors seek entry of an order authorizing the Debtors to employ and retain Epiq as their claims, noticing, and solicitation agent in the Chapter 11 Cases.  In its capacity, Epiq

will, among other things, distribute notices and transmit, receive, process, docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases.

78.    I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Chapter 11 Cases and other developments. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a notice and claims agent is both necessary and in the best interests of the Debtors' estates and creditors because the Debtors will be relieved of the burdens associated with the notice and claims processing services to be provided by Epiq.  Relieved of such burdens, the Debtors will be able to devote their full attention and resources to maximizing value for their stakeholders and facilitating the orderly administration of the Chapter 11 Cases.  Accordingly, on behalf of each of the Debtors, I respectfully submit that the relief requested in the Claims Agent Application should be granted.

**B.     Operational Pleadings Requiring Immediate Relief**

   i.    *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing (A) Debtors To Continue To Maintain Existing Cash Management System, Bank Accounts, and Business Forms, (B) Debtors To Open and Close Bank Accounts, and (C) Financial Institutions To Administer the Bank Accounts and Honor and Process Related Checks and Transfers, (II) Waiving Deposit and Investment Requirements, (III) Allowing Intercompany Transactions and Affording Administrative Expense Priority to Post-Petition Intercompany Claims, and (IV) Authorizing Debtors To Continue Utilizing the C2FO Platform (the **Cash Management Motion**")*

79.    The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue operating their prepetition Cash Management System with respect to intercompany cash management, including the continuation of Cash Dominion, (ii) maintain their existing Bank Accounts located at certain Banks and open and close Bank Accounts post-petition in the ordinary course of business, and (iii) maintain their existing Business Forms, (b) authorizing the applicable financial institutions to treat, service, and administer the Bank Accounts in the

ordinary course of business and to receive, process, honor, and pay all checks or wire transfers used by the Debtors, (c) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis, (d) allowing the Debtors to continue to enter into and perform Intercompany Transactions, (e) affording post-petition Intercompany Claims administrative expense priority treatment under sections 503(b)(1) and 364(a) of the Bankruptcy Code, and (f) authorizing the Debtors to continue utilizing the C2FO Platform.

80.     In the ordinary course of business, the Debtors utilize the Cash Management System to collect and disburse funds generated by the operations of the Debtors.  On June 1, 2023, the Debtors entered into Cash Dominion under the Prepetition ABL Credit Agreement.  As a result, on and after such date, the Debtors' cash receipts in certain Bank Accounts have been swept daily by BoA and applied against the Prepetition ABL Credit Facility.

81.     The Debtors' Cash Management System consists of 31 Bank Accounts with seven different Banks:  BoA; BMO; M&T; Citizens; Scotia; RBC; and CNB.  Of the 31 Bank Accounts, 24 hold cash denominated in U.S. dollars, while the remaining seven Bank Accounts hold cash denominated in Canadian dollars.

82.     The Bank Accounts held by IB LLC, one of the primary operating entities among the U.S. Debtors, include, among others, the following:

a.   **Primary Concentration Account**.  IB LLC owns a concentration account with BoA (last three digits of account: #297) used by the Debtors' U.S. entities in the operation of their businesses (the "**Primary Concentration Account**").  The Primary Concentration Account typically receives and transfers funds from and to all of the other Debtor entities that have bank accounts, sometimes through intermediary Debtor entities.  The Primary Concentration Account also funds via reverse wire the payroll for all of the Debtors' employees paid in U.S. dollars.  In addition, the Debtors use the Primary Concentration Account to pay vendors and other parties that require wire or direct debit as the method of payment.

b.   **Collections Account**.  IB LLC's Primary Collections Account for the sale of its products in the U.S. resides with BoA (#310) (.  The Primary Collections Account is subject to Cash Dominion.

c. **Payables Account**. IB LLC maintains a disbursement account with BoA for the processing of payables (#292) (the "**Payables Account**"), including ACH transfers and check payments as well as direct debits.

d. **U.S. Retail Accounts**. IB LLC's three operating retail stores each operate zero balance collection accounts ("**ZBAs**") at BoA (#084, #233, and #351), which receipts get swept into a separate Retail Concentration Account located at BoA (#614). Receipts in the Retail Concentration Account sweep into the Primary Collection Account and, ultimately, into the Primary Concentration Account.

e. **BMO Accounts**. IB LLC maintains three ZBA Bank Accounts with BMO: a lockbox account (#602); a collections account utilized by a retail store (#610); and a disbursement account (#578). These BMO accounts receive certain customer payments denominated in U.S. dollars and process certain direct debit payments. Receipts in these accounts also get swept into a BMO concentration account (#438) and, periodically, into the Primary Concentration Account.

f. **Miscellaneous Banks Accounts**. IB LLC maintains two Bank Accounts located at M&T (#574) and Citizens (#736), which serve as business checking accounts for miscellaneous activities, including business licenses and petty cash.

g. **PayPal Account**. The Debtors also have a PayPal account through which customers may remit payments to the Debtors' U.S. entities. The Debtors routinely sweep cash from the PayPal account to the Primary Concentration Account.[7]

83. The Bank Accounts maintained by the Canadian Debtors, include, among others, the following:

a. **IB Inc. Accounts**. IB Inc operates 12 Bank Accounts for collections, disbursements, and concentration of funds, of which seven are denominated in U.S. dollars and five are denominated in Canadian dollars:

  i. Six of IB Inc.'s U.S.-dollar Bank Accounts are located at RBC, CNB, and BoA (#419,[8] #396, #491, #617, #122, and #031). The Debtors sweep the cash from these disbursement and concentration accounts to a main concentration account located at BoA (#414) (the "**Primary Canada USD Concentration Account**"). The Debtors transfer cash between the Primary Canada USD Concentration Account and the Primary Concentration Account, as well as between the Primary Canada USD Concentration

---

[7]  The Debtors also have a PayPal account for the Canadian Debtors; however, such account currently is dormant.

[8]  ZBA Bank Account subject to Cash Dominion.

Account and the Primary Canada CAD Concentration Account (as defined below).

ii. The Debtors generally utilize five IB Inc. Canadian-dollar Bank Accounts to conduct their Canadian operations. These accounts are located at RBC and BoA #157, #086, #210, #228, and #202. The Debtors' primary collections account for the sale of its products in Canada resides with BoA (#210) (the "**Canada Collections Account**"). The Canada Collections Account is subject to Cash Dominion. The other four Bank Accounts sweep to a main concentration account located at BoA (#202) (the "**Primary Canada CAD Concentration Account**"). The Debtors utilize the Primary Canada CAD Concentration Account to fund payroll for their Canadian employees[9] and to transfer cash to and from each of the Primary Concentration Account and the Primary Canada USD Concentration Account.

b. **CB Inc. Accounts**. CB Inc. owns two legacy Bank Accounts, both denominated in Canadian dollars and located at Scotia, that were opened by Corelle Brands prior to the 2019 merger. CB Inc.'s lockbox ZBA Bank Account (#910) collects cash receipts that automatically sweep to the CB Concentration Account (#813) (. The Debtors then transfer all funds in the CB Concentration Account to the Primary Canada CAD Concentration Account.

84. The Debtors also maintain four miscellaneous Bank Accounts. The Debtors' ultimate parent company, Holdings, owns one account with BoA (#391), which the Company used to support corporate transaction funds flow; however, such account has been dormant for most of the last 12 months. Instant Brands Acquisition Intermediate Holdings Inc. does not have a bank account. URS-2 (Corning) LLC maintains a Bank Account with BoA (#478), and the Debtors transfer cash between this account and the Primary Concentration Account. Instant Brands Holdings Inc. has an account with BoA (#433) used to withdraw and repay funds to and from the asset-based lending facility and the term loan facility, including both paying interest and principal amounts on account of these credit facilities. Finally, URS-1 (Charleroi) LLC maintains a Bank

---

[9]   In general, receipts into the IB Inc. Canadian dollar Bank Accounts constitute a sufficient source for the funding of wages and benefits of the Canadian employees and, as such, there is minimal funding need from the Primary Concentration Account.

Account with BoA (#190), and the Debtors transfer cash between this account and the Bank Account owned by Instant Brands Holdings Inc.

85.     The Cash Management System enables the Debtors to monitor the collection and disbursement of funds and maintain control over the administration of their Bank Accounts.  The disbursement portion of the Cash Management System is largely manual, as the Debtors' employees monitor the system, manage the proper disbursement of funds, and utilize the wire, check, and ACH transfers capabilities with all seven Banks.  Disbursements on account of precious metal leases, financing leases, insurance, Purchase Cards, benefits, payroll, and taxes are made through the main or concentration accounts for each applicable entity (via wire or direct debit).

86.     The cash collection portion of the Cash Management System is highly sophisticated, allowing the Debtors' customers to automatically remit payments for products purchased.  As described above, the Debtors receive funds from a variety of sources (including customers, credit cards, and non-customer receipts (*e.g.*, sublease payments, customs, and duty drawbacks)) into one or more of the Debtors' collection or concentration accounts.

87.     In general, the balances of all of the collection and lockbox accounts, as well as the retail and the ZBA disbursement accounts, get swept into the Debtors' eight concentration accounts.  As of the Petition Date, the aggregate amount on deposit in the concentration accounts totaled $8,109,041, the aggregate balance in the three Bank Accounts subject to Cash Dominion totaled $2,471,482, and the aggregate balance in all of the other Bank Accounts is $50,666.

88.     The Debtors pay, usually via automatic debiting, Bank Fees of approximately $11,000 per month in the aggregate in connection with the Bank Accounts, credit card processing, and other similar transactions, with the majority of such payments remitted to BoA.  The Debtors estimate that approximately $14,000 in Bank Fees is outstanding as of the Petition Date.

89.     The Debtors also maintain relationships with each other and certain Non-Debtor affiliates in the ordinary course of business (collectively, the "**Intercompany Transactions**") that result in Intercompany Claims.  In general, the Intercompany Transactions are made through wire or book transfers to (a) facilitate the purchase of product and the payment of employee wages and benefits and sales and marketing expenses (although, for the avoidance of doubt, the Debtors do not pay any wages or benefits for employees of non-Debtor entities), (b) reimburse certain Company entities for various expenditures associated with their businesses, (c) fund the Bank Accounts for general capital expenditures, and (d) transfer funds to the Operating Accounts.  All of the Non-Debtors that are funded through the Cash Management System are domiciled abroad and maintain foreign bank accounts.

90.     In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted within the Company, at any given time there may be an Intercompany Claim owed by one Debtor or Non-Debtor to another, which allows the Company to facilitate and maintain its foreign operations.  The Intercompany Claims are generally reflected as journal entry receivables and payables each month. Further, each Debtor and Non-Debtor tracks all fund transfers in its respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  Indeed, the Company's general practice is to maintain schedules that record all cash activity in the Bank Accounts and to reconcile such amounts with the Company's books and monthly cash balance.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.  The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business consistent with past practice.

91.     As part of the Cash Management System, the Debtors utilize Purchase Card Programs with certain issuing banks, including PNC Bank, National Association, to (a) enable certain senior managers with the Debtors to pay for travel and entertainment expenses (*e.g.,* expenses relating to airfare, hotels, car rentals, gas, taxi, business parking, business meals, and entertainment) and (b) allow the Debtors to purchase various products and services needed in the ordinary course at their facilities in support of their manufacturing and operational processes (*e.g.,* solvents, petroleum, gas products, and transportation).  The aggregate credit limit for the Purchase Cards issued under the Purchase Card Program is $750,000.

92.     Payments made on account of the Purchase Cards are funded through direct debit from the Primary Concentration Account.  On average, the Debtors estimate that they currently spend approximately $450,000 per month using these Purchase Cards.  As of the Petition Date, the Debtors estimate that they owe approximately $385,000 on account of the Purchase Cards Programs.  If the Purchase Cards Programs were to be discontinued and the Purchase Cards could no longer be used, the Debtors operations and accounting system would be disrupted unnecessarily and would create undue burdens on the Debtors' employees to finance business expenses and subsequently seek reimbursement.  The Debtors seek authority to continue the Purchase Card Programs subject to the terms and conditions thereof on a post-petition basis consistent with past practice, including the payment of all balances and fees as they become due and owing under the accounts (whether pre or post-petition).

93.     In the ordinary course of their business operations, the Debtors, like many other producers or sellers of customer goods, participate in a program that affords them the ability to monetize certain accounts receivable on an accelerated timeline.  As part of the program, the Debtors entered into an agreement with Pollen, Inc. ("**C2FO**") whereby the Debtors can offer

discounts to participating customers on C2FO's business-to-business platform (the "**C2FO Platform**") to incentivize such customers to process and pay their accounts payable to the Debtors at a faster, but cheaper, rate than the original terms of sale. By accessing the C2FO Platform, the Debtors can better manage their liquidity constraints and reduce the credit risk associated with the holding of receivables to maturity.

94.     As part of the Cash Management System, the Debtors utilize numerous preprinted correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, checks, invoices, sales orders, acknowledgements, and other Business Forms, in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize expenses to their estates and avoid confusion on the part of customers, vendors, and suppliers during the pendency of the Chapter 11 Cases, the Debtors request that the Court authorize their continued use of all correspondence and Business Forms (including, without limitation, letterhead, purchase orders, invoices, as well as preprinted and future checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

95.     The basic structure of the Cash Management System constitutes the Debtors' ordinary, usual, and essential business practices. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The Cash Management System is integrated with the Debtors' accounting processes and software that produce the Debtors' financial statements and includes the necessary accounting controls to enable the Debtors, as well as other interested parties in the Chapter 11 Cases, to trace funds

through the system.  The design, development, testing, and implementation of this portion of the Debtors' accounting system, and its interfacing with the Cash Management System, require the dedicated efforts of a significant number of the Debtors' employees.  If the Debtors were required to dismantle the Cash Management System, it would disrupt the Debtors' day-to-day operations and their accounting processes and software.  Dismantling the Cash Management System would also impair the Debtors' ability to generate timely reports of transactions and balances, as well as financial statements required under the Debtors' prepetition credit documents.

96.    The widespread use of similar cash management systems is attributable to the numerous benefits they provide, including the ability to tightly control corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the expeditious movement of funds and developing of timely and accurate account balance and presentment information.  These controls are particularly important here, given the significant amount of cash that flows through the Cash Management System on an annual basis.

97.    It would be very time consuming, difficult, and costly for the Debtors to establish an entirely new system of accounts and a new cash management system, and doing so would disrupt the Debtors' relationships with their key counterparties and suppliers.  The attendant delays from opening new accounts, revising cash management procedures, and instructing their commercial counterparties and countless other entities to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.  Under the circumstances, maintenance of the Cash Management System is essential and clearly in the best interest of the Debtors' estates.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption to the Cash Management System would facilitate the Debtors' efforts to

maximize the value of their estates in the Chapter 11 Cases.  In short, any benefits of the Debtors' strict compliance with the U.S. Trustee Guidelines would be far outweighed by the resulting expense, inefficiency, and disruption to the Debtors' businesses.

98.     Similarly, to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to preserve and enhance the value of the Debtors' estates, it is important that the Debtors be permitted to continue to maintain the Bank Accounts with the same account numbers following the commencement of the Chapter 11 Cases, subject to a prohibition against honoring checks issued or dated before the Petition Date absent a prior order of the Court.

99.     By avoiding the disruption and delay to the Debtors' disbursements that would necessarily result from closing the Bank Accounts and opening new Bank Accounts, all parties in interest, including employees, vendors, and counterparties, would be best served by preserving business continuity.  The benefit to the Debtors, their business operations, and all parties in interest would be considerable.  The confusion that would ensue absent the relief requested in the Cash Management Motion would substantially hinder the Debtors' restructuring efforts.

100.    Further, it would minimize Debtor expenses to authorize continued use of the Business Forms, substantially in the forms existing immediately before the Petition Date, without modification to add reference to the Debtors' status as debtors in possession.  As a result of the press releases issued by the Debtors and other press coverage, parties doing business with the Debtors undoubtedly would be aware of the Debtors' status as debtors in possession and, thus, in the absence of such relief, the Debtors' estates would be required to bear a potentially significant expense that the Debtors respectfully submit is unwarranted.

101.     The Cash Management System is the mechanism whereby the Debtors are able to transfer their revenue toward the payment of their obligations and without which the Debtors' operations would be severely disrupted.  Similarly, if the Debtors are not permitted to maintain and use their Bank Accounts and continue to use their existing Business Forms as set forth in the Cash Management Motion, the resulting prejudice would include (a) disruption of the ordinary financial affairs and business operations of the Debtors, (b) delay in the administration of the Debtors' estates, (c) compromise of the Debtors' internal controls and accounting system, and (d) costs to the Debtors' estates to set up new systems, open new accounts, and print new Business Forms. The Debtors also seek authorization to implement changes to the Cash Management System in the ordinary course of business, including opening any additional Bank Accounts or closing any existing Bank Account as they may deem necessary and appropriate.

102.     I submit that cause exists to waive the investment and deposit restrictions of section 345(b) of the Bankruptcy Code on an interim basis, as set forth in the Proposed Orders, to the extent that the Debtors' cash management deposits do not comply without prejudice to the Debtors' right to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code in the Chapter 11 Cases.  The Banks at which the Debtors maintain accounts are financially stable banking institutions and are FDIC-insured (up to an applicable unit per account). Because the Debtors do not and do not plan to have any investments in the Bank Accounts other than cash, the Debtors do not believe that any additional guaranties or sureties are necessary.  The Debtors intend to be in chapter 11 only a short period of time, and the costs of having to obtain additional guaranties or sureties far outweigh the risk of the Debtors continuing to maintain their traditional cash-only Bank Accounts for the short period of time they remain in chapter 11.

43

103.    Nonetheless, as the continuation of Intercompany Transactions is critical to the Company's ability to continue to operate their businesses, out an abundance of caution, the Debtors request express authorization to engage in Intercompany Transactions post-petition.   If the Debtors' Intercompany Transactions are unable to continue, a number of services or goods provided by and among the Company entities would experience significant disruption. Discontinuing the Intercompany Transactions would hinder the Company's ability to make timely payments to its non-Debtor affiliates and provide benefits to their employees.   Importantly, the laws of certain foreign jurisdictions in which the non-Debtor affiliates operate require that intercompany payables be settled within certain specified periods of time or the entities risk losing their operating licenses.   Violation of these laws and the resulting legal consequences could have a disastrous impact on the Company as a whole.   I believe that the continuation of the Intercompany Transactions is in the best interests of the Debtors and their estates and stakeholders and request authority to continue entering into and performing under such Intercompany Transactions in the ordinary course of business on a post-petition basis.   Accordingly, the Debtors request authorization to continue to enter into and perform Intercompany Transactions. The Debtors also request that all Intercompany Claims against a Debtor by another Debtor or Non-Debtor arising after the Petition Date, as a result of Intercompany Transactions and transfers in the ordinary course of business, be afforded administrative expense priority status in accordance with sections 503(b) and 364(a) of the Bankruptcy Code.

104.    Lastly, I believe that utilizing the C2FO Platform would be in the ordinary course of their businesses because (a) they are commonplace and routine in the Debtors' industry and (b) the Debtors have long engaged in the program as part of their ordinary course cash management practices, since the platform allows the Debtors to manage their liquidity constraints and risks.

Accordingly, I believe that section 363(c)(1) of the Bankruptcy Code allows the Debtors to continue utilizing the C2FO Platform. Nevertheless, out of an abundance of caution, the Debtors seek entry of orders authorizing the Debtors to use the C2FO Platform to the extent that such authorization is required under section 363(b) of the Bankruptcy Code.

105.   I submit that offering discounts to accelerate payments of accounts receivable pursuant to the C2FO Platform represents a sound exercise of their business judgment and is justified under section 363(b) for the reasons already expressed: the discounts promote prompt payment, which allows the Debtors to stabilize their cash receipts and reduce the credit risk associated with holding the receivables to maturity. Furthermore, termination of the Debtors' participation in the C2FO Platform would remove a critical source of liquidity needed to facilitate the Debtors' operation as a going concern, which could, in turn, result in a diminution in the value of the Debtors' estates.

106.   I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

    ii.   *Debtors' Emergency Motion For Entry of an Order Authorizing (I) Debtors To (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees To Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions To Honor and Process Related Checks and Transfers (the "Wages and Benefits Motion")*

107.   The Debtors seek entry of an order:

    (a) authorizing, but not directing, the Debtors to:

        (i)  pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the

Employer Taxes, the Withholdings, the Reimbursement Obligations, the Relocation Obligations, the Health and Welfare Plan Obligations, the COBRA Obligations, the PTO Obligations, the Disability Obligations, the Retirement Obligations, the Workers' Compensation Obligations, the Contingent Workers Obligations, the Non-Insider Severance Obligations, the Non-Insider Retention Obligations, the Non-Insider AIP Obligations, and the Miscellaneous Obligations; and

(ii) unless otherwise set forth in the Wages and Benefits Motion, continue, in their sole discretion, their plans, practices, programs, procedures, and policies for their current and former Employees, as applicable, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended, or supplemented from time to time by the Debtors, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay or cause to be paid related administrative obligations;

(b) permitting current and former Employees holding claims under the Workers' Compensation Program to proceed with such claims in the appropriate judicial or administrative fora; and

(c) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

108.    Crucial to their businesses, the Debtors employ a talented and dedicated workforce that enables the Debtors to maintain their high standards of quality, safety, and sustainability.  The Debtors' workforce consists of a combination of full-time, part-time, and temporary employees, as well as individuals employed by, and provided through, staffing and consulting agencies and individuals providing personal services directly as independent contractors.  As of the Petition Date, the Debtors employ over 1,800 Employees that carry out a multitude of functions in the Debtors' corporate and sales offices, manufacturing operations, distribution centers, and retail stores, including manufacturing, distribution, finance, retail, information technology, consumer service, customer service, sales, marketing, social media, human resources, product development, design, quality management, maintenance, sourcing, supply chain, transportation, and warehousing.

109.    The Employees are located in multiple sites throughout North America: (a) approximately 140 Employees are associated with the Debtors' facility in Downers Grove, Illinois, where Instant Brands' headquarters and some of its distribution activities are located; (b) approximately 600 Employees work in Greencastle, Pennsylvania, where Instant Brands manages its direct-to-consumer business, packs and picks its Pyrex® brand products, and performs other miscellaneous functions; (c) approximately 450 Employees work in Corning, New York, where Instant Brands, among other activities, manufactures its Corelle Vitrelle® products; (d) approximately 350 individuals work in Charleroi, Pennsylvania, where the Company manufactures its Pyrex® brand products; (e) approximately 200 Employees work in Byhalia, Mississippi, where Instant Brands manufactures its Snapware® products; (f) approximately 50 Employees work in Riverside, California, focusing on the warehousing and distribution of domestically produced and imported products; (g) approximately 30 Employees work in the Debtors' four retail stores in Illinois, New Jersey, and California; (h) approximately 40 Employees work remotely in sales, finance, and other corporate administrative services in the United States; and (i) approximately 30 Employees work in Canada, performing sales and marketing activities as well as customer support.  More than 1,000 of the Employees are represented by one or more unions.[10]

110.    The Debtors' Prepetition Employee Obligations include the following:

a.    **Wages**.  The Debtors pay their Employees' wages and salaries under a number of different pay cycles: approximately 450 Employees are paid bi-weekly, every other Friday, five calendar days in arrears; approximately 1,150 Employees are paid every week, five calendar days or two weeks in arrears, depending on the location of the Employees.  I believe that, as of the Petition Date, none of the Employees are owed Wages in excess of the $15,150 statutory cap under section 507(a)(4) of the Bankruptcy Code.  ADP serves as the Debtors' payroll administrator, for which

---

[10]   The collective bargaining agreement for the unionized Employees located in Greencastle, Pennsylvania expires on July 30, 2023; however, the Debtors intend to renew such agreement in the ordinary course of business.

the Debtors pay approximately $27,000 per month for processing payroll, tax withholdings, and other human resources information systems. Generally, ADP withdraws Wages, taxes, and garnishments from the Debtors' bank account one-to-two days prior to their applicable pay dates.

b. **Employer Taxes**. The Debtors incur certain tax obligations owed directly by the Debtors in connection with or on account of the Wages that the Debtors are required to remit to certain governmental authorities under applicable law, such as Social Security and Medicare employer taxes. During 2022, the aggregate Employer Taxes averaged approximately $730,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $575,000 on account of the Employer Taxes.

c. **Withholding Obligations**. The Debtors withhold from applicable Employees' Wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security, Medicare, federal and state income and other payroll taxes, contributions for medical, dental, vision, and retirement plans, payroll taxes, union dues, and contributions and payroll deductions for various insurance programs, health savings accounts, flexible savings accounts, garnishments, and other similar mandatory withholdings. The Debtors' average Withholdings are summarized below:

|  | US Debtor Payroll | |
| --- | --- | --- |
|  | Estimated Amount Per Month | Estimated Amount Accrued Unpaid at Petition Date |
| Taxes | $      1,868,199 | 524,352 |
| Benefits - Dental | 22,304 | 5,907 |
| Benefits - Disability | 3,600 | 1,122 |
| Benefits - HSA & FSA | 46,671 | 13,287 |
| Benefits - Medical | 271,379 | 78,682 |
| Benefits - Misc. | 695 | 251 |
| Benefits - Other insurance | 27,636 | 7,725 |
| Benefits - Pension | 708,017 | 208,452 |
| Benefits - Vision | 2,025 | 536 |
| Garnishment | 42,581 | 13,466 |
| Other | (1,309) | (135) |
| Union Dues | 56,211 | 17,992 |
| **Total** | **$      3,048,009** | **871,635** |

48

| | Canadian[11] Debtor Payroll | |
|---|---|---|
| | Estimated Amount Per Month | Estimated Amount Accrued Unpaid at Petition Date |
| Govt pension | $        4,911 | 2,455 |
| Employment Ins. (EI) | 1,374 | 687 |
| Fed. tax | 26,870 | 13,435 |
| Vol Retirement Savings Plan | 2,519 | 1,260 |
| Vol Retirement Savings Plan $ | 600 | 300 |
| Vol Retirement Savings Plan 2nd acct | 750 | 375 |
| **Total** | **$        37,024** | **18,512** |

I believe that the Withholdings, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code.

d. **Business Expense Reimbursement**. In accordance with their corporate policies, the Debtors reimburse applicable Employees who incur business expenses in the ordinary course of performing their business duties on behalf of the Debtors. Reimbursement is made directly to an Employee for business expenses paid by such Employee. During 2022, the aggregate Reimbursement Obligations averaged approximately $27,500 per month. Although it is difficult for the Debtors to determine the exact amount of the Reimbursement Obligations outstanding at any particular time because of the generally unpredictable and irregular nature of Employees seeking payment thereof, the Debtors estimate that they owe approximately $20,000 related to Reimbursement Obligations as of the Petition Date.

e. **Relocation Benefits**. In the ordinary course of business, the Debtors pay or reimburse applicable Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit on a case-by-case basis at the Debtors' discretion. As of the Petition Date, the Debtors have no outstanding Relocation Obligations.

f. **Health and Welfare Benefits**. The Debtors offer several Health and Welfare Plans to applicable Employees through a variety of companies, which consist of a combination of employer or Employee funding and self or third-party insurance. Administrative costs in respect of the medical, dental, and vision plans averaged approximately $150,000 per month during the first quarter of 2023 for current applicable U.S. Employees. Although Employees in Canada benefit from medical, dental, and vision insurance provided by the Canadian government, the Debtors provide fully-insured supplemental medical, dental, and vision insurance that is administered through Sun Life. Certain retirees of the Debtors also receive healthcare benefits: those in the United States are self-funded and administered by Sterling Benefits, LLC, while those in Canada are administered and fully-insured

---

[11] Amounts shown are denominated in U.S. dollars.

by Sun Life.  During 2022, payments on account of Health and Welfare Plans totaled approximately $13,000,000, comprised of approximately (a) $11,000,000 for payments under the medical, dental, and vision plans, (b) $830,000 for contributions to health savings and flexible savings accounts, (c) $1,150,000 for payments under the life and accidental death and dismemberment insurance plans, and (d) $20,000 for payments under the employee assistance plan (*e.g.*, counseling service for employees).  The Debtors work with a third-party administrator for management, reporting, and processing of COBRA Obligations to applicable former Employees.  All applicable U.S. Employees have the right under COBRA to elect to receive COBRA coverage, which extends medical, dental, and vision benefits to which an Employee was entitled immediately prior to termination for a specified post-termination period up to 18 months.  Employees who elect to receive COBRA coverage are required to pay 102% of the elected premiums, a portion of which may be paid by the Debtors during a severance period.  As of the Petition Date, approximately 10 former Employees and their dependents had elected to receive COBRA coverage.  Because of the manner in which expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult for the Debtors to determine the extent of their outstanding obligations under the Health and Welfare Plans at any particular time.  Based on historical experience and expected future trends, the Debtors estimate that the cost of the Health and Welfare Plan Obligations (including payments to administrators) is approximately $1,100,000 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of the Health and Welfare Plan Obligations (including payments to administrators).

g.  **Paid Time Off**.  Pursuant to the Debtors' general paid time off policies, eligible Employees are paid their regularly scheduled full-time or part-time Wages for each PTO day, up to the maximum number of days accrued.  In accordance with the applicable policy, each eligible Employee generally may accrue 10 to 20 PTO days per calendar year, with the opportunity to accrue additional time based on seniority in certain jurisdictions.  In the United States, Employees generally must use PTO days in the calendar year in which they are accrued or otherwise forfeit such PTO days.  Employees also have PTO for a set list of holidays and floating personal days, which generally ranges from 10 to 14 days per calendar year, depending on the location and terms of the collective bargaining agreements.  Upon termination of employment, all accrued, earned, and unused PTO is paid out; however, floating personal days are not.  The Debtors intend to honor prepetition accrued PTO and holiday pay obligations for their eligible Employees in the ordinary course of business.

h.  **Disability Benefits**.  The Debtors also offer disability benefits to their eligible Employees, consisting of short-term and long-term disability benefits.  In the event that an Employee becomes eligible for disability benefits, the benefits are provided for up to 26 weeks, depending on years of service, location, and local policy.  Short-term disability benefits are administered by Prudential and self-funded by the Debtors.  After the short-term disability benefits are exhausted, certain eligible Employees may receive additional long-term disability benefits that are fully-

insured and administered by Prudential. In Canada, Employees are eligible to receive long-term disability benefits managed as part of the Debtors' health and welfare package. During the first quarter of 2023, the Debtors incurred expenses of approximately $100,000 on account of the obligations related to the benefits described in this paragraph. As of the Petition Date, the Debtors estimate that they owe approximately $50,000 on account of the Disability Obligations (including payments to administrators).

i.   **Retirement Plans**.  The Debtors maintain a single-employer, 401(k) retirement plan managed by John Hancock Retirement Plan Services. The 401(k) Plan is a qualified defined contribution savings plan. The Debtors generally match an eligible Employee's voluntary contributions dollar-for-dollar for the first 1% of the Employee's compensation and 50% of the next 5% of the Employee's compensation, subject to variations among locations and limits under the Internal Revenue Code. As of December 31, 2022, approximately 2,900 of the Debtors' current and former Employees were participating in the 401(k) Plan. During 2022, the Debtors' 401(k) matching contributions averaged approximately $325,000 per month. The Debtors estimate that, as of the Petition Date, approximately $230,000 in 401(k) Plan matching obligations remain outstanding.

j.   **Workers' Compensation Program**.  Under applicable law in the United States and other jurisdictions, the Debtors are required to maintain workers' compensation programs, or similarly required programs, to cover Employees' workers' compensation claims arising from or related to their employment with the Debtors and to satisfy the Debtors' obligations arising under or related to the Workers' Compensation Programs. The Debtors have purchased insurance to cover Workers' Compensation Obligations that are backed by secured letters of credit for which the Debtors are liable—if the Debtors were to fail to make payments owed under the Workers' Compensation Program, such secured letters of credit would be drawn. For each claim under a Workers' Compensation Program, the Debtors file an injury report with a third-party claims administrator, Sedgwick, which performs an independent investigation of whether the claim is eligible for coverage. Sedgwick administers, reviews, investigates, and pays out any eligible claims and seeks reimbursement of such claims from the Debtors on a monthly basis (monthly invoices typically range from $20,000 to $100,000). The Debtors also maintain a reserve for future anticipated liabilities based on annual actuarial reports that estimate claims based on claims paid during the preceding year. As of April 30, 2023, based on the most recent actuarial report received by the Debtors, the Debtors have accrued approximately $2,800,000 of potential claims on account of Workers' Compensation Obligations. The Debtors are responsible for Workers' Compensation Obligations up to the deductible amount and the limits per occurrence. The Debtors believe that they are current on account of their Workers' Compensation Obligations.

k.   **Contingent Workers**.  From time to time, the Debtors use the personal services of individuals employed by, and provided through, staffing and consulting agencies and of individuals providing personal services directly as independent contractors.

51

Such services are necessary to the operation of the Debtors' businesses. The Contingent Workers include, but are not limited to, warehouse staff, temporary office workers, administrative, clerical, and maintenance staff, information technology specialists, factory staff, drivers, designers, salespeople, customer service representatives, and other short-term service providers as needed on an *ad hoc* basis. As of the Petition Date, the Debtors engage approximately 260 Contingent Workers. Payments to the Contingent Workers vary according to the terms of the Contingent Workers' individual contracts with the Debtors or according to the terms of the Debtors' contracts with the appropriate staffing agencies. It is difficult for the Debtors to determine the total accrued and unpaid prepetition obligations due to the Contingent Workers because of the generally unpredictable and irregular nature of such obligations. During the first quarter of 2023, the Debtors paid out approximately $3,000,000 on account of Contingent Workers Obligations. The Debtors believe that, as of the Petition Date, accrued and unpaid Contingent Workers Obligations total approximately $2,200,000.

l. **Severance Program**. There are several Severance Programs maintained by the Debtors in the ordinary course of business for the benefit of certain Employees and subject to local laws and regulations in certain jurisdictions. Some of these Employees eligible for severance may be considered insiders of the Debtors. The Severance Programs, based on historical practices, provide eligible terminated Employees with cash payments, outplacement services, and contributions to extend healthcare benefits. Eligible Employees include non-union, non-retail store Employees normally scheduled to work 30 or more hours per week and who are terminated by the Debtors for reasons other than unsatisfactory performance. Severance payments are generally one to two weeks of pay per year of service subject to a maximum of 39 weeks. The Debtors pay the employer portion of healthcare premiums during the severance period. During the first quarter of 2023, the Debtors paid approximately $341,000 on account of Severance Obligations. The Debtors estimate that, as of the Petition Date, there is $11,000 of Severance Obligations owed to Employees under the Severance Programs. Although it is difficult for the Debtors to estimate the average monthly cost of the Non-Insider Severance Obligations, given the generally unpredictable and irregular nature of such obligations, the Debtors believe that the monthly cost of maintaining the Non-Insider Severance Programs for Eligible Non-Insider Employees is negligible in the context of the Debtors' aggregate compensation and benefit obligations.

m. **Retention Programs**. The Debtors implemented a retention plan for certain key Employees who are not Insiders of the Debtors to incentivize them to actively support and drive a successful conclusion of the Chapter 11 Cases. The Debtors believe that having the authority to pay the Non-Insider Retention Obligations to non-Insider Employees is essential to their business in order to retain, and provide security to, eligible non-Insider Employees.

n. **Non-Insider Incentive Plans**. In the ordinary course of business, the Debtors offer awards under an annual incentive plan to certain full-time Employees for the purpose of providing such Employees with a direct financial incentive to meet

certain financial goals and other departmental objectives identified by the Debtors. Each Employee's AIP opportunity is based on his or her role and position within the Debtors' businesses.  The actual AIP payment to eligible Employees is determined annually by the Debtors' senior management based on the Debtors' financial performance.  Due to variability of the Debtors' performance, the annual AIP payment amounts have varied significantly from year-to-year.  The AIP is earned over the course of a calendar year and typically paid in the second quarter of the following calendar year.  The Debtors paid non-Insider Employees the AIP for the calendar year 2022 in April 2023, which totaled approximately $2,900,000 in the aggregate.

o. **Miscellaneous Obligations**.   Finally, the Debtors maintain a number of miscellaneous programs aimed at developing Employees' job skills, boosting Employee morale, providing certain recruitment incentives, assisting Employees with certain personal costs, and equipping Employees with the appropriate safety equipment and apparel.  The Debtors estimate that the Miscellaneous Obligations relating to these programs average approximately $10,000 in the aggregate per month.  As of the Petition Date, the Debtors estimate that approximately $2,000 of Miscellaneous Obligations remain outstanding.

111.    The Debtors' ability to pay the Prepetition Employee Obligations in a timely manner is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to their successful reorganization.  I believe that any prepetition amounts that the Debtors will pay in respect of the Prepetition Employee Obligations would be modest relative to the size of their estates.  Non-payment of the Prepetition Employee Obligations or failure to maintain the Employee Programs and pay related administrative obligations would, among other things, have a detrimental effect on the financial and medical well-being and morale of their Employees and lead to the departure of certain Employees.  Such departures would cause a severe disruption in the Debtors' businesses, to the detriment of all parties in interest.

112.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief in the Wages and Benefits Motions should be granted.

     *iii.*    *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From the Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (III) Authorizing Debtors To Return Goods, (IV) Authorizing Debtors To Pay Certain Prepetition Claims of Lien Claimants, and (V) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers (the "**Vendor Motion**")*

113.    The Debtors seek entry of interim and final orders (a) establishing procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors or Foreign Vendors regarding the validity and amount of their respective claims and to determine, in the Debtors' reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), whether such parties so qualify for the relief requested in the Vendor Motion, (b) authorizing, but not directing, the Debtors to pay in the ordinary course of business, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)) and business judgment, prepetition obligations related to Critical Vendors and Foreign Vendors, as well as valid claims of Vendors under section 503(b)(9) of the Bankruptcy Code, (c) granting Prepetition Order Vendors administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed obligations arising from the Debtors' outstanding prepetition purchase orders and other short and longer term contracts for certain Goods received and accepted by the Debtors on or after the Petition Date, and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), under section 363 of the Bankruptcy

Code, (d) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods purchased from Vendors by the Debtors prior to the Petition Date for credit against such Vendors' prepetition claims, (e) authorizing, but not directing, the Debtors to pay, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), all or a portion of the Lienholder Claims, and (f) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

114. In connection with the normal operation of their businesses, the Debtors purchase Goods (including finished goods (*e.g.*, appliances)) and various Goods utilized to manufacture glass housewares (*e.g.,* silica, resins, and other commodities and raw materials) and various Services from Vendors that are unaffiliated with the Debtors are, by and large, the sole source or limited source for unique or customized materials or services, or services needed for compliance with certain laws and regulations, and provide material economic or operational advantages when compared to other available vendors. Without these Critical Vendors, the Debtors could not operate. As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular Goods or Services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill, market share, and estates.

115. In addition, the Debtors purchase a significant portion of their Goods and Services in the ordinary course of business from certain Foreign Vendors that operate in foreign jurisdictions and have little to no connection to the United States. If the Foreign Vendors are not paid, they may withhold vital Goods and Services, thereby interrupting the Debtors' operations.

Such an interruption could have a drastic impact on the Debtors' businesses due to the Debtors' dependence on such Goods and Services, the lack of alternative suppliers, and the time necessary to replace the Foreign Vendors.  Therefore, the Debtors' ability to maintain their businesses depends on their ability to preserve key relationships with the Foreign Vendors.

116.    Despite the global reach of the automatic stay, it is possible that certain Foreign Vendors may seek to enforce claims against the Debtors in foreign jurisdictions or otherwise interfere with the Debtors' operations outside the United States, thereby threatening the Debtors' ability to operate and to attract new business and imperiling the success of the Chapter 11 Cases. Furthermore, some of the Foreign Vendors, who are unfamiliar with United States bankruptcy law and who may be beyond the jurisdiction of the Court, may not be willing to do business with a "Chapter 11 Debtor" absent payment of claims, including accrued prepetition claims, in the ordinary course.

117.    While the Debtors hope and expect to ensure a continuing post-petition supply of Goods and Services by consensual negotiation with their Vendors, the Debtors recognize that their fiduciary duties require them to consider and plan for the Vendors that may refuse to provide future Goods or Services unless their prepetition claims are paid.  Replacement vendors and contractors, even where available, would likely result in substantially higher costs for the Debtors and severe operational disruption.  Moreover, replacement vendors or contractors may lack knowledge of the Debtors' operations or fail to match the Debtors' high standards, thereby placing the safety of the Debtors' employees and the reputation of the Debtors' businesses and services at risk.

118.    A significant portion of the Goods and Services purchased by the Debtors are generally shipped directly to and received by the Debtors on an as-needed basis for the Debtors' operations, all as directed by the Debtors.  As a consequence of the commencement of the Chapter

11 Cases, I believe that many of the Vendors may be particularly concerned that they will not be paid for the delivery or shipment of Goods or the provision of Services after the Petition Date if such delivery, shipment, or provision was based on a Prepetition Order, or that their Prepetition Order Claims would be treated as general unsecured claims.  Accordingly, the Vendors holding such Prepetition Order Claims may refuse to provide Goods or Services to the Debtors (or may recall shipments of Goods) unless the Debtors issue substitute purchase orders post-petition or obtain an order of the Court (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed Prepetition Orders or (b) authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

119.    If the Debtors can pay Critical Vendors and Foreign Vendors their prepetition claims and pay the Prepetition Order Vendors their Prepetition Order Claims, and thereby (a) maintain lower costs of Goods and Services purchased during the post-petition period, (b) ensure delivery of Goods ordered prepetition but not yet delivered, (c) ensure the provision of critical Services, and (d) avoid the severe disruption and safety risks to the Debtors' employees and the disruption and reputation risks to the Debtors' businesses that might result from the cessation of such essential Goods or Services, it is prudent for the Debtors to do so.  Failure to pay the Critical Vendors, the Foreign Vendors, or the Prepetition Order Vendors, and the consequent discontinuity of the Goods or Services rendered by these Vendors, may disrupt the Debtors' businesses.  This would cause significant and irreparable harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the Critical Vendor Claims, the Foreign Vendor Claims, and the Prepetition Order Claims.

120.    The Debtors' Critical Vendors and Foreign Vendors include the following:

a.    **Sourced Finished Goods Vendors**.  The Debtors purchase from the Sourced Finished Goods Vendors various finished goods. These finished goods include,

among other things, electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers, other multi-feature appliances, and housewares. The success of the Debtors' appliance sector of their businesses requires the Debtors keeping shelves stocked with a variety of their products to meet a diverse range of customer needs and demands. In doing so, the Debtors rely on a steady supply of merchandise manufactured abroad by Sourced Finished Goods Vendors. Without a continuous supply of merchandise from the Sourced Finished Goods Vendors, the Debtors risk losing their core identity and damaging customer and brand loyalty that the Debtors worked to cultivate. Thus, the benefits of paying these Sourced Finished Goods Vendors substantially outweigh any associated costs given the critical and ongoing need for the merchandise. As of the Petition Date, the Debtors estimate that they owe the Sourced Finished Goods Vendors, in the aggregate, approximately $41.3 million on account of their prepetition claims.

b. **Specialty Material Vendors**. The Debtors purchase or lease from the Specialty Material Vendors various specialty materials required for the manufacturing and packaging of the Debtors' glass products. These materials include, among other things, silica, soda ash, potassium, cullet, oxygen, natural gas, other minerals, precious metals,[12] components, and customized corrugated packaging. Many of these Specialty Material Vendors provide specialty materials utilized in the production and packaging processes that cannot be easily replaced and are sole source providers. Attempting to find replacement sources of these materials would result in significant additional expenses, and such replacement sources may very well not be available in the volumes required. Additionally, certain Specialty Material Vendors and the materials themselves are dictated by the customer in order to meet certain specifications. Thus, the benefits of paying these Specialty Material Vendors substantially outweigh any associated costs given the crucial roles that these materials play in the ongoing viability of the Debtors' businesses. As of the Petition Date, the Debtors estimate that they owe the Specialty Material Vendors, in the aggregate, approximately $8.4 million on account of their prepetition claims.

c. **Logistics Providers**. The Debtors employ the services of certain third-party Logistics Providers that provide to the Debtors a range of supply chain services, including highly engineered solutions, customized products used during the shipping and transportation process, and high-value-add contract logistics. The Logistics Providers arrange for the transportation and delivery of goods from the Debtors' manufacturing facilities to their customers and from the Debtors' suppliers (particularly the kitchen appliance manufacturers) to the Debtors'

---

[12] As part of their manufacturing processes, the Debtors use precious metals, such as platinum and rhodium, to coat high wear areas of its glass furnaces and parts used in the glass melting process. These metals essentially comprise a working component of the Debtors' machinery and are not part of the finished products. Given the significant costs of such precious metals, the Debtors lease platinum from Bank of Montreal and rhodium from SCMI US Inc. As part of these arrangements, the Debtors could be required to purchase these precious metals at a given day's spot rate, thereby resulting in potential obligations in the amount of approximately $35 million to $38 million. The Debtors are negotiating revised terms with their lessors of precious metals and would file a motion with the Court seeking approval of any resolved terms.

facilities.  The Debtors would risk disruption in their supply and delivery chain and would be unable to transport their products in a timely and cost-effective manner absent the continued services provided by the Logistics Providers.  As of the Petition Date, the Debtors estimate that they owe the Logistics Providers, in the aggregate, approximately $320,000 on account of their prepetition claims.

d.  **Service Providers**.  The Debtors employ other various skilled Service Providers to ensure that the Debtors' operations run as efficiently as possible.  These services are vital to ensuring continuing operations of manufacturing and distribution facilities and administrative operations utilized by the Debtors on a daily basis.  The Service Providers largely perform maintenance, repair, and operational services, supply the goods (*e.g.*, lubricants, component parts, molds, and other crucial components) necessary for the continued manufacturing operations for the U.S. housewares business, and provide outsourced information technology services and administrative support, including processing functions, document review, and daily transaction coding.  As of the Petition Date, the Debtors estimate that they owe Service Providers, in the aggregate, approximately $4.1 million on account of their prepetition claims.

e.  **Safety and Regulatory Compliance Vendors**.  The Debtors employ various skilled Safety and Regulatory Compliance Vendors to ensure that the Debtors' operations fully comply with the safety and regulatory requirements, provide the Debtors' employees with a safe work environment, and provide the Debtor's customers and consumers products that are safe for use.  Specifically, the Safety and Regulatory Compliance Vendors provide Goods and Services that include, among other things, facility security, medical supplies, safety training, employee safety equipment, and products and materials testing.  Failure to comply with such regulations could result in injuries, fines, and potential interruption of operations.  Accordingly, the benefits of paying the Safety and Regulatory Compliance Vendors significantly outweigh any associated costs given the critical roles that the Safety and Regulatory Compliance Vendors play in the safety of the Debtors' employees and the ongoing viability of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that they owe Safety and Regulatory Compliance Vendors, in the aggregate, approximately $320,000 on account of their prepetition claims.

f.  **Foreign Vendors**.  In order to maintain and service their operations, the Debtors purchase many of the same goods and services described in the foregoing subparagraphs (a)-(d) outside of the United States from Foreign Vendors, including, among others, Sourced Finished Goods Vendors.  Importantly, a substantial percentage of the Goods described above in paragraph (a) consist of Foreign Vendors, including numerous manufacturers in China.  As of the Petition Date, the Debtors estimate that they owe Foreign Vendors, in the aggregate, approximately $45.3 million on account of their prepetition claims.

121.  The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to Critical Vendors and Foreign Vendors,

would be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims are on account of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date.  As of the Petition Date, the Debtors estimate that, in the aggregate, approximately $9.1 million of the $74.3 million of total outstanding accounts payables would be entitled to administrative expense status as 503(b)(9) Claims.  As they are administrative claims incurred in the ordinary course of the Debtors' businesses, I believe that they are authorized to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the Bankruptcy Code.

122.    The Debtors estimate that the maximum amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims during the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $17.3 million.  Similarly, the Debtors estimate that the maximum amount of claims that the Debtors believe would be entitled to administrative expense status as 503(b)(9) Claims during the first 30 days of the Chapter 11 Cases totals, in the aggregate, approximately $4.73 million.

123.    Finally, the Debtors estimate that the amount needed to pay the Critical Vendor Claims and the Foreign Vendor Claims after the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $40.2 million.  The Debtors also estimate that the amount of claims entitled to administrative expense status as 503(b)(9) Claims after the first 30 days of the Chapter 11 Cases is, in the aggregate, approximately $4.37 million.[13]

---

[13]    Neither the Interim Period Vendor Claims Cap nor the amounts requested to be authorized thereafter include any prepetition claims that the Debtors seek to pay pursuant to other orders requested to be entered by the Court in the Chapter 11 Cases.

124.     A summary of the relief that the Debtors are seeking related to the Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims, on both interim and final basis, is set forth below:

| Categories | Total | Critical and Foreign Vendor Claims | 503(b)(9) Claims |
|---|---|---|---|
| Interim Relief in Total | $22,000,000 | $17,270,000 | $4,730,000 |
| Final Relief in Total | $66,540,000 | $57,440,000 | $9,100,000 |

125.     The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts, in their reasonable discretion (with the consent of the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and consent of the ABL DIP Agent (acting at the direction of the requisite ABL DIP Lenders)), as they become due and payable in the ordinary course of business operations.  The Debtors' cash on hand, the cash generated by the Debtors' businesses, and the proceeds of the post-petition credit facilities would provide ample liquidity for payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, and 503(b)(9) Claims, as well as the ongoing obligations of the Debtors' continued operations in the ordinary course during the pendency of the Chapter 11 Cases.

126.     In operating their businesses, the Debtors use and make payments to shippers, contractors, mechanics, warehousemen, and technical engineers that repair, maintain, equip, supply, transport, store products, and otherwise service necessary equipment and machinery.  As of the Petition Date, the Debtors estimate that they owe approximately $1.7 million to Lien Claimants for prepetition goods, labor, shipping, delivery, and other charges.

127.     The Debtors seek authority to pay the prepetition charges of the Lien Claimants who, under applicable law, have the potential to assert statutory liens against property of the Debtors or their customers if the Debtors fail to pay for Goods provided or Services rendered

before the Petition Date.  Failure to pay for such Goods and Services may result in material disruption to the Debtors operations, as set forth below.

128.    In order to ensure efficient operations, maintain safe and orderly working conditions at their operating locations, and satisfy contractual arrangements with their customers, the Debtors, at times, hire third-party service providers or purchase Goods to use to care for the manufacturing facilities.  These purchased Goods and Services include, among others, (a) common carrier and freight transport, (b) construction and general contractor service and related materials, (c) equipment procurement, service, and repair, (d) mechanical work, and (e) storage.  If these costs are not paid, then there could be significant negative repercussions affecting the Debtors' ability to operate their businesses in an effective and safe manner. Any disruption in the flow of the aforementioned Goods, Services, parts, equipment, shipping, or supplies would immediately impact on-time delivery, production of products, and operation of the Debtors' businesses. Further, any disruption in the flow of parts or Services would cause the Debtors immediate and substantial economic harm and erode their ability to meet delivery obligations.

129.    Much of the production equipment in use by the Debtors is highly customized and both industry and site specific, and the available pool of experienced Lien Claimants is therefore limited.  Furthermore, the technical knowledge of the Debtors' engineers and contractors is, in many cases, specially tailored or unique to the Debtors' businesses.  For example, the Debtors manufacture Corelle® products in Corning, New York utilizing a one-of-a-kind manufacturing process for which only a limited number of third parties have the knowledge and skills to furnish, operate, and repair the necessary equipment used in such manufacturing process.  Although equipment, engineers, and contractors can in theory be obtained or sourced elsewhere, doing so economically and with new providers represents a significant logistical and financial hurdle.  The

benefits of paying these equipment providers significantly outweigh the long-term costs of failing to pay them for prepetition debts owed by the Debtors.

130.    While the Debtors themselves employ on-site mechanics and engineers at many of their properties, the Debtors cannot afford to employ sufficient mechanics to repair and maintain all the specialized equipment the Debtors operate in all possible locations at which service might be required.  Accordingly, in many cases, the Debtors have service agreements or longstanding business relationships with third-party maintenance Lien Claimants and even individuals trained and licensed to provide maintenance services at the various sites.  The Debtors have, over the years, nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive.  In addition, these Lien Claimants have developed in depth knowledge of the specific mechanical and engineering requirements of the facilities and/or other equipment.  It is essential to the continuity of the Debtors' operations, and the preservation of value of the Debtors' estates, that the Debtors maintain their relationships with these Lien Claimants.

131.    In sum, because the Debtors are dependent on many third-party Lien Claimants, it is essential that the commencement of the Chapter 11 Cases not give any third-party Lien Claimants reason or excuse to cease performing Services or to retain products, equipment, or other Goods.

132.    I submit that the relief requested in the Vendor Motion represents a sound exercise of the Debtors' business judgment, is within the Debtors' ordinary course of business, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.  Indeed, the relief sought in the Vendor Motion is amply justified by the critical need for the continued receipt and/or distribution of Goods and Services.  The prompt payment of the Critical

Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims, which may be necessary to obtain the delivery and/or provision of the related Goods and Services, is within the Debtors' ordinary course of business and crucial for orderly and efficient operation of the Debtors' businesses. Unless the Debtors have the authority to pay for these essential Goods and Services, their businesses will suffer irreparable harm.

133.    I submit that the relief requested in the Vendor Motion is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders. I believe that payment of the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims will be necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with the Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants, and maximize the value of the Debtors' assets for the benefit of all stakeholders. The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date. During this period, the Debtors, their attorneys and financial advisors, and other professionals will be focusing on stabilizing operations in chapter 11. At the same time, while the Debtors are distracted with stabilizing their businesses and strategic planning, Critical Vendors, Foreign Vendors, Prepetition Order Vendors, other Vendors, and Lien Claimants may attempt to assert their considerable leverage and deny provision of Goods and Services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought in the Vendor Motion is not granted, such Vendors or Lien Claimants would have no incentive to continue to supply Goods or Services to the Debtors on Customary Trade Terms.

134.    I strongly believe that the uninterrupted supply of Goods and Services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.  The continued availability of trade credit, in amounts and on terms consistent with those that the Debtors have worked hard to obtain over the years, is also clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and to focus on returning to profitability. I believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms would enable the Debtors to maintain stable business operations at this critical time, to maintain their competitiveness, and to maximize the value of their businesses for the benefit of all interested parties.  Conversely, any disruption or cancellation of deliveries of Goods or provision of essential Services, and any concurrent deterioration of trade credit, could spell disaster for the Debtors' restructuring efforts.

135.    In addition, I believe that, if the Lienholder Claims are not paid, there could be significant negative repercussions.  The Lien Claimants could assert Liens that could, at the very least, result in the disruption in the flow of the services, parts, equipment, shipping, or supplies of the Debtors' businesses.  For example, the Lien Claimants could potentially assert Liens against or maintain possession of the Debtors' materials and equipment necessary for the performance of their business segments and delivery obligations.  The Lien Claimants could also withhold services and equipment that are necessary to maintain an efficient, orderly, and safe working environment at Debtors' operating locations.  This would no doubt jeopardize the Debtors' relationship with its customer base.  Although the Debtors can, in theory, obtain equipment and services elsewhere, due to the highly customized and industry-specific nature of these equipment or services, doing so represents a significant financial and logistic hurdle.  Based on these potentially value-destroying

consequences, I submit that the relief requested in the Vendor Motion is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders. Absent this relief, the value of the Debtors' estates would suffer, possibly precipitously. Consequently, the Debtors' stakeholders would benefit if the requested relief is granted.

136.   Based on the foregoing, the Debtors' ability to pay the Critical Vendor Claims, Foreign Vendor Claims, Prepetition Order Claims, 503(b)(9) Claims, and Lienholder Claims is critical to the ongoing operations of their businesses, as discussed above, and therefore necessary to their successful reorganization.

137.   I believe that sufficient assets should exist to pay all 503(b)(9) Claims in full under a proposed plan of reorganization. Accordingly, to the extent that the 503(b)(9) Claims give rise to priority claims, the relief requested in the Vendor Motion would only affect the timing of the payment of these priority 503(b)(9) Claims and would not prejudice the rights of general unsecured creditors.

138.   I believe that the relief requested in the Vendor Motion to pay Prepetition Order Claims in the ordinary course would merely confirm the treatment of such obligations under the Bankruptcy Code and assure the Prepetition Order Vendors that they would be paid for Goods received and accepted by the Debtors post-petition in the ordinary course of business. The relief would also help ensure a continuous supply of materials that add value to the Debtors' operations. Absent the relief requested in the Vendor Motion, however, the Debtors would be required to expend substantial time and resources convincing many Prepetition Order Vendors of the Debtors' authority to make certain payments, reissuing Prepetition Orders, or even obtaining further relief from the Court to provide the Prepetition Order Vendors with the assurance of such administrative priority, causing disruption to the Debtors' businesses. Without the Goods, the Debtors'

businesses would be harmed, and their opportunity to preserve and enhance the value of their assets would be jeopardized.  The authorization sought in the Vendor Motion would not prejudice the Debtors' ability to contest the validity of any invoices, and it would not extend to any amounts that are disputed by the Debtors or that are in respect of Goods that are not received and accepted by the Debtors subsequent to the Petition Date.

139.   I submit that an order authorizing, but not directing, returns of Goods to Vendors for credit against their prepetition claims, subject to the prior rights of holders of security interests in such Goods or the proceeds of such Goods, to the extent of such interests, is in the best interests of the Debtors' estates.  Such relief would enable the Debtors to (a) obtain proper credit for otherwise unusable Goods, cost-effectively and without undue financial risk, and (b) effectively manage inventory and enhance the Debtors' financial performance and the value of the assets of their estates.

140.   Many of the Lien Claimants who have provided prepetition Goods or Services to the Debtors may hold Liens against the Debtors' property under applicable producer's, mechanic's, repairman's, materialman's, warehousemen's, and shipping lien statutes, and their foreign equivalents.  I submit that to the extent that such Liens and/or Interests are perfected or may be perfected, paying the Lienholder Claims would not reduce unsecured creditor recoveries in the Chapter 11 Cases.  Indeed, payment now only provides such parties with what they would be entitled to receive eventually upon consummation of a chapter 11 plan, without any interest costs that might otherwise accrue during the Chapter 11 Cases.  Far from being harmed, the Debtors' unsecured creditors would benefit from the Debtors' smooth operation transition into chapter 11 bankruptcy.

141.     Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Vendor Motion should be granted.

>    *iv.*     *Debtors' Emergency Motion For Entry of Interim and Final Orders Authorizing (I) Debtors To Honor Prepetition Obligations to Customers and Otherwise Continue Customer Practices and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Customer Programs Motion**")*

142.     The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their reasonable business discretion, to (i) fulfill and honor the Customer Obligations (as defined below) as they deem appropriate and (ii) continue, renew, replace, implement new, and terminate any Customer practices as they deem appropriate, in the ordinary course of business, without further application to the Court and (b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

143.     The Company operates in a highly competitive market for kitchenware and appliances.   Customers can purchase many of the Customer Products from the Company's competitors.   As a result, retaining the Company's relationships with its Customers is a matter of paramount importance to the Debtors, their estates, and all parties in interest.   Without expanding their Customer Products' brands and directly reaching Consumers at online or physical Points of Sale, the profitability of the Debtors' Customer Products would be reduced.   Moreover, the inability to maintain stability in existing Customer relationships would irreparably damage the Debtors' profitability and outlook.   It is essential, therefore, that the Debtors maintain their current Customers through this challenging period without interruption.   Fulfilling the Customer Obligations accomplishes this goal by ensuring Customer satisfaction and generating repeat business and net revenue increases.

144.    Customer relationships are valuable assets of the Company and the Debtors' estates, and the commencement of the Chapter 11 Cases may negatively affect Customers' attitudes and behavior toward the Company unless, *inter alia*, the Debtors can take the measures requested by the Customer Programs Motion.  In particular, the Company's goodwill and ongoing business relationships may erode if its Customers perceive—whether correctly or not—that the Company is unable or unwilling to fulfill the prepetition commitments it made through the Customer Obligations.  Preserving the "business as usual" atmosphere (especially for the non-Debtor subsidiaries not part of the Chapter 11 Cases), and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption to the Company's fulfillment of its Customer Obligations, would facilitate the Debtors' efforts to maximize the value of their estates in the Chapter 11 Cases.

145.    Before the Petition Date, and in the ordinary course of business, the Company incurred various Customer Obligations related to their wide variety of Customer Products provided under various contracts and arrangements.  It is essential and in the best interests of the Debtors, their estates, and their creditors that the Debtors be permitted to honor their prepetition and post-petition Customer Obligations and to continue or implement new Customer practices in the ordinary course of the Debtors' businesses as the Debtors deem necessary.  For the year 2022, the Debtors estimate that they incurred approximately $105 million on account of Customer Obligations related to Customer practices.  I submit that the benefits to the Debtors, their estates and creditors, and all other parties in interest of continuing the Customer practices and paying the Customer Obligations on a timely basis far exceed the costs associated with such practices and payments.

146.    The Debtors' Customer Programs include the following:

(a)  **Refund and Exchange Programs**.  The Company allows its Consumers to return or exchange eligible merchandise pursuant to customary refund and exchange programs (subject to customary verification).  Similarly, to incentivize new and existing Retailers to include the Company's Customer Products for re-sale, the Company utilizes various practices and incurs associated costs designed to reduce the costs associated with, and increase the efficiency in the handling of, damaged, mislabeled, unused, or returned Customer Products for Retailers.  The Refund and Exchange Programs are critical to maintaining the goodwill of the Company's Customer base, as they allow the Debtors to protect Customer confidence and ensure Customer satisfaction.  Programs like the Refund and Exchange Programs are common among retailers, manufacturers, and distributors of consumer products, and similar programs are employed by the Company's competitors.  During the first quarter of 2023, the Debtors incurred on average approximately $150,000 per month of expenses on account of the Refund and Exchange Programs.  It is difficult for the Debtors to quantify the costs associated with the Refund and Exchange Programs, since they are typically applied by simply adjusting the affected invoices or applied against future invoices.

(b)  **Consumer Promotions**.  In the ordinary course of business, and across its various Points of Sale, including those that are direct-to-consumer, the Company conducts certain permanent and temporary sales promotions for its Consumers that are an integral part of the sales package available to Consumers and a fundamental part of the Company's ongoing operations and marketing effort.  Consumers are encouraged by various of the Consumer Incentive Programs to purchase more Customer Products from the Company to achieve greater incentives or savings, which results in larger net revenue for the Company.  The Consumer Incentive Programs also enable and encourage Retailers to actively and successfully promote the Company's Customer Products.  It is difficult for the Debtors to quantify the costs associated with the Consumer Promotions and the Consumer Incentive Programs, since they are typically applied by simply adjusting the affected invoices.  However, the Debtors believe that, as of the Petition Date, their obligations relating to the Consumer Promotions and the Consumer Incentive Programs are *de minimis*.

(c)  **Retailer Promotions**.  In the ordinary course of business, and across its various Points of Sale, the Company also conducts certain permanent and temporary working trade events for and with its Retailers.  The Company maintains agreements with certain Retailers to deduct agreed-upon amounts from the Company's invoices, or provide other forms of reimbursement, in exchange for a broad range of promotional activities, including cooperative advertising, data analytics, marketing services, support of higher volume sell-through of existing Customer Products, new Customer Product introductions, or new points of distribution within the Retailer's existing network.  During the first quarter of 2023, although the Debtors estimate that they spent, paid, or issued invoice

70

deductions aggregating approximately $4.6 million on account of Retailer Promotions and the Retail Incentive Programs, the Debtors believe that the Retailer Promotions and the Retail Incentive Programs generated many multiples of this amount in revenue during this time period.

(d) **Off-Invoice Allowances**.  The Off-Invoice Allowances include the Company providing (a) flat-rate and payment term discounts, (b) defective allowances, and (c) other non-compliance charges (*e.g.*, claim deductions, incorrect quantities, early or late shipments of Customer Products, etc.).  The Company "funds" the Off-Invoice Allowances by deducting the relevant amounts directly from the Company's invoice to the applicable Retailer.  During the first quarter of 2023, although the Debtors incurred an average of approximately $1.6 million per month on account of Off-Invoice Allowances, the Debtors believe that the Off-Invoice Allowances generated many multiples of this amount in revenue during this time period.  Accordingly, the Off-Invoice Allowances are a critical part of the sales initiatives offered to Retailers and an essential part of the Company's ongoing efforts to actively and successfully sell the Company's Customer Products.

(e) **Product Warranties**.  Consistent with industry practice the Debtors provide their Customers with Product Warranties covering certain qualifying product non-conformities, ranging from one year to lifetime coverage, which generally cover product defects not attributable to external factors (such as damage caused by the Customer or by other factors beyond the Company's control).  The Product Warranty Program's costs are funded in part by third-party manufacturers of products sold by the Debtors and in part by the Debtors.  To account for such costs, the Company maintained a reserve of $1.4 million as of March 31, 2023.  As of the Petition Date, the Debtors are not aware of any outstanding cash obligations owing on account of the Product Warranty Program.

(f) **Marketing Programs**.  From time to time, the Company participates in and sponsors several Customer and industry-specific events and conducts marketing and other promotional activities to promote the Company's Customer Products to Customers, which drive higher sales volumes and revenues for the Company.  The Debtors' notable Marketing Programs include their sponsorship of the ShopRite LPGA Classic (which includes donations to various food banks) and their participation in collaborative events with Walmart and other Customers (*e.g.*, a Home Depot Foundation event supporting armed forces and communities impacted by natural disasters).  During the first quarter of 2023, the Debtors estimate that they spent less than $10,000 on account of Marketing Programs; however, the Debtors estimate that, as of the Petition Date, approximately $50,000 of the Debtors' Marketing Programs obligations remains outstanding.

147.     The Debtors' ability to maintain and pay Customer Obligations in a timely manner is critical to the ongoing operation of the Company's businesses, as discussed above, and therefore necessary to the Debtors' successful reorganization.  I believe that any prepetition amounts that the Debtors will pay in respect of Customer Obligations would be small relative to the size of their estates.  The failure to satisfy the Customer Obligations could have a material adverse impact on the day-to-day operations of the Company's businesses and cause an irreparable loss of Customer support and confidence, thus potentially substantially diminishing the value of the Debtors' estates. If the Debtors are prohibited from honoring the Customer Obligations and maintaining their Customer practices consistent with their past business practices, Customers may lose confidence in the Company's ability to honor orders.  Ultimately, the damage from refusing to honor the Customer Obligations far exceeds the costs associated with honoring prepetition obligations and continuing these practices.  The relief requested in the Customer Programs Motion will protect the Company's goodwill during this critical time and enhance the Debtors' ability to maximize value for the estate.

148.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Customer Programs Motion should be granted.

     *v.*    *Debtors' Emergency Motion For Entry of Interim and Final Orders Establishing Notification and Hearing Procedures For, and Approving Restrictions on, Certain Transfers of and Declarations of Worthlessness with Respect to Equity Interests in the Debtors' Estates (the "***Tax Attribute Motion***")*

149.     The Debtors seek entry of interim and final orders, pursuant to sections 105(a) and 362 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, to enforce the automatic stay by implementing court-ordered procedures intended to protect the Debtors' estates against the

possible loss of valuable tax assets that could flow from stay violations.  In particular, the Proposed Orders would (a) authorize, but not direct, the Debtors, in their sole discretion, to establish and implement restrictions on, and notification requirements regarding the Beneficial Ownership of, certain transfers of, or declarations of worthlessness with respect to, Holdings' Common Shares, IB Inc.'s Exchangeable Common Shares, shares of Holdings' Series A Preferred Stock, Holdings' Special Voting Shares, IB Inc.'s Exchangeable Preferred Shares, or any Beneficial Ownership therein, (b) direct that any purchase, sale or other transfer of, or declaration of worthlessness with respect to, Stock in violation of the Procedures shall be null and void *ab initio*, (c) approve the form of notice notifying holders of Stock of the Procedures and (d) grant related relief.

150.    The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or directly offset federal tax liability in future years.  Such Tax Attributes may also be utilized by the Debtors to offset any taxable income generated by transactions consummated during the Chapter 11 Cases.  Failure to preserve such assets could cause the Debtors' estates to suffer a significant tax liability to the detriment of stakeholder interests.  Accordingly, the value of the Tax Attributes would inure to the benefit of all of the Debtors' stakeholders.

151.    I believe that the relief requested in the Tax Attribute Motion is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Attribute Motion should be granted.

> vi.   *Debtors' Emergency Motion For Entry of an Order Authorizing (I) Debtors To (A) Continue and Renew their Liability, Property, Casualty, Surety Bond, and Other Insurance Programs and Honor All Obligations in Respect Thereof, (B) Honor and Renew the Terms of the Premium Financing Agreement and Pay the Financing Agreement Payments Thereunder and (C) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Insurance Motion**")*

152.   The Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to maintain, continue, review, purchase, and renew, in their sole discretion, their various liability, property, casualty, surety bond, and other insurance and reinsurance programs in the ordinary course of their businesses  through several private insurance carriers and sureties on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, (b) authorizing, but not directing, the Debtors to honor and renew, in their sole discretion, the terms of the Premium Financing Agreement and pay the Financing Agreement Payments thereunder, (c) authorizing, but not directing, the Debtors to enter into, in their sole discretion, new premium financing agreements in the ordinary course of business, and (d) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to fund the foregoing.  This would include, among others, authorization to (x) pay all amounts arising under the Insurance Programs, whether due and payable before, on, or after the Petition Date, (y) pay any and all financial obligations arising under the Premium Financing Agreement, including the Financing Agreement Payments, and (z) renew current or obtain new insurance policies, premium financing agreements, and surety bonds as needed in the ordinary course of business.

153.   In the ordinary course of their businesses, the Debtors, like other similar enterprises, maintain various Insurance Programs (some of which may be required by the Debtors' prepetition debt documents, corporate documents, and/or applicable law), through the Carriers.  A non-

exhaustive summary of the Debtors' Insurance Programs is annexed to the Proposed Order attached to the Insurance Motion.

154.    The Insurance Programs include coverage for, among other things, personal injury, property damage, operation of vehicles, flood, product recall, breach of duty by officers or directors, cyber liability, fiduciary liability, employment liability, commercial crime, equipment damage, casualty, and various other property-related and general liabilities.    As part of the Insurance Programs, the Debtors also maintain (a) a workers' compensation policy covering claims that exceed the Debtors' self-insured coverage thresholds and (b) surety bonds to satisfy the requirements of certain third parties or federal, state, or local regulations, including U.S. customs importer and drawback bonds.    All of the Insurance Programs are essential to the ongoing operation of the Debtors' businesses and the preservation of the value of the Debtors' estates.

155.    Most of the Insurance Programs (excluding surety bonds) are scheduled to renew on July 1, 2023.    The premiums for most of the Insurance Programs are determined annually and are due either in their entirety at policy or bond inception or in periodic installments throughout the policy or bond term.    The Debtors make such payments to various parties, including directly to the Carriers and indirectly to the Carriers through the Broker in the ordinary course of business.

156.    The Debtors' aggregate annual Insurance Premiums under the Insurance Programs total approximately $6.1 million (excluding (a) extension and runoff premiums for the Executive Risk Management Liability, First Excess Directors and Officers insurance policies, Second Excess Directors and Officers insurance policies, and Third Excess Directors and Officers Insurance policies and (b) premiums for the surety bonds).    The Debtors currently finance the Insurance Premiums, as well as the Broker's Fees, pursuant to a premium financing agreement  with AFCO Credit Corporation and pay approximately $610,000 per month, which results in an annual interest

rate of approximately 3.74%.[14]   The Premium Finance Agreement is an integral part of the Company's Insurance Programs and vital to its ability to finance and procure the Insurance Programs without the need to pay all of its Insurance Premiums and Broker's Fees in one large lump sum.  As of the Petition date, the Debtors do not believe that any prepetition amounts on account of Financing Agreement Payments remain outstanding.  The Debtors believe that all material Insurance Premiums that were due and payable on or prior to the Petition Date have been fully paid, but, out of an abundance of caution, the Debtors seek authority to satisfy any unpaid prepetition Insurance Premiums.

157.    Pursuant to the Insurance Programs, the Debtors may be required to pay various deductibles or retention amounts, depending upon the type of claim and insurance policy involved. Under certain policies, the Carriers and a third-party administrator for casualty losses, Sedgwick CMS Holdings, Inc., may pay claimants and then invoice the Debtors or draw funds directly from the Debtors' bank accounts for reimbursement of claims paid within any Insurance Deductible.  In such situations, the Carriers may have prepetition claims against the Debtors.  As of the Petition Date, the Debtors do not believe that there are any material prepetition obligations owed to Carriers relating to Insurance Deductibles, but, out of an abundance of caution, the Debtors seek authority to satisfy any unpaid prepetition Insurance Deductibles.

158.    The Debtors employ Southeast Series of Lockton Companies LLC to assist them with the procurement and management of the Insurance Programs.  The Broker also provides other consulting services to the Debtors.  The Debtors estimate that they pay the Broker annual fees in

---

[14]   The Debtors do not finance the following premiums:  (a) those Insurance Premiums paid on account of Wisconsin workers compensation, flood insurance at Corning, and professional liability insurance covering nurses at plant, (b) extension and runoff premiums for the Executive Risk Management Liability, First Excess Directors and Officers insurance policies, Second Excess Directors and Officers insurance policies, and Third Excess Directors and Officers Insurance policies, and (c) premiums for the surety bonds.

the approximate amount of $250,000 in the aggregate.  Employment of the Broker allows the Debtors to obtain and manage the Insurance Programs in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies and surety bonds.  Accordingly, I believe that it is in the best interest of their estates and economic stakeholders to continue their business relationships with the Broker.  As of the Petition Date, the Debtors do not believe any prepetition Broker's Fees remain outstanding.

159.    The nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The non-payment of any premiums, deductibles, or related fees under the Insurance Program could result in one or more of the Carriers terminating or declining to renew their insurance policies or surety bonds, or refusing to enter into new insurance policies or surety bonds with the Debtors in the future.  If any of the Insurance Programs lapse without renewal, the Debtors could be in violation of state and/or federal law and be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

160.    Moreover, pursuant to contractual, legal, or regulatory obligations with numerous third-party property owners, customers, suppliers, distributors, contractors, lenders, and governmental authorities, the Debtors are obligated to remain current with respect to certain of the Insurance Programs.  Furthermore, the Debtors must maintain certain of the Insurance Programs to comply with the operating guidelines of the Office of the United States Trustee for Region 7. Thus, in order for the Debtors to maintain their operations in compliance with various contractual, legal and regulatory obligations, the Debtors must be able to continue the Insurance Programs without disruption.

161.    Even where coverage is not expressly required by applicable law, the Debtors are nevertheless compelled by sound business practice to maintain essential insurance or surety bond coverage.  Any interruption in such coverage would expose the Debtors to a variety of risks, including the possible (a) incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Programs, (b) incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims, (c) inability to obtain similar types and levels of insurance or surety bond coverage, and (d) incurrence of higher costs for reestablishing lapsed policies or surety bonds or obtaining new insurance coverage or surety bonds.

162.    The Debtors' ability to pay their Insurance Obligations (including the Broker's Fees) and the Financing Agreement Payments in a timely manner and maintain and honor their Insurance Programs and obligations under the Premium Financing Agreement is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to their successful reorganization.  The Debtors believe that any prepetition amounts that they may pay in respect of Insurance Programs (including the Broker's Fees) and the Premium Financing Agreement would be small relative to the size of the Debtors' estates and the critical benefits provided by the Insurance Programs and the Premium Financing Agreement.  As noted above, interruption of the Debtors' insurance or surety bond coverage could, among other things, cause the Debtors to violate state and/or federal law and expose the Debtors to direct liability for significant claims that otherwise would be covered by insurance or a surety bond, thus potentially substantially diminishing the value of the Debtors' estates.  For the Debtors to pay what would be relatively small prepetition amounts under the Insurance Programs (including the Broker's Fees) and the Premium Financing Agreement to avoid such outcomes is in the best interests of the

Debtors, their estates, and all of the Debtors' stakeholders and other parties in interest. Accordingly, the continuation of the Insurance Programs and the Premium Financing Agreement and the payment of any prepetition Insurance Premiums and Financing Agreement Payments, including any payments to the Premium Financer and the Broker, falls within the sound business judgment of the Debtors and would benefit, rather than prejudice, the Debtors' creditors by preserving the property of the Debtors' estates.

163.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

vii.    *Debtors' Emergency Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utilities Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "***Utilities Motion***")*

164.    The Debtors seek entry of an order, pursuant to sections 105 and 366 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and section B of the Complex Procedures (a) prohibiting the Utilities from altering, refusing, or discontinuing any Utility Services to, or discriminating against, the Debtors on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (b) determining that the Debtors' proposed offer of deposits, as set forth in the Utilities Motion, provides the Utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and (c) approving procedures for resolving requests by Utilities for additional or different assurances beyond those set forth in the Utilities Motion.

165.    In connection with the operation of their businesses and management of their properties, the Debtors obtain Utility Services, including electricity, natural gas, telephone, water and sewage, telecommunications, waste removal, and other similar services, from a number of Utilities.  The Debtors have made an extensive and good-faith effort to identify all of the Utilities that provide the Debtors Utility Services and to include such Utilities on the Utilities List. Nonetheless, the Debtors reserve the right to supplement the Utilities List by filing a notice a Supplemental Notice at a later date with the Court if necessary.

166.    During the first quarter of 2023, the Debtors paid an average of approximately $1.8 million per month on account of all Utility Services.  The Debtors pay Utility Services through their accounts payable system or as a component of their rent payments to certain landlords.  To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed Utility Services invoices.

167.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the preservation of the value of the Debtors' estates.  The Debtors' businesses are supported by, among other things, corporate offices, manufacturing facilities, and warehouses, all of which depend on reliable delivery of power and other Utility Services.  Should any Utility alter, refuse, or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted.  The impact of this disruption on the Debtors' business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' estates.

168.    The relief requested in the Utilities Motion will help ensure that the Debtors' operations will not be disrupted.  Furthermore, the relief requested provides the Utilities with a fair and orderly procedure for addressing requests for additional or different adequate assurance. Without the Adequate Assurance Procedures, as defined in the Utilities Motion, the Debtors could

be forced to address numerous requests by the Utilities in a disorganized manner at a critical period in the Chapter 11 Cases and during a time when the Debtors' efforts could be more productively focused on the continuation of the Debtors' operations and consummation of a chapter 11 plan for the benefit of all parties in interest.

169.    I believe that the Utilities have "adequate assurance of payment" even without the Proposed Adequate Assurance.   Contemporaneously herewith, the Debtors are seeking authorization to use cash collateral and enter into the DIP Facilities, which would enable them to pay their operating costs, including any utility costs, as they come due.  The Debtors, thus, anticipate having sufficient resources to pay, and intend to pay, any and all valid post-petition obligations for Utility Services in a timely manner.  In addition, the Debtors' reliance on Utility Services for the operation of their businesses provides them with a powerful incentive to stay current on their utility obligations.

170.    Notwithstanding the foregoing, I believe that the Proposed Adequate Assurance and the Adequate Assurance Procedures are reasonable, satisfy the requirements of section 366 of the Bankruptcy Code, and are necessary for the Debtors to carry out their reorganization efforts. If they are not approved, the Debtors could be forced to address payment requests by any Utility in a disorganized manner, which would distract management from focusing on the Debtors' reorganization and consummation of a chapter 11 plan.  Moreover, on the 30th day following the Petition Date, the Debtors could be surprised by a Utility unilaterally (a) deciding that it is not adequately protected, (b) discontinuing service, or (c) making an exorbitant demand for payment to continue service.  Such discontinuation of Utility Service could put the Debtors' reorganization efforts in jeopardy.

171.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

      *viii.*    *Debtors' Emergency Motion For Entry of an Order Authorizing (I) Debtors To Pay Certain Prepetition Taxes, Governmental Assessments, and Fees and (II) Financial Institutions To Honor and Process Related Checks and Transfers (the "**Taxes Motion**")*

172.    The Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, Taxes and Fees, whether asserted prior to, on, or after the Petition Date, and (b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

173.    In the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and/or incur (a) Income Taxes (federal, state, and local), (b) Sales and Use Taxes, (c) Property Taxes, (d) Environmental, Safety, and Other Permits, Fees, and Assessments, (e) Customs Duties, (f) Penalties, and (g) Other Taxes and Fees.  The Debtors remit the Taxes and Fees to various federal, state, and local governmental authorities, both domestic and foreign, including taxing, permitting, and licensing authorities.  Withholding of employment and wage-related taxes is addressed in the Wages Motion.  I believe that, as of the Petition Date, approximately $6.4 million of the Taxes and Fees have accrued and remain outstanding.  After entry of the Proposed Order, the Debtors intend to pay such outstanding amounts as soon as possible or as they come due in the ordinary course of business.

174.    The Debtors have federal, state, and local income tax obligations to certain Governmental Authorities related to their income in various jurisdictions.  For the year of 2022, the Debtors paid approximately $11.6 million in the aggregate on account of Income Taxes.  As

of the Petition Date, the Debtors estimate that approximately $3.5 million of Income Taxes have accrued (including with respect to the VDA (as described below)),[15] of which approximately $1.6 million will become due and payable within 30 days following the Petition Date.  The Debtors' current practice generally is to pay such amounts to the appropriate Governmental Authorities on various dates during the year, and no later than when they come due.  The Governmental Authorities may assert additional claims against the Debtors' estates for interest and penalties if such Income Taxes are not timely paid.  Paying these Income Taxes in the ordinary course of business, therefore, would reduce costs by minimizing claims for interest and penalty charges.

175.    On occasion, the Debtors incur various general sales and use taxes, gross receipts taxes, and other similar taxes.  The Debtors remit these Sales and Use Taxes to the applicable Governmental Authorities.  For the year of 2022, the Debtors paid approximately $5.4 million on account of Sales and Use Taxes.  As of the Petition Date, the Debtors have accrued but not remitted approximately $400,000 in Sales and Use Taxes.  The Debtors estimate that approximately $290,000 of such accrued prepetition Sales and Use Taxes will become payable during the first 30 days of the Chapter 11 Cases.  Interest and penalties may accrue if such Sales and Use Taxes are not timely paid.

176.    The Debtors have property tax obligations to certain Governmental Authorities for their real and personal property holdings.  For the year 2022, the Debtors paid Property Taxes of approximately $900,000 in the aggregate.  As of the Petition Date, the Debtors have accrued but not remitted approximately $740,000 of Property Taxes on account of real and personal property. The Debtors estimate that $130,000 of such accrued prepetition Property Taxes will become

---

[15]  In accordance with the terms of the VDA, the Debtors remit installments every other week on account of an uncertain tax position (including principal and interest) due to the State of California, with the last installment due in September 2023.

payable during the first 30 days of the Chapter 11 Cases.  It is critical that the Debtors are authorized to pay any Property Taxes where under applicable law the failure to pay gives rise to a secured state law lien.  Interest and penalties accrue if such Property Taxes are not timely paid.  Paying these Property Taxes, therefore, would reduce costs to the Debtors' estates by minimizing interest and penalty charges.

177.    The Debtors incur various fees, penalties, and assessments in connection with environmental, health, safety, and various other laws and regulations, and participation in state regulatory agencies and boards.  For the year of 2022, the Debtors incurred approximately $40,000 in Environmental, Safety, and Other Permits, Fees, and Assessments, in addition to periodic application fees incurred on an as-needed basis.   In addition, the Debtors estimate that approximately $53,000 of Environmental, Safety, and Other Permits, Fees, and Assessments have accrued as of the Petition Date.  The Debtors estimate that $40,000 of such accrued prepetition Environmental, Safety, and Other Permits, Fees, and Assessments will become payable during the first 30 days of the Chapter 11 Cases.  The Debtors are required by applicable law to remit these Environmental, Safety, and Other Permits, Fees, and Assessments to the relevant Governmental Authorities on a periodic basis.  Certain of the Environmental, Safety, and Other Permits, Fees, and Assessments may result in additional claims against the Debtors' estates for substantial administrative, civil, or criminal penalties in the event that the Debtors fail to timely remit payments.  Moreover, failure to pay such Environmental, Safety, and Other Permits, Fees, and Assessments to the appropriate Governmental Authorities may result in the Debtors' loss of permits and other authorizations necessary for the continuation of their businesses under applicable laws or regulations.

178.     The Debtors also remit certain customs and import duties to various customs agencies around the world.  For the year of 2022, the Debtors incurred approximately $16.7 million in Customs Duties.  In addition, the Debtors estimate that approximately $1.9 million of Customs Duties have accrued as of the Petition Date.  The Debtors estimate that $1.4 million of such accrued prepetition Customs Duties will become payable during the first 30 days of the Chapter 11 Cases.

179.     The Debtors also pay Penalties and fines to Governmental Authorities in certain instances.  As of the Petition Date, there are certain alleged Penalties incurred in the ordinary course of business totaling approximately $4.1 million relating to an uncertain tax position in California.  Pursuant to a voluntary disclosure agreement ("**VDA**") between certain of the Debtors and the State of California Franchise Tax Board, the Debtors agreed to pay to the State of California $200,000 every other week on account of the uncertain tax position, along with the associated interest.  Under the VDA, the last installment is due in September 2023 and, so long as the Debtors remit all of the required installments, the State of California will abate the associated $4.1 million Penalty.  As such, it is imperative that the Debtors be permitted to pay such amounts as they become due to avoid this substantial Penalty.  Moreover, these Penalties and others (if any), or portions thereof, may be determined to qualify as taxes under section 507 of the Bankruptcy Code; however, the Debtors reserve all rights with respect to the validity, priority, character, and amount of any such Penalties.

180.     The Debtors also remit various other taxes and fees required in certain jurisdictions including federal, state, or local taxes, charges, licensing fees, goods and services taxes, commercial activity taxes, franchise taxes, corporate taxes, annual report fees, privilege fees, and business license or permitting fees in the ordinary course of business (including any amounts required to be withheld, incurred, or collected under applicable law).  The Debtors are required to

remit these Other Taxes and Fees to the appropriate Governmental Authorities on a periodic basis. For the year of 2022, the Debtors paid a *de minimis* amount in the aggregate on account of Other Taxes and Fees.  As of the Petition Date, the Debtors believe that they have no material accrued and unremitted Other Taxes and Fees.  The Debtors' current practice generally is to pay such amounts to the appropriate Governmental Authorities on various dates during the year, and no later than when they come due, as interest and penalties may accrue if such Other Taxes and Fees are not timely paid.  Paying these Other Taxes and Fees, therefore, would reduce costs by minimizing interest and penalty charges.

181.    The Debtors' ability to pay Taxes and Fees in a timely manner is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to their successful reorganization.  I believe that any prepetition amounts that the Debtors will pay in respect of Taxes and Fees would be small relative to the size of their estates.  Non-payment of Taxes and Fees could, among other things, cause certain Governmental Authorities to take precipitous action, including conducting audits, filing liens, pursuing payment of the Taxes and Fees from the Debtors' directors, officers, and other employees, and seeking to lift the automatic stay, thus potentially substantially diminishing the value of the Debtors' estates.  Failure to pay the Taxes and Fees may also lead to the assertion of interest and/or penalties thereon or the loss of critical operational permits or licenses.

182.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving an orderly transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be granted.

*[Signature page follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   June 13, 2023
         Downers Grove, Illinois

                                        */s/ Adam Hollerbach*
                                        Adam Hollerbach
                                        Chief Restructuring Officer