## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **INSTANT BRANDS ACQUISITION** | § | **Case No. 23-90716 (DRJ)** |
| **HOLDINGS INC.,** *et al.*, | § | |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## DEBTORS' EMERGENCY MOTION
## FOR ENTRY OF ORDERS (I)(A) APPROVING
## BIDDING PROCEDURES FOR SALE OF DEBTORS'
## ASSETS, (B) AUTHORIZING POTENTIAL SELECTION
## OF STALKING HORSE BIDDER(S), (C) APPROVING BID
## PROTECTIONS, (D) SCHEDULING AUCTION FOR, AND
## HEARING TO APPROVE, SALE OF DEBTORS' ASSETS,
## (E) APPROVING FORM AND MANNER OF NOTICES OF
## SALE, AUCTION, AND SALE HEARING, AND (F) APPROVING
## ASSUMPTION AND ASSIGNMENT PROCEDURES, (II)(A) APPROVING
## SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## INTERESTS, AND ENCUMBRANCES AND (B) AUTHORIZING
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
## <u>UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF</u>

---

**Emergency relief has been requested. Relief is requested not later than 3:30 p.m. (prevailing Central Time) on July 12, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 12, 2023 at 3:30 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

> **You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Jones's conference room number is 205691.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Jones's homepage.  The meeting code is "Judge Jones".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jones's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

Instant Brands Acquisition Holdings Inc. and certain of its affiliates (collectively, the "**Debtors**"),[2] each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Debtors' Emergency Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Authorizing Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (E) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (F) Approving Assumption and Assignment Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (this "**Motion**").  This Motion is supported by (a) the *Declaration of Ronen Bojmel in Support of Debtors' Emergency Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Authorizing Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (E) Approving Form and Manner*

---

[2]   The Debtors and their direct and indirect non-Debtor subsidiaries are collectively referred to herein as "**Instant Brands**" or the "**Company**."

*of Notices of Sale, Auction, and Sale Hearing, and (F) Approving Assumption and Assignment Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "**Bojmel Declaration**"), which is attached hereto as **<u>Exhibit A</u>** and incorporated by reference herein, and (b) the *Declaration of Adam Hollerbach as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [Docket No. 39] (the "**Hollerbach Declaration**" and, together with the Bojmel Declaration, the "**Declarations**"), which was filed on the Petition Date (as defined herein) and is incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

### <u>Relief Requested</u>

1.      By this Motion, and pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of the following:

a.      an order, substantially in the form attached hereto (the "**Bidding Procedures Order**"),

i.      authorizing and approving the bidding procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the

"**Bidding Procedures**"), in connection with the sale of the Bid Assets (as defined herein)[3] (the "**Sale Transaction**"[4]);

ii.    authorizing, but not obligating, the Debtors to select a Stalking Horse Bidder in consultation with the Consultation Parties (each as defined herein);

iii.    approving the Bid Protections (as defined herein) that the Debtors may offer to prospective Stalking Horse Bidders, if any, in accordance with the terms and conditions set forth in the Bidding Procedures;

iv.    scheduling an auction of the Bid Assets (the "**Auction**") to be held on August 24, 2023 at 10:00 a.m. (prevailing Eastern Time);

v.    scheduling a hearing (the "**Sale Hearing**") to consider approval of the proposed Sale Transaction to be held on August [30], 2023 at [●].m. (prevailing Central Time);[5]

vi.    authorizing and approving the (A) notice of the sale of the Bid Assets, the Indication of Interest Deadline, the Bid Deadline (each as defined herein), the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "**Sale Notice**"), (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease listed on the Potential Assumed Contracts Schedule (as defined below) (collectively, the "**Contracts and Leases**" and each, an "**Assumed Contract**" or "**Assumed Lease**") regarding the Debtors' potential assumption and assignment of such Counterparty's Assumed Contracts or Assumed Leases (collectively, the "**Potential Assumed Contracts**") and the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Potential Assumption and Assignment Notice**"), and (C) notice to each Counterparty listed on the Proposed Assumed Contracts Schedule (as defined herein), substantially in

---

[3]   Notwithstanding the Debtors' request for authorization and approval of the Bidding Procedures, the Debtors reserve the right to seek by separate motion, in the exercise of their sound business judgment and fiduciary duties (in consultation with the Consultation Parties (as defined herein)), the authority to sell assets of the Debtors' estates (that do not constitute all or substantially all of the Debtors' assets) pursuant to section 363 of the Bankruptcy Code.

[4]   As described below, the Bidding Procedures provide that there may be one or several Sale Transactions. To the extent that this Motion refers to the Sale Transaction, or terms related thereto, in the singular it shall include the plural, and vice versa.

[5]   This date remains subject to Court approval.

the form attached to the Bidding Procedures Order as <u>Exhibit 4</u> (the "**Proposed Assumption and Assignment Notice**"); and

vii.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**");

b.    an order (the "**Sale Order**") authorizing and approving

i.    the sale of the Bid Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Bid Assets; and

ii.    the assumption and assignment of the proposed Assumed Contracts and Assumed Leases (collectively, the "**Proposed Assumed Contracts**") in connection with the proposed Sale Transaction; and

c.    granting related relief.

## <u>Jurisdiction, Venue, and Authority</u>

2.    The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

3.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.    Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

**A.    General Background**

5.    On June 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 40] entered by the Court on June 13, 2023 in each of the Chapter 11 Cases.

7.    On June 15, 2023, the Ontario Superior Court of Justice (Commercial List) issued an order recognizing the Chapter 11 Cases as foreign main proceedings.  *See* In Re Instant Brands Inc. (15 June 2023), Toronto, Ont Sup Ct CV-23-00701154-000CL (Initial Recognition Order).

8.    On June 27, 2023, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.  *See United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 177].  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.    Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Hollerbach Declaration.

B.      **The Bid Assets**[6]

10.      The Debtors commenced the Chapter 11 Cases to pursue the consummation of one or more sale transactions, or a standalone restructuring, that would maximize the value of their estates and the recoveries for their stakeholders.

11.      Instant Brands designs, manufactures, and markets a global portfolio of innovative and iconic consumer lifestyle brands, including Instant®, Pyrex®, Corelle®, Corningware®, Snapware®, Chicago Cutlery®, and Visions®.  With people-first and purpose-driven solutions in mind, Instant Brands is reimagining how people live, eat, connect, and play inside the home—and in the spaces where people gather.  Headquartered in Downers Grove, Illinois, Instant Brands sells its products worldwide, employs more than 2,000 people, and operates in several countries outside the United States, including Canada, Singapore, England, South Korea, Australia, Taiwan, and China.

12.      As described more fully in the Hollerbach Declaration, Instant Brands sells its consumer dinnerware, bakeware, kitchen and household appliances, cutlery, food storage, and other storage products on an omnichannel basis, both directly to consumers and on a wholesale basis.  Instant Brands' products are sold at more than 30 global retailers, including Walmart, Target, and Costco, as well as on eCommerce platforms, such as Amazon and Alibaba.  While North America accounted for approximately 74% of Instant Brands' total net sales in 2022, Instant Brands also achieved significant presence in certain international markets, primarily Asia, the United Kingdom, and Australia.  Instant Brands' strategy involves driving growth by innovating its core brands and products to meet consumer needs, entering new categories to leverage a portfolio of iconic brands, expanding its global footprint, and leveraging its global infrastructure

---

[6]  The assets and operations described in this section are referred to, collectively, as the "**Bid Assets**" herein.

to do it.  Its growth strategy is also focused on creating best-in class consumer connection with Instant Brands engaging more than 30 million consumers worldwide through a variety of social and digital mediums, including the Instant Brands Connect App.

13.     Instant Brands enjoys a broad customer base and a diversified lineup of products, with major manufacturing and distribution operations in North America and Asia.  Instant Brands' products include well-known best sellers that employ innovative technology that are generally divided into two categories:  appliances and housewares.  The appliance sector includes, among other things, electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers, and other multi-feature appliances.  The houseware division includes various consumer dinnerware, bakeware, cookware, cutlery, and plastic storage containers under the Pyrex®, Corelle®, CorningWare®, Snapware®, and ChicagoCutlery® brands.

14.     Instant Brands' go-to-market approach differs depending upon the maturity of the retail distribution and customer concentration in each country.  Instant Brands has positions in major channels of distribution for its products in North America and has also achieved significant presence in certain international markets, including South Korea, Australia, and China.  The Company's EMEA business based in the United Kingdom is growing at an annual rate of more than 30%.  Instant Brands has also established sales subsidiaries in South Korea, Australia, China, and Singapore and also relies on third-party distributor relationships.

15.     Instant Brands operates four manufacturing facilities, three of which are owned by the Company.  The Corning, New York manufacturing facility is owned by the Company and is the world's only producer of the three-layer Vitrelle® glass dinnerware, which is sold under the Corelle® brand.  The Charleroi, Pennsylvania manufacturing operation is also owned by the Company and produces Pyrex® products.  The Byhalia, Mississippi location produces the

Company's Snapware® products.  The Company-owned Malaysian location decorates Vitrelle® glass products for distribution in Asia.  The Company's Corelle®, Pyrex®, and Snapware® products represent a significant portion of the Company's net sales.  In addition to its manufacturing facilities, Instant Brands also operates three distribution facilities in the United States.

16.     Instant Brands also owns almost 1,300 trademarks and patents around the world and licenses trademarks from many globally recognized companies, including Disney and Sanrio.

**C.     Marketing and Sale Process**

17.     The Debtors' formal retention of their proposed investment banker, Guggenheim Securities, LLC ("**Guggenheim Securities**") began on January 1, 2023.  The Debtors engaged Guggenheim Securities to assist the Debtors in exploring strategic alternatives, first focusing on raising incremental liquidity, later shifting to a comprehensive restructuring, and, as liquidity worsened, pivoting to the negotiation of bridge financing.  The Debtors, together with their advisors at Guggenheim Securities, AlixPartners, LLP, and Davis Polk & Wardwell LLP, aggressively pursued various restructuring alternatives and engaged in arms'-length negotiations with key stakeholders, including (a) an ad hoc group of lenders (the "**Ad Hoc Group of Term Loan Lenders**") holding more than half of the term loans under the Company's Prepetition Term Loan Credit Facility (as defined in the Hollerbach Declaration), (b) the lenders (the "**Prepetition ABL Lenders**") under the Company's Prepetition ABL Credit Facility (as defined in the Hollerbach Declaration), and (c) Cornell Capital LLC, Cornell Capital Partners III LP, and their respective controlled affiliates (together, "**Cornell Capital**"), which collectively control a majority of the existing voting equity interests in Instant Brands.  As diligence and negotiations progressed, however, it became clear that the Debtors' liquidity runway did not afford the parties sufficient time to negotiate an out-of-court restructuring.  As a result, the Debtors, with the assistance of their advisors, pivoted to negotiating debtor-in-possession financing with the Ad Hoc Group of Term

Loan Lenders and the Prepetition ABL Lenders and commenced the instant Chapter 11 Cases to manage liquidity and pursue the consummation of one or more sale transactions or a plan of reorganization through a court-supervised process.

18.     To finance the Debtors' businesses as they pursue such transactions, the Debtors sought and obtained senior secured superpriority post-petition financing in the aggregate amount of $257.5 million.   After considering a wide-range of potential strategic alternatives and negotiating with all relevant stakeholders and counterparties, the Debtors, in consultation with their advisors (including Guggenheim Securities), have ultimately determined that a sale of all, substantially all, or a portion of the Debtors' assets would be a potential path to maximizing and preserving value for the benefit of the Debtors' stakeholders.

19.     Through the sale process outlined in this Motion, the Debtors intend to execute a broad marketing process for the Bid Assets.   The Debtors, with the assistance of Guggenheim Securities, have already begun the post-petition marketing process in connection with the filing of the Chapter 11 Cases, contacting relevant parties from the Company's prepetition restructuring process as well as additional potential purchasers, including those who may be interested in only a subset of the Bid Assets.

20.     To elicit the highest or otherwise best offers for the Bid Assets, the Debtors and their advisors (in consultation with the ABL DIP Agent, the Term DIP Agent, the Prepetition Term Agent (all as defined in the DIP Order[7]), the Committee,[8] and, collectively, the "**Consultation**

---

[7]  As used herein, "**DIP Order**" means the *Interim Order (I) Authorizing the Debtors To (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 96] and any supplemental and/or final order entered in connection therewith.

[8]  The Committee is included at this juncture solely for its incorporation into the definition of "Consultation Parties."   The Committee was only appointed on June 27, 2023 and retained counsel and a financial advisor on June 28, 2023 and June 29, 2023, respectively.   The Debtors have engaged in discussions with the Committee regarding

Parties"), together with their respective advisors) have developed proposed Bidding Procedures that would allow interested parties to submit bids for (a) all of the Bid Assets, (b) particular lots of individual Bid Assets, or (c) combinations thereof, as specified in the Bidding Procedures, in each case, subject to the terms and provisions of the Bidding Procedures.  Pursuant to the Bidding Procedures, the Debtors intend to market the Bid Assets to potential buyers and facilitate access to diligence materials.  Such materials would include a non-confidential presentation and, for those executing a confidentiality agreement with the Debtors, access to a virtual data room, which would contain confidential presentation materials, additional legal, financial, operational, and other information on the Debtors, and, as appropriate, meetings with management.

21.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe would maximize the value of their estates and produce maximum recoveries.   This process principally includes approval of the Bidding Procedures that are designed to (a) promote active bidding from interested parties, (b) obtain the highest or otherwise best offers available for the Bid Assets, and/or (c) maximize value in a Chapter 11 Plan Transaction, in each case for the benefit of all stakeholders.  Moreover, the Bidding Procedures provide the Debtors with the flexibility to consider bids in the form of chapter 11 plans of reorganization.

22.     The Debtors, in consultation with their advisors, believe that the process and time periods set forth in the Bidding Procedures are reasonable and would provide parties with sufficient time and information necessary to formulate bids to purchase the Bid Assets.  In

---

this Motion and the Bidding Procedures, and both reflect certain comments received from the Committee's advisors. However, since the Committee is still conducting diligence, certain issues remain under discussion, including with respect to the proposed timeline, which the Debtors and the Committee hope to resolve prior to the hearing scheduled for July 12, 2023.  The Committee reserves all its rights as to such issues, including the right to file an objection prior to the objection deadline.

formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Bid Assets to maximize realizable value, all the while preventing the disclosure of confidential information to competitors that could be damaging to the business going forward. Speed and efficiency are critical, in light of the Debtors' obligations under their DIP Credit Agreements,[9] the Company's liquidity profile, and the need to ensure that the Debtors maximize and preserve value for all stakeholders.

23.     Completion of the sale process in a timely and efficient manner would help maximize the value of the Bid Assets. The time periods set forth in the Bidding Procedures are prudent and consistent with the case milestones set forth in the DIP Credit Agreements (which were negotiated and agreed to among the Debtors, with the advice of their advisors, and the Consultation Parties (other than the Committee)), and failure to adhere to such time periods could jeopardize the closing of a Sale Transaction. Thus, the Debtors have determined that pursuing one or more transactions in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and would provide interested parties with sufficient opportunity to participate.

24.     Accordingly, the Debtors believe that approval of the Bidding Procedures and the related relief requested in this Motion would allow the Debtors to efficiently maximize value and

---

[9]     The "**DIP Credit Agreements**" include (a) that certain Superpriority Senior Secured Priming Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 15, 2023, by and among, *inter alios*, Instant Brands Holdings Inc. (the "**Borrower**"), Instant Brands Acquisition Intermediate Holdings Inc. ("**Holdings**"), the lenders and issuing banks from time to time party thereto, and Bank of America, N.A., as administrative agent and collateral agent, and (b) that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of June 15, 2023, by and among the Borrower, Holdings, the lenders from time to time party thereto, and Wilmington Trust, National Association, as administrative agent and collateral agent.

is in the best interests of the Debtors' estates and their stakeholders.  Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

**D.      The Stalking Horse Bidder and Bid Protections**

25.      The Debtors believe that having the maximum flexibility to run their sale process would produce the highest recovery for all stakeholders.   Accordingly, the Debtors seek authorization, but not direction, in accordance with the Bidding Procedures, to exercise their business judgment (in consultation with the Consultation Parties) to agree with any Qualified Bidder (as defined herein) that (a) such Qualified Bidder's Qualified Bid (as defined herein) shall serve as the minimum bid for the Bid Assets or any lot thereof (such Qualified Bidder, a "**Stalking Horse Bidder**" and, such Qualified Bid, a "**Stalking Horse Bid**") and (b) the Debtors would enter into the transaction(s) contemplated by such Stalking Horse Bid(s) unless a higher or otherwise better Qualified Bid is submitted with respect to such Bid Assets or lot thereof, as determined by the Debtors (in consultation with the Consultation Parties) in accordance with the Bidding Procedures.

26.      In order to incentivize prospective purchasers to agree to become a Stalking Horse Bidder, the Debtors seek authorization, but not direction, to exercise their business judgment to offer (in consultation with the Consultation Parties) the following bid protections to such Stalking Horse Bidder(s), payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which the Stalking Horse Bid relates):  (a) payment of a break-up fee in an amount not to exceed three percent of the cash portion of the purchase price set forth in the Stalking Horse Bid (the "**Break-Up Fee**") and (b) reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**") in an amount up to $500,000; *provided* that (i) the payment

of any Break-Up Fee and/or Expense Reimbursement shall be subject to the terms and conditions of the definitive agreement(s) reached between the Debtors and such Stalking Horse Bidder(s), (ii) the obligation to pay any Break-Up Fee or Expense Reimbursement would not be binding on the Debtors until the approval of such Bid Protections in accordance with the Bidding Procedures, and (iii) no Break-Up Fee or Expense Reimbursement shall be paid to an insider of the Debtors. For the avoidance of doubt, the Debtors would provide Expense Reimbursement only to a Stalking Horse Bidder (and such expenses must be reasonable, documented, and subject to review by the Debtors and the Consultation Parties), and any Bid Protections would be payable solely out of the proceeds of the sale to which they relate.

27.     In the event that the Debtors, in consultation with the Consultation Parties, desire to designate a Qualified Bid as a Stalking Horse Bid and enter into an asset purchase agreement (the "**Stalking Horse APA**") that provides for Bid Protections (subject to the limitations set forth herein), the Debtors would file a notice with the Court (the "**Stalking Horse Notice**") that (a) sets forth the identity of the Stalking Horse Bidder, (b) sets forth the amount of the Stalking Horse Bid and what portion of the Stalking Horse Bid (if any) would be in the form of cash, (c) identifies the Bid Assets (or lot thereof) to be purchased and the contracts and leases to be assumed, (d) states whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid, (e) specifies any proposed Bid Protections, and (f) attaches the Stalking Horse APA, including all exhibits, schedules, and attachments thereto.  The Debtors propose to serve the Stalking Horse Notice on the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"), counsel to each of the Consultation Parties, and those parties requesting notice pursuant to Bankruptcy Rule 2002 of all pleadings filed in the

Chapter 11 Cases (collectively, the "**Stalking Horse Notice Parties**"), with no further notice being required.

28.     The Stalking Horse Notice would also specify the deadline to file objections (any such objections, "**Stalking Horse Objections**") to the designation of the Stalking Horse Bidder, the terms of the Stalking Horse Bid, or the Bid Protections set forth therein, which deadline (the "**Stalking Horse Objection Deadline**") would be no earlier than three business days after service of the Stalking Horse Notice on the Stalking Horse Notice Parties.   Stalking Horse Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Procedures**"), (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Debtors and the Stalking Horse Notice Parties by the Stalking Horse Objection Deadline.

29.     If a timely Stalking Horse Objection is filed and served, to the extent the Debtors are unable to resolve it consensually, the Debtors may schedule a hearing (the "**Stalking Horse Hearing**") before the Court on an expedited basis (on not less than three-days' notice).   At the Stalking Horse Hearing, the Debtors would seek the Court's authorization to enter into the Stalking Horse APA, including the Bid Protections contained therein.

30.     If no Stalking Horse Objection is timely and properly filed and served, upon the expiration of the Stalking Horse Objection Deadline, the Debtors may file a certificate of no objection with the Court and, upon such a filing, the Debtors propose (a) that their designation of the Stalking Horse Bidder and agreement respecting Bid Protections shall be deemed approved

and (b) that the Debtors may enter into the Stalking Horse APA, in each case without further notice or opportunity to be heard.

**E.      The Proposed Sale and Bidding Procedures**

        *i.      Overview*

31.     The Bidding Procedures are designed to promote a competitive and efficient sale process to maximize the value of the Bid Assets.  If approved, the Bidding Procedures would allow the Debtors to solicit and identify bids from potential buyers or investors that constitute the highest or otherwise best offer for the Bid Assets or the highest or otherwise best Chapter 11 Plan Bid on a schedule consistent with the deadlines under the Bidding Procedures, the milestones in the DIP Credit Agreements, and the Debtors' strategy for maximizing value for their stakeholders.

32.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated herein in their entirety.  Certain of the key terms of the Bidding Procedures are highlighted in the chart below.[10]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
| --- | --- |
| **Consultation Rights** | Throughout the sale process, the Debtors, with the assistance of their advisors, will regularly and timely consult with the following parties (collectively, the "**Consultation Parties**"): (a) the Committee; (b) the ABL DIP Agent; and (c) the Term DIP Agent (acting at the direction of the requisite Term DIP Lenders) and the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Lenders) (all as defined in the DIP Order) (the Term DIP Agent and the Prepetition Term Agent, together, the "**Term Agents**"), including in each case the legal and financial advisors thereto.  The Debtors will provide updates as reasonably appropriate to the Consultation Parties as to the status of the Sale Process.<br><br>The ABL DIP Agent and the Term Agents shall be Consultation Parties unless and until the ABL DIP Agent and Term Agent, as applicable, has indicated to the Debtors (including their advisors) in writing (which may be by email) that it intends, on behalf of its respective requisite lenders, to submit a bid in the Bidding Process (as defined herein), at which point such ABL DIP Agent or Term Agent, as applicable, shall not be a Consultation Party with respect to (a) any review of competing bids (including Qualified Bids), (b) any determination regarding which bids constitute Qualified Bids, (c) the designation of any |

--------

[10]  To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures or the DIP Order, as applicable.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | bid as a Stalking Horse Bid, or (d) the selection of a Successful Bidder or an Alternate Bidder (as defined below), unless and until such agent(s) indicates in writing that it no longer intends to submit a bid.  In the event that any Prepetition Term Lender, Term DIP Lender, or ABL DIP Lender, or (in each case) any affiliate thereof, becomes a Potential Bidder (as defined below) (such bidder, a "**Bidding Lender**"), the ABL DIP Agent or Term Agents, as applicable, shall not provide any information that they receive in their role as Consultation Parties to such Bidding Lender.

The Debtors shall not consult with or provide copies of bids regarding any assets to any insider or affiliate of the Debtors pursuant to the terms of the Bidding Procedures if such party has a bid for the Bid Assets pending or has expressed any interest (written or verbal) in bidding for any of the Debtors' assets; *provided* that, if such insider or affiliate of the Debtors chooses not to submit any bid, and so informs the Debtors and the Consultation Parties in writing on or before the Bid Deadline, then such party may receive copies of all bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended hereunder). |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** | **Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified Bidder requirements.**

A party may participate in the bidding process by submitting a bid for (i) all or substantially all of the Bid Assets and/or (ii) one or more, or any combination of, Bid Assets as that party may desire.

The Bidding Procedures also provide that the Debtors, in consultation with the Consultation Parties, may consider competing bids (each, a "**Chapter 11 Plan Bid**") in the form of a chapter 11 plan of reorganization (a "**Chapter 11 Plan Transaction**"), subject to the requirements set forth in the Bidding Procedures.

    A.    **Interested Parties.**  Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the bidding process, Interested Parties must deliver (unless previously delivered) the following items to Guggenheim Securities:

   1.   an executed confidentiality agreement in form and substance satisfactory to the Debtors, in consultation with the Consultation Parties;

   2.   a statement and other factual support demonstrating, to the Debtors' satisfaction, in consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in purchasing some or all of the Bid Assets;

   3.   a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

   4.   sufficient information, as defined by the Debtors, in consultation with the Consultation Parties, to allow the Debtors, in consultation with the Consultation Parties, to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close a sale transaction pursuant to the Bidding Procedures, which may include, but is not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties) or, if the Interested Party is an entity formed for the purpose of acquiring some or all of the Bid Assets, (i) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties) and (ii) a written commitment acceptable to the Debtors, in consultation with the Consultation Parties, that the Sponsor(s) are |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

responsible for the Interested Party's obligations in connection with the Bidding Process.

If the Debtors determine (in consultation with the Consultation Parties) after receipt of the items identified above, that an Interested Party has a *bona fide* interest in purchasing some or all of the Bid Assets, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will provide such Potential Bidder with access to the Debtors' confidential electronic data room concerning the Bid Assets (the "**Data Room**"). Each of the ABL DIP Agent and Term Agents shall automatically be deemed a Potential Bidder and shall not be required to submit any of the foregoing information.

**B.      Due Diligence.** Until the Bid Deadline, in addition to granting access to the Data Room, the Debtors will provide Potential Bidders with due diligence access and additional information as may be requested by a Potential Bidder, to the extent that the Debtors determine, in consultation with the Consultation Parties, that such requests are reasonable and appropriate under the circumstances. All due diligence requests shall be directed to Guggenheim Securities. The Debtors, with the assistance of Guggenheim Securities, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

For any Potential Bidder that is a competitor of the Debtors (or an affiliate thereof), the Debtors reserve the right to withhold any diligence materials that the Debtors determine are commercially sensitive or otherwise not appropriate for disclosure to such Potential Bidder, or to require that the Potential Bidder enter into a "clean team" or similar arrangement acceptable to the Debtors in order to receive such diligence materials.

Unless **otherwise** determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) the Bidding Process is terminated in accordance with its terms.

**C.      Non-Binding Indications of Interest.** Any Potential Bidder interested in purchasing the Bid Assets must submit a non-binding indication of interest (an "**Indication of Interest**") to Guggenheim Securities so as to be received no later than 3:00 p.m. (prevailing Central Time) on July 19, 2023 (the "**Indication of Interest Deadline**"). The Indication of Interest must (i) set forth a proposed purchase price for the proposed transaction, including by identifying separately any cash and non-cash components of the proposed transaction consideration, which non-cash components shall be limited only to assumption of liabilities of any of the Debtors, and (ii) identify any proposed conditions to closing the transaction. Promptly upon receiving the Indications of Interest, the Debtors shall provide the Indications of Interests to the Consultation Parties.

Each Potential Bidder will be deemed to consent to the Debtors' sharing its Indication of Interest and any subsequent bid to purchase the Bid Assets (together with any supporting materials submitted in connection therewith) with the Consultation Parties, subject to the terms and conditions of the Bidding Procedures. Submitting an Indication of Interest does not (i) obligate the submitting party to submit a formal bid or participate in the sale process and (ii) exempt the submitting party from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction. Any Potential Bidder that fails to submit an Indication of Interest by the Indication of Interest Deadline may not be deemed a Qualified Bidder pursuant to section 2 of the Bidding Procedures unless such condition is waived by the Debtors, in consultation with the Consultation Parties. For the avoidance of doubt, neither the ABL DIP Agent nor any Term Agent, on behalf of the DIP Secured Parties or the Prepetition Secured Parties (as applicable), need to submit an Indication of Interest to be deemed a Qualified Bidder.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

**D.** **Bid Deadline.** A Potential Bidder who desires to be deemed a Qualified Bidder must deliver to Guggenheim Securities, with copies to Davis Polk & Wardwell LLP ("**Davis Polk**"), 450 Lexington Avenue, New York, New York 10017 (Attn: Brian M. Resnick, Steven Z. Szanzer, and Joanna McDonald), the Required Bid Documents (as defined below), so as to be received no later than **3:00 p.m. (prevailing Central Time) on August 21, 2023** (the "**Bid Deadline**"). The Debtors, in consultation with the Consultation Parties, and without the need for further Bankruptcy Court approval, may extend the Bid Deadline by a reasonable period of time if the Debtors, in consultation with the Consultation Parties, believe that such extension would further the goal of attaining the highest or otherwise best offer for the Bid Assets. If the Debtors extend the Bid Deadline, the Debtors will promptly notify all Potential Bidders of such extension.

**E.** **Bid Requirements.**

1. <u>Required Bid Documents</u>. All bids must be accompanied by the following items (collectively, the "**Required Bid Documents**"):

a. a letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the Bid Assets (or lot thereof) identified in such offer;

b. other than for any Chapter 11 Plan Bid, a duly authorized and executed purchase agreement based on the form purchase agreement provided by the Debtors (through their advisors), marked to show any revisions, including, among other things, the purchase price for the Bid Assets (or lot thereof, as applicable), together with all exhibits and schedules thereto (including, among other things, a proposed form of order approving the transaction(s) contemplated in such purchase agreement). For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form asset purchase agreement would not satisfy this requirement;

c. each Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such bidder, pursuant to which the bidder proposes to effectuate the Chapter 11 Plan Transaction, in the form of a non-taxable recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization, and must provide for a fully-committed investment of capital in exchange for substantially all of the equity of the reorganized Debtors;

d. written evidence acceptable to the Debtors, in their discretion and in consultation with the Consultation Parties, demonstrating financial wherewithal, operational ability, and corporate authorization to consummate the proposed transaction;

e. a written acknowledgment that the bidder (i) has had an opportunity to conduct any and all due diligence regarding the Bid Assets, the Sale Transaction, and/or a Chapter 11 Plan Transaction, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and any other information in making the bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or any of their advisors (including Guggenheim Securities, AlixPartners, LLP, and Davis Polk) or other representatives regarding the bid, the Bid Assets (or lot thereof), the Sale Transaction, the Chapter 11 Plan Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except as expressly stated in these Bidding Procedures, and (iv) the bidder did not

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

engage in any collusive conduct and acted in good faith in submitting its bid; and

f.    written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction without financing, in either case which is satisfactory to the Debtors in their discretion, in consultation with the Consultation Parties.

2.    <u>Identity of Purchaser</u>.  Full disclosure of the legal identity of the purchaser (including any Sponsor(s), if the purchaser is an entity formed for the purpose of consummating the proposed transaction).

3.    <u>Bid Assets; Consideration</u>.

a.    Other than for a Chapter 11 Plan Bid, identification of Bid Assets (or lot thereof) to be purchased and Contracts and Leases to be assumed.

b.    Other than for a Chapter 11 Plan Bid, clearly states which liabilities of the Debtors or the Bid Assets (or lot thereof) will be assumed.

c.    Includes a statement of proposed terms for employees, including with respect to the Debtors' affected collective bargaining agreements and affected labor unions.

d.    Sets forth the consideration, including the form thereof, for the Bid Assets (or lot thereof) to be purchased and the Contracts and Leases to be assumed (the "**Bid Consideration**"); *provided* that, if there is an Approved Stalking Horse Bid, the consideration must be at least equal to the following: (i) the consideration set forth in the Approved Stalking Horse Bid; *plus* (ii) the aggregate amount of any Approved Bid Protections; *plus* (iii) two percent of the consideration set forth in the Approved Stalking Horse Bid (the "**Minimum Overbid**").

e.    Allocates the Bid Consideration among the Bid Assets and Contracts and Leases to be assumed (per lot of Bid Assets).

4.    <u>No Financing/Diligence Contingency</u>.  No condition on the obtainment of financing or on the outcome of unperformed due diligence.

5.    <u>Regulatory Approvals</u>.  Includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors, in consultation with the Consultation Parties, of the ability to obtain such approvals or consents as soon as reasonably practicable, and in no event later than September 7, 2023, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents.

6.    <u>Alternate Bidder</u>.  Must expressly state that the bidder agrees to serve as an Alternate Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable Bid Assets.

7.    <u>Good Faith Deposit</u>.  Is accompanied by a cash deposit by wire transfer to a Deposit Agent in an amount equal to ten percent of the consideration set forth in connection with such bid.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | 8. <u>Authorized Representatives</u>.  A list setting forth the representatives that are authorized to appear and act on behalf of the bidder in connection with the proposed transaction.<br><br>9. <u>No Bid Protections</u>.  Statement that the bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment (other than if such bid is selected to be a Stalking Horse Bid and subject to Section 4 of the Bidding Procedures) and that it waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code.<br><br>10. <u>Adequate Assurance</u>.  Evidence supporting the bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance of such bidder's ability to perform in the future under any contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the bidder, in a form that will permit the Debtors to disseminate immediately such evidence to the non-Debtor counterparties to such contracts and leases.<br><br>11. <u>Cure Costs</u>.  Indication whether or not the bidder will assume all cure costs associated with any Contracts and Leases it intends to assume.<br><br>**F.     Designation of Qualified Bids; Cure of Non-Qualifying Bids.** The Debtors, in consultation with the Consultation Parties, shall have the right to deem a bid a Qualified Bid.  The Debtors will be authorized to approve joint bids in their reasonable discretion, in consultation with the Consultation Parties, on a case-by-case basis.  If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies through and, in consultation with the Consultation Parties, after the Bid Deadline.  If any bid is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with the Bidding Procedures, the Debtors, to the extent applicable, shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit.<br><br>**G.     Deemed Acknowledgments and Representations.** Each Qualified Bidder shall be deemed to acknowledge and represent that such bidder:<br><br>1.   has reviewed, understands, and accepts the Bidding Procedures;<br><br>2.   has consented to the jurisdiction of the Bankruptcy Court; and<br><br>3.   intends to consummate its Qualified Bid if it is selected as the Successful Bidder. |
| **Provisions Governing Credit Bidding** | **Part 3 of the Bidding Procedures sets forth the provisions governing Credit Bidding**<br><br>Pursuant to section 363(k) of the Bankruptcy Code and subject to the terms and conditions set forth in the DIP Order, the DIP Documents, and the Prepetition Credit Documents, the DIP Secured Parties and the Prepetition Secured Parties, to the extent such parties have a valid and perfected lien on any assets of the Debtors' estates, shall have the right to credit bid up to the full amount of the applicable outstanding DIP Obligations and Prepetition Obligations, as the case may be, in any bulk or piecemeal sale of all, substantially all, or any portion of the Bid Assets constituting DIP Collateral or Prepetition Collateral, as applicable; *provided* that any such credit bid must be submitted on or before the Bid Deadline and include cash consideration sufficient to satisfy the Carve Out and any senior liens on the collateral that is subject to the credit bid, except to the extent otherwise agreed by the holders of such senior liens in their sole and absolute discretion.  If the DIP Secured Parties or the Prepetition Secured Parties submit a credit bid in accordance with the foregoing, and such bid is received by the Bid Deadline, such bidder shall be deemed to be a Qualified Bidder |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | and any such credit bid shall be deemed to be a Qualified Bid (without the need for any Good Faith Deposit). |
| **Provisions Governing Stalking Horse Bidders and Bid Protections** | **Part 4 of the Bidding Procedures sets forth the provisions governing the selection and approval of Stalking Horse Bidders (including offering Bid Protections in connection therewith)**<br><br>**A.      Selection of Stalking Horse Bidder.**  The Debtors are authorized, but not obligated, to exercise their business judgment (in consultation with the Consultation Parties) to agree with any Qualified Bidder that (i) such Qualified Bidder's Qualified Bid shall serve as the minimum bid for the Bid Assets or any lot thereof (such Qualified Bidder, a "**Stalking Horse Bidder**" and, such Qualified Bid, a "**Stalking Horse Bid**") and (ii) the Debtors will enter into the transaction(s) contemplated in such Stalking Horse Bid unless a higher or otherwise better Qualified Bid is submitted with respect to such Bid Assets or lot thereof, as determined by the Debtors (in consultation with the Consultation Parties) in accordance with the Bidding Procedures.<br><br>**B.      Bid Protections.**  In order to incentivize prospective purchasers to agree to become a Stalking Horse Bidder, the Debtors are authorized, but not obligated, to exercise their business judgment (in consultation with the Consultation Parties) to offer the following bid protections to such Stalking Horse Bidder(s), payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which such Stalking Horse Bid relates): (i) payment of a break-up fee in an amount not to exceed three percent of the cash portion of the purchase price set forth in the Stalking Horse Bid (the "**Break-Up Fee**") and (ii) reimbursement of the reasonable and documented fees and out-of-pocket expenses actually incurred by the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**") in an amount up to $500,000; *provided* that (a) the payment of any Bid Protections shall be subject to the terms and conditions of the definitive agreement(s) executed between the Debtors and such Stalking Horse Bidder(s), (b) any Bid Protections will not be binding on the Debtors until the approval of such Bid Protections in accordance with the Bidding Procedures, and (c) no Break-Up Fee shall be paid to an insider of the Debtors.  For the avoidance of doubt, the Debtors will provide Expense Reimbursement only to the Stalking Horse Bidder(s) and such expenses must be reasonable, documented, and subject to review by the Debtors and the Consultation Parties.  To the extent payable, any Bid Protections would be paid out of the proceeds of the sale to which they relate.<br><br>**C.      Stalking Horse Notice.**  In the event that the Debtors, in consultation with the Consultation Parties, desire to designate a Qualified Bid as a Stalking Horse Bid and enter into a Stalking Horse APA with a Stalking Horse Bidder that provides for Bid Protections (subject to the limits on those Bid Protections set forth in the Bidding Procedures, the Debtors may file a Stalking Horse Notice with the Bankruptcy Court that (i) sets forth the identity of the Stalking Horse Bidder, (ii) sets forth the amount of the Stalking Horse Bid and what portion of the Stalking Horse Bid (if any) would be in the form of cash, (iii) identifies the Bid Assets (or lot thereof) to be purchased and the contracts and leases to be assumed, (iv) states whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid, (v) specifies any proposed Bid Protections, and (vi) attaches the Stalking Horse APA, including all exhibits, schedules, and attachments thereto and serve such Stalking Horse Notice on the U.S. Trustee, counsel to each of the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Cases (collectively, the "**Stalking Horse Notice Parties**"), with no further notice being required**.** |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | **D.**    **Stalking Horse Objections.**<br><br>1.   The Stalking Horse Notice shall also specify the deadline to file Stalking Horse Objections to the designation of the Stalking Horse Bidder, the terms of the Stalking Horse Bid, or the Bid Protections set forth therein, which deadline (the "**Stalking Horse Objection Deadline**") shall be no earlier than three business days after service of the Stalking Horse Notice on the Stalking Horse Notice Parties. Stalking Horse Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court and served on the Debtors and the Stalking Horse Notice Parties by the Stalking Horse Objection Deadline.<br><br>2.   If a timely Stalking Horse Objection is filed and served, to the extent not resolved consensually, the Debtors may schedule a Stalking Horse Hearing before the Bankruptcy Court to be held on an expedited basis (on not less than three-days' notice) seeking authorization to enter into the Stalking Horse APA (including the Bid Protections contained therein). If no timely Stalking Horse Objection is filed and served, upon the expiration of the Stalking Horse Objection Deadline, the Debtors shall file with the Bankruptcy Court a CNO and, upon such filing, (a) the Debtors' designation of the Stalking Horse Bidder and agreement respecting Bid Protections shall be deemed approved and (b) the Debtors may enter into the Stalking Horse APA, in each case without further notice or opportunity to be heard. |
| **Provisions Governing the Auction and Permitting the Modification of Bidding and Auction Procedures** | **Part 5 of the Bidding Procedures sets forth the procedures governing the Auction.**<br><br>**A.**    **Date, Time, and Location.** The Auction shall be conducted at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 on August 24, 2023 at 10:00 a.m. (prevailing Eastern Time), or such later time on such day or such other place as the Debtors (in consultation with the Consultation Parties) shall notify all Participating Parties.<br><br>**B.**    **Participants and Attendees.** Attendance will be limited to the representatives or agents (including legal and financial advisors) of (i) the Debtors, (ii) the Consultation Parties, and (iii) the Qualified Bidders (including any Approved Stalking Horse Bidders).<br><br>**C.**    **Auction Procedures.**<br><br>1.   <u>Notice of Qualification</u>. Prior to the Auction, the Debtors will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders with (i) copies of the Starting Bid, (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the Qualified Bidders.<br><br>2.   <u>Starting Bid</u>. The first round of bidding at the Auction shall commence at the Starting Bid. For the avoidance of doubt, the Starting Bid may be comprised of multiple Qualified Bids if the aggregate consideration of such Qualified Bids is higher and better than an Approved Stalking Horse Bid.<br><br>3.   <u>Subsequent Bids</u>. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one Subsequent Bid is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors, in their discretion and in consultation with the Consultation Parties, determine that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
|---|---|
| | better offer than the Leading Bid, in each case taking into account other Qualified Bids for other Bid Assets; *provided* that, with respect to the first round, if there is an Approved Stalking Horse Bidder, any Qualified Bid must provide incremental consideration at least equal to the Minimum Overbid. In each subsequent round after the first round, the Debtors, in their discretion and in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding. |
| | 4.   Highest or Best Offer.   After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in their discretion and in consultation with the Consultation Parties, will determine and announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "**Leading Bid**").   Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided* that the value for such non-cash consideration shall be determined by the Debtors, in their discretion and in consultation with the Consultation Parties. |
| | 5.   Partial Bids.   If any of the Qualified Bids submitted by the Bid Deadline are structured as a Partial Bid, the Debtors (in consultation with the Consultation Parties) may conduct separate auctions at the Auction for each lot of assets (each, an "**Auction Lot**") subject to a Partial Bid.   The Debtors may, in consultation with the Consultation Parties, combine multiple Partial Bids into an Auction Lot to compete against an Approved Stalking Horse Bid.   The Debtors may designate each Auction Lot at any time prior to the Auction. |
| | 6.   Modification of Bidding and Auction Procedures.   The Debtors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, the amount of time allotted to submit Subsequent Bids); *provided* that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in connection herewith and (b) be disclosed to all Qualified Bidders. |
| **Provisions Regarding Selection of Successful Bid and Alternate Bid** | **Part 6 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bid(s) and Alternate Bid(s).** |
| | **A.       Selection of Successful Bids.**   Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, shall (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction and, in the case of a Chapter 11 Plan Transaction, the structure, confirmability, and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document, and obtain confirmation of such proposed chapter 11 plan), (ii) determine and identify the highest or otherwise best offer or collection of offers (the "**Successful Bid(s)**"), (iii) determine and identify the next highest or otherwise best offer or collection of offers (the "**Alternate Bid(s)**"), and (iv) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (a) the identity of the party or parties that submitted the Successful Bid(s) (the "**Successful Bidder(s)**"), (b) the amount and other material terms of the Successful Bid(s), (c) the identity of the party or parties that submitted the Alternate Bid(s) (the "**Alternate Bidder(s)**"), and (d) the amount and other material terms of the Alternate Bid(s). |
| | Each Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated.   Notwithstanding anything in the Bidding Procedures to the contrary, any Qualified Bid submitted by a DIP Agent or the Prepetition Term Agent shall not be |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | required to serve as an Alternate Bid absent such DIP Agent's or Prepetition Term Agent's consent. |
| | **B.** **Execution of Definitive Documentation.** As soon as reasonably practicable after the completion of the Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction(s) contemplated by the applicable Successful Bid(s). Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) with the Bankruptcy Court, together with a proposed Sale Order. |
| **Provisions Regarding Sale Hearing and Closing with Successful Bidders and Alternative Bidders** | **Part 7 of the Bidding Procedures sets forth procedures regarding closing with Successful Bidder(s) or Alternative Bidder(s).**<br><br>The Sale Hearing will be held on August [30], 2023 at: [●].m. (prevailing Central time)[11] before the Honorable Judge David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas. The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, by an announcement of the adjourned date at a hearing before the Bankruptcy Court or by filing a notice on the Bankruptcy Court's docket. At the Sale Hearing, the Debtors will seek the Bankruptcy Court's approval of the Successful Bid(s) and, at the Debtors' election, the Alternate Bid(s).<br><br>The Debtors' presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Bankruptcy Court. Following the Bankruptcy Court's entry of the Sale Order, the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s). If the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), then the Debtors shall file a notice with the Court advising of such failure. Upon the filing of such notice with the Bankruptcy Court, the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate the transaction(s) with the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Bankruptcy Court. If the failure to consummate the transaction(s) contemplated by the Successful Bid(s) is the result of a breach by the Successful Bidder(s) (the "**Breaching Bidder(s)**") of its (their) asset purchase agreement(s), the Debtors reserve the right to seek all available remedies from such Breaching Bidder(s), subject to the terms of the applicable asset purchase agreement. |

ii.    *Key Dates and Deadlines*

33.    Consistent with the Debtors' need to consummate any sale of the Bid Assets as efficiently as practicable in accordance with the milestones set forth in the DIP Credit Agreements, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

---

[11] This date remains subject to Court approval.

| | |
|---|---|
| **July 12, 2023 at 3:30 p.m.** **(prevailing Central Time)** | Hearing to consider approval of the Bidding Procedures and for entry of the Bidding Procedures Order |
| **July 21, 2023** | Target date for the Debtors to file Potential Assumed Contracts Schedule |
| **July 19, 2023 at 3:00 p.m.** **(prevailing Central Time)** | Indication of Interest Deadline |
| **August 11, 2023 at 4:00 p.m.** **(prevailing Central Time)** | Cure Objection Deadline |
| **August 21, 2023 at 3:00 p.m.** **(prevailing Central Time)** | Bid Deadline |
| **August 24, 2023 at 10:00 a.m.** **(prevailing Eastern Time)** | Auction (if any) to be held at the New York offices of Davis Polk & Wardwell LLP |
| **August 25, 2023** | Target date for the Debtors to file with the Court the Notice of Auction Results |
| **August 28, 2023 at 4:00 p.m.** **(prevailing Central Time)** | Deadline to object to the Sale Transaction to the Successful Bidder; and the Assumption and Assignment Objection Deadline |
| **August [30], 2023 at [●].m.** **(prevailing Central Time)**[12] | Hearing to consider approval of the Sale Transaction(s) and for entry of the Sale Order(s) |

## F.  Noticing Procedures

34.    The Debtors propose the following "**Noticing Procedures**":

a.    <u>**Sale Notice and Publication**</u>.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class mail) upon the following: (i) the U.S. Trustee; (ii) Ropes & Gray LLP, as counsel to the Term DIP Secured Parties (as defined in the DIP Order); (iii) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the ABL DIP Agent (as defined in the DIP Order); (iv) DLA Piper LLP (US), as counsel to the Committee; (v) Counterparties to Contracts and Leases; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the state attorneys general for states in which the Debtors conduct business; (x) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties

---

[12]  This date remains subject to Bankruptcy Court approval.

who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets; (xii) all other known parties with any interest in the Bid Assets; and (xiii) any party that, as of the filing of this Motion, has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**"); *provided* that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided*, *further*, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence. The Debtors would also cause the Sale Notice to be published once in the national edition of *USA Today* or another publication with similar national circulation as soon as practicable following entry of the Bidding Procedures Order and would post the Sale Notice and the Bidding Procedures Order on the Debtors' case information website located at https://dm.epiq11.com/InstantBrands (the "**Case Information Website**"). This publication of the Sale Notice would provide notice of the sale to any other interested parties whose identities are unknown to the Debtors. The Sale Notice would include, among other things, the date, time, and place of the Auction and the Sale Hearing and the deadline for filing any objections relating to the Bidding Procedures or any Sale Transaction, once they are set by the Court.

b.     **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, would make a determination regarding which bids qualify as Qualified Bids. Prior to the Auction, the Debtors would (i) notify each Qualified Bidder that has timely and properly submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders with (A) a copy of the Starting Bid, (B) an explanation of how the Debtors value the Starting Bid, and (C) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

c.     **Notice of Hearing if Auction Not Held**. If (i) no more than one Qualified Bid is timely and properly submitted by the Bid Deadline (whether a Stalking Horse Bid (as approved by the Court, whether upon a Stalking Horse Hearing or certificate of no objection, an "**Approved Stalking Horse Bid**") or otherwise) or (ii) multiple Partial Bids are timely and properly submitted by the Bid Deadline for non-overlapping lots of the Bid Assets, the Debtors may, in their discretion and in consultation with the Consultation Parties, elect to cancel the Auction and seek approval of the transactions contemplated in such Approved Stalking Horse Bid, Qualified Bid that is not an Approved Stalking Horse Bid, or Partial Bid(s), as applicable, at the Sale Hearing. If no Auction is to be conducted, the Debtors would file with the Court, serve on the Sale Notice Parties, and cause to be published on the Case Information Website a notice (i) indicating that the Auction for the Bid Assets has been canceled, (ii) indicating that the Approved Stalking Horse Bid, the Qualified Bid, or the Partial Bid(s) (as applicable) is or are the Successful Bid(s)

with respect to the Bid Assets, and (iii) setting forth the date and time of the Sale Hearing.

    d.    **Notice of Auction Results**.  Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and any Alternate Bid(s) (the "**Notice of Auction Results**") with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

35.    The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the objection deadline, the Bid Deadline, and the times and locations of the Auction and Sale Hearing.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and the Complex Procedures.

**G.**    **Assumption and Assignment Procedures**

36.    In connection with the Sale Transaction, the Debtors anticipate that they would assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the Assumed Contracts and Assumed Leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby also seek approval of the proposed Assumption and Assignment Procedures set forth herein, which are designed to, among other things, (a) outline the process by which the Debtors would serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases.  Specifically, the Assumption and Assignment Procedures are as follows:

    a.    **Potential Assumed Contracts Schedule**.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assumed

Contracts (the "**Potential Assumed Contracts Schedule**") that specifies (i) each of the Contracts and Leases that potentially could be assumed and assigned in connection with the sale of the Bid Assets, including the name of each Counterparty, and (ii) the proposed Cure Cost with respect to each Potential Assumed Contract.

b.      **Potential Assumption and Assignment Notice**.  The Debtors shall, as soon as reasonably practicable after entry of the Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (i) include the Potential Assumed Contracts Schedule, (ii) list the Debtors' good faith calculation of the Cure Costs with respect to the Potential Assumed Contracts identified on the Potential Assumed Contracts Schedule, (iii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to designation by the Successful Bidder and Court approval, (iv) prominently display the deadline to file an Assumption and Assignment Objection (as defined herein), and (v) prominently display the date, time, and location of the Sale Hearing.

c.      **Proposed Assumption and Assignment Notice**.  The Debtors shall, in conjunction with the filing of the Notice of Auction Results, file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Proposed Assumption and Assignment Notice, which shall (i) include a schedule of the Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**") as agreed between the Debtors and the Successful Bidder, (ii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iii) prominently display the deadline to file an Assumption and Assignment Objection, and (iv) prominently display the date, time, and location of the Sale Hearing.

d.      **Assumption and Assignment Objections**.

i.      <u>Objection Deadlines</u>.  Any Counterparty may object to the potential or proposed assumption or assignment of its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, (D)(1) for objections relating to proposed Cure Costs, be filed no later than **August 11, 2023 at 4:00 p.m. (prevailing Central**

Time) (the "**Cure Objection Deadline**") and (2) for all other objections, **August 28, 2023 at 4:00 p.m. (prevailing Central Time**) (the "**Assumption and Assignment Objection Deadline**"), and (E) be served on (1) proposed counsel to the Debtors, (y) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Brian M. Resnick, Steven Z. Szanzer, and Joanna McDonald and (z) Haynes & Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, Texas 77010, Attn: Charles A. Beckham, Jr., Arsalan Muhammad, and David A. Trausch, (2) counsel to the Term DIP Secured Parties, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Ryan Preston Dahl, Matthew M. Roose, Daniel Gwen, Lindsay C. Barca, and Eric P. Schriesheim, (3) counsel to the ABL DIP Agent, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606, Attn: James J. Mazza, Jr. and Robert E. Fitzgerald, (4) counsel to the Committee, DLA Piper LLP (US), 1251 Avenue of the Americas, 27th Floor, New York, New York 10020, Attn: Dennis O'Donnell and Oksana Lashko, and (5) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Jayson B. Ruff and Vianey Garza (collectively, the "**Assumption and Assignment Objection Notice Parties**").

ii.      Resolution of Assumption and Assignment Objections.  If a Counterparty timely files an Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in their discretion and in consultation with the Successful Bidder and the Consultation Parties, shall determine (subject to the Court's calendar).  If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court or by agreement with the Counterparty), each Successful Bidder may elect, in its sole and absolute discretion, one of the following options:  (A) treat such Counterparty's contract or lease as property excluded from the Bid Assets (an "**Excluded Contract**" or "**Excluded Lease**," respectively) or (B) temporarily treat the Proposed Assumed Contract as an Excluded Contract or Excluded Lease, as applicable (a "**Designated Agreement**"), proceed to the closing of the Sale Transaction with respect to all other Bid Assets, and determine whether to treat the Designated Agreement as an Assumed Contract or Assumed Lease, as applicable, or an Excluded Contract or Excluded Lease, as applicable, within ten business days after resolution of such objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the applicable Successful Bidder).

iii.     Failure To File Timely Assumption and Assignment Objection.  If a Counterparty fails to timely and properly file with the Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract or Assumed Lease.  Notwithstanding anything to the contrary in the Assumed Contract or Assumed Lease, or any

other document, the Cure Costs set forth in the Potential Assumed Contracts Schedule or the Supplemental Assumed Contracts Schedule (as defined herein) shall be controlling and would be the only amount necessary to cure any alleged outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment would become effective, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder, or the property of any of them.

e.  **Modification of Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule**.

i.  In addition to the rights of the Successful Bidder described above with respect to an Assumption and Assignment Objection at or prior to the closing of the Sale Transaction, each Successful Bidder may elect, in its sole and absolute discretion, to (A) exclude any contract or lease on the Potential Assumed Contracts Schedule as an Assumed Contract or Assumed Lease, as applicable (in which case it shall become an Excluded Contract or Excluded Lease, as applicable) or (B) include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumed Contracts Schedule, by providing to the Debtors written notice of its election to exclude or include such contract or lease, as applicable.

ii.  If the Debtors or any Successful Bidder identify during the pendency of the Chapter 11 Cases (before or after the closing of the applicable Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, such Successful Bidder may, in its sole and absolute discretion, elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures.

iii.  Following the conclusion of the Auction, if any, and the selection of the Successful Bidder(s), the Debtors reserve the right, at any time before the closing of the Sale Transaction(s), to modify the previously-stated Cure Costs associated with any Proposed Assumed Contract, subject to notice requirements in the Assumption and Assignment Procedures.

iv.  In the event that any contract or lease is added to the Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule or previously-stated Cure Costs are modified, in accordance with the

procedures set forth in this Motion, the Debtors would promptly file, cause to be published on the Case Information Website, and serve a supplemental assumption and assignment notice, by email or ECF where available, or otherwise by first class mail, on the applicable Counterparty (each, a "**Supplemental Assumption and Assignment Notice**"). Each Supplemental Assumption and Assignment Notice shall (A) include a schedule of the modified Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule (the "**Supplemental Assumed Contracts Schedule**"), (B) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (C) prominently display the deadline to file a Supplemental Assumption and Assignment Objection (as defined below), and (D) prominently display the date, time, and location of the Sale Hearing.

v.      Any Counterparty listed on a Supplemental Assumed Contracts Schedule whose contract or lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of a Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**"). All Supplemental Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, and (D) **no later than 14 days from the date of service of such Supplemental Assumption and Assignment Notice**, (1) be filed with the Court and (2) be served on the Assumption and Assignment Objection Notice Parties. Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

f.      **Reservation of Rights**. The inclusion of an Assumed Contract, an Assumed Lease, or, in each case, Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, Supplemental Assumption and Assignment Notice, or Supplemental Assumed Contracts Schedule shall not constitute, nor be deemed, a determination or admission by the Debtors, the Successful Bidder(s), or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Assumed Contract and Assumed Lease listed on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, or Supplemental Assumed Contracts Schedule. The Debtors' inclusion of any

Assumed Contract or Assumed Lease on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, and/or Supplemental Assumed Contracts Schedule shall not be a guarantee that such Assumed Contract or Assumed Lease ultimately would be assumed or assumed and assigned.

### Basis for Relief

**A.     The Bidding Procedures are Fair and Appropriate and Should Be Approved**

37.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate:  maximizing the value of sale proceeds received by the estate.  *See In re Johnson*, 433 B.R. 626, 638 (Bankr. S.D. Tex. 2010) (citing *Cheng v. K&S Diversified Invs. (In re Cheng)*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004)) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564‒65 (8th Cir. 1997) (recognizing that the main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established to enhance competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

38.     The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Bid Assets or serve as an investor with respect to a Chapter 11 Plan Transaction.  Given the time constraints,

the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to elicit the highest or otherwise best offer(s) reasonably available for the Bid Assets. Additionally, the Bidding Procedures would allow the Debtors to conduct the Auction in a fair and transparent manner that would encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.

39. Courts in this district routinely approve procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales. *See, e.g.*, *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 20, 2023) [Docket No. 471]; *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) [Docket No. 134]; *In re Kalera, Inc.*, No. 23-90290 (DRJ) (Bankr. S.D. Tex. Apr. 27, 2023) [Docket No. 98]; *In re Nielsen & Bainbridge, LLC*, No. 23-90071 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2023) [Docket No. 215]; *In re Cleveland Integrity Servs., Inc.*, No. 23-90052 (CML) (Bankr. S.D. Tex. Feb. 6, 2023) [Docket No. 69]; *In re Pipeline Health System, LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 11, 2022) [Docket No. 149]; *In re Basic Energy Servs., Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Aug. 25, 2021) [Docket No. 179]; *In re Limetree Bay Servs., LLC*, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex. Aug. 11, 2021) [Docket No. 392]; *In re Wash. Prime Grp. Inc.*, Case No. 21-31948 (MI) (Bankr. S.D. Tex. July 8, 2021) [Docket No. 289]; *In re Chesapeake Energy Corp.*, Case No. 20-33233 (DRJ) (Bankr. S.D. Tex. Oct. 6, 2020) [Docket No. 1305]; *In re McDermott Int'l, Inc.*, Case No. 20-30336 (DRJ) (Bankr. S.D. Tex. Feb. 24, 2020) [Docket No. 476]; *In re S. Foods Grps., LLC*, Case No. 19-36313 (DRJ) (Bankr. S.D. Tex. March 19, 2020) [Docket No. 1178]; *In re Alta Mesa Res., Inc.*, Case No. 19-35133 (MI) (Bankr. S.D. Tex. Oct. 11, 2019) [Docket No. 317]. Accordingly, the Bidding Procedures should be approved because, under the

circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

**B.     The Procedures for Designating a Stalking Horse Bidder and Offering Bid Protections Have Sound Business Purposes and Should Be Approved**

40.     As noted above, the Bidding Procedures contemplate (but do not require) the Debtors, in the exercise of their business judgment and in consultation with the Consultation Parties, to (a) agree with a Qualified Bidder that its Qualified Bid would constitute a Stalking Horse Bid and (b) offer the Bid Protections to such Stalking Horse Bidder.[13]  The Debtors believe that their ability to offer Bid Protections to a prospective Stalking Horse Bidder is necessary, both to set a floor for the value of the Bid Assets and to attract potential buyers to bid for such assets, and would maximize the realizable value of the Bid Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

41.     In the event that the Debtors, in consultation with the Consultation Parties, desire to designate a Qualified Bid as a Stalking Horse Bid and enter into a Stalking Horse APA that provides for Bid Protections subject to the limitations set forth herein, the Debtors would file the Stalking Horse Notice with the Court and serve such notice on the Stalking Horse Notice Parties, followed by a certificate of no objection should no party in interest file a Stalking Horse Objection by the Stalking Horse Objection Deadline.  Once any such certificate of no objection is filed, the Debtors propose (a) that their designation of the Stalking Horse Bidder and agreement respecting Bid Protections shall be deemed approved and (b) that the Debtors may enter into the Stalking Horse APA, in each case without further notice or opportunity to be heard.

---

[13]  In the event that there are multiple bids for non-overlapping lots of the Bid Assets, the Bidding Procedures allow the possibility of designating multiple bids as Stalking Horse Bids for such non-overlapping lots.

42.     If a Stalking Horse Objection is timely and properly filed and served, to the extent the Debtors are unable to resolve it consensually, the Debtors may schedule a Stalking Horse Hearing on an expedited basis (on not less than three-days' notice).  At the Stalking Horse Hearing, the Debtors would seek the Court's authorization to enter into the Stalking Horse APA, including the Bid Protections contained therein.

43.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  The Fifth Circuit has held that bid protections should be approved in chapter 11 cases so long as (a) there was no "self-dealing or manipulation among the parties who negotiated" the bid protections, (b) the bid protections would "facilitate[]," rather than "hinder[]," the bidding process, and (c) the bid protections are "reasonable in comparison to the size of" the contemplated transaction.  *ASARCO*, 650 F.3d at 603.

44.     Here, the Bid Protections satisfy the *ASARCO* factors.  As for the first factor, the Debtors would only offer the Bid Protections to the extent that they believe, in the exercise of their business judgment and consistent with their fiduciary duties (and in consultation with the Consultation Parties), that offering these protections would enhance the ultimate recovery to be received by all stakeholders.  In addition, as set forth in the Bidding Procedures, no Bid Protections may be offered to an insider of the Debtors.  Accordingly, there should be no basis to conclude that any offer of Bid Protections might be infected by manipulation or self-dealing.

45.     Second, the Bid Protections would facilitate, and not hinder, the bidding process. The Bid Protections would enable the Debtors to secure an adequate floor for the Bid Assets and insist that competing bids be materially higher or better than the Approved Stalking Horse Bid. *See ASARCO*, 650 F.3d at 602 n.9 (noting that break-up fees "provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent

bid may encourage later bidders" (quotation omitted)); *Official Comm. of Unsecured Creditors of Walker Cty. Hosp. Corp. v. Walker Cty. Hosp. Dist. (In re Walker Cty. Hosp. Corp.)*, 3 F.4th 229, 231 n.2 (5th Cir. 2021) (same).  A prospective Stalking Horse Bidder would not likely agree to hold out its bid and act as a stalking horse without Court approval of the Bid Protections; thus, the Debtors could risk losing out on the opportunity to obtain the highest or otherwise best offer for the Bid Assets and would certainly lose out on the downside protection an Approved Stalking Horse Bid would provide.

46.     Third, for the reasons set forth in the Bojmel Declaration, the Bid Protections are reasonable relative to the size, nature, and complexity of the contemplated Sale Transaction, and particularly in light of the efforts that would necessarily have been expended by a Stalking Horse Bidder.  The Bid Protections would make up only a small percentage of any reasonable price for the Bid Assets that a Stalking Horse Bidder might offer—the Break-Up Fee, for instance, represents only three percent of the consideration offered by the Stalking Horse Bidder, and even then only of the cash portion of such consideration.

47.     Courts in this district have approved protections similar to the Bid Protections proposed here as reasonable.  *See, e.g.*, *In re Basic Energy Servs., Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Aug. 25, 2021) [Docket No. 179]; *In re Limetree Bay Servs., LLC*, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex. Aug. 11, 2021) [Docket No. 392]; *In re Chesapeake Energy Corp.*, Case No. 20-33233 (DRJ) (Bankr. S. D. Tex. Oct. 6, 2020) [Docket No. 1305]; *In re McDermott Int'l, Inc.*, Case No. 20-30336 (DRJ) (Bankr. S.D. Tex. Feb. 24, 2020) [Docket No. 476]. Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should likewise be approved.

C.      **The Proposed Sale Transaction Satisfies the Requirements of Section 363 of the Bankruptcy Code**

48.      Ample authority exists for approval of the potential Sale Transaction contemplated by this Motion.  Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Int'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . ."); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

49.      Courts emphasize that the business judgment rule is not an onerous standard—that it is instead "flexible and encourages discretion."  *ASARCO*, 650 F.3d at 601.  "Great judicial deference is given to the [debtor's] exercise of business judgment."  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  A sound business justification for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of

creditors and interest holders.  *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor in possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

50.    Moreover, section 105(a) of the Bankruptcy Code confers a bankruptcy court with broad equitable powers to confer relief in alignment with bankruptcy policies.  *See United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (holding that section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to fashion equitable remedies "in a manner consistent with the provisions of the Bankruptcy Code"); *see also In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Trevino*, 599 B.R. 526, 542–43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . 'authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.'").

### i.    *The Debtors Have Demonstrated a Sound Business Justification for the Potential Sale Transaction*

51.    For the reasons set forth in the Bojmel Declaration, a strong business justification exists for the sale of the Bid Assets as described herein.  Exploring an orderly but expeditious sale

of the Bid Assets or Chapter 11 Plan Transaction is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders. To that end, the DIP Credit Agreements expressly require that the Debtors timely consummate any Sale Transaction or identify investors for a Chapter 11 Plan Transaction by no later than September 7, 2023 (or, in the case of a Chapter 11 Plan Transaction, such later date as is required to comply with the requirements of the Bankruptcy Code, Bankruptcy Rule, and Local Rules for confirmation of a chapter 11 plan). Additionally, the Debtors believe that any Sale Transaction or Chapter 11 Plan Transaction consummated in accordance with the Bidding Procedures would produce fair and reasonable purchase prices for the Bid Assets.

52. The Bidding Procedures were carefully designed to facilitate a flexible, robust, and competitive bidding process. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their economic stakeholders. Any transaction governed by the Bidding Procedures undoubtedly would serve the important objectives of obtaining a fair and reasonable purchase price for the Bid Assets, along with the highest or otherwise best value for the Bid Assets or the most favorable Chapter 11 Plan Transaction, which would inure to the benefit of all parties in interest in the Chapter 11 Cases.

53. Finally, nothing in the Bidding Procedures requires the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines that taking such action, or refraining from taking such action, is required to comply with applicable law or its fiduciary duties under applicable law, thereby allowing the Debtors to pivot to an alternative transaction.

54.     For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transactions and related relief requested herein.

###     ii.     The Noticing Procedures Are Reasonable and Appropriate

55.     "[A] sale of assets under § 363 requires notice and a hearing and is subject to court approval." *In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010).  The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known relevant creditors and all other parties in interest with adequate, timely notice of, among other things, the potential Sale Transaction, Bidding Procedures, Auction, and Sale Hearing.

## D.     The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

56.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  "The purpose of § 363(m)'s stay requirement is in furtherance of the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citation and internal quotation marks omitted).  "Section 363(m) patently protects, from later modifications on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990).

57.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term in two ways in the context of section 363(m) of the Bankruptcy Code.  First, it has "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  *TMT Procurement Corp.*, 764 F.3d at 521 (citations omitted).  Second, the Fifth Circuit has "noted that 'the misconduct that would destroy a purchaser's good faith status . . . involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Id.* (citations omitted).

58.     The Debtors submit that the Successful Bidder would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors have engaged independent, sophisticated counsel and other professional advisors to represent their interests with respect to the sale process and, to the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit a Sale Transaction to be set aside under section 363(m) of the Bankruptcy Code.

59.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Bid Assets.  *See* Bidding Procedures § 2(b).  Any asset purchase agreement with a Successful Bidder executed by the Debtors would be negotiated at arm's length and in good faith.  Accordingly, the Debtors seek a finding that any Successful Bidder under the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

60.     Based on the foregoing, the Debtors submit that the Debtors' entrance into a Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**E.     The Bid Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

61.     In the interest of attracting the best offers, the Bid Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

  a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

  b.     such entity consents;

  c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

  d.     such interest is in bona fide dispute; or

  e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814 (Bankr. W.D. Tex. 2013) ("Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied by the Court to authorize a debtor . . . to sell its property . . . free and clear of interests of a third party.").

62.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §

105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

63.     The Debtors submit that the sale of the Bid Assets free and clear of liens, claims, interests, and encumbrances would satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent that a party objects to the Sale Transaction on the basis that it allegedly holds a prepetition lien or encumbrance on the Bid Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

64.     Moreover, the Debtors have sent or will send the Sale Notice to any purported prepetition lienholders.  If such lienholders do not object to the proposed Sale Transaction, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on any of the Bid Assets (other than those assumed or permitted, if any, in connection with a Sale Transaction) timely and properly objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing.  *See Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

65.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate

in the Auction, to the detriment of the Debtors' economic stakeholders.  Accordingly, the Debtors request that the Court authorize the sale of the Bid Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (including, without limitation, all DIP Liens, Adequate Protection Liens, Prepetition Liens, DIP Obligations, Adequate Protection Obligations, Prepetition Obligations, and DIP Superpriority Claims (as each is defined in the DIP Order)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

## F.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

66.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The decision to assume or reject an unexpired lease is a matter within the "business judgment" of the debtor.  *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989).  "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."  *Richmond Leasing Co.*, 762 F.2d at 1309 (citation and internal quotation marks omitted).

67.    Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for their Bid Assets.  The assumption and assignment of Proposed Assumed Contracts is a critical element of the value of the Bid Assets.  Given that the ability to consummate an agreed Sale Transaction is critical to the Debtors' efforts to maximize

value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

68.     The consummation of any Sale Transaction involving the assignment of a Proposed Assumed Contract would be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts and Leases to be assumed be cured and that the Debtors provide adequate assurance that such defaults would be promptly cured.  The Debtors' assumption and assignment of Proposed Assumed Contracts would be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale Transaction or any later applicable effective date.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which would set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on the Potential Assumed Contracts Schedule.  As a result, Counterparties would have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the applicable Sale Hearing.

69.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re Tex. Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (citation and internal quotation marks omitted).  "Assurance of future performance is adequate if performance is likely (i.e. more probable than not) and the degree of assurance necessary to be deemed adequate falls considerably short of an absolute guaranty."  *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr.

E.D. Tex. 1999).  "Some helpful factors include 'whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee.'"  *In re Tex. Health Enters. Inc.*, 72 F. App'x 122, 126 (5th Cir. 2003) (citation omitted).

70.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Proposed Assumed Contracts. Each affected Counterparty would have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.  Further, the Debtors propose to file with the Court a Proposed Assumption and Assignment Notice, which would set forth a list of the Proposed Assumed Contracts, in advance of the Sale Hearing.  To the extent necessary, the Debtors would present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder to perform under the Proposed Assumed Contracts.

71.     In addition, to facilitate the assumption and assignment of Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract or Assumed Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[14]

---

[14]  Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

## **Emergency Consideration**

72.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion.  As set forth in this Motion and the Bojmel Declaration, the Debtors believe that continuing a sale process pursuant to the Bidding Procedures, and in accordance with the milestones under the DIP Credit Agreements, will maximize the value of the Bid Assets for the benefit of all stakeholders.  Accordingly, shortening notice of this Motion is warranted.

## **Waiver of Bankruptcy Rules 6004(a), 6004(h), and 6006(d)**

73.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

74.     The Debtors have already commenced the marketing and sale process to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with a Sale Transaction be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

## **Notice**

75.     Notice of this Motion will be provided to the following parties: (a) the U.S. Trustee; (b) DLA Piper LLP (US), as counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of Texas; (f) the state attorneys general for states in which the Debtors conduct business; (g) Ropes & Gray LLP, as counsel to the Ad Hoc Group of Term Loan Lenders and the Term DIP Secured Parties; (h) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the ABL DIP Agent; (i) Kramer Levin Naftalis & Frankel LLP, as counsel to Cornell; and (j) any party identified in section E of the Complex Procedures (collectively, the "**Notice Parties**").  A copy of this Motion and any Order approving it will also be made available on the Debtors' Case Information Website.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   June 30, 2023
       Houston, Texas

HAYNES AND BOONE, LLP

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.:   (713) 547-2000
Email: charles.beckham@haynesboone.com
      arsalan.muhammad@haynesboone.com
      david.trausch@haynesboone.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Joanna McDonald (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.:   (212) 450-4000
Email: brian.resnick@davispolk.com
      steven.szanzer@davispolk.com
      joanna.mcdonald@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.


## **Certificate of Service**

I certify that, on June 30, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.