United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 03, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | **Chapter 11** |
| **INSTANT BRANDS ACQUISITION HOLDINGS INC.**, *et al.*, | § § § | **Case No. 23-90716 (DRJ)** |
| Debtors.[1] | § § § | **Jointly Administered Re: Docket No.** __199__ |

### ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENTS AND RELATED DOCUMENTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Instant Brands Acquisition Holdings Inc. ("**IBAH**") and certain of its affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the Chapter 11 Cases, for entry of orders (collectively, the "**Sale Order**"), among other things, (a) approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests, and encumbrances, (b) authorizing the Debtors to enter into and perform their obligations under the APAs (as defined below) and related documents, (c) authorizing the

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Housewares APA, the Appliances APA, the Bidding Procedures, and the Bidding Procedures Order (each, as defined herein), as applicable.

assumption and assignment of certain Contracts and Leases, and (d) granting related relief, in each case, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution and that this Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a); and the Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion, the *Declaration of Ronen Bojmel in Support of Debtors' Emergency Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Authorizing Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (E) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (F) Approving Assumption and Assignment Procedures, (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 199-1] (the "**Bojmel Declaration**"), the *Declaration of Adam Hollerbach as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [Docket No. 39] (the "**Hollerbach Declaration**"), and the *Supplemental Declaration of Ronen Bojmel in Support of Entry of Order (A) Approving the Sale of Substantially All of the Debtors'*

*Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform their Obligations under the Asset Purchase Agreements and Related Documents, (C) Authorizing the Assumption and Assignment of Certain Contracts and Leases, and (D) Granting Related Relief* [Docket No. 630] (the "**Supplemental Bojmel Declaration**" and, together with the Bojmel Declaration and the Hollerbach Declaration, the "**Declarations**"); and the Court having held the Sale Hearing (as defined below) to consider the relief requested in the Motion; and the Court having determined that the legal and factual bases set forth in the Motion and the Declarations and at the Hearing establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

### Background

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated to the extent consistent with this Sale Order.

B.      On June 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.      The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 40] entered by the Court on June 13, 2023 in each of the Chapter 11 Cases.

D.      On June 15, 2023, the Ontario Superior Court of Justice (Commercial List) issued an order recognizing the Chapter 11 Cases as foreign main proceedings.

E.      On June 27, 2023, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.  *United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 177].

F.      On July 12, 2023, following a hearing (the "**Bidding Procedures Hearing**"), the Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Authorizing Potential Selection of Stalking Horse Bidder(s), (III) Approving Bid Protections, (IV) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (V) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (VI) Approving Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. 253] (the "**Bidding Procedures Order**" and the bidding procedures attached as Exhibit 1 to the Bidding Procedures Order, the "**Bidding Procedures**").  On July 20, 2023, the Ontario Superior Court of Justice (Commercial List) issued an order recognizing the Bidding Procedures Order.

G. On September 28, 2023, the Debtors filed the *Notice of Auction Results and Scheduled Sale Hearing* [Docket No. 611] identifying the Successful Bidders and Alternate Bidder following the Auction and attaching the APAs (as defined below).

H. IB Housewares US Holdings, LLC and IB Housewares Canada Holdings, Inc. (collectively, the "**Housewares Buyer**"), as party to that certain Asset Purchase Agreement, dated as of September 27, 2023, by and among IBAH, each of the subsidiaries of IBAH listed on Schedule 1 thereto, and the Housewares Buyer (as may be amended, amended and restated, supplemented, or otherwise modified, in each case, in accordance with the terms of this Sale Order, the "**Housewares APA**," a copy of which is attached hereto in substantially final form as **Exhibit A**), has submitted the highest and best offer for the Debtors' assets to be acquired pursuant to the Housewares APA (the "**Housewares Assets**"). The Debtors' determination that the consideration provided by the Housewares Buyer under the Housewares APA constitutes the highest and best offer for the Housewares Assets, is reasonable, and constitutes a valid and sound exercise of the Debtors' business judgment.

I. IB Appliances US Holdings, LLC and IB Appliances Canada Holdings, Inc. (collectively, the "**Appliances Buyer**," together with the Housewares Buyer, the "**Buyers**," and each, a "**Buyer**"), as party to that certain Asset Purchase Agreement, dated as of September 27, 2023, by and among IBAH, each of the subsidiaries of IBAH listed on Schedule 1 thereto, and the Appliances Buyer (as may be amended, amended and restated, supplemented, or otherwise modified, in each case, in accordance with the terms of this Sale Order, the "**Appliances APA**," together with the Housewares APA, the "**APAs**" and each, an "**APA**"), has submitted the highest and best offer that was duly submitted in accordance with the Bidding Procedures, for the Debtors' assets to be acquired pursuant to the Appliances APA (the "**Appliances Assets**," and together with

5

the Housewares Assets, the "**Acquired Assets**"). A copy of the Appliances APA in substantially final form is attached as **Exhibit B** hereto. The Debtors' determination that the consideration provided by the Appliances Buyer under the Appliances APA constitutes the highest or otherwise best offer for the Appliances Assets, is reasonable, and constitutes a valid and sound exercise of the Debtors' business judgment.

J.        On October 3, 2023, the Court conducted a hearing on the Motion (the "**Sale Hearing**") at which time all interested parties were offered an opportunity to be heard with respect to the Motion and the proposed sale of the Housewares Assets to the Housewares Buyer (the "**Housewares Sale**"), and the proposed sale of the Appliances Assets to the Appliances Buyer (the "**Appliances Sale**," and together with the Housewares Sale, the "**Sales**" and each, a "**Sale**"); and the Court has reviewed and considered the Motion, the APAs, the Bidding Procedures Order, and the record before the Court, including the Bidding Procedures Hearing; and the appearance of all interested parties and all responses and objections to the Motion and the Sales having been duly noted in the record of the Sale Hearing.

**Notice of Transactions, APA, Sale Hearing, Deadlines, and Cure Costs**

K.        As evidenced by the affidavits or declarations of service and publication previously filed with the Court, the Debtors have provided proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Bid Deadline (as defined below), the Sale Hearing, the APAs, and the transactions contemplated by each of the Housewares APA (the "**Housewares Transaction**") and Appliances APA (the "**Appliances Transaction**," and together with the Housewares Transaction, the "**Transactions**", and each, a "**Transaction**"), and corresponding Transaction Documents (as defined in each of the APAs) free and clear of any liens, claims, or interests (other than the Assumed Liabilities and Permitted Encumbrances expressly assumed

6

under, or expressly permitted by, the Housewares APA or the Appliances APA,[3] as applicable, or this Sale Order) to the fullest extent permitted under section 363(f) of the Bankruptcy Code, and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Buyers at Closing pursuant to this Sale Order and the terms of the Housewares APA or Appliances APA, as applicable, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, and 9014, Local Rules 2002-1 and 4002-1 and the Bidding Procedures Order, to all persons and entities entitled to such notice, including all Notice Parties (as defined in the Motion), Sale Notice Parties (as defined herein), and all other persons and entities as directed by this Court. The aforementioned notices are (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice and (ii) adequate and sufficient under the circumstances of the Chapter 11 Cases, and no other or further notice of the Motion, the Bid Deadline, the Sale Hearing, the APAs, or the Transactions is required. With respect to parties in interest whose identities could not be reasonably ascertained by the Debtors, the Sale Notice (as defined in the Bidding Procedures) published in the national edition of *USA Today* on July 20, 2023 [Docket No. 278], was sufficient and reasonably calculated to provide notice to such parties under the circumstances. The Debtors published the Motion, Bidding Procedures Order, the Bidding Procedures, the Sale Notice, and certain other documents relevant to the Sales on its Case Information Website.

L.    A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities, including, without limitation, (i) the

---

[3] Hereinafter, "**Assumed Liabilities**" and "**Permitted Encumbrances**" as defined in (i) the Housewares APA shall be referred to herein as "**Assumed Housewares Liabilities**" and "**Permitted Housewares Encumbrances**" and (ii) in the Appliances APA shall be referred to herein as "**Assumed Appliances Liabilities**" (together with the Assumed Housewares Liabilities, the "**Assumed Liabilities**") and "**Permitted Appliances Encumbrances**" (together with the Permitted Housewares Encumbrances, the "**Permitted Encumbrances**").

7

U.S. Trustee, (ii)Dechert LLP, as counsel to the Term DIP Lenders (as defined in the Final DIP Order[4]), (iii) Ropes & Gray LLP, as counsel to the Term DIP Lenders (as defined in the Final DIP Order), (iv) Ropes & Gray LLP, as counsel to the Term Agents, (v) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the ABL DIP Agent (as defined in the Final DIP Order), (vi) DLA Piper LLP (US), as counsel to the Committee, (vii) Cohen, Weiss and Simon LLP, as counsel to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, (viii) Counterparties to Contracts and Leases, (ix) the Securities and Exchange Commission, (x) the Internal Revenue Service, (xi) the United States Attorney's Office for the Southern District of Texas, (xii) the state attorneys general for states in which the Debtors conduct business, (xiii) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, (xiv) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets, (xv) all other known parties with any interest in the Bid Assets, and (xvi) any party that, as of the filing of this Motion, has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

### Highest or Otherwise Best Offer

M.      On September 7, 2023, each of the Housewares Buyer and the Appliances Buyer submitted a written offer for the Housewares Assets and the Appliances Assets, respectively. The

---

[4] As used herein, the "**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 257] and any supplemental and/or final order entered in connection therewith.

written offer by each of the Housewares Buyer and Appliances Buyer constitutes a "Qualified Bid" as defined in the Bidding Procedures.

N.     As set forth in the Supplemental Bojmel Declaration, and as demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors and the Buyers have complied in all respects with the Bidding Procedures Order.  The sale process was duly noticed and conducted in a non-collusive, fair, and good faith manner, and the process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets and assume the Assumed Liabilities.  In accordance with the Bidding Procedures, the bid deadline (the "**Bid Deadline**") was September 7, 2023 at 3:00 p.m. (prevailing Central Time).  On the Bid Deadline, a common affiliate of the Buyers submitted a "Qualified Bid" (as defined in the Bidding Procedures) for the purchase of substantially all of the assets of the Debtors in a single sale which, as a result of a the competitive Auction process, was subsequently split into the contemplated Housewares Transaction and the Appliances Transaction. The closing of bidding at the Auction occurred on September 18, 2023.

O.     The Acquired Assets were adequately marketed by the Debtors and their advisors, and the consideration provided by the Housewares Buyer under the Housewares APA, and  by the Appliances Buyer under the Appliances APA: (i) each constitutes the highest and best offer for the Housewares Assets and Appliances Assets, respectively, that was duly submitted in accordance with the Bidding Procedures and (ii) provides fair and reasonable consideration to the Debtors for (a) the Housewares Assets and the assumption of the Assumed Housewares Liabilities, and (b) the Appliances Assets and the assumption of the Assumed Appliances Liabilities, respectively.  Each of the Housewares APA and the Appliances APA presents the best opportunity to maximize and

realize the value of the Housewares Assets and the Appliances Assets in connection with the Auction, respectively, for the benefit of the Debtors and their estates, in each case, under the circumstances of these Chapter 11 Cases. The Debtors' determination (in consultation with the Consultation Parties) that the consideration to be provided by (x) the Housewares Buyer, as well as the assumption of the Assumed Housewares Liabilities under the Housewares APA and (y) the Appliances Buyer, as well as the assumption of the Assumed Appliances Liabilities under the Appliances APA, constitutes the highest and best offer for the Housewares Assets, and the highest and best offer for the Appliances Assets that was duly submitted in accordance with the Bidding Procedures, respectively, and is a valid and sound exercise of the Debtors' business judgment.

P.      Approval of the Motion and the APAs, as well as the consummation of the Transactions, is in the best interests of the Debtors, their respective creditors and estates, and all parties in interest. The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for the Sales outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the consummation of the Transactions is necessary and appropriate to preserve and maximize the value of the Debtors' estates. Not transferring the Housewares Assets and Appliances Assets free and clear of all Claims, Liens, Encumbrances, and any other potential liabilities or obligations (other than Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and Assumed Appliances Liabilities and Permitted Appliances Encumbrances, respectively) would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Housewares Assets and Appliances Assets other than pursuant to a transfer that is free and clear of all Claims, Liens, Encumbrances, and any other liabilities or obligations (in each case, other than Assumed Housewares Liabilities and Permitted Housewares

10

Encumbrances and the Assumed Appliances Liabilities and Permitted Appliances Encumbrances, respectively) would be of substantially less benefit to the Debtors' estates.

Q.      Entry of this Sale Order approving and authorizing the Debtors' entry into each of the Housewares APA and Appliances APA and the Debtors' performance of all the provisions in each of the Housewares APA and Appliances APA, is a necessary condition precedent to the Housewares Buyer's consummation of the Housewares Transaction and the Appliance Buyer's consummation of the Appliance Transaction, respectively.

R.      None of the Debtors nor the Buyers is entering into the Housewares APA or Appliances APA, as applicable, or proposing to consummate the Transactions, fraudulently or for the purpose of hindering, delaying, or defrauding any creditor of the Debtors or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

S.      The terms and conditions set forth in each of the APAs, including the form and total consideration to be realized by the Debtors pursuant to each of the APAs, (i) are in the best interests of the Debtors' creditors and estates and (ii) constitute fair value, full and adequate consideration, reasonably equivalent value, and reasonable market value for the Housewares Assets and Appliance Assets, as applicable, in each case, under the circumstances of these Chapter 11 Cases. The Housewares Buyer is the Successful Bidder for the Housewares Assets, and the Appliances Buyer is the Successful Bidder for the Appliances Assets, each in accordance with the Bidding Procedures Order.

**Good Faith of the Debtors and the Buyers**

T.     The sales process conducted by the Debtors in accordance with the Bidding Procedures Order was at arms' length, non-collusive, in good faith, and substantively and procedurally fair to all entities.

U.     The Debtors, the Buyers, and their respective professionals and advisors have complied in good faith with the Bidding Procedures Order in all respects.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the Declarations, and the evidence adduced and representations proffered by counsel at the Bidding Procedures Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted and the Debtors (a) afforded all creditors, other parties in interest, and all potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer(s) to purchase the Acquired Assets in accordance with the Bidding Procedures, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets, and (c) appropriately considered all bids that were duly submitted in accordance with the Bidding Procedures.

V.     The APAs and the Transactions were proposed and negotiated by and among the Debtors, and the Housewares Buyer or the Appliances Buyer, as applicable, without collusion, in good faith, and at arms' length.

W.     Neither of the Buyers nor any of their respective affiliates, members, officers, directors, shareholders, members, partners, principals, or any of their respective representatives, successors, or assigns are an "insider" of any of the Debtors, as the term "insider" is defined in section 101(31) of the Bankruptcy Code.  Each of the Housewares Buyer and Appliances Buyer is

entering into the Housewares Transactions and Appliances Transactions, respectively, in good faith, is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code (and is therefore entitled to the full protection of that provision), and otherwise has proceeded in good faith in all respects in connection with this proceeding. None of the Debtors or the Buyers has engaged in any action or inaction that would cause or permit the APAs or the Transactions to be avoided or would impose any costs or damages under section 363(n) of the Bankruptcy Code or otherwise. The protections afforded by section 363(m) are integral to the Transactions and the Buyers would not consummate the Transactions without such protections.

X.     Neither the ABL DIP Secured Parties (as defined in the Final DIP Order) nor the Term DIP Secured Parties (as defined in the Final DIP Order) object to entry of this Order. Without limitation of the foregoing, prior to the applicable Closing Date, and following entry of this Order, the Debtors, the ABL DIP Agent and the other applicable ABL DIP Secured Parties shall enter into one or more amendments to the ABL DIP Credit Agreement (as defined in the Final DIP Order) to, among other things, permit the consummation of each Sale, the automatic release of the applicable DIP Liens (as defined in the Final DIP Order) on the applicable Acquired Assets and the application of the applicable Sale Proceeds (as defined below) to the ABL DIP Obligations (as defined in the Final DIP Order), as contemplated by paragraph 8, in each case on the terms contemplated by this Order. In the event that (x) the Debtors, the ABL DIP Agent and the other applicable ABL DIP Secured Parties fail to so amend the ABL DIP Credit Agreement or (y) if otherwise, there is any conflict or inconsistency between the provisions of such amended ABL DIP Credit Agreement and the provisions of this Order permitting the consummation of each Sale,

in each case of (x) and (y), the provisions of this Order permitting the consummation of each Sale on the terms contemplated hereby shall govern and control.[5]

**Assumption and Assignment of the Proposed Assumed Contracts**

Y.    In accordance with the Bidding Procedures Order, the Debtors filed with the Court, caused to be published on the Case Information Website, and served upon (i) each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease listed on the *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 294] (the "**Original Potential Assumption and Assignment Notice**") as supplemented or amended by the *Notice of First Amended Schedule of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 492] (the "**First Amended Potential Assumption and Assignment Notice**" and together with the Original Potential Assumption and Assignment Notice, and as further amended, modified, or otherwise supplemented from time to time, the "**Potential Assumption and Assignment Notice**") of the potential assumption and assignment of such Counterparty's Contracts or Leases [6] (collectively, the "**Potential Assumed Contracts**") and the amount necessary to cure any defaults thereunder (the "**Cure Costs**") and (ii) each Counterparty listed on Schedule 2.05(a) of each of the APAs, as each may be supplemented or amended prior to and subsequent to Closing in accordance with the terms of (y) the Housewares APA, a notice (the "**Housewares Proposed Assumption and Assignment Notice**") of the assumption and

---

[5] Hereinafter, as used in this Sale Order, the terms "**ABL DIP Credit Agreement**" and "**DIP Documents**" shall each have the meaning ascribed to such term in the Final DIP Order, as such ABL DIP Credit Agreement and DIP Documents, respectively, are or may be amended, supplemented, or otherwise modified in accordance with their respective terms, including after the date hereof in connection with the Transactions.

[6] "**Contract**" and "**Lease**" shall have the meanings as set forth in the Housewares APA or Appliances APA, as applicable.

assignment of the Desired 365 Contracts (as defined in, and as modified in accordance with, the Housewares APA and this Sale Order, the "**Proposed Assumed Housewares Contracts**") as agreed between the Debtors and the Housewares Buyer, and (z) the Appliances APA, a notice (the "**Appliances Proposed Assumption and Assignment Notice**" and together with the Housewares Proposed Assumption and Assignment Notice, the "**Proposed Assumption and Assignment Notices**") of the assumption and assignment of the Desired 365 Contracts (as defined in, and as modified in accordance with, the Appliances APA and this Sale Order, the "**Proposed Assumed Appliances Contracts**" (together with the Proposed Assumed Housewares Contracts, the "**Proposed Assumed Contracts**" and each, a "**Proposed Assumed Contract**")) as agreed between the Debtors and the Appliances Buyer. The service and provision of the Potential Assumption and Assignment Notice and the Proposed Assumption and Assignment Notices was good, sufficient, and appropriate under the circumstances, including but not limited to providing each counterparty a full and fair opportunity to object to the assumption and assignment of its Contract and its proposed Cure Costs, and the service and provision of any further Supplemental Assumption and Assignment Notice, whether before or after the Closing, that conforms to the terms of the Bidding Procedures Order and the applicable APA shall be deemed good, sufficient, and appropriate notice under the circumstances. No other or further notice of any of the foregoing is required. The Counterparties to the Potential Assumed Contracts have had an adequate opportunity to object to the Cure Costs set forth in the Potential Assumption and Assignment Notice.

Z. The applicable deadlines to file or assert an objection to the Cure Costs of any Contract or Lease (a "**Cure Objection**") have expired, and to the extent any such entity timely and properly filed (or informally asserted to the Debtors or their advisors) a Cure Objection, or timely

asserted a Cure Objection for which the Debtor waived the requirement to formally file such Cure Objection, all such Cure Objections have been (i) resolved, withdrawn, or overruled or (ii) continued to a later date by the Debtors, in consultation with the Housewares Buyer or Appliances Buyer, as applicable, the Consultation Parties, and the objecting entity (subject to the Court's calendar). To the extent that any entity did not timely and properly file (or informally assert to the Debtors or their advisors) a Cure Objection by the original deadline of August 25, 2023 at 4:00 p.m. (prevailing Central Time) or, as applicable, the deadline for objections to previously proposed Cure Cost modifications or newly added Contracts or Leases, as set forth in the First Amended Potential Assumption and Assignment Notice, by September 13, 2023 at 4:00 p.m. (prevailing Central Time), such entity shall forever be barred and estopped from objecting to the Cure Cost as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist.

AA.    As set forth in the Motion and the Declarations, and as more fully demonstrated at the Sale Hearing, it is in the best interests of the Debtors and their respective estates to assume and assign the Proposed Assumed Housewares Contracts to the Housewares Buyer and to assign the Proposed Assumed Appliances Contracts to the Appliances Buyer, in accordance with the terms and conditions of the Housewares APA and the Appliances APA, respectively, and the terms and conditions of the Bidding Procedures Order, and this Sale Order. The Debtors' assumption and assignment of the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts to the Housewares Buyer and the Appliances Buyer, respectively, meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The Transactions contemplated by the APAs provide significant benefits to the Debtors' estates. The Debtors cannot obtain these benefits without the assumption and assignment of the Proposed

Assumed Contracts, which are a material part of the Acquired Assets and the Transactions contemplated by the APAs. Accordingly, the assumption and assignment of the Proposed Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

BB.    Subject to the terms and conditions set forth in the Bidding Procedures Order, the APAs, and this Sale Order, the payment by the Housewares Buyer or Appliances Buyer (as applicable) or the Debtors of the Cure Costs listed on the Potential Assumed Contracts Schedule (or such amounts (i) agreed by and among the Debtors, each of the Housewares Buyer or Appliances Buyer, as applicable, and the applicable Counterparties or (ii) determined by the Court) shall satisfy the requirement of section 365(b)(1)(A) of the Bankruptcy Code.

CC.    Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, a debtor in possession may assign such contract or lease if such contract or lease is assumed by the debtor in possession in accordance with section 365 of the Bankruptcy Code, and the proposed assignee provides "adequate assurance of future performance" of the obligations arising under such contract or lease from and after the date of the assignment. The Debtors have satisfied the requirements necessary to assume the Proposed Assumed Contracts. As set forth in the Supplemental Bojmel Declaration, and as demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors demonstrated that the Housewares Buyer and the Appliances Buyer has the resources to perform the obligations under the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, respectively, and, thus, has provided "adequate assurance of future performance" of the obligations under such Proposed Assumed Contracts. Accordingly, the requirements for assignment of the Proposed Assumed

17

Contracts to the Housewares Buyer or the Appliances Buyer, as applicable, under sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code have been satisfied. To the extent that any party's consent to assumption or assignment of any Proposed Assumed Contract is required by the Bankruptcy Code and applicable non-bankruptcy law, such party is deemed to have consented by not timely objecting to the Motion.

DD.    Pursuant to section 2.05 of the Housewares APA and the Appliances APA, as applicable, the Housewares Buyer and the Appliances Buyer may modify the list of Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, respectively, after the date of this Sale Order. Such modification rights include, but are not limited to, the right of the Housewares Buyer or the Appliances Buyer to designate a contract for assumption by the Debtors and assignment to the Housewares Buyer or the Appliances Buyer, respectively, as well as for exclusion from the Housewares Sale or the Appliances Sale, as applicable. The Housewares Buyer and the Appliances Buyer would not have agreed to the Housewares Sale or the Appliances Sale, respectively, without such modification rights. The notice and opportunity to object provided to counterparties to such Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and in this Sale Order, fairly and reasonably protect any rights that such counterparties and other parties in interest may have with respect to such Contracts.

### Corporate or Limited Liability Company Authority

EE.    The Debtors have (i) full power and authority to perform all of their obligations under the APAs and all other documents contemplated thereby and any prior execution and delivery of, and performance of obligations under, each of the APAs and all other documents contemplated thereby is hereby ratified, (ii) all of the power and authority necessary to consummate the Transactions contemplated by each of the APAs, and (iii) taken all actions

18

necessary to authorize, approve, execute, and deliver the APAs and to consummate the Transactions contemplated by each of the APAs.

### Section 363 Is Satisfied

FF.     Each of the APAs shall be a valid and binding contract between the Debtors, and the Housewares Buyer or the Appliances Buyer, as applicable, and shall be enforceable pursuant to its terms.

GG.     The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code because the Debtors do not qualify as debtors that, in connection with offering a product or a service, disclose to an individual a policy prohibiting the transfer of personally identifiable information about individuals that are not affiliated with the Debtors. Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

HH.     The Acquired Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

II.     Each of the sale of the Housewares Assets to the Housewares Buyer under the terms of the Housewares APA, and the sale of the Appliances Assets to the Appliances Buyer under the terms of the Appliances APA, meet the applicable provisions of section 363(f) of the Bankruptcy Code, and, except as expressly provided in the Housewares APA with respect to the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, or the Assumed Appliances Liabilities and Assumed Appliances Encumbrances, the transfer of the Housewares Assets to the Housewares Buyer, and the transfer of the Appliances Assets to the Appliance Buyer, respectively, shall be free and clear of all Liens and Claims (each as defined below), notwithstanding whether only one or both of the Transactions close, and shall not subject the Housewares Buyer or any of

the Housewares Buyer's assets, or the Appliances Buyer or any of the Appliances Buyer's assets, to any liability for any Liens or Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability). The DIP Secured Parties (as defined in the Final DIP Order) have consented to the release of the DIP Liens on Acquired Assets upon the Closing of the respective APA solely in accordance with this Order, including the application of Sale Proceeds set forth in paragraph 8. All other holders of Liens or Claims that did not object, or that withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code. The interests of all holders of Liens and Claims are adequately protected, thereby satisfying section 363(e) of the Bankruptcy Code; *provided* that such Liens and Claims shall attach to the sale proceeds in the order of their priority, and with the same validity, extent, force and effect that they have against such Acquired Assets immediately prior to the Closing Date (as defined below) with respect to such Acquired Assets; *provided further, however*, that setoff rights held by or against the Housewares Buyer or the Appliances Buyer shall be extinguished to the extent that there is no longer mutuality after the consummation of the Housewares Transaction or Appliances Transaction, as applicable.

JJ.     Neither the Housewares Buyer nor the Appliances Buyer would enter into the Housewares APA or the Appliances APA, respectively, or consummate the Transactions under such APA, thus adversely affecting the Debtors, their estates, creditors, employees, and other parties in interest, if the sale of the Housewares Assets and the Appliances Assets, as applicable, were not as of the Closing of each Transaction (and not conditioned on the Closing of both Transactions) free and clear of all Claims, Liens, and Encumbrances (other than the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and the Assumed Appliances Liabilities and Permitted Appliances Encumbrances, respectively) or if such Buyer would, or in

the future could, be liable for any Claims or Liens, including, without limitation and as applicable, certain liabilities that expressly are not to be assumed by such Buyer, as set forth in the APA to which such Buyer is a party or in this Sale Order. Neither the Housewares Buyer nor the Appliances Buyer would consummate the Housewares Transaction or the Appliances Transaction, respectively, unless the Housewares APA or the Appliances APA (as applicable) specifically provides, and the Court specifically orders, that none of such Buyer, its assets, or the Acquired Assets (as defined in the APA to which such Buyer is a party), shall have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Claim or Lien, or any successor or transferee liability for any of the Debtors, in each case, other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, or (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances.

KK.    Each of the transfer of the Housewares Assets to the Housewares Buyer under the Housewares APA, and of the Appliances Assets to the Appliances Buyer under the Appliances APA, shall be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Housewares Assets or Appliances Assets, respectively, free and clear of all Liens and Claims (notwithstanding whether only one or both of the Transactions close), other than (i) with respect to the Housewares Assets, the Assumed Housewares Liabilities, and Permitted Housewares Encumbrances, or (ii) with respect to the Appliances Assets, the Assumed Appliances Liabilities, and Permitted Appliances Encumbrances. The Debtors may sell their interests in the Housewares Assets and Appliances Assets free and clear of all Liens and Claims (other than (a) with respect to the Housewares Assets, the Assumed Housewares Liabilities and

Permitted Housewares Encumbrances, or (b) with respect to the Appliances Assets, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances) because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied, with all such Liens and Claims under each of the Housewares APA and Appliances APA to attach to the proceeds of the Housewares Transaction and Appliances Transaction, respectively, to be received by the Debtors with the same validity, force, priority, and effect that they had as against the Acquired Housewares Assets or Acquired Appliances Assets (as applicable), and any claims and defenses the Debtors and their estates may possess with respect thereto. Each of the transfer of the Housewares Assets to the Housewares Buyer, and of the Appliances Assets to the Appliances Buyer shall vest such Buyer with good and marketable title to the such Assets free and clear of all Liens and Claims (except as provided in Housewares APA or the Appliances APA, as applicable, solely with respect to (i) in the case of the Housewares APA, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, or (ii) in the case of the Appliances APA, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances); *provided* that such Liens and Claims shall attach to the proceeds of the Housewares Transaction  and such Liens and Claims shall attach to the proceeds of the Appliances Transaction, in each case, in the order of their priority, and with the same validity, extent, force, and effect that such Liens and Claims have against such Acquired Assets, and any claims and defenses the Debtors and their estates may have with respect thereto, immediately prior to the Closing Date with respect to such Transaction.

LL.     Neither the Housewares Buyer nor the Appliances Buyer nor any of their respective affiliates is a successor to the Debtors or their respective estates by reason of any theory of law or equity, and neither the Housewares Buyer nor the Appliances Buyer shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their respective estates by

reason thereof. Neither the Housewares Buyer nor the Appliances Buyer is a continuation or substantial continuation of the Debtors or their respective estates, and there is no continuity between either of the Buyers and the Debtors. Neither of the Buyers has a common identity of incorporators, directors, or equity holders with the Debtors. Neither the Buyers is holding itself out to the public as a continuation of the Debtors or their respective estates, and neither the Housewares Transaction nor the Appliances Transaction amounts to a consolidation, merger, or de facto merger of the Debtors with the Housewares Buyer or the Appliances Buyer, respectively.

MM.  Upon Closing, and to the greatest extent allowed by applicable law, except as expressly provided herein or in the applicable APAs, neither the Housewares Buyer nor the Appliances Buyer shall have any liability (including, but not limited to, any successor liability) or other obligation of any of the other Debtors arising under or related to the sale and transfer of the Housewares Assets or the Appliances Assets, respectively, to the such Buyer with respect to excluded liabilities (other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, or (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances).  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Housewares APA or Appliances APA, neither the Housewares Buyer nor the Appliances Buyer, respectively, shall be liable for any Claims against the Debtors or any of their predecessors or affiliates, and neither the Housewares Buyer nor the Appliances Buyer shall have any successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing of such APA, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted,

whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Housewares Assets or Appliances Assets, prior to the Closing of the Housewares Transaction or the Appliances Transaction, respectively. For the avoidance of doubt, effective as of the Closing of the Housewares Transaction or the Appliances Transaction, the Debtors are deemed to release and forever discharge the Housewares Buyer and Appliances Buyer, respectively, and any of such Buyer's affiliates, successors, and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to (i) where the Buyer is the Housewares Buyer, the Housewares Transaction or the operation of the Housewares Assets prior to the Closing of the Housewares Transaction, in each case, except for the Assumed Housewares Liabilities and Permitted Housewares Encumbrances or (ii) where the Buyer is the Appliances Buyer, the Appliances Transaction or the operation of the Appliances Assets prior to the Closing of the Appliances Transactions, in each case, except for the Assumed Appliances Liabilities and Permitted Appliances Encumbrances, and except for the Housewares Buyer's or Appliances Buyer's respective obligations under the Housewares APA or the Appliances APA, and this Sale Order.

NN. The sale and assignment of the Housewares Assets and the Appliance Assets outside of a plan of reorganization pursuant to the Housewares APA and the Appliances APA, respectively, neither impermissibly restructures the rights of the Debtors' creditors nor

impermissibly dictates the terms of a liquidating plan for the Debtors. Neither of the APAs nor the Transactions contemplated thereby constitute a *sub rosa* chapter 11 plan.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

### General Provisions

1. Unless otherwise provided for herein or in the Bidding Procedures Order, all objections to or reservation of rights regarding the Motion or the relief requested therein that have not been withdrawn, waived, continued by the Court, or settled as announced to the Court at the Sale Hearing, or by stipulation filed with the Court, or as resolved in this Sale Order are hereby overruled on the merits with prejudice. All persons and entities that failed to timely object thereto are deemed to consent to the relief sought therein. Any counterparty to a Contract or Lease that has not filed with the Court an objection to the assumption or assignment such Contract or Lease as of the date specified in the Bidding Procedures Order is deemed to have consented to such assumption and assignment. With the exception of timely filed and pending objections to Cure Costs, all objections to the entry of this Sale Order or to the relief granted herein, whether filed, stated on the record before this Court or otherwise, which have not been withdrawn, waived, or settled, are denied and overruled on the merits, except to the extent reflected in this Sale Order. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2. Notice of the Bidding Procedures, the Sales (and all Transactions contemplated in connection therewith), the assumption and assignment of the Proposed Assumed Housewares Contracts to the Housewares Buyer pursuant to the Housewares APA, and of the Proposed Assumed Appliances Contracts to the Appliances Buyer pursuant to the Appliances APA, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the

circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

### Approval of the APA

3.         The Sale of the Housewares Assets contemplated by the Housewares APA, and the Sale of the Appliances Assets contemplated by the Appliances APA, is hereby approved, as set forth herein.   The Debtors are authorized to enter into each of the APAs (and all ancillary documents), all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects, including, without limitation, any amendment to the Housewares APA or Appliances APA that the Debtors and the respective Buyer determines is necessary or desirable in connection with the Housewares Transaction or Appliances Transaction, respectively; *provided* that any such amendment, modification, or supplementation of the APAs or waiver of any rights or obligations by the  applicable Buyer, in each case, in any material respect, (a) shall require the prior written consent, not to be unreasonably withheld, conditioned or delayed, of (i) the Required Lenders (as defined in the Term DIP Credit Agreement (as defined in the Final DIP Order)), and (ii) only if the DIP ABL Repayment In Full has not occurred, the Required Revolving Lenders (as defined in the ABL DIP Credit Agreement (as defined in the Final DIP Order)) and (b) shall be made in consultation with the Committee; *provided*, *further*, that any change to the amount or timing of payment of cash consideration payable under either APA (as determined by the terms set forth in the applicable APA as of the date hereof) shall be considered material.   The failure to specifically include any particular provision of either APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that each APA be authorized and approved in its entirety.   The transfers of the Housewares Assets by the Debtors to the Housewares Buyer, and the transfer of the Appliances Assets by the

Debtors to the Appliances Buyer, shall be a legal, valid, and effective transfer of the Housewares Assets and the Appliances Assets, respectively. The consummation of the Housewares Transaction and the Appliances Transaction is hereby approved and authorized under sections 363(b) and 365 of the Bankruptcy Code.

4.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Transactions, including the sale to the Housewares Buyer of all Housewares Assets, and the sale to the Appliances Buyer of all Appliances Assets, in accordance with the terms and conditions set forth in the Housewares APA and Appliances APA, respectively, and this Sale Order, including, without limitation, (i) executing, acknowledging, and delivering such deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and confirming to the Buyers, or reducing to possession, any or all of the Acquired Assets, and (ii) entering into any transition services or operations support agreements with the Buyers, and any other agreements related to implementing the Transactions, and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by either of the APAs or this Sale Order. The Debtors are further authorized to pay, without further order of the Court, whether before, at, or after the Closing of the Housewares Transaction or the Appliances Transaction (as applicable), any reasonable expenses or costs that are required to be paid to consummate such Transaction or perform their obligations under the Housewares APA and the Appliances APA, respectively.

5.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or that would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to the Buyers in accordance with the APAs and this Sale Order.

6.     Notice of the Bidding Procedures, the Auction, the Sales (and all transactions contemplated in connection therewith), the assumption and assignment of the 365 Contracts to the Buyers pursuant to the APAs, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and Local Bankruptcy Rules 2002-1 and 4002-1.

## Sale and Transfer Free and Clear of Liens and Claims

7.     Except as otherwise expressly provided in the applicable APA or the terms of this Sale Order, in each case solely with respect to Assumed Liabilities and Permitted Encumbrances (as defined in the applicable APA), the applicable Acquired Assets shall be sold free and clear at the time of each Closing (notwithstanding whether only one or both of the Transactions close on the applicable Closing Date) of all liens, claims, liabilities, interests, rights, actions, suits, and other Encumbrances, including, without limitation, all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights (including restrictions on transferability), claims for receipt of income, or other exercise of any attributes of ownership), limitations, hypothecations, allowances, credits, deposits, charges, indentures, loan agreements, instruments, leases, subleases, licenses, sublicenses, options, deeds of trust, easements, rights-of-way, encroachments, servitudes, restrictive covenants, rights of use or possession, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, recoupment rights, contract

rights, rights of setoff, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, debts arising in any way in connection with any agreements, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims (including any rights under labor or employment agreements), employment rights and claims, pension rights and claims, employee benefits rights and claims (including any claim under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), any other employee or worker's compensation claims (including occupation disease, unemployment, or temporary disability claims as may arise pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination Act (each as amended), (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended), (i) state discrimination laws, (j) state unemployment compensation or similar laws, (k) any other state or federal benefits or claims relating to employment with Debtors or their predecessors, (l) the WARN Act (29 U.S.C. §§ 2101, *et seq.*) or similar state law, or any tax states or ordinances including the Internal Revenue Code of 1986), wage claims, tax claims, assessments, assertions of regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts (as defined in section 101(12) of the Bankruptcy Code) arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guarantees, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees under section 365(n) of the Bankruptcy Code or any similar statute, the costs and expenses of the administration of the Debtors' estates, and all other

matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases (but, for the avoidance of doubt, in each case arising from (x) with respect to the Housewares Assets, the ownership or use of the Housewares Assets or the operation of the Business (as defined in the Housewares APA, the "**Housewares Business**") prior to the Closing Date (as defined in the Housewares APA, the "**Housewares Closing Date**") or (y) with respect to the Appliances Assets, the ownership or use of the Appliances Assets or the operation of the Business (as defined in the Appliances APA, the "**Appliances Business**") prior to the Closing Date (as defined in the Appliances APA, the "**Appliances Closing Date**," together with the Housewares Closing Date, the "**Closing Dates**" and each, a "**Closing Date**")), and in each case, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to claims otherwise arising under any theory, law, or doctrine of successor liability or related theories, as well as any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof (all of the foregoing, collectively, "**Claims**"), and any consensual or nonconsensual lien, statutory lien, real or personal property lien, mechanics' lien, materialmans' lien, warehousemans' lien, tax lien, other encumbrance, and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof (all of the foregoing, collectively, "**Liens**"); *provided* that such Liens and Claims shall attach to the sale proceeds in the order of their priority, and with the same validity, extent, force and effect that they have against such Housewares Assets or Appliances Assets immediately prior to the Housewares Closing Date or the Appliances Closing Date, as

applicable, subject to any claims and defenses the Debtors and their estates may possess with respect thereto (in each case, other than such claims and defenses against the DIP Secured Parties). For the avoidance of any doubt, the Claims, Liens, and Encumbrances on those assets of the Debtors that are not Acquired Assets shall remain with the same validity, force, priority, and effect.

8.     Notwithstanding anything herein or in the APAs to the contrary, the Debtors are authorized and directed, without further notice or relief from the Court, to, promptly following receipt of the cash proceeds of each of the Sales (the "**Sale Proceeds**"), apply the applicable Sale Proceeds to the indefeasible repayment of all DIP Obligations[7] and Prepetition Term Obligations in accordance with the following:

a.   in the event the Appliances Closing does not occur on the same Closing Date as the Housewares Closing (the applicable Sale that occurs first, the "**Initial Closing Sale**"):

i.   first, to (X) an account of, and determined by, the Debtors (which account shall be an account that is subject to liens in favor of both the ABL DIP Secured Parties and the Term DIP Secured Parties and shall be subject to the Liens set forth on Exhibit C of the Final DIP Order (including the Liens in favor of the DIP Secured Parties and the Prepetition Term Secured Parties) subject to the same rankings and priorities set forth on such exhibit), in an amount, if any, reasonably estimated to be needed to fund the Housewares Business or Appliances Business (whichever is not in respect of the Initial Closing Sale) and the Chapter 11 Cases, including professional fees (solely

---

[7] Capitalized terms used in paragraphs 8 through 12 but not otherwise defined herein have the meaning set forth in the Final DIP Order.

to the extent anticipated to be paid prior to the Outside Date under the APA for the Sale that is not the Initial Closing Sale), which amount, if any, shall be determined in good faith by the Debtors with the consent of the "Required Lenders" (under and as defined in the Term DIP Credit Agreement (the "**Term Required Lenders**")), and solely if such Sale Proceeds will not be used to complete the DIP ABL Repayment in Full below, the "Required Revolving Lenders" (under and as defined in the ABL DIP Credit Agreement (the "**ABL Required Revolving Lenders**")) in their sole and absolute discretion, it being understood that any portion of such amount that from time to time is subsequently determined not to be needed for such purposes is hereby authorized to be paid as set forth under this paragraph 8(a) (without reference to this paragraph 8(a)(i)(X)); (Y) the ABL DIP Agent to be applied by the ABL DIP Agent pursuant to clauses (1), (2) or (3) below, as determined in good faith by the ABL Required Revolving Lenders (and in consultation with the Debtors) (*provided* that, (x) such determination by the ABL Required Revolving Lenders shall be an election between either (1) or (2) below subject to the Debtors' right of election set forth in the immediately following clause (y), and (y) notwithstanding the foregoing, at the election of the Debtors (and subject to the consent of the Term Required Lenders), such Sale Proceeds shall be applied pursuant to clause (3) below, notwithstanding any other determination by the ABL Required Revolving Lenders to the contrary), as follows: (1) to the repayment of the then-outstanding ABL DIP Obligations

32

in accordance with the ABL DIP Credit Agreement in an amount sufficient to cause the principal of and interest on all ABL DIP Loans, all fees and other ABL DIP Obligations (other than contingent indemnity obligations with respect to then unasserted claims not then due and payable and obligations in respect of "Secured Hedging Agreements" or "Secured Banking Services Agreements" (each as defined in the ABL DIP Credit Agreement)) to be repaid in full in cash and commitments thereunder permanently reduced to a level to be agreed between the Debtors and the ABL Required Revolving Lenders (whereupon there shall be no further borrowings of ABL DIP Loans under the ABL DIP Credit Agreement), in each case, other than with respect to issued and outstanding "Letters of Credit" (under and as defined in the ABL DIP Credit Agreement) related to the Assets that are not subject to the Initial Closing Sale which shall remain outstanding (including the commitments of the ABL DIP Lenders in respect thereof), remain governed by the terms of the ABL DIP Credit Agreement (subject to any other terms and conditions acceptable to the ABL Required Revolving Lenders in their sole and absolute discretion and set forth in an amendment to the ABL DIP Credit Agreement (the "**DIP ABL Amendmen**t")) and continue to be secured by the Liens on all DIP Collateral (other than any Acquired Assets subject to such Initial Closing Sale) set forth on Exhibit C of the Final DIP Order, subject to the same rankings and priorities set forth on such exhibit; *provided* that this clause (Y)(1) shall only apply to the extent that the Debtors, in their absolute

discretion, acting in good faith, and in consultation with the Term Required Lenders, are satisfied with such terms and conditions set forth in the DIP ABL Amendment, the terms of which shall be subject to the sole and absolute discretion of the ABL Required Revolving Lenders;[8] (2) subject to prior consultation with the Term Required Lenders, to the repayment in cash of the then-outstanding ABL DIP Obligations in accordance with the ABL DIP Credit Agreement (without any corresponding reduction of the revolving commitments thereunder) in an amount of such Sale Proceeds solely constituting proceeds of ABL DIP Priority Collateral and the portion of the DIP Collateral constituting Unencumbered Property (other than the assets of the UnSubs) to which the ABL DIP Secured Parties are entitled (as determined by the DIP Secured Parties in accordance with the DIP Intercreditor Agreement), whereupon any remaining ABL DIP Obligations after giving effect to such repayment shall remain outstanding on the terms set forth in the ABL DIP Credit Agreement; or (3) with the consent of the

---

[8] It is the expectation of the Debtors, the Term Required Lenders and the ABL Required Revolving Lenders that, in the event the Debtors in their discretion do not elect the ABL DIP Repayment In Full pursuant to clause (3), the applicable Sale Proceeds will be applied to the ABL DIP Obligations as set forth in this clause (1) rather than (2) below, absent unforeseen changes in circumstances or inability to reach agreement on the ABL DIP Amendment, and subject to agreement on mutually acceptable amendment documentation to the DIP ABL Credit Agreement. The ABL Required Revolving Lenders have informed the Debtors that terms and conditions acceptable to the ABL Required Revolving Lenders for these purposes will include a covenant in such amendment documentation that the Debtors maintain, at all times following the Initial Closing Sale and prior to the DIP ABL Repayment In Full, a Tranche A Borrowing Base (as defined in the ABL DIP Credit Agreement) of at least 200% of the face amount of issued and outstanding Letters of Credit under the ABL DIP Credit Agreement (net of applicable reserves) and commitments in an amount to be mutually agreed, with the Borrowing Base being reported on a weekly basis. A breach of such covenant to maintain a minimum Tranche A Borrowing Base would lead to restitution of cash dominion (it being understood that, notwithstanding the foregoing, failure to maintain such minimum amount may be cured with the delivery of cash collateral on terms to be set forth in any such amendment to the ABL DIP Credit Agreement). Notwithstanding the foregoing or anything herein to the contrary, the Debtors' rights with respect to these terms as may be set forth in the DIP ABL Amendment are reserved in all respects.

Term Required Lenders, to the repayment in full in cash of the then-outstanding ABL DIP Obligations in accordance with the ABL DIP Credit Agreement in an amount sufficient to cause the ABL DIP Facility to be "Paid in Full" (as defined in the ABL DIP Credit Agreement) and the "Termination Date" (as defined in the ABL DIP Credit Agreement) (including, without limitation, to the extent applicable, cash collateralizing (solely for the benefit of the applicable issuing bank), backstopping and/or expiring and/or terminating all applicable "Letters of Credit" (as defined in the ABL DIP Credit Agreement) outstanding under the DIP ABL Facility after giving effect to such repayment and termination on terms no less favorable to the Debtors than as set forth in the ABL DIP Credit Agreement or as otherwise agreed to by the applicable "Issuing Bank" (as defined in the ABL DIP Credit Agreement), the applicable Buyer and the Debtors) to occur in connection therewith (the "**DIP ABL Repayment In Full**"); *provided* that if such Sale Proceeds are not sufficient to cause both the DIP ABL Repayment In Full and satisfaction of clause (a)(i)(X) above, after satisfaction of clause (a)(i)(X) above[9], such Sale Proceeds shall be applied to the ABL DIP Obligations pursuant to this clause (a)(i)(Y)(3) to the maximum extent possible to cause (x) a repayment of outstanding ABL DIP Loans (together with a permanent commitment reduction in the amount of

---

[9] The Debtors believe that the Sale Proceeds from the Initial Closing Sale (regardless of which Sale is the Initial Closing Sale) will be sufficient to cover all amounts set forth in this clause "first" of paragraph 8(a) in full and that this proviso will not be utilized.

such ABL DIP Loans so repaid such that ABL DIP Loans so repaid may no longer be reborrowed under the ABL DIP Facility) and (y) if applicable, to the extent the amount of outstanding "Letters of Credit" (as defined in the ABL DIP Credit Agreement) exceed the applicable commitments under the ABL DIP Facility immediately after giving effect to such repayment, the cash collateralization (solely for the benefit of the applicable issuing bank) of all such "Letters of Credit" on terms no less favorable to the Debtors than as set forth in the ABL DIP Credit Agreement or as otherwise agreed to by the applicable "Issuing Bank" (as defined in the ABL DIP Credit Agreement), the applicable Buyer and the Debtors (the partial repayment of ABL DIP Obligations described in this proviso, together with any partial repayment described in clause (a)(i)(Y)(1) and/or clause (a)(i)(Y)(2) above, each, a "**DIP ABL Partial Repayment**"); and (Z) the funding of the Agreed GS Transaction Fees into escrow in accordance with paragraph 12 hereof (the "**GS Transaction Fees Escrow**") solely to the extent funds remain available following the satisfaction of both (i) clause (a)(i)(X) above and (ii) the DIP ABL Repayment In Full; and

ii. <u>second</u>, to the extent of any remaining Sale Proceeds after application pursuant to the immediately preceding clause "first", to the Term DIP Agent to be applied by the Term DIP Agent (subject to paragraph 9) to the repayment in cash of the then-outstanding Term DIP Obligations in accordance with the Term DIP Credit Agreement until the principal of and interest on each Term DIP Loan, all fees and other Term DIP Obligations

36

(other than contingent indemnity obligations with respect to then unasserted claims not then due and payable) shall have been paid in full in cash, all commitments of the Term DIP Lenders thereunder shall be terminated and the "Termination Date" (as defined in the Term DIP Credit Agreement) shall occur in connection therewith (the "**Term DIP Repayment In Full**"); and

b.  in the event that (x) the Closings occur on the same Closing Date or (y) the Closing Date of the Sale that does not constitute the Initial Closing Sale occurs, in either case:

    i.  <u>first</u>, to the extent the DIP ABL Repayment In Full shall not have occurred pursuant to paragraph 8(a) above, to the ABL DIP Agent to be applied by the ABL DIP Agent to the repayment in full in cash of the then-outstanding ABL DIP Obligations, in accordance with the ABL DIP Credit Agreement, in an amount sufficient to cause the DIP ABL Repayment In Full to occur;

    ii.  <u>second</u>, to the extent of any remaining Sale Proceeds after application pursuant to the immediately preceding clause "first", to fund the GS Transaction Fees Escrow up to the amount of the Agreed GS Transaction Fees amount (to the extent not previously funded pursuant to paragraph 8(a) above);

    iii.  <u>third</u>, to the extent of any remaining Sale Proceeds after application pursuant to the immediately preceding clause "second", into an escrow account (or other accounts determined by the Debtors) (such account, the "**Wind Down Reserve Account**") in an amount that the Debtors estimate

may be needed to fund a plan of liquidation and wind down of the Debtors'
estates (including establishing and funding appropriate reserves and/or
escrow accounts for professional fees described in paragraph 7 of the DIP
Order) after taking into account any cash or other assets excluded from the
Sales, as determined in good faith by the Debtors with the consent of the
Term Required Lenders and in consultation with the Committee (the **"Wind
Down Reserve Amount"**), or as otherwise determined by the Bankruptcy
Court, it being understood that (1)(A) the amounts deposited in escrow into
the Wind Down Reserve Account shall constitute cash collateral subject to
the Liens set forth on Exhibit C of the Final DIP Order (including the Liens
in favor of the DIP Secured Parties and the Prepetition Term Secured Parties)
subject to the same rankings and priorities set forth on such exhibit, and (B)
the consent of the Term Required Lenders or subsequent order of the
Bankruptcy Court shall be required to use any funds deposited in escrow
into the Wind Down Reserve Account for any purpose (including
professional fees), it being understood that such Term Required Lenders'
consent to the funding into escrow of the Wind Down Reserve Amount shall
not constitute their consent to any such use of funds, and (2) that any portion
of the Wind Down Reserve Amount that from time to time is subsequently
determined not to be needed for such purposes is hereby authorized to be
paid as set forth under paragraph 8(b)(iv) and 8(b)(v) below; and

iv. fourth, to the extent of any remaining Sale Proceeds after application
pursuant to the immediately preceding clause "third", and to the extent the

DIP Term Repayment In Full shall not have occurred pursuant to paragraph 8(a) above, to the Term DIP Agent to be applied by the Term DIP Agent (subject to paragraph 9) to the repayment in full in cash of the then-outstanding Term DIP Obligations, in accordance with the Term DIP Credit Agreement, in an amount sufficient to cause the DIP Term Repayment In Full to occur; and

v.  <u>fifth</u>, to the extent of any remaining Sale Proceeds after application pursuant to the immediately preceding clause "fourth", to the Prepetition Term Agent to be applied by the Prepetition Term Agent to the repayment of the then-outstanding Prepetition Term Obligations in accordance with the Prepetition Term Credit Agreement until all such Sale Proceeds have been applied.

9.  Notwithstanding anything in the APAs to the contrary (including Section 3.01 and Section 7.09(a) of each APA) no reduction of any component of the Purchase Price (as defined in the applicable APA) on account of any "Round-Tripping Amount" (as defined in the applicable APA) shall (a) reduce the Sale Proceeds payable in respect of the waterfall provisions of paragraphs 8(a)(i) and 8(b)(i) – (iii) or (b) reduce any Term DIP Lender's pro rata allocation of Term DIP Obligations to be repaid in cash out of the Sale Proceeds below the amount that would otherwise be repaid to such Term DIP Lender in cash if no adjustment had occurred to any component of the Purchase Price as a result of the Round-Tripping Amount. In addition to the foregoing, (x) no "Buyer DIP Lender" (as defined in the applicable APA) shall receive any repayment in cash of any Term DIP Obligations out of Sale Proceeds after giving effect to the application of the Round-Tripping Amount in satisfaction of such Term DIP Obligations of such

Buyer DIP Lender and (y) no Round-Tripping Amount shall be applied in satisfaction of any Term DIP Obligations other than with respect to Term DIP Obligations held by a Buyer DIP Lender.

10. Notwithstanding the payment priorities set forth in paragraph 8 or any prior order of this Court to the contrary, any Sale Proceeds used to repay the ABL DIP Agent and the Term DIP Agent or to fund the GS Transaction Fees Escrow as set forth above shall be deemed to have been marshalled and applied as: first, the Sale Proceeds allocable to the Unencumbered Property (as defined in the Final DIP Order) (the "**Unencumbered Property Proceeds**"); second, with respect to the ABL DIP Obligations, the Sale Proceeds allocable to Exclusive ABL DIP Collateral, and with respect to the Term DIP Obligations, the Sale Proceeds allocable to the Exclusive Term DIP Collateral, in each case, which are not Unencumbered Property Proceeds; and third, with respect to the ABL DIP Obligations, the Sale Proceeds allocable to Priority ABL DIP Collateral, and with respect to the Agreed GS Transaction Fees and the Term DIP Obligations, the Sale Proceeds allocable to the Term DIP Priority Collateral and the ABL Priority Collateral (following the DIP ABL Repayment In Full).

11. For the avoidance of doubt, and notwithstanding anything herein, in the APAs, or in the applicable DIP Documents or Prepetition Term Documents to the contrary, upon the occurrence of (1) each "Closing" (as defined in the applicable APA for such Closing), all security interests, Liens and other "Encumbrances" (as defined in the applicable APA for such Closing) relating to the transferred "Assets" (as defined in the applicable APA) of the Debtors and their respective Subsidiaries securing any ABL DIP Obligations and/or Term DIP Obligations shall in each case be automatically and irrevocably released and terminated, in respect of such Assets that are the subject of such Closing, in each case, so long as a DIP ABL Partial Repayment or the DIP ABL Repayment In Full, as applicable, shall have occurred in connection therewith and in

accordance with paragraph 8 hereof, (2) the ABL DIP Repayment In Full, (x) the ABL DIP Credit Agreement and related ABL DIP Documents evidencing the ABL DIP Facility shall be automatically and irrevocably terminated (except for provisions in the ABL DIP Documents that, by their express terms, survive such termination) and (y) all security interests, encumbrances and other Liens, guaranties, collateral, agreements to subordinate in connection therewith relating to the assets and properties of the Debtors and their respective Subsidiaries securing the ABL DIP Obligations shall be automatically and irrevocably released and terminated and/or (3) the Term DIP Repayment In Full, (x) the Term DIP Credit Agreement and related Term DIP Documents evidencing the Term DIP Facility shall be automatically and irrevocably terminated (except for provisions in the Term DIP Documents that, by their express terms, survive such termination) and (y) all security interests, encumbrances and other Liens, guaranties, collateral, agreements to subordinate in connection therewith relating to the assets and properties of the Debtors and their respective Subsidiaries securing the Term DIP Obligations shall be automatically and irrevocably released and terminated.

12.     Notwithstanding anything to the contrary herein, in the Final DIP Order, in the order approving the retention of Guggenheim Securities, or in the Guggenheim Engagement Letter as approved by the Court in connection with these Chapter 11 Cases, solely in accordance with paragraph 8 of this Sale Order and after the DIP ABL Repayment In Full, the Debtors shall segregate and escrow (for the exclusive benefit of Guggenheim Securities, subject only to the last sentence of this paragraph 12) cash in an amount equal to (i) $4.0 million in respect of the Sale Transaction Fee (as defined in the Guggenheim Engagement Letter) (the "**Agreed GS Sale Transaction Fee**"), plus (ii) $1,625,000 in respect of the Financing Fee (as defined in the Guggenheim Engagement Letter) payable to Guggenheim Securities for DIP financing previously

incurred by the Debtors, in each case from the identifiable cash proceeds of Term DIP Priority Collateral (including Exclusive Term DIP Collateral) sold in any such Sale (the amounts in the immediately preceding clauses (i) and (ii), collectively, the "**Agreed GS Transaction Fees**"). Notwithstanding anything to the contrary herein or in any other order of this Court to the contrary, the Agreed GS Sale Transaction Fee shall constitute the only Sale Transaction Fee (as defined in the Guggenheim Engagement Letter) payable to Guggenheim Securities in connection with these Chapter 11 Cases and no other Sale Transaction Fee or Restructuring Transaction Fee (each as defined in the Guggenheim Engagement Letter) shall be payable to Guggenheim Securities in connection with these Chapter 11 Cases, in each case, unless either Sale does not close; provided that, so long as Guggenheim Securities is entitled to and is paid the Agreed GS Transaction Fees, Guggenheim Securities shall not be entitled to a Restructuring Transaction Fee under any circumstances. Any and all funds segregated and escrowed from time to time in the GS Transaction Fees Escrow shall be used, first, to pay the Agreed GS Transaction Fees. To the extent that any portion of such escrowed funds cannot be utilized for such purpose as a result of such portion of the Agreed GS Transaction Fees corresponding thereto having been disallowed by a final order of the Bankruptcy Court, then such unutilized funds (and only such unutilized funds) shall be deemed Term DIP Priority Collateral and shall be subject to the Liens set forth on Exhibit C of the Final DIP Order (including the Liens in favor of the DIP Secured Parties and the Prepetition Term Secured Parties), subject to the same rankings and priorities set forth on such exhibit.

13. At the Closing of each of the Housewares Transaction and Appliances Transaction, notwithstanding whether only one or both of the Transactions close so long as the DIP ABL Partial Repayment or the DIP ABL Repayment In Full, as applicable, shall have occurred in accordance

with paragraph 8 hereof, all of the Debtors' right, title, and interest in and to, and possession of, the Housewares Assets and Appliances Assets, as applicable, shall be immediately vested in the Housewares Buyer and the Appliances Buyer, respectively, pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, in each case free and clear of any and all Claims, Liens and Encumbrances except for (i) with respect to the Housewares Assets, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (ii) with respect to the Appliances Assets, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances; *provided* that such Liens and Claims shall attach to the sale proceeds in the order of their priority, and with the same validity, extent, force, and effect that they have against such Acquired Assets immediately prior to the applicable Closing Date. Each of such transfers shall constitute a legal, valid, binding and effective transfer of such Housewares Assets and Appliances Assets upon the closing of the Housewares Transaction and Appliances Transaction, respectively, and shall vest the Housewares Buyer and Appliances Buyer with all of the Debtors' rights, title, and interests in the Housewares Assets and Appliances Assets, as applicable, free and clear of all Liens, Claims, Encumbrances, and interests of any kind or nature whatsoever (with the sole exceptions of (a) with respect to the Housewares Assets, any Assumed Housewares Liabilities and Permitted Housewares Encumbrances and (b) with respect to the Appliances Assets, any Assumed Appliances Liabilities and Permitted Appliances Encumbrances). All persons or entities, presently, or on or after the Closing, in possession of some or all of the Acquired Assets are directed to surrender possession of the Housewares Assets or Appliances Assets directly to the Housewares Buyer or Appliances Buyer, respectively, or the designees of the Housewares Buyer or Appliances Buyer on the Housewares Closing or Appliances Closing, respectively, or at such time thereafter as such Buyer may request.

14.     Upon the applicable Closing Date, each Buyer Entity as defined in the Housewares APA (each, a "**Housewares Buyer Entity**") and each Buyer Entity as defined in the Appliances APA (each, an "**Appliances Buyer Entity**") is hereby authorized in connection with the consummation of the Housewares Transaction and Appliances Transaction, respectively, to (i) with respect to the Housewares Transaction, allocate the applicable Housewares Assets, Assumed Housewares Liabilities, and Permitted Housewares Encumbrances and (ii) with respect to the Appliances Transaction, allocate the applicable Appliances Assets, Assumed Appliances Liabilities, and Permitted Appliances Encumbrances, among its affiliates, designees, assignees, and/or successors in accordance with the Housewares APA and the Appliances APA, respectively, and to assign, sublease, sublicense, transfer, or otherwise dispose of any of the Housewares Assets (in the case of a Housewares Buyer Entity) or the Appliances Assets (in the case of an Appliances Buyer Entity) to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded to such Buyer under this Sale Order or the applicable APA.

15.     This Sale Order (a) shall be effective as a determination that, as of the applicable Closing Date of each of the Housewares Transaction and Appliances Transaction, notwithstanding whether only one or both of the Transactions close so long as the DIP ABL Partial Repayment or the DIP ABL Repayment In Full in accordance with paragraph 8, as applicable, shall have occurred), (1) no Claims or Liens (other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, or (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances) will be capable of being asserted against the Housewares Buyer or the Appliances Buyer or any of their respective assets (including the Housewares Assets and the Appliances Assets, respectively), (2) the Housewares Assets and the Appliances Assets have been transferred

to the Housewares Buyer and the Appliances Buyer, respectively, free and clear of all Claims, Liens, and Encumbrances (other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances); *provided* that such Liens and Claims shall attach to the sale proceeds in the order of their priority, and with the same validity, extent, force and effect that they have against the Housewares Assets and Appliances Assets immediately prior to the Housewares Closing Date and Appliances Closing Date, respectively, and (3) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any Acquired Assets (collectively, the "**Recording Officers**").  All Recording Officers are hereby authorized and directed to (y) accept any and all documents or instruments necessary and appropriate to consummate the Transactions or to record and reflect that each of the Housewares Buyer and Appliances Buyer is the owner of the Housewares Assets and Appliances Assets, respectively, free and clear of all Liens (other than  (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances) and (z) strike all

recorded Liens on the Acquired Assets from their records.  The Acquired Assets are sold free and clear of any reclamation rights.

16.     Except as otherwise expressly provided in the applicable APA, all persons and entities (and their respective successors and assigns), including, without limitation, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding Claims or Liens arising under or out of, in connection with, or in any way relating to, (i) the Debtors, the Housewares Assets, the ownership, sale, or operation of the Housewares Assets or the Housewares Business prior to Closing of the Housewares Transaction, or the transfer of the Housewares Assets to the Housewares Buyer or (ii) the Debtors, the Appliances Assets, the ownership, sale, or operation of the Appliances Assets or the Appliances Business prior to Closing of the Appliances Transaction, or the transfer of the Appliances Assets to the Appliances Buyer, in each case, are hereby forever barred, estopped, and permanently enjoined from asserting such Claims or Liens against (i) the Housewares Buyer, its affiliates, successors and assigns, its property, or the Housewares Assets or (ii) the Appliances Buyer, its affiliates, successors and assigns, its property, or the Appliances Assets.  Following each of the Closing (as defined in the Housewares APA, the "**Housewares Closing**") and the Closing (as defined in the Appliances APA, the "**Appliances Closing**"), no holder of any Claim or Lien (except as it relates to (i) with respect to the Housewares Closing, an Assumed Housewares Liability or a Permitted Housewares Encumbrance, or (ii) with respect to the Appliances Closing, to an Assumed Appliances Liability or a Permitted Appliances Encumbrance) shall interfere with the Housewares Buyer or the Appliances Buyer's title to or use and enjoyment of the Housewares Assets or the Appliances

Assets, respectively, based on or related to any such Claim or any related Lien, or based on any action the Debtors may take in the Chapter 11 Cases.

17. If any person or entity that has filed financing statements, mortgages, *lis pendens*, or other documents or agreements evidencing Claims or Liens against or in the Housewares Assets or Appliances Assets shall not have delivered to the Debtors prior to the Housewares Closing or the Appliances Closing, respectively, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Claims, Liens, and Encumbrances that the person or entity has with respect to such Acquired Assets or otherwise, then with regard to the Housewares Assets that are purchased by the Housewares Buyer pursuant to the Housewares APA and this Sale Order, and the Appliances Assets that are purchased by the Appliances Buyer pursuant to the Appliances APA and this Sale Order, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Acquired Assets, (b) the Housewares Buyer or the Appliances Buyer, as applicable, is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims, Liens, and Encumbrances against the applicable Buyer and the applicable Acquired Assets, and (c) the Housewares Buyer or the Appliances Buyer, as applicable, may seek from the Court or any other court an order to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims, Liens and Encumbrances with respect to the applicable Acquired Assets other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances. This Sale Order is deemed to be

in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the sale and assignment of the Acquired Assets free and clear of Claims, Liens and Encumbrances (other than (i) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (ii) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances) shall be self-executing, and none of the Debtors nor the Buyers nor either one of them shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

18. To the maximum extent permitted by applicable nonbankruptcy law, (a) the Housewares Buyer and the Appliances Buyer shall be authorized, as of the Housewares Closing Date or the Appliances Closing Date, respectively, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Licenses**") of the Debtors with respect to the applicable Acquired Assets, and (b) all Licenses are deemed to have been, and hereby are directed to be, transferred to the Housewares Buyer or the Appliances Buyer, as of the Housewares Closing Date or the Appliances Closing Date, respectively. Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or assignment of any governmental License or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory law. To the extent any Licenses in respect of the Housewares Assets or the Appliances Assets cannot be transferred to the Housewares Buyer or the Appliances Buyer, respectively, in accordance with this paragraph, the Housewares Buyer and the Appliances Buyer, with reasonable assistance from the Debtors, shall work promptly and diligently to apply for and secure all necessary government approvals for

the transfer or new issuance of such Licenses to the Housewares Buyer or the Appliances Buyer, respectively, and the Debtors shall maintain the Licenses in good standing to the fullest extent allowed by applicable law for such Buyer's benefit until equivalent new Licenses are issued to such Buyer, which in each case shall be at such Buyer's sole cost to the extent obligations are incurred after (i) with respect to the Housewares Buyer, the Housewares Closing Date and (ii) with respect to the Appliances Buyer, the Appliances Closing Date. For the avoidance of doubt, while nothing in this Sale Order or either of the APAs releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, the Housewares Buyer and the Appliances Buyer shall be entitled to operate under each state License currently held by or on behalf of the Debtors in relation to the Housewares Assets and Appliances Assets, respectively, until such time as each such License is transferred to such Buyer and/or an equivalent License is issued to such Buyer.

19. Notwithstanding any provision to the contrary in this Sale Order and any implementing Sale documents, nothing shall (a) authorize the assumption, sale, assignment or other transfer to the Housewares Buyer or Appliances Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, (v) leases, or (vi) agreements (collectively, "**Federal Interests**"), without compliance by the Debtors and such Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law, (b) be interpreted to require the government to novate, approve, or otherwise consent to the assumption, sale, assignment, or other transfer of any Federal Interests, (c) affect the government's rights to offset or recoup any amounts due under, or relating to, the Federal Interests, unless otherwise limited by section 553 of the Bankruptcy Code, or (d) confer exclusive jurisdiction to the Bankruptcy Court with respect to the Federal Interests, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of

the United States Code). Each of the Buyers and the United States reserve all rights and defenses with respect to this paragraph.

20. To the extent provided in section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Housewares Assets or Appliances Assets sold, transferred, assigned, or conveyed to the Housewares Buyer or Appliances Buyer, respectively, on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Housewares Transactions or Appliances Transactions, respectively.

## No Successor or Transferee Liability

21. Other than as expressly set forth in the Housewares APA or Appliances APA, neither the Housewares Buyer nor the Appliances Buyer, respectively, shall be deemed, as a result of any action taken in connection with the APA to which such Buyer is a party, the consummation of the Transactions contemplated by such APA, or the transfer or operation of the assets that constitute Acquired Assets under such APA, to (a) be a legal successor or otherwise be deemed a successor to any of the Debtors for any purpose, (b) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates, (c) be an alter ego or a mere continuation or substantial continuation of any of the Debtors, or have a common identity or continuity of enterprise with any of the Debtors, including, without limitation, (with respect to clause (a) through (c) of this paragraph) within the meaning of any foreign, federal, state, or local revenue law, pension law, ERISA, tax, labor, employment, products liability, environmental, health, and safety laws, or other law, doctrine, rule, or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule, or regulation, including, without limitation, under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), CERCLA (as defined below), the Fair Labor Standard

Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Americans with Disabilities Act of 1990 (as amended), the Federal Rehabilitation Act of 1973 (as amended), and the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, or (d) be liable for (i) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (as defined under such APA) (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under CERCLA, or any other environmental, health, and safety laws, or (ii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors (other than liabilities as set forth in section 2.03(b) of such APA) (A) for any taxes of any kind for any period, (B) under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), other than liabilities as set forth in section 2.03(f) of such APA, or (C) under any products liability or intellectual property law or doctrine, or any other law or doctrine (except as expressly set forth in such APA), with respect to the Debtors' liability under any law, rule, regulation, or doctrine.

22.     Other than as expressly set forth in the Housewares APA or the Appliances APA, neither the Housewares Buyer nor the Appliances Buyer, respectively, shall have (a) any responsibility for (i) any liability or other obligation of the Debtors or related to the Housewares Assets (in the case of the Housewares Buyer) or the Appliances Assets (in the case of the Appliances Buyer), (ii) any remaining Claims or Liens against the Debtors or any of their predecessors or affiliates, or (iii) liabilities on account of any taxes arising, accruing, or payable

under, out of, in connection with, or in any way relating to, the operation of the Housewares Assets or Appliances Assets prior to the Housewares Closing or the Appliances Closing, respectively, or (b) any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or product lines or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment, infringement or products liability, whether known or unknown as of such Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, (i) liabilities or obligations under the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**") or any other environmental, health, and safety laws, (ii) liabilities or obligations under ERISA, COBRA, or other similar state or local laws with respect to any pension plan, welfare plan, or other employee benefit plan, (iii) liabilities or obligations under any collective bargaining agreement or employment agreement, or (iv) any liabilities or obligations or any foreign, federal, state, or local labor, employment, or environmental law whether of similar import or otherwise by virtue of such Buyer's purchase of any Acquired Assets or assumption of (x) the Assumed Housewares Liabilities by the Housewares Buyer or an affiliate of the Housewares Buyer, or (y) the Assumed Housewares Liabilities by the Housewares Appliances Buyer or an affiliate of the Housewares Buyer, (all liabilities described in paragraph 21 and this paragraph 22 of this Sale Order, "**Successor or Transferee Liability**").

23. Except as otherwise expressly provided in (a) this Sale Order and (b) with respect to the Housewares Buyer, the Housewares APA or with respect to the Appliances Buyer, the Appliances APA, nothing shall require the Housewares Buyer or the Appliances Buyer to (i)

continue or maintain in effect, or assume any liability in respect of, any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement, or other agreements to which the Debtors are a party or have any responsibility therefor, including, without limitation, medical, welfare, and pension benefits payable after retirement or other termination of employment, (ii) assume any responsibility as a fiduciary, plan sponsor, or otherwise, for making any contribution to, or in respect of the funding, investment, or administration of any employee benefit plan, arrangement, or agreement (including, but not limited to, pension plans), or the termination of any such plan, arrangement, or agreement, or (iii) hire any employees, or assume or maintain in effect, or assume any liability in respect of, any collective bargaining agreement, employment agreement, wage rate, compensation plan, or arrangement or any other terms and conditions of employment for any employees of the Debtors.

24.     Effective upon the Housewares Closing (in the case of the Housewares Buyer) or the Appliances Closing (in the case of the Appliances Buyer), except with respect to (a) in the case of the Housewares Buyer, Assumed Housewares Liabilities and Permitted Housewares Encumbrances and (b) in the case of the Appliances Buyer, Assumed Appliances Liabilities, and Permitted Appliances Encumbrances, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Housewares Buyer or the Appliances Buyer or their respective assets (including the Housewares Assets and Appliances Assets, respectively), affiliates, successors or assigns with respect to any (i) Claim or Lien or (ii) Successor or Transferee Liability, including, without limitation, the following actions with respect to clauses (i) and (ii):  (u) commencing or continuing any action or other proceeding pending or threatened; (v) enforcing, attaching, collecting, or recovering in any manner any

judgment, award, decree, or order; (w) creating, perfecting, or enforcing any Lien or Claim; (x) asserting any setoff, right of subrogation, or recoupment of any kind; (y) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect hereof; or (z) revoking, terminating, or failing or refusing to renew any License, permit, or authorization to operate any of the Housewares Assets (in the case of the Housewares Buyer) or the Appliances Assets (in the case of the Appliances Buyer), or conduct any of the businesses operated with such assets.

### **Good Faith of the Buyer**

25.     Each of the Housewares Buyer and Appliances Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Housewares Transaction contemplated by the Housewares APA and the Appliances Transaction contemplated by the Appliances APA, are undertaken by the Housewares Buyer and Appliances Buyer, respectively, without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Housewares Sale or the Appliances Sale shall not affect the validity of the Housewares Transaction or the Appliances Transaction, respectively, unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.  The Debtors and each of the Buyers, as applicable, will be acting in good faith if they proceed to consummate the Housewares Sale or the Appliances Sale at any time after entry of this Sale Order, to the extent permitted under the Housewares APA and the Appliances APA, respectively.

26.     Neither the Debtors, the Housewares Buyer nor the Appliances Buyer have engaged in any collusion with other bidders or taken any other action or inaction that would cause or permit any of the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise.  The consideration provided by the Housewares Buyer for the Housewares Assets  under the Housewares APA, and the Consideration provided by the Appliances Buyer for the Appliances Assets under the Appliances APA, in each case, is fair and reasonable and is not less than the value of such assets as determined by the Auction conducted in accordance with the Bidding Procedures, and neither the Housewares Transaction or Appliances Transaction may be avoided under section 363(n) of the Bankruptcy Code or otherwise.

27.     Neither the Housewares Buyer nor the Appliances Buyer is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

### Assumption and Assignment of Contracts and Leases

28.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Housewares Closing or the Appliances Closing and the resolution of all timely filed Assumption and Assignment Objections, and the payment of (a) any Cure Costs (as defined in the Housewares APA, the "**Housewares Cure Costs**"), to the extent set forth in the Housewares APA,  and (b) any Cure Costs (as defined in the Appliances APA, the "**Appliances Cure Costs**"), to the extent set forth in the Housewares APA: (i) the Debtors' assumption and assignment to the Housewares Buyer, and the Housewares Buyer's assumption, of the Proposed Assumed Housewares Contracts, on the terms set forth in the Housewares APA, and (ii) the Debtors' assumption and assignment to the Appliances Buyer, and the Appliances Buyer's assumption, of the Proposed Assumed Appliances Contracts, on the terms set forth in the Appliances APA, are hereby approved and the requirements of section 365(b) and 365(f)(2) with

respect thereto are hereby found and deemed to be satisfied. Nothing in this paragraph 28 shall in any way limit, affect or impair Pancal Sycamore Canyon 257, LLC's objections [Docket Nos. 417 and 531].

29. The Debtors are hereby authorized and, unless the Debtors and the Housewares Buyer or the Appliances Buyer, as applicable, otherwise agree, are directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign (i) to the Housewares Buyer, effective upon the payment of the Housewares Cure Costs and the closing of the Housewares Sale or any later applicable effective date, the Proposed Assumed Housewares Contracts, and (ii) to the Appliances Buyer, effective upon the payment of the Appliances Cure Costs and the closing of the Appliances Sale or any later applicable effective date, the Proposed Assumed Appliances Contracts, in each case, free and clear of all interests (other than (x) with respect to the Housewares Buyer, the Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and (y) with respect to the Appliances Buyer, the Assumed Appliances Liabilities and Permitted Appliances Encumbrances) and (b) execute and deliver to the Housewares Buyer or Appliances Buyer such documents or other instruments as such Buyer deems may be necessary to assign and transfer the Proposed Assumed Housewares Contracts and the Proposed Assumed Appliances Contracts to the Housewares Buyer and Appliances Buyer, respectively.

30. No section or provision of any Proposed Assumed Contract that purports to (a) prohibit, restrict or condition the assignment of a Proposed Assumed Contract, including, but not limited to, the conditioning of such assignment on the consent of any counterparty to such Proposed Assumed Contract; (b) authorize the termination, cancellation, or modification of a Proposed Assumed Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in

56

control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges, or other financial accommodations in favor of the counterparty to a Proposed Assumed Contract, or modification of any term or condition upon the assignment of a contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) or 365(l), as applicable, of the Bankruptcy Code, or is otherwise unenforceable under section 365(e) of the Bankruptcy Code. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Housewares Buyer or the Appliances Buyer, of each of the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, respectively, have been satisfied. Effective upon the Housewares Closing or the Appliances Closing, the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, respectively, shall be transferred and assigned to, and from and following the Housewares Closing or the Appliances Closing, remain in full force and effect for the benefit of, the Housewares Buyer or the Appliances Buyer, respectively, notwithstanding any provision in any of the Proposed Assumed Contracts that prohibits, restricts, or conditions such assignment or transfer, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to each of the Proposed Assumed Contracts after such assumption and assignment of such Proposed Assumed Contract to the Housewares Buyer or Appliances Buyer, except as provided in the applicable Housewares APA or Appliances APA, respectively.

31. All defaults or other obligations of the Debtors under the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, arising or accruing prior to the Housewares Closing or the Appliances Closing, respectively, or required to be paid pursuant

to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Proposed Assumed Housewares Contracts or the Proposed Assumed Appliances Contracts, shall be cured by the Debtors, on the one hand, or the Housewares Buyer or the Appliances Buyer, respectively, on the other hand, to the extent set forth in the applicable APA and this Sale Order. The Cure Costs set forth in the Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notices, or Supplemental Assumption and Assignment Notice, as applicable (the "**Applicable Assumption and Assignment Notice**"), shall constitute the only amounts due to the Counterparty under the Proposed Assumed Contracts as of the Petition Date, and no other defaults exist and no other amounts are due on account of any facts occurring prior to the Petition Date, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Petition Date.

32.     Except as provided herein, all objections to the Debtors' calculation of Cure Costs with respect to any of the Contracts or Leases (each such objection, a "**Cure Objection**") have been overruled, withdrawn, waived, settled or otherwise resolved. Any Cure Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Court. The pendency of a dispute relating to a particular Contract shall not prevent or delay the assumption or assignment of any other Contract or the closing of any Sale. For the avoidance of doubt, Pancal Sycamore Canyon 257, LLC's objections [Docket Nos. 417 and 531] have not been resolved by the parties and, therefore, such objections have not been overruled, withdrawn, waived, settled or otherwise resolved.

33.     Upon (a) payment of the Housewares Cure Costs pursuant to the terms of this Sale Order and the Housewares APA, and the Debtors' assignment of the Proposed Assumed

Housewares Contracts to the Housewares Buyer, and (b) payment of the Appliances Cure Costs pursuant to the terms of this Sale Order and the Appliances APA, and the Debtors' assignment of the Proposed Assumed Appliances Contracts to the Appliances Buyer, in each case, under the provisions of this Sale Order, no default or other obligations arising or accruing prior to or as a result of the Housewares Closing or the Appliances Closing shall exist under any Proposed Assumed Housewares Contracts or Proposed Assumed Appliances Contracts, respectively, and each Counterparty is forever barred, estopped, and permanently enjoined from (i) declaring a default by the Debtors, the Housewares Buyer, or the Appliances Buyer, under any such Proposed Assumed Housewares Contract or Proposed Assumed Appliances Contract, respectively, based on (x) with respect to any Proposed Assumed Housewares Contract, acts or occurrences existing prior to or as of, or arising by reason of, the Housewares Closing or (y) with respect to any Proposed Assumed Appliances Contract, acts or occurrences existing prior to or as of, or arising by reason of, the Appliances Closing, (ii) raising or asserting against the Debtors, the Housewares Buyer or the Appliances Buyer, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability, or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, known or unknown, liquidated or unliquidated, senior or subordinate), counterclaim, defense, setoff or any other matter arising under or out of, in connection with, or in any way related to, the Proposed Assumed Housewares Contracts or the Proposed Assumed Appliances Contracts, existing prior to or as of, or arising by reason of, the Housewares Closing or the Appliances Closing, respectively, or (iii) taking any other action against the Housewares Buyer or Appliances Buyer as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the Proposed Assumed Housewares Contracts or Proposed Assumed Appliances Contracts, respectively, based on acts or occurrences

existing prior to or as of the applicable Closing Date or arising by reason of the applicable Closing. Each Counterparty hereby is also forever barred, estopped, and permanently enjoined from (A) asserting against the Debtors or the Housewares Buyer or Appliances Buyer, or the property of any of them, any default or claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the applicable Closing Date and (B) imposing or charging against the Housewares Buyer or Appliances Buyer, as applicable, or their respective affiliates, any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to the Housewares Buyer or Appliances Buyer, of the Proposed Assumed Housewares Contracts or the Proposed Assumed Appliances Contracts, as applicable. To the extent a Counterparty fails to timely object to the Cure Costs for any Proposed Assumed Contract in accordance with the Bidding Procedures Order, such Cure Costs shall be deemed to be finally determined and any such Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Costs at any time.

34. Each of the Housewares Buyer and Appliances Buyer, has provided adequate assurance of future performance under the Contracts (as defined in the Housewares APA and Appliances APA, respectively), in each case, within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code. Subject to the terms and conditions of the applicable Housewares APA and the Appliances APA, and upon the Housewares Closing or the Appliances Closing, respectively, the Housewares Buyer and Appliances Buyer, shall have (a) to the extent necessary, cured or provided adequate assurance of cure of any default existing prior to the Housewares Closing or Appliances Closing under the Proposed Assumed Housewares Contracts or Proposed Assumed Appliances Contracts, respectively, in each case, within the meaning of sections 365(b)(l)(A) and 365(f)(2)(A) of the Bankruptcy Code and (b) to the extent necessary,

provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default under the Proposed Assumed Housewares Contracts prior to the Housewares Closing, or a default under the Proposed Assumed Appliances Contracts prior to the Appliances Closing, in each case, within the meaning of sections 365(b)(l)(B) and 365(f)(2)(B) of the Bankruptcy Code. The Housewares Buyer's or Appliances Buyer's obligations to pay the Housewares Cure Costs under the Housewares APA, and the Appliance Cure Costs under the Appliance APA, and the agreement of the Housewares Buyer and Appliances Buyer to perform the obligations under the Proposed Assumed Housewares Contracts in accordance with the terms of the Housewares APA and the Proposed Assumed Appliances Contracts in accordance with the terms of the Appliances APA, in each case, shall constitute adequate assurance of future performance within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any objections to adequate assurance of future performance that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.

35. To the furthest extent permitted by law, any party that may have had the right to consent to the assumption or assignment of any of the Proposed Assumed Contract is deemed to have consented to such assumption and assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to timely object to the assumption or assignment of such Proposed Assumed Contract in accordance with the Bidding Procedures Order, and the Housewares Buyer and Appliances Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts, in each case, pursuant to sections 365(b)(1)(C), 365(b)(3), if applicable, and 365(f)(2)(B) of the Bankruptcy Code. Any Counterparty to any of

the Proposed Assumed Contracts designated to be assumed and assigned to the Housewares Buyer or Appliances Buyer, as applicable, who has not timely filed and served an objection in accordance with the Bidding Procedures Order shall be barred from objecting, or asserting monetary or non-monetary defaults, with respect to any such Proposed Assumed Contracts, and such Proposed Assumed Contracts shall be deemed assumed by the Debtors and assigned to the applicable Buyer in accordance with the terms of the applicable APA and this Sale Order.

36.     All counterparties to Contracts and Leases assigned to the Housewares Buyer or Appliances Buyer, in accordance with the terms of this Sale Order and the Housewares APA or Appliances APA, respectively, shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of such Buyer, and shall not charge such Buyer for any instruments, applications, consents, or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Proposed Assumed Contracts to the Buyer.

37.     At any time prior to the applicable Closing Date, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, the Housewares Buyer or the Appliances Buyer shall have the right, in such Buyer's sole discretion, to provide written notice to Debtor of such Buyer's election to: (i) designate an executory contract (including any executory contract that is a Proposed Assumed Contract immediately before such designation) as an excluded contract (an "**Excluded Contract**"), and upon such designation such proposed excluded contract shall constitute an Excluded Contract and an excluded asset (an "**Excluded Asset**") (and, if applicable, will cease to constitute an Asset); and (ii) designate an executory contract as a Proposed Assumed Contract, and upon such designation such executory contract will constitute an Asset

and Assigned Contract and will be conveyed to Buyer under the Housewares APA or Appliances APA, at the Housewares Closing or the Appliances Closing, as applicable (and, in each case and if applicable, will cease to constitute an Excluded Asset), so long as (a) such executory contract is added to the Proposed Assumed Contracts prior to the entry of any Order by this Court approving the rejection of such executory contract and, in the case of any desired executory Canadian Contract, prior to the service of the motion seeking the CCAA Sale Order, and (b) the assumption and assignment has been or is approved by this Court (including through this Sale Order) and, in the case of proposed executory Canadian Contracts, the CCAA Court (including through the CCAA Sale Order).

38.     At any time within sixty days after the applicable Closing Date, but only to the extent consistent with the Bidding Procedures Order, the Bidding Procedures, the Sale Order and CCAA Sale Order (as applicable), the Housewares Buyer and the Appliances Buyer shall have the right, in such Buyer's sole discretion, to provide written notice to Debtor of such Buyer's election to: (i) (a) in the case of the Housewares Buyer, designate a Proposed Assumed Housewares Contract as an Excluded Contract, and upon such designation such Proposed Assumed Housewares Contract will constitute an Excluded Contract and Excluded Asset, if after the Housewares Closing (x) this Court determines (or the parties otherwise agree) that the actual Housewares Cure Costs exceed the Housewares Cure Costs listed on Disclosure Schedule 5.09(c) of the Housewares APA or (y) a timely filed or asserted objection to a Housewares Cure Cost or to Housewares Buyer's assumption and assignment of a Contract, in each case that was asserted prior to the Housewares Closing, remains unresolved or is resolved in a manner unsatisfactory to the Housewares Buyer, in each case as determined by the Housewares Buyer in its sole discretion and (b) in the case of the Appliances Buyer, designate a Proposed Assumed Appliances Contract as an Excluded

Contract, and upon such designation such Proposed Assumed Appliances Contract will constitute an Excluded Contract and Excluded Asset, if after the Appliances Closing (x) this Court determines (or the parties otherwise agree) that the actual Appliances Cure Costs exceed the Appliances Cure Costs listed on Disclosure Schedule 5.09(c) of the Appliances APA or (y) a timely filed or asserted objection to a Appliances Cure Cost or to Appliances Buyer's assumption and assignment of a contract, in each case that was asserted prior to the Appliances Closing, remains unresolved or is resolved in a manner unsatisfactory to the Appliances Buyer, in each case as determined by the Appliances Buyer in its sole discretion; *provided* that if, at such time, such Proposed Assumed Contract had already been assumed pursuant to, in each case of this subclause (i), the Sale Order or the CCAA Sale Order, such Buyer shall be responsible for, and shall promptly reimburse the Debtors for, any and all liabilities relating to such Proposed Assumed Contract that would be entitled to priority pursuant to Section 503(b) of the Bankruptcy Code; and (ii) designate any Executory Contract disclosed to the Housewares Buyer or the Appliances Buyer for the first time after the Housewares Closing or Appliances Closing, respectively (any such contract, an "**Omitted Contract**") as a Proposed Assumed Housewares Contract or Proposed Assumed Appliances Contract, as applicable. The Debtors shall, promptly following discovery of an Omitted Contract (but in no event later than three Business Days after such discovery), (x) notify applicable Buyer in writing of such Omitted Contract and the corresponding estimated Cure Costs related thereto (if any) and (y) as requested by such Buyer in writing (email to suffice), either file a Supplemental Assumption and Assignment Notice as set forth in the Bidding Procedures Order or file a motion (on an expedited basis, if requested by such Buyer) with this Court and (if applicable) the CCAA Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted

Contract in accordance with section 2.05 of the applicable APA; *provided* that such Buyer shall be responsible for, and shall pay, all Cure Costs related to such Omitted Contract. Such Executory Contract will constitute an Asset and Assigned Contract and will be conveyed to such Buyer under the applicable APA (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) there is no objection to the Supplemental Assumption and Assignment Notice (if one is filed) and Buyer has accepted such Omitted Contract in writing (email to suffice) as an Assigned Contract under the applicable APA or (B) to the extent a motion is filed to assume and assign such Omitted Contract, the assumption and assignment is approved by this Court and (if applicable) the CCAA Court.

39.     From the date of the entry of this Sale Order, the Debtors may, in consultation with the Housewares Buyer or the Appliances Buyer, settle objections to assumption and assignment of any Proposed Assumed Housewares Contract or Proposed Assumed Appliances Contract, respectively, including to proposed Cure Costs, without any further notice to or action by any party or order of the Court (including by paying any agreed Cure Costs); *provided* that notice to and consent of the applicable Buyer shall be required to the extent such Buyer is liable for such Cure Costs pursuant to the applicable APA.

40.     Notwithstanding anything to the contrary contained in this Sale Order or in the Proposed Assumption and Assignment Notices, the Cure Costs listed in the Proposed Assumption and Assignment Notices or elsewhere with respect to any and all contracts between any Debtor and Zhejiang Tianxi Kitchen Appliance Co., Ltd. ("**Tianxi**") (collectively, the "**Tianxi Contracts**") (a) comprise only prepetition amounts owed by the Debtors as of June 11, 2023 on account of the Tianxi Contracts, as modified to reflect (i) invoices for prepetition goods delivered or services provided that the Debtors processed subsequent to June 11, 2023 and (ii) payments made on

account of prepetition obligations pursuant to orders entered by the Court; and (b) do not include (i) amounts owed for postpetition shipments up to the Appliances Closing, (ii) postpetition orders made by any of the Debtors and accepted by Tianxi up to the Appliances Closing, and/or (iii) any other amounts owed by any of the Debtors to Tianxi and incurred from June 12, 2023 to the Appliances Closing (collectively, such amounts as set forth in item (b)(i)-(iii) immediately above are referred to herein as the "**Tianxi Administrative Claims**"), *provided* that the Debtors reserve their rights to object to the amount, character, validity, or priority of any Tianxi Administrative Claims, *provided*, *further*, that that any such objections are not inconsistent with item (a) above in this paragraph.  Notwithstanding anything to the contrary contained in this Sale Order or in the Proposed Assumption and Assignment Notices, the Tianxi Administrative Claims shall survive the Appliances Closing and remain an obligation of the Debtors.  The Appliances Buyer agrees that, to the extent assumed by the Debtors and assigned to the Appliances Buyer in accordance with the APAs and this Sale Order, the Tianxi Contracts are subject to Paragraph 4.d. of that certain letter agreement by and between Tianxi and Debtor Instant Brands LLC, dated August 4, 2023.

41.     Nothing in this Sale Order, the Motion, the Bidding Procedures Order, any Applicable Assumption and Assignment Notice, or any other notice or any other document is or shall be deemed an admission by the Debtors that any Contract or Lease is an executory contract or unexpired lease or must be assumed and assigned pursuant to the APAs or in order to consummate the Transactions.

42.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Housewares Buyer of the Proposed Assumed Housewares Contracts, and to the Appliances Buyer of the Proposed Assumed Appliances Contracts, have been satisfied.  Each of the Proposed Assumed Housewares Contracts

and Proposed Assumed Appliances Contracts shall be deemed to be valid, binding, and in full force and effect and enforceable in accordance with their terms as of the Housewares Closing and Appliances Closing, as applicable, in each case, subject to any amendments or modifications agreed to between a Counterparty and the Housewares Buyer or the Appliances Buyer, as applicable.  Upon the Housewares Closing or Appliances Closing and in accordance with sections 363 and 365 of the Bankruptcy Code, the Housewares Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Proposed Assumed Housewares Contracts, and the Appliances Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Proposed Assumed Appliances Contracts, and each of the Proposed Assumed Housewares Contracts and Proposed Assumed Appliances Contracts shall be fully enforceable by the Housewares Buyer and Appliances Buyer, respectively, in accordance with the terms and conditions of such Proposed Assumed Contract, in each case, except as limited or modified by this Sale Order or other order of the Court.  To the extent provided in the Housewares APA or the Appliances APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Housewares Buyer or the Appliances Buyer, respectively, to effectuate the foregoing.

43.     The assumption and assignment of the Proposed Assumed Housewares Contracts will not be effectuated if the Housewares Closing does not occur and the Housewares APA is terminated.  The assumption and assignment of the Proposed Assumed Appliances Contracts will not be effectuated if the Appliances Closing does not occur and the Appliances APA is terminated.

44.     Notwithstanding anything in the applicable APA or herein to the contrary, upon Closing of each of the Housewares Sale and the Appliances Sale and without the need for any further action, the applicable Buyer shall acquire and together with each of their affiliates then

release, waive and shall be deemed to have released and waived all Claims and causes of action under Section 2.01(b)(xxi) of the Appliances APA or Section 2.01(b)(xii) of the Housewares APA, as applicable, including, without limitation, all avoidance actions arising under Sections 544 through 553 of the Bankruptcy Code and analogous state law, the CCAA or the BIA, lender liability actions and similar causes of action (collectively, "**Avoidance Actions**"), including proceeds thereof, that are excluded from the Retained Avoidance Actions as set forth on Disclosure Schedule 2.01(b)(xxi) of the Appliances APA or Disclosure Schedule 2.01(b)(xxii) to the Housewares APA, as applicable.

45.     In addition to the foregoing paragraph, upon the consummation of each of the Sales, all Avoidance Actions (if any) against holders of general unsecured claims that are not transferred to the Housewares Buyer under the Housewares APA or to the Appliances Buyer under the Appliances APA, are hereby waived, released, relinquished, settled and discharged, unconditionally, irrevocably and forever, including, without limitation, by: (i) the Debtors, (ii) any remaining Debtors after the consummation of the Sale, (iii) any liquidation trust or liquidation trustee in these Chapter 11 Cases, (iv) subject to the DIP ABL Payment in Full, each of the ABL DIP Secured Parties, (v) each of the Term DIP Secured Parties and Prepetition Term Secured Parties (as defined in the Final DIP Order), and (vi) each of the affiliates, subsidiaries, successors, assigns, agents, directors, officers, employees, representatives, and advisors in each case, solely in their respective capacities as such (collectively, "**Related Parties**") of the parties listed in the foregoing clauses (i)-(v), and each such party and each of their respective Related Parties covenants not to sue holders of general unsecured claims for any Avoidance Actions (including during the period leading up to the consummation of each Sale).  For the avoidance of doubt, the foregoing release and covenant not to sue does not include the Retained Avoidance Actions as set

forth on Schedule 2.01(b)(xxi) of the Appliances APA or Schedule 2.01(b)(xxii) to the Housewares APA, as applicable.

46.     Each non-Debtor counterparty to an Proposed Assumed Housewares Contract or Proposed Assumed Appliances Contract shall be forever barred, estopped, and permanently enjoined from asserting against the Housewares Buyer or the Appliances Buyer, respectively, or their respective property (including, without limitation, the Housewares Assets (in the case of the Housewares Buyer) or the Appliances Asset (in the case of the Appliances Buyer)), any fee, acceleration, default, breach, claim (including any counterclaim, defense, or setoff capable of being asserted against the Debtors), pecuniary loss, or condition to assignment existing or on account of any facts occurring prior to or as a result of the Petition Date.

## Alternate Bid

47.     In accordance with the Bidding Procedures, Conair IB Appliances LLC (the "**Alternate Appliances Bidder**") was chosen by the Debtors to be the Alternate Bidder for the Appliances Assets, and the bid of the Alternate Appliances Bidder for the Appliances Assets with a gross purchase price of $129,000,000 and otherwise on the terms and conditions in its final bid placed at the Auction on September 18, 2023 (the "Alternate Appliances Bid") was selected as the Alternate Bid for the Appliances Assets.  In the event the Appliances Buyer fails to close the Appliances Transaction or the Debtors otherwise have the right to terminate the Appliances APA pursuant to the terms thereof, the Debtors may terminate the Appliances APA and accept the Alternate Appliances Bid, subject in all respects to the terms and conditions thereof as detailed on the record at the Auction on September 18, 2023; provided that the consummation of the sale of the Appliances Assets with the Alternate Appliances Bidder will be subject to (a) the terms and conditions of the Alternate Appliances Bid, including, for the avoidance of doubt those outlined

on the record at the Auction on September 18, 2023, (b) the Alternate Appliances Bidder's negotiation of, and agreement to, final definitive documentation reasonably satisfactory to the Debtors and the Alternate Appliances Bidder (or as otherwise ordered by the Bankruptcy Court), and (c) entry of an order approving such sale in form and substance reasonably satisfactory to the Debtors and the Alternate Appliances Bidder. In accordance with the Alternative Appliances Bid, if the Closing of the Appliances Transaction or the transactions contemplated by the Alternate Appliances Bid have not occurred on or prior to November 13, 2023, the Alternate Appliances Bidder shall be entitled to provide a notice of termination to the Debtors, and following delivery of such notice, the Alternate Appliances Bid shall be deemed validly terminated, and the Debtors shall return the Alternate Appliances Bidder's Good Faith Deposit in accordance with the terms of the Bidding Procedures.

## **Other Provisions**

48.    Neither the Housewares Buyer nor the Appliances Buyer shall be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Housewares APA or Appliances APA, respectively, or any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided, however*, that the Court shall retain exclusive jurisdiction over any and all disputes and matters arising from or related to any of the APAs, the Transactions and the implementation, interpretation, and enforcement of this Sale Order.

49.    To the extent the Debtors receive, hold, or otherwise come into possession of any payment or asset that constitutes Housewares Assets or Appliances Assets after the Closing, the Debtors shall immediately deliver or otherwise turn over each such payment or asset to the

Housewares Buyer or the Appliances Buyer, respectively. To the extent the Housewares Buyer or the Appliances Buyer receives, holds, or otherwise comes into possession of any payment or asset that constitutes Excluded Assets under the Housewares APA after the Housewares Closing, or Excluded Assets under the Appliances APA after the Appliances Closing, respectively, such Buyer shall immediately deliver or otherwise turn over each such payment or asset to the Debtors.

50.     This Sale Order and the Housewares APA or the Appliances APA shall be binding in all respects upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Housewares Buyer and the Appliances Buyer, respectively, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of (whether known or unknown), and holders of equity interests in, any Debtor, any holders of Claims or Liens in, against, or on all or any portion of the Housewares Assets or Appliances Assets, as applicable, all counterparties to any Contracts or Leases and all Recording Officers. Neither this Sale Order, the Transactions nor the APAs, nor either of them, shall be subject to rejection or avoidance under any circumstances. This Sale Order and each of the Housewares APA and the Appliances APA shall inure to the benefit of the Debtors, their estates, their creditors, and the Housewares Buyer and the Appliances Buyer, respectively, and their respective successors and assigns.

51.     Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases, any order confirming any such chapter 11 plan, or any order approving wind-down or dismissal of the Chapter 11 Cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of the either of the APAs (including any related agreements), or this Sale Order, and to

the extent of any conflict or derogation between this Sale Order or either of the APAs and such future plan or order, the terms of this Sale Order and the applicable APA, including any related agreements, shall control.

52. The provisions of this Sale Order and each of APAs are non-severable and mutually dependent.

53. Each of the APAs and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; *provided* that any such amendment, modification, or supplementation of the APAs or waiver of any rights or obligations by the applicable Buyer, in each case, in any material respect, (a) shall require the prior written consent, not to be unreasonably withheld, conditioned or delayed, of (i) the Term Required Lenders and (ii) only if the ABL Repayment In Full has not occurred, the ABL Required Revolving Lenders and (b) shall be made in consultation with the Committee; *provided*, *further*, that any change to the amount or timing of payment of cash consideration payable under either APA (as determined by the terms set forth in the applicable APA as of the date hereof) shall be considered material.

54. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including, without limitation, the APAs and the Transactions.

55. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APAs, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Housewares Buyer or the Appliances Buyer, or their respective designees, and to adjudicate,

if necessary, any and all disputes concerning or relating in any way to the Transactions. The Court retains jurisdiction to compel delivery of the Housewares Assets and Appliances Assets, to protect the Housewares Buyer or the Appliances Buyer, respectively, and their respective assets, including the Housewares Assets and Appliance Assets, respectively, against any Claims, Liens, and Successor or Transferee Liability, and to enter orders, as appropriate, pursuant to sections 105, 363, or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Housewares Assets to the Housewares Buyer, and to transfer the Appliances Assets to the Appliances Buyer.

56. The requirements set forth in Bankruptcy Rules 6003(b), 6004, and 6006 and Local Rule 9013-1 have been satisfied or otherwise deemed waived.

57. As provided by Bankruptcy Rule 9014, the terms and conditions of this Sale Order shall be effective immediately upon entry and shall not be subject to the stay provisions contained in Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in closing the each of the Sales and the Debtors and each of the Housewares Buyer and the Appliances Buyer intend to close the Housewares Sale and Appliances Sale as soon as possible.

58. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

59. Except as expressly provided in this Sale Order, no provision of this Sale Order shall abridge, amend, terminate or otherwise modify (a) the Prepetition Documents (as defined in the Final DIP Order), (b) the Prepetition Liens or the DIP Liens (each as defined in the Final DIP Order), or the Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the DIP Secured Parties, with such Liens and Claims attaching to the proceeds of the Housewares Sale and the Appliances Sale in order of their priority, and with the same validity, extent, force and

effect as immediately prior to the Housewares Closing Date or the Appliances Closing Date, respectively, or (c) the obligations of the Debtors regarding the application of proceeds of the sale as provided under the DIP Documents and the Final DIP Order; *provided* that, for the avoidance of doubt, upon each of the Housewares Closing and the Appliances Closing, the Housewares Assets and Appliances Assets, respectively, shall be sold free and clear of any and all Liens and Claims (except for Assumed Housewares Liabilities and Permitted Housewares Encumbrances, and Assumed Appliances Liabilities and Permitted Appliances Encumbrances, respectively) and such sales free and clear of Liens and Claims shall not be conditioned on the Closing of both the Housewares Transaction and the Appliances Transaction.

60.     The Debtors are authorized to take all actions necessary or appropriate to effectuate relief granted in respect to the Acquired Assets pursuant to this Sale Order. The Debtors are authorized to enter into any amendments to the DIP Credit Agreements as necessary or desirable to effectuate the consummation of the Transactions.

61.     Any and all payments or proceeds remitted to the DIP Agents, the DIP Lenders or any DIP Secured Parties pursuant to the DIP Documents, including in connection with this Order shall be irrevocable, non-refundable, and without any rights to clawback, received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code whether asserted or assessed by through or on behalf of the Debtors or any other party.

62.     To the extent any provisions of this Sale Order conflict with, or are otherwise inconsistent with, the terms and conditions of the Housewares APA or the Appliances APA, (including all ancillary documents executed in connection therewith), the Bidding Procedures

Order, or any prior order in these cases, this Sale Order shall govern and control. Except as expressly provided herein, nothing in this Sale Order or either APA shall in any way prejudice the rights of the DIP Secured Parties or the Debtors under the Final DIP Order or any DIP Documents, each of which is hereby reserved.

**Signed: October 03, 2023.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

**Housewares APA**

*Execution Version*

**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

DATED AS OF SEPTEMBER 27, 2023,

BY AND AMONG

INSTANT BRANDS ACQUISITION HOLDINGS INC.,

EACH OF THE SUBSIDIARIES OF

INSTANT BRANDS ACQUISITION HOLDINGS INC.

LISTED ON THE SIGNATURE PAGES HERETO,

IB HOUSEWARES US HOLDINGS, LLC,

AND

IB HOUSEWARES CANADA HOLDINGS, INC.

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions...................................................................................................... 2
Section 1.02    Other Definitions and Interpretive Matters.................................................. 25

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01    Purchase and Sale. ....................................................................................... 27
Section 2.02    Excluded Assets. .......................................................................................... 30
Section 2.03    Assumed Liabilities. .................................................................................... 32
Section 2.04    Excluded Liabilities. .................................................................................... 33
Section 2.05    Cure Costs; Desired 365 Contracts. ............................................................ 33
Section 2.06    Assignment of Assets Subject to Consent Requirements. ............................ 35
Section 2.07    Misallocated Assets. .................................................................................... 36
Section 2.08    Further Assurances. ...................................................................................... 36
Section 2.09    Allocation of Assets and Liabilities............................................................. 36
Section 2.10    Withholding. ................................................................................................. 37
Section 2.11    Sequencing.................................................................................................... 37
Section 2.12    Transition Services Agreement; Accounting Procedures. ........................... 37
Section 2.13    Insurance Policies and Rights. ..................................................................... 38
Section 2.14    Deferred Closing........................................................................................... 38

## ARTICLE 3
## PURCHASE PRICE

Section 3.01    Purchase Price. ............................................................................................. 40
Section 3.02    Good Faith Deposit....................................................................................... 40
Section 3.03    Estimated Purchase Price.............................................................................. 41
Section 3.04    NWC and Cure Adjustment. ........................................................................ 41
Section 3.05    Acquired Entity Adjustment. ....................................................................... 44
Section 3.06    Adjustments. ................................................................................................. 45

## ARTICLE 4
## CLOSING

Section 4.01    Closing Date.................................................................................................. 46
Section 4.02    Payments on the Closing Date. ..................................................................... 46
Section 4.03    Buyer's Deliveries. ....................................................................................... 46
Section 4.04    The Selling Entities' Deliveries. .................................................................. 46

-i-

# TABLE OF CONTENTS
(continued)

Page

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

| | | |
|---|---|---|
| Section 5.01 | Organization and Good Standing. | 47 |
| Section 5.02 | Authority; Validity. | 48 |
| Section 5.03 | Governmental Approvals; No Conflict. | 48 |
| Section 5.04 | Financial Statements. | 49 |
| Section 5.05 | No Undisclosed Material Liabilities. | 50 |
| Section 5.06 | Absence of Certain Changes. | 50 |
| Section 5.07 | Legal Proceedings. | 50 |
| Section 5.08 | Compliance with Laws; Permits. | 51 |
| Section 5.09 | Material Contracts; Cure Costs | 51 |
| Section 5.10 | Intellectual Property. | 53 |
| Section 5.11 | Environmental Compliance. | 56 |
| Section 5.12 | Title. | 57 |
| Section 5.13 | Matters Related to Assets; Casualty Losses | 57 |
| Section 5.14 | Insurance. | 58 |
| Section 5.15 | Security Arrangements. | 58 |
| Section 5.16 | Customers and Suppliers. | 59 |
| Section 5.17 | Anti-Corruption. | 59 |
| Section 5.18 | Brokers or Finders. | 60 |
| Section 5.19 | Employee Benefit Plans; Labor and Employment Matters. | 60 |
| Section 5.20 | Taxes. | 64 |
| Section 5.21 | Investment Canada Act. | 65 |
| Section 5.22 | International Trade. | 65 |
| Section 5.23 | Warranties; Product Liability. | 66 |
| Section 5.24 | Accounts Receivable; Inventory | 67 |
| Section 5.25 | Related Party Transactions. | 67 |
| Section 5.26 | Acquired Entities. | 67 |
| Section 5.27 | Competition Act Assets and Gross Revenues | 68 |

### ARTICLE 6
### REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| Section 6.01 | Organization and Good Standing. | 68 |
| Section 6.02 | Authority; Validity; Consents. | 69 |
| Section 6.03 | No Conflict. | 69 |
| Section 6.04 | Legal Proceedings. | 70 |
| Section 6.05 | Bankruptcy. | 70 |
| Section 6.06 | Brokers or Finders. | 70 |
| Section 6.07 | Financing. | 70 |
| Section 6.08 | Independent Evaluation. | 71 |
| Section 6.09 | Solvency. | 72 |
| Section 6.10 | Canadian Sales Tax Matters. | 72 |

-ii-

# TABLE OF CONTENTS
(continued)

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

| | | |
|---|---|---|
| Section 7.01 | Access and Reports. | 72 |
| Section 7.02 | Operations Prior to the Closing Date. | 73 |
| Section 7.03 | Commercially Reasonable Efforts. | 76 |
| Section 7.04 | Regulatory Approvals. | 77 |
| Section 7.05 | Bankruptcy Court Approval. | 78 |
| Section 7.06 | Alternative Proposals. | 79 |
| Section 7.07 | Damage or Destruction. | 79 |
| Section 7.08 | Buyer Efforts to Obtain Financing. | 80 |
| Section 7.09 | Seller Obligations in Respect of the Debt Financing. | 82 |
| Section 7.10 | Additional Selling Entities. | 85 |
| Section 7.11 | Public Announcements; Filings. | 85 |
| Section 7.12 | Alternate Bidder. | 86 |
| Section 7.13 | Sale Free and Clear. | 86 |
| Section 7.14 | Acquired Entity Intercompany Obligations. | 86 |
| Section 7.15 | Resignations. | 87 |
| Section 7.16 | Term DIP Secured Party Investment Opportunity. | 87 |

## ARTICLE 8
## ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| Section 8.01 | Taxes. | 87 |
| Section 8.02 | Allocation of Purchase Price. | 91 |
| Section 8.03 | Assigned Contracts; Adequate Assurance and Performance. | 92 |
| Section 8.04 | Employee Matters. | 93 |
| Section 8.05 | Post-Closing Books and Records. | 97 |
| Section 8.06 | Intellectual Property Matters. | 98 |
| Section 8.07 | Title Matters. | 99 |
| Section 8.08 | Insurance Access. | 100 |
| Section 8.09 | Disclaimers. | 101 |
| Section 8.10 | Collection of Accounts Receivable. | 102 |
| Section 8.11 | Data Transfer. | 103 |
| Section 8.12 | Cooperation Relating to Litigation and Other Proceedings. | 103 |

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| Section 9.01 | Accuracy of Representations | 104 |
| Section 9.02 | Selling Entities' Performance | 104 |
| Section 9.03 | No Material Adverse Effect | 104 |
| Section 9.04 | Seller's Deliveries | 104 |

# TABLE OF CONTENTS
(continued)

                                                                                      **Page**

## ARTICLE 10
### CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

Section 10.01    No Order. .............................................................................. 105
Section 10.02    Sale Order ............................................................................. 105
Section 10.03    HSR Act ................................................................................ 105
Section 10.04    Information Officer's Certificate. ......................................... 105

## ARTICLE 11
### CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

Section 11.01    Accuracy of Representations ................................................ 106
Section 11.02    Buyer's Performance ............................................................ 106
Section 11.03    Buyer's Deliveries. ............................................................... 106

## ARTICLE 12
### TERMINATION

Section 12.01    Termination Events. .............................................................. 106
Section 12.02    Effect of Termination. ........................................................... 107
Section 12.03    Procedure Upon Termination. ............................................... 108

## ARTICLE 13
### GENERAL PROVISIONS

Section 13.01    No Survival of Representations and Warranties. ................... 109
Section 13.02    Notices. ................................................................................. 109
Section 13.03    Waiver. .................................................................................. 110
Section 13.04    Entire Agreement; Amendment. ............................................ 111
Section 13.05    Assignment. ........................................................................... 111
Section 13.06    Severability. .......................................................................... 111
Section 13.07    Expenses. ............................................................................... 112
Section 13.08    Specific Performance. ........................................................... 112
Section 13.09    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver..... 113
Section 13.10    Counterparts. ........................................................................ 114
Section 13.11    Parties in Interest; No Third Party Beneficiaries. ................. 114
Section 13.12    No Recourse. .......................................................................... 114
Section 13.13    Disclosure Schedules; Materiality. ....................................... 116
Section 13.14    Liquidating Trustee. .............................................................. 116
Section 13.15    Conflicts; Privileges. ............................................................ 116
Section 13.16    Liability of Financing Sources. ............................................. 117

NAI-1538018312v20

**Exhibits:**

| | |
|---|---|
| Exhibit A | Form of IP Assignment Agreements |
| Exhibit B | Form of Master Assignment |
| Exhibit C | Form of Transition Services Agreement |

**Schedules:**

| | |
|---|---|
| Schedule 1 | Selling Entities |
| Schedule 2 | Debtor Selling Entities |
| Schedule 1.01(a) | Accounting Procedures |
| Schedule 1.01(b) | Company Employees |
| Schedule 1.01(c)(1) | Seller Knowledge Persons |
| Schedule 1.01(c)(2) | Buyer Knowledge Persons |
| Schedule 1.01(d) | Permitted Encumbrances |
| Schedule 2.01(b)(v) | Real Property Interests |
| Schedule 2.01(b)(vii)(y) | Other 365 Contracts |
| Schedule 2.01(b)(xv) | Assumed Benefit Plans |
| Schedule 2.01(b)(xxii) | Retained Causes of Action |
| Schedule 2.02(l) | Deposits |
| Schedule 2.02(s) | Other Excluded Assets |
| Schedule 2.05(a) | 365 Contracts |
| Schedule 4.04(h) | Acquired Equity Securities |
| Schedule 7.02 | Operation Prior to Close |
| Schedule 7.04 | Transferred Permits |
| Schedule 8.02(b)(i) | Allocation Principles |
| Schedule 8.02(b)(ii) | Initial Allocation |
| Schedule 8.03(c) | Seller Credit Obligations |
| Schedule 8.04(a) | Non-Offer Employees |

Disclosure Schedules

v

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of September 27, 2023, is by and among Instant Brands Acquisition Holdings Inc., a company organized under the laws of the State of Delaware whose address is 3025 Highland Parkway, Suite 700, Downers Grove, Illinois 60515 ("**Seller**"), each of the Subsidiaries of Seller listed on Schedule 1 hereto (together with Seller, the "**Selling Entities**"), IB Housewares US Holdings, LLC, a Delaware limited liability company ("**US Buyer**"), and IB Housewares Canada Holdings, Inc., a corporation incorporated under the laws of the Province of Ontario (the "**Canadian Buyer**", together with US Buyer, each a "**Buyer Entity**" and collectively, "**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business;

WHEREAS, on June 12, 2023 (the "**Petition Date**"), the Subsidiaries of Seller listed on Schedule 2 hereto (together with Seller, the "**Debtor Selling Entities**") commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on June 15, 2023, the Debtor Selling Entities commenced proceedings before the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "**CCAA**") recognizing the Bankruptcy Cases as "foreign main proceedings" (the "**CCAA Recognition Proceedings**");

WHEREAS, the Selling Entities desire to sell to Buyer all of the Assets, and Buyer desires to purchase from the Selling Entities all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

WHEREAS, the Selling Entities' ability, and Buyer's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court and the CCAA Sale Order by the CCAA Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01    *Definitions.*

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**365 Contracts**" means all of the Debtor Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of Section 365 of the Bankruptcy Code to the extent Related to the Business.

"**Accounting Firm**" has the meaning set forth in Section 3.04(b).

"**Accounting Procedures**" means the principles, practices, procedures and methodologies set forth on Schedule 1.01(a).

"**Accounts Receivable**" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to Seller or any of its Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts payable, or that may become payable, to Seller or any of its Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables, and (vi) other amounts due to Seller or any of its Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of Seller, in each case to the extent Related to the Business.

"**Acquired Entities**" means IB Australia, CB Singapore (including its Japan Branch and Taiwan Branch), Corelle Brands (Asia Pacific) Sdn Bhd., Corelle Brands Manufacturing (M) Sdn. Bhd., Corelle Brands Sales (M) Sdn. Bhd., CB Korea, Corelle Brands (Hong Kong) Co. Limited and Corelle Brands (Shanghai) Co., Ltd. (including Shenzhen First Branch Company, Hangzhou First Branch Company and Corelle Brands (Shanghai) Co., Ltd. First Branch Company).

"**Acquired Entity Accrued Taxes**" means an amount equal to the sum of the accrued but unpaid income Taxes of the Acquired Entities in jurisdictions where any Acquired Entity has filed Tax Returns or has commenced operations since 2022, separately calculated for each jurisdiction in which the Acquired Entities are liable for Taxes, calculated, except as otherwise provided herein, in accordance with the past practice and accounting methodologies of the Acquired Entities applied in filing their Tax Returns, and taking into account, without duplication, (i) any estimated income Taxes or prepaid income Taxes paid by any Selling Entity or Acquired Entity prior to the Closing and any transaction tax deductions and other Tax attributes of the Acquired Entities, in each case solely to the extent such item actually reduces cash Taxes payable for a Pre-Closing Tax Period and (ii) any Tax liabilities arising from a change in accounting method made on or prior to the Closing relating to any cash received by the Acquired Entities as deferred revenue that has not

2

been recognized in taxable income as of the Closing Date; *provided*, *however*, that no amount treated as "Acquired Entity Indebtedness" shall be included in "Acquired Entity Accrued Taxes".

"**Acquired Entity Cash**" means, with respect to the Acquired Entities and without duplication, the aggregate amount of all unrestricted cash and cash equivalents, including marketable securities, short term investments or liquid instruments convertible into cash, deposits in transit, the amount of any received and uncleared checks, money orders, wires or drafts, <u>minus</u> any issued but uncleared checks, money orders, wires or drafts, in each case, as determined as of the Measurement Time in accordance with the Accounting Procedures; *provided*, *however*, that such amounts will be net of any Tax costs that would be incurred if such amounts were repatriated to the United States.

"**Acquired Entity Closing Statement**" has the meaning set forth in Section 3.05(a).

"**Acquired Entity Indebtedness**" means, with respect to the Acquired Entities as of immediately prior to the Closing, determined in accordance with the Accounting Procedures and without duplication, all (i) obligations for borrowed money, (ii) obligations in respect of letters of credit (to the extent drawn), bankers' acceptances, surety bonds or similar credit transactions, (iii) liabilities evidenced by any bond, note, debenture or other debt security, (iv) obligations under any interest rate, currency or other hedging or swap transaction, derivative obligation or other similar arrangement (valued at the termination cost thereof), (v) obligations under conditional sale, title retention or similar agreements or arrangements creating an obligation with respect to the deferred purchase price of, or a contingent payment for, property or services (other than customary trade credit or trade payables), including any "earnout" or similar payments (in each case, valued at the maximum amount thereof), (vi) to the extent not included in Net Working Capital, transaction bonuses or other change-in-control payments, ordinary course bonuses, severance or similar termination payment obligations of the Acquired Entities to any Person to the extent accrued and unpaid prior to the Closing, but excluding any payments triggered by a termination of employment by Buyer or one of its Affiliates following the Closing (plus the employer-paid portion of any employment, payroll, unemployment or withholding Taxes that are imposed in connection with the payment of any such obligations), (vii) indebtedness secured by an Encumbrance or any property or asset owned by any Acquired Entity, (viii) obligations of the Acquired Entities related to leases classified as finance or capital leases in the Financial Statements, (ix) Taxes, the payment of which has been deferred pursuant to any COVID-19 Measures or other Applicable Law, (x) guarantees, including guarantees of any items set forth in clauses (i) through (ix), and (xi) prepayment premiums, if any, and accrued interest, redemption costs, fees and expenses related to any of the items set forth in clauses (i) through (x). Notwithstanding the foregoing, "Acquired Entity Indebtedness" shall not include (A) any obligations solely between or among the Acquired Entities, (B) the Acquired Entity Intercompany Obligations or (C) indebtedness arranged by the Buyer or its Affiliates at or following the Closing.

"**Acquired Entity Intercompany Obligations**" means all intercompany obligations between one or more Selling Entities, on the one hand, and one or more Acquired Entities, on the other hand.

"**Acquired Equity Securities**" has the meaning set forth in Section 2.01(b)(xxiii).

3

"**Actual Fraud**" means, with respect to any Person, actual and intentional common law fraud under the Laws of the State of Delaware with respect to any representation or warranty contained in this Agreement or in any other Transaction Document; provided "Actual Fraud" will not include fraud based on imputed or constructive knowledge, equitable fraud, promissory fraud, unfair dealings fraud, any torts (including fraud) based on negligence or recklessness or any other fraud not otherwise including an element of scienter.

"**Adjustment Escrow Amount**" means $5,000,000.

"**Adjustment Escrow Funds**" means, at any time, the portion of the Adjustment Escrow Amount *plus* all interest and income then held in such escrow account.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that none of the creditors of the Selling Entities (other than any creditor who is a Subsidiary of any Selling Entity) will be considered an Affiliate of a Selling Entity for purposes of this Agreement.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Allocation**" has the meaning set forth in Section 8.02(b).

"**Alternate Bidder**" means the bidder with the next highest or otherwise second-best bid for the Assets, as determined in accordance with the Bidding Procedures.

"**Alternative Financing**" has the meaning set forth in Section 7.08(d).

"**Alternative Financing Commitment Letter**" has the meaning set forth in Section 7.08(d).

"**Announcement 7**" means the Announcement on Several Issues concerning the Enterprise Income Tax on Indirect Transfer of Properties by Non-Resident Enterprises (in Chinese, "关于非居民企业间接转让财产企业所得税若干问题的公告"), promulgated by the State Taxation Administration of the PRC on 3 February 2015 as Public Notice 2015 No. 7, as may be amended or supplemented from time to time and including any similar or replacement law, notice, circular or bulletin on the Tax treatment of offshore indirect transfer of any Chinese taxable property.

"**Antitrust Division**" has the meaning set forth in Section 7.04(a).

"**Antitrust Laws**" means, collectively, the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, the Competition and Consumer Act 2010 (Cth), the Competition Act, the Monopoly Regulations and Fair Trade Act (Republic of Korea) and the Foreign Investment Promotion Law (Republic of Korea) and any other federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Applicable Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of lessening competition, monopolization or restraint of trade as well as all applicable supranational, national, federal, state, provincial, local or foreign laws designed or intended to review investments by foreign investors to the extent applicable to the purchase and sale of the Assets, including the

foreign Investment Promotion Law (Republic of Korea) and other similar investment Laws of any foreign jurisdiction.

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.17(a).

"**Appliances APA**" means that certain Asset Purchase Agreement among the Selling Entities and the Appliances Buyer in respect of the acquisition of assets related to the Excluded Business, substantially on the terms last proposed by the Appliances Buyer at the Auction (including on the record established at the Auction), and as may be further revised thereafter as mutually agreed between the Appliances Buyer and the Selling Entities.

"**Appliances Buyer**" means the Successful Bidder or Alternate Bidder (in each case, as defined in the Bidding Procedures) (as applicable) for the Assets (as defined in the Appliances APA).

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Assets**" has the meaning set forth in Section 2.01(b).

"**Assumed Benefit Plans**" has the meaning set forth in Section 2.01(b)(xv).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b)(vi).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Audited Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Australian GST**" means GST within the meaning given to that term in the A New Tax System (Goods and Services Tax) Act 1999 (Cth) of Australia.

"**Australian GST Amount**" has the meaning set forth in Section 8.01(j).

"**Available Insurance Policy**" has the meaning set forth in Section 8.08.

"**Balance Sheet Date**" has the meaning set forth in Section 5.04(a).

"**Bankruptcy and Equity Exception**" has the meaning set forth in Section 5.02.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

5

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**BIA**" means the Bankruptcy and Insolvency Act, R.S.C 1985, C. B-3, as amended.

"**Bidding Procedures**" means the procedures employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities attached to the Bidding Procedures Order as Exhibit 1.

"**Bidding Procedures Order**" means the Order of the Bankruptcy Court approving the Bidding Procedures [Docket No. 253].

"**BMO Lease Agreement**" has the meaning set forth in the definition of "Leased Precious Metals."

"**Business**" means the business of designing, manufacturing, marketing, distributing and selling consumer dinnerware, bakeware, cookware, cutlery, food storage, and other storage products lifestyle brands, including Pyrex®, Corelle®, Corningware®, Snapware®, Visions® and Chicago Cutlery®, in each case, as conducted by Seller and its Subsidiaries (including, for the avoidance of doubt, the Acquired Entities).

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks in New York, New York or the Province of Ontario, Canada are authorized or required by Applicable Law to close.

"**Business IT Assets**" has the meaning set forth in Section 5.10(i).

"**Buyer**" has the meaning set forth in the introductory paragraph.

"**Buyer DIP Lender**" has the meaning set forth in the definition of "Round-Tripping Amount."

"**Buyer Entity**" has the meaning set forth in the introductory paragraph.

"**Canadian Assets**" means all Assets belonging to the Canadian Sellers, other than any Owned Intellectual Property of any Canadian Seller (in each case, which will be purchased by US Buyer and assigned to US Buyer pursuant to the IP Assignment Agreements).

"**Canadian Assigned Contracts**" means, collectively, (i) the Desired 365 Canadian Contracts, and (ii) all other Assigned Contracts that are assigned by any Canadian Seller to the Canadian Buyer.

"**Canadian Buyer**" has the meaning set forth in the introductory paragraph.

"**Canadian GST/HST**" means goods and services tax and harmonized sales tax imposed under Part IX of the ETA.

"**Canadian Sales Taxes**" means Canadian GST/HST and any sales, value-added, retail, use or similar tax imposed by any Canadian province.

"**Canadian Sellers**" means the Selling Entities designated as "Canadian Sellers" in Schedule 1 hereto.

"**Cash Purchase Price**" has the meaning set forth in Section 3.01(a).

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**CB Korea**" means Corelle Brands (Korea) Co. Ltd.

"**CB Singapore**" means Corelle Brands (Asia Pacific) Pte. Ltd.

"**CCAA**" has the meaning set forth in the Recitals.

"**CCAA Court**" has the meaning set forth in the Recitals.

"**CCAA Recognition Proceedings**" has the meaning set forth in the recitals.

"**CCAA Sale Order**" means an Order of the CCAA Court, in form and substance acceptable to the Canadian Buyer, acting reasonably, which shall, among other things: (i) recognize and give full force and effect to the Sale Order in all provinces and territories in Canada, pursuant to Section 49 of the CCAA, (ii) approve this Agreement and the transactions contemplated hereunder, (iii) vest the Canadian Assets in the Canadian Buyer, free and clear of all Encumbrances, other than the Permitted Encumbrances, (iv) assign all of the Canadian Assigned Contracts to the Canadian Buyer and set out the Cure Costs related thereto, and (v) provide that upon payment of the applicable Cure Costs, all past defaults under the Canadian Assigned Contracts shall be deemed to be cured and each such Canadian Assigned Contract shall be in good standing and effective, according to its terms.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Clean Team Agreement**" means that certain Clean Team Agreement, dated as of August 3, 2023, by and between Instant Brands Acquisition Holdings Inc. and Centre Lane Partners V, L.P.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Acquired Entity Accrued Taxes**" has the meaning set forth in Section 3.05(a).

"**Closing Acquired Entity Cash**" has the meaning set forth in Section 3.05(a).

"**Closing Acquired Entity Indebtedness**" has the meaning set forth in Section 3.05(a).

"**Closing Acquired Entity Net Figure**" means a dollar amount, which may be a positive or negative number, equal to the (a) Closing Acquired Entity Cash, *minus* (b) Closing Acquired Entity Indebtedness, and *minus* (c) Closing Acquired Entity Accrued Taxes, in each case, as finally determined in accordance with the procedures set forth in Section 3.05.

"**Closing Date**" has the meaning set forth in Section 4.01.

"**Closing Excess Cure Costs**" has the meaning set forth in Section 3.04(a).

"**Closing Net Working Capital**" has the meaning set forth in Section 3.04(a).

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means any agreement or other Contract between any Selling Entity with a labor union, works council, employee association or other labor organization representing any Company Employees.

"**Company Employees**" means (i) those employees of the Selling Entities listed on Schedule 1.01(b), which such schedule shall be subject to update by Seller prior to the Closing consistent with Section 7.02 with such updates provided to Buyer within seven Business Days prior to the Closing, and (ii) the Shared Services Employees identified as constituting "Company Employees" for purposes of this Agreement in accordance with Section 8.04(h).

"**Competition Act**" means the Competition Act (Canada) R.S.C. 1985, c. C-34.

"**Conditions Certificates**" means (i) a certificate signed by an officer of each Buyer Entity and addressed to the Selling Entities and the Information Officer (in form and substance satisfactory to the Selling Entities and the Information Officer, acting reasonably) certifying that the closing conditions set forth in Sections 10.01, 10.02, 10.03 and 10.04 and Sections 11.01, 11.02 and 11.03 have been satisfied or waived and (ii) a certificate signed by an officer of each of the Selling Entities and addressed to Buyer and the Information Officer (in form and substance satisfactory to Buyer and the Information Officer, acting reasonably) certifying that the closing conditions set forth in Sections 9.01, 9.02, 9.03 and 9.04 and Sections 10.01, 10.02, 10.03 and 10.04 have been satisfied or waived.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b).

"**Contract**" means any agreement, contract, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases.

"**Control**" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have correlative meanings; *provided; however*, solely with respect to Intellectual Property, "**Control**" or "**Controlled**" means possession of the right to assign or grant a license,

sublicense or other right to or under such item of Intellectual Property without violating the terms of any Contract with any Third Party.

"**Controlled Group**" means any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any Selling Entity or (ii) which together with any Selling Entity is treated as a single employer under Section 414(t) of the Code.

"**Copyrights**" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office, the Canadian Intellectual Property Office, or in any similar office or agency of the United States, any State thereof, Canada or any other jurisdiction, and any renewal of any of the foregoing.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**COVID-19 Measures**" means any commercially reasonable action or inaction by Seller or any Subsidiary of Seller in response to COVID-19, including any workforce reduction or its or their compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar Applicable Law in connection with, related to, or in response to COVID-19, including the CARES Act and Families First Act, or any change in any Applicable Law related to, in connection with or in response to COVID-19.

"**Cure Costs**" means all monetary Liabilities, including pre-petition monetary Liabilities, of the Debtor Selling Entities that must be paid or otherwise satisfied to cure all of the Debtor Selling Entities' monetary and other defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code or Section 11 of the CCAA at the time of the assumption thereof and assignment of the Desired 365 Contracts to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or the CCAA Court or approved pursuant to the Assignment and Assumption Procedures as defined and provided for in the Bidding Procedures Order.

"**Cure Costs Adjustment**" means the (i) the Closing Excess Cure Costs as finally determined pursuant to Section 3.04, *minus* (ii) the Estimated Excess Cure Costs, which amount may only be a positive number.

"**Cure Costs Cap**" means Cure Costs associated with the Business not to exceed $4,600,000.

"**Current Representation**" has the meaning set forth in Section 13.15(a).

"**Damage or Destruction Loss**" has the meaning set forth in Section 7.07.

"**Data Protection Laws**" means the data protection and privacy laws of each jurisdiction where any Selling Entity or Acquired Entity is established and operating the Business, or otherwise subject to, and those of each jurisdiction where any Personal Information is collected, transmitted,

9

secured, stored, shared or otherwise processed by or on behalf a Selling Entity in connection with the operation of the Business.

"**Davis Polk**" has the meaning set forth in Section 13.15(a).

"**Deal Communications**" has the meaning set forth in Section 13.15(b).

"**Debt Commitment Letter**" has the meaning set forth in Section 6.07(a).

"**Debt Financing**" has the meaning set forth in Section 6.07(a).

"**Debt Financing Agreements**" has the meaning set forth in Section 7.08.

"**Debt Financing Sources**" means the entities that are party to the Debt Commitment Letter that have committed to provide or otherwise entered into agreements in connection with all or any part of the Debt Financing, together with their Affiliates, and including the parties to any related joinder agreements, credit agreements or indentures (including the definitive agreements relating thereto), any underwriters, placement agents or initial purchasers in connection with the Debt Financing and their respective successors and assigns, and their respective Affiliates and their and their respective Affiliates' officers, directors, employees, controlling Persons, partners, trustees, attorneys, advisors and other representatives and agents and their respective successors and assigns.

"**Debtor Selling Entities**" has the meaning set forth in the recitals.

"**Deeds**" has the meaning set forth in Section 4.04(e).

"**Deferred Acquired Entity**" means each of CB Korea and IB Australia.

"**Deferred Closing**" has the meaning set forth in Section 2.14(a).

"**Deferred Closing Actions**" has the meaning set forth in Section 2.14(a).

"**Deferred Closing Date**" has the meaning set forth in Section 2.14(a).

"**Deposit Amount**" has the meaning set forth in Section 3.02.

"**Deposit Escrow Account**" means the deposit escrow account to be maintained with the Escrow Agent on behalf of the Selling Entities.

"**Designated Person**" has the meaning set forth in Section 13.15(a).

"**Desired 365 Contracts**" has the meaning set forth in Section 2.05(a).

"**Desired 365 Canadian Contracts**" means all Desired 365 Contracts to be assumed by the Canadian Buyer.

"**DIP Credit Facilities**" means, collectively, (i) that certain Superpriority Senior Secured Priming Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 15,

2023, by and among the Debtor Selling Entities and their applicable Affiliates party thereto, Bank of America, N.A., as administrative agent and as collateral agent and each lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time and (ii) that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of June 15, 2023, by and among the Debtor Selling Entities and their applicable Affiliates party thereto, Wilmington Trust, National Association, as administrative agent and as collateral agent and each lender from time to time party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time (the DIP Credit Facility described in this clause (ii), the "**Term DIP Credit Facility**").

"**Disclosed Personal Information**" has the meaning set forth in Section 8.11.

"**Dispute Notice**" has the meaning set forth in Section 3.04(b).

"**Disputed Item**" has the meaning set forth in Section 3.04(b).

"**Downward Acquired Entity Adjustment**" has the meaning set forth in Section 3.05(d).

"**Encumbrance**" means any lien (statutory or otherwise), pledge, mortgage, hypothecation, deed of trust, security interest, charge, debenture, lease, license, occupancy agreement, option, easement, demand, covenant, right of first refusal, title defect, adverse claim, community or marital property interest, equitable interest, restrictions on use, encroachment, right of way, servitude or other encumbrances, in each case of any type, nature or kind whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material or known or unknown.

"**Environment**" means soil, soil vapor, surface waters, groundwater, drinking water, land, stream sediments, natural resources, surface or subsurface strata, ambient air or indoor air.

"**Environmental Laws**" means any Applicable Laws relating to the protection of the Environment or public or workplace health or safety (as it pertains to exposure to hazardous or toxic substances or materials), or any Release, storage, use, treatment, transportation, management, handling, generation, production, manufacture, importation, exportation, sale, distribution, labeling or recycling of, or exposure to, any pollutant or contaminant or ignitable, corrosive, reactive or otherwise toxic, dangerous, deleterious, harmful, hazardous or otherwise regulated material, substance or waste.

"**Equity Commitment Letter**" has the meaning given to such term in Section 6.07(a).

"**Equity Financing**" has the meaning given to such term in Section 6.07(a).

"**Equity Financing Source**" has the meaning given to such term in Section 6.07(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Escrow Agent**" means Citibank, N.A.

11

"**Escrow Agreement**" means the Escrow Agreement to be entered into among US Buyer, Seller and the Escrow Agent at the Closing, substantially in the form agreed by the Parties acting reasonably.

"**Estimated Acquired Entity Accrued Taxes**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Cash**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Indebtedness**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Net Figure**" means a dollar amount, which may be a positive or negative number, equal to the (a) Estimated Acquired Entity Cash, *minus* (b) Estimated Acquired Entity Indebtedness, and *minus* (c) Estimated Acquired Entity Accrued Taxes, in each case as included in the Estimated Closing Statement.

"**Estimated Closing Statement**" has the meaning set forth in Section 3.03.

"**Estimated Excess Cure Costs**" has the meaning set forth in Section 3.01(c).

"**Estimated Net Working Capital**" has the meaning set forth in Section 3.03.

"**Estimated Net Working Capital Adjustment**" has the meaning set forth in Section 3.03.

"**Estimated Purchase Price**" has the meaning set forth in Section 3.01(a).

"**ETA**" means the Excise Tax Act (Canada) R.S.C. 1985, c. E-15.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Business**" means the business of designing, marketing, distributing and selling kitchen and home appliances, including electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers and other multi-feature appliances, in each case, as conducted by Seller and its Subsidiaries.

"**Excluded Contracts**" means all Contracts of each Selling Entity other than the Assigned Contracts.

"**Excluded Equity Securities**" has the meaning set forth in Section 2.02(b).

"**Excluded Intellectual Property**" means all Intellectual Property other than the Purchased Intellectual Property.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Records**" means (i) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (ii) each Selling Entity's respective federal, state, provincial, local or non-U.S. income, franchise or margin tax files and records (not including, for the avoidance of doubt, any Tax files or records of any Acquired Entity), (iii) employee files (other than files of Transferred Employees that are permitted to be transferred

12

pursuant to Applicable Law), (iv) records relating to the sale of the Assets pursuant to the Bidding Procedures, including competing bids, (v) proprietary data (including any engineering studies and forecasts and economic studies) solely to the extent relating to Excluded Assets, (vi) information and data that is subject to Third Party contractual restrictions on assignment or disclosure to the extent relating to Excluded Assets, or any privileged information to the extent the transfer pursuant hereto would jeopardize such privilege; *provided*, *however*, the Selling Entities shall use their commercially reasonable efforts to provide a summary of such privileged information to the extent Related to the Business which would not violate any such privilege, (vii) copies of records stored for archival or back up purposes solely to the extent relating to Excluded Assets or Excluded Liabilities, and (viii) any other files or records solely to the extent relating to any Excluded Assets or Excluded Liabilities.

"**Facilities**" has the meaning set forth in Section 2.01(b)(i).

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 257] and any supplemental and/or final order entered in connection therewith.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), and a judgment or Order of the CCAA Court (or any other Court of competent jurisdiction) issued and entered by the CCAA Court (or such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court, CCAA Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or the CCAA (as applicable); *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order as long as such motion has not been filed.

"**Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Financing**" has the meaning set forth in Section 6.07(a).

"**Financing Commitment Letters**" has the meaning set forth in Section 6.07(a).

"**Financing Cooperation Expenses**" has the meaning set forth in Section 7.09(b).

"**Financing Cooperation Indemnity**" has the meaning set forth in Section 7.09(b).

"**FTC**" has the meaning set forth in Section 7.04(a).

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any transnational, federal, tribal, state, territory, provincial, parish, county, municipal or other governmental or quasi-governmental, taxing, administrative, judicial, arbitral or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Government Contract**" means any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, letter agreement, purchase order, delivery order, task order, grant, cooperative agreement, change order or other commitment or funding vehicle that (i) exists between a Selling Entity and any Governmental Authority or (ii) is entered into by a Selling Entity as a subcontractor at any tier in connection with a Contract between another Person and a Governmental Authority.

"**Government Official**" means any officer or employee of a Governmental Authority or any department, agency or instrumentality thereof, including state-owned entities, or of a public organization or any person acting in an official capacity for or on behalf of any such government, department, agency or instrumentality or on behalf of any such public organization.

"**Hazardous Substance**" means any pollutant or contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, including petroleum, its derivatives, by-products and other hydrocarbons, asbestos or asbestos-containing materials, polychlorinated biphenyls, per-and polyfluoroalkyl substances, and any other substance, waste or material regulated or which could give rise to liability under any Environmental Laws.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**HSR Second Request**" means delivery by the FTC or the United States Department of Justice of a "Request for Additional Information and Documentary Material" in connection with the Notification and Report Forms to be filed by the Parties with the FTC and the United States Department of Justice.

"**IB Australia**" means Instant Brands (Australia) Pty Ltd. (ABN 59 003 708 183).

"**IB Holdings**" means Instant Brands Holdings Inc.

"**India Distribution Agreement**" means the distribution agreement or share transfer form, effective immediately prior to the Closing, among WK India, CB Singapore and IB Holdings,

14

pursuant to which CB Singapore will distribute all of the issued and outstanding equity interests of WK India to IB Holdings (or such other Selling Entity), in form and substance reasonably acceptable to Buyer and Seller.

"**Indirect Transfer Report**" has the meaning set forth in Section 8.01(i)(i).

"**Information Officer**" means Ernst & Young Inc., in its capacity as information officer in the CCAA Recognition Proceedings.

"**Information Officer's Certificate**" means the certificate issued by the Information Officer, in substantially the form attached to the CCAA Sale Order, certifying that the Information Officer has received the Conditions Certificates.

"**Initial Allocation**" has the meaning set forth in Section 8.02(b).

"**Insurance Policies**" has the meaning set forth in Section 5.14.

"**Insurance Policies and Rights**" has the meaning set forth in Section 2.01(b)(vi).

"**Intellectual Property**" means any Copyrights, Patents, Trademarks, trade secrets, know-how, software, rights in data and databases or inventions (whether patentable or not), and all rights in the foregoing, and any other similar type of proprietary right or intellectual property right.

"**Intended Tax Treatment**" has the meaning set forth in Section 8.02(a).

"**Interim Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Investment Canada Act**" means the Investment Canada Act (Canada), R.S.C. 1985, c.28 (1st Supp).

"**IP Assignment Agreements**" means the IP Assignment Agreement(s) in substantially the form attached hereto as <u>Exhibit A</u> to be entered into between US Buyer and the applicable Selling Entities.

"**IRS**" means the Internal Revenue Service of the United States.

"**Knowledge**" means, with respect to any matter in question, (i) in the case of each Selling Entity, the knowledge, after reasonable review and inquiry, of any of the individuals listed on Schedule 1.01(c)(1), and (ii) in the case of Buyer, the knowledge, after reasonable review and inquiry, of any of the individuals listed on Schedule 1.01(c)(2).

"**Leased Precious Metals**" means the precious metals that would constitute Leased Bullion (as defined in the SCMI Lease Agreement and the BMO Lease Agreement) under (i) that certain Lease Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**SCMI Lease Agreement**"), dated as of May 21, 2019, by and between SCMI US Inc. and Instant Brands LLC, as amended by that certain First Amendment to the Lease Agreement, dated as of May 21, 2019, by and between Instant Brands LLC and (ii) that certain Amended and Restated Lease Agreement (as amended, restated, amended and restated,

15

supplemented or otherwise modified from time to time, the "**BMO Lease Agreement**"), dated as of August 17, 2023, by and between Bank of Montreal and Instant Brands LLC.

"**Leased Real Property**" has the meaning set forth in Section 5.12(b).

"**Leases**" has the meaning set forth in Section 5.12(b).

"**Liability**" means any and all Claims, debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Licenses**" has the meaning set forth in Section 5.09(a)(xvi).

"**Local Transfer Agreements**" means the local share transfer agreements, forms, notarial deeds, instruments or other similar documents, dated as of the Closing (or, solely with respect to CB Korea, such later time as contemplated by Section 2.14), between IB Holdings and US Buyer with respect to the transfer of all of the issued and outstanding equity interests of (i) Instant Brands (Australia) Pty Ltd (ABN 59 003 708 183), (ii) CB Singapore, (iii) CB Korea and (iv) Corelle Brands (Hong Kong) Co. Limited, in each case in form and substance reasonably agreed to by the Parties. For the sake of clarity, (a) the Local Transfer Agreements shall not have any effect on the value being given or received by Seller or Buyer, including the allocation of the Assets and Liabilities as between them, all of which shall be determined solely in accordance with this Agreement, and (b) in the event of any conflict whatsoever between any Local Transfer Agreement and this Agreement, the terms of this Agreement shall control in all respects.

"**Major Customer**" has the meaning set forth in Section 5.16(a).

"**Major Supplier**" has the meaning set forth in Section 5.16(b).

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry), or any other code having, or capable of performing or facilitating, any of the following functions (whether intentionally designed as such, or resulting from a design flaw, unpatched vulnerability, or otherwise): (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed or with which such code interoperates, communicates, or transacts, or (ii) compromising the privacy or data security of a user, system, or software, or accessing modifying, damaging or destroying any data, file, software, or system without the user's knowledge or consent.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance in substantially the form attached hereto as Exhibit B to be entered into among US Buyer, the Canadian Buyer and the Selling Entities at the Closing.

16

"**Material Adverse Effect**" means any event, condition, circumstance, development, change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or condition (financial or otherwise) of the Business or the Assets or Assumed Liabilities, considered as a whole or (b) would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated hereby on a timely basis; *provided* that, solely with respect to clause (a), no effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect: (i) any change in the United States economy or foreign economies where the Selling Entities operate, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the industry in which the Business operates; (iii) any Proceeding by any Person by reason of, based upon, attributable to, resulting from or arising in connection with, the negotiation, entry into or consummation of the transactions contemplated by this Agreement, any other Transaction Document or the Confidentiality Agreement; (iv) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action after the date hereof; (v) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic (including COVID-19), other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (vi) any change in Applicable Law or accounting rules (or the interpretation or enforcement thereof), in each case after the date hereof; (vii) any effect resulting from the public announcement of this Agreement, the negotiation, execution, performance of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of the Business, including the effect of any of the foregoing on the relationships, contractual or otherwise, of the Business with clients, customers, employees, suppliers, vendors, service providers or Governmental Authorities (including the failure to obtain any consents in connection with the transactions contemplated hereby); (viii) any effect resulting from the filing or continuation of the Bankruptcy Cases, including the Debtor Selling Entities' inability to pay its obligations as a result of the filing of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Proceeding); (ix) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (x) any action taken (or omitted to be taken) at the express written request or with the express written consent of Buyer or any of its Affiliates; and (xi) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is expressly required to be taken (or not taken) pursuant to this Agreement; *provided however*, that, in the case of clauses (i), (ii), (iv), (v) and (vi), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such events, conditions, circumstances, developments, changes or effects have a disproportionate adverse effect

on the Business, the Assets or the Assumed Liabilities, taken as a whole, as compared to other similarly situated participants in the industries in which the Business operates.

"**Material Contracts**" has the meaning set forth in Section 5.09(a).

"**Material Permit**" has the meaning set forth in Section 5.08(b).

"**Measurement Time**" has the meaning set forth in Section 4.01.

"**Necessary Consent**" has the meaning set forth in Section 2.06(i).

"**Net Working Capital**" means the aggregate value of the accounts receivable (excluding intracompany transactions) and inventory of the Business *minus* the aggregate value of trade accounts payable of the Business, in each case, determined on a consolidated basis as of the Measurement Time and determined in accordance with the Accounting Procedures. For the avoidance of doubt, "Net Working Capital" shall not include any item taken into account in the definition of (i) Acquired Entity Indebtedness or (ii) Acquired Entity Accrued Taxes.

"**Net Working Capital Adjustment**" means the amount, which may be a positive or negative number, equal to (i) the Estimated Net Working Capital or the Closing Net Working Capital, as applicable, *minus* (ii) the Net Working Capital Target.

"**Net Working Capital Target**" means $170,000,000.

"**NWC Adjustment Amount**" means (i) the Net Working Capital Adjustment as finally determined pursuant to Section 3.04, *minus* (ii) the Estimated Net Working Capital Adjustment, which amount may be a positive or negative number.

"**NWC and Cure Decrease**" has the meaning set forth in Section 3.04(f).

"**NWC and Cure Increase**" has the meaning set forth in Section 3.04(e).

"**NWC and Cure Statement**" has the meaning set forth in Section 3.04(a).

"**Offer Employees**" has the meaning set forth in Section 8.04(a).

"**Omitted Contract**" has meaning set forth in Section 2.05(c)(ii).

"**Open Source License**" means a license meeting the definition of "Open Source" promulgated by the Open Source Initiative or any other license pursuant to which source code is made generally available on terms which allow for further redistribution with or without modification at no cost.

"**Order**" means any award, writ, injunction, consent, settlement, determination, assessment, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 12.01(b)(i).

"**Owned Intellectual Property**" means all Intellectual Property to the extent owned or exclusively Controlled or purported to be owned or exclusively Controlled by Seller or any of its Subsidiaries and Related to the Business.

"**Owned Real Property**" has the meaning set forth in Section 5.12(a).

"**Party**" and "**Parties**" each have the meaning set forth in the introductory paragraph.

"**Party Affiliate**" has the meaning set forth in Section 13.12(a).

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, registered industrial designs, applications for industrial designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisionals, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, Canadian Intellectual Property Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"**PBGC**" means the Pension Benefit Guaranty Corporation of the United States.

"**PBGC Agreement**" means the Agreement dated January 31, 2003 between the PBGC and IB Holdings (formerly known as WKI Holding Company, Inc.), as amended.

"**Payoff Amount**" has the meaning set forth in Section 7.09(a).

"**Payoff Letter**" has the meaning set forth in Section 7.09(a).

"**Pension/OPEB Liabilities**" means an aggregate amount equal to $32,000,000.

"**Permits**" means any approvals, authorizations, consents, exemptions, accreditations, qualifications, licenses, permits, registrations, certificates or similar documents or authority issued or granted by any Governmental Authority.

"**Permitted Encumbrances**" means (i) with respect to the Assets and the Acquired Entities, (a) zoning, entitlement and building regulations and land use restrictions imposed by Governmental Authorities which are not violated by the current use or occupancy of such real property or the operation of the Business as currently conducted, (b) covenants, conditions, restrictions, easements and other similar matters affecting title to real property that does not (or would not reasonably be expected to) materially impair the ownership or value of such property or the occupancy or use of such property for the purposes which it is currently used by the Business, (c) with respect to any Real Property Interest, all matters of public record, to the extent valid and subsisting, (d) non-exclusive licenses of Intellectual Property granted in the ordinary course of business, (e) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, (f) any Encumbrances that will be released by the Sale Order and (g) the Encumbrances set forth on Schedule 1.01(d), and (ii) with respect to the Acquired Entities, (a) statutory Encumbrances for Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, in each case, for which appropriate reserves have been established in accordance with GAAP, (b) mechanics', carriers',

19

workers', repairers' and other similar Encumbrances arising or incurred in the ordinary course of business for amounts for obligations that are not material or overdue or the amount or validity of which are being contested in good faith by appropriate proceedings, (c) purchase money Encumbrances and Encumbrances securing rental payments under capital lease arrangements, (d) Encumbrances arising under leases of property or equipment in favor of the owner thereof and (e) deposits to secure the performance of bids, Contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and similar obligations incurred in the ordinary course of business.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means any information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, including a reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"**PRC**" means the People's Republic of China.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on and including the Closing Date.

"**Precious Metal Liabilities**" means Assumed Liabilities in respect of the precious metal leases in an aggregate amount of $7,130,000.

"**Prepayment Amount**" has the meaning set forth in Section 7.09(a).

"**Prepayment Notice Confirmation**" has the meaning set forth in Section 7.09(a).

"**Proceeding**" means any Claim, action, charge, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts.

"**Property Tax Credit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (or portion thereof) that were paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Debit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Pre-Closing Tax Period (or portion thereof) that were not paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Purchase Price Adjustment**" means the excess of the Property Tax Credit Amount over the Property Tax Debit Amount, which amount may be a positive or negative number.

"**Purchase Price**" has the meaning set forth in Section 3.01.

"**Purchased Intellectual Property**" has the meaning set forth in Section 2.01(b)(xiii).

"**Qualifying Offer**" has the meaning set forth in Section 8.04(a).

"**R&W Insurance Policy**" has the meaning set forth in Section 13.12(c).

"**Real Property Interests**" has the meaning set forth in Section 2.01(b)(v).

"**Records**" has the meaning set forth in Section 2.01(b)(viii).

"**Registered Intellectual Property**" has the meaning set forth in Section 5.10(a).

"**Related to the Business**" means (i) primarily or exclusively used in, (ii) primarily or exclusively owned, leased, licensed or otherwise held for use in, or (iii) primarily or exclusively related to the operation or conduct of, in each case, the Business.

"**Release**" means any presence, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the Environment (including the abandonment or discarding of barrels, containers or other closed receptacles containing any Hazardous Substance).

"**Released Parties**" has the meaning set forth in Section 13.12(b).

"**Releasors**" has the meaning set forth in Section 13.12(b).

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants and financial advisors.

"**Round-Tripping Amount**" means (i) in the event that the Closing occurs after the Closing (as defined in the Appliances APA), the amount of the Payoff Amount (as set forth in the Payoff Letter with respect to the Term DIP Credit Facility) or (ii) in the event that the Closing occurs prior to the Closing (as defined in the Appliances APA), the Prepayment Amount set forth

in the Prepayment Notice Confirmation, in each case, allocable to the outstanding obligations of the Debtor Selling Entities or any of their Affiliates owed to Buyer or any of its Affiliates (in the capacity as lenders with respect to the Term DIP Credit Facility) (each, a "**Buyer DIP Lender**") under the Term DIP Credit Facility.

"**Sale Order**" means an Order of the Bankruptcy Court approving the sale of the Assets to Buyer and assumption by Buyer of the Assumed Liabilities, in substantially the form reasonably acceptable to Buyer and Seller, with such changes thereto as are required by the Bankruptcy Court.

"**Sanctioned Person**" means any Person that is the subject of Sanctions Laws, including (i) any Person listed on any sanctions-related list of designated Persons, including OFAC's Specially Designated Nationals and Blocked Persons List and other applicable lists maintained by the United Nations or the governments of Canada, the United Kingdom, the European Union, any European Union member state, or any other applicable Governmental Authority, (ii) any Person located, organized or resident in Cuba, Iran, North Korea, Syria, or the Crimea, so-called Luhansk People's Republic, or so-called Donetsk People's Republic regions of Ukraine, or (iii) any entity that is, in the aggregate, 50% or greater owned, directly or indirectly, or otherwise Controlled by, or acting or purporting to act on behalf of, a Person or Persons described in clauses (i) or (ii).

"**Sanctioned Territory**" has the meaning set forth in Section 5.22(a).

"**Sanctions Laws**" means the Applicable Laws administered or enforced by the United States (including by the United States Department of the Treasury, Office of Foreign Assets Control ("**OFAC**") or the U.S. Department of State), the United Nations or the governments of Canada, the United Kingdom, the European Union, any European Union member state, or any other applicable Governmental Authority relating to economic or trade sanctions.

"**SCMI Lease Agreement**" has the meaning set forth in the definition of "Leased Precious Metals."

"**Seller**" has the meaning set forth in the introductory paragraph.

"**Seller Benefit Plans**" any (i) "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (ii) employment, consulting, termination, severance, salary continuation, termination protection, change in control, transaction bonus, retention or similar plan, program, policy or agreement  or (iii) other plan, agreement, policy, program, funds or arrangements of any kind (whether written or oral) providing for compensation, bonuses, profit-sharing, or other forms of incentive (whether equity-based or otherwise) or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits and any trust, escrow or similar agreement related thereto, whether or not funded, in each case (A) that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by any Selling Entity for the benefit of any current or former Company Employee or (B) with respect to which any Selling Entity has or could reasonably be expected to have any current or contingent Liability; provided, however, that in no event shall "**Seller Benefit Plan**" include any arrangement maintained by a Governmental Authority to which any Selling Entity is required to contribute under Applicable Law.

"**Seller Credit Obligations**" has the meaning set forth in Section 8.03(c).

"**Seller Intercompany Obligations**" means all intercompany obligations solely between or among Selling Entities.

"**Seller Related Party**" means Seller and its Subsidiaries and its and their respective stockholders, partners, members, Affiliates, directors, officers, employees, controlling Persons and agents.

"**Selling Entities**" has the meaning set forth in the introductory paragraph.

"**Shared Services Employees**" means the employees listed on Schedule 1.01(b), which includes all employees of the Selling Entities who provide services to both the Business and the Excluded Business; *provided*, *that*, such schedule shall be subject to update by Seller prior to the Closing consistent with Section 7.02 with such updates provided to Buyer within seven Business Days prior to the Closing.

"**Solvent**" has the meaning set forth in Section 6.09.

"**Specified Termination**" has the meaning set forth in Section 3.02(b).

"**Straddle Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) (i) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (ii) holds a majority of the equity interest.

"**Successful Bidder**" means the bidder with the highest or otherwise best bid for the Assets, as determined in accordance with the Bidding Procedures.

"**Superior Proposal**" means any bona fide proposal or offer to or from a Person other than Buyer or its Representatives with respect to (i) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (ii) any other direct or indirect acquisition involving the Assets, that, in each case, the Selling Entities have determined in good faith in their reasonable business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.

"**TAA**" means the Taxation Administration Act 1953 (Cth).

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**", "**Taxation**" "**Taxing**") means all federal, state, provincial, territory, local or foreign taxes, including all net income, gross receipts, capital, sales, use, goods and services (including all Australian GST and Canadian Sales Taxes), ad valorem, value added, custom duties, duties, registration, transfer, import, export, franchise, profits, premiums, inventory, capital stock, environmental, disability, recapture, levies, rates, license, withholding, payroll, employment, social security, worker's compensation, unemployment, government pension plan premiums and contributions, utility, excise, severance,

23

stamp, occupation, real property, personal property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Tax Act**" means the Income Tax Act (Canada) and the regulations thereunder.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, estimate, information return, election, notice, designation and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"**Term DIP Agent**" has the meaning set forth in the Final DIP Order.

"**Term DIP Credit Facility**" has the meaning set forth in the definition of "DIP Credit Facilities".

"**Term DIP Secured Parties**" has the meaning set forth in the Final DIP Order.

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

"**Trade Compliance Laws**" means any Applicable Laws relating to the regulation of imports, exports, re-exports, transfers, releases, shipments, transmissions or any other provision of goods, technology, software or services, including (i) the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120 et seq., (ii) the Export Administration Regulations (EAR), 15 C.F.R. Parts 730 et seq., (iii) Sanctions Laws, (iv) all Applicable Laws relating to customs and imports, including, without limitation, the customs regulations set forth in Title 19 of the Code of Federal Regulations, the Tariff Act of 1930, as amended, and the Applicable Laws, regulations and programs administered or enforced by the U.S. Department of Commerce, U.S. International Trade Commission, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement and their respective predecessor agencies, (v) the antiboycott laws administered by the U.S. Department of Commerce and U.S. Department of the Treasury's Internal Revenue Service and (vi) similar trade compliance laws in jurisdictions in which the Selling Entities operate or have operated.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, social media identifier or account, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, Canada or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction Documents**" means this Agreement, the Master Assignment, the IP Assignment Agreements, the Escrow Agreement, the Local Transfer Agreements, the Transition

Services Agreement, the Equity Commitment Letter, the India Distribution Agreement and any other agreements, instruments or documents (including any elections referred to in Article 8, if applicable) entered into pursuant to this Agreement or such other Transaction Documents.

"**Transfer Taxes**" has the meaning set forth in Section 8.01(a).

"**Transferred Employees**" means any (i) Offer Employee who accepts (or is deemed to accept) an offer of employment with Buyer or one of its Subsidiaries pursuant to Section 8.04 and (ii) individual who is employed by an Acquired Entity as of immediately prior to the Closing.

"**Transition Services Agreements**" means the Transition Services Agreement, in substantially the form attached hereto as <u>Exhibit C</u> (with such changes thereto as may be mutually agreed by Buyer and the Selling Entities pursuant to Section 2.12), to be entered into among Buyer and the Selling Entities at the Closing.

"**Trustee**" has the meaning set forth in Section 13.14.

"**Upward Acquired Entity Adjustment**" has the meaning set forth in Section 3.05(c).

"**US Buyer**" has the meaning set forth in the introductory paragraph.

"**WARN**" has the meaning set forth in Section 8.04(e)(v).

"**WK India**" means World Kitchen (India) Private Limited.

Section 1.02    *Other Definitions and Interpretive Matters.*

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    *Time*.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.  Any references to "days" in this Agreement means calendar days and not Business Days, unless Business Days are specified.

(ii)    *Dollars*.  Any reference in this Agreement to "Dollars" or "$" means United States dollars.

(iii)    *Exhibits; Schedules; Disclosure Schedules*.  All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)    *Gender and Number*.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

25

(v)    *Headings*.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    *Accounting Terms*.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.

(vii)    *Herein*.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)    *Or.*  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)    *Including*.  The word "including" or any variation thereof means "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    *Statute*.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi)    *Contract*.  References to a Contract (including this Agreement) mean such Contract as amended, restated, modified or supplemented from time to time.

(xii)    *Subsidiaries of Seller*.  All references to Subsidiaries of Seller are intended to include the Acquired Entities in addition to the Selling Entities, unless explicitly stated otherwise.

(xiii)    *Made Available*.  The phrase "made available" or "provided" to Buyer or similar phrases as used in this Agreement means that the subject documents were posted to the online data room hosted by Intralinks, titled "Project Inspire M&A" and maintained by the Selling Entities in connection with the transactions contemplated by this Agreement on or prior to the date of this Agreement.

(xiv)    *Ordinary Course of Business*.  The words "ordinary course of business" will be deemed immediately followed by the words "consistent with past practices" (if such words or words of similar effect do not already follow).

(b)    *No Strict Construction*.  Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event

26

an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

ARTICLE 2
PURCHASE AND SALE

Section 2.01   *Purchase and Sale.*

(a)      Upon the terms and subject to the conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing in the sequence set out in Section 2.11, the Selling Entities will sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer will purchase, acquire and accept, the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)      The "**Assets**" means all right, title and interest of each Selling Entity in, to or under all of their respective assets, rights, claims and properties of every nature, kind and description and wherever located, whether real, personal or mixed, tangible and intangible (including goodwill) and whether now existing or hereafter acquired, to the extent Related to the Business, including the following, but excluding, for the avoidance of doubt, the Excluded Assets:

(i)      all plants, offices, and manufacturing, processing, distribution, storage, warehousing and other facilities of any Selling Entity to the extent Related to the Business (collectively, the "**Facilities**"), together with all equipment, machinery, vehicles, fixtures, supplies, furniture, leasehold improvements, and other personal, movable and mixed property of any Selling Entity that is located at or in the immediate vicinity of the Facilities or used (or held for use) in connection with the use, ownership or operation of the Facilities (or any portion thereof);

(ii)      to the extent not described in Section 2.01(b)(i), all items of tangible personal property or equipment owned or leased by any Selling Entity to the extent Related to the Business;

(iii)      all inventory and software Related to the Business (including maintenance, repair and operation inventory, spare parts, supplies, packaging, work-in-progress, raw materials, in-bound in-transit, plant consumables, plastic trays and accessories) owned or used (or held by any Selling Entity for use), whether in transit to or from any Selling Entity and whether in any Facilities, held by any third parties or otherwise and all open purchase orders with suppliers (but excluding any products shipped to third parties prior to the Closing Date);

(iv)      all precious metals (including rhodium and platinum) that are used or held for use in the Business; *provided*, that, for the avoidance of doubt, the Leased Precious Metals shall only constitute Assets to the extent that the SCMI Lease Agreement or the

27

BMO Lease Agreement, as applicable, constitutes an Assigned Contract that is actually assigned to Buyer pursuant to this Agreement;

(v)     all Owned Real Property and Leased Real Property set forth on Disclosure Schedule 2.01(b)(v), together with the rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits, tenements, appurtenant rights and privileges relating thereto (in each case, excluding unexpired Leases that are 365 Contracts) (collectively, the "**Real Property Interests**");

(vi)    subject to Section 2.06 and Section 2.13, all current and prior insurance policies of any Selling Entity related to the Business, the Assets or the Assumed Liabilities, and all rights and benefits of any of Seller or any of its Subsidiaries of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Debtor Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries (collectively, the "**Insurance Policies and Rights**");

(vii)   (x) all Contracts that constitute, as of the Closing, Desired 365 Contracts, and (y) all other Contracts that are not 365 Contracts and are Related to the Business as set forth on Disclosure Schedule 2.01(b)(vii)(y) (collectively, the "**Assigned Contracts**");

(viii)  subject to Section 2.06, all Permits and Orders (in each such case, whether preliminary or final) required of any Selling Entity for the ownership, operation or use (or held for use) of the Assets to the extent Related to the Business;

(ix)    all books, databases, files, records, Tax Returns (and associated workpapers), plans, advertising and promotional materials, information, data and other similar items (other than the Excluded Records) in any Selling Entity's possession, whether in written or electronic or any other format, including customer and supplier lists, mailing lists, sales and promotional literature, and other sales related materials to the extent Related to the Business (collectively, the "**Records**");

(x)     all rights, claims, accounts and causes of action (including warranty and similar claims) of any Selling Entity against Persons (including any of Seller's Subsidiaries) other than any other Selling Entity (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by any Selling Entity (regardless of whether such rights are currently exercisable) associated with the Assets;

(xi)    the amount of and all rights to any proceeds received by any Selling Entity in respect of (x) the loss, destruction or condemnation of any Assets occurring prior to, on or after the Closing or (y) any Assumed Liabilities or the operation of such Assets;

NAI-1538018312v20

(xii)    all warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, Related to the Business, or any products or services provided in connection therewith;

(xiii)    all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, security and other deposits or the like (other than Taxes), in each case, Related to the Business and made by or on behalf of any Selling Entity before the Closing Date, to the extent related to the period after the Closing;

(xiv)    all Owned Intellectual Property, all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Owned Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Owned Intellectual Property, including the right to license and the right to file, prosecute and maintain the Owned Intellectual Property and the right to collect royalties or other payments with respect to the Owned Intellectual Property (the "**Purchased Intellectual Property**");

(xv)    the Seller Benefit Plans listed on Disclosure Schedule 2.01(b)(xv) (the "**Assumed Benefit Plans**") and all assets held with respect thereto;

(xvi)    the Collective Bargaining Agreements;

(xvii)    all goodwill and other intangible assets Related to the Business, including all customer relationships, all rights under any confidentiality agreements executed by any Third Party for the benefit of any Selling Entity to the extent relating to the Assets, and all information and documents related thereto (other than the Excluded Records);

(xviii)    to the extent Related to the Business, all rights of any Selling Entity under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any current or former employees, or current or former directors, consultants, independent contractors and agents of any Selling Entity or any of their Affiliates or with third parties in respect of the Business;

(xix)    all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, refunds or rights of set off to the extent Related to the Business;

(xx)    all rights to any refunds (or credits against Taxes otherwise due and payable in lieu of refunds) with respect to Taxes that are assessed on, or in respect of, or are attributable to, the Business or the Acquired Entities, except refunds or credits of any such Taxes that were paid by any Selling Entity prior to the Closing (other than any Taxes taken into account in determining Property Tax Credit Amount or refunds or credits taken into account as a reduction to Acquired Entity Accrued Taxes) or were taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

(xxi)    any rights, awards, defenses, claims, counterclaims or causes of action as of the Closing of any Selling Entity relating to any Proceeding or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and

29

counterparties to any Assigned Contracts or Real Property Interests, in each case, to the extent Related to the Business, whether arising by way of counterclaim or otherwise (but excluding for the avoidance of doubt, counterclaims and defenses related to Excluded Assets);

(xxii)   all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, the CCAA or the BIA, including any proceeds thereof, to the extent Related to the Business, other than those listed on Schedule 2.01(b)(xxii);

(xxiii)  all shares of capital stock or other equity interests in the Acquired Entities (the "**Acquired Equity Securities**"), excluding, for the avoidance of doubt, the Excluded Equity Securities;

(xxiv)  all current assets of the Business, including those included in the calculation of the Net Working Capital;

(xxv)  all computer systems, networks, hardware, computer software, databases and data collections, websites and other equipment used to process store, maintain and operate data, information and functions, in any form or by any method, used by any Selling Entity and Related to the Business;

(xxvi)  all of the Acquired Entity Intercompany Obligations; and

(xxvii) all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like, in each case, Related to the Business and made by or on behalf of any Selling Entity before the Closing Date, to the extent related to the period after the Closing.

No provision of this Section 2.01 shall be construed to limit the scope of the Assets acquired by Buyer indirectly through its acquisition of the Acquired Entities through the purchase of the Acquired Equity Securities hereunder, it being understood that Buyer shall indirectly acquire all such assets, properties, claims and rights except as otherwise expressly provided herein.

Section 2.02   *Excluded Assets.*

Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign, convey or deliver the Excluded Assets to Buyer, and the Selling Entities will retain all right, title and interest to, in and under the Excluded Assets.  The term "**Excluded Assets**" means, and is limited to, the following assets, rights and properties of the Selling Entities:

(a)      any amounts (including the Purchase Price) paid or payable to any Selling Entity pursuant to this Agreement or any other Transaction Document;

(b)      any shares of capital stock or other equity interest of any Selling Entity or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Selling Entity (including with respect to WK India, Instant Brands (EMEA) Limited

30

and Instant Brands (Ireland) Limited), in each case other than the Acquired Equity Securities, which are all included in the Assets (such excluded capital stock or equity interests, the "**Excluded Equity Securities**");

(c)    all minute books and other corporate books to the extent relating to any Selling Entity's organization or existence, and all stock ledgers, corporate seals and stock certificates of any Selling Entity (excluding, for the avoidance of doubt, any books, ledgers, seals and certificates relating to the Acquired Entities and the Acquired Equity Securities);

(d)    all Excluded Records;

(e)    all Excluded Contracts;

(f)    all Excluded Intellectual Property;

(g)    all Seller Intercompany Obligations;

(h)    all rights to any refunds (or credits against Taxes otherwise due and payable in lieu of refunds) with respect to Taxes that are assessed on, or in respect of, or are attributable to, the Assets or the Acquired Entities that were paid by any Selling Entity prior to the Closing (other than any Taxes taken into account in determining Property Tax Credit Amount or refunds or credits taken into account as a reduction to Acquired Entity Accrued Taxes) or were taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

(i)    all cash and cash equivalents (including (w) any cash that (A) is collateralizing any letters of credit issued pursuant to any credit agreement or facility or (B) held in trust or any trust account for or on behalf of any Selling Entity, (x) marketable securities, (y) short-term investments and (z) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by any of Selling Entity), other than (I) any cash or other proceeds received or to which Buyer is or may be entitled under or pursuant to Section 2.01(b)(x), Section 2.01(b)(xi), Section 2.01(b)(xii), Section 2.01(b)(xx) and Section 2.01(b)(xxvii) or (II) held by any Acquired Entity;

(j)    all rights, claims of any nature or causes of action by or in the right of Seller or any of its Subsidiaries, on the one hand, against any current or former director, officer, employee, partner, member, Representative or agent of Seller or any of its Subsidiaries (other than Transferred Employees), on the other hand, whether arising by counterclaim or otherwise, other than those listed on Schedule 2.01(b)(xxii);

(k)    all bank accounts, safety deposit boxes, lock boxes and securities accounts of the Selling Entities and the contents thereof;

(l)    all outside of the ordinary course of business deposits made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases as set forth on Disclosure Schedule 2.02(l);

(m)    any rights, claims or causes of action of any Selling Entity under this Agreement, any other Transaction Document or the Confidentiality Agreement;

31

(n)      the proceeds of the sale of any Excluded Assets;

(o)      all Seller Benefit Plans that are not Assumed Benefit Plans and all assets held with respect to such Seller Benefit Plans;

(p)      all assets, rights and properties (i) primarily or exclusively used in, (ii) primarily or exclusively owned, leased, licensed or otherwise held for use in, or (iii) primarily or exclusively related to the operation or conduct of, in each case, the Excluded Business;

(q)      all property reportable under any unclaimed property, escheat or similar Law where the dormancy period elapsed prior to the Closing Date;

(r)      all assets constituting "Assets" under the Appliances APA; and

(s)      those other properties and assets described on Disclosure Schedule 2.02(s).

Section 2.03    *Assumed Liabilities.*

Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (collectively, the "**Assumed Liabilities**") and no other Liabilities:

(a)      *Generally.*  All Liabilities directly arising from the ownership or operation of the Business or the Assets by Buyer after the Closing, and with respect to Taxes, any Taxes that are assessed on, or in respect of, or are attributable to, the Assets or the Acquired Entities for any Post-Closing Tax Period (or portion thereof);

(b)      *Assigned Contract*s.  All of the Selling Entities' Liabilities under the Assigned Contracts, to the extent arising or attributable to any period after the Closing or arising on or prior to the Closing solely to the extent requiring performance after the Closing; *provided*, such Liability does not relate to any failure to perform, improper performance, breach of warranty or other breach, default or violation of such Assigned Contract by any Selling Entity on or prior to the Closing;

(c)      *Real Property Interests*.  All of the Selling Entities' Liabilities under the Real Property Interests, to the extent arising or attributable to any period after the Closing;

(d)      *Cure Costs*.  All Cure Costs;

(e)      *Intercompany Obligations*.  All Liabilities relating to Acquired Entity Intercompany Obligations;

(f)      *Accounts Payable*.  All trade accounts payable of the Business, to the extent included in the calculation of the Net Working Capital;

(g)      *Taxes*.  100% of the Transfer Taxes and all Taxes taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

32

(h)     *Transferred Employees; Assumed Benefit Plans; Collective Bargaining Agreements*.  All Liabilities (i) arising out of, or relating to, the employment, or termination of employment with Buyer or any of its Affiliates, of any Transferred Employee, in each case, arising on or following the Closing, (ii) arising out of, or relating to, any Assumed Benefit Plans or Collective Bargaining Agreements, in each case, whether arising before, on or following the Closing, or (iii) assumed by, or transferred to, Buyer or any of its Affiliates pursuant to Section 8.04;

(i)     *Environmental*.  All Liabilities arising from the ownership or operation of the Assets or the Business by the Buyer after the Closing concerning the violation of any Environmental Laws or the presence or Release of any Hazardous Substance at, on, under or migrating from any Assets; and

(j)     *WARN*.  The Liabilities and obligations assumed by Buyer pursuant to Section 8.04(e)(v).

Section 2.04   *Excluded Liabilities.*

Notwithstanding anything herein to the contrary, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any Liability of any Selling Entity other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**").

Section 2.05   *Cure Costs; Desired 365 Contracts.*

(a)     Schedule 2.05(a) sets forth a complete list as of the date hereof of all 365 Contracts that Buyer intends to assume at the Closing (the "**Desired 365 Contracts**").  Upon Closing, subject to the terms and conditions hereof, the Selling Entities, as applicable, will assign the Desired 365 Contracts to Buyer, and Buyer will (i) assume the applicable Liabilities in accordance with Section 2.03(b) and (ii) as promptly as reasonably practicable, pay or cause to be paid, pursuant to Section 365 of the Bankruptcy Code, the Sale Order and the CCAA Sale Order, all Cure Costs pursuant to Section 2.03(d) relating to the Desired 365 Contracts as and when finally determined by the Bankruptcy Court or the CCAA Court pursuant to the procedures set forth in the Sale Order and (as applicable) the CCAA Sale Order.

(b)     At any time prior to the Closing Date, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, Buyer will have the right to provide written notice to Seller of Buyer's election to:

(i)     designate a 365 Contract (including any 365 Contract that is a Desired 365 Contract immediately before such designation) as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)     designate a 365 Contract as a Desired 365 Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such 365 Contract is added to the Assigned

33

Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract and, in the case of any Desired 365 Canadian Contact, prior to the service of the motion seeking the CCAA Sale Order, and (B) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order) and, in the case of Desired 365 Canadian Contracts, the CCAA Court (including through the CCAA Sale Order).

(c)  At any time within 60 days after the Closing Date, but only to the extent consistent with the Bidding Procedures Order, the Bidding Procedures, the Sale Order and CCAA Sale Order (as applicable), Buyer will have the right, in Buyer's sole discretion, to provide written notice to Seller of Buyer's election to:

(i)  designate a Desired 365 Contract as an Excluded Contract, and upon such designation such Desired 365 Contract will constitute an Excluded Contract and Excluded Asset, if after the Closing Date (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the Cure Costs listed on Disclosure Schedule 5.09(c) or (B) a timely filed or asserted objection to a Cure Cost or to Buyer's assumption and assignment of a Contract, in each case that was asserted prior to the Closing Date, remains unresolved or is resolved in a manner unsatisfactory to the Buyer, in each case as determined by the Buyer in its sole discretion; *provided* that if, at such time, such Contract had already been assumed pursuant to, in each case of this subclause (i), the Sale Order or the CCAA Sale Order, Buyer shall be responsible for, and shall promptly reimburse Seller for, any and all Liabilities relating to such Contract that would be entitled to priority pursuant to Section 503(b) of the Bankruptcy Code; and

(ii)  designate any 365 Contract disclosed to Buyer for the first time after the Closing Date (any such contract, an "**Omitted Contract**") as a Desired 365 Contract. Seller shall, promptly following discovery of an Omitted Contract (but in no event later than three Business Days after such discovery), (x) notify Buyer in writing of such Omitted Contract and the corresponding estimated Cure Costs related thereto (if any) and (y) as requested by Buyer in writing (email to suffice), either file a Supplemental Assumption and Assignment Notice as set forth in the Bidding Procedures Order or file a motion (on an expedited basis, if requested by the Buyer) with the Bankruptcy Court and (if applicable) the CCAA Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.05; *provided* that Buyer shall be responsible for, and shall pay, all Cure Costs related to such Omitted Contract. Such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) there is no objection to the Supplemental Assumption and Assignment Notice (if one is filed) and Buyer has accepted such Omitted Contract in writing (email to suffice) as an Assigned Contract or (B) to the extent a motion is filed to assume and assign such Omitted Contract, the assumption and assignment is approved by the Bankruptcy Court and (if applicable) the CCAA Court.

(d)  To the extent that Buyer makes a valid designation with respect to any 365 Contracts pursuant to clause (b) above, the applicable Exhibits and Schedules to this Agreement

34

will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(e)     If Buyer exercises its rights in clause (b) above to designate a 365 Contract as a Desired 365 Contract or as an Excluded Asset (as the case may be), then the Parties acknowledge and agree that (i) there will be no increase or reduction in the Cash Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing and (ii) notwithstanding anything in this Agreement to the contrary, the Cure Costs associated with such 365 Contract, which, in the case of any 365 Contract designated as a Desired 365 Contract pursuant to Section 2.05(b)(ii), shall be paid by Buyer and shall not be taken into account in determining any Estimated Excess Cure Costs or Closing Excess Cure Costs, as applicable.  If Buyer exercises its rights in clause (c) above to designate a Desired 365 Contract as an Excluded Contract or to designate an Omitted Contract as a Desired 365 Contract, then the Cure Costs associated therewith shall not be taken into account in determining any Closing Excess Cure Costs.

Section 2.06     *Assignment of Assets Subject to Consent Requirements.*

Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any Third Party thereto (each such action, a "**Necessary Consent**"), would constitute a breach thereof or of any Applicable Law or Order or in any way adversely affect the rights of Buyer thereunder, (ii) such Necessary Consent has not been obtained or rendered moot (after giving effect to the Sale Order and the CCAA Sale Order and the Bankruptcy Code and the CCAA) and (iii) the Bankruptcy Court or the CCAA Court has not entered an Order providing that such Necessary Consent is not required.  In such event, subject to the terms and conditions hereof, the Closing will proceed with respect to the remaining Assets, and there will be no reduction in the Purchase Price as a result thereof.  If, as of the Closing, any Necessary Consent has not been obtained, then (A) Seller and Buyer will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer; *provided* that Seller will not be obligated to pay any consideration or grant any accommodation therefor to any Third Party from whom such Necessary Consent is requested or to initiate any Proceedings to obtain any such Necessary Consent; and (B) Seller and Buyer will reasonably cooperate in a mutually agreeable arrangement, without the need for any Necessary Consent, under which Buyer would obtain the benefits and assume the obligations under such Asset in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which the Selling Entities would enforce their rights thereunder for the benefit of Buyer with Buyer assuming each applicable Selling Entities' obligations thereunder.  To the extent permitted under Applicable Law, Seller shall hold in trust for and pay to Buyer promptly upon receipt thereof, such Asset and all income, proceeds and other monies received by any Selling Entity to the extent related to such Asset in connection with the arrangements under this Section 2.06.

35

Section 2.07    *Misallocated Assets.*

Subject to Section 2.06 and Section 2.12, at all times on or after the Closing Date, (i) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (ii) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities, Buyer, Seller or the applicable Subsidiary of Seller will promptly transfer (or cause to be transferred), for no additional consideration, such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party.

Section 2.08    *Further Assurances.*

From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.08 will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the earliest of the date that (i) the last remaining service of Seller or any of its Subsidiaries under the Transition Services Agreement has been fulfilled or expired, (ii) the effective date of a plan of reorganization or liquidation submitted by any of the Debtor Selling Entities to the Bankruptcy Court, *provided* that any liquidation trustee or trust (or person or entity acting in a similar capacity) acting in the Bankruptcy Cases shall continue to provide services under the Transition Services Agreement until the last remaining service of Seller or any of its Subsidiaries has been fulfilled or expired and *provided, further*, that any services provided by Buyer under the Transaction Services Agreement shall inure to the benefit of any such liquidating trustee or trust (or any person or entity acting in a similar capacity) or (iii) any structured dismissal of any of the Bankruptcy Cases; *provided*, that, any order approving a structured dismissal shall provide for the provision of any remaining services under the Transition Services Agreement.

Section 2.09    *Allocation of Assets and Liabilities.*

Subject to Section 2.05(b)(ii), at least five Business Days prior to the Closing, Buyer shall provide a schedule to the Selling Entities setting forth in reasonable detail the contemplated allocation of the Assets and related Assumed Liabilities as between US Buyer and the Canadian Buyer.  Upon the reasonable request of Buyer, the Selling Entities shall in good faith cooperate with Buyer in identifying certain Assets and Assumed Liabilities that are Related to the Business as conducted in the United States of America or Canada for purposes of accurately allocating such Assets and Assumed Liabilities between US Buyer and the Canadian Buyer on the Closing Date. The Parties acknowledge and agree that the exhibits and schedules to the Master Assignment may be amended by Buyer in its sole discretion at any time prior to the Closing Date solely to reflect Buyer's intended allocation of such Assets and Assumed Liabilities.  Further, the Parties acknowledge and agree that is the intention of the Parties that the Canadian Buyer purchase and acquire substantially all of the Canadian Assets of the Business and assume all of the applicable

36

related Assumed Liabilities directly from the applicable Canadian Seller, which shall be reflected on the allocation of Assets and Assumed Liabilities in the Master Assignment.

Section 2.10   *Withholding.*

Subject to Section 8.01(k), Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Selling Entity or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment.  If Buyer determines that an amount is required to be deducted or withheld, Buyer shall: (a) as promptly as reasonably practicable, provide written notice to Seller before the payment relevant to such deduction or withholding is to be made, (b) reasonably cooperate in good faith with Seller to reduce or eliminate the deduction or withholding of such amount to the extent possible under Applicable Law, and (c) provide Seller a reasonable opportunity to provide forms or documentation that would exempt such payment from withholding. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. However, if such deduction or withholding was made in respect of a notice received from a Governmental Authority in relation to Buyer (or an affiliate of Buyer) having an unpaid tax debt or tax-related liability or the Governmental Authority's anticipation of potential non-payment of Buyer's (or Buyer's Affiliate's) tax debt or tax liability (including pursuant to section 255 of the Income Tax Assessment Act 1936 (Cth) or section 260-5 of Schedule 1 to the Taxation Administration Act 1953 (Cth)), Buyer will pay an additional amount to the Selling Entity (or other payee) to ensure that the Selling Entity (or other payee) receives and retains the same amount that it would have received had such deduction or withholding (on account of Buyer (or its Affiliate) tax debts or liabilities) not been deducted or withheld from the payment.

Section 2.11   *Sequencing.*

Notwithstanding anything herein to the contrary, the acquisition of the Acquired Equity Securities by the US Buyer shall be deemed to occur at the first moment in time immediately following the Closing and the acquisition of the Canadian Assets by the Canadian Buyer shall occur immediately thereafter at the second moment in time following the Closing.

Section 2.12   *Transition Services Agreement; Accounting Procedures.*

(a)      After the date hereof, to the extent applicable, Buyer and the Selling Entities shall use commercially reasonable efforts to negotiate and document such additional terms to the form of Transition Services Agreement attached hereto as <u>Exhibit C</u> as may be reasonably necessary and appropriate in the event that the Closing occurs before the consummation of the transactions contemplated by the Appliances APA (or the consummation of the transactions contemplated by the Appliances APA otherwise fails to occur), including with respect to (a) the continuation of services to the Excluded Business by Shared Services Employees who are identified as Company Employees hereunder and (b) the continuation of participation by employees of the Excluded Business in any health and welfare Assumed Benefit Plans, in each case, following the Closing. Notwithstanding anything herein to contrary, in no event shall (i) the failure of Buyer and the Selling Entities to agree on such additional terms be deemed to be a breach of this Section 2.12 or

37

(ii) the agreement of Buyer and the Selling Entities to such additional terms be a condition to close or otherwise be a requirement of Buyer's obligations under this Agreement to close (it being understood that in the event that Buyer and the Selling Entities fail to mutually agree on such additional terms prior to the Closing, the Transition Services Agreement to be executed and delivered by Buyer and the Selling Entities at the Closing pursuant to Section 4.03(b) and Section 4.04(a), respectively, shall be in substantially the form attached hereto as <u>Exhibit C</u>).

(b)     After the date hereof and prior to the Closing, Buyer and the Selling Entities shall use commercially reasonable efforts to negotiate and revise the Accounting Procedures set forth on Schedule 1.01(a) for specific principles and methodologies for apportioning between the Business, on the one hand, and the Excluded Business, on the other hand, balance sheet accounts of the Business that, in the ordinary course of business, are consolidated or aggregated with accounts receivable, and inventory or trade accounts payable attributable to the Excluded Business. Notwithstanding anything herein to the contrary, in no event shall (i) the failure of Buyer and the Selling Entities to agree to any revision to Schedule 1.01(a) be deemed to be a breach by the Selling Entities or Buyer of this Section 2.12(b) or (ii) the agreement of Buyer and the Selling Entities on any revision be a condition to close hereunder or otherwise be a requirement of Buyer's or the Selling Entities' obligations to close under this Agreement.

Section 2.13     *Insurance Policies and Rights*.

Notwithstanding anything in this Agreement to the contrary, but without limiting Section 8.08, in the event that the Closing occurs prior to the closing of the transactions contemplated by the Appliances APA, Buyer and Seller acknowledge and agree that the Insurance Policies and Rights shall remain with the Selling Entities and shall not be transferred, conveyed, assigned or delivered to Buyer until, and unless, the closing of the transactions contemplated by the Appliances APA occurs; *provided* that, for the avoidance of doubt, in the event the Appliances APA is terminated or the closing of the transactions contemplated thereby otherwise fails to occur, whether before, on or after the Closing Date, the Insurance Policies and Rights shall, for all purposes under this Agreement, only transfer to the Buyer with respect to those that are exclusively related to the Business  and all such other Insurance Policies and Rights shall be deemed to be Excluded Assets.

Section 2.14     *Deferred Closing*.

(a)     Notwithstanding any other provision of this Agreement to the contrary, if, and only if, any consent, approval, order, or authorization of, or registration, declaration, or filing with or exemption by, any Governmental Authority having competent jurisdiction in South Korea or Australia that is required to transfer the Acquired Equity Securities of a Deferred Acquired Entity (each, a "**Deferred Closing Action**") has not been obtained or satisfied as of the Closing Date, then the closing of the transactions contemplated hereby with respect to such Deferred Acquired Entity (each, a "**Deferred Closing**") shall not take place at the Closing (and, for the avoidance of doubt, shall not be deemed to prevent the Closing from occurring) and shall instead take place as soon as possible following the Closing, but in any event within five Business Days, after the date on which all of the deliveries and conditions described in Section 2.14(b) and Section 2.14(c) are satisfied or, to the extent permitted by Applicable Law, waived with respect to such Deferred Acquired Entity (each, a "**Deferred Closing Date**").

NAI-1538018312v20

(b)     At the applicable Deferred Closing:

(i)     Buyer shall deliver, or shall cause to be delivered, to Seller (or such other Persons where so designated) any of the documents or other deliverables required to be delivered pursuant to Section 4.03 to the extent related to Deferred Acquired Entity and not previously delivered to Seller (or such other Persons); and

(ii)     the Seller Entities shall deliver, or cause to be delivered, to Buyer any of the documents or other deliverables required to be delivered pursuant to Section 4.04 to the extent related to such Deferred Acquired Entity and not previously delivered to Buyer.

(c)     The obligation of the Parties to consummate the applicable Deferred Closing shall be subject to the satisfaction or, in the sole discretion of Buyer and Seller, waiver, at or prior to such Deferred Closing Date, of each of the following conditions:

(i)     All of the Deferred Closing Actions with respect to the applicable Deferred Acquired Entity shall have been completed or satisfied; and

(ii)     there will not be in effect any Order (whether temporary, preliminary or permanent) or Applicable Law of any Governmental Authority having competent jurisdiction restraining, enjoining or otherwise prohibiting or challenging the validity, legality or, preventing or making illegal the consummation of such Deferred Closing.

(d)     From the Closing Date until the applicable Deferred Closing Date, Buyer and Seller shall, to the extent permitted by contractual obligation and Applicable Law, use commercially reasonable efforts to cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits, assume the obligations and bear the economic burdens associated with owning or operating the business conducted by the applicable Deferred Acquired Entity  (including, for the avoidance of doubt, the costs of any compensation or benefits in respect of any employees of such Deferred Acquired Entity and all Liabilities of such Deferred Acquired Entity).

(e)     The Parties acknowledge that the portion of the Estimated Purchase Price allocable to each Deferred Acquired Entity shall be paid and deemed to have been paid on the Closing Date (and there shall be no reduction in the Purchase Price as a result thereof).  The transfer of the Acquired Equity Securities of each Deferred Acquired Entity and the assumption of the Liabilities with respect thereto shall be effected without the payment of any additional consideration by Buyer and shall not modify, alter or otherwise affect any obligations with respect to the calculation or payment of the Purchase Price (or the adjustments to the Estimated Purchase Price).

(f)     Until the conveyance, assignment, transfer or delivery to Buyer of the Acquired Equity Securities of an applicable Deferred Acquired Entity, and except as expressly contemplated by the Transaction Documents or with Buyer's prior written consent, from the Closing until the consummation of the applicable Deferred Closing, Seller shall use commercially reasonable efforts to conduct the business of such applicable Deferred Acquired Entity in the ordinary course of business (it being understood that, after the Closing, as between the Parties, Buyer will be solely and exclusively responsible for the prosecution, maintenance and enforcement, in its sole discretion, of the Intellectual Property owned or Controlled by such Deferred Acquired Entity at

39

Buyer's sole cost and expense). In addition, until the consummation of the applicable Deferred Closing, Seller shall not take any actions that would be prohibited by Section 7.02(a)(ii)(A) through (O) or Section 7.02(a)(ii)(T) (solely to the extent relating to the foregoing sections), solely with respect to such applicable Deferred Acquired Entity, to the same extent as if such provisions were to apply to Seller or such Subsidiaries until such Deferred Closing. Without limiting the foregoing, and to the extent permitted by Applicable Law, Seller shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to take such reasonable and lawful direction from Buyer with respect to the operation and conduct of the business of such Deferred Acquired Entity and shall permit Buyer to make all strategic and business decisions relating thereto, including, in each case, to the extent permissible under Applicable Law and under contractual arrangements. Seller shall also cooperate with Buyer in good faith, and Seller shall provide Buyer with regular updates regarding the activities and operations of any such Deferred Acquired Entity, to the extent requested by Buyer during the period prior to any Deferred Closing.

ARTICLE 3
PURCHASE PRICE

Section 3.01    *Purchase Price.*

The aggregate purchase price, as may be adjusted pursuant to Sections 3.04 and 3.05, for the purchase, sale, assignment and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets will consist of the following (collectively, the "**Purchase Price**"):

(a)    An amount in cash equal to $228,200,000 (the "**Cash Purchase Price**"), *plus* the Property Tax Purchase Price Adjustment, *plus* the Estimated Net Working Capital Adjustment, *minus* the Estimated Acquired Entity Accrued Taxes, *minus* the Estimated Excess Cure Costs, *minus* the Estimated Acquired Entity Indebtedness, *plus* the Estimated Acquired Entity Cash, *minus* the Round-Tripping Amount, *minus* the Pension/OPEB Liabilities and *minus* the Precious Metal Liabilities (collectively, the "**Estimated Purchase Price**");

(b)    the assumption of the Assumed Liabilities; and

(c)    Cure Costs (to the extent payable under Section 2.05); provided, however, to the extent the Cure Costs exceed the Cure Costs Cap (such excess, the "**Estimated Excess Cure Costs**"), the Cash Purchase Price will be reduced on a dollar-for-dollar basis by the Estimated Excess Cure Costs as set forth in Section 3.01(a).

The Estimated Purchase Price will be delivered by Buyer as set forth in Section 4.02.

Section 3.02    *Good Faith Deposit.*

Buyer has deposited into the Deposit Escrow Account with the Escrow Agent an amount equal to $22,820,000.00 (such amount, the "**Deposit Amount**") in cash.  The Deposit Amount will be released by the Escrow Agent and delivered to either Buyer or Seller, in accordance with this Section 3.02.  The Deposit Amount will be distributed out of the Deposit Escrow Account as follows (and Buyer and the Selling Entities agree to promptly deliver joint written instructions to

40

the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)     if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the Estimated Purchase Price payable by Buyer as set forth in Section 4.02;

(b)     if this Agreement is terminated by Seller pursuant to Section 12.01(d) or 12.01(e) (or is terminated by either Party pursuant to Section 12.01(b)(i) and at the time of such termination this Agreement could have been terminated by Seller pursuant to Section 12.01(d) or Section 12.01(e)) (each, a "**Specified Termination**"), then the Deposit Amount will be delivered to Seller within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Seller; and

(c)     if this Agreement is terminated for any reason other than a Specified Termination, the Deposit Amount will be returned to Buyer within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Buyer; *provided*, *however*, if Buyer is chosen as the Alternate Bidder in accordance with the Bidding Procedures and Section 7.12 hereof, the Deposit Amount shall be released by the Escrow Agent and delivered to Buyer only upon, and within two Business Days of, the earlier of (A) the Selling Entities closing a transaction for the Assets with the Successful Bidder and (B) the Outside Date.

Section 3.03     *Estimated Purchase Price.*

No later than three Business Days prior to the Closing, Seller shall deliver to Buyer a written statement (the "**Estimated Closing Statement**") setting forth Seller's good faith estimates of the amount of (a) the Estimated Excess Cure Costs, (b) Property Tax Purchase Price Adjustment, including the Property Tax Credit Amount and the Property Tax Debit Amount, (c) Net Working Capital (the "**Estimated Net Working Capital**"), including the amount of the Net Working Capital Adjustment (the "**Estimated Net Working Capital Adjustment**"), (d) the Acquired Entity Accrued Taxes (the "**Estimated Acquired Entity Accrued Taxes**"), (e) the Acquired Entity Cash (the "**Estimated Acquired Entity Cash**"), (f) the Acquired Entity Indebtedness (the "**Estimated Acquired Entity Indebtedness**"), (g) the Round-Tripping Amount and (h) the Estimated Purchase Price based on the foregoing calculations in clauses (a)-(g).  Nothing in this Section 3.03 shall in any way limit, affect or impair the rights of Buyer in connection with the final determination of the Purchase Price in accordance with Section 3.04 and Section 3.05.  The Estimated Closing Statement and the estimates and calculations contained therein shall be prepared in accordance with the Accounting Procedures and the applicable definitions of this Agreement and include materials showing in reasonable detail Seller's support for such calculations.

Section 3.04     *NWC and Cure Adjustment.*

(a)     As soon as practicable, but no later than 90 days after the Closing Date, Buyer shall prepare and deliver to Seller its good faith calculations of the (a) Net Working Capital (the "**Closing Net Working Capital**"), including the amount of the Net Working Capital Adjustment, and (b) the Cure Costs in excess of the Cure Costs Cap (the "**Closing Excess Cure Costs**"), including the Cure Costs Adjustment (the "**NWC and Cure Statement**").  The NWC and Cure Statement shall be prepared in accordance with the Accounting Procedures and the applicable

41

definitions of this Agreement and shall include materials showing in reasonable detail support for such calculations.  From and after the delivery of the NWC and Cure Statement by Buyer, Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates who were involved in the preparation of the NWC and Cure Statement solely for purposes of facilitating Seller's review of the NWC and Cure Statement.  Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business, (ii) Buyer's accountants shall not be obligated to make any work papers available, except in accordance with their disclosure procedures and then only after Seller and its Representatives have executed an agreement relating to access of such work papers in form and substance reasonably acceptable to such accountants and (iii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client or similar legal privilege with respect to such information; *provided*, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to provide a summary of such information that does not violate the applicable legal privilege.  If Buyer fails to timely deliver the NWC and Cure Statement, then Seller shall have the sole and exclusive right thereafter to either (x) prepare the NWC and Cure Statement or (y) deliver to Buyer a written notice that it does not propose any further adjustments to the Estimated Purchase Price in respect of the Net Working Capital Adjustment or the Cure Costs Adjustment pursuant to this Section 3.04.  In the case of the foregoing clause (x), Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates (subject to the conditions and restrictions described in the fourth sentence of this Section 3.04(a)) solely for purposes of facilitating Seller's preparation of the NWC and Cure Statement.

(b)     If Seller does not give written notice of any dispute (a "**Dispute Notice**"), identifying in reasonable detail each item in dispute and the dollar amount in dispute for each item (each, an "**Disputed Item**"), to Buyer within 45 days after receiving the NWC and Cure Statement, Buyer and Seller agree that the NWC and Cure Statement shall be deemed to set forth the final Closing Net Working Capital and final Closing Excess Cure Costs for purposes of calculating the final Net Working Capital Adjustment and final Cure Costs Adjustment and the NWC and Cure Statement shall be deemed final, binding and non-appealable by the Parties.  Prior to the end of such 45-day period, Seller may accept the NWC and Cure Statement by delivering written notice to that effect to Buyer, in which case the Net Working Capital Adjustment and Cure Costs Adjustment will be finally determined when such notice is given and the NWC and Cure Statement shall be deemed final, binding and non-appealable by the Parties.  If Seller delivers a Dispute Notice to Buyer within such 45-day period, Seller shall be deemed to have agreed with all items and amounts in the NWC and Cure Statement not specifically referenced as a Disputed Item in the Dispute Notice, and such items and amounts shall be final, binding and non-appealable on the Parties.  Buyer and Seller shall use commercially reasonable efforts to resolve in good faith any Disputed Items during the 15-day period commencing on the date Buyer timely receives the Dispute Notice from Seller.  The Parties acknowledge and agree that the Federal Rules of Evidence Rule 408 shall apply to Buyer and Seller during such 15-day period of negotiations and any subsequent dispute arising therefrom.  Any Disputed Item that is resolved during such 15-day period shall be deemed final, binding and non-appealable by the Parties.  If Seller and Buyer do

42

not agree upon a final resolution with respect to any Disputed Item within such 15-day period, any such remaining Disputed Items shall be submitted a nationally-recognized independent accounting firm agreed upon in good faith by Buyer and Seller; provided, however, that if Buyer and Seller cannot agree on such a firm, Buyer and Seller shall each appoint a firm to elect a third such nationally-recognized independent accounting firm (such accounting firm, the "**Accounting Firm**"). In the event the NWC and Cure Statement is prepared by Seller rather than Buyer pursuant to the penultimate sentence of Section 3.04(a), then Buyer shall replace Seller and Seller shall replace Buyer in this Section 3.04(b).

(c)     The Accounting Firm shall be requested to render a written determination of the applicable dispute (acting as an expert and not as an arbitrator) within 20 days after referral of the matter to the Accounting Firm, which determination must be in writing and must set forth, in reasonable detail, the basis therefor and must be based solely on (i) the definitions and other applicable provisions of this Agreement (including the Accounting Procedures) and (ii) a single presentation (which presentations shall be limited to the remaining Disputed Items) submitted by each of Buyer and Seller to the Accounting Firm within 10 days after the engagement thereof (which the Accounting Firm shall forward to the other Party), and not on independent review, which such determination shall be final, binding and non-appealable on Buyer and Seller absent fraud or manifest error, and any Party may seek to enforce such decision in a court of competent jurisdiction. No ex parte conferences, oral examinations, testimony, depositions, discovery or other form of evidence gathering or hearings shall be conducted or allowed; provided, that at the Accounting Firm's request, or as mutually agreed by Seller and Buyer, Seller and Buyer may meet with the Accounting Firm so long as representatives of both Seller and Buyer are present. The Accounting Firm shall resolve each Disputed Item by choosing a value not in excess of, nor less than, the greatest or lowest value, respectively, set forth in the presentations delivered to the Accounting Firm pursuant to this Section 3.04(c).

(d)     The terms of appointment and engagement of the Accounting Firm shall be as reasonably agreed upon between Seller and Buyer, and any associated engagement fees shall be initially borne 50% by Seller and 50% by Buyer; provided, that such fees shall ultimately be borne as set forth below. All other costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Accounting Firm shall be borne by such Party incurring such cost and expense. The fees and disbursements of the Accounting Firm shall ultimately be allocated between Seller, on the one hand, and Buyer, on the other, in the same proportion that the aggregate amount of the Disputed Items submitted to the Accounting Firm that are unsuccessfully disputed by each such Party (as finally determined by the Accounting Firm) bears to the total amount of such Disputed Items so submitted. For example, should the Disputed Items total an aggregate amount equal to $1,000 and the Accounting Firm awards $600 in favor of Seller's position, 60% of the costs of the Accounting Firm's review would be borne by Buyer and 40% of such costs would be borne by Seller. The NWC and Cure Statement shall be revised as appropriate to reflect the resolution of any objections thereto pursuant to this Section 3.04 and, as so revised, such NWC and Cure Statement shall be deemed to set forth the final Closing Net Working Capital and final Closing Excess Cure Costs for all purposes hereunder (including the determination of the final Net Working Capital Adjustment and final Cure Costs Adjustment).

(e)     If the final NWC Adjustment Amount minus the final Cure Costs Adjustment is a positive amount (the "**NWC and Cure Increase**"), then within three Business Days after the date

43

on which the Net Working Capital Adjustment and Cure Costs Adjustment is finally determined pursuant to this Section 3.04, (i) Buyer shall pay the NWC and Cure Increase to Seller by wire transfer or delivery of immediately available funds; provided, however, that in no event shall the NWC and Cure Increase payable by Buyer pursuant to this Section 3.04(e) exceed an amount equal to the amount of the Adjustment Escrow Funds, and (ii) the Parties shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Seller the entirety of the Adjustment Escrow Funds.

(f)     If the final NWC Adjustment Amount *minus* the final Cure Costs Adjustment is a negative amount (the "**NWC and Cure Decrease**"), then within three Business Days after the date on which the Net Working Capital Adjustment and Cure Costs Adjustment is finally determined pursuant to this Section 3.04, (i) Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Buyer from the Adjustment Escrow Funds an amount equal to the absolute value of the NWC and Cure Decrease; provided, however, that in no event shall the NWC and Cure Decrease exceed the Adjustment Escrow Funds, and (ii) to the extent that any Adjustment Escrow Funds remain following the distribution in clause (i), Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Seller the remainder of the Adjustment Escrow Funds.

Section 3.05     *Acquired Entity Adjustment.*

(a)     Simultaneously with the delivery of the NWC and Cure Statement, but no later than 90 days after the Closing Date, Buyer shall prepare and deliver to Seller its good faith calculations of (i) the Acquired Entity Accrued Taxes (the "**Closing Acquired Entity Accrued Taxes**"), (ii) the Acquired Entity Indebtedness (the "**Closing Acquired Entity Indebtedness**"), (iii) the Acquired Entity Cash (the "**Closing Acquired Entity Cash**") and (iv) based on the foregoing calculations in clauses (i)-(iii), the Closing Acquired Entity Net Figure (the "**Acquired Entity Closing Statement**"). The Acquired Entity Closing Statement shall be prepared in accordance with the Accounting Procedures and the applicable definitions of this Agreement and shall include materials showing in reasonable detail support for such calculations. From and after the delivery of the Acquired Entity Closing Statement by Buyer, Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates who were involved in the preparation of the Acquired Entity Closing Statement solely for purposes of facilitating Seller's review of the Acquired Entity Closing Statement. Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business or the Acquired Entities, (ii) Buyer's accountants shall not be obligated to make any work papers available, except in accordance with their disclosure procedures and then only after Seller and its Representatives have executed an agreement relating to access of such work papers in form and substance reasonably acceptable to such accountants and (iii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client or similar legal privilege with respect to such information; provided, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to provide a summary of such information that does not violate the applicable legal privilege. If Buyer fails to timely deliver the Acquired Entity Closing Statement, then Seller shall have the sole and exclusive

44

right thereafter to either (x) prepare the Acquired Entity Closing Statement or (y) deliver to Buyer a written notice that it does not propose any further adjustments to the Estimated Purchase Price pursuant to this Section 3.05.  In the case of the foregoing clause (x), Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates (subject to the conditions and restrictions described in the fourth sentence of this Section 3.05(a)) solely for purposes of facilitating Seller's preparation of the Acquired Entity Closing Statement.

(b)     Buyer and Seller acknowledge and agree that procedures set forth in Section 3.04(b), Section 3.04(c) and Section 3.04(d) shall apply to this Section 3.05, *mutatis mutandis*, with (i) "Closing Acquired Entity Accrued Taxes," "Closing Acquired Entity Indebtedness" and "Closing Acquired Entity Cash," as applicable, substituted for "Closing Net Working Capital" and Closing Excess Cure Costs," (ii) "Acquired Entity Closing Statement" substituted for "NWC and Cure Statement" and (iii) "Closing Acquired Entity Net Figure" substituted for "Net Working Capital Adjustment" and "Cure Costs Adjustment."

(c)     If the final Closing Acquired Entity Net Figure exceeds the Estimated Acquired Entity Net Figure (the "**Upward Acquired Entity Adjustment**"), then within three Business Days after the date on which the Closing Acquired Entity Net Figure is finally determined pursuant to this Section 3.05, Buyer shall pay the amount of such Upward Acquired Entity Adjustment to Seller by wire transfer or delivery of immediately available funds; provided, however, that in no event shall the Upward Acquired Entity Adjustment payable by Buyer pursuant to this Section 3.05(c) exceed the amount of the Adjustment Escrow Funds.

(d)     If the Estimated Acquired Entity Net Figure exceeds the final Closing Acquired Entity Net Figure (the "**Downward Acquired Entity Adjustment**"), then within three Business Days after the date on which the Closing Acquired Entity Net Figure is finally determined pursuant to this Section 3.05, (i) Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Buyer from any remaining portion of the Adjustment Escrow Funds, an amount equal to the absolute value of the Downward Acquired Entity Adjustment; provided, however, that in no event shall the Downward Acquired Entity Adjustment exceed the Adjustment Escrow Funds.

(e)     Notwithstanding anything to the foregoing in this Agreement, in the event that the Net Working Capital Adjustment and Cure Costs Adjustment are finally determined pursuant to Section 3.04 prior to the final determination of the Closing Acquired Entity Net Figure in accordance with this Section 3.05, the Parties acknowledge and agree that any then-remaining portion of the Adjustment Escrow Funds shall not be released to Seller until the Closing Acquired Entity Net Figure has been determined and the Upward Acquired Entity Adjustment or Downward Acquired Entity Adjustment has been fully and finally settled pursuant to Sections 3.05(c) and 3.05(d).

Section 3.06     *Adjustments.*

The Parties and their Affiliates shall treat any payments made with respect to the NWC Adjustment Amount, the Cure Costs Adjustment and the Closing Acquired Entity Net Figure, in each case pursuant to Section 3.04 and Section 3.05, as applicable, as an adjustment to the

Estimated Purchase Price for applicable Income Tax purposes except to the extent otherwise required by Applicable law.

## ARTICLE 4
## CLOSING

Section 4.01    *Closing Date.*

Subject to the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 hereof (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is three Business Days after the satisfaction or waiver of the conditions set forth in Article 9, Article 10 and Article 11 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by the Selling Entities and Buyer.  The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date**."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Closing Date (the "**Measurement Time**").

Section 4.02    *Payments on the Closing Date.*

At the Closing, Buyer will pay an amount equal to (a) the Estimated Purchase Price, *minus* (i) the Deposit Amount delivered in accordance with Section 3.02 and (ii) the Adjustment Escrow Amount, in cash by wire transfer of immediately available funds to the accounts designated in writing by Seller at least three Business Days prior to the Closing Date and (b) the Adjustment Escrow Amount in cash by wire transfer of immediately available funds to the account set forth in the Escrow Agreement.

Section 4.03    *Buyer's Deliveries.*

At the Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)    the payments required to be made at the Closing pursuant to Section 4.02;

(b)    each Transaction Document to be delivered at the Closing to which Buyer is a party, duly executed (and acknowledged, where applicable) by such Buyer Entity; and

(c)    the Conditions Certificate of the Buyer Entities.

Section 4.04    *The Selling Entities' Deliveries.*

At the Closing, the Selling Entities will deliver, or cause to be delivered, to Buyer:

(a)    each Transaction Document to be delivered at the Closing to which any Selling Entity is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by the applicable Selling Entity;

46

(b)     the Conditions Certificate of the Selling Entities;

(c)     a copy of the Sale Order as entered by the Bankruptcy Court;

(d)     a copy of the CCAA Sale Order as entered by the CCAA Court;

(e)     possession of each Owned Real Property, together with duly executed special warranty deeds (collectively, the "**Deeds**") for each Owned Real Property conveying fee simple title in such Owned Real Property to Buyer, subject only to Permitted Encumbrances;

(f)     customary factual affidavits of title, transfer tax forms and other similar documents reasonably necessary to permit a nationally recognized title insurance company of Buyer's choosing to record the Deeds and to issue standard ALTA Form Title Insurance Policies with extended coverage in favor of Buyer (or its designee) insuring that Buyer (or its designee) owns fee simple title to the Owned Real Property at Closing free and clear of Encumbrances (other than Permitted Encumbrances) in an amount reasonably acceptable to Buyer;

(g)     a certificate of non-foreign status of each Selling Entity (or, if such Selling Entity is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), a certificate of non-foreign status from the entity that is treated as the transferor of property for U.S. federal income tax purposes) meeting the requirements of Treasury Regulation Section 1.1445-2(b)(2); and

(h)     subject to Schedule 4.04(h) and Section 2.14, (A) with respect to any Acquired Equity Security (other than an Acquired Equity Security owned by an Acquired Entity) that is not certificated, a written instrument of assignment evidencing the transfer of such Acquired Equity Security to Buyer, duly executed by such applicable Selling Entity, or (B) with respect to any Acquired Equity Security (other than an Acquired Equity Security owned by an Acquired Entity) that is certificated, the equity certificates evidencing all of such Acquired Equity Security, free and clear of all Encumbrances, accompanied by equity interest powers duly executed by such applicable Selling Entity, as applicable;.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Except as set forth in the Disclosure Schedules (as interpreted in accordance with Section 13.13), each Selling Entity jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 5.01     *Organization and Good Standing.*

Seller and each Subsidiary of Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the limitations imposed on Seller or any such Subsidiary as a result of having filed a petition for relief under the Bankruptcy Code, Seller and each such Subsidiary has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Seller and each Subsidiary of Seller (including the Acquired Entities) is duly qualified, licensed or otherwise authorized to do business and is in good standing in each jurisdiction where the character

47

of its business or the nature of its properties makes such qualification, licensing or authorization necessary, except for such failures to be so qualified, licensed, authorized or in good standing as would not, individually or in the aggregate, reasonably be expected to be material to Business, taken as a whole.

Section 5.02    *Authority; Validity.*

Subject to entry of the Sale Order, the CCAA Sale Order and such other authorization as is required by the Bankruptcy Court or the CCAA Court, as applicable, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is or will be a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling Entity and no other corporate proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at the Closing will be duly and validly executed and delivered by such Selling Entity at the Closing. Subject to entry of the Sale Order and the CCAA Sale Order and assuming the due authorization, execution and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity (the "**Bankruptcy and Equity Exception**").

Section 5.03    *Governmental Approvals; No Conflict.*

Except for (a) entry of the Sale Order, CCAA Sale Order, or the Bidding Procedures Order, (b) notices, filings and consents required in connection with the Bankruptcy Cases and the CCAA Recognition Proceedings, (c) any applicable notices, filings, waiting period terminations or expirations, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act, and (d) items listed on Disclosure Schedule 5.03, none of the Selling Entities is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a

48

whole. When the consents and other actions described in the preceding sentence, including entry of the Sale Order and CCAA Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not (i) result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation under, (A) the certificate of incorporation, bylaws or other governing documents of such Selling Entity or Acquired Entity, (B) any Order applicable to such Selling Entity or any Acquired Entity or any of the Assets owned or held by it or on its behalf, (C) any Applicable Law with respect to such Selling Entity or any Acquired Entity, or (D) require any consent under, or give any Third Party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities or the Acquired Entities is a party as of the Closing and which constitutes an Asset or Assumed Liability, or (ii) result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Assets or any Acquired Entity, except, solely with respect to clauses (i)(B) through (D) and this clause (ii), to the extent that any such breach, violation, default under, conflict with, rights of termination, amendment, acceleration, suspension, revocation or cancellation would not (x) reasonably be expected, individually or in the aggregate, to be material to the Business, taken as a whole, or (y) be enforceable against such Acquired Entity, Asset or Assumed Liability following the Closing in accordance with the Sale Order and CCAA Sale Order.

Section 5.04   *Financial Statements.*

(a)     Attached to Disclosure Schedule 5.04(a) are copies of the (i) audited consolidated balance sheet as of December 31, 2020, December 31, 2021 and December 31, 2022 and the related audited consolidated statements of operations, stockholders' equity and cash flows for the fiscal years then ended (the "**Audited Financial Statements**") and (ii) the unaudited interim consolidated balance sheet as of July 31, 2023, and the related unaudited interim consolidated statements of operations, stockholders' equity and cash flows for the seven-months ended July 31, 2023 (the "**Interim Financial Statements**" and the date of such Interim Financial Statements, the "**Balance Sheet Date**"), in each case of Seller and its Subsidiaries (clauses (i) and (ii), collectively, the "**Financial Statements**"). The Financial Statements (A) fairly present, in all material respects, the consolidated financial position of Seller and its Subsidiaries as of the dates thereof and the consolidated results of operations, stockholder's equity and cash flows for the periods then ended (subject, in each case, to normal year-end adjustments in the case of the Interim Financial Statements, none of which will be, individually or in the aggregate, material to the Business, taken as a whole), (B) have been prepared in accordance with GAAP applied on a consistent basis in the ordinary course of business (except, solely with respect to the Audited Financial Statements, as may be indicated in the notes thereto) and (C) have been prepared and were derived from, and are in accordance with, the books and records of Seller and its Subsidiaries (which are correct and complete in all material respects).

(b)     The books of account and other financial records of the Business have been kept accurately in the ordinary course of business and in compliance with all Applicable Laws in all material respects, and Seller and its Subsidiaries make and keep books, records and accounts that,

in reasonable detail, accurately reflect, in all material respects, their transactions and dispositions of assets.

(c)     Seller and its Subsidiaries maintain a system of internal controls over financial reporting that is designed to provide reasonable assurances regarding the reliability of financial reporting, including that (i) transactions are executed in accordance with management's general or specific authorizations and recorded as necessary to permit preparation of the Financial Statements in accordance with GAAP and to maintain accountability for the Business' and the Acquired Entities' assets and (ii) access to the Business' and the Acquired Entities' assets is permitted only in accordance with management's general or specific authorization.  Since January 1, 2020, no accountant of Seller or its Subsidiaries has notified Seller or any of its Subsidiaries of any weaknesses in internal accounting or other controls.

Section 5.05    *No Undisclosed Material Liabilities.*

There are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business or any Acquired Entity, other than (a) Liabilities specifically reflected or reserved for in the Financial Statements or disclosed in the notes thereto; (b) Liabilities incurred in the ordinary course of business since the Balance Sheet Date (other than Liabilities for default, breach of Contract, tort, infringement or violation of Applicable Law that, in each case, are not material to the Business, taken as a whole); (c) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.05; and (d) Liabilities that will constitute Excluded Liabilities.

Section 5.06    *Absence of Certain Changes.*

From the Balance Sheet Date, (a) the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course of business and consistent in all material respects with past practices, (b) there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (c) none of the Selling Entities or the Acquired Entities have taken any action that, if undertaken after the date hereof, would constitute a violation of Section 7.02(a)(ii).

Section 5.07    *Legal Proceedings.*

Except for the Bankruptcy Cases, the CCAA Recognition Proceedings and any adversary Proceedings or contested motions commenced in connection therewith or disclosed in Disclosure Schedule 5.07, after giving effect to the Sale Order and CCAA Sale Order, there is no, and since January 1, 2020 there has been no, Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person, relating to the Acquired Entities, the Business, the Assets or Assumed Liabilities (a) that is material to the Business or the Acquired Entities or that would reasonably be expected to give rise to any material Liability of Buyer or any Acquired Entity or be materially adverse to the ownership or use by Buyer of the Assets after the Closing, as such Assets are presently owned and used (or held for use) by Seller or its Subsidiaries, as applicable, (b) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party

50

or (c) that is against any Selling Entity or any Acquired Entity and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents. There is no Order enjoining any Selling Entity or Acquired Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity or Acquired Entity to take any material action, in connection with the ownership, lease, possession, use or operation of any Acquired Entity or the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities.

Section 5.08   *Compliance with Laws; Permits.*

(a)     The ownership and operation of (i) the Business or the Assets by the Selling Entities and (ii) each Acquired Entity, in each case is, and since January 1, 2020 has been, in material compliance with all Applicable Laws.   Except as set forth in Disclosure Schedule 5.08(a), the Selling Entities and the Acquired Entities have not received any written or, to the Knowledge of each Selling Entity, oral notification or communication from any Governmental Authority or any other Person regarding any actual or alleged material violation of, or material failure to comply with, any Applicable Law.

(b)     (i)The Selling Entities and the Acquired Entities have obtained and maintained all necessary Permits with regard to the ownership or operation of the Assets and the conduct of the Business, (ii) no Selling Entity or Acquired Entity has received written or, to the Knowledge of each Selling Entity, oral notice of material default under any such Permit and (iii) no material violations exist in respect of Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been finally resolved with no ongoing obligation or liability to the Business or any Acquired Entity.   Disclosure Schedule 5.08(b) sets forth a true, correct and complete list and description of all necessary Permits issued to or held by the Acquired Entities or the Selling Entities and used in the conduct of the Business or the Assets (each, a "**Material Permit**"). Each Material Permit is valid and in full force and effect.  There is no pending or, to the Knowledge of each Selling Entity, threatened termination, expiration, revocation or modification of any such Material Permit, and no event has occurred or circumstances exist that would give rise to or serve as a basis for such termination, expiration, revocation or modification.

Section 5.09   *Material Contracts; Cure Costs*

(a)     Disclosure Schedule 5.09(a) sets forth a true, correct and complete list of Contracts and 365 Contracts (or in the case of Disclosure Schedule 5.09(a)(ii)(A) and 5.09(a)(ii)(B), counterparties to Contracts and 365 Contracts) effective as of the date hereof to which Seller or any of its Subsidiaries (including any Acquired Entity) is a party or is bound and that fall within the following categories (each Contract set forth or required to be set forth on Disclosure Schedule 5.09, a "**Material Contract**", and collectively, the "**Material Contracts**"):

(i)     any material lease or sublease of real property included as an Asset (whether a Selling Entity or any Acquired Entity is lessor, sublessor, lessee or sublessee);

51

(ii)    other than purchase orders issued in the ordinary course of business, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $2,500,000 or more; or (B) annual receipts by the Business of more than $5,000,000 in any calendar year;

(iii)    any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement or any other similar Contract involving a sharing of profits and losses, in each case, to the extent Related to the Business;

(iv)    any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Acquired Entities, the Business or the Assets following the date of this Agreement;

(v)    any Contract where the Business is, and Buyer or any Acquired Entity would be required to become, obligor or guarantor relating to indebtedness;

(vi)    any Contract containing covenants expressly limiting, individually or in the aggregate, the freedom of the Acquired Entities, the Business or Assets to compete with any Person in a product or line of business or operate in any jurisdiction;

(vii)    any Contract that contains (A) exclusivity requirements, "most-favored nation" or similar provisions binding on any Acquired Entity, the Business or the Assets, or (B) minimum commitment terms in favor of the counterparty with respect to the Business;

(viii)    any Government Contract applicable to the Business or the Assets;

(ix)    any Contract granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any Asset or any assets or properties of any Acquired Entity;

(x)    any Contract involving capital expenditures of more than $250,000, individually or in the aggregate, over any 12-month period by or on behalf of the Business or any Acquired Entity;

(xi)    any Contract which involves the sale, issuance, purchase or repurchase of any Acquired Equity Security;

(xii)    any Contract with a Major Customer or Major Supplier;

(xiii)    any Contracts for the settlement of any Proceeding (A) for which there are ongoing obligations or liabilities to the Business or any Acquired Entity, or (B) which, in the last three years, resulted in Liabilities to the Business or any Acquired Entity in excess of $500,000;

52

(xiv)    any Contract reflecting leases of personal property by or to the Business or any Acquired Entity which individually have a value in excess of $250,000 per year;

(xv)    any Collective Bargaining Agreement; or

(xvi)    any Contract pursuant to which Seller or any of its Subsidiaries (A) licenses or is otherwise permitted by a Third Party or any other Selling Entity to use any Intellectual Property material to the conduct of the Business (other than any "shrink wrap," "commercially available software package" or "click through" license that is generally available on and actually licensed under standard terms) or (B) licenses or otherwise granted or conveyed to any Third Party or any other Selling Entity any right, title or interest in or to any material Owned Intellectual Property (other than any non-exclusive licenses granted in the ordinary course of business) (clauses (A) and (B), collectively, the "**Licenses**").

(b)    Each Material Contract is a legal, valid and binding obligation of the Selling Entity or Acquired Entity party thereto and, to the Knowledge of each Selling Entity, the other parties thereto in accordance with its terms and conditions, and is enforceable against such Selling Entity or Acquired Entity, except as such legality, validity and enforceability may be limited by the Bankruptcy and Equity Exception or the obligation to pay Cure Costs.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a material default under or a material violation of any Material Contract or would cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of any Encumbrance upon any Asset or any Acquired Entity.  Except for payment defaults, neither Seller nor any of its Subsidiaries has received written or, to the Knowledge of each Selling Entity, oral notice that it has breached, violated or defaulted under any Material Contract or that the counterparty thereto intends to terminate or modify in any material respect any such Material Contract.  A true, correct and complete copy of each Material Contract has been made available to Buyer.

(c)    Disclosure Schedule 5.09(c) sets forth a true, correct and complete list as of the date hereof of the Cure Costs.

Section 5.10    *Intellectual Property.*

(a)    Disclosure Schedule 5.10(a) sets forth a true, correct and complete list of all registrations and applications for registration of the Owned Intellectual Property as of the date hereof (collectively, "**Registered Intellectual Property**"), setting forth for each item (i) the record owner, and, if different, the legal owner and beneficial owner of such item, (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial, filing, application or identification number of such item; and (iv) the current status of such filing or application.

(b)    The Selling Entities and the Acquired Entities are the sole and exclusive owner of, or exclusively Control, the Owned Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances). The Registered Intellectual Property is subsisting and, to the Knowledge of each Selling Entity, valid and enforceable.   Except as limited by Section

53

365(c)(1)(A) of the Bankruptcy Code and Section 11.3(2) of the CCAA, the Selling Entities and Acquired Entities own or have a right to use, all Intellectual Property necessary for the operation of the Business as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances). To the extent that any Selling Entity or Acquired Entity has licensed any Trademarks to any Third Party, such Selling Entity and Acquired Entity has control over the character and quality of such licensed Trademarks.

(c)     No Proceedings are pending or, to the Knowledge of each Selling Entity, threatened against any Selling Entity or Acquired Entity before a Governmental Authority with regard to the ownership or use by any Selling Entity or Acquired Entity of any Owned Intellectual Property or the validity, scope or enforceability of any Registered Intellectual Property, including any interference, reissue, reexamination, opposition or other Proceeding relating to any Registered Intellectual Property. The operation of the Business by the Selling Entities and the Acquired Entities does not infringe, misappropriate or otherwise violate, and, since January 1, 2020, has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Person. Since January 1, 2020, neither Seller nor any of its Subsidiaries has received any written notice from any Third Party alleging that the operation of the Business infringes, violates, or misappropriates the Intellectual Property of any Third Party, or offering to license any Intellectual Property to any Selling Entity or Acquired Entity in connection with the operation of the Business. To the Knowledge of each Selling Entity, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property and no such Proceedings are currently being asserted or threatened in writing against any Person by any Selling Entity or Acquired Entity. None of the Owned Intellectual Property is subject to any outstanding Order.

(d)     If any Selling Entity or Acquired Entity has acquired or purports to have acquired ownership of any Owned Intellectual Property from any Person, such Selling Entity or Acquired Entity has obtained a valid and enforceable written assignment sufficient to irrevocably transfer all rights in and to the Owned Intellectual Property acquired from such Person, and such Person has executed a valid and irrevocable waiver of moral rights in respect of such Owned Intellectual Property, where applicable. All inventions, discoveries, and works of authorship embodying any of the Owned Intellectual Property were created solely by either (i) employees of any Selling Entity or any Acquired Entity acting within the scope of their employment who have validly and irrevocably assigned all of their rights, including all Intellectual Property therein, to such Selling Entity or Acquired Entity, and who have validly and irrevocably waived all of their moral rights in such Intellectual Property, where appliable or (ii) a Third Party who has validly and irrevocably assigned all of its rights, including all Intellectual Property therein, to any Selling Entity or Acquired Entity, and who has validly and irrevocably waived all of its moral rights in such Intellectual Property, where applicable, and no such Third Party owns or has or has retained any rights to any such Intellectual Property.

(e)     No Selling Entity or Acquired Entity has transferred (or agreed to transfer) ownership of, or granted (or agreed to grant) any exclusive license of or exclusive right to use, or authorized the retention of any exclusive rights to use or joint ownership of any Intellectual Property that, but for such transfer or agreement to transfer, would have been Owned Intellectual Property.

54

(f)      (i) Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code and Section 11.3(2) of the CCAA, following the Closing, Buyer will be permitted to exercise all of the Selling Entities' and the Acquired Entities' rights and receive all of the Selling Entities' and Acquired Entities' benefits (including payments) under all Licenses which are Assigned Contracts to the same extent that the Selling Entities and Acquired Entities would have been able to had the transactions contemplated by this Agreement not occurred and without the payment of any additional amounts or consideration other than the ongoing fees, royalties or other payments which the relevant Selling Entity or Acquired Entity would otherwise have been required to pay pursuant to the terms of such Licenses had the transactions contemplated by this Agreement not occurred, and (ii) Buyer will have and be permitted to exercise all of the Selling Entities' and Acquired Entities' rights under the Owned Intellectual Property to the same extent that the Selling Entities and Acquired Entities would have been able to had the transactions contemplated by this Agreement not occurred.

(g)      The Selling Entities and Acquired Entities have taken commercially reasonable steps to protect and maintain any material trade secrets and know-how included in the Owned Intellectual Property, and, to the Knowledge of each Selling Entity, there are no unauthorized uses or disclosures of any such trade secrets or know-how.

(h)      No software included in the Owned Intellectual Property contain any Malicious Code. Seller and its Subsidiaries have adopted and enforce a written policy designed to ensure that the software included in the Owned Intellectual Property is free of Malicious Code, and to ensure the prompt identification, removal and remediation of any Malicious Code.  No event has occurred, and, to the Knowledge of each Selling Entity, no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license or disclosure of any source code owned or exclusively Controlled by the Acquired Entities or source code included in the Owned Intellectual Property to any Third Party, including  to or from any escrow agent. No software owned or exclusively Controlled by the Acquired Entities or software included in the Owned Intellectual Property or the use thereof by any Selling Entity or Acquired Entity are subject to any obligation under any Open Source License to be delivered or licensed under any Open Source License, or otherwise in source code form, for the purpose of making modifications or derivative works, or for little or no fee.  The Selling Entities and Acquired Entities are in material compliance with all Open Source Licenses to which they are bound.

(i)      To the Knowledge of each Selling Entity, the information technology systems owned or controlled by each Selling Entity and Acquired Entity in connection with the Business (the "**Business IT Assets**") (i) operate and perform, in each case, in all material respects in accordance with their documentation and; (ii) have not malfunctioned or failed in any material respect.  Each Selling Entity and each Acquired Entity has taken commercially reasonable steps in accordance with customary industry standards and practices to protect the confidentiality, integrity and security of Business IT Assets (and all information and transactions stored or contained therein or transmitted thereby) and Personal Information owned or controlled by any Selling Entity or any Acquired Entity from unauthorized use, access, interruption, modification or corruption. Since January 1, 2020, there have been no material unauthorized intrusions or breaches of security with respect to the Business IT Assets.

NAI-1538018312v20

(j)     Since January 1, 2020, there has been no material unauthorized access, loss, damage, use, sharing, modification, or other misuse of any Personal Information owned or controlled by any Selling Entity or Acquired Entity. No Proceeding relating to any material improper use, unauthorized access or disclosure of, or a material breach in the security of, any Personal Information has been made since January 1, 2020.

(k)     The Selling Entities have implemented procedures designed to comply with the California Consumer Privacy Act (CCPA), as amended by the California Privacy Rights Act (CPRA) and the Virginia Consumer Data Protection Act (VCDPA).

Section 5.11     *Environmental Compliance.*

(a)     The Acquired Entities and the Assets owned or held by the Selling Entities and their Business operations are and have been since January 1, 2020 in compliance in all material respects with applicable Environmental Laws.

(b)     Since January 1, 2020 or prior to that date if not fully resolved, no written notice, order, request for information, complaint or penalty has been received by the Selling Entities or the Acquired Entities, and (y) there has been no Proceeding pending or, to the Knowledge of each Selling Entity, threatened, in the case of each of clauses (x) and (y), which (A) alleges a violation of or liability under any Environmental Law, and (B) relates to the Acquired Entities, the Assets or the Business.

(c)     (i) There currently are effective all Permits required under any Environmental Law that are necessary for each Selling Entity's and Acquired Entity's activities and operations relating to the Assets and the Business, (ii) any applications for renewal of such Permits have been submitted on a timely basis and (iii) each Selling Entity and each Acquired Entity is and has been since January 1, 2020 in compliance in all material respects with the terms and conditions of such Permits.

(d)     There has been no Release or threat of Release of any Hazardous Substance at or in the vicinity of the Assets or any property formerly owned, leased, serviced or operated by any Selling Entity or Acquired Entity that requires or may require reporting, investigation, assessment, cleanup, remediation or any other type of response action under any Environmental Law or any Contract.

(e)     No Selling Entity or Acquired Entity has assumed, undertaken, agreed to provide indemnification for or otherwise become subject to any material Liability of any other Person relating to or arising from any Environmental Law.

(f)     Each Selling Entity's and Acquired Entity's services and operations in connection with the Assets and Business have not given rise to exposure of persons to Hazardous Substances in a manner that would reasonably be expected to give rise to liability under any Environmental Laws.

(g)     Seller has made available to the Buyer copies of all material documents, records and information in its possession or control concerning compliance with or potential Liability

56

under Environmental Laws or the exposure of any Person to any Hazardous Substance in any way associated with the Assets, the Business or the Acquired Entities.

Section 5.12    *Title.*

(a)    Disclosure Schedule 5.12(a)(i) sets forth a true, correct and complete list of all of the Real Property Interests owned in fee by Seller or any of its Subsidiaries that are Related to the Business (the Real Property Interests listed or required to be listed on Disclosure Schedule 5.12(a)(i), the "**Owned Real Property**"), specifying the street address and the current owner of each parcel of Owned Real Property. Each Selling Entity and Acquired Entity has good and valid fee simple title to all Owned Real Property owned by it, free and clear of all Encumbrances, except for Permitted Encumbrances and Encumbrances listed on Disclosure Schedule 5.12(a)(ii). No Selling Entity or Acquired Entity currently leases any parcel or any portion of any parcel of any Owned Real Property to any other Person, other than Leases to a Selling Entity.

(b)    Disclosure Schedule 5.12(b)(i) sets forth a true, correct and complete list of all Real Property Interests that are leased by Seller or any of its Subsidiaries (whether as a lessor, sublessor, lessee or sublessee) that are Related to the Business (the Real Property interests listed or required to be listed on Disclosure Schedule 5.12(b)(i), the "**Leased Real Property**"), and a description of the associated leases therefor (the "**Leases**"). Each of the Leases constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity or Acquired Entity and is in full force and effect in accordance with its terms, except as enforceability may be limited by the Bankruptcy and Equity Exception. The applicable Selling Entity or Acquired Entity has good and valid leasehold title to all of the Leased Real Property free and clear of all Encumbrances, except for Permitted Encumbrances. Seller has made available to Buyer true, correct and complete copies of each Lease.

(c)    No event has occurred and, to the Knowledge of each Selling Entity, no circumstances exist that, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination or modification of, or acceleration of rent under, any Lease. No Selling Entity or Acquired Entity has received written notice of any claim by any Person under any such Lease alleging that such Selling Entity or Acquired Entity has committed a breach of any such Lease, and has not provided or received any written notice of any intention to terminate any such Lease.

(d)    The Owned Real Property and Leased Real Property constitute all of the real property rights necessary to own and conduct the Business in all material respects as currently owned, operated and conducted by Seller or any of its Subsidiaries.

(e)    There are no condemnation, expropriation or other Proceedings with eminent domain pending or, to the Knowledge of each Selling Entity, threatened, with respect to any Real Property Interest.

Section 5.13    *Matters Related to Assets; Casualty Losses.*

(a)    Seller and its Subsidiaries have good title to, or a valid leasehold interest in, all of the rights, personal properties, interests, equipment and other tangible and intangible assets shown

57

to be owned, licensed or leased on the Financial Statements or otherwise used (or held for use) by the Business or the Acquired Entities, in each case are free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     All of the equipment, machinery, vehicles and other tangible assets of the Acquired Entities or that constitute Assets are (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and usage, (ii) not in need of any repairs, which, if not made, would affect the integrity or safety of such Assets, (iii) suitable for use by the Acquired Entities or the Selling Entities to conduct the Business as currently conducted with respect to such Assets, and (iv) suitable and safe for use by consumers in each case in all material respects.

(c)     The Assets owned or used (or held for use) by the Selling Entities and the Acquired Entities constitute all assets, properties, rights, privileges and interests of whatever kind or nature, real or personal or mixed, tangible or intangible, used or necessary, that are sufficient to conduct the Business as currently conducted by the Selling Entities and Acquired Entities, in all material respects, other than the operations and business conducted with respect to the Excluded Assets and Excluded Business.

(d)     There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

Section 5.14     *Insurance.*

A true, correct and complete list of the insurance policies related to the Business currently conducted by Seller and its Subsidiaries (including the Acquired Entities) with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) is attached hereto as Disclosure Schedule 5.14 (collectively, the "**Insurance Policies**"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, all of the Insurance Policies are in full force and effect and neither Seller nor any of its Subsidiaries nor, to the Knowledge of each Selling Entity, any other party to such Insurance Policy is in breach, violation or default (including with respect to the payment of premiums or the giving of notices). No event has occurred (with notice or the lapse of time or both), including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies. Except as set forth in Disclosure Schedule 5.14, no material claim is outstanding under any of the Insurance Policies, and no carrier of any Insurance Policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim. No notice of cancellation or termination has been received or, to the Knowledge of each Selling Entity, threatened with respect to any such Insurance Policy.

Section 5.15     *Security Arrangements.*

All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries (including the Acquired Entities) with Governmental Authorities or Third Parties and relating to

the Assets owned or held by Seller or any such Subsidiary as of the date hereof are described on Disclosure Schedule 5.15.

Section 5.16    *Customers and Suppliers.*

(a)    Disclosure Schedule 5.16(a) contains a true, correct and complete list of the 20 largest customers, including distributors, of the Business, taken as a whole, for (i) the 12-month period ended December 31, 2022 and (ii) the seven-month period ended on the Balance Sheet Date (as determined on the basis of the total dollar amount of sales in respect of goods and services sold, in each case, a "**Major Customer**"), showing the total dollar amount of gross sales to each such Major Customer during such period.

(b)    Disclosure Schedule 5.16(b) contains a true, correct and complete list of the 20 largest suppliers of the Business, taken as a whole, for (i) the 12-month period ended December 31, 2022 and (ii) the seven-month period ended on the Balance Sheet Date (as determined on the basis of the total dollar amount of purchases made by Seller and its Subsidiaries, in each case, a "**Major Supplier**"), showing the total dollar amount of purchases by the Business from each such Major Supplier during such period.  The only supplier of the Business of the Canadian Sellers is Instant Brands LLC.

(c)    Except as set forth on Disclosure Schedule 5.16(c), (i) there has not been an actual termination, cancellation, non-renewal or material reduction in volume with respect to the Business between the Business, on the one hand, and any Major Customer or Major Supplier (as measured by 2023 gross sales or 2023 total purchases), on the other hand, and (ii) no Major Customer or Major Supplier has given Seller or any of its Subsidiaries written notice that such Major Customer or Major Supplier, as applicable, intends to, or to the Knowledge of each Selling Entity, has otherwise threatened to, terminate its business with Seller or any of its Subsidiaries, or reduce or become unable for any reason to maintain the volume of business transacted with the Business in any material respect (as measured by 2023 gross sales or 2023 total purchases) (other than reductions in volume as contemplated by any Material Contract with such Major Customer or Major Supplier).

Section 5.17    *Anti-Corruption.*

(a)    No Seller, its Subsidiaries, nor any of their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, has in the three years prior to the Closing Date, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2020, or any other applicable anti-bribery law (collectively, the "**Anti-Corruption Laws**"). Seller and its Subsidiaries have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws. To the Knowledge of each Selling Entity, none of the current officers, directors or employees of Seller or any of its Subsidiaries is a Government Official.

59

(b)     In the three years prior to the Closing Date, the Business has been conducted and the Assets have been operated in material compliance with all Applicable Laws relating to anti-money laundering and financial record-keeping and reporting. Seller and its Subsidiaries have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of any Applicable Laws relating to anti-money laundering or financial record-keeping and reporting , and in the three years prior to the Closing Date, there has been no such Proceeding.

Section 5.18     *Brokers or Finders.*

Except for fees and expenses payable to Guggenheim Securities, LLC, no Selling Entity nor Acquired Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.19     *Employee Benefit Plans; Labor and Employment Matters.*

(a)     Disclosure Schedule 5.19(a) contains a true, correct and complete list of each material Seller Benefit Plan, and identifies the Assumed Benefit Plans.  Seller has made available to Buyer a true, correct and complete copy of each material Seller Benefit Plan (or, in the case of an unwritten Seller Benefit Plan, a summary description thereof) and, to the extent applicable, (i) each trust related thereto, (ii) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (iii) the most recent summary plan descriptions and summaries of material modifications with respect thereto, (iv) the most recent determination, advisory or opinion letters received from the IRS with respect to each Seller Benefit Plan that is intended to be tax qualified, (v) all insurance contracts and other documents relating to the funding or payment of benefits under any Assumed Benefit Plan, (vi) all material, non-routine correspondence relating to any Seller Benefit Plan between any Selling Entity or their representatives and any Governmental Authority within three years prior to the date hereof or the Closing Date, and (vii) all material data necessary to administer each Assumed Benefit Plan in a form which is sufficient for the proper administration of the Assumed Benefit Plan in accordance with its terms and all Applicable Laws and such data is, to the Knowledge of each Selling Entity, complete and correct in all material respects.

(b)     Since January 1, 2020, each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in material compliance with Applicable Laws (including ERISA and the Code) and with the terms of such Assumed Benefit Plan.  There are no pending or, to the Knowledge of each Selling Entity, threatened claims, suits or proceedings (except routine claims for benefits payable in the ordinary course of business) against any Assumed Benefit Plan before any Governmental Authority, nor, to the Knowledge of each Selling Entity, is there any basis for one.

60

(c)     Except as set forth on Disclosure Schedule 5.19(c), none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event) will (i) entitle any Company Employee to any material compensation or benefit under any Seller Benefit Plan, (ii) accelerate the timing of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any Company Employee or trigger any other material obligation under any Seller Benefit Plan, (iii) result in any loss of tax deduction under Section 280G or the imposition of any excise tax under Section 4999 of the Code on any Transferred Employee, or (iv) result in any forgiveness of indebtedness with respect to any Company Employee (or dependents of such Company Employee), trigger any funding obligation under any Assumed Benefit Plan or impose any restrictions or limitations on the rights of any Selling Entity to administer, amend or terminate any Assumed Benefit Plan on or following the Closing Date other than as imposed by Applicable Law.

(d)     Except as set forth on Disclosure Schedule 5.19(d), no Seller Benefit Plan (i) is a (A) plan subject to Title IV of ERISA, (B) "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code or (C) "multiple employer plan" within the meaning of Section 210(a) of ERISA or Section 413(c) of the Code or (ii) provides any post-retirement medical, dental or life insurance benefits to any Company Employees (other than coverage mandated by Applicable Law, including COBRA).

(e)     Each Assumed Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable IRS determination letter or is based on a protype plan which has received a favorable opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired, and, to the Knowledge of each Selling Entity, nothing has occurred since the date of any such determination that could reasonably be expected to give the IRS grounds to revoke such letter.

(f)     With respect to each group health plan benefiting any current or former Company Employee or any member of the Controlled Group that is subject to Section 4980B of the Code, the Selling Entities and, to the Knowledge of each Selling Entity, each member of the Controlled Group (to the extent that could reasonably be expected to result in a material liability to Buyer following the Closing) have complied in all material respects with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA.

(g)     With respect to each Seller Benefit Plan subject to Title IV of ERISA: (i) a notice of intent to terminate any such Seller Benefit Plan has not been filed; and (ii) the Pension Benefit Guaranty Corporation has not notified any Selling Entity that it has instituted or, to the Knowledge of each Selling Entity, threatened in writing to institute proceedings to terminate any such Seller Benefit Plan. Each Seller Benefit Plan to which Section 412 of the Code or Section 302 of ERISA applies has satisfied the requirements of Sections 412, 430 and 436 of the Code and Sections 302 and 303 of ERISA.  Disclosure Schedule 5.19(g) identifies the "funding shortfall" within the meaning of Section 430(c) of the Code or Section 303(c) of ERISA for each such Seller Benefit Plan as of January 1, 2023, and no event has occurred which would be reasonably expected to materially change any such funding shortfall.  No Seller Benefit Plan is in "at-risk status" within the meaning of Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA or subject to the limitations of Section 436 of the Code. Except as set forth on Disclosure Schedule 5.19(g)-1, no

61

Seller Benefit Plan has or has incurred an accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, nor has any waiver of the minimum funding standards of Section 302 of ERISA and Section 412 of the Code been requested of or granted by the IRS with respect to any Seller Benefit Plan, nor has any lien in favor of any Seller Benefit Plan arisen under Section 430(k) of the Code or Section 303(k) of ERISA. Except as set forth on Disclosure Schedule 5.19(g)-2, no Selling Entity or any member of the Controlled Group has been required to provide security to any defined benefit pension plan by the Pension Benefit Guaranty Corporation or pursuant to Section 412(c)(4) or 436 of the Code or Section 302 of ERISA, and there have been no "installment acceleration amounts" as that term is defined in Section 430(c)(7)(C) of the Code. There has been no "reportable event" within the meaning of Section 4043 of ERISA and the regulations and interpretations thereunder which has not been fully and accurately reported in a timely fashion, as required, or which, whether or not reported, would constitute grounds for the Pension Benefit Guaranty Corporation to institute termination proceedings with respect to any Seller Benefit Plan.

(h)     No Transferred Employee has a right to any gross up or indemnification from any Selling Entity with respect to any such Assumed Benefit Plan, payment or arrangement subject to Section 409A of the Code.

(i)     All material (i) insurance premiums required to be paid with respect to, (ii) benefits, expenses and other amounts due and payable under, and (iii) contributions, transfers or payments required to be made to, any Assumed Benefit Plan, in each case, on or prior to the Closing Date will have been paid, made or accrued on or prior to the Closing Date.

(j)     Except as set forth in Disclosure Schedule 5.19(j), neither the Selling Entities nor Acquired Entities is party to or otherwise bound by any collective bargaining, works council or other agreement with a labor representative with respect to Company Employees.

(k)     There are no strikes, slowdowns, other concerted work stoppages or any other material labor disputes involving any Company Employee pending or, to the Knowledge of each Selling Entity, threatened nor have there been any such disputes, strikes, slowdowns or concerted work stoppages or other material labor disputes in the past five years, and  there are no unfair labor practice charges pending against any of the Selling Entities before the National Labor Relations Board or any other Governmental Authority with respect to any Company Employee.

(l)     The Selling Entities are, and since January 1, 2020 have been, in material compliance with all Applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, employment standards, pay equity, hours, employee classification as exempt/non-exempt or eligible or ineligible for overtime, independent contractor classification, employee leave, collective bargaining and labor relations,  health and safety, immigration, child labor, discrimination, harassment, human rights, accessibility, retaliation, disability rights or benefits, affirmative action, and workers' compensation.

(m)     Disclosure Schedule 5.19(m) sets forth a true, correct and complete list of all Company Employees as of the date hereof, and includes the following information, as applicable: name (or anonymized by employee number where required by Applicable Law); title or position; status (part-time, full-time, exempt, non-exempt, etc.); work location (including U.S. city and state

62

or Canadian city and province); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; union affiliation; visa or work permit status; and an indication of whether or not such employee is on leave of absence and anticipated return date. Disclosure Schedule 5.19(m) shall be updated upon reasonable request and within five Business Days of the anticipated Closing Date.

(n)     Since January 1, 2020, there have been no material Proceedings against any of the Selling Entities filed or, to the Knowledge of each Selling Entity, threatened in writing to be brought or filed, by or on behalf of any current or former employee or other service provider of, or applicant for employment with, any of the Selling Entities.

(o)     Since January 1, 2020, (i) to the Knowledge of each Selling Entity, there have been no written allegations of sexual harassment, sexual abuse, or other sexual misconduct against any officer, director or executive of any of the Selling Entity, (ii) there have been no Proceedings pending or, to the Knowledge of each Selling Entity, threatened in writing related to any allegations of sexual harassment, sexual abuse, or other sexual misconduct by any officer, director or executive of any of the Selling Entities and (iii) none of the Selling Entities have entered into any settlement agreements related to allegations of sexual harassment, sexual abuse, or other sexual misconduct by any officer, director or executive of a Selling Entity.

(p)     The consent or rendering of formal advice by, or the conclusion of any legally required consultation process with, any labor or trade union, works council or other employee representative body is not required for the Selling Entities to enter into this Agreement or to consummate any of the transactions contemplated hereby.

(q)     None of the Assumed Benefit Plans, or any insurance contract relating thereto, require or permit a material retroactive increase in premiums or payments.

(r)     All contributions, premiums or Taxes required to be made or paid by the Selling Entities to or under each Assumed Benefit Plan have been made or paid in a timely fashion in accordance with Applicable Law, and the terms of the applicable Assumed Benefit Plan.

(s)     To the Knowledge of each Selling Entity, none of the Selling Entities has made any commitment or representations to any employee, director, or independent contractors or consultant to materially adopt, amend, modify or terminate any Assumed Benefit Plan, in connection with the consummation of the transactions contemplated hereby.

(t)     Except as set forth on Disclosure Schedule 5.19(t), none of the Selling Entities have, in the past three years, sponsored, administered, maintained, contributed to, or been required to contribute to (i) a registered pension plan within the meaning of that term in subsection 248(l) of the Tax Act, (ii) a "multi-employer pension plan" within the meaning of that term as set out in the Pension Benefits Act (Ontario), or an equivalent plan under pension standards legislation of another applicable Canadian jurisdiction, (iii) a "multi-employer plan" within the meaning of that term in subsection 8500(l) of the Income Tax Regulations (Canada) or (iv) a Seller Benefit Plan with two (2) or more contributing employers who are not "affiliates" within the meaning of the Business Corporations Act (Ontario).

Section 5.20    *Taxes.*

(a)    Each Selling Entity and Acquired Entity has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed.  All such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by any Selling Entity or Acquired Entity (whether or not shown on any Tax Return) have been paid.  No material claim has ever been made (and remains unsolved) by an authority in a jurisdiction in which a Selling Entity or Acquired Entity does not file Tax Returns that such Selling Entity or Acquired Entity is or may be subject to Taxation by that jurisdiction.

(b)    There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any liability for any material Taxes of any Selling Entity or Acquired Entity.  No Selling Entity or Acquired Entity has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)    Each Selling Entity has withheld from each payment made to any Person, including any of its present or former employees, all amounts required by Applicable Law to be withheld, and has remitted such withheld amounts within the prescribed periods to the appropriate Governmental Authority. Each Selling Entity has remitted all Canada Pension Plan contributions, provincial pension plan contributions, employment insurance premiums, employer health taxes and other Taxes payable by it in respect of the employees to the proper Governmental Authority within the time required under Applicable Law.

(d)    There are no Encumbrances with respect to Taxes (other than Permitted Encumbrances) upon the Assets or any assets owned by any of the Acquired Entities.

(e)    No Selling Entity or Acquired Entity has any material obligations under any unclaimed property, escheat or similar Applicable Law.

(f)    Each Canadian Seller is not a non-resident of Canada within the meaning of the Tax Act and none of the Assets of any other Seller are "taxable Canadian property" for the purposes of the Tax Act.

(g)    Except for Instant Brands (Canada) Holding Inc., each of the Canadian Sellers is registered for Canadian GST/HST purposes under Part IX of the ETA and its registration number is set forth in Disclosure Schedule 5.20(g).

(h)    Each Selling Entity has duly and timely collected all material amounts on account of all Transfer Taxes, including Canadian Sales Taxes required by Applicable Law to be remitted by it where the failure to do so would be capable of forming or resulting in an Encumbrance on or other claim (i) against any Buyer Entity, or (ii) against or seizure of all or any part of the Assets.

(i)    Except as set forth on Disclosure Schedule 5.20(i), none of the Selling Entities have maintained, contributed to or have any Liability or obligation to contribute to any "registered pension plan" as that term is defined in the Tax Act.

(j)     None of the Selling Entities or Acquired Entities have been a party to a transaction that is or is substantially similar to a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(2), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

(k)     No Acquired Entity is a party to any Tax indemnity, Tax allocation or Tax sharing agreement that will remain in effect after the Closing, other than any such agreement entered into in the ordinary course of business the principal purpose of which is not related to Tax.

(l)     There are no requests for rulings pending between any Selling Entity or any Acquired Entity and any Tax Authority.

(m)     None of the Acquired Entities (i) is or has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group exclusively consisting of other Acquired Entities), or (ii) has any liability for Taxes of any other Person (other than members of a group exclusively consisting of other Acquired Entities), as a transferee or successor, by Contract or otherwise.

(n)     No Acquired Entity has (or has had) a permanent establishment or taxable presence in any country other than the country where such Acquired Entity is organized.

(o)     None of the Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Post-Closing Tax Period (or portion thereof) as a result of (i) a change in any method of accounting made on or prior to the Closing; (ii) a closing agreement (or similar agreement under any corresponding or similar provision of Applicable Law) executed on or prior to the Closing; (iii) an installment sale or open transaction disposition made on or prior to the Closing Date; (iv) any prepaid amount received or deferred revenue accrued on or prior to the Closing Date; (v) the application of Section 951 or Section 951A of the Code with respect to income earned or recognized or payments received on or prior to the Closing Date (regardless of when such income is taken into account for Tax purposes) or (vi) an election under Section 965(h) of the Code.

(p)     None of Corelle Brands (Canada) Inc., Instant Brands (Canada) Holding Inc., or Instant Brands Inc. is transferring any "United States real property interest" (as defined in Section 897(c)(1) of the Code) pursuant to this Agreement.

Section 5.21   *Investment Canada Act.*

Neither the Canadian Sellers nor any entity they control carries on a "cultural business" within the meaning of the Investment Canada Act.

Section 5.22   *International Trade.*

(a)     No Selling Entity, Acquired Entity nor any of their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, is currently, or during the three years prior to the date hereof or the Closing Date has been, (i) a Sanctioned Person, (ii) located, organized or resident in a country or territory that is the subject of comprehensive sanctions administered by the United States Treasury Department's Office of Foreign Assets

65

Control (including Cuba, Iran, North Korea, Syria or the Crimea, so-called Luhansk People's Republic, or so-called Donetsk People's Republic regions of Ukraine) (a "**Sanctioned Territory**"), (iii) engaged in any dealings or transactions with, involving or for the benefit of any Sanctioned Person or in or with any Sanctioned Territory or (iv) otherwise in violation of applicable Sanctions Laws.

(b)    Each Selling Entity, Acquired Entity and their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, is in compliance, and has been in compliance during the three years prior to the date hereof or the Closing Date, with all Trade Compliance Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(c)    During the three years prior to the date hereof or the Closing Date, neither any Selling Entity or any Acquired Entity has made any voluntary disclosure to any Governmental Authority under the Trade Compliance Laws, and there have been no actual or threatened inquiries, investigations or enforcement actions regarding compliance by any Selling Entity or any Acquired Entity with Trade Compliance Laws, and no Governmental Authority has assessed any fine or penalty against, or issued any warning letter to, any Selling Entity or any Acquired Entity with regard to compliance with Trade Compliance Laws.

(d)    During the three years prior to the date hereof or the Closing Date, none of the products or materials imported by, for or on behalf of each Selling Entity and each Acquired Entity for which final liquidation has not yet occurred is subject to or otherwise covered by an antidumping duty order or countervailing duty order that remains in effect or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by any Governmental Authority. During the three years prior to the date hereof or the Closing Date, none of the products or materials imported by, for or on behalf of any Selling Entity or any Acquired Entity are subject to, or meet the criteria to be subject to, any Withhold Release Order administered by U.S. Customs and Border Protection or any equivalent Order outside the United States, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(e)    No Selling Entity or Acquired Entity is importing, nor in the three years prior to the date hereof or the Closing Date has imported, products or materials mined, produced, or manufactured wholly or in part with the use of forced labor or mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region or by an entity on the Uyghur Forced Labor Prevention Act Entity List.

Section 5.23    *Warranties; Product Liability.*

Except as specifically reflected, reserved against or otherwise disclosed in the Financial Statements or incurred since the date of the Interim Financial Statements and except as would not be reasonably be expected to be material to the Business, the Assets or the Assumed Liabilities, taken as a whole, (a) there is no Proceeding relating to any product of the Business, including the packaging and advertising related thereto, designed, formulated, manufactured, processed, sold or placed in the stream of commerce by Seller or any of its Subsidiaries or any services provided by the Business, or Proceeding involving a product which is pending or, to the Knowledge of each

66

Selling Entity, threatened, by any Person, and (b) there has neither been, nor is there under consideration by the Business, any product recall or post-sale warning of a material nature conducted by or on behalf of the Business concerning any product. Since January 1, 2020, (a) all products materially complied with and currently comply with all Orders and Applicable Laws, (b) all products are safe for use by consumers, and (c) there have not been and there are no material defects or deficiencies in such products of the Business.

Section 5.24    *Accounts Receivable; Inventory*

(a)    Since the Balance Sheet Date, the Business has not adversely modified payment terms for Accounts Receivable in such a manner as would reasonably be expected to result in an Accounts Receivable portfolio that, in amount or character, is materially and adversely different than that maintained by the Business in the ordinary course of business.  To the Knowledge of each Selling Entity, the Accounts Receivable of Seller and its Subsidiaries in connection with the Business is, in the aggregate, collectible in full, net of any reserve therefor, in the ordinary course of business.  No material counter claims, defenses, offsetting claims or adjustments with respect to the Accounts Receivable are pending or threatened.

(b)    The inventory of the Business is, in all material respects, of a quality and quantity useable and saleable in the ordinary course of business and is merchantable and fit for its intended use, subject to appropriate and adequate allowances reflected on the Interim Financial Statements. The inventory of the Business is not excessive in kind or amount in any material respect in light of the ordinary and normal course of conduct and reasonably anticipated needs of the Business in a normal operating cycle.  The inventory is not held on consignment, or otherwise, by any Person (other than Seller or any of its Subsidiaries).

Section 5.25    *Related Party Transactions.*

Except as set forth on Disclosure Schedule 5.25, none of Seller nor any of its Subsidiaries (including the Acquired Entities), nor any current or former officer, employee, director, manager or Affiliate of Seller or any of its Subsidiaries (or any individual in such Person's immediate family), (a) is a party to any material Contract, commitment or transaction or involved in any material business arrangement or relationship with the Business, other than in the case of Company Employees or employees of the Acquired Entities, salaries and employee benefits and other transactions pursuant to any Seller Benefit Plan in the ordinary course of business or any transaction bonus payable to Company Employees or employees of the Acquired Entities in connection with the transactions contemplated by this Agreement, or (b) to the Knowledge of each Selling Entity, has any interest in (i) any material property, asset or right used or held for use by the Business or (ii) any Person that is a customer, distributor or supplier of, or other material commercial counterparty to or competitor of the Business.

Section 5.26    *Acquired Entities.*

(a)    The Selling Entities directly or indirectly own all of the issued and outstanding equity securities of the Acquired Entities.  No Third Party has the right, directly or indirectly, to acquire any equity interest of the Acquired Entities.  Disclosure Schedule 5.26(a) accurately sets forth a true, correct and complete list of (i) each Acquired Entity, (ii) the issued and outstanding

shares and other equity securities of such Acquired Entity, and (iii) the holder(s) of such shares and other equity securities of such Acquired Entity. All of the issued and outstanding equity interests of the Acquired Entities have been duly authorized, are validly allotted and issued, are fully paid up, and are owned legally and beneficially by the applicable Selling Entity (or another Acquired Entity) set forth on Disclosure Schedule 5.26(a)(iii), free and clear of all Encumbrances. None of the authorized and outstanding equity interests of each Acquired Entity was issued in violation of any preemptive or similar rights and all issuances, sales and repurchases by each Acquired Entity of their respective equity interests has been effected in compliance with all Applicable Law.

(b)        Except as set forth on Disclosure Schedule 5.26(b), there are no outstanding equity securities, options, warrants, rights, contracts, pledges, calls, puts, rights to subscribe, rights of first refusal, repurchase rights, exchange rights, conversion rights, preemptive rights, or other agreements or commitments to which any Acquired Entity is a party or which is binding upon any Acquired Entity providing for the issuance, disposition or acquisition of any of its equity, capital or profits or any rights or interests exercisable therefor. There are no outstanding or authorized stock options, equity appreciation, phantom shares, profit participation or similar rights with respect to the Acquired Entities.

(c)        Except as set forth on Disclosure Schedule 5.26(c), none of the Acquired Entities have outstanding bonds, debentures, notes or other similar obligations, the holders of which have the right to vote (or which are convertible into or exercisable for shares or equity securities having the right to vote) with the equityholders of any of the Acquired Entities on any matter. There are no voting trusts or other agreements or understandings to which any Acquired Entity is a party with respect to the voting of any equity interests of such Acquired Entity.

Section 5.27    *Competition Act Assets and Gross Revenues*

The aggregate value of the Assets and the gross revenues from sales in or from Canada generated from the Assets do not, in either case, exceed CAD $93 million, as determined in accordance with the Competition Act.

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Each Buyer Entity, severally and not jointly, represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01    *Organization and Good Standing.*

Each Buyer Entity is a duly incorporated or organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization. Each Buyer Entity has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Each Buyer Entity is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and each Buyer Entity or its Affiliates will be duly qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s)

68

where the Assets are located, in each case other than where failure to be so qualified would not have a material and adverse effect on the ability of such Buyer Entity to consummate the transactions contemplated by this Agreement. Buyer has made available to Seller true and correct copies of each Buyer Entity's governing documents as in effect as of the date hereof and as of the Closing, as applicable.

Section 6.02    *Authority; Validity; Consents.*

Each Buyer Entity has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is or will be a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by each Buyer Entity and such other Transaction Documents to which such Buyer Entity is or will be a party and the consummation by such Buyer Entity of the transactions contemplated herein and therein have been duly, validly authorized and approved by the applicable governing body of such Buyer Entity and no other corporate or other proceedings on the part of such Buyer Entity are necessary to authorize the execution and delivery by such Buyer Entity of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by each Buyer Entity and each other Transaction Document to which such Buyer Entity will be a party that is required to be executed and delivered by such Buyer Entity at the Closing will be duly and validly executed and delivered by such Buyer Entity, as applicable, at the Closing. Subject to entry of the Sale Order and the CCAA Sale Order and assuming the due authorization, execution and delivery by the other Parties to this Agreement and such other Transaction Documents, no other action on the part of such Buyer Entity or its Affiliates is necessary to authorize this Agreement or the other Transaction Documents to which such Buyer Entity is or will be a party and this Agreement and the other Transaction Documents to which such Buyer Entity is or will be a party constitutes or will constitute as of the Closing the legal, valid and binding obligation of Buyer, enforceable against such Buyer Entity in accordance with their respective terms, except in each case as such enforceability may be limited by the Bankruptcy and Equity Exception.

Section 6.03    *No Conflict.*

Except for (a) any applicable notices, filing, waiting period terminations or expirations, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act and (b) items listed on Disclosure Schedule 6.03, each Buyer Entity is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to affect such Buyer Entity's ability to perform its obligations under this Agreement or any other Transaction Document to which it is or will be party or to consummate the transactions contemplated hereby or thereby. When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or

69

lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer Entity under (i) any Contract to which it or its assets is bound, (ii) its certificate of incorporation, bylaws or other governing documents (as applicable), (iii) any Order applicable to such Buyer Entity or its assets or (iv) any Applicable Law, except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect such Buyer Entity's ability to perform its obligations under this Agreement or any other Transaction Documents to which it is or will be a party or to consummate the transactions contemplated hereby or thereby.

Section 6.04    *Legal Proceedings.*

There are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to delay the Closing or have a material and adverse effect on any Buyer Entity's performance of any of its obligations and covenants under this Agreement and the other Transaction Documents to which it is or will be a party.

Section 6.05    *Bankruptcy.*

There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against any Buyer Entity.

Section 6.06    *Brokers or Finders.*

Neither any Buyer Entity nor any Person acting on behalf of such Buyer Entity has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Selling Entity is or will become liable.

Section 6.07    *Financing.*

(a)      Buyer has delivered to Seller on or prior to the date hereof true, complete and fully executed copies of (i) the commitment letter (including all related exhibits, schedules, annexes, supplements and term sheets thereto, and including any related redacted fee letters as described below, as each of the foregoing may be amended, supplemented, replaced, substituted, terminated or otherwise modified or waived from time to time after the date hereof in compliance with Section 7.08(b), the "**Debt Commitment Letter**") from the Debt Financing Sources party thereto confirming their respective commitments to provide Buyer with debt financing in connection with the transactions contemplated hereby in the amounts set forth therein (the "**Debt Financing**") and (ii) a commitment letter (the "**Equity Commitment Letter**" and together with the Debt Commitment Letter, the "**Financing Commitment Letters**") from Centre Lane Partners V, L.P. (the "**Equity Financing Source**") confirming its commitment to provide Buyer with equity financing in connection with the transactions contemplated hereby in the amount set forth therein (the "**Equity Financing**" and together with the Debt Financing, the "**Financing**").

(b)      Each Financing Commitment Letter is in full force and effect and is a valid and binding obligation of Buyer and the other parties thereto, enforceable against Buyer and the other

parties thereto in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity). As of the date of this Agreement, none of the Financing Commitment Letters have been amended or modified, and the respective commitments contained in the Financing Commitment Letters have not been withdrawn, rescinded or otherwise modified, and no such amendment, modification, withdrawal or rescission of any of the Financing Commitment Letters is contemplated or the subject of current discussions. As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default or breach on the part of Buyer or any of its Affiliates or any other Person, under any of the Financing Commitment Letters. All fees (if any) required to be paid under the Financing Commitment Letters on or prior to the date hereof have been paid in full. There are no conditions precedent directly or indirectly related to the funding of the full amount of the Financing other than as expressly set forth in the Financing Commitment Letters. Other than the Financing Commitment Letters, there are no other contracts, arrangements or understandings entered into by Buyer or any Affiliate thereof related to the funding or investing, as applicable, of the Financing (except as set forth in the customary fee letter relating to the commitments in respect of the Debt Financing, a true, complete and fully executed copy of each of which has been provided to Seller, with only the fee amounts, "market flex", pricing terms, pricing caps and other commercially sensitive terms redacted; *provided that* such redacted provisions do not permit the imposition of any new conditions (or the modification or expansion of any existing conditions)). As of the date of this Agreement, Buyer has no reason to believe that any of the conditions to the Financing will not be satisfied or that the full amount of the Financing will not be available in full to Buyer on the Closing Date.

(c)     The aggregate proceeds of the Financing (after giving effect to any market flex provisions) will be in an amount sufficient to make full payment in cash of the Estimated Purchase Price and any other amounts to be paid by Buyer hereunder and under the other Transaction Documents. For the avoidance of doubt, Buyer acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, the consummation of the Financing shall not be a condition to any obligations of Buyer hereunder, including the obligation to consummate the Closing or other transactions contemplated hereby or by the other Transaction Documents.

Section 6.08  *Independent Evaluation.*

Buyer (a) is experienced in the evaluation, purchase, ownership and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and is aware of the risks associated with the purchase, ownership and operation of such assets and interests related thereto, (b) is capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (c) is able to bear the economic risks associated with the Assets, ownership and operation thereof and its obligations hereunder. In entering into this Agreement and except for the representations and warranties expressly set forth in this Agreement or in any other Transaction Document, no Selling Entity, its Affiliates and its and their respective Representatives or any Person acting on their behalf is making or has made any other express or any implied representations or warranties to Buyer, and Buyer disclaims reliance upon any other representations and warranties (including as to the accuracy and completeness thereof), with respect to any Selling Entity or any of its or their respective Affiliates, any of their respective

71

business, operations, assets, liabilities, condition (financial or otherwise) or prospects or any other matter relating to any Selling Entity or any of its or their respective Affiliates. Buyer acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and the Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of the transactions contemplated by this Agreement.

Section 6.09    *Solvency.*

After giving effect to the transactions contemplated by this Agreement (including receipt of the proceeds of the Financing in connection with the Closing) and assuming the accuracy of the representations and warranties set forth in this Agreement and each other Transaction Document, Buyer and its Subsidiaries, taken as a whole, will be Solvent. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer, Seller or their respective Subsidiaries. For purposes of this Agreement, "**Solvent**" when used with respect to any Person, means that such Person (a) will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) has property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability), (c) has assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute, matured and payable, (d) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as they become absolute, matured and payable and (e) are not engaged in business or a transaction for which they have unreasonably small capital.

Section 6.10    *Canadian Sales Tax Matters*

The Canadian Buyer is or will be registered for Canadian GST/HST purposes under Part IX of the ETA effective on or before the Closing Date, and shall provide its registration number to Seller forthwith upon receipt of same from the relevant Governmental Authority, in any case before the Closing Date.

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01    *Access and Reports.*

(a)    From the date hereof through Closing, subject to Applicable Laws, upon the receipt of reasonable written request from Buyer of any such activities, Seller and its Subsidiaries (including the Acquired Entities) will afford Buyer's officers and other authorized Representatives reasonable access, during normal business hours, ((i) to those of its officers, employees, consultants and authorized Representatives (including its legal advisors and accountants) possessing information relating to the Assets or the Business, (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Assets, the Assumed

72

Liabilities or the Acquired Entities, (iii) to any reasonably available financial and operating data and other information in connection with the Assets (including the Acquired Entities) and (iv) to all offices, plants, buildings, facilities and other physical locations and properties included in the Assets or owned, leased or licensed by the Acquired Entities, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's authorized Representatives will (i) abide by any reasonable safety rules, regulations and operating policies provided in writing by Seller or its Representatives and (ii) at Seller's option, be accompanied by at least one (1) Representative of Seller. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the Business or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities; provided that the Selling Entities use reasonable efforts to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation or providing a summary of such information which would not result in a waiver of privilege). Seller acknowledges and agrees that following the date hereof, Seller shall use commercially reasonable efforts to coordinate calls on behalf of Buyer and its authorized Representatives with at least five Major Customers and at least three Major Suppliers, in each case as Buyer may reasonably request in advance in writing.

(b)     Buyer acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.01(a), and is subject to the terms of the confidentiality agreement, dated June 26, 2023, between Seller and Centre Lane Partners V, L.P. (the "**Confidentiality Agreement**") and the Clean Team Agreement, the terms of each of which are incorporated herein by reference. Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and the CCAA Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement, the Clean Team Agreement or otherwise.

Section 7.02   *Operations Prior to the Closing Date.*

(a)     Except (i) as otherwise expressly contemplated by this Agreement, (ii) as disclosed in Schedule 7.02, (iii) with the prior written consent (electronic consent being sufficient) of Buyer or the approval of the Bankruptcy Court and, if required, the CCAA Court, (iv) as otherwise required by Applicable Laws or any Contract to which Seller or any of its Subsidiaries are bound, or as requested or required by any Governmental Authority, or (v) as required or prohibited pursuant to a Bankruptcy Court Order, the Bankruptcy Cases or the CCAA Recognition Proceedings or limited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors, including (x) the exercise by the board of directors of Seller of its fiduciary duties to maximize the value of Seller's estate and (y) limitations on Seller's or its Subsidiaries' ability to pay amounts relating to the period prior to the Petition Date and the impact of Seller filing for bankruptcy with respect to any Contract to which it or any of its Subsidiaries is a party, from the date hereof until the Closing Date:

(i)     Seller will use its commercially reasonable efforts to (A) operate the Assets operated by Seller and its Subsidiaries in the ordinary course of business in all material respects, (B) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, (C) preserve intact, in all material respects, the business organizations and relationships with Third Parties of the Assets and keep available the services of Company Employees, employees of the Acquired Entities and consultants and agents of the Selling Entities and the Acquired Entities in connection with the services such Persons provided in respect of the Assets in the ordinary course of business, and (D) comply, in all material respects, with all Applicable Laws and Orders applicable to the Assets (*provided*, *however*, that no action by any Selling Entity with respect to any of the matters addressed by Section 7.02(a)(ii) shall be deemed a breach of any of clauses (A) through (D) unless such action would constitute a breach of such Section 7.02(a)(ii)); and

(ii)     Seller will not, and will cause its Subsidiaries (including the Acquired Entities) not to, solely with respect to the Assets:

(A)     liquidate, dissolve, recapitalize or otherwise wind up its operations of the Business or the Acquired Entities;

(B)     terminate, cancel, materially amend or modify, grant a material waiver or consent with respect to or extend any Material Contract, or enter in to any Contract that would be a Material Contract, in each case other than in the ordinary course of business;

(C)     except for the India Distribution Agreement, sell, lease, transfer, abandon, terminate, permit to lapse, fail to maintain, exclusively license, assign or otherwise dispose of any of the Assigned Contracts or other material Assets, in each case other than in the ordinary course of business;

(D)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any material assets, securities, properties, interests or businesses for the conduct of the Business, in each case other than purchases of inventory in the ordinary course of business;

(E)     other than as permitted by Section 7.02(a)(ii)(D), make any material loans, advances or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller) with respect to the Business, other than advances to employees in the ordinary course of business;

(F)     subject any of the Assets or any assets or properties of any Acquired Entity to any Encumbrances, except for Permitted Encumbrances;

(G)     enter into any agreement or arrangement that materially limits or otherwise restricts in any material respect the conduct of the Business or the use or salability of the Assets or that would reasonably be expected to, after the Closing

NAI-1538018312v20

Date, limit or restrict in any material respect the Business or Buyer's use of the Assets;

(H)    change its accounting methods, policies or practices, in each case as they relate to the Assets;

(I)    commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Assets or any assets of the Acquired Entities or impair title thereto;

(J)    other than as required by Applicable Law or by the terms of any Seller Benefit Plan as in effect on the date hereof, (1) increase or materially decrease the compensation, bonus or other benefits of any Company Employee or any employee of any Acquired Entity or (2) establish, adopt or amend any Collective Bargaining Agreement or Seller Benefit Plan (other than as contemplated under this Agreement);

(K)    (1) involuntarily terminate the employment (other than for cause) of any Company Employee or any employee of an Acquired Entity with a base salary of $125,000 or more, or (2) hire any employee to become a Company Employee or any employee of an Acquired Entity with a base salary of $125,000 or more;

(L)    cancel or modify any Insurance Policy, except where replaced with a substantially similar policy;

(M)    amend any Tax Returns, settle or compromise any audit with respect to Taxes, make or change any Tax election, change or adopt any method of Tax accounting, or take any other action that could reasonably be expected to affect Taxes with respect to the Assets or the Acquired Entities for any Post-Closing Tax Period (or portion thereof);

(N)    adopt any amendments to the governing documents of the Acquired Entities;

(O)    (1) authorize for issuance, grant, issue, deliver or sell, or agree or commit to grant, issue, deliver or sell (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), or accelerate the vesting of any stock or equity interest of any class or any other securities or equity equivalents (including any options) of the Acquired Entities, (2) enter into any Contract with respect to the foregoing, or (3) grant, or agree or commit to grant, restricted stock, restricted stock units, profits interests, options, phantom units or any other similar equity-based rights in the Acquired Entities;

(P)    take any action (other than any actions required by the Bankruptcy Court or Applicable Law) in breach of the Bidding Procedures Order, the Sale Order or the CCAA Sale Order or any Order made in the Bankruptcy Cases and CCAA Recognition Proceedings;

75

(Q)     (1) reject, terminate or disclaim (other than by expiration in accordance with its terms) any Desired 365 Contract or Material Contract or seek the approval of the Bankruptcy Court or CCAA Court to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a Third Party to so terminate (including any action by a Third Party to obtain Bankruptcy Court approval to terminate) any such Contract, except in each case, to the extent Buyer has indicated in writing that it wishes the Selling Entities to terminate or reject such Contract;

(R)     with respect to any Asset (1) agree to allow relief from the stay of proceedings in the Bankruptcy Cases or the CCAA Recognition Proceedings without the prior written consent of Buyer; or (2) fail to use commercially reasonable efforts to oppose any action by a Third Party to obtain relief from the stay of proceedings in the Bankruptcy Cases or the CCAA Recognition Proceedings;

(S)     voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any Third Party in pursuing or seeking, a dismissal of or abstention of the Bankruptcy Court from any of the Bankruptcy Cases, conversion of any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code or the appointment of an examiner with expanded powers in any of the Bankruptcy Cases or any trustee, receiver or monitor is appointed in the CCAA Recognition Proceedings or in any Canadian bankruptcy, proposal or CCAA proceedings in respect of any Seller; or

(T)     agree or commit to do any of the foregoing.

Section 7.03     *Commercially Reasonable Efforts.*

Subject to Section 7.04, Seller, on the one hand, and Buyer, on the other hand, will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent to the other party's obligations to consummate the Closing set forth in Article 9, Article 10 and Article 11 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.  Nothing in this Section 7.03 will require Buyer, Seller or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to waive any right under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

76

Section 7.04    *Regulatory Approvals.*

(a)    Buyer and Seller will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other applicable Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within five Business Days after the date of this Agreement in the case of all filings required under the HSR Act or any other applicable Antitrust Laws (*provided, however*, that with respect to any filing reasonably determined to be required in South Korea or Australia, as applicable, such filing shall only be required to be made within 15 Business Days following the date hereof), (ii) comply at the earliest practicable date with any request under the HSR Act or other Applicable Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice (the "**Antitrust Division**") or any other Governmental Authority in respect of such filings or such transactions, and (iii) cooperate with each other in connection with (A) any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith), (B) resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Authority under any Applicable Laws with respect to any such filing or any such transaction, and (C) updating, transferring, replacing, cancelling or obtaining the Permits set forth in Schedule 7.04. Each such Party will use reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated by this Agreement. Each such Party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. No Party hereto will independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend or participate. Subject to Applicable Law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to Proceedings under the HSR Act or other Applicable Laws. Seller and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.04 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Buyer, as the case may be). Notwithstanding the foregoing or anything to the contrary in this Agreement, no Party shall (or shall permit any of its Affiliates to) commit to or agree with any Governmental Authority to stay, toll, or extend, any applicable waiting period or enter into any similar timing agreement or agree to withdraw its filing under the HSR Act or any other antitrust Applicable Laws, without the prior written consent of the other Parties (not to be unreasonably withheld, conditioned or delayed); provided, however, that, upon the reasonable request of Seller, Buyer shall promptly withdraw its filing pursuant to the HSR Act and shall refile its filing pursuant to the HSR Act within two Business Days of such withdrawal.

77

(b)     Buyer understands and agrees that Buyer will use its reasonable best efforts to take, and will cause its Affiliates to take, all actions necessary to obtain all Governmental Authorizations and to avoid or eliminate each and every impediment under any Applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to occur as soon as possible (and in any event prior to the Outside Date), including not effecting any transaction or entering into any agreement to effect any transaction (including any merger or acquisition) that might materially increase the risk of any Governmental Authority seeking or entering any injunction or other order or decree prohibiting the consummation of the transactions contemplated by this Agreement; *provided* that the Parties hereto understand and agree that the reasonable best efforts of Buyer, solely for purposes of this Section 7.04(b), will not be deemed to require: (i) entering into any settlement, undertaking, consent decree, stipulation or agreement with or required by any Governmental Authority in connection with the transactions contemplated hereby; (ii) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of businesses, product lines or assets, including the assets of Buyer or any of its Affiliates or the Assets; (iii) terminating existing relationships, contractual rights or obligations of Buyer or its Affiliates (including those relating to the Assets); or (iv) otherwise taking or committing to take actions that after the Closing would limit Buyer's or its Affiliates' freedom of action with respect to, or its ability to retain or exercise rights of ownership or control with respect to, one or more of the businesses, product lines or assets of Buyer or its Affiliates (including the Assets).

Section 7.05     *Bankruptcy Court Approval.*

(a)     Each of the Selling Entities and Buyer acknowledges that this Agreement and the sale of the Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court and CCAA Court approval.  Buyer acknowledges that (i) to obtain such approval, the Debtor Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court or required by the CCAA Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code and CCAA, as applicable, with respect to each Desired 365 Contract.

(b)     If this Agreement and the sale of the Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, (i) Buyer agrees that it will promptly take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and the CCAA Sale Order and a finding of adequate assurance of future performance by Buyer of the Desired 365 Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court and CCAA Court, as applicable, for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (ii) Buyer and the Selling Entities agree to use commercially reasonable efforts to cause (A) the Bankruptcy Court to enter the Sale Order with such changes or modifications as may be requested by Buyer or Seller that are consented to in the sole discretion of the Buyer, and (B) the CCAA Court to enter the CCAA Sale Order.  In the event the entry of the Sale Order or CCAA Sale Order is appealed,

each of the Debtor Selling Entities and Buyer will use their commercially reasonable efforts to defend such appeal(s).

(c)     The Debtor Selling Entities will give Buyer reasonable advance notice and proposed drafts of (i) all pleadings, motions, affidavits, Orders, applications, schedules, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court or the CCAA Court, as applicable, unless such advance notice is impossible or impracticable under the circumstances, in which case the Debtor Selling Entities will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court or the CCAA Court, as applicable, and (ii) the proposed service lists in connection with any motion seeking entry of the CCAA Sale Order prior to service of materials in connection therewith and, in each case of foregoing clause (i) and (ii), consult in advance and in good faith with Buyer regarding the form and substance of any such proposed filing and any such service list, as applicable.

(d)     The Debtor Selling Entities covenant and agree that if the Sale Order is entered, the terms of any plan of reorganization or liquidation, or any structured dismissal, of any of the Bankruptcy Cases or the CCAA Recognition Proceedings, submitted by the Debtor Selling Entities to the Bankruptcy Court and (as applicable) the CCAA Court for confirmation, sanction or recognition (as applicable) will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated hereby, including any transaction that is contemplated by or approved pursuant to the Sale Order and the CCAA Sale Order.

Section 7.06   *Alternative Proposals.*

Buyer agrees and acknowledges that the Selling Entities, including through their respective Representatives, are and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Assets, and are and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Bidding Procedures.

Section 7.07   *Damage or Destruction.*

Until the Closing, the Assets shall remain at the risk of the Selling Entities.  In the event of any material damage to or destruction of any of the Assets after the date hereof and prior to the Closing (in any such case, a "**Damage or Destruction Loss**"), Seller shall give prompt written notice thereof to Buyer.  If any such Damage or Destruction Loss is covered by insurance policies and, if such damage or destruction is to a Facility, is not repaired or replaced by a similar facility in reasonable proximity to such damaged Facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing in accordance with Section 2.01(b)(xi).

79

Section 7.08   *Buyer Efforts to Obtain Financing.*

(a)      Buyer shall use (and shall cause each of its Affiliates and Representatives to use) its reasonable best efforts to arrange and obtain the Financing on terms and conditions not less favorable than those described in the Financing Commitment Letters (including any flex provisions)), including to take all actions that are necessary, proper or advisable to as promptly as practicable obtain the Financing in a quantum sufficient to consummate the transactions contemplated hereby and to pay all applicable amounts hereunder, including taking all actions that are necessary, proper or advisable to: (i) maintain in effect the Financing Commitment Letters and to obtain and maintain in effect such other definitive documentation as necessary to effectuate the Debt Financing at or prior to Closing (the "**Debt Financing Agreements**"); (ii) negotiate and enter into the Debt Financing Agreements on the terms and conditions contained in the Financing Commitment Letters (including any flex provisions); (iii) satisfy, or obtain a waiver thereof, on a timely basis all conditions to funding under the Financing Commitment Letters and such definitive agreements thereto, (iv) consummate the Financing at or prior to the Closing and (v) enforce their rights under the Financing Commitment Letters. Buyer shall not amend, supplement or otherwise modify or waive its rights under the Equity Commitment Letter if such amendment, supplement, modification or waiver would (1) impose new or additional conditions precedent or expand upon the conditions precedent to the Equity Financing as set forth in the existing Equity Commitment Letters, (2) reduce the aggregate amount of available Equity Financing to less than the amount required to consummate the transactions contemplated by this Agreement or (3) otherwise reasonably be expected to delay or prevent the Closing. Buyer shall furnish true and complete copies of the Debt Financing Agreements and any fully executed commitment letter, fee letter, annexes, exhibits, schedule and other attachment associated therewith to Seller promptly upon their execution.

(b)      Buyer shall from time to time keep Seller reasonably informed with respect to all material activity concerning the status of the Financing contemplated by the Financing Commitment Letters and shall give Seller notice of any material adverse change with respect to the Debt Financing as promptly as practicable. Without limiting the generality of the foregoing, Buyer shall, as promptly as reasonably practicable after obtaining Knowledge thereof, give Seller notice of: (w) the termination, repudiation, rescission, cancellation or expiration of the Financing Commitment Letters and the Debt Financing Agreements, (x) any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach or default) by any party to any of the Financing Commitment Letters or the Debt Financing Agreements in each case of which Buyer becomes aware, (y) the receipt of any written notice or other written communication, in each case received from any Debt Financing Source or Equity Financing Source with respect to any (1) breach of Buyer's obligations under the Financing Commitment Letters or the Debt Financing Agreements, or actual or potential default, termination or repudiation by any party to any of the Financing Commitment Letters or the Debt Financing Agreements (including any proposal by any Debt Financing Source or Equity Financing Source or other Person to withdraw, terminate, repudiate, rescind or make a material change in the terms of (including the amount of Financing contemplated) any Financing Commitment Letters) or (2) material dispute between or among any parties to the Financing Commitment Letters or the Debt Financing Agreements or any provisions of any of the Financing Commitment Letters, in each case, with respect to the obligation to fund the Debt Financing or the amount of the Financing to be funded at Closing and (z) of the receipt of any written notice or other written communication

80

on the basis of which Buyer reasonably expects that a party to the Financing Commitment Letters will fail to fund the relevant Financing or is reducing the amount of the Financing.  As soon as reasonably practicable, but in any event within two Business Days of the date of Seller's written request to Buyer, Buyer shall provide any information reasonably requested by Seller relating to any circumstance referred to in clauses (w)-(z) of the immediately preceding sentence.

(c)      Buyer shall have the right from time to time to amend, supplement or otherwise modify the Debt Commitment Letter to add and appoint additional arrangers, bookrunners, underwriters, agents, lenders and similar entities, to provide for the assignment and reallocation of a portion of the financing commitments contained therein and to grant customary approval rights to such additional arrangers and other entities in connection with such appointments; *provided* that, no such amendment, supplement or other modification shall (i) reduce (or have the effect of reducing) the aggregate amount of available Debt Financing (including by increasing the amount of fees to be paid or original issue discount (except as set forth in any "market flex" provisions existing on the date of this Agreement)) to less than the amount required to consummate the transactions contemplated by this Agreement, unless there is a corresponding increase in the Equity Financing, (ii) impose new or additional conditions precedent or expand upon the conditions precedent to the Debt Commitment Letter as set forth in the existing Debt Commitment Letter in a manner that could be expected to (A) make the timely funding of the Debt Financing, or the satisfaction of the conditions to obtaining the Financing less likely to occur when required pursuant to the terms hereof or (B) adversely impact the ability of either Buyer or Seller to enforce its rights against other parties to the Debt Commitment Letter, (iii) adversely change the timing of the funding of the Debt Financing thereunder, (iv) be reasonably expected to impair, delay or prevent the availability of all or a portion of the Debt Financing or the consummation of the transactions contemplated by this Agreement, or (v) otherwise materially adversely affect the ability of Buyer to enforce its rights under the Debt Commitment Letter or to consummate the transactions contemplated by this Agreement or the timing of the Closing, including by making the funding of the Financing less likely to occur. Buyer shall furnish to Seller a copy of any executed written amendment, supplement, replacement, substitution, termination, modification or waiver of the Debt Commitment Letter. Buyer shall not permit or consent to or agree to any amendment, restatement, replacement, supplement, termination or other modification or waiver of any provision or remedy under, the Equity Commitment Letter (other than to increase the amount of Equity Financing available thereunder). Buyer shall furnish to Seller a copy of any executed written amendment, restatement, replacement, supplement, modification, waiver or consent of or relating to the Equity Commitment Letter promptly upon execution of definitive agreements related to the Equity Financing thereof. For purposes of this Agreement, references to the "Debt Commitment Letter", the "Equity Commitment Letter" and the "Financing Commitment Letters" shall include any such document as permitted or required by this Section 7.08(c) to be amended, supplemented, replaced, supplemented or otherwise modified or waived, in each case from and after such amendment, supplement, replacement, supplement or other modification or waiver and, for the avoidance of doubt, references to "Equity Financing" and "Debt Financing" shall include, in whole or in part (as applicable), any supplemental, replacement or substitute financing provided for thereunder.

(d)      In the event that any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated by the Debt Commitment Letter (including the flex provisions), and such portion is required to consummate the transactions contemplated by this Agreement on

81

or prior to the Closing Date, (i) Buyer shall promptly notify Seller and (ii) Buyer shall use (and shall cause each of its Affiliates and Representatives to use) its reasonable best efforts to (A) arrange and obtain, as promptly as practicable following the occurrence of such event, any such portion from alternative sources, on terms, taken as whole, that are no more adverse to Buyer (including after giving effect to the market flex provisions) ("**Alternative Financing**") and (B) provide Seller with a copy of the new financing commitment that provides for such Alternative Financing (including all related exhibits, schedules, annexes, supplements and term sheets thereto, and including any related fee letter, which may be redacted in a manner consistent with debt commitment fee letter delivered to Seller on or about the date hereof) (the "**Alternative Financing Commitment Letter**"); *provided* that the terms of such Alternative Financing shall not (A) impose additional conditions precedent or materially expand upon the conditions precedent to the Debt Financing as set forth in the existing Debt Commitment Letter, (B) reduce the aggregate amount of available Debt Financing to less than the amount required to consummate the transactions contemplated by this Agreement or (C) otherwise reasonably be expected to delay or prevent the Closing. As applicable, references in this Agreement to (x) the Debt Financing shall include such Alternative Financing and (y) the Debt Commitment Letter shall include the Alternative Financing Commitment Letter.

Section 7.09    *Seller Obligations in Respect of the Debt Financing.*

(a)    Prior to the Closing, Seller shall use its reasonable efforts to provide to Buyer and shall use its reasonable efforts to cause its Representatives to provide to Buyer, such assistance and cooperation as is customary for debt financings of the type contemplated by the Debt Commitment Letter and as is reasonably requested by Buyer and that is necessary in connection with arranging and obtaining the Debt Financing, including (i) participation in a reasonable number of virtual meetings, presentations, road shows, drafting sessions and due diligence sessions that are customary for financings of a type similar to the Debt Financing, (ii) as promptly as reasonably practicable, furnishing Buyer, its Affiliates and its financing sources with financial and other pertinent materials and information regarding Seller within Seller's possession as may be reasonably requested by Buyer and necessary to satisfy the conditions set forth in the Debt Commitment Letter, (iii) assisting Buyer in a commercially reasonable manner with the preparation of customary marketing materials, including lender and investor presentations, and similar documents and materials reasonably requested by Buyer in connection with the Debt Financings, (iv) facilitating the pledging of collateral to the extent reasonably requested by Buyer (which shall only be effective at Closing), including delivering possessory collateral (such as certificated equity and promissory notes) within its possession to Buyer (or its designee), (v) promptly, and in any event no later than three Business Days prior to the Closing Date, provide documentation and other information reasonably requested by Buyer at least ten Business Days prior to the Closing Date and requested to satisfy an express condition precedent to the funding of the Debt Financing pursuant to the Debt Commitment and otherwise required to evidence compliance with the Patriot Act of 2001, antiterrorism legislation, "know-your-customer" and anti-money-laundering rules and regulations, (vi) executing and delivering customary authorization letters relating to the Debt Financing, (vii) executing and delivering customary prepayment notices with respect to the DIP Credit Facilities relating to the prepayment of the indebtedness thereunder to be prepaid or repaid at the Closing, and (viii)(A) to the extent the Closing of the transactions contemplated by this Agreement occurs prior to the consummation of the transactions contemplated by the Appliances APA, arranging for the delivery to Buyer of an executed

82

prepayment notice confirmation (each, a "**Prepayment Notice Confirmation**") from the applicable administrative agent or other similar agent under each of the DIP Credit Facilities (and, in the case of the Term DIP Credit Facility, executed and delivered by each Buyer DIP Lender), which Prepayment Notice Confirmations shall (x) indicate (1) the total amount to be paid in respect of the applicable DIP Credit Facility as of the anticipated Closing Date (such total amount with respect to each DIP Credit Facility, the "**Prepayment Amount**") and (2) solely in the case of the Term DIP Credit Facility, the Round-Tripping Amount (which shall constitute a portion of, and not an addition to, the Prepayment Amount in respect of the Term DIP Credit Facility), (y) provide wire instructions to make the applicable Prepayment Amount and state that each Buyer DIP Lender agrees that pursuant to the transactions contemplated by this Agreement, the Round-Tripping Amount of the applicable Prepayment Amount shall be deemed automatically and irrevocably satisfied on a cashless basis upon the occurrence of the Closing and (z) state that all Encumbrances, guaranties and security interests relating to the Assets and securing obligations under the applicable DIP Credit Facility shall be, upon the payment of such Prepayment Amount, automatically released and terminated (provided, that this Section 7.09 shall not require any Selling Entity or any of its Subsidiaries to cause such prepayment, release and termination unless the Closing shall occur substantially concurrently therewith) and (B) to the extent the Closing of the transactions contemplated by this Agreement occurs after the consummation of the transactions contemplated by the Appliances APA, arranging for the delivery to Buyer of executed pay-off letters (each, a "**Payoff Letter**") in customary form and substance from the applicable administrative agent or other similar agent under each of the DIP Credit Facilities (and, in the case of the Term DIP Credit Facility, executed and delivered by each Buyer DIP Lender), which Payoff Letters shall (x) indicate (1) the total amount required to be paid to fully satisfy all principal, interest, prepayment premiums, penalties or similar obligations under the applicable DIP Credit Facility as of the anticipated Closing Date (and the daily accrual thereafter) (such total amount with respect to each DIP Credit Facility, the "**Payoff Amount**") and (2) solely in the case of the Payoff Letter for the Term DIP Credit Facility, the Round-Tripping Amount (which shall constitute a portion of, and not an addition to, the Payoff Amount in respect of the Term DIP Credit Facility), (y) provide wire instructions to make the applicable Payoff Amount and state that upon receipt of the applicable Payoff Amount in accordance with such wire instructions, the applicable DIP Credit Facility and related instruments evidencing such DIP Credit Facility shall be automatically terminated (except for provisions in such DIP Credit Facility that, by their express terms, survive such termination) (provided that, solely with respect to the Term DIP Credit Facility, the applicable Payoff Letter shall also state that each Buyer DIP Lender agrees that pursuant to the transactions contemplated by this Agreement, the Round-Tripping Amount of the applicable Payoff Amount shall be deemed automatically and irrevocably satisfied on a cashless basis upon the occurrence of the Closing), and (z) state that all Encumbrances, guaranties, security interests, collateral and agreements to subordinate in connection therewith relating to the assets and properties of the Selling Entities and any of their respective Subsidiaries securing such obligations thereunder shall be, upon the payment of such Payoff Amount, automatically released and terminated (provided, that this Section 7.09 shall not require any Selling Entity or any of its Subsidiaries to cause such repayment, release and termination unless the Closing shall occur substantially concurrently therewith); provided, however, that nothing herein shall require Seller to (1) take any action that would be effective prior to the Closing to the extent it would, in Seller's reasonable judgment, interfere unreasonably with the business or operations of Seller, (2) furnish any information not customarily required for completion of debt financings similar to the Debt

83

Financing, (3) prepare any financial information in compliance with Regulation S-X or (4) cause its officers, employees or advisors to take any action in person if Seller reasonably determines that it would compromise the health or safety of any employee of Seller or any Subsidiary in light of COVID-19.

(b)     Neither Seller nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or make any other payment or incur any other liability or provide or agree to provide any indemnity in connection with the Financings or any of the foregoing that would be effective prior to the Closing.  None of Seller, the Subsidiaries of Seller or their respective Affiliates or Representatives shall be required to execute or enter into or perform any agreement with respect to the financings contemplated by the Financing Letters that is not contingent upon the Closing or that would be effective prior to the Closing.  Notwithstanding anything to the contrary contained herein, nothing in this Section 7.09 shall require any cooperation or assistance to the extent it would: (i) require Seller to amend any terms of this Agreement; (ii) require Seller or any of its Affiliates to take any action that would (A) subject any director, manager, officer or employee of Seller or any of its Affiliates or other respective Representatives to any actual or potential personal liability, (B) conflict with, violate or result in a breach of or a default under any organizational documents of Seller or any of its Affiliates, any Contract or Applicable Law, (C) require providing access to or disclose information that Seller reasonably determines could jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Seller or any of its Affiliates; *provided* that, Seller or any of its Affiliates shall use their commercially reasonable efforts to disclose such information to Buyer without disclosing such privileged or confidential information (for example, by redacting such information as reasonably necessary (in the good faith determination of Seller) to avoid such disclosure or providing a summary of such information which would not result in a waiver of privilege) or (D) require any such entity to change any fiscal period; or (iii) require any director or manager of Seller or any Subsidiary to pass resolutions or consents to approve or authorize the execution of the Debt Financing.  Buyer shall indemnify and hold harmless Seller, its Affiliates and their respective Representatives from and against any and all losses, costs, damages, claims, fines, fees, penalties, liabilities, deficiencies, demands, judgments, actions, obligations, settlement payments or expenses (including reasonable and documented out-of-pocket fees and expenses of outside attorneys) suffered or incurred by any of them of any type in connection with the arrangement of any Financing and any information used in connection therewith (collectively, the "**Financing Cooperation Indemnity**").  Whether or not the Closing occurs, Buyer shall, promptly upon request by Seller, reimburse Seller for all out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) incurred by Seller or any of its Affiliates or Representatives in connection with this Section 7.09 (collectively, the "**Financing Cooperation Expenses**") and the foregoing obligations shall survive termination of this Agreement; <u>provided</u> that the Financing Cooperation Expenses shall not include general legal or other expenses Seller or any of its Affiliates or Representatives would have incurred regardless of whether cooperation was requested pursuant to this Section 7.09. All information provided by Seller or any of its Affiliates or any of their respective Representatives pursuant to this Section 7.09 shall be kept confidential in accordance with the Confidentiality Agreement, except that Buyer shall be permitted to disclose such information to the Debt Financing Sources, rating agencies and prospective lenders during primary syndication of the Debt Financing subject to such Persons entering into customary confidentiality undertakings reasonably satisfactory to Seller with respect to such information. Notwithstanding anything to the contrary, the condition set forth in Section 9.02(a), as it applies

84

to Seller's obligations under this Section 7.09, shall be deemed satisfied unless (A) Seller has materially breached its obligations under this Section 7.09, (B) Buyer has notified Seller of such material breach in writing with a reasonably sufficient amount of time prior to the Closing to afford Seller with a reasonable opportunity to cure such material breach and (C) such material breach was a proximate cause of Buyer's failure to receive any portion of the proceeds of the Debt Financing.

(c)      Buyer and Seller agree that, if in connection with Buyer's (i) amendment, supplement, replacement, or modification of any Debt Commitment Letter not prohibited by Section 7.08 or (ii) execution of an Alternative Financing Commitment Letter or Alternative Financing, the scope of the assistance required under this Section 7.09 as compared to the assistance that would be required or reasonably expected to be required in connection with the Debt Commitment Letter in effect on the date of this Agreement and the related Debt Financing is changed or expanded, Seller shall be deemed to have complied with this Section 7.09 for purposes of Section 9.02(a) if Seller has provided Buyer with the assistance that would otherwise be required under this Section 7.09 with respect to the Debt Commitment Letter in effect on the date of this Agreement and the related Debt Financing (but applied to the financing contemplated by such amended, supplemented, replaced, or modified Debt Commitment Letter or such Alternative Financing, as applicable), in each case without giving effect to any such amendment, supplement, replacement, or modification or Alternative Financing Commitment Letter or Alternative Financing, as applicable, to the extent that it provides for such additional or different requirements.

(d)      Seller and its Subsidiaries hereby consent to the use of their respective logos in marketing materials for the Debt Financing; *provided*, *however*, that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage Seller or any of its Subsidiaries or the reputation or goodwill of Seller or any of its Subsidiaries.

Section 7.10   *Additional Selling Entities.*

If, at any time after the date of this Agreement either Party discovers that any of the rights, interests, properties, or other assets constituting the Assets is owned by a Subsidiary of Seller who is not a Selling Entity, Seller shall promptly cause such Subsidiary to become a Selling Entity hereunder as if an original party hereto, to deliver a joinder in form and substance reasonably acceptable to Buyer and, subject to Section 2.06, to promptly transfer (or cause to be transferred) such Assets to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA.  Prior to any such transfer, the applicable Subsidiary of Seller possessing any such Asset will hold it in trust for the benefit of Buyer.

Section 7.11   *Public Announcements; Filings.*

No Party nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby, without the prior written approval of the other Parties, not to be unreasonably withheld, delayed or conditioned.  Notwithstanding the immediately preceding sentence, in the event any Party reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court, the CCAA Court or otherwise under Applicable Law, such Party shall give the other Parties advance written notice of, and a

meaningful opportunity (as reasonably practicable under the circumstances) to review and comment on, the proposed timing, manner, form and substance of any such filing, but prior written approval shall not be required. The Party whose proposed filing is the subject of review shall reasonably consider carefully and in good faith all comments timely received from the other Parties. Nothing herein shall prevent any Party or any Affiliate thereof which is a private equity or other investment fund from making customary disclosures on a confidential basis to its existing or prospective investors, managers, members, directors, officers, financing sources, direct and indirect partners and agents in connection with fundraising, marketing informational or reporting activities. The Parties and any of their respective Affiliates or successors may also issue press releases or make web postings or other public announcements that include only such information that was previously included in any press release or announcement made in accordance with the first sentence of this Section 7.11.

Section 7.12    *Alternate Bidder.*

If an Auction is conducted, and the Selling Entities do not choose Buyer as the Successful Bidder, but instead choose Buyer as the Alternate Bidder in accordance with the Bidding Procedures, Buyer will serve as the Alternate Bidder. If Buyer is chosen as the Alternate Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of the closing of the sale of the Assets to the Successful Bidder and the Outside Date. If the Superior Proposal with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

Section 7.13    *Sale Free and Clear.*

The Selling Entities acknowledge and agree, and the Sale Order and CCAA Sale Order shall be drafted to provide, without limitation, that, except as expressly provided in this Agreement, (a) on the Closing Date and concurrently with the Closing, all then-existing Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) against or created by Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA, shall be fully released from and with respect to the Assets and (b) Buyer is not a successor to any Selling Entity or the bankruptcy estate by reason of any theory of law or equity, and Buyer shall not assume or in any way be responsible for any Liability of the Selling Entities or any of their Affiliates (other than, for the avoidance of doubt, indirectly by means of the acquisition of the Acquired Entities) or the bankruptcy estate. Notwithstanding the foregoing, on the Closing Date, the Assets shall be transferred to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA.

Section 7.14    *Acquired Entity Intercompany Obligations*.

Following the date hereof through the Closing (or the earlier termination of this Agreement pursuant to Article 12), Seller and its Representatives shall reasonably cooperate with Buyer and

86

its Representatives to identify any Acquired Entity Intercompany Obligations that are reasonably likely to result in material and adverse Tax consequences to Buyer or any Acquired Entity at or following the Closing in connection the assignment and assumption of such Acquired Entity Intercompany Obligation to Buyer and, upon the written request of Buyer, Seller shall use its commercially reasonable efforts to settle or terminate such Acquired Entity Intercompany Obligation prior to the Closing, in each case, unless otherwise mutually agreed to by Seller and Buyer, solely to the extent such settlement or termination would not be reasonably expected to have any material and adverse Tax consequences to any Acquired Entity for any Pre-Closing Tax Period or any Seller Entity (including any Tax costs that would be incurred by any Seller Entity or Acquired Entity in connection with such settlement or termination) as reasonably determined in good faith by Seller; *provided, however*, in no event shall Seller's failure to cause such Acquired Entity Intercompany Obligation to be settled or terminated result in the breach of this Section 7.14 or in the failure of the condition set forth in Section 9.02 to be satisfied and, in such event, Buyer will assume such Acquired Entity Intercompany Obligation effective upon the Closing.

Section 7.15    *Resignations*.

Prior to the Closing, Seller shall use commercially reasonable efforts to obtain the resignation, effective as of the Closing, of each director, officer and manager of the Acquired Entities reasonably requested by Buyer at least five Business Days prior to the Closing.

Section 7.16    *Term DIP Secured Party Investment Opportunity.*

Following the date hereof, Buyer shall, and shall cause its Affiliates to, provide an opportunity for the Term DIP Secured Parties to participate in the transactions contemplated by this Agreement through an equity investment, with an aggregate purchase price of up to $15,000,000, on substantially the same terms and conditions as the Equity Financing made by the Equity Financing Source (including, for the avoidance of doubt, for the same class of security and at the same price per security as the Equity Financing Source is acquiring in such transaction, and otherwise in a *pari passu* manner) and otherwise on terms and conditions reasonably acceptable to the parties as negotiated in good faith.  Notwithstanding anything herein to the contrary in no event shall (i) the failure of Buyer and the Term DIP Secured Parties to agree on an investment be deemed to be a breach by Buyer of this Section 7.16, so long as Buyer has acted in good faith to negotiate and consummate the transactions contemplated by this Section 7.16 with the Term DIP Secured Parties (including with respect to the *pari passu* nature of the investment as contemplated herein); provided, for the avoidance of doubt, in no event shall Buyer's actual or alleged breach (material or otherwise) of this Section 7.16 result in the failure of the condition set forth in 11.02 to be satisfied, or (ii) such investment be a condition to close hereunder or otherwise be a requirement of Buyer's or the Selling Entities' obligations to close under this Agreement.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

Section 8.01    *Taxes.*

(a)    *Transfer Taxes.*  Buyer shall be responsible for all documentary, stamp, transaction, transfer (including real property transfer), registration, motor vehicle registration, sales, use, value

added, excise and other similar non-income Taxes, including Canadian Sales Taxes and Australian GST (subject to an in accordance with Section 8.01(i)), and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes. Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes, including using commercially reasonable efforts to avail themselves of any available Tax elections to reduce or eliminate any such Transfer Taxes. To the extent Seller or any of its Subsidiaries is required by Applicable Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Buyer will remit an amount equal to such Transfer Taxes to Seller not less than five Business Days prior to the due date for such payment.

(b)     The Canadian Buyer and each Canadian Seller shall, to the extent applicable, jointly make election(s) under subsection 167(1) of the ETA (and any Canadian provincial equivalent) in respect of the sale of the Canadian Assets, in the prescribed form, such that no Canadian GST/HST (or any Canadian provincial equivalent) is payable in respect of such sale. The Canadian Buyer shall timely file such election forms with the appropriate Governmental Authority in the prescribed manner. Notwithstanding such joint elections, in the event it is determined that any Canadian Seller is liable to collect and remit Canadian GST/HST (or any Canadian provincial equivalent) in respect of the sale of the Canadian Assets, the Canadian Buyer shall pay the Canadian GST/HST (or any Canadian provincial equivalent), plus all applicable interest and penalties, to such Canadian Seller for remittance to the appropriate Governmental Authority, and the Canadian Buyer shall indemnify such Canadian Seller and its directors, employees and shareholders harmless with respect to any such Canadian GST/HST (or any Canadian provincial equivalent), interest, penalties or other damages, losses and expenses arising therefrom.

(c)     At the request of the Canadian Buyer, the Canadian Buyer and the Canadian Sellers shall, to the extent applicable, jointly make an election pursuant to section 22 of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of the Canadian Sellers transferring their Accounts Receivable (excluding, for certainty, any Excluded Assets) to the Canadian Buyer as part of the Canadian Assets. The Canadian Buyer and the Canadian Sellers agree to jointly make the necessary election(s) and to execute and file within the prescribed time the prescribed election form(s) required to give effect to the foregoing.

(d)     At the request of the Canadian Buyer, the Canadian Buyer and the Canadian Sellers shall, to the extent applicable, jointly make an election under Section 20(24) of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of amounts for future obligations and shall timely file such election(s) with the appropriate Governmental Authority. To the extent applicable for Canadian Tax purposes, Canadian Sellers and the Canadian Buyer acknowledge that a portion of the Canadian Assets was transferred to the Canadian Buyer as payment by such applicable Canadian Seller to the Canadian Buyer for the assumption by the Canadian Buyer of any such future obligations of such applicable Canadian Seller.

(e)     *Straddle Periods*.  In the case of any Straddle Period, (i) all Property Taxes for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis and (ii) all other Taxes shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period as if the Pre-Closing Tax Period ended at the close of business on the Closing Date.

(f)     *Cooperation and Audits*.  Buyer and its Affiliates, and Seller and its Affiliates will cooperate on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement and the filing of Tax Returns until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

(g)     *Section 338 Election or Check-the-Box Election*. Buyer and Seller shall cooperate in good faith to determine whether to make an election under Section 338(g) or Section 338(e) of the Code (or any similar provision of any state or local Law) with respect to any Acquired Entity or to make a check-the-box election in respect of any Acquired Entity on or prior to the Closing Date, in each case, taking into account the benefit and detriment of making such election to each Party.

(h)     *Section 245A Election*. If Buyer requests (in its sole discretion), the Selling Entities shall make (or shall cause their relevant Affiliates to make) an election pursuant to Treasury Regulations Section 1.245A-5(e)(3)(i) (and any corresponding elections under applicable state or local law) with respect to any Acquired Entity for which such an election is available.

(i)     *Indirect Transfer Tax Filing*.  Any PRC income Taxes on capital gains attributable to the indirect transfer of the equity interests in Corelle Brands Shanghai (Co.), Ltd. Will be for the account of Seller.  Notwithstanding anything to contrary provided in this Agreement, the Parties irrevocably agree that the Seller shall be solely responsible for any related PRC Tax filing and reporting, as further detailed herein.

(i)     Seller shall make all filings or disclosures with the competent PRC Tax Authority as required in connection with the indirect transfer of 100% equity interests in Corelle Brands (Shanghai) Co., Ltd., including any filings or notices required to be made to the PRC Tax Authority in accordance with the Announcement 7 (the "**Indirect Transfer Report**"), promptly after the signing of this Agreement (and in any event within 30 days). If Buyer or any Acquired Entity directly receives from any PRC Tax Authority any determination, order, ruling, assessment or notice in connection with Announcement 7, Buyer shall promptly notify Seller of the same, provide Seller with such determination, order, ruling, assessment or notice within five days of receipt, and consult in good faith with Seller and obtain Seller's consent (such consent not to be unreasonably withheld or delayed) before submitting any response to the relevant PRC Tax Authority that may be required.

(ii)     Seller and Buyer acknowledge and agree that Seller shall have the sole right and discretion to communicate and negotiate with the PRC Tax Authority, to dispute or appeal the requests or decisions of the PRC Tax Authority, and to reach any settlement on

89

any relevant issues with the PRC Tax Authority in connection with the assessment of the PRC Taxes as a result of the indirect transfer.

(iii)    Seller shall file PRC income Tax Returns and pay to the PRC Tax Authority any PRC income Taxes on capital gains finally assessed thereby. If and to the extent a final and irrevocable tax assessment is imposed on Seller by the PRC Tax Authority in respect of the Announcement 7, Seller will after such assessment has become final and irrevocable, provide a copy of such assessment to Buyer.

(iv)    Seller will prepare all the required documents and bear the reasonable expenses and cost with respect to the preparation and filing of the Indirect Transfer Report and PRC income Tax Returns. Buyer shall, or shall procure that its relevant Affiliates shall, provide any information requested by Seller and necessary for the preparation of such documents and take any action reasonably required for the filing of the Indirect Transfer Report and PRC income Tax Returns without undue delay. Seller shall within five Business Days after Seller having received the same, provide to Buyer: a copy of the acceptable evidence of the Indirect Transfer Report under the Announcement 7; a copy of the relevant PRC income Tax Return; and a copy of the payment receipt of PRC income Taxes.

(v)    The Selling Entities shall jointly and severally indemnify and hold harmless Buyer (or any of its Affiliates) from and against all losses or costs which Buyer (or any of its Affiliates) may suffer as a result of any failure of Seller to comply with its obligations under this Section 8.01(h).

(j)    *Australian GST*.  If Australian GST is payable on a supply made under or in connection with this Agreement, for which the consideration is not expressly stated to be GST inclusive, the party providing the consideration for that supply must pay to the supplier as additional consideration an amount equal to the amount of GST payable on that supply (the "**Australian GST Amount**").  The Australian GST Amount is payable at the same time and in the same manner that the other consideration for the supply is provided, except that the Australian GST Amount need not be paid until the supplier gives a tax invoice to the recipient of the supply. Where any indemnity, reimbursement or similar payment under this Agreement is based on any cost, expense or other liability incurred under this Agreement, it will be reduced by an amount equal to any input tax credit entitlement which the party being reimbursed or indemnified is entitled to in relation to the relevant cost, expense or other liability. If at any time an adjustment is made between the supplier or any other payer of Australian GST and the relevant Governmental Authority on account of Australian GST on any supply made or other matter or thing done under or in connection with this Agreement by the supplier, a corresponding adjustment must be made as between the supplier and the recipient and additionally, any payment required to give effect to that adjustment must be made.  Unless the context requires otherwise, words and expressions that have a defined meaning in the *A New Tax System (Goods and Services Tax) Act 1999* (Cth) will have the same meaning when used in this Section 8.01(i).

(k)    *Foreign Resident CGT Withholding Tax*.

(i)    For the purposes of subsections 14-225(1) and 14-225(2) of Schedule 1 to the TAA, by entering into this Agreement each Selling Entity declares the shares in Instant

Brands (Australia) Pty Ltd. are not, and will not be, indirect Australian real property interests (as defined in section 855-25 of the ITAA 1997), in each case for the six-month period beginning on the date of this Agreement.

(ii)    Buyer acknowledges and agrees that: (A) the declarations in Section 8.01(k)(i) constitute declarations for the purposes of section 14-210(3) and section 14-225(1) and/or 14-225(2) of Schedule 1 to the TAA, given by each of the Selling Entities to Buyer; (B) it does not know the declarations in Section 8.01(k)(i) to be false in respect of each Selling Entity; and (C) as a result of the declarations given in Section 8.01(k)(i)(A) and Section 8.01(k)(ii)(B), it will not (despite any provision to the contrary in this Agreement) withhold an amount under section 14-200 of Schedule 1 to the TAA.

(iii)    If Closing occurs later than six months after the date of this Agreement, each Selling Entity agrees to provide further declarations under Section 8.01(k)(i) immediately prior to the Closing Date.

Section 8.02    *Allocation of Purchase Price.*

(a)    The Parties agree and intend to treat, for applicable Tax purposes, the Round-Tripping Amount as additional consideration for the Assets paid by Buyer to the Seller pursuant to this Agreement, and then deemed utilized to repay outstanding obligations of the Debtor Selling Entities or any of their Affiliates owed to the Buyer DIP Lenders (the "**Intended Tax Treatment**"), unless required by a "determination" as defined under section 1313(a) of the Code.

(b)    The Purchase Price (including the amount of any Assumed Liabilities) and the Round-Tripping Amount (plus any other amounts properly taken into account under the Code or the Tax Act) shall be allocated among the Assets in accordance with Applicable Law (including Section 1060 of the Code and the Treasury regulations promulgated thereunder) and the principles set forth on Schedule 8.02(b)(i) (the "**Allocation**"); *provided*, that the Parties hereby acknowledge and agree that the Estimated Purchase Price shall be initially allocated in accordance with a preliminary allocation among the Assets prepared to the extent necessary to calculate Transfer Taxes and delivered by Buyer to Seller at least five Business Days prior to the Closing Date, which preliminary allocation shall be used for purposes of calculating any Transfer Taxes due and payable prior to the determination of the final Allocation (the "**Initial Allocation**"). The Allocation (which shall be prepared consistent with the Initial Allocation, except as otherwise required by Applicable Law) shall be delivered by Buyer to Seller within 60 days following the final determination of the NWC Adjustment Amount, the Cure Costs Adjustment and the Closing Acquired Entity Net Figure in accordance with Section 3.04 and Section 3.05, for Seller's review and comment. If, within 30 days after the delivery of the Allocation, Seller notifies Buyer in writing that Seller objects to any allocation set forth thereon, Buyer and Seller shall negotiate in good faith to resolve such objection. In the event that Buyer and Seller are unable to resolve such dispute within 30 days following Seller's notification of such objection, Buyer and Seller shall jointly retain a referee chosen and mutually acceptable to both Buyer and Seller to resolve the disputed items. Upon resolution of the disputed items, the Allocation shall be adjusted to reflect such resolution. The costs, fees and expenses of the referee shall be borne equally by Buyer and Seller.

(c)  (i) Seller and Buyer will report, act and file (and will cause their respective Affiliates to report, act and file) all applicable Tax Returns (including IRS Form 8594 and any Canadian Tax Returns) in all respects and for all purposes consistent with the Allocation and the Intended Tax Treatment and (ii) neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation or the Intended Tax Treatment, except, in each case, to the extent otherwise required by a "determination" as defined under section 1313(a) of the Code.

Section 8.03  *Assigned Contracts; Adequate Assurance and Performance.*

(a)  With respect to each Desired 365 Contract, Buyer will deliver with this Agreement, or as soon as reasonably practicable thereafter, information Buyer reasonably believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Desired 365 Contract as required under Section 365 of the Bankruptcy Code, which information the Selling Entities will be permitted to disseminate to any Third Party that is a party to any Desired 365 Contract upon Seller's determination that this Agreement constitutes a Qualified Bid (as defined in the Bidding Procedures Order). In the event Buyer cannot demonstrate adequate assurance of future performance with respect to a Desired 365 Contract, at Buyer's election, such Desired 365 Contract shall become an Excluded Contract.

(b)  From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)  Without limiting the provisions of Section 8.03(a), Buyer acknowledges that no Selling Entity will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance in effect as of the date hereof to secure performance or payment under any Assigned Contracts, in each case as set forth on Schedule 8.03(c) (collectively, "**Seller Credit Obligations**") after the Closing or otherwise with respect to the Business.  On or before the Closing, Buyer will use its commercially reasonable efforts to obtain from the creditor or other counterparty (or, in the case of letters of credit, bonds or other similar Seller Credit Obligations, the issuing bank (or similar entity) thereof) a full release (in a form and substance reasonably satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or issuing bank (or similar entity), as applicable, or fulfillment of other obligations to a counterparty or issuing bank (or similar entity), as applicable, under the Seller Credit Obligations (including any lenders or other financing parties participating in such letters of credit, bonds or similar Seller Credit Obligations). If any Seller Credit Obligation remains outstanding as of the Closing Date, Buyer will indemnify Seller and its Subsidiaries and hold them harmless against any Liabilities that Seller or any such Subsidiary may incur under any such Seller Credit Obligations attributable to periods from and after the Closing.

(d)  Notwithstanding anything to the contrary contained herein, Buyer will not (i) enter into any transactions after the Closing in the name of Seller or any of its Affiliates or that would be covered by Seller Credit Obligations or (ii) amend, modify, extend or renegotiate any material term of any obligation that is covered by a Seller Credit Obligations in any manner that increases or extends the potential exposure of Seller, any Subsidiary of Seller, or any of its or their respective Affiliates under any Seller Credit Obligations.

92

Section 8.04    *Employee Matters.*

(a)    *Offers of Employment*.  Buyer shall (or shall cause its Affiliates to), within a reasonable period of time (but not fewer than five Business Days) prior to the Closing, make an offer of employment (on an "at will" basis, to the extent allowed by Applicable Law), subject to Buyer's standard onboarding processes as applied in the ordinary course of business, to all of the Company Employees who are employed by a Selling Entity, other than the employees set forth on Schedule 8.04(a) (such employees who are required to receive an offer hereunder, the "***Offer Employees***"), which such offers of employment (x) made to any Offer Employees who are not covered by a collective bargaining or similar agreement shall (i) provide for a primary work location that is no more than 40 miles from the applicable employee's primary work location immediately prior to the Closing, (ii) satisfy the requirements of this Section 8.04 (including by providing for compensation and benefits as set forth in Section 8.04(b)) and (iii) provide for employment with Buyer or its applicable Affiliate commencing effective as of the Closing, subject to the occurrence of the Closing, and (y) made to any Offer Employees who are covered by a Collective Bargaining Agreement shall (1) be on the same terms and conditions as set forth in the applicable Collective Bargaining Agreement, (2) provide such Company Employees with full credit for any seniority accrued while an employee of any of the Selling Entities, (3) provide for employment in the same position, shift and plant location as in effect immediately prior to the Closing, subject to any change made pursuant to the terms of the applicable Collective Bargaining Agreement, (4) otherwise satisfy any other applicable requirements of this Section 8.04 and (5) provide for employment with Buyer or its applicable Subsidiary commencing effective as of the Closing, subject to the occurrence of the Closing (an offer of employment made in accordance with this Section 8.04(a), a "**Qualifying Offer**").  Subject to Applicable Law, any Offer Employee who has received an offer of employment pursuant to this Section 8.04(a) shall be deemed to have accepted such offer if they continue to perform services following the Closing, unless such Offer Employee expressly rejects such offer of employment.  Any Offer Employee who does not become a Transferred Employee will be terminated by Selling Entities and their respective Affiliates.  In the event an Offer Employee does not become a Transferred Employee as a result of such employee's rejection of a Qualifying Offer made by Buyer or its applicable Affiliate, then the applicable Selling Entity shall be responsible for, and shall indemnify Buyer and its respective Affiliates against, any and all damages and Liabilities associated with the termination of employment of any such Offer Employee, as applicable, whether incurred prior to, on or after the Closing, including any employment-related legal claims brought by, and any severance benefits provided to, such Offer Employee.

(b)    *Maintenance of Terms and Conditions*.  For a period of 12 months following the Closing Date, Buyer shall provide, or shall cause its Affiliates to provide, each Transferred Employee not covered by a Collective Bargaining Agreement with (a) a base salary or wage rate that is at least equal to the base salary or wage rate provided to such Transferred Employee immediately prior to the Closing, (b) target short-term cash incentive compensation opportunities (including annual bonus and commission opportunities) that are at least equal to the target short-term cash incentive compensation opportunities (including annual bonus and commission opportunities) provided to such Transferred Employee immediately prior to the Closing and (c) employee benefits (including severance benefits) that are no less favorable in the aggregate than the employee benefits (including severance benefits) provided to such Transferred Employee immediately prior to the Closing.  The terms and conditions of employment for Transferred

93

Employees who are covered by a Collective Bargaining Agreement shall continue to be governed by the applicable Collective Bargaining Agreement, as may be modified in the future.

(c)     *Service Credit.*  From and after the Closing, with respect to any "employee benefit plan" (as defined in Section 3(3) of ERISA) or other benefit plan or arrangement maintained by Buyer or its Affiliates in which any Transferred Employee is eligible to participate, each Transferred Employee's service with any of the Selling Entities (as well as service with any predecessor employer) prior to the Closing shall be treated as service with Buyer and its Affiliates from and after the Closing for all purposes, including for purposes of determining eligibility to participate, level of benefits, vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan); *provided* that the foregoing shall not apply to the extent that it would result in any duplication of benefits for the same period of service.

(d)     *Pre-Existing Conditions and Co-Payments*.  Buyer shall use commercially reasonable efforts to waive, or shall cause its Affiliates to use commercially reasonable efforts to waive, any preexisting conditions, limitations, exclusions, actively at work requirements and waiting periods under any health or welfare benefit plan maintained by Buyer or any of its Affiliates in which Transferred Employees (and his or her eligible dependents) will be eligible to participate from and after the Closing, except to the extent that such items would not have been satisfied or waived under the comparable Seller Benefit Plan immediately prior to the Closing. Buyer shall use commercially reasonable efforts to recognize, or shall cause its Affiliates to use commercially reasonable efforts to recognize, all co-payments, deductibles and similar expenses and out-of-pocket maximums incurred by each Transferred Employee (and his or her eligible dependents) prior to the Closing during the plan year in which the Closing occurs for purposes of satisfying any comparable deductible and co-payment limitations and out-of-pocket requirements under the relevant welfare benefit plans in which such Transferred Employee (and his or her eligible dependents) will be eligible to participate from and after the Closing during the plan year in which Closing occurs.

(e)     *Labor Agreements.*

(i)     The Parties hereby agree to cooperate in good faith and to promptly take all actions necessary or appropriate to comply in all material respects with all information, consultation, bargaining and other processes and requirements, as applicable, relating to any labor unions or similar employee representative bodies in connection with the transactions contemplated by this Agreement, whether arising under any applicable collective bargaining or similar agreement, Applicable Law or otherwise.

(ii)     In furtherance of its obligations pursuant to Section 8.04(e)(i): (1) Buyer shall provide all reasonable assistance required by Seller or any of its Affiliates in relation to any such information, consultation, bargaining or similar processes, including providing reasonable assistance to Seller and its Affiliates with responding to any inquiries or requests (including information requests) from the applicable labor union in connection any such processes; (2) Buyer shall promptly disclose to Seller and its Affiliates accurate details of any proposed changes to terms and conditions of employment it plans to implement effective as of the Closing to enable timely compliance with such applicable information, consultation and bargaining obligations; and (3) to the extent reasonably

94

requested by Seller, Buyer shall participate in applicable meetings with labor unions or other employee representatives covering the Company Employees.

(iii)    Effective as of the Closing and subject to a representative complement of bargaining unit employees having accepted offers of employment at each plant location, (i) Buyer shall (and shall cause its Subsidiaries to) recognize each labor union or similar employee representative body that represents any Company Employees as the bargaining representative of the Company Employees constituting the applicable bargaining unit and (ii) Buyer or its Affiliate shall adopt and assume the Collective Bargaining Agreements, and Buyer shall be responsible for, and shall indemnify the Selling Entities and their respective Affiliates in respect of, all Liabilities and obligations arising out of, or relating to, any such Collective Bargaining Agreement.  Buyer shall take all such actions as are necessary or appropriate (including executing any applicable documents or consents) in order to effectuate the foregoing provisions of this Section 8.04(e)(iii).

(iv)    Promptly following the date hereof, Buyer shall supply Seller with a letter (in a form mutually agreed between Buyer and Seller) to be provided to the Seller designated international representative for each respective labor union or other similar employee representative body that is a party to a Collective Bargaining Agreement, pursuant to which Buyer shall: (i) affirmatively agree to recognize the labor unions or other employee representative bodies representing the Company Employees should a representative complement of employees become employed at each plant; (ii) commit to making offers of employment to each Company Employee who is a bargaining unit employee in the position and shift they hold as of immediately prior to the Closing; (iii) agree to recognize current seniority of each Company Employee who is a bargaining unit employee; and (iv) promise to adopt the Collective Bargaining Agreement in effect at each location should a representative complement of employees become employed at each plant. Seller shall enclose the aforementioned letter with its notice of sale to the applicable labor union international representative.

(v)    *WARN.* Buyer shall assume all Liabilities and obligations for the provision of notice or payment in lieu of notice and any applicable penalties under the Worker Adjustment and Retraining Notification Act, as amended, and any similar foreign, state or local law ("**WARN**") arising as a result of or in connection with the transactions contemplated by the Transaction Documents.  Buyer hereby indemnifies the Selling Entities and their respective Affiliates against and agrees to hold each of them harmless from any and all damages incurred or suffered by Seller or any of its Affiliates with respect to WARN arising as a result of any post-Closing employment actions taken by Buyer in connection with the transactions contemplated by the Transaction Documents or in connection with Buyer's failure to make an offer of employment to any Company Employees consistent with Buyer's obligations under this Section 8.04; *provided*, *however*, that no such indemnification shall be required in the event that WARN is triggered as a result of Seller's or its Affiliates' breach of any of their obligations set forth in Section 7.02(a)(ii)(K)(1) or Seller's failure to disclose any "employment losses" (within the meaning of WARN) actions that could result in WARN liability (when aggregated together with any post-Closing "employee losses" undertaken by Buyer).

95

(f)     *Actions Regarding Assumed Benefit Plans.*  Effective as of the Closing, Buyer shall assume sponsorship and administration of and have all responsibility and liability for all Assumed Benefit Plans, including for all benefits payable thereunder.  Seller and Buyer shall take all actions necessary to effectuate a transfer of such Assumed Benefit Plan sponsorship and administration from the applicable Selling Entity to Buyer, including the adoption of appropriate board resolutions, adoption of plan amendments, notifying Assumed Benefit Plan participants, providing all required summary plan descriptions and summaries of material modification, filing any required IRS Forms 5310-A and notices to the PBGC, reporting such transfers on Forms 5500 due with respect to such Assumed Benefit Plans subject to the consent of the applicable respective third-party providers, assignment of third-party service agreements, providing contact information to Buyer for third-party providers, and providing copies of all files in the Seller's possession (including electronic files) related to such Assumed Benefit Plans.  Seller and Buyer agree to take any actions reasonably required by the PBGC, with respect to the transfer of sponsorship of the Instant Brands Pension Plan from IB Holdings to Buyer.  Subject to the following sentence and the PBGC's consent, (A) Buyer and IB Holdings shall take all actions necessary to amend the PBGC Agreement to reflect that all responsibilities and obligations of IB Holdings under such PBGC Agreement shall be assumed by, and transfer to, Buyer effective as of the Closing, (B) Buyer and Seller shall take all actions necessary to (1) effectuate the assignment and assumption by, and transfer to, Buyer of all responsibilities, liabilities and obligations (including, without limitation, all reimbursement obligations) pursuant to that certain reimbursement agreement pursuant to which Bank of Montreal issued that certain Irrevocable Standby Letter of Credit No. BMCH303393OS dated as of August 17, 2021 for the benefit of the PBGC or (2) deliver, or cause to be delivered, to the PBGC a new irrevocable letter of credit that satisfies the requirements of the PBGC, and (C) Buyer as sponsor of the Instant Brands Pension Plan effective as of Closing shall comply with all obligations of the PBGC Agreement.  Notwithstanding the foregoing, Buyer shall not be subject to the covenants described in the immediately preceding sentence if the PBGC enters into a written amendment to the PBGC Agreement with IB Holdings stating that the PBGC Agreement and all responsibilities and obligations of IB Holdings under such PBGC Agreement, including the obligation to maintain a letter of credit in favor of the PBGC, are terminated effective as of the date on which the sponsorship of the Instant Brands Pension Plan is transferred from IB Holdings to Buyer.

(g)     *Cooperation; Employee Communications.*

(i)     Each of Buyer and Seller recognize it to be in the best interests of the Parties and their respective employees that the transactions in this Section 8.04 be effected in an orderly manner and agree to devote their respective reasonable best efforts and to cooperate fully in complying with the provisions of this Section 8.04.  Without limiting the generality of the foregoing, each Party agrees to execute, deliver and file all documents and to take all such actions as are deemed necessary or desirable in order to carry out and perform the purpose of this Section 8.04 and to facilitate the transactions referred to in this Section 8.04.

(ii)     Seller and Buyer shall promptly cooperate in good faith (1) in communications with Company Employees with respect to employee benefit plans maintained by the Selling Entities or Buyer or their respective Affiliates and with respect to other matters arising in connection with the transactions contemplated by the

Transaction Documents and (2) if applicable, to satisfy, or cause to be satisfied, any information and consultation requirements (including promptly responding to information requests from labor unions) to the extent that they apply to the transactions contemplated by the Transaction Documents.

(h) *Shared Services Employees*. Prior to the Closing Date, Buyer and Seller shall mutually cooperate in good faith to identify no later than fourteen Business Days prior to the anticipated Closing Date the Shared Services Employees that are allocable to the Business and who will thereby constitute Company Employees for purposes of this Agreement (including, for the avoidance of doubt, for purposes of determining who Buyer will make an offer of employment to under Section 8.04(a)) and the Shared Services Employees that are allocable to the Excluded Business and who will thereby constitute "Company Employees" for purposes of the Appliances APA (including, for the avoidance of doubt, for purposes of determining who Appliances Buyer will make an offer of employment to under Section 8.04(a) of the Appliances APA). In connection with the foregoing, Buyer and Seller intend and agree that all Shared Services Employees shall be made an offer of employment by Buyer or its applicable Affiliate either (i) to be employed by Buyer or one of its Affiliates in the Business pursuant to the terms of Section 8.04(a) or (ii) to be employed by Buyer or one of its Affiliates in the Excluded Business pursuant to Section 8.04(a) of the Appliances APA, in each case subject to such Shared Services Employee's continued employment through the date such offer is made.

(i) *No Third-Party Beneficiaries.* Nothing in this Section 8.04, express or implied, (1) is intended to or shall confer upon any Person other than the parties hereto, including any Company Employee (or Company Employee representative), any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, (2) shall establish, or constitute an amendment, termination or modification of, or an undertaking to amend, establish, terminate or modify, any benefit plan, program, agreement or arrangement or (3) shall create any obligation on the part of any Selling Entity, Buyer or any of their respective Affiliates to employ any Company Employee for any period following the Closing.

Section 8.05  *Post-Closing Books and Records.*

Until the earlier of the closure of the Bankruptcy Cases and seven years after the Closing Date, (a) Buyer will use commercially reasonable efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer will allow such Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any Records included in the Assets solely for purposes relating to the Bankruptcy Cases, the performance of obligations under the other Transaction Documents, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, officers, employees, counsel, accountants and auditors will have the right to make copies of any such Records for such purposes. Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records. Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business, and (ii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the

97

extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client privilege with respect to such information; provided, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to provide a summary of such information that does not violate the applicable legal privilege. Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will keep confidential and not disclose or use the Records that would have been included in the Records but for the failure to obtain a material Third Party consent or any Records to which it has access under this Section 8.05, except for the use thereof as expressly permissible hereunder.

Section 8.06   *Intellectual Property Matters.*

(a)   On or prior to the date that is 30 days after the Closing Date, Seller shall (and shall cause each Selling Entity to) use its commercially reasonable efforts to change their respective legal and corporate names to such other names that do not include any of the Trademarks included in the Purchased Intellectual Property (or any portion thereof) and seek an Order of the Bankruptcy Court and the CCAA Court (as applicable) to make corresponding changes to the case caption for the Bankruptcy Cases and style of case for the CCAA Recognition Proceedings, pursuant to the terms of the Sale Order and the CCAA Sale Order (as applicable) or such further Order of the Bankruptcy Court and the CCAA Court (as applicable).

(b)   Effective as of the Closing, Seller hereby grants, and shall cause the Selling Entities and its and their respective Affiliates to grant, to Buyer and its Affiliates an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to continue to use any and all Trademarks that are included in the Excluded Intellectual Property and used in the Business as of the Closing Date as such Trademarks are used as of the Closing Date (and natural evolutions and expansions thereof) for a transitional period of six months following the Closing. As soon as reasonably practicable after the Closing, but in any event within six months after the Closing Date, Buyer shall dispose of, destroy, remove, strike over or delete all of the Trademarks included in the Excluded Intellectual Property. All goodwill associated with the usage of the Trademarks included in the Excluded Intellectual Property shall inure to the benefit of the applicable Selling Entity.

(c)   Effective as of the Closing, Buyer hereby grants, and shall cause its Affiliates to grant, to the Selling Entities and their respective Affiliates an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to continue to use any and all Trademarks that are included in the Purchased Intellectual Property and used in the Excluded Business as of the Closing Date as such Trademarks are used as of the Closing Date (and natural evolutions and expansions thereof) for a transitional period of six months following the Closing. As soon as reasonably practicable after the Closing, but in any event within six months after the Closing Date, the Selling Entities shall dispose of, destroy, remove, strike over or delete all of the Trademarks included in the Purchased Intellectual Property. All goodwill associated with the usage of the Trademarks included in the Purchased Intellectual Property shall inure to the benefit of the Buyer.

(d)   Effective as of the Closing, Seller hereby grants, and shall cause the Selling Entities and its and their respective Affiliates to grant, to Buyer and its Affiliates an irrevocable, perpetual worldwide, non-exclusive, fully paid-up, royalty-free, non-sublicensable (except, through multiple

98

tiers, to Buyer's and its Affiliates' customers, end users, vendors, suppliers, distributors, contractors, and service providers) right and license to continue to use the Excluded Intellectual Property (other than Trademarks) that is used in the Business as of the Closing Date as such Intellectual Property is used in the Business as of the Closing Date (and natural evolutions and expansions thereof).

(e)     Effective as of the Closing, Buyer hereby grants, and shall cause its Affiliates to grant, to Seller, the Selling Entities and its and their respective Affiliates, an irrevocable, perpetual worldwide, non-exclusive, fully paid-up, royalty-free, non-sublicensable (except, through multiple tiers, to Seller's, the Selling Entities' and its and their Affiliates' customers, end users, vendors, suppliers, distributors, contractors, and service providers) right and license to continue to use the Purchased Intellectual Property (other than Trademarks) that is used in the Excluded Business as of the Closing Date as such Intellectual Property is used in the Excluded Business as of the Closing Date (and natural evolutions and expansions thereof).

(f)     Notwithstanding Section 13.05, the licenses set forth in this Section 8.06 are non-transferable; *provided* that such licenses may be assigned in whole or in part to an Affiliate or to any Person in connection with the sale of all or any portion of the Business or the Excluded Business, as applicable (including any line of business, product or service), whether by merger, consolidation, acquisition, restructuring, stock or asset sale or similar transaction or series of related transactions.

(g)     The licenses granted in Section 8.06(d) and 8.06(e) are, and will otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, a license of rights to "intellectual property" (as defined under Section 101 of the Bankruptcy Code), and Seller and Buyer will retain and may fully exercise all of its rights and elections under the Bankruptcy Code (or any similar foreign law) with respect thereto.

(h)     For the avoidance of doubt, Sections 8.06(d), (e), (f), (g) and (h) shall survive in perpetuity.

Section 8.07   *Title Matters.*

The Selling Entities will use commercially reasonable efforts to deliver, or cause to be delivered, to Buyer, at or prior to the Closing, (i) copies of existing surveys, legal descriptions and title policies relating to the Owned Real Property in each case, in any Selling Entities' possession or control, (ii) such deeds, assignments and other customary instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as Buyer may reasonably request in order to vest in Buyer all of the applicable Selling Entity's right, title and interests in, to or under any or all Real Property Interests, in each case, in any Selling Entities' possession or control and (iii) such ordinary and customary documents (including any factually accurate title affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Owned Real Property.

Section 8.08    *Insurance Access.*

Following the Closing Date, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets prior to the Closing Date, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' non-transferable third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to the Closing (each such policy, an "**Available Insurance Policy**"); *provided*, that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)    Buyer shall report any potentially insured pre-Closing Date claim to Seller, as promptly as practicable and in any event in sufficient time so that such claim may be made in accordance with Seller's claim reporting procedures in effect immediately prior to the Closing;

(b)    Premiums and premium increases, fees and expenses incurred by Seller or any of its Subsidiaries to the extent resulting from any access to, or any claims made by Buyer or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives, will, in each case, be promptly reimbursed to Seller by Buyer;

(c)    Any recovery under any Available Insurance Policy shall be net of all uninsured, uncovered, unavailable or uncollectible amounts of all such claims made by Buyer or any of its Affiliates under the policies as provided for under the Available Insurance Policies (including any deductible, retention or other similar amounts);

(d)    Claims made by Buyer pursuant to this Section 8.08 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Available Insurance Policies. With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a payment by Seller or any of its Subsidiaries, Buyer shall reimburse Seller or such Subsidiary for such payment. It is understood that Buyer will not have access to or coverage under any non-transferable insurance policy retained by Seller or any of its Subsidiaries that is not "occurrence based"; and

(e)    Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.08 after such entity's Bankruptcy Case has been closed.

Section 8.09    *Disclaimers.*

(a)    *General Disclaimer.*  To the extent required by Applicable Laws to be operative, the disclaimers of certain warranties contained in this Section 8.09 are "conspicuous disclaimers" for purposes of any Applicable Laws.

(b)    **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) OR IN ANY OTHER TRANSACTION DOCUMENT, (I) NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED OR OTHERWISE, WITH RESPECT TO, OR IN RELATION TO, ANY OF THE ASSETS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND BUYER EXPRESSLY WAIVES AND ACKNOWLEDGES THAT NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY SUCH WARRANTY OR REPRESENTATION, AND BUYER IS NOT RELYING ON ANY SUCH WARRANTY OR REPRESENTATION, (II) SELLER, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY, IN WRITING OR OTHERWISE) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY STATEMENT, OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF EACH SELLER OR ANY OF ITS RESPECTIVE AFFILIATES) AND (III) ALL PROPERTIES INCLUDED IN THE ASSETS WILL BE CONVEYED BY SELLER OR ITS APPLICABLE SUBSIDIARIES AND ACCEPTED BY BUYER ON AN AS IS, WHERE IS BASIS WITH ALL DEFECTS AND FAULTS WITHOUT RECOURSE AND WITHOUT WARRANTY (INCLUDING ANY WARRANTY OF TITLE).**

(c)    **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) OR IN ANY OTHER TRANSACTION DOCUMENT, BUYER ACKNOWLEDGES AND AGREES THAT SELLER AND SELLER'S SUBSIDIARIES ARE CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (III) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (IV) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (V) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE ASSETS (SURFACE AND SUBSURFACE), (VI) COMPLIANCE WITH APPLICABLE LAWS, (VII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (VIII) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IX)**

101

**CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER OR ANY SUBSIDIARY OF SELLER ASSOCIATED WITH SAME EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT. NOTWITHSTANDING THE FOREGOING OR ANY PROVISION TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NOTHING IN THIS SECTION 8.09 SHALL LIMIT ANY RIGHT OR REMEDY OF BUYER WITH RESPECT TO ACTUAL FRAUD.**

Section 8.10    *Collection of Accounts Receivable.*

(a)    As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable or accounts receivable, in each case, included in the Assets and relating to work performed or products sold by the Business prior to, on or after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for Buyer's own account.

(b)    As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to Accounts Receivable or accounts receivable, in each case, included in the Assets and relating to work performed or products sold by Buyer or the Business prior to, on or after the Closing, as the case may be, shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable included in the Assets and relating to work performed or products sold by the Business prior to, on or following the Closing Date.

Section 8.11  *Data Transfer.*

As required under Data Protection Laws (including, for the avoidance of doubt, Section 7.2 of the Canadian Personal Information Protection and Electronic Documents Act), the Parties confirm that the Personal Information disclosed in connection with the transactions contemplated by this Agreement ("**Disclosed Personal Information**") is necessary for the purposes of determining whether to proceed with the transactions contemplated by this Agreement and, if the determination is made to proceed with the transactions, to complete them. At all times, each Buyer Entity shall protect all Disclosed Personal Information using security safeguards appropriate to the sensitivity of the information. Prior to Closing, each Buyer Entity shall not use or disclose the Disclosed Personal Information for any purposes other than those related to determining if it shall proceed with the transactions contemplated by this Agreement, the performance of this Agreement, or the consummation of the transactions contemplated by this Agreement. Following the consummation of the transactions contemplated by this Agreement, the Parties agree that each Buyer Entity (a) shall not use or disclose the Disclosed Personal Information for any purposes other than those for which the information was initially collected, unless additional consent is obtained, or as otherwise permitted or required by Applicable Laws, (b) shall protect the confidentiality of all Disclosed Personal Information with security safeguards appropriate to the sensitivity of such information, and (c) shall give effect to any withdrawal of consent with respect to the Disclosed Personal Information. If the transactions contemplated by this Agreement do not proceed, each Buyer Entity shall return to the Selling Entities or, at the Selling Entities' written request, securely destroy the Disclosed Personal Information within a reasonable period of time.

Section 8.12  *Cooperation Relating to Litigation and Other Proceedings.*

(a)     From and after the Closing, Seller and its Subsidiaries, on the one hand, and Buyer, on the other hand, shall cooperate in all reasonable respects in connection with the defense or prosecution of any Proceeding by or against any Person or compliance with any audit, investigation or other regulatory review by any Governmental Authority, in each case, relating to or arising out of the conduct of the Business or the Excluded Business prior to or after the Closing Date (other than any Proceeding between Buyer or its Affiliates or assignees, on the one hand, and any Selling Entity or any of its Affiliates or related entities or assignees, on the other hand, arising out of the transactions contemplated hereby).  The Party requesting such cooperation will pay the out-of-pocket expenses (including reasonable legal fees and disbursements) of the other Party providing such cooperation and of its Affiliates and their respective officers, directors, employees and agents reasonably incurred in connection with providing such cooperation, but such Party will not be responsible to reimburse the Party providing such cooperation for such Party's time spent in such cooperation or the salaries or costs of fringe benefits or other similar expenses paid by the Party providing such cooperation to its Affiliates or their respective officers, directors, employees and agents while assisting in the defense or prosecution of any such Proceeding.

(b)     From and after the Closing Date, Buyer agrees not to (i) bring any avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, the

CCAA or the BIA or (ii) sell, transfer, pledge, encumber, hypothecate, assign or otherwise dispose of any such causes of action.

ARTICLE 9
CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

Section 9.01 *Accuracy of Representations.* (a) (i) The representations and warranties of the Selling Entities contained in Sections 5.01 (solely the first two sentences thereof), 5.02, 5.03(i)(A), 5.26(a) (solely the first two sentences thereof) and 5.26(b) (solely the last sentence thereof) will be true and correct in all respects, except for *de minimis* inaccuracies, as of the Closing, as if made at and as of the Closing, (ii) the representations and warranties of the Selling Entities contained in Sections 5.13(a), 5.26(a) (except the first and second sentences of Section 5.26(a)) and 5.26(b) (except the last sentence of Section 5.26(b)) will be true and correct in all material respects as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, (iii) the representations and warranties of the Selling Entities contained in Section 5.06(b) will be true and correct in all respects as of the Closing, as if made at and as of the Closing and (iv) the other representations and warranties of Seller contained in this Agreement (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth therein) will be true and correct as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, except in the case of clause (iv) for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) Buyer will have received a certificate on behalf of each Selling Entity to such effect signed by a duly authorized officer of Seller.

Section 9.02 *Selling Entities' Performance.* (a) Each Selling Entity will have performed or caused to be performed in all material respects each of the covenants that such Selling Entity is required to perform pursuant to this Agreement at or prior to the Closing (or will have cured any such breach to the extent necessary to satisfy this condition), and (b) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 9.03 *No Material Adverse Effect.* No Material Adverse Effect shall have occurred and Buyer will have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

Section 9.04 *Seller's Deliveries.* Each of the deliveries required to be made to Buyer pursuant to Section 4.04 will have been delivered (or the applicable Selling Entity will make such deliveries at the Closing).

104

# ARTICLE 10
# CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate the Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to the Closing, of each of the following conditions:

Section 10.01 *No Order.* There will not be in effect any Order (whether temporary, preliminary or permanent) or Applicable Law restraining, enjoining or otherwise prohibiting, preventing or making illegal the consummation of the Closing.

Section 10.02 *Sale Order.* The Bankruptcy Court will have entered the Sale Order, and such order will be a Final Order in full force and effect and will not have been stayed or vacated. The CCAA Court shall have entered the CCAA Sale Order, in form and substance acceptable to the Buyers, and such order will be a Final Order in full force and effect and will not have been stayed or vacated.

Section 10.03 *HSR Act.* The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act will have expired or been terminated.

Section 10.04 *Information Officer's Certificate.*

(a)    When the conditions to Closing set out in Article 9, Article 10 (other than this Section 10.04) and Article 11 have been satisfied or waived by the Selling Entities and Buyer, as applicable, the Selling Entities and Buyer will each deliver to the Information Officer the applicable Conditions Certificate. Upon receipt of each of the Conditions Certificates, the Information Officer shall (i) issue forthwith its Information Officer's Certificate concurrently to the Selling Entities and Buyer, at which time the Closing will be deemed to have occurred; and (ii) file as soon as practicable a copy of the Information Officer's Certificate with the CCAA Court (and shall provide a true copy of such filed certificate to the Selling Entities and Buyer).

(b)    The parties hereto acknowledge and agree that the Information Officer shall be entitled to file the Information Officer's Certificate with the CCAA Court without independent investigation upon receiving the Conditions Certificates, and the Information Officer will be relying exclusively on the basis of the Conditions Certificates and without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions and shall have no liability to the Selling Entities or Buyer or any other Person as a result of filing the Information Officer's Certificate upon receiving such Conditions Certificates.

# ARTICLE 11
# CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Closing, of each of the following conditions:

105

Section 11.01 *Accuracy of Representations*.  (a) The representations and warranties of Buyer contained in Article 6 of this Agreement will be true and correct in all material respects as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, except for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a material and adverse effect on Buyer's ability to consummate the contemplated transactions and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.02 *Buyer's Performance*.  (a) Buyer will have performed or caused to be performed in all material respects each of the covenants that Buyer is required to perform pursuant to this Agreement prior to or at the Closing (or will have cured any such breach to the extent necessary to satisfy such condition) and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.03 *Buyer's Deliveries*.  Each of the deliveries required to be made to Seller pursuant to Section 4.03 will have been delivered (or Buyer will make such deliveries at the Closing).

ARTICLE 12
TERMINATION

Section 12.01 *Termination Events*.

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)  by mutual written agreement of Seller and Buyer;

(b)  by written notice of either Seller or Buyer to such other Party if:

(i)  the Closing has not occurred by the close of business on November 13, 2023 (the "**Outside Date**"); *provided*, that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(i) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein which has prevented the consummation of the Closing;

(ii)  there is in effect a Final Order by any court of competent jurisdiction in the United States or Canada enjoining, restraining or otherwise prohibiting the Closing; *provided* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(ii) if such party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach has been the cause of, or resulted in, the occurrence of such Final Order;

(iii)  any of the Selling Entities enter into a definitive agreement providing for a Superior Proposal and the closing of the sale of the relevant Assets to the applicable acquirer pursuant to such Superior Proposal has occurred;

(iv)     if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect;

(v)     if, with, or without Seller's consent, (i) the Bankruptcy Cases are converted into cases under Chapter 7 of the Bankruptcy Code or dismissed, (ii) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Cases, or (iii) any trustee, interim receiver, receiver or monitor or similar official is appointed in the CCAA Recognition Proceedings or in any Canadian bankruptcy, proposal or CCAA proceedings in respect of any Seller.

(c)     so long as Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, by Buyer by written notice to Seller if (i) any Selling Entity materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such material breach would result in a failure of a condition set forth in Article 9 or Article 10 and (iii) such material breach has not been waived or cured by the earlier of (1) 10 Business Days after the giving of written notice by Buyer to Seller of such material breach and (2) the Outside Date;

(d)     so long as no Selling Entity is in material breach of any of its representations, warranties, covenants or agreements contained herein, by Seller by written notice to Buyer if (i) Buyer materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such material breach would result in a failure of a condition set forth in Article 10 or Article 11 and such material breach has not been waived or cured by the earlier of (1) 10 Business Days after the giving of written notice by Seller to Buyer of such material breach and (2) the Outside Date;

(e)     by Seller by written notice to Buyer if (i) all of the conditions set forth in Article 9 and Article 10 have been satisfied or validly waived by Buyer (other than those conditions which by their terms or nature are to be satisfied at the Closing), (ii) Seller has provided notice on behalf of all the Selling Entities to Buyer that the Selling Entities are prepared to consummate the Closing and (iii) Buyer fails to consummate the transactions contemplated hereby, including payment of the Estimated Purchase Price, as and when required by Section 4.01; or

(f)     by written notice of Seller or Buyer to such other Party at any time following the third Business Day after the date on which an HSR Second Request has been issued in respect of the transactions contemplated by this Agreement.

Section 12.02  *Effect of Termination.*

(a)     In the event of a valid termination of this Agreement by Buyer or Seller pursuant to this Article 12, all rights and obligations under this Agreement will terminate without any Liability of any Party or Person to any other Party or Person; *provided* that, nothing herein will relieve any Party from Liability for any willful and material breach of this Agreement or Actual Fraud prior to such termination (subject, in each case, to the last sentence of Section 12.02(b)); and *provided*, *further*, that the provisions of this Section 12.02, Section 12.03, Section 3.02, Section 7.01(b), Section 7.09(b), Section 8.09 and Section 13.07 (and, to the extent applicable to

107

the interpretation or enforcement of such provisions, Article 1 and Article 13) will survive the termination of this Agreement.

(b)     Buyer and Seller acknowledge and agree that in the event of a Specified Termination, the Deposit Amount will be delivered to Seller in accordance with Section 3.02(b). The Parties acknowledge and agree that the amount of losses that would be incurred by the Selling Entities as a result of a Specified Termination is difficult to estimate, and that the Deposit Amount represents a reasonable estimate of such losses.  Notwithstanding anything to the contrary in this Agreement, (i) Seller's right to receive the Deposit Amount pursuant to this Section 12.02(b), (ii) any amounts owing pursuant to Section 7.09(b) and Section 13.07, (iii) Seller's right to enforce the Confidentiality Agreement and (iv) the rights and remedies of Seller available under the Equity Commitment Letter shall, collectively, be the sole and exclusive remedies (except for specific performance pursuant to Section 13.08(b) and potential monetary damages pursuant to claims for a willful and material breach of this Agreement or Actual Fraud, in each case prior to the valid termination of this Agreement, subject to the last sentence of this Section 12.02(b)) of the Selling Entities against Buyer, any Party Affiliate or any Debt Financing Source (and any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents) for any losses suffered as a result of the failure of the Closing to occur, any breach of any covenant in this Agreement (whether willfully, knowingly, intentionally, unintentionally or otherwise) or the failure of the transactions contemplated by this Agreement to be consummated, and upon receipt in full by Seller of the Deposit Amount (together with any amounts owed pursuant to Section 7.09(b) and Section 13.07), none of Buyer, any Party Affiliate or any Debt Financing Source, or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or Representatives, shall have any further Liability relating to or arising out of this Agreement, the Financing or the transactions contemplated by this Agreement or in respect of any other document or theory of Applicable Law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in tort or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any Applicable Law or otherwise.  Notwithstanding any other provision hereof, in no event will Buyer be subject to, and no Selling Entity will be entitled to receive (or attempt to receive), monetary damages if this Agreement is terminated in circumstances in which Seller is entitled to the Deposit Amount or to the extent such monetary damages would exceed the amount of the Deposit Amount (plus any amounts owed pursuant to Section 7.09(b) and Section 13.07).

Section 12.03 *Procedure Upon Termination.*

In the event of termination pursuant to Section 12.01, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to Section 12.02) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller. If this Agreement is terminated as provided herein, Seller will be deemed to have delivered notice to Buyer that it must return or destroy all Confidential Information (as defined in the Confidentiality Agreement) pursuant to Section 5 of the Confidentiality Agreement and Buyer will redeliver to the Selling Entities or destroy all documents, work papers and other materials of Buyer and its Representatives relating to the transactions contemplated hereby, in accordance with the

terms of the Confidentiality Agreement, including the requirement to confirm any such destruction in writing to the Selling Entities.

ARTICLE 13
GENERAL PROVISIONS

Section 13.01 *No Survival of Representations and Warranties.*

The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof, except in the event of Actual Fraud. Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, 90 days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable Order of a court of competent jurisdiction or settlement.

Section 13.02 *Notices.*

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand, (b) when sent by email (except that if notice is received after 5:00 p.m. local time at the place of receipt, it shall be effective the following Business Day) or (c) one Business Day following the day sent by overnight courier, in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

> (i)    If to any Selling Entity, then to:
>
> Instant Brands Acquisition Holdings Inc.
> 3025 Highland Parkway, Suite 700 Downers Grove, Illinois 60515
> Attn: Catherine R. Landman
> E-mail:  cathy.landman@instantbrands.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
Attn: William J. Chudd
   Brian Resnick
450 Lexington Avenue
New York, NY 10017
E-mail: william.chudd@davispolk.com
    brian.resnick@davispolk.com

(ii)  If to Buyer:

IB Housewares US Holdings, LLC
c/o Anchor Hocking Holdings, Inc.
Attn: Mark Eichhorn
519 Pierce Avenue
Lancaster, OH 43130
E-mail: Mark.Eichhorn@AnchorHocking.com

and

Centre Lane Partners, LLC
Attn: Quinn Morgan; Mayank Singh, Timothy Chiodo
60 E 42nd Street, Suite 2220
New York, NY 10165
E-mail: qmorgan@centrelanepartners.com;
msingh@centrelanepartners.com; tchiodo@centrelanepartners.com

with a copy (which will not constitute notice) to:

Jones Day
Attn: Jason Grove; Thomas Wearsch; Genna Ghaul
250 Vesey Street,
New York, NY 10281
E-mail: jrgrove@jonesday.com; twearsch@jonesday.com;
gghaul@jonesday.com

Section 13.03  *Waiver.*

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Applicable Laws, (i) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (ii) no notice to or demand on one Party will be deemed to be a waiver of any right of the party hereto that gives such notice or demand to take further action without notice or demand.

110

Section 13.04  *Entire Agreement; Amendment.*

This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof.  Except as permitted under Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties; provided, that any such amendment, modification, or supplementation of this Agreement or waiver of any rights or obligations by the Selling Entities, in each case in any material respect, shall require the prior written consent of the Term DIP Agent acting at the instruction of Required Lenders (as defined in the Term DIP Credit Facility) (not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, this Section 13.04, Section 13.09, Section 13.11, Section 13.12 and Section 13.16, in each case to the extent the proposed amendment to any such Section is adverse to any Debt Financing Source (or any other provision of this Agreement to the extent a modification, waiver of termination of such provision would modify the substance of any of the foregoing provisions), may not be amended without the prior written consent of such Debt Financing Source.

Section 13.05  *Assignment.*

This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided,* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer (A) prior to the Closing, without the prior written consent of any Selling Entity, to one or more of Buyer's Affiliates, so long as (x) such Affiliate is designated in writing by Buyer to Seller, (y) Buyer continues to remain obligated in full hereunder, and (z) any such assignment would not reasonably be expected to impede or delay the Closing and (B) following the Closing, without the prior written consent of any Selling Entity, to (x) its Affiliates or (y) the Debt Financing Sources as collateral security for its obligations under any of Debt Financing Agreements (except that (i) no such assignment shall relieve Buyer of any of its obligations hereunder and (ii) in no event shall any Debt Financing Source be required or deemed to assume any obligation of Buyer hereunder); *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court and the CCAA Court (if applicable).  Any attempted or purported assignment in violation of this Section 13.05 will be deemed void *ab initio*.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 13.06  *Severability.*

The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an

acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 13.07  *Expenses.*

Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; *provided* that (a) Buyer shall pay all filing fees and expense of the Parties required in connection with any HSR Act filing or any other filing in connection with any Antitrust Laws and (b) Seller will pay all fees or expenses required to be paid to the Escrow Agent in connection with the Deposit Escrow Account and the Escrow Agreement.

Section 13.08  *Specific Performance.*

(a)  Subject to Section 13.08(b), the Parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with the terms hereof, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, subject to Section 13.08(b), each Party will be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which they are entitled at law or in equity.

(b)  It is explicitly agreed that Seller shall be entitled to specific performance of Buyer's obligation to cause the Equity Financing to be funded and to consummate the transactions contemplated by this Agreement if and only if (i) all conditions in Article 9 and Article 10 have been satisfied (other than those conditions that by their terms or nature are to be satisfied at the Closing), (ii) Buyer fails to consummate the Closing on the date on which the Closing was required to occur pursuant to Section 4.01, (iii) Seller has irrevocably confirmed by written notice that if specific performance is granted, then the Closing shall occur and (iv) the Debt Financing (or the Alternative Financing, as applicable, in accordance with Section 7.08(d)) has been funded or will be funded at the Closing if the Equity Financing is funded at the Closing.  The foregoing sentence shall not limit the right of any Party to seek an injunction or injunctions, specific performance or other equitable relief under this Agreement for any other reason or in any circumstances other than those reasons or circumstances explicitly set forth in the foregoing sentence.

(c)  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.  The right of specific performance and other equitable relief in this Section 13.08 is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

Section 13.09  *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.*

(a)      Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto; provided, however, that the adjudication of any claim, suit, action or other proceeding of any kind or nature, whether at law or equity, in contract, in tort or otherwise, against the Debt Financing Sources in connection with this Agreement, the Debt Financing, the Debt Commitment Letter or the transactions contemplated by the Debt Financing shall be governed by and in accordance with the laws of the State of New York (without regard to its choice of law rules) except as otherwise set forth in the Debt Commitment Letter.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute.  The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties each consent to service of process by mail (in accordance with Section 13.02) or any other manner permitted by law.  Notwithstanding the foregoing, no party hereto, nor any of its Affiliates, shall bring, or support, any suit, action or other proceeding, whether at law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way relating to this Agreement or any of the transactions contemplated hereby, including any dispute arising out of or relating in any way to the Debt Commitment Letter, the Debt Financing or the definitive agreements executed in connection therewith or the transactions contemplated thereby, anywhere other than in: (a) any New York State court sitting in the Borough of Manhattan; or (b) if under Applicable Law, exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York, and each party hereto agrees (on behalf of itself and its Affiliates) that the laws of the State of New York shall govern any such suit, action or other proceeding and submits for itself and its property with respect to any such suit, action or other proceeding to the exclusive jurisdiction of the aforementioned courts in this Section 13.09.

(c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS

NAI-1538018312v20

AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF, IN EACH CASE, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE DEBT COMMITMENT LETTER OR IN CONNECTION WITH THE DEBT FINANCING.

Section 13.10  *Counterparts.*

This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 13.11  *Parties in Interest; No Third Party Beneficiaries.*

This Agreement will inure to the benefit of and be binding upon Buyer, Seller and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that (a) Section 13.12(a) is intended for the benefit of and is enforceable by the Party Affiliates, (b) Section 13.12(b) is intended for the benefit of and is enforceable by the Released Parties and (c) Sections 7.16 and 13.04 and Schedule 2.01(b)(xxii) are intended for the benefit of and is enforceable by the Term DIP Secured Parties; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a Party hereunder; *provided, further*, that the Debt Financing Sources are intended third party beneficiaries of the provisions of Section 13.04, Section 13.09, this Section 13.11 and Section 13.16, in each case, to the extent contemplated thereby.

Section 13.12  *No Recourse.*

(a)    Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (each, other than, for the avoidance of doubt, a Party itself a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, Contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed

114

on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party hereunder or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith, or for any claim (whether in tort, Contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

(b)     Effective as of the Closing (but only if the Closing actually occurs), except for any (i) rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, (ii) rights or obligations under the Appliances APA and the other Transaction Documents (as defined in the Appliances APA) contemplated by the Appliances APA, (iii) claims of Actual Fraud and (iv) claims by employees under Seller Benefit Plans or rights to earned but unpaid wages or compensation, unpaid vacation and unreimbursed business expenses, in each case, to the extent constituting an Assumed Liability, each Selling Entity, on behalf of itself and each of its Affiliates (other than the Acquired Entities) and each of its and their respective past, present or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Releasors**"), hereby irrevocably and unconditionally releases and forever discharges Buyer (with respect to the Business), each Acquired Entity, their respective Affiliates and each of the foregoing's respective past, present or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Released Parties**") of and from any and all Proceedings, executions, Orders, duties, debts, dues, accounts, bonds, Liabilities, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon contract, tort or otherwise), which any of the Releasors may have against any of the Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to the ownership or operation of the Acquired Entities or the Business or any action taken or failed to be taken by any of the Released Parties in respect thereof.  From and after the Closing and notwithstanding any applicable statute of limitations, each Selling Entity shall not and shall cause each of the other Releasors not to, bring any Proceeding against Buyer (with respect to the Business), the Acquired Entities or any of the other Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by such Selling Entity on behalf of itself and the other Releasors hereunder.

(c)     Buyer agrees that if Buyer or any of its Affiliates obtains or binds a representations and warranties insurance policy with respect to any of the representations or warranties set forth in Article 5 (each, a "**R&W Insurance Policy**"), each such R&W Insurance Policy will at all times provide that: (i) the insurer will have no, and will waive any and all, subrogation rights against Seller, any of its Subsidiaries or any of its or their respective Affiliates (except in the event of Actual Fraud); and (ii) Seller is third party beneficiary of such waiver.

(d)     The Seller Related Parties acknowledge and agree that the Debt Financing Sources shall not be subject to any liability or claims to the Seller Related Parties in connection with the Debt Financing or in any way relating to this Agreement or any of the transactions contemplated hereby or thereby, or in respect of any oral representations made or alleged to have been made in

115

connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law, in equity, in contract, in tort or otherwise. Notwithstanding the foregoing, nothing in this Section 13.12 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Commitment Letter.

Section 13.13 *Disclosure Schedules; Materiality.*

The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other Disclosure Schedules is reasonably apparent on its face without further investigation. The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.14 *Liquidating Trustee.*

If at any time Seller liquidates, its estate is converted to Chapter 7, or a bankruptcy proceeding under the BIA, or otherwise has a trustee, receiver or other Representative or similar official appointed by the Bankruptcy Court, the CCAA Court or any other Court of competent jurisdiction (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes performing Seller's obligations under Section 2.06 with respect to such abandoned assets. Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable. Further, such power of attorney will also be granted to Buyer for purposes of performing Seller's obligations under Section 2.06 with respect to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 13.15 *Conflicts; Privileges.*

(a) It is acknowledged by each of the parties that Seller has retained Davis Polk & Wardwell LLP ("**Davis Polk**") to act as its counsel in connection with the negotiation, execution and performance of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby (the "**Current Representation**"), and that no other party has the status of a client of Davis Polk for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that after the Closing, Davis Polk may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any Transaction Document, and, for the avoidance of doubt, any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the

116

interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Davis Polk may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters. Buyer hereby waives and agrees not to assert (1) any claim that Davis Polk has a conflict of interest in any representation described in this Section 13.15 or (2) any confidentiality obligation with respect to any communication between Davis Polk and any Designated Person occurring during the Current Representation.

(b)     Buyer hereby agrees that all communications (whether before, at or after the Closing) between Davis Polk and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives and Buyer hereby agrees that it will not intentionally seek to compel disclosure to Buyer or any of its Representatives of any Deal Communication or any other evidentiary privilege (*provided*, *however*, that Buyer shall not be restricted from seeking access thereto pursuant to a discovery request or similar means in connection with any dispute between or among the Parties pursuant to any legal process permitted in connection therewith).

(c)     Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a Third Party, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such Third Party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of Seller on behalf of the Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed). Without limiting the last sentence of Section 13.15(b), in the event that Buyer or any of its respective directors, officers, employees or other representatives is legally required by Order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (x) as soon as reasonably practicable notify the Selling Entities in writing (including by making specific reference to this Section 13.15(c)), (y) agree that the Selling Entities may seek a protective order and (z) use, at the Selling Entities' sole cost and expense, commercially reasonable efforts to assist therewith.

Section 13.16  *Liability of Financing Sources.*

No Seller Related Party shall have any rights or claims against any Debt Financing Source in connection with this Agreement, the Debt Financing or the transactions contemplated hereby or thereby, or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financing contemplated thereby, whether at law or equity, in contract, in tort or otherwise; *provided* that, notwithstanding the foregoing, nothing in this Section 13.16 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Financing or any financing commitment in respect thereof.

*[Signature page follows.]*

117

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

*[Signature Page to Asset Purchase Agreement]*

**URS-1 (CHARLEROI) LLC**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**EKCO GROUP, LLC**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**CORELLE BRANDS (GHC) LLC**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**URS-2 (CORNING) LLC**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

[*Signature Page to Asset Purchase Agreement*]

DocuSign Envelope ID: 53CEA279-69D4-4F4B-9605-E0ABEBEA9EE3

**CORELLE BRANDS (LATIN AMERICA) LLC**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

**EKCO HOUSEWARES, INC.**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

**EKCO MANUFACTURING OF OHIO, INC.**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

**INSTANT BRANDS LLC**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

[*Signature Page to Asset Purchase Agreement*]

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**INSTANT BRANDS (CANADA) HOLDING INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**INSTANT BRANDS INC.**

By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

[*Signature Page to Asset Purchase Agreement*]

**BUYER**


**IB HOUSEWARES US HOLDINGS, LLC**


By: _____

Name:   Mark Eichhorn

 Title:    Chief Executive Officer


**IB HOUSEWARES CANADA HOLDINGS, INC.**


By: _____

Name:   Mark Eichhorn

Title:    Chief Executive Officer


[*Signature Page to Asset Purchase Agreement*]

**Exhibit A**

Form of IP Assignment Agreements

[See Attached]

CONFIDENTIAL

## EXHIBIT A

### FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of [●] (the "Effective Date"), is by and among Instant Brands Acquisition Holdings Inc., a Delaware company ("Assignor"), each of the Subsidiaries of Seller listed on the signature pages hereto (together with Assignor, the "Assignor Entities") and IB Housewares US Holdings, LLC, a Delaware limited liability company ("Assignee").

### W I T N E S S E T H :

WHEREAS, pursuant to the terms and conditions of the Asset Purchase Agreement dated September 27, 2023 among Assignee and the Assignor Entities (the "Asset Purchase Agreement"), the Assignor Entities desire to sell, convey, transfer, assign and deliver to Assignee all of the Assignor Entities' right, title and interest in, to and under the Owned Intellectual Property, including the Intellectual Property set forth on Exhibit I hereto (the "Assigned IP"), and Assignee desires to acquire and accept all of the Assignor Entities' entire right, title and interest in, to and under such Assigned IP.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.     The Assignor Entities hereby sell, convey, transfer, assign and deliver to Assignee, and Assignee does hereby acquire and accept, all of the Assignor Entities' right, title and interest in, to and under the Assigned IP throughout the world and all rights corresponding thereto, together with all goodwill associated therewith and all income, royalties or payments now or hereafter due or payable in relation to the Assigned IP, and all benefits, privileges, causes of action, common law rights, and remedies relating thereto throughout the world.

3.     The parties hereto acknowledge and agree that the representations, warranties, covenants, indemnities, limitations and other terms contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the fullest extent provided therein.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4.     Upon the reasonable written request by Assignee, the Assignor Entities shall execute all documents and take all actions as may be necessary to enable Assignee to perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation from, but at the sole expense of, Assignee.

5.      The Assignor Entities hereby authorize and request the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of entire right, title and interest in, to and under the Assigned IP.

6.      Section 13.09 (*Governing Law; Consent to Jurisdiction; Jury Trial Waiver*) of the Asset Purchase Agreement is hereby incorporated herein by reference, *mutatis mutandis*, as if set forth in full herein.

7.      This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns.  No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

[SIGNATURE PAGE FOLLOWS]

#97236387v2

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR ENTITIES:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____

Name: _____

Title: _____

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____

Name: _____

Title: _____

**INSTANT BRANDS (TEXAS) INC.**

By: _____

Name: _____

Title: _____

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____

Name: _____

Title: _____

*Signature Page to IP Assignment*

**URS-1 (CHARLEROI) LLC**


By: _____
Name: _____
Title: _____


**EKCO GROUP, LLC**


By: _____
Name: _____
Title: _____


**CORELLE BRANDS (GHC) LLC**


By: _____
Name: _____
Title: _____


**URS-2 (CORNING) LLC**


By: _____
Name: _____
Title: _____


*Signature Page to IP Assignment*

**CORELLE BRANDS (LATIN AMERICA) LLC**

By: _____
Name: _____
Title: _____

**EKCO HOUSEWARES, INC.**

By: _____
Name: _____
Title: _____

**EKCO MANUFACTURING OF OHIO, INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS LLC**

By: _____
Name: _____
Title: _____

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: _____
Title: _____

*Signature Page to IP Assignment*

**INSTANT BRANDS (CANADA)**
**HOLDING INC.**

By: _____
Name: _____
Title: _____


**INSTANT BRANDS INC.**

By: _____
Name: _____
Title: _____

*Signature Page to IP Assignment*

**AS ASSIGNEE:**

**IB HOUSEWARES US HOLDINGS, LLC**


By: _____

Name: _____

Title: _____

**EXHIBIT I**[1]

**ASSIGNED IP**

**<u>Patents</u>**

| <u>Title</u> | <u>Patent No.</u><br><u>(Application No.)</u> | <u>Issue Date</u><br><u>(Filing Date)</u> |
|---|---|---|
| | | |

---

[1] The Assignor Entities and Assignee will use their respective commercially reasonable efforts during the interim period to accurately populate this Exhibit I.

## **Trademarks**

| Trademark | Registration No. (Application No.) | Registration Date (Application Date) |
|---|---|---|
|  |  |  |

## **Copyrights**

| Title | Registration No. | Registration Date |
|-------|------------------|-------------------|

#97236387v2

## Domain Names

| Domain Name |
| --- |

#97236387v2

**Exhibit B**

Form of Master Assignment

[See Attached]

*CONFIDENTIAL*
*Final Form*

## EXHIBIT B[1]

## FORM OF MASTER ASSIGNMENT, BILL OF SALE, DEED, AND CONVEYANCE

This Master Assignment, Bill of Sale, Deed, and Conveyance (this "Agreement") is entered into as of [●], by and among IB Housewares US Holdings, LLC, a Delaware limited liability company ("US Buyer"), IB Housewares Canada Holdings, Inc., a corporation incorporated under the laws of the Province of Ontario (the "Canadian Buyer", together with US Buyer, each a "Buyer Entity" and collectively, "Buyer"), Instant Brands Acquisition Holdings Inc., a company organized under the laws of the State of Delaware ("Seller"), and each of the Subsidiaries of Seller listed on the signature pages hereto (together with Seller, the "Selling Entities").

WHEREAS, Buyer and the Selling Entities have entered into the Asset Purchase Agreement, dated as of September 27, 2023 (the "Purchase Agreement"), pursuant to which, among other things, Buyer has agreed to purchase from the Selling Entities, and the Selling Entities have agreed to sell to Buyer, all of the Assets, and Buyer has agreed to assume all of the Assumed Liabilities, upon the terms and subject to the conditions set forth in the Purchase Agreement (collectively, the "Transaction");

WHEREAS, the execution, delivery and performance of this Agreement is an integral part of the transactions contemplated by the Purchase Agreement; and

WHEREAS, Buyer and the Selling Entities now desire to consummate the Transaction in part by the execution and delivery of this Agreement in order to give immediate effect thereto.

NOW, THEREFORE, pursuant to the Purchase Agreement and in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Asset Transfer.  As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, each Selling Entity hereby irrevocably sells, assigns, transfers, conveys and delivers to Buyer, and Buyer hereby purchases, acquires and accepts from the Selling Entities, all of the Selling Entities' respective right, title and interest in, to and under all of the Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances).

2.    Assumed Liabilities.  As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, Buyer hereby assumes and agrees to pay, perform and otherwise discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), all of the Assumed Liabilities.

3.    Excluded Liabilities and Excluded Assets.  The Selling Entities shall retain and remain solely responsible for, and Buyer is not hereby assuming and shall not otherwise be obligated to pay,

---

[1] This Exhibit B may be separated out during the interim period in order to make clear that the Canadian Sellers will sell, assign, transfer, convey and deliver all of the Assets (other than the Owned Intellectual Property) to the Canadian Buyer.

perform, discharge or in any way become responsible for, any of the Excluded Liabilities. The Selling Entities shall retain all, and Buyer is not hereby acquiring any, right, title or interest in, to or under the Excluded Assets.

4.  Purchase Agreement. This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement. This Agreement is given to further evidence (and give immediate effect to) the transfers and assignments of the interests in the Assets contemplated by the Purchase Agreement upon the terms and conditions specified therein. Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, reduce, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, and any of the obligations, of Buyer or the Selling Entities set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement will govern.

5.  Notices. All notices and other communications to be given under the terms of this Agreement or which any of the parties hereto desire to give hereunder shall be in writing and shall be made in accordance with Section 13.02 (*Notices*) of the Purchase Agreement.

6.  Governing Law; Jurisdiction. The parties hereto hereby agree that the provisions of Section 13.09 (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*) of the Purchase Agreement are hereby made part of this Agreement as if they were contained herein, *mutatis mutandis*.

7.  Headings. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

8.  Defined Terms. All capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

9.  Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original of this Agreement and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.02 of the Purchase Agreement, delivery of an executed counterpart of a signature page to this Agreement by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

10.  Miscellaneous. The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and assigns, and nothing in this Agreement is intended or shall be construed to give any other Person any legal or equitable right, remedy or claim under, or in respect of, this Agreement or any provision contained herein. This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto. This Agreement may be terminated, amended or modified, and any of the terms, covenants or conditions hereof may be waived, only by a writing signed by each of the parties hereto or, in the case of a waiver, by the party or parties waiving compliance. Each item and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever that term or

2

provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby. Each of the parties hereto has been represented by its own counsel and acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in connection with the construction or interpretation of this Agreement.

[*Remainder of this page is intentionally left blank*]

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties herein have executed this Master Assignment, Bill of Sale, Deed, and Conveyance as of the date set forth in the first paragraph hereof.

**BUYER:**

**IB HOUSEWARES US HOLDINGS, LLC**

By: _____
Name:  Mark Eichhorn
Title:    Chief Executive Officer

**IB HOUSEWARES CANADA HOLDINGS, INC.**

By: _____
Name:  Mark Eichhorn
Title:    Chief Executive Officer

*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**SELLER:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____


**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: _____
Title: _____


**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: _____
Title: _____


**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____
Name: _____
Title: _____


*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**URS-1 (CHARLEROI) LLC**

By: _____
Name: _____
Title: _____


**EKCO GROUP, LLC**

By: _____
Name: _____
Title: _____


**CORELLE BRANDS (GHC) LLC**

By: _____
Name: _____
Title: _____


**URS-2 (CORNING) LLC**

By: _____
Name: _____
Title: _____


*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**CORELLE BRANDS (LATIN AMERICA) LLC**

By: _____
Name: _____
Title: _____

**EKCO HOUSEWARES, INC.**

By: _____
Name: _____
Title: _____

**EKCO MANUFACTURING OF OHIO, INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS LLC**

By: _____
Name: _____
Title: _____

*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: _____
Title: _____


**INSTANT BRANDS (CANADA)
HOLDING INC.**

By: _____
Name: _____
Title: _____


**INSTANT BRANDS INC.**

By: _____
Name: _____
Title: _____

**Exhibit C**

Form of Transition Services Agreement

[See Attached]

**CONFIDENTIAL**

**FORM OF**

**TRANSITION SERVICES AGREEMENT**

dated as of [●], 2023

by and among

**INSTANT BRANDS ACQUISITION HOLDINGS INC.,**

**EACH OF THE SUBSIDIARIES OF**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

**SET FORTH ON THE SIGNATURE PAGES HERETO,**

**IB APPLIANCES US HOLDINGS, LLC,**

**IB APPLIANCES CANADA HOLDINGS, INC.,**

**IB HOUSEWARES US HOLDINGS, LLC,**

and

**IB HOUSEWARES CANADA HOLDINGS, INC.**

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions.* ........................................................................................................ 2
Section 1.02. *Other Definitional and Interpretative Provisions.* ........................................... 2

ARTICLE 2
PURCHASE AND SALE OF SERVICES

Section 2.01. *Purchase and Sale of Services.* ....................................................................... 3
Section 2.02. *Discontinuation of Services.* ............................................................................ 4
Section 2.03. *Recipient and Provider.* ................................................................................... 5
Section 2.04. *Third-Party Licenses and Consents* ............................................................... 6
Section 2.05. *Third-Party Service Providers.* ........................................................................ 6

ARTICLE 3
SERVICE COSTS; OTHER CHARGES

Section 3.01. *Service Costs Generally* .................................................................................. 6
Section 3.02. *Right to Offset* ................................................................................................. 6
Section 3.03. *Taxes.* .............................................................................................................. 7
Section 3.04. *Invoicing and Settlement of Service Costs.* .................................................... 7

ARTICLE 4
THE SERVICES

Section 4.01. *Standards of Service.* ...................................................................................... 9
Section 4.02. *Suspension of Services* ................................................................................... 9
Section 4.03. *Management of Services* .................................................................................. 9
Section 4.04. *Policies and Procedures.* ................................................................................ 10
Section 4.05. *Limitations.* ...................................................................................................... 10

ARTICLE 5
DISCLAIMER, LIABILITY AND INDEMNIFICATION

Section 5.01. *Indemnification of Provider by Recipient* ...................................................... 10
Section 5.02. *Indemnification of Recipient by Provider* ...................................................... 11
Section 5.03. *Indemnification as Exclusive Remedy* ........................................................... 11
Section 5.04. *Liability for Payment Obligations* .................................................................. 11
Section 5.05. *Indemnification Procedures.* .......................................................................... 11
Section 5.06. *Exclusion of Warranties.* ................................................................................ 11
Section 5.07. *Limitation of Liability* ..................................................................................... 11

ARTICLE 6
TERM AND TERMINATION

i

Section 6.01. *Term.* ........................................................................................................ 12
Section 6.02. *Termination.* ............................................................................................... 13
Section 6.03. *Effect of Termination* ................................................................................. 13

ARTICLE 7
ADDITIONAL AGREEMENTS

Section 7.01. *Confidential Information.* ............................................................................ 13
Section 7.02. *Intellectual Property.* .................................................................................. 15
Section 7.03. *Access to Information.* ................................................................................. 16
Section 7.04. *Employment and Labor Matters* ................................................................. 16
Section 7.05. *The Transfer of Undertakings* ..................................................................... 16

ARTICLE 8
MISCELLANEOUS

Section 8.01. *No Agency; Independent Contractor Status* ................................................ 17
Section 8.02. *Subcontractors* ............................................................................................. 17
Section 8.03. *Force Majeure* ............................................................................................. 17
Section 8.04. *Entire Agreement* ........................................................................................ 18
Section 8.05. *Information* ................................................................................................... 18
Section 8.06. *Notices.* ........................................................................................................ 18
Section 8.07. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver* .......... 19
Section 8.08. *Severability.* ................................................................................................. 20
Section 8.09. *Amendments and Waivers* ........................................................................... 20
Section 8.10. *Successors and Assigns* ............................................................................... 20
Section 8.11. *Specific Performance* .................................................................................. 21
Section 8.12. *Third Party Rights* ....................................................................................... 21
Section 8.13. *Counterparts* ................................................................................................ 21

Schedule A        Seller Services
Schedule B        Buyer Services
Schedule C        Excluded Services
Schedule D        Data Processing Addendum

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "**Agreement**"), dated as of [●], 2023 (the "**Effective Date**"),[1] is by and among Instant Brands Acquisition Holdings Inc., a Delaware corporation ("**Seller**"), each of the Subsidiaries of Seller set forth on the signature pages hereto (together with Seller, the "**Selling Entities**"), [●], LLC, a Delaware limited liability company ("**US [●] Buyer**"), and [●], Inc., a corporation incorporated under the laws of the Province of Ontario ("**Canadian [●] Buyer**" and together with US [●] Buyer, the "[●] **Buyer**"); *provided, however*, that solely upon the Closing of the [●][2] Purchase Agreement, [●], LLC, a Delaware limited liability company ("**US [●] Buyer**"), and [●], Inc., a corporation incorporated under the laws of the Province of Ontario ("**Canadian [●] Buyer**" and together with US [●] Buyer, the "[●] **Buyer**" and [●] Buyer together with [●] Buyer, severally but not jointly, each a "**Buyer Entity**" and collectively, "**Buyer**"), shall each execute and deliver a countersigned page to this Agreement and be joined as parties hereto. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**."[3]

## RECITALS

WHEREAS, the Selling Entities and Appliances Buyer entered into the Asset Purchase Agreement, dated as of September 27, 2023 (as such agreement may be amended from time to time, the "**Appliances Purchase Agreement**"), pursuant to which Appliances Buyer agreed to purchase from the Selling Entities all of the Assets (as defined in the Appliances Purchase Agreement), on the terms and subject to the conditions set forth in the Appliances Purchase Agreement;

WHEREAS, the Selling Entities and Housewares Buyer entered into the Asset Purchase Agreement, dated as of September 27, 2023 (as such agreement may be amended from time to time, the "**Housewares Purchase Agreement**" and, together with the Appliances Purchase Agreement, the "**Purchase Agreements**" and each, a "**Purchase Agreement**"), pursuant to which Housewares Buyer agreed to purchase from the Selling Entities all of the Assets (as defined in the Housewares Purchase Agreement), on the terms and subject to the conditions set forth in the Housewares Purchase Agreement; and

WHEREAS, each Purchase Agreement contemplates that the Selling Entities and Buyer will enter into this Agreement, pursuant to which (a) the Selling Entities will provide to Buyer and its Affiliates certain transitional services with respect to the applicable Business in order to facilitate an orderly transition of the applicable Assets to such Buyer and to enable Buyer to conduct the applicable Business in substantially the same manner as conducted immediately prior to the applicable Closing and (b) Buyer will provide, or will cause its Affiliates to provide, to the Selling Entities certain transitional services with respect to their respective operations of the Excluded Assets or any business now, previously or hereafter conducted by the Selling Entities other than the Business (the "**Retained**

---

[1] **Note to Draft**: Buyer will require Seller Services immediately upon the first Closing (regardless of whether the Appliances APA or the Housewares APA closes first).

[2] **Note to Draft**: To be the APA that will close last.

[3] **Note to Draft**: To be populated with the applicable names depending on which transaction closes first and upon the Closing of the second transaction such buyer entities will join this Agreement as parties thereto.

**Business**"), in each case, after the Effective Date and each in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions.* Any capitalized term that is used, but not defined, herein shall have the meaning assigned to such term in the applicable Purchase Agreement. In addition, for the purpose of this Agreement, the following terms shall have the meanings set forth below.

"**Provider**" means (a) the applicable Selling Entity in its capacity as the Person providing or causing to be provided the Seller Services or (b) Buyer in its capacity as the Person providing or causing to be provided the Buyer Services, as the case may be.

"**Recipient**" means (a) the applicable Selling Entity in its capacity as the recipient, directly or indirectly through one or more of its controlled Affiliates, of the Buyer Services or (b) Buyer in its capacity as the recipient, directly or indirectly through one or more of its controlled Affiliates, of the Seller Services, as the case may be.

"**Service End Date**" means, with respect to any Service, the service end date for such Service as set forth on Schedule A or Schedule B, as applicable.

"**Service Period**" means, with respect to any Service, the period commencing on the Effective Date and ending at the close of business on the earlier of (a) the date such Service is terminated in accordance with Section 2.02 or 4.02, (b) the Service End Date for such Service, and (c) the date this Agreement is terminated in accordance with Section 6.01, 6.02 or **Error! Reference source not found.**.

"**Services**" means the Seller Services, the Buyer Services, or both, as the context requires.

Section 1.02. *Other Definitional and Interpretive Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits, Annexes and Schedules are to Articles, Sections, Exhibits, Annexes and Schedules of this Agreement unless otherwise specified. All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. Where there is any inconsistency between the definitions set out in Section 1.01 and the definitions set out in any other Section or any Schedule, Exhibit or Annex, then, for the purposes of construing such Section, Schedule, Exhibit or Annex, the definitions set out in such Section, Schedule, Exhibit or Annex shall prevail. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if". Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without

2

limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute, law or other Applicable Law shall be deemed to refer to such statute, law or other Applicable Law as amended from time to time and, if applicable, to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms thereof. References to any Person include the successors and permitted assigns of that Person. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including". References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The word "or" shall not be exclusive (i.e., "or" shall mean "and/or"). The word "shall" shall have the same meaning as "will" and vice versa. All references to any time herein shall refer to Eastern Time. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Except where the context otherwise requires, references to "a party" or "the parties" will be deemed to refer to a party or the parties to this Agreement, respectively.

## ARTICLE 2
### PURCHASE AND SALE OF SERVICES

Section 2.01. *Purchase and Sale of Services.*

(a) On the terms and subject to the conditions of this Agreement, from and after the Effective Date, and for the applicable Service Period, the Selling Entities shall use commercially reasonable efforts to provide (or cause to be provided) to Buyer (or any Affiliate thereof designated by Buyer) the services set forth on <u>Schedule A</u>. Each of the services set forth on <u>Schedule A</u>, as such Schedule may be amended from time to time in accordance with this Agreement, are referred to individually as a "**Seller Service**" and collectively as the "**Seller Services**."

(b) On the terms and subject to the conditions of this Agreement, from and after the Effective Date, and for the applicable Service Period, Buyer shall use its commercially reasonable efforts to provide (or cause to be provided) to the applicable Selling Entities (or an Affiliate thereof designated by the Selling Entities) the services set forth on <u>Schedule B</u>. Each of the services set forth on <u>Schedule B</u>, as such Schedule may be amended from time to time in accordance with this Agreement, are referred to individually as a "**Buyer Service**" and collectively as the "**Buyer Services**."

(c) Except for the Services expressly contemplated to be provided in accordance with the provisions of this Agreement (including Section 2.01(d)) or another Transaction Document, neither Provider, nor any of its Affiliates, shall have any obligation under this Agreement to provide any services to Recipient or its Affiliates. Notwithstanding anything herein to the contrary, in no event shall Provider be required to provide any legal, financial, accounting or tax advice or any of the other services identified in <u>Schedule C</u> (the "**Excluded Services**"). The provision to the Business of any Excluded Services shall be discontinued as of the Effective Date.

(d)      If, during the Term, a Party identifies a service that (i) (A) the Selling Entities provided to the applicable Business during the Baseline Period in connection with the ordinary course operation of the Business or (B) the applicable Business provided to the Retained Business during the Baseline Period in connection with the ordinary course operation of the Retained Business, (ii) was omitted from Schedule A or Schedule B, as applicable, (iii) (A) Buyer reasonably determines that it needs in order to continue to operate the applicable Business in substantially the same manner in which the Business operated during the Baseline Period or (B) the Selling Entities reasonably determine is needed in order to continue to operate the Retained Business in substantially the same manner in which the Retained Business operated during the Baseline Period, and (iv) is not an Excluded Service (each, an "**Additional Service**"), then upon written request of the Party that identifies or desires to receive such Additional Services, the Parties shall negotiate in good faith to provide (or cause to be provided) such Additional Service to Recipient; *provided* that, the Selling Entities shall not be obligated to provide any Additional Service to the extent the activities comprising such Additional Service were, during the Baseline Period, performed for the Business by positions held by Transferred Employees.  To the extent that the Parties reach an agreement with respect to providing such Additional Services, the Parties shall cooperate and act in good faith to add such services to Schedule A or Schedule B, as applicable, and mutually agree to a description of the Additional Service, the Service Period during which the Additional Service will be provided, the Service Costs for the Additional Service and any other terms applicable thereto.  The provision of any Additional Services shall be deemed part of the "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement.

(e)      Provider and Recipient shall each nominate a representative to act as the primary contact person with respect to the provision of the Services (the "**Service Coordinators**").  Each Party may change its Service Coordinator from time to time at its sole discretion by providing prior written notice to the other Party (including contact information for such Service Coordinator).  Unless otherwise agreed to in writing by the Parties, all communications relating to the day-to-day provision of the Services shall be directed to the Service Coordinators.  The Service Coordinators shall work in good faith and use commercially reasonable efforts to effectuate a smooth transition of the Services from the Provider to the Recipient (or its designee) on the terms and subject to the conditions set forth in this Agreement.

Section 2.02.  *Discontinuation of Services*.

(a)      Any Service (or portion thereof) may be discontinued as of a date that is earlier than the Service End Date upon the mutual written consent of the Parties, and, in such case, Schedule A or Schedule B, as applicable, shall be deemed amended to delete such Service as of such date, and this Agreement shall be of no further force and effect with respect to such Service, except as to obligations or liabilities accrued pursuant to this Agreement through the date of discontinuation of such Service, or in connection with such termination.

(b)      Recipient may discontinue all or any portion of a Service, so long as any non-terminated Service is not dependent on such portion of a Service proposed to be discontinued, by providing no less than 30 days' advance written notice to Provider ("**Termination Notice**") at any time, and, in such case, the applicable Service (or portion thereof) shall terminate on the termination date specified in the Termination Notice (or such other date mutually agreed in writing by Recipient and Provider), and Schedule A or Schedule B, as applicable, shall be deemed amended to delete such Service (or portion thereof) as of the termination date, and this Agreement shall be of no further force and effect with respect to such Service (or portion thereof), except as to obligations or liabilities accrued pursuant to this Agreement prior to the date of termination of such Service (or portion thereof), or in connection with such

termination; *provided* that, to the extent set forth on <u>Schedule A</u> or <u>Schedule B</u>, certain Services (or portions thereof) may not be terminated prior to the Service End Date.

(c)     Any Service (or portion thereof) may be terminated without the termination of any other Service (or portion thereof); *provided* that, if, in the reasonable determination of the Provider, it is technically infeasible or commercially impracticable to terminate one Service (or portion thereof) without terminating one or more other Services (or portions thereof), Recipient shall be required to concurrently terminate all such Services (or portions thereof) for which separate termination would be technically infeasible or commercially impracticable (such required termination, an "**Interdependency Termination**"). Within a reasonable period of time following receipt of any Termination Notice (but in no event more than 15 Business Days following receipt of any Termination Notice), Provider may provide Recipient with written notice ("**Provider Notice**") of (i) any reasonable and documented out-of-pocket costs that Provider has incurred, or reasonably expects to incur, solely as a result of early termination of the applicable Service (or portion thereof), including for commitments made to, or in respect of, personnel or third-party service providers (including subcontractors), to provide the Services (or portions thereof) through the applicable Service End Date, costs related to terminating such commitments or prepaid expenses related to the applicable Services (or portions thereof) that cannot or will not be reimbursed (collectively, the "**Early Termination Costs**"), and (ii) whether early termination of the applicable Service (or portion thereof) will require an Interdependency Termination. The Provider Notice shall set forth an estimate (to the extent then known by Provider) of the amount of the Early Termination Costs. Recipient may withdraw its Termination Notice by delivering a withdrawal notice within five Business Days following the receipt of such Provider Notice from Provider. If Recipient does not withdraw the Termination Notice within such period, such Termination Notice will be final and irrevocable, and Recipient shall reimburse Provider for all Early Termination Costs reasonably incurred by Provider as a result of such early termination; *provided* that, Provider shall use commercially reasonable efforts to mitigate such costs. Such reimbursement shall be made by Recipient to Provider in accordance with Section 3.04.

Section 2.03. *Recipient and Provider.*

(a)     It is understood and agreed that (i) the Services to be provided to Recipient under this Agreement shall, at such Recipient's request be provided to any Person that is a controlled Affiliate of Recipient (in which case, such controlled Affiliate shall be included in the definition of "Recipient" for all purposes hereof in respect of such Service), which controlled Affiliates it may change at its discretion from time to time, and (ii) Provider may satisfy its obligation to provide or procure Services hereunder by causing one or more of its Affiliates to provide or procure such Services (in which case, such Affiliates shall be included in the definition of "Provider" for all purposes hereof in respect of such Service), which Affiliates it may change at its discretion from time to time, *provided* that, Provider shall remain responsible for the performance of such Affiliates.

(b)     Without limiting or expanding any other provision of this Agreement, Recipient shall, and shall cause its Affiliates to, reasonably cooperate with Provider to the extent necessary for Provider to fulfill its obligations with respect to the provision of the applicable Services. Such cooperation shall include, subject to Section 7.01, (i) providing information reasonably requested by Provider or one of its Affiliates or Third-Party Service Providers and (ii) making available, as reasonably requested by Provider or one of its Affiliates or Third-Party Service Providers, timely decisions, authorizations and consents, in each case as and to the extent necessary for Provider to perform, or cause its applicable Affiliates or Third-Party Service Providers to perform, its obligations hereunder in a timely and efficient manner.

Provider shall not be liable for any impairment of any Service caused by Recipient's failure to provide information of the type described in the immediately preceding sentence such that it renders performance by Provider of such Service unlawful or impracticable.

Section 2.04. *Third-Party Licenses and Consents*. Each Party shall use its commercially reasonable efforts to obtain, and to keep and maintain in effect, all governmental or third party licenses and consents required for the provision of any Service, including with respect to access and use of any third party software, by Provider in accordance with the terms of this Agreement; *provided* that, if the Parties are unable to obtain any such license or consent, Provider shall notify Recipient in writing and shall, and shall cause its controlled Affiliates to, use commercially reasonable efforts to implement an appropriate alternative arrangement to provide such Services. Any costs relating to obtaining any such licenses or consents or incurred as a result of such alternative arrangement shall be split equally between Provider and Recipient; *provided* that, Provider shall not incur any such costs without the prior written consent of Recipient, which consent shall not be unreasonably withheld.

Section 2.05. *Third-Party Service Providers*. If and to the extent Provider proposes to provide all or any portion of the Services hereunder through a subcontractor or other third party, Provider and Recipient shall mutually agree as to the selection of such subcontractor or other third party (each such subcontractor or other third party, a "**Third-Party Service Provider**"); *provided*, that each Third-Party Service Provider will be subject to, and Provider will use commercially reasonable efforts to ensure that each Third-Party Service Provider engaged by it complies with, service standards and confidentiality provisions at least equivalent to those set forth herein. If Provider receives written notice from any Third-Party Service Provider that such Third-Party Service Provider intends to terminate a service pursuant to which Provider provides a Service to Recipient, then Provider shall use commercially reasonable efforts to secure the continued provision of that Service from such Third-Party Service Provider or an alternative Third-Party Service Provider. Each Party agrees that if Provider engages a Third-Party Service Provider to provide a Service, then Provider will retain responsibility for the provision of such Service to be performed by such Third-Party Service Provider.

## ARTICLE 3
### SERVICE COSTS; OTHER CHARGES

Section 3.01. *Service Costs Generally*. The fee to be paid by Recipient to Provider for each Service to be provided under this Agreement shall be as set forth opposite such Service on Schedule A or Schedule B, as applicable (any such costs being referred to herein as "**Service Costs**"). If at any time after the Effective Date Provider believes that the Service Costs are materially insufficient to compensate it for the cost of providing the Services it is obligated to provide hereunder, Provider shall notify Recipient and the Parties will commence good faith negotiations toward an agreement as to the appropriate course of action with respect to pricing of such Services for future periods, and if the Parties agree to an adjustment, Schedule A or Schedule B, as applicable, will be amended to reflect any agreed changes to the Services and any updated Service Costs. For the avoidance of doubt, except as expressly set forth herein (including **Error! Reference source not found.**) or Schedule A or Schedule B, (i) the Service Costs for each Service shall commence on the Effective Date and (ii) the Service Costs for each Service are fixed and are not subject to adjustment if all or a portion of such Service is not utilized by Recipient.

Section 3.02. *Right to Offset*. Recipient hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment or similar right that Recipient has or may have with respect to

6

the payment of the Service Costs or any other payments to be made by Recipient pursuant to this Agreement.

Section 3.03. *Taxes.* (a) Recipient (or its applicable Affiliate) shall be responsible for and shall pay all applicable goods and services sales, use or similar taxes, levies and charges, together with any interest, penalties and additions thereto ("**Service Taxes**") imposed by applicable taxing authorities on the provision of the Services to Recipient (or such Affiliate) or on any payment hereunder, whether or not such Service Taxes are shown on any invoices (provided that, if the omission of such Service Taxes from an invoice results in the imposition of additional Service Taxes, Recipient (or such Affiliate) shall not be responsible for such additional Service Taxes). Service Taxes shall be incremental to other payments or charges identified in this Agreement. If Provider or any of its Affiliates is required to pay any portion of such Service Taxes, Provider shall provide Recipient with evidence that such Service Taxes have been paid, and Recipient (or its applicable Affiliate) shall reimburse Provider (or its applicable Affiliate) for such Service Taxes. Each party shall, and shall cause its Affiliates to, use commercially reasonable efforts to avail itself of any available exemptions from such Service Taxes and to cooperate with the other party in providing any information or documentation that may be necessary to obtain such exemptions.

(b) All sums payable under this Agreement shall be paid free and clear of all deductions or withholdings in respect of any taxes, levies or charges unless the deduction or withholding is required by Applicable Law, in which event the Recipient shall promptly notify the Provider of such required withholding. The Recipient shall withhold (or cause to be withheld) such taxes, levies or charges and pay (or cause to be paid) such withheld amounts over to the applicable taxing authority in accordance with the requirements of the Applicable Law and provide the Provider with an official receipt confirming payment. Such amounts deducted or withheld, and paid to the appropriate taxing authority, shall be treated as paid to the Provider for all purposes of this Agreement. The Parties agree to use commercially reasonable efforts to reduce or eliminate taxes, levies or charges (including pursuant to any applicable double taxation or similar treaty) or receive a refund of, or to claim a tax credit for, such taxes, for which deductions or withholdings would be required under this clause (b).

(c) If anything done by the Provider under this Agreement is a supply on which VAT is chargeable, the Recipient shall pay to the Provider (in addition to any other amounts payable under this Agreement) an amount equal to any VAT so chargeable, provided that the Provider has provided the Recipient with a valid VAT invoice in respect of such VAT. Where the Recipient is obligated under this Agreement to reimburse the Provider for any fee, cost, charge or expense, the amount which the Recipient is required to pay in respect of such matter shall include any VAT incurred by the Provider (or any member of a group to which the Provider belongs for VAT purposes), except to the extent the Provider (or any member of a group to which the Provider belongs for VAT purposes) determines it is able to recover such VAT by way of repayment or credit. "**VAT**" shall mean value added tax as levied in accordance with (but subject to derogation from) Council Directive 2006/112/EC or any similar tax outside the European Union.

Section 3.04. *Invoicing and Settlement of Service Costs.*

(a) Unless <u>Schedule A</u> or <u>Schedule B</u>, as applicable, provides otherwise or the Parties agree in writing to a different arrangement, (i) the applicable Buyer Entity, if Provider is Buyer or any Affiliate thereof, or (ii) the applicable Selling Entity, if Provider is a Selling Entity or any Affiliate thereof, shall invoice the applicable Selling Entity or Buyer, respectively, on a monthly basis for all Service Costs incurred hereunder in respect of the prior month to the extent such Service Costs are reasonably

determinable during such month, and to the extent any such amounts are not reasonably determinable, Provider shall continue to invoice such amounts (including after the termination of this Agreement) as promptly as practicable after such amounts are determined until all amounts are invoiced and paid (the date of delivery of such invoice or notification, the "**Invoice Date**"); *provided* that, Provider will use commercially reasonable efforts to provide Recipient with notice of the existence of amounts that are not reasonably determinable with respect to any calendar month and when such amounts are expected to be invoiced. For the avoidance of doubt, all such invoices and payments shall be made in U.S. dollars.

(b) Recipient agrees to pay, on or before the date that is 30 days after the Invoice Date (such date, the "**Payment Date**"), by wire transfer of immediately available funds payable to the order of (i) the applicable Buyer Entity, if Provider is Buyer or any Affiliate thereof, or (ii) the applicable Selling Entity, if Provider is a Selling Entity or any Affiliate thereof, of or to such account or accounts designated by Provider, all amounts specified in the invoice or notification delivered pursuant to the preceding clause (a).

(c) If Recipient fails to make payment of any Service Costs in accordance with this Section 3.04, it shall be required to pay, in addition to the amount of such unpaid Service Costs, interest on such amount at a rate per annum equal to 5% per annum compounded quarterly, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "**Interest Rate**"), in each case compounded monthly from, and including, the relevant Payment Date through, but excluding, the actual date of payment.

(d) If there is a good faith dispute (an "**Invoice Dispute**") between Provider and Recipient regarding any amount set forth in any invoice, the disputing party shall promptly notify the other party in writing (each such notice, an "**Invoice Dispute Notice**") of each amount that is the subject of the Invoice Dispute and the basis therefor, and such amount shall be excluded from the amount due pursuant to Section 3.04(b) until resolution of the Invoice Dispute in accordance with the procedures set forth below in this Section 3.04(d); *provided* that, any undisputed portion of such amount shall be included in the calculation of the amount due pursuant to Section 3.04(b) and paid in accordance with Section 3.04(b). Provider and Recipient shall cooperate and use their commercially reasonable efforts to resolve such Invoice Dispute. If Provider and Recipient are unable to resolve the Invoice Dispute within 20 days after the applicable party's receipt of the Invoice Dispute Notice, then either Provider or Recipient may refer the Invoice Dispute for resolution to an independent accounting firm agreed upon in good faith by Provider and Recipient; *provided*, *however*, in the event such parties are unable to mutually agree on such Person, Seller, on the one hand, and Buyer, on the other hand, will each select an independent accounting firm of recognized national standing and each such selected accounting firm will select a third independent accounting firm of recognized national standing to be deemed to be the independent accounting firm selected by the parties for purposes of this Section 3.04(d), which firm may not be the regular auditing firm of either such party (the "**Invoice Accounting Referee**"), which shall determine the disputed amounts. The determinations of the Invoice Accounting Referee shall be final and binding on Provider and Recipient. The fees and expenses of the Invoice Accounting Referee shall be borne by Provider and Recipient in the same proportion that the aggregate amount of the disputed items submitted to the Accounting Referee that are unsuccessfully disputed by each such party (as finally determined by the Accounting Referee) bears to the total amount of such disputed items so submitted. If based on the determinations of the Invoice Accounting Referee any amount is owed by one party to the other party, then the applicable party shall promptly pay such amount with interest, from the date that such amount was required to be paid pursuant to Section 3.04(b) to (but excluding) the date of payment by the applicable party of such excess, at the Interest Rate.

8

# ARTICLE 4
## THE SERVICES

Section 4.01.  *Standards of Service*.  (a) Unless Schedule A or Schedule B, as applicable, indicates otherwise or the Parties agree in writing to a different arrangement, the level or volume of any specific Service required to be provided to Recipient hereunder shall be at a level or volume consistent in all material respects with the level or volume, as the case may be, of such specific Service as utilized by the Business, or the Retained Business, as applicable, during the 12-month period prior to the applicable Closing (the "**Baseline Period**") provided (i) by the Selling Entities or their Affiliates to the Business or (ii) by the Business to the Retained Business, as applicable (such level or volume, the "**Anticipated Volume**").

(b)      Unless Schedule A or Schedule B, as applicable, indicates otherwise or the Parties agree in writing to a different arrangement, each Party shall, and shall cause its applicable Affiliates and/or Third-Party Service Providers to, use its commercially reasonable efforts to perform the Services exercising the same general and reasonable degree of care, responsiveness, completeness and quality and in any event no less than such Party has historically exercised (including during the Baseline Period) in performing the same or similar services for such Party's own account in the ordinary course of business and in accordance with any additional services standards for such Services set forth on Schedule A or Schedule B, as applicable (the "**Services Standard**").

(c)      The Parties shall comply with their respective data protection obligations as set out in Schedule D (the "**Data Processing Addendum**").

(d)      Where necessary or appropriate, as mutually determined by the Parties, for Recipient to receive the Services in a particular country or region, the Parties or their local Affiliates shall enter into an additional, ancillary agreement setting forth such additional terms and conditions applicable to such country or region (each, a "**Local Agreement**").  The Local Agreements may address as necessary any specific legal, regulatory, human resource or procedural requirements necessary for compliance with applicable local Law (e.g., tax or employment) or due to variations in practices or as otherwise agreed to by the Parties.  All Local Agreements shall be subject to the terms of this Agreement.  In the event of any conflict between a Local Agreement and this Agreement, this Agreement controls.  No Local Agreement shall be effective or enforceable unless and until executed by both Parties.

Section 4.02.  *Suspension of Services*.  Provider will not be obligated to perform any Service to the extent that the provision of such Service (i) would violate any Applicable Law to which Provider is subject or (ii) would require Provider to breach any Contract to which it is party; *provided*, that in the case of the foregoing clauses (i) and (ii), Provider will use commercially reasonable efforts to provide the applicable Service in a manner according with the standards set forth in Section 4.01 as closely as possible and that avoids any such violation or breach.  If Provider determines that it is unable to provide any Service in accordance with the terms of this Agreement as a result of the circumstances set forth in this Section 4.02, Provider shall as promptly as commercially practicable and permitted by Applicable Law provide Recipient written notice of such fact and the Parties will cooperate in good faith to determine the best alternative approach.

Section 4.03.  *Management of Services*.  Except as may otherwise be expressly provided in this Agreement, the management of and control over the provision of the Services by Provider shall reside solely with Provider and notwithstanding anything to the contrary, Provider shall be permitted to choose

9

the methodology, systems and applications it utilizes in the provision of such Services; *provided* that, Provider shall remain responsible for the performance of the Services in accordance with this Agreement. The provision, use of and access to the Services shall be subject to (i) any technical and operational changes that may be required to manage any reasonable restrictions imposed by Provider in respect of data access, (ii) any third-party services, resources or dependencies, (iii) any Applicable Law, and (iv) the terms of this Agreement.

Section 4.04. *Policies and Procedures*.

(a) Except to the extent inconsistent with this Agreement, Recipient shall (and shall cause its respective Representatives and any subcontractors to) comply with the internal policies, procedures, rules and regulations of Provider (as may be updated from time to time in the ordinary course of business) applicable to (i) the use of Provider's computers, networks, telephone systems, software, data, equipment or other facilities in connection with the Services or (ii) Recipient's conduct while on Provider's premises or utilizing Provider's facilities in connection with the Services.

(b) Recipient shall (i) not attempt to obtain access to, use or interfere with any information technology systems of Provider or its Affiliates, or any data owned, used or processed by Provider or its Affiliates, except access to the extent required to do so to receive the Services, (ii) maintain reasonable security measures to protect the systems of Provider and its Affiliates to which it has access pursuant to this Agreement from access by unauthorized third parties, and any "back door," "time bomb," "Trojan Horse," "worm," "drop dead device," "virus" or other computer software routine intended or designed to disrupt, disable, harm or otherwise impede in any manner the operation of such systems, (iii) not permit access or use of information technology systems of Provider or its Affiliates by a third party other than as authorized by prior written consent of Provider or its Affiliates, (iv) not disable, damage, erase, disrupt or impair the normal operation of the information technology systems of Provider or its Affiliates, and (v) comply with the security policies and procedures of Provider and its Affiliates (as may be updated from time to time in the ordinary course of business) that Provider has provided to the Recipient.

Section 4.05. *Limitations*.

(a) It is understood that the Services to be provided to Recipient under this Agreement shall only be provided for the purposes of conducting the Business or the Retained Business, as applicable, substantially as conducted during the Baseline Period and facilitating an orderly transition of the operation of the Business or the Retained Business, as applicable, following the Closing. Neither Recipient, nor any of its Affiliates, may resell, license the use of or otherwise permit the use by others of any Services, except with the prior written consent of Provider.

(b) In providing the Services, Provider shall not be obligated to (i) maintain the employment of any specific employee or (ii) pay any costs related to the transfer or conversion of Recipient's data to Recipient or any alternate supplier of Services, all of which shall be paid by Recipient.

ARTICLE 5
DISCLAIMER, LIABILITY AND INDEMNIFICATION

Section 5.01. *Indemnification of Provider by Recipient*. Each Party, in its capacity as Recipient hereunder, agrees to indemnify and hold harmless the other Party, in its capacity as Provider hereunder, its Affiliates and their respective directors, officers, partners, members, agents, employees,

10

representatives and their respective successors and assigns (each, a "**Provider Indemnified Person**") from and against any and all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any Action, as defined below, whether involving a Third-Party Claim or a claim solely between the parties) ("**Damages**"), and to reimburse each Provider Indemnified Person for all reasonable expenses (including reasonable attorneys' fees) as they are incurred in investigating, preparing, pursuing or defending any action, suit, investigation or Proceeding, in each case by or before any arbitrator or Governmental Authority (collectively, "**Actions**"), whether or not in connection with pending or threatened litigation and whether or not any Provider Indemnified Person is a party, in each case arising out of the Services rendered or to be rendered by or on behalf of any Provider Indemnified Person pursuant to this Agreement or any actions or inactions by or on behalf of any Provider Indemnified Person in connection with any such Services; *provided*, that Recipient shall not be responsible for any Damages of such Provider Indemnified Person to the extent such Damages have resulted from a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services.

Section 5.02. *Indemnification of Recipient by Provider.* Each Party, in its capacity as Provider hereunder, agrees to indemnify and hold harmless the other Party, in its capacity as Recipient hereunder, its Affiliates, and their directors, officers, partners, members, agents and employees and their respective successors and assigns (each, a "**Recipient Indemnified Person**") from and against any Damages, and to reimburse each Recipient Indemnified Person for all reasonable expenses (including reasonable attorneys' fees), as they are incurred in investigating, preparing, pursuing or defending any Action, whether or not in connection with pending or threatened litigation and whether or not any Recipient Indemnified Person is a party, in each case solely to the extent such Damages have resulted from a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services.

Section 5.03. *Indemnification as Exclusive Remedy.* Except for the termination provisions of Section 6.02, the indemnification provisions of this Article 5 shall be the exclusive remedy for breach of the Agreement. For the avoidance of doubt, the limitations on liability set forth herein shall apply to all Actions between the Parties as well as any Third-Party Claims.

Section 5.04. *Liability for Payment Obligations.* Nothing in this Article 5 shall be deemed to eliminate or limit, in any respect, a Party's express obligation to pay Service Costs, Service Taxes, VAT (or amounts in respect of VAT) or Early Termination Costs for Services to be rendered pursuant to this Agreement.

Section 5.05. *EXCLUSION OF WARRANTIES.* EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE SCHEDULES, THE SELLER SERVICES, BUYER SERVICES AND RIGHTS GRANTED HEREUNDER ARE PROVIDED AND GRANTED "AS-IS" WITH NO WARRANTIES, AND PROVIDER AND RECIPIENT EACH EXPRESSLY EXCLUDES AND DISCLAIMS AND WAIVES ANY WARRANTIES UNDER OR ARISING AS A RESULT OF THIS AGREEMENT, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TIMELINESS, TITLE, NON-INFRINGEMENT OR ANY OTHER WARRANTY WHATSOEVER.

Section 5.06. *Limitation of Liability.* (a) Each Party agrees that (i) in its capacity as Recipient, each Provider Indemnified Person shall not have any liability, whether direct or indirect, in contract or tort or otherwise, to any Recipient Indemnified Person or any other Person for or in connection with the

11

Services rendered or to be rendered by or on behalf of any Provider Indemnified Person pursuant to this Agreement, the transactions contemplated hereby or any actions or inactions by or on behalf of any Provider Indemnified Person in connection with any such Services or transactions except to the extent any Damages have resulted from a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services, (ii) in the case of Provider's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with providing any Services hereunder, the aggregate liability of Provider with respect thereto shall not exceed two times the aggregate amount of such Service Costs paid hereunder with respect thereto to Provider and (iii) except as otherwise provided in the foregoing clause (ii), the aggregate liability of Provider with respect to this Agreement shall not exceed the aggregate amount of such Service Costs paid hereunder to Provider.

(b)     Notwithstanding the provisions of Section 5.06(a), neither Provider nor Recipient shall be liable for any (i) consequential, indirect, incidental, special or other speculative form of damages or any damages based on lost profits, diminution in value, a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) or of any other financial metric (in each case, whether trailing, forward or otherwise), (ii) punitive or exemplary damages (except to the extent actually paid by a Recipient Indemnified Person or Provider Indemnified Person, respectively, to a third party pursuant to a Third-Party Claim) or (iii) Damages that would not exist if not for, or to the extent aggravated by, any act or wrongful omission of the Recipient Indemnified Person or Provider Indemnified Person, respectively.

(c)     In addition to the foregoing, each Party agrees that it shall, in all circumstances, use commercially reasonable efforts to mitigate and otherwise minimize its Damages and those of any of its Affiliates, whether direct or indirect, due to, resulting from or arising in connection with any failure by the other party to comply fully with its obligations under this Agreement.

ARTICLE 6
TERM AND TERMINATION

Section 6.01. *Term.*

(a)     The term of this Agreement (the "**Term**") shall commence immediately upon the Effective Date and, unless earlier terminated pursuant to Section 6.02 or **Error! Reference source not found.**, shall terminate (i) with respect to each Service upon the expiration of the Service Period set forth on Schedule A or Schedule B, as applicable, and (ii) in its entirety upon the earliest to occur of (A) the 12-month anniversary of the Effective Date, (B) expiration or termination of the Service Periods of all Services (subject to extensions thereof pursuant to Section 6.01(b)), and (C) the mutual written consent of the Parties to terminate this Agreement; *provided* that, the provisions of Sections **Error! Reference source not found.**, 3.03, 3.04, 7.01 and 7.02 and Articles 5, 6 and 8 shall survive any such termination indefinitely.

(b)     With respect to any Service Period, the applicable Recipient shall have the right to extend such Service Period for up to two additional three-month periods following the stated expiration of the applicable Service Period (each such period, a "**Renewal Period**"), by providing written notice of such election to the applicable Provider at least 30 days prior to the expiration of the Service Period or then-applicable Renewal Period. The Service Cost for any Service during any Renewal Period shall be the Service Cost of such Service during the original Service Period, *plus* 3%. All of the terms and conditions of this Agreement shall be extended and remain in force for the duration of any such Renewal Period.

Section 6.02.  *Termination.*

(a)     Except as otherwise provided in <u>Schedule A</u> or <u>Schedule B</u>, and subject to Section 2.02, this Agreement may be terminated as follows:

(i)     by the mutual written agreement of the Parties;

(ii)     by Recipient, at any time with respect to all or certain of the Services (or portion thereof) that it receives, if (i) Provider shall have failed to perform any of its material obligations under this Agreement relating to any such Service, (ii) Recipient shall have notified Provider in writing of such failure, and (iii) such failure (A) shall have continued uncured for a period of 15 days or more after receipt by Provider of such written notice thereof or (B) is incapable of remedy; or

(iii)     by Provider, at any time with respect to all or part of the Services (or portion thereof) that it provides, if (i) Recipient shall have failed to perform any of its material obligations under this Agreement relating to any such Service, (ii) Provider shall have notified Recipient in writing of such failure, and (iii) such failure (A) shall have continued uncured for a period of 15 days or more after receipt by Recipient of such written notice thereof or (B) is incapable of remedy; *provided*, *however*, that if a Party challenges or contests in good faith any invoice delivered for Services rendered pursuant to the procedures in Section 3.04(d), such challenge or contest shall not be deemed a breach of a material obligation hereunder.

Section 6.03.  *Effect of Termination.*  (a) Other than as required by Applicable Law, upon termination of any Service (or portion thereof) pursuant to Section 2.02, Section 4.02 or Section 6.02, Provider shall have no further obligation to provide the terminated Service and Recipient shall have no obligation to pay any Service Costs relating to such Services; *provided* that, notwithstanding such termination, Recipient shall remain liable to Provider for (i) all Service Costs owed and payable in respect of Services provided prior to the effective date of the termination and (ii) in the case of a termination under Section 6.02(a)(iii), any costs incurred by Provider between the time of such termination and the time the provision of the relevant Service(s) would have terminated absent such early termination.

(b)     Termination of this Agreement as provided for herein shall not prejudice or affect any rights or remedies which shall have accrued or shall thereafter accrue to either Party.

ARTICLE 7
ADDITIONAL AGREEMENTS

Section 7.01.  *Confidential Information.*

(a)     The Parties hereby covenant and agree to maintain confidential all Confidential Information relating to the other Party or any of such other Party's Affiliates.  Without limiting the generality of the foregoing, each Party shall cause its Affiliates, employees, agents and other Representatives to exercise the same level of care with respect to Confidential Information relating to the other Party or any of its Affiliates as it would with respect to proprietary information, materials and processes relating to itself or any of its Affiliates.  "**Confidential Information**" shall mean all information, materials and processes relating to a Party or any Affiliate of such Party obtained by the other Party or any Affiliate thereof at any time (whether prior to or after the date hereof) in any format

13

whatsoever (whether orally, visually, in writing, electronically or in any other form) relating to, arising out of or in connection with the Services rendered or to be rendered hereunder and shall include, economic and business information or data, business plans, computer software and information relating to employees, vendors, customers, products, financial performance and projections, processes, strategies and systems but shall not include (i) information which becomes generally available to the public other than by release in violation of the provisions of this Section 7.01(a), (ii) information which becomes available on a non-confidential basis to a Party from a source lawfully in possession of the information other than the other Party to this Agreement, *provided* that, the Party in question reasonably believes that such source is not or was not bound to hold such information confidential, and (iii) information acquired or developed independently by a Party without violating this Section 7.01(a) or any other confidentiality agreement with the other Party. Except with the prior written consent of the other Party, each Party will use the other Party's Confidential Information only in connection with the performance of its obligations hereunder and each Party shall use commercially reasonable efforts to restrict access to the other Party's Confidential Information to those employees of such party and its Affiliates and its and their Representatives requiring access for the purpose of performing their obligations hereunder. Notwithstanding any provision of this Section 7.01(a) to the contrary, a Party may disclose such portion of the Confidential Information relating to the other Party to the extent, but only to the extent, the disclosing Party reasonably believes that such disclosure is required by judicial or administrative process or by other requirements of Applicable Law or pursuant to any listing agreement with any national securities exchange to which a Party is subject; *provided* that, if permissible under Applicable Law, the disclosing Party will as promptly as commercially practicable notify the other Party of such requirement and allows such Party a reasonable opportunity to seek a protective order or other appropriate remedy to prevent such disclosure or waive compliance with this Article 7. To the extent no such protective order or other remedy is obtained, or the furnishing Party does not waive compliance with the terms of this Article 7, the receiving Party will, and will instruct its Representatives to, disclose only that portion of such Confidential Information which it is advised in writing by its legal counsel is legally required to be disclosed pursuant to such external request and will use its reasonable best efforts to obtain assurances that confidential treatment will be accorded such Confidential Information. The Parties acknowledge that money damages may not be a sufficient remedy for any breach of the provisions of this Section 7.01(a) and that the non-breaching Party shall be entitled to seek equitable relief in a court of law, including injunction and specific performance, in the event of, or to prevent, a breach or threatened breach of this Section 7.01(a).

(b) To the extent disclosure of Confidential Information by a Party to another Party may cause the waiver of any applicable privilege protecting disclosure in any proceeding against a Governmental Authority, the Parties shall take commercially reasonable efforts to effect an agreement regarding common legal interest to protect disclosure of such privileged Confidential Information.

(c) Upon the termination of this Agreement, except to the extent otherwise required by Applicable Law and/or its internal policies and procedures, each Party shall, at its election, promptly return to the other party or destroy all Confidential Information of the other received under or pursuant to the performance of this Agreement (including, to the extent practicable, all copies (in any and all media) and summaries thereof) that is within such Party's or its Affiliates' or its or their Representatives' possession, power, custody or control; *provided* that, no Party or any such Party's Affiliates or its or their Representatives shall be required to delete Confidential Information from back-up, archival electronic storage; *provided*, *further*, that, any Confidential Information retained by such Party or its Affiliates shall continue to be subject to Section 7.01(a). Promptly upon the request of a Party, the other Party shall confirm in writing to such first Party that it has complied with this Section 7.01(c). Notwithstanding

anything in this Section 7.01, to the extent information is required to be held in confidence under both this Section 7.01 and any provision of the applicable Purchase Agreement, the provisions of the applicable Purchase Agreement shall control.

(d)     Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by the Selling Entities to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement, the Clean Team Agreement or otherwise.

Section 7.02.  *Intellectual Property.*

(a)     Subject to the terms and conditions of this Agreement, with respect to each Service, Provider hereby grants to Recipient a limited, non-exclusive and royalty-free license on an "as is," warranty-free basis, solely during the Service Period of such Service, to use any Intellectual Property both (i) owned or licensable (without the consent of or payment to any third party) by Provider and (ii) provided or otherwise made available by Provider to Recipient as part of such Service, but in each case solely to the extent necessary for: (A) where Buyer is Recipient, Buyer to receive and use such Service as provided for and in accordance with this Agreement and to otherwise conduct the Business on an irrevocable, perpetual, sublicensable and assignable basis; or (B) where a Selling Entity is Recipient, such Selling Entity to liquidate and wind up such Selling Entity's estate on a non-sublicensable and non-assignable (except as expressly provided in Section 8.10) basis.  For clarity, where a Selling Entity is Provider, the foregoing license to Buyer applies to Intellectual Property not considered an Asset under Section 7.02(c).

(b)     Subject to the terms and conditions of this Agreement, with respect to each Service, Recipient hereby grants to Provider a limited, non-exclusive, royalty-free, non-sublicensable (except to any third-party service provider as expressly set forth herein), non-assignable (except as expressly provided for in Section 8.10) license on an "as is," warranty-free basis, solely during the Service Period of such Service, to use any Intellectual Property owned or licensable (without the consent of or payment to any third party) by Recipient, but in each case solely to the extent necessary for Provider, its Affiliates and any Third-Party Service Provider to perform such Service as provided for and in accordance with this Agreement (it being understood that Provider shall have the right to grant a sublicense under the foregoing license to any of its Affiliates, subcontractors or third-party service providers), *provided* that where the Buyer or its Affiliate is Recipient, this license to such Selling Entity only applies to Intellectual Property that is embodied in documentation, materials, information or technology that are made available to the applicable Selling Entities by Buyer or that the applicable Selling Entity has authorized access to for the sole purpose of providing the Seller Services to Buyer or its Affiliate.

(c)     As between the Parties: (A) where Buyer is the Provider, subject to the license granted under (a), any and all Intellectual Property developed or acquired by or for Buyer or any of its Affiliates or any Third-Party Service Provider, whether alone or jointly with any other Person, in connection with providing or making available any Buyer Services, shall be owned solely and exclusively by Buyer and, to the extent that any Selling Entity or any of its Affiliates acquires any right, title or interest in or to any such Intellectual Property, Recipient, on behalf of itself and its Affiliates, hereby irrevocably assigns to Buyer or its designee all such right, title and interest.  The applicable Selling Entity shall take or cause to be taken such further actions, including the execution and delivery of such further documents and instruments, as may be reasonably required to effectuate fully this Section 7.02(c), or (B) where a Selling

15

Entity is the Provider, any and all documentation, materials, information, technology or other deliverables, in any form, provided or made available by such Selling Entity or any of its Affiliates or any Selling Entity Third-Party Service Provider to Buyer or its Affiliate, in connection with the Services, and all Intellectual Property related thereto and shall constitute part of the Assets under the applicable Purchase Agreement.

(d)     EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 7.02, NO LICENSES OR ANY OTHER RIGHT, TITLE OR INTEREST IN OR TO ANY INTELLECTUAL PROPERTY OR OTHER ASSETS ARE GRANTED TO EITHER PARTY OR ANY OF ITS AFFILIATES UNDER THIS AGREEMENT, WHETHER BY IMPLICATION, ESTOPPEL, EXHAUSTION OR OTHERWISE, AND EACH PARTY RETAINS AND RESERVES ANY AND ALL RIGHT, TITLE AND INTEREST NOT EXPRESSLY GRANTED UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY, NOTHING IN THIS Section 7.02 IS INTENDED DILUTE OR DIMINISH ANY REPRESENTATIONS, WARRANTIES, INDEMNITIES OR OTHER REMEDIES WITH RESPECT TO INTELLECTUAL PROPERTY IN THE APPLICABLE PURCHASE AGREEMENT OR OTHERWISE MODIFY THE APPLICABLE PURCHASE AGREEMENT.

Section 7.03.  *Access to Information.*  Subject to Applicable Law and the confidentiality provisions of Section 7.01, with respect to any Service during the term of such Service, each Party shall, and shall cause its Affiliates to, upon reasonable advance notice, afford the other Party and its Affiliates and Representatives reasonable access, during normal business hours, to the employees, properties, systems, books and records and other documents that are reasonably requested in connection with the provision and receipt of such Service hereunder*; provided* that, any such access shall not unreasonably interfere with the conduct of the business of the Party providing such access; and *provided*, *further*, that, in the event any Party reasonably determines that affording any such access to the other Party would be commercially detrimental in any material respect or violate any Applicable Law or agreement to which such Party or any Affiliate thereof is a party, or waive any attorney-client privilege applicable to such Party or any Affiliate thereof, the Parties shall use commercially reasonable efforts to permit the compliance with such request in a manner that avoids any such harm or consequence.

Section 7.04.  *Employment and Labor Matters.*  All employment and labor matters relating to employees of Provider (including, without limitation, employees involved in the provision of Services to Recipient) shall be within the exclusive control of Provider, and Recipient shall not take any action affecting such matters.  Nothing in this Agreement is intended to transfer the employment of employees engaged in the provision of any Service from Provider to Recipient.  All employees and Representatives of Provider and any of its Affiliates will be deemed for all compensation, employee benefits, tax and social security contribution purposes to be employees or Representatives of Provider or its Affiliates (or their subcontractors) and not employees or Representatives of Recipient or any of its Affiliates.  In providing the Services, such employees and Representatives of Provider and its Affiliates (or their subcontractors) will be under the direction, control and supervision of Provider or its Affiliates (or their subcontractors) and not of Recipient or its Affiliates.

Section 7.05.  *The Transfer of Undertakings*.  For purposes of this Section 7.05, "**TUPE**" means the Transfer of Undertakings (Protection of Employment) Regulations 2006 as amended from time to time or other national legislation implementing the Acquired Rights Directive.  Further to Section 7.04, it is the understanding of the Parties that the termination of this Agreement or the arrangements envisaged under it (whether in whole or part) will not result in the transfer of any employees pursuant to TUPE.  If

16

by virtue of TUPE and the termination or expiry of this Agreement (whether in whole or in part) for whatever reason, any employment or any contract of employment or any liability regarding the employment of any person employed by Provider or any of Provider's Affiliates, agents, sub-contractors, suppliers or associates involved in the provision of the Services (a "**Provider Employer**") shall transfer to (or be alleged to transfer to) the Recipient or any of Recipient's Affiliates, agents, sub-contractors, suppliers or associates (a "**Recipient Employer**"), such person being a "**Transferred Employee**": (i) Recipient Employer may terminate the employment of any such Transferred Employee; and (ii) Provider shall indemnify Recipient in full for and against all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any Action) incurred or suffered by Recipient Employer arising out of (x) the termination of any such Transferred Employee, (y) any obligations the Recipient Employer may have with respect to the Transferred Employee under TUPE, and (z) any other act or omission of Provider Employer, or any other event or occurrence, in respect of such Transferred Employee, in either case whether before, on or after the termination or expiry of this Agreement (whether in whole or in part).

ARTICLE 8
MISCELLANEOUS

Section 8.01. *No Agency; Independent Contractor Status.* Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between the Parties or constitute or be deemed to constitute any Party the agent or employee of any other Party for any purpose whatsoever and no Party shall have authority or power to bind any other Party or to contract in the name of, or create a liability against, any other Party in any way or for any purpose. The Parties acknowledge and agree that Provider is an independent contractor in the performance of each and every part of this Agreement and nothing herein shall be construed to be inconsistent with this status. Provider shall have the authority to select the means, methods and manner by which any Service is performed.

Section 8.02. *Subcontractors.* Provider may hire or engage one or more subcontractors to perform all or any of its obligations under this Agreement; *provided* that, Provider shall (i) use the same degree of care in selecting any subcontractors as it would if such subcontractor was being retained to provide similar services to Provider, (ii) ensure that such subcontractor is responsible for the provisions of Section 4.01 and (iii) in all cases, remain responsible for ensuring that obligations hereunder with respect to the scope of the Services, the Services Standard and the content of the Services provided to Recipient.

Section 8.03. *Force Majeure.* (a) For purposes of this Section 8.03, "**force majeure**" means an event beyond the reasonable control of either Party, which by its nature could not have been foreseen by such Party, or, if it could have been foreseen, was unavoidable, and includes without limitation, acts of God, storms, floods, riots, fires, sabotage, civil commotion or civil unrest, interference by civil or military authorities, threat, declaration, continuation, escalation or acts of war (declared or undeclared) or acts of terrorism, cyber-attacks, embargo, pandemics, failure or shortage of energy sources, raw materials or components, strike, walkout, lockout or other labor trouble or shortage, delays by unaffiliated suppliers or carriers, and acts, omissions or delays in acting by any Governmental Authority or the other Party.

(b) Without limiting the generality of Section 5.06(a), Provider shall not be liable to Recipient or any other Person for interruption of service, any delays or failure to fulfill any obligations under this Agreement, so long as and to the extent the interruption, delay or fulfillment of such obligation is prevented, frustrated, hindered, or delayed as a consequence of circumstances of force majeure; *provided* that, Provider shall have used commercially reasonable efforts to minimize to the extent practicable the

17

effect of force majeure on its obligations hereunder; *provided*, *however*, that in no event shall Provider be required to pay any money or other consideration (unless Recipient agrees to reimburse Provider therefor) or grant any material accommodation to any Person (including any material amendment to any contract) or to initiate any claim or proceeding against any Person; *provided*, *further*, that, nothing in this Section 8.03 shall be construed to require the settlement of any strike, walkout, lockout or other labor dispute on terms which, in the reasonable judgment of Provider, are contrary to its interests. It is understood that the settlement of a strike, walkout, lockout or other labor dispute will be entirely within the discretion of Provider.  Provider shall use commercially reasonable efforts to promptly notify Recipient upon learning of the occurrence of such event.

Section 8.04.  *Entire Agreement*.  This Agreement (including the Schedules), any other writing signed by the parties that specifically references this Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 8.05.  *Information*.  Subject to Applicable Law and privileges, each Party covenants and agrees to provide the other Party with all information regarding itself and transactions under this Agreement that the other Party reasonably believes are required to comply with all applicable federal, state, county and local laws, ordinances, regulations and codes, including, but not limited to, securities laws and regulations.

Section 8.06.  *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission, so long as a receipt of such email is requested and received) (whether or not expressly required herein) and shall be given,

if to Buyer (as applicable), to:

IB Housewares US Holdings, LLC
c/o Anchor Hocking Holdings, Inc.
Attn: Mark Eichhorn
519 Pierce Avenue
Lancaster, OH 43130
E-mail:  Mark.Eichhorn@AnchorHocking.com

or

IB Appliances US Holdings, LLC
Centre Lane Partners, LLC
Attn: Quinn Morgan; Mayank Singh, Timothy Chiodo
60 E 42nd Street, Suite 2220
New York, NY 10165
E-mail: qmorgan@centrelanepartners.com; msingh@centrelanepartners.com; tchiodo@centrelanepartners.com

with a copy (which shall not constitute notice) to:

18

Jones Day
250 Vesey Street
New York, NY 10281
Attention:      Jason R. Grove; William T. Sinchuk
Email:          jrgrove@JonesDay.com; wsinchuk@jonesday.com

if to Seller, to:

Instant Brands Acquisition Holdings Inc.
3025 Highland Parkway, Suite 700
Downers Grove, Illinois 60515
Attention:      Catherine R. Landman
Email:         cathy.landman@instantbrands.com

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:      William J. Chudd
                  Brian Resnick
Facsimile No.:  (212) 701-5800
E-mail:         william.chudd@davispolk.com
                  brian.resnick@davispolk.com

or such other address, facsimile number or email as such Party may hereafter specify for the purpose by notice to the other Parties. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

Section 8.07. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*.

(a)      Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy

Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with Section 8.06.) or any other manner permitted by law.

(c)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08. *Severability*. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.09. *Amendments and Waivers*. (a) Except as otherwise provided in this Agreement, any provision of this Agreement (including the Schedules) may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)     The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 8.10. *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns (including, for the avoidance of doubt, any liquidating trustee or trust (or any person or entity acting in a similar capacity)); *provided* that, (x) this Agreement and the rights and obligations of Seller may be assigned, in whole or in part, by Seller to one or more third parties that purchase all or a portion of the Retained Business, (y) other than as set forth in the preceding clause (x), no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party, except that either Party may assign any or all of its rights and obligations under this Agreement to any of its Affiliates; *provided* that no such assignment shall release such Party from any liability or obligation under this Agreement.

20

Section 8.11.  *Specific Performance*.  The parties agree that irreparable damage would occur, and that the Parties would not have any adequate remedy at law, if any provision of this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated hereby) were not performed in accordance with the terms hereof.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, or to enforce specifically the performance of the terms and provisions hereof or thereof in the courts referenced in Section 8.07(b).  In furtherance of the foregoing, the Parties hereby waive, to the fullest extent permitted by Applicable Law, (a) any and all defenses to any action for specific performance hereunder, including any defense based on the claim that a remedy at law would be adequate and (b) any requirement to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.12.  *Third Party Rights*.  Except as otherwise provided herein, no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person, other than the Parties and their respective successors and assigns.

Section 8.13.  *Counterparts*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLER:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**INSTANT BRANDS LLC**

By: _____
Name: _____
Title: _____


**URS-1 (CHARLEROI) LLC**

By: _____
Name: _____
Title: _____


**EKCO GROUP, LLC**

By: _____
Name: _____
Title: _____


**CORELLE BRANDS (GHC) LLC**

By: _____
Name: _____
Title: _____


**URS-2 (CORNING) LLC**

By: _____
Name: _____
Title: _____

[*Signature Page to Transition Services Agreement*]

**CORELLE BRANDS (LATIN AMERICA) LLC**

By: _____

Name: _____

Title: _____

**EKCO HOUSEWARES, INC.**

By: _____

Name: _____

Title: _____

**EKCO MANUFACTURING OF OHIO, INC.**

By: _____

Name: _____

Title: _____

*[Signature Page to Transition Services Agreement]*

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (CANADA) HOLDING INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____

[*Signature Page to Transition Services Agreement*]

**BUYER**


**IB APPLIANCES US HOLDINGS, LLC**


By: _____
Name:  Quinn Morgan
Title:    President


**IB APPLIANCES CANADA HOLDINGS, INC.**


By: _____
Name:  Quinn Morgan
Title:   President


**IB HOUSEWARES US HOLDINGS, LLC**


By: _____
Name: _____
Title: _____


**IB HOUSEWARES CANADA HOLDINGS, INC.**


By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**Schedule A**
**Seller Services**

| | Function | Service Name | Description | Duration | Monthly charge | Basis for charge |
|---|---|---|---|---|---|---|
| 1 | Operations | Customs Bond | • Reasonable access to the Selling Entities' customs bonds for Business imports. | 60 days | $0 | N/A |
| | | Leases | • Access to the leased real property located at:<br>○ 3025 Highland Parkway, Downers Grove, IL pursuant to the Office Lease, dated September 30, 2020 (as amended).<br>○ 1200 South Antrim Way, Greencastle, PA, dated December 16, 2012 (as amended) | 9 weeks | To include all applicable real estate costs as required to be paid under such applicable lease (e.g., rent, common area maintenance, utilities and insurance) | N/A |
| 2 | HR | Management Access | • Access to certain Non-Offer Employees to be agreed for Business consultation purposes and ongoing support. | 9 weeks | TBD | N/A |

## Schedule B
## Buyer Services[4]

| | Function | Service Name | Description | Duration | Hourly Charge | Monthly Estimate | Basis for charge |
|---|---|---|---|---|---|---|---|
| 1 | Finance | Account Wind Down | • Supervise the cessation of activity and close all appropriate accounts and obligations with financial institutions | 9 weeks | $115 | $100,000 | 2.5 FTE Salaries |
| | | Audit | • Engage external professionals, support, supervise, and disseminate final audits for the estate | | | | |
| | | Claims Reconciliation | • Assist Legal team members in the termination of payment for contracts | | | | |
| | | Control | • Manage payment and processing of accounts payable and receivable throughout the Wind Down<br>• Supervise and monitor adherence to Wind Down budget<br>• Forecast cash flows and liquidity for term of Wind Down | | | | |
| | | Payroll | • Manage cessation of payroll for transferred employees and obligations, and fulfill payroll obligations for Wind Down team | | | | |
| | | Tax | • Engage external professionals, support, supervise, and submit final tax documents to appropriate authorities | | | | |
| 2 | HR | Benefit Termination | • Terminate benefit programs held by estate<br>• Notify authorities of benefit terminations<br>• Engage external professionals, support, supervise, and submit benefit audits or other statutory requirements to effect benefit plan closures | 9 weeks | $90 | $16,000 | 1 FTE Salary |
| | | Personnel Reduction | • Manage the reduction in staffing of personnel not transferred to include design, implementation, and statutory reporting of said reduction<br>• Manage retention and attendant benefit administration for Wind Down team members<br>• Close all accounts for employment statistic recording and taxation with appropriate agencies | | | | |
| 3 | IT | Data Migration | • Identify data for retention<br>• Create archive for retention<br>• House data in reliable, sustainable format | 9 weeks | $120 | $20,000 | 0.5 FTE Salary |

---

[4] Notwithstanding anything set forth in this Agreement, Buyer is under no obligation to engage a Third-Party Service Provider at its sole cost and expense to perform any Service.

| | Function | Service Name | Description | Duration | Hourly Charge | Monthly Estimate | Basis for charge |
|---|---|---|---|---|---|---|---|
| | | | • Develop access protocols for retained data | | | | |
| | | Operations Wind Down | • Coordinate termination of IT-related accounts, services and attendant contracts<br>• Coordinate sanitation of orphaned data and non-transferred hardware<br>• Coordinate liquidation of orphaned hardware | | | | |
| 4 | Legal | Contract Termination | • Assist other Wind Down team members in the negotiation, cure, and termination of outstanding contracts held by the estate post-close | 9 weeks | $120 | $50,000 | 1.5 FTE Salaries |
| | | Entity Wind Down | • Monitor and execute the termination of all estate entities with respective authorities for all aspects of the estate's activities<br>• Notice through applicable channels the Wind Down of the estate as required by appropriate authorities<br>• Monitor and execute the closing of all accounts with regulatory authorities as appropriate | | | | |
| | | Liability Termination | • Monitor and execute the cessation of all non-contractual obligations of the estate as appropriate | | | | |
| 5 | Sourcing | Contract Support | • Assist Legal team members in identification of retained contracts<br>• Assist in identification and negotiation of termination cures where applicable<br>• Execute termination of applicable contracts | 9 weeks | $120 | $27,000 | 0.75 FTE Salary |
| | | Facilities Wind Down | • Identify facilities not subject to transition<br>• Execute shut down of remaining facilities, to include leasehold termination, utilities termination, asset liquidation, and custody forfeiture | | | | |

*[Signature Page to Transition Services Agreement]*

**<u>Schedule C</u>**
**<u>Excluded Services</u>**

None.

**Schedule D**
**Data Processing Addendum**

In this Schedule D: (i) references to "controller", "processor", "processing", "personal data" and "personal data breach" shall have the same meaning as defined in the Data Protection Laws; and (ii) "Data Protection Laws" shall mean (a) EC Regulation 2016/679 (the "GDPR") on the protection of natural persons with regard to the processing of personal data and on the free movement of such data or the UK GDPR (as defined in section 3(10) of the Data Protection Act 2018) in respect of the United Kingdom; (b) Directive 2002/58/EC of the European Parliament and of the Council of 12 July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications); and (c) all other binding applicable data protection, data privacy and data security laws.

1. The Parties agree that Provider will act as a processor with respect to the personal data that it processes on behalf of Recipient in the course of it providing the Services. This Schedule D sets out the obligations of the Parties with respect to such processing. The categories of personal data and data subjects are set out in Clause 8.

2. Provider shall not engage any sub-processors to process any personal data without the prior specific or general written authorization of Recipient (in respect of Recipient's personal data) and without ensuring that the sub-processors are subject to the same data protection obligations as set out in this Schedule D. Provider shall at all times remain fully liable for the acts and omissions of the sub-processors as regards the processing of the personal data. In the case of general written authorization, Provider shall inform Recipient of any intended changes concerning the addition or replacement of any sub-processor(s), thereby giving Recipient the opportunity to object to such changes.

3. Recipient (as applicable) shall comply with the obligations imposed on controllers under the Data Protection Laws, including ensuring that there is a lawful basis for processing any personal data that is processed on its behalf by Provider.

4. Provider shall (and shall procure that its sub-processors shall) comply with Data Protection Laws as applicable to data processors and shall also:

(a) process the personal data only on documented instructions of Recipient (in respect of Recipient's personal data) and in accordance with the terms of this Agreement;

(b) keep the personal data confidential and ensure that any person it authorizes to process Recipient's personal data (including its staff, agents and subcontractors) shall be subject to such duty of confidentiality (whether a contractual or a statutory duty);

(c) take all appropriate technical and organizational measures necessary to ensure that personal data are protected against loss, destruction and damage, unauthorized access, use, modification, disclosure or other misuse;

(d) use the personal data obtained as a result of this Agreement only for the purposes of providing the Services and for no other purposes;

*[Signature Page to Transition Services Agreement]*

(e)     ensure that only persons authorized by Provider have access to personal data and ensure the reliability of the persons who will be approved by Provider to have access to personal data and who otherwise process the personal data;

(f)     notify Recipient without undue delay, and in any event within thirty six (36) hours after becoming aware of any personal data breach;

(g)     assist Recipient in ensuring compliance with its obligations under Articles 32 to 36 of the GDPR, taking into account the nature of processing and the information available to Provider;

(h)     provide reasonable assistance to Recipient to enable Recipient to comply with its obligations to respond to requests for exercising the data subject's rights under the Data Protection Laws; and

(i)     on reasonable notice and during normal working hours of Provider, allow for and contribute to audits to audit Provider's processing operations, systems and/or facilities where reasonably required to assess Provider's compliance with this Schedule D and , co-operate with all requests of Recipient for information and make available information to Recipient to demonstrate Provider's compliance with this Schedule D.

5.     Where, by operation of this Schedule D, Clause 4(g)-(i), Provider is obliged to provide assistance to Recipient, or to third parties at the request of Recipient (including submission to an audit or inspection and/or the provision of information), the costs and expenses that are reasonably incurred by Provider will be payable by Recipient in accordance with the fees set forth on Schedule A and Schedule B.

6.     On the termination of this Agreement, howsoever arising, Provider shall return all copies of the personal data to Recipient (in respect of Recipient's personal data) or, at Recipient's (in respect of Recipient's personal data) specific and written request, delete all copies of the personal data subject to applicable legal obligations on Provider to retain any such documents containing personal data (in which event Provider shall restrict the access to and processing of such personal data to the extent necessary to meet the requirements of such legally required obligations and continue to hold such personal data in accordance with the terms of this Schedule D).

7.     Provider shall not transfer personal data outside the United Kingdom (other than to the European Economic Area) or the European Economic Area without the prior written consent of Recipient (in respect of Recipient's personal data) and, where such written consent is provided by Recipient, only following the execution (and any required regulatory approval) of standard contractual clauses in the form approved by the UK government or the European Commission from time to time or such equivalent data transfer agreements or arrangements (including the EU-US Data Privacy Framework or binding corporate rules) in compliance with the applicable provisions of the Data Protection Laws.

8.     The particulars of the processing undertaken by Provider on behalf of Recipient are as follows:[5]

---

[5] **Note to Draft**: These particulars will need to be reviewed/confirmed in conjunction with the populated Service Schedule once available.

*[Signature Page to Transition Services Agreement]*

| Subject matter and duration of processing | The subject matter of the processing under this Agreement is personal data processed by Provider in performance of the Services.<br>The duration of the processing under this Agreement is determined in accordance with <u>Schedule A</u> and <u>Schedule B</u> (Services). |
|---|---|
| Nature and purpose of processing | The purpose of the processing under this Agreement is Provider's performance of the Services. |
| Types of personal data | Types of personal data processed are:<br>• Name;<br>• Title;<br>• Position; and<br>• Contact information (company, email, phone, physical business address). |
| Categories of data subjects | Data subjects are:<br>• Prospects, customers, business partners and vendors of Recipient (who are natural persons);<br>• Employees or contact persons of Recipient's prospects, customers, business partners and vendors; and<br>• Employees, agents, advisors, freelancers of Recipient (who are natural persons). |

[*Signature Page to Transition Services Agreement*]

**Exhibit B**

**Appliances APA**

*Execution Version*

**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

DATED AS OF SEPTEMBER 27, 2023,

BY AND AMONG

INSTANT BRANDS ACQUISITION HOLDINGS INC.,

EACH OF THE SUBSIDIARIES OF

INSTANT BRANDS ACQUISITION HOLDINGS INC.

LISTED ON THE SIGNATURE PAGES HERETO,

IB APPLIANCES US HOLDINGS, LLC,

AND

IB APPLIANCES CANADA HOLDINGS, INC.

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions.................................................................................................. 2
Section 1.02    Other Definitions and Interpretive Matters.................................................. 24

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01    Purchase and Sale. ..................................................................................... 25
Section 2.02    Excluded Assets. ........................................................................................ 28
Section 2.03    Assumed Liabilities. ................................................................................... 30
Section 2.04    Excluded Liabilities. ................................................................................... 31
Section 2.05    Cure Costs; Desired 365 Contracts. ............................................................ 31
Section 2.06    Assignment of Assets Subject to Consent Requirements. ............................ 33
Section 2.07    Misallocated Assets. .................................................................................. 34
Section 2.08    Further Assurances. .................................................................................... 34
Section 2.09    Allocation of Assets and Liabilities. ........................................................... 35
Section 2.10    Withholding. .............................................................................................. 35
Section 2.11    Sequencing. ............................................................................................... 35
Section 2.12    Transition Services Agreement; Accounting Procedures. ............................ 35

## ARTICLE 3
## PURCHASE PRICE

Section 3.01    Purchase Price. .......................................................................................... 36
Section 3.02    Good Faith Deposit. ................................................................................... 37
Section 3.03    Estimated Purchase Price. ........................................................................... 37
Section 3.04    NWC and Cure Adjustment. ....................................................................... 38
Section 3.05    Acquired Entity Adjustment. ...................................................................... 40
Section 3.06    Adjustments. .............................................................................................. 42

## ARTICLE 4
## CLOSING

Section 4.01    Closing Date................................................................................................ 42
Section 4.02    Payments on the Closing Date. .................................................................... 42
Section 4.03    Buyer's Deliveries. ..................................................................................... 42
Section 4.04    The Selling Entities' Deliveries. .................................................................. 43

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Section 5.01    Organization and Good Standing................................................................. 43

-i-

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 5.02 | Authority; Validity. | 44 |
| Section 5.03 | Governmental Approvals; No Conflict. | 44 |
| Section 5.04 | Financial Statements. | 45 |
| Section 5.05 | No Undisclosed Material Liabilities. | 46 |
| Section 5.06 | Absence of Certain Changes. | 46 |
| Section 5.07 | Legal Proceedings. | 46 |
| Section 5.08 | Compliance with Laws; Permits. | 47 |
| Section 5.09 | Material Contracts; Cure Costs | 47 |
| Section 5.10 | Intellectual Property. | 49 |
| Section 5.11 | Environmental Compliance. | 52 |
| Section 5.12 | Title. | 52 |
| Section 5.13 | Matters Related to Assets; Casualty Losses. | 53 |
| Section 5.14 | Insurance. | 54 |
| Section 5.15 | Security Arrangements. | 54 |
| Section 5.16 | Customers and Suppliers. | 54 |
| Section 5.17 | Anti-Corruption. | 55 |
| Section 5.18 | Brokers or Finders. | 55 |
| Section 5.19 | Employee Benefit Plans; Labor and Employment Matters. | 56 |
| Section 5.20 | Taxes. | 59 |
| Section 5.21 | Investment Canada Act. | 61 |
| Section 5.22 | International Trade. | 61 |
| Section 5.23 | Warranties; Product Liability. | 62 |
| Section 5.24 | Accounts Receivable; Inventory | 62 |
| Section 5.25 | Related Party Transactions. | 63 |
| Section 5.26 | Acquired Entities. | 63 |

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| Section 6.01 | Organization and Good Standing. | 64 |
| Section 6.02 | Authority; Validity; Consents. | 64 |
| Section 6.03 | No Conflict. | 65 |
| Section 6.04 | Legal Proceedings. | 65 |
| Section 6.05 | Bankruptcy. | 65 |
| Section 6.06 | Brokers or Finders. | 66 |
| Section 6.07 | Financing. | 66 |
| Section 6.08 | Independent Evaluation. | 67 |
| Section 6.09 | Solvency. | 67 |
| Section 6.10 | Canadian Sales Tax Matters | 68 |

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

| | | |
|---|---|---|
| Section 7.01 | Access and Reports. | 68 |
| Section 7.02 | Operations Prior to the Closing Date. | 69 |

-ii-

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 7.03 | Commercially Reasonable Efforts. | 72 |
| Section 7.04 | Regulatory Approvals. | 72 |
| Section 7.05 | Bankruptcy Court Approval. | 74 |
| Section 7.06 | Alternative Proposals. | 75 |
| Section 7.07 | Damage or Destruction. | 75 |
| Section 7.08 | Buyer Efforts to Obtain Financing. | 75 |
| Section 7.09 | Seller Obligations in Respect of the Debt Financing. | 78 |
| Section 7.10 | Additional Selling Entities. | 81 |
| Section 7.11 | Public Announcements; Filings. | 81 |
| Section 7.12 | Alternate Bidder. | 81 |
| Section 7.13 | Sale Free and Clear | 82 |
| Section 7.14 | Acquired Entity Intercompany Obligations. | 82 |
| Section 7.15 | Resignations. | 83 |

## ARTICLE 8
## ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| Section 8.01 | Taxes. | 83 |
| Section 8.02 | Allocation of Purchase Price. | 84 |
| Section 8.03 | Assigned Contracts; Adequate Assurance and Performance. | 85 |
| Section 8.04 | Employee Matters. | 86 |
| Section 8.05 | Post-Closing Books and Records. | 89 |
| Section 8.06 | Intellectual Property Matters. | 90 |
| Section 8.07 | Cooperation Relating to Litigation and Other Proceedings. | 91 |
| Section 8.08 | Insurance Access. | 92 |
| Section 8.09 | Disclaimers. | 93 |
| Section 8.10 | Collection of Accounts Receivable. | 94 |
| Section 8.11 | Data Transfer. | 95 |

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| Section 9.01 | Accuracy of Representations | 95 |
| Section 9.02 | Selling Entities' Performance | 96 |
| Section 9.03 | No Material Adverse Effect | 96 |
| Section 9.04 | Seller's Deliveries | 96 |

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

| | | |
|---|---|---|
| Section 10.01 | No Order. | 96 |
| Section 10.02 | Sale Order | 96 |
| Section 10.03 | HSR Act | 96 |
| Section 10.04 | Competition Act Clearance | 96 |

NAI-1538022664v15

**TABLE OF CONTENTS**
(continued)

                                                                            **Page**

Section 10.05          Information Officer's Certificate. ................................................. 97

ARTICLE 11
CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO
CLOSE

Section 11.01          Accuracy of Representations ....................................................... 97
Section 11.02          Buyer's Performance ................................................................... 97
Section 11.03          Buyer's Deliveries. ...................................................................... 97

ARTICLE 12
TERMINATION

Section 12.01          Termination Events. .................................................................... 98
Section 12.02          Effect of Termination. ................................................................. 99
Section 12.03          Procedure Upon Termination. ................................................... 100

ARTICLE 13
GENERAL PROVISIONS

Section 13.01          No Survival of Representations and Warranties. ......................... 100
Section 13.02          Notices. ...................................................................................... 101
Section 13.03          Waiver. ....................................................................................... 102
Section 13.04          Entire Agreement; Amendment. ................................................. 102
Section 13.05          Assignment. ................................................................................ 102
Section 13.06          Severability. ............................................................................... 103
Section 13.07          Expenses. ................................................................................... 103
Section 13.08          Specific Performance. ................................................................ 103
Section 13.09          Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver..... 104
Section 13.10          Counterparts. .............................................................................. 105
Section 13.11          Parties in Interest; No Third Party Beneficiaries. ....................... 105
Section 13.12          No Recourse. .............................................................................. 106
Section 13.13          Disclosure Schedules; Materiality. ............................................ 107
Section 13.14          Liquidating Trustee. ................................................................... 107
Section 13.15          Conflicts; Privileges. .................................................................. 108
Section 13.16          Liability of Financing Sources. ................................................. 109

NAI-1538022664v15

**Exhibits:**

Exhibit A                            Form of IP Assignment Agreements
Exhibit B                            Form of Master Assignment
Exhibit C                            Form of Transition Services Agreement

**Schedules:**

Schedule 1                     Selling Entities
Schedule 2                     Debtor Selling Entities
Schedule 1.01(a)         Accounting Procedures
Schedule 1.01(b)         Company Employees
Schedule 1.01(c)(1)     Seller Knowledge Persons
Schedule 1.01(c)(2)     Buyer Knowledge Persons
Schedule 1.01(d)         Permitted Encumbrances
Schedule 2.01(b)(xxi)   Avoidance Actions
Schedule 2.05(a)         365 Contracts
Schedule 7.02               Operation Prior to Close
Schedule 7.04               Transferred Permits
Schedule 8.02(b)(i)     Allocation Principles
Schedule 8.02(b)(ii)    Initial Allocation
Schedule 8.03(c)         Seller Credit Obligations
Schedule 8.04(a)         Non-Offer Employees

Disclosure Schedules

NAI-1538022664v15

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of September 27, 2023, is by and among Instant Brands Acquisition Holdings Inc., a company organized under the laws of the State of Delaware whose address is 3025 Highland Parkway, Suite 700, Downers Grove, Illinois 60515 ("**Seller**"), each of the Subsidiaries of Seller listed on Schedule 1 hereto (together with Seller, the "**Selling Entities**"), IB Appliances US Holdings, LLC, a Delaware limited liability company ("**US Buyer**"), and IB Appliances Canada Holdings, Inc., a corporation incorporated under the laws of the Province of Ontario (the "**Canadian Buyer**", together with US Buyer, each a "**Buyer Entity**" and collectively, "**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business;

WHEREAS, on June 12, 2023 (the "**Petition Date**"), Seller and the Subsidiaries of Seller listed on Schedule 2 hereto (together with Seller, the "**Debtor Selling Entities**") commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on June 15, 2023, the Debtor Selling Entities commenced proceedings before the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "**CCAA**") recognizing the Bankruptcy Cases as "foreign main proceedings" (the "**CCAA Recognition Proceedings**");

WHEREAS, the Selling Entities desire to sell to Buyer all of the Assets, and Buyer desires to purchase from the Selling Entities all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

WHEREAS, the Selling Entities' ability, and Buyer's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court and the CCAA Sale Order by the CCAA Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

NAI-1538022664v15

# ARTICLE 1
# DEFINITIONS

Section 1.01    *Definitions.*

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**365 Contracts**" means all of the Debtor Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of Section 365 of the Bankruptcy Code to the extent Related to the Business.

"**Accounting Firm**" has the meaning set forth in Section 3.04(b).

"**Accounting Procedures**" means the principles, practices, procedures and methodologies set forth on Schedule 1.01(a).

"**Accounts Receivable**" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to Seller or any of its Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts payable, or that may become payable, to Seller or any of its Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables, and (vi) other amounts due to Seller or any of its Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of Seller, in each case to the extent Related to the Business.

"**Acquired Entities**" means Instant Brands (EMEA) Limited (a private limited company incorporated under the laws of England and Wales, company number 07545659, and with its registered address at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0DB) and Instant Brands (Ireland) Limited.

"**Acquired Entity Accrued Taxes**" means an amount equal to the sum of the accrued but unpaid income Taxes of the Acquired Entities, as of the Measurement Time, in jurisdictions where any Acquired Entity has filed Tax Returns or has commenced operations since 2022, separately calculated for each jurisdiction in which the Acquired Entities are liable for Taxes, calculated, except as otherwise provided herein, in accordance with the past practice and accounting methodologies of the Acquired Entities applied in filing their Tax Returns, and taking into account, without duplication, (i) any estimated income Taxes or prepaid income Taxes paid by any Selling Entity or Acquired Entity prior to the Closing and any transaction tax deductions and other Tax attributes of the Acquired Entities, in each case solely to the extent such item actually reduces cash Taxes payable for a Pre-Closing Tax Period and (ii) any Tax liabilities arising from a change in accounting method made on or prior to the Closing relating to any cash received by the Acquired Entities as deferred revenue that has not been recognized in taxable income as of the Closing Date; *provided*, *however*, that no amount treated as "Acquired Entity Indebtedness" shall be included in "Acquired Entity Accrued Taxes".

2

"**Acquired Entity Cash**" means, with respect to the Acquired Entities and without duplication, the aggregate amount of all unrestricted cash and cash equivalents, including marketable securities, short term investments or liquid instruments convertible into cash, deposits in transit, the amount of any received and uncleared checks, money orders, wires or drafts, <u>minus</u> any issued but uncleared checks, money orders, wires or drafts, in each case, as determined as of the Measurement Time in accordance with the Accounting Procedures; *provided*, *however*, that such amounts will be net of any Tax costs that would be incurred if such amounts were repatriated to the United States.

"**Acquired Entity Closing Statement**" has the meaning set forth in Section 3.05(a).

"**Acquired Entity Indebtedness**" means, with respect to the Acquired Entities as of immediately prior to the Closing, determined in accordance with the Accounting Procedures and without duplication, all (i) obligations for borrowed money, (ii) obligations in respect of letters of credit (to the extent drawn), bankers' acceptances, surety bonds or similar credit transactions, (iii) liabilities evidenced by any bond, note, debenture or other debt security, (iv) obligations under any interest rate, currency or other hedging or swap transaction, derivative obligation or other similar arrangement (valued at the termination cost thereof), (v) obligations under conditional sale, title retention or similar agreements or arrangements creating an obligation with respect to the deferred purchase price of, or a contingent payment for, property or services (other than customary trade credit or trade payables), including any "earnout" or similar payments (in each case, valued at the maximum amount thereof), (vi) to the extent not included in Net Working Capital, transaction bonuses or other change-in-control payments, ordinary course bonuses, severance or similar termination payment obligations of the Acquired Entities to any Person to the extent accrued and unpaid prior to the Closing, but excluding any payments triggered by a termination of employment by Buyer or one of its Affiliates following the Closing (plus the employer-paid portion of any employment, payroll, unemployment or withholding Taxes that are imposed in connection with the payment of any such obligations), (vii) indebtedness secured by an Encumbrance or any property or asset owned by any Acquired Entity, (viii) obligations of the Acquired Entities related to leases classified as finance or capital leases in the Financial Statements, (ix) Taxes, the payment of which has been deferred pursuant to any COVID-19 Measures or other Applicable Law, (x) guarantees, including guarantees of any items set forth in clauses (i) through (ix), and (xi) prepayment premiums, if any, and accrued interest, redemption costs, fees and expenses related to any of the items set forth in clauses (i) through (x). Notwithstanding the foregoing, "Acquired Entity Indebtedness" shall not include (A) any obligations solely between or among the Acquired Entities, (B) the Acquired Entity Intercompany Obligations or (C) indebtedness arranged by the Buyer or its Affiliates at or following the Closing.

"**Acquired Entity Intercompany Obligations**" means all intercompany obligations between one or more Selling Entities, on the one hand, and one or more Acquired Entities, on the other hand.

"**Acquired Equity Securities**" has the meaning set forth in Section 2.01(b)(xxii).

"**Actual Fraud**" means, with respect to any Person, actual and intentional common law fraud under the Laws of the State of Delaware with respect to any representation or warranty contained in this Agreement or in any other Transaction Document; <u>provided</u> "Actual Fraud" will

not include fraud based on imputed or constructive knowledge, equitable fraud, promissory fraud, unfair dealings fraud, any torts (including fraud) based on negligence or recklessness or any other fraud not otherwise including an element of scienter.

"**Adjustment Escrow Amount**" means $5,000,000.

"**Adjustment Escrow Funds**" means, at any time, the portion of the Adjustment Escrow Amount *plus* all interest and income then held in such escrow account.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that none of the creditors of the Selling Entities (other than any creditor who is a Subsidiary of any Selling Entity) will be considered an Affiliate of a Selling Entity for purposes of this Agreement.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Allocation**" has the meaning set forth in Section 8.02(b).

"**Alternate Bidder**" means the bidder with the next highest or otherwise second-best bid for the Assets, as determined in accordance with the Bidding Procedures.

"**Alternative Financing**" has the meaning set forth in Section 7.08(d).

"**Alternative Financing Commitment Letter**" has the meaning set forth in Section 7.08(d).

"**Antitrust Laws**" means, collectively, the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, the Competition and Consumer Act 2010 (Cth), the Competition Act and any other federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Applicable Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of lessening competition, monopolization or restraint of trade.

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.17(a).

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**ARC**" means an advance ruling certificate issued by the Commissioner of Competition pursuant to Section 102 of the Competition Act.

"**Assets**" has the meaning set forth in Section 2.01(b).

4

"**Assumed Benefit Plans**" has the meaning set forth in Section 2.01(b)(xiv).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b)(vi).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Audited Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Available Insurance Policy**" has the meaning set forth in Section 8.08.

"**Balance Sheet Date**" has the meaning set forth in Section 5.04(a).

"**Bankruptcy and Equity Exception**" has the meaning set forth in Section 5.02.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**BIA**" means the Bankruptcy and Insolvency Act, R.S.C 1985, C. B-3, as amended.

"**Bidding Procedures**" means the procedures employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities attached to the Bidding Procedures Order as Exhibit 1.

"**Bidding Procedures Order**" means the Order of the Bankruptcy Court approving the Bidding Procedures [Docket No. 253].

"**Business**" means the business of designing, marketing, distributing and selling kitchen and home appliances, including electric pressure cookers, air fryers, coffee machines, Dutch ovens, air purifiers and other multi-feature appliances, in each case, as conducted by Seller and its Subsidiaries (including, for the avoidance of doubt, the Acquired Entities).

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks in New York, New York or the Province of Ontario, Canada are authorized or required by Applicable Law to close.

"**Business IT Assets**" has the meaning set forth in Section 5.10(j).

"**Buyer**" has the meaning set forth in the introductory paragraph.

"**Buyer DIP Lender**" has the meaning set forth in the definition of "Round-Tripping Amount.

"**Buyer Entity**" has the meaning set forth in the introductory paragraph.

"**Canadian Assets**" means all Assets belonging to the Canadian Sellers, other than any Purchased Intellectual Property of any Canadian Seller (in each case, which will be purchased by US Buyer and assigned to US Buyer pursuant to the IP Assignment Agreements).

"**Canadian Assigned Contracts**" means, collectively, (i) the Desired 365 Canadian Contracts, and (ii) all other Assigned Contracts that are assigned by any Canadian Seller to the Canadian Buyer.

"**Canadian Buyer**" has the meaning set forth in the introductory paragraph.

"**Canadian Sales Taxes**" means GST/HST and any sales, value-added, retail, use or similar tax imposed by any Canadian province.

"**Canadian Sellers**" means the Selling Entities designated as "Canadian Sellers" in Schedule 1 hereto.

"**Cash Purchase Price**" has the meaning set forth in Section 3.01(a).

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**CCAA**" has the meaning set forth in the Recitals.

"**CCAA Court**" has the meaning set forth in the Recitals.

"**CCAA Recognition Proceedings**" has the meaning set forth in the recitals.

"**CCAA Sale Order**" means an Order of the CCAA Court, in form and substance acceptable to the Canadian Buyer, acting reasonably, which shall, among other things: (i) recognize and give full force and effect to the Sale Order in all provinces and territories in Canada, pursuant to Section 49 of the CCAA, (ii) approve this Agreement and the transactions contemplated hereunder, (iii) vest the Canadian Assets in the Canadian Buyer, free and clear of all Encumbrances, other than the Permitted Encumbrances, (iv) assign all of the Canadian Assigned Contracts to the Canadian Buyer and set out the Cure Costs related thereto, and (v) provide that upon payment of the applicable Cure Costs, all past defaults under the Canadian Assigned Contracts shall be deemed to be cured and each such Canadian Assigned Contract shall be in good standing and effective, according to its terms.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Acquired Entity Accrued Taxes**" has the meaning set forth in Section 3.05(a).

6

"**Closing Acquired Entity Cash**" has the meaning set forth in Section 3.05(a).

"**Closing Acquired Entity Indebtedness**" has the meaning set forth in Section 3.05(a).

"**Closing Acquired Entity Net Figure**" means a dollar amount, which may be a positive or negative number, equal to the (a) Closing Acquired Entity Cash, *minus* (b) Closing Acquired Entity Indebtedness, and *minus* (c) Closing Acquired Entity Accrued Taxes, in each case, as finally determined in accordance with the procedures set forth in Section 3.05.

"**Closing Date**" has the meaning set forth in Section 4.01.

"**Closing Excess Cure Costs**" has the meaning set forth in Section 3.04(a).

"**Closing Net Working Capital**" has the meaning set forth in Section 3.04(a).

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Commissioner of Competition**" means the Commissioner of Competition, appointed pursuant to the Competition Act or any Person duly authorized to exercise the powers and perform the duties on behalf of the Commissioner of Competition and shall include the Competition Bureau.

"**Company Employees**" means (i) those employees of the Selling Entities listed on Schedule 1.01(b), which such schedule shall be subject to update by Seller prior to the Closing consistent with Section 7.02 with such updates provided to Buyer within seven Business Days prior to the Closing, and (ii) the Shared Services Employees identified as constituting "Company Employees" for purposes of this Agreement in accordance with Section 8.04(h).

"**Competition Act**" means the Competition Act (Canada) R.S.C. 1985, c. C-34.

"**Competition Act Clearance**" means that either (i) the Commissioner of Competition shall have issued an ARC to the Canadian Buyer in respect of the transactions contemplated by this Agreement, or (ii) (a) the applicable waiting period under Section 123 of the Competition Act shall have expired or been terminated or (b) a waiver under subsection 113(c) of the Competition Act shall have been issued by the Commissioner of Competition and, in the case of either of (a) or (b), the Canadian Buyer shall have received a No Action Letter in respect of the transactions contemplated by this Agreement.

"**Competition Tribunal**" means the Competition Tribunal established by subsection 3(1) of the *Competition Tribunal* Act, R.S.C., 1985, c. 19 (2nd Supp.).

"**Conditions Certificates**" means (i) a certificate signed by an officer of each Buyer Entity and addressed to the Selling Entities and the Information Officer (in form and substance satisfactory to the Selling Entities and the Information Officer, acting reasonably) certifying that the closing conditions set forth in Sections 10.01, 10.02, 10.03 and 10.04 and Sections 11.01, 11.02 and 11.03 have been satisfied or waived and (ii) a certificate signed by an officer of each of the Selling Entities and addressed to Buyer and the Information Officer (in form and substance

7

satisfactory to Buyer and the Information Officer, acting reasonably) certifying that the closing conditions set forth in Sections 9.01, 9.02, 9.03 and 9.04 and Sections 10.01, 10.02, 10.03 and 10.04 have been satisfied or waived.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b).

"**Contract**" means any agreement, contract, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases.

"**Control**" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have correlative meanings; *provided; however*, solely with respect to Intellectual Property, "**Control**" or "**Controlled**" means possession of the right to assign or grant a license, sublicense or other right to or under such item of Intellectual Property without violating the terms of any Contract with any Third Party.

"**Controlled Group**" means any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any Selling Entity or (ii) which together with any Selling Entity is treated as a single employer under Section 414(t) of the Code.

"**Copyrights**" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office, the Canadian Intellectual Property Office, or in any similar office or agency of the United States, any State thereof, Canada or any other jurisdiction, and any renewal of any of the foregoing.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**COVID-19 Measures**" means any commercially reasonable action or inaction by Seller or any Subsidiary of Seller in response to COVID-19, including any workforce reduction or its or their compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar Applicable Law in connection with, related to, or in response to COVID-19, including the CARES Act and Families First Act, or any change in any Applicable Law related to, in connection with or in response to COVID-19.

"**Cure Costs**" means all monetary Liabilities, including pre-petition monetary Liabilities, of the Debtor Selling Entities that must be paid or otherwise satisfied to cure all of the Debtor Selling Entities' monetary and other defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code or Section 11 of the CCAA at the time of the assumption thereof and assignment of the Desired 365 Contracts to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or the CCAA Court or approved pursuant to the Assignment and Assumption Procedures as defined and provided for in the Bidding Procedures Order.

"**Cure Costs Adjustment**" means the (i) the Closing Excess Cure Costs as finally determined pursuant to Section 3.04, *minus* (ii) the Estimated Excess Cure Costs, which amount may only be a positive number.

"**Cure Costs Cap**" means Cure Costs associated with the Business not to exceed $3,400,000.

"**Current Representation**" has the meaning set forth in Section 13.15(a).

"**Damage or Destruction Loss**" has the meaning set forth in Section 7.07.

"**Data Protection Laws**" means the data protection and privacy laws of each jurisdiction where any Selling Entity or Acquired Entity is established and operating the Business, or otherwise subject to, and those of each jurisdiction where any Personal Information is collected, transmitted, secured, stored, shared or otherwise processed by or on behalf a Selling Entity in connection with the operation of the Business.

"**Davis Polk**" has the meaning set forth in Section 13.15(a).

"**Deal Communications**" has the meaning set forth in Section 13.15(b).

"**Debt Commitment Letter**" has the meaning set forth in Section 6.07(a).

"**Debt Financing**" has the meaning set forth in Section 6.07(a).

"**Debt Financing Agreements**" has the meaning set forth in Section 7.08.

"**Debt Financing Sources**" means the entities that are party to the Debt Commitment Letter that have committed to provide or otherwise entered into agreements in connection with all or any part of the Debt Financing, together with their Affiliates, and including the parties to any related joinder agreements, credit agreements or indentures (including the definitive agreements relating thereto), any underwriters, placement agents or initial purchasers in connection with the Debt Financing and their respective successors and assigns, and their respective Affiliates and their and their respective Affiliates' officers, directors, employees, controlling Persons, partners, trustees, attorneys, advisors and other representatives and agents and their respective successors and assigns.

"**Debtor Selling Entities**" has the meaning set forth in the recitals.

"**Deposit Amount**" has the meaning set forth in Section 3.02.

"**Deposit Escrow Account**" means the deposit escrow account to be maintained with the Escrow Agent on behalf of the Selling Entities.

"**Designated Person**" has the meaning set forth in Section 13.15(a).

"**Desired 365 Contracts**" has the meaning set forth in Section 2.05(a).

9

"**Desired 365 Canadian Contracts**" means all Desired 365 Contracts to be assumed by the Canadian Buyer.

"**DIP Credit Facilities**" means, collectively, (i) that certain Superpriority Senior Secured Priming Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 15, 2023, by and among the Debtor Selling Entities and their applicable Affiliates party thereto, Bank of America, N.A., as administrative agent and as collateral agent and each lender and other party thereto from time to time, as amended, amended and restated, supplemented or otherwise modified from time to time and (ii) that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of June 15, 2023, by and among the Debtor Selling Entities and their applicable Affiliates party thereto, Wilmington Trust, National Association, as administrative agent and as collateral agent and each lender from time to time party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time (the DIP Credit Facility described in this clause (ii), the "**Term DIP Credit Facility**").

"**Disclosed Personal Information**" has the meaning set forth in Section 8.11.

"**Dispute Notice**" has the meaning set forth in Section 3.04(b).

"**Disputed Item**" has the meaning set forth in Section 3.04(b).

"**Downward Acquired Entity Adjustment**" has the meaning set forth in Section 3.05(d).

"**Encumbrance**" means any lien (statutory or otherwise), pledge, mortgage, hypothecation, deed of trust, security interest, charge, debenture, lease, license, occupancy agreement, option, easement, demand, covenant, right of first refusal, title defect, adverse claim, community or marital property interest, equitable interest, restrictions on use, encroachment, right of way, servitude or other encumbrances, in each case of any type, nature or kind whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material or known or unknown.

"**Environment**" means soil, soil vapor, surface waters, groundwater, drinking water, land, stream sediments, natural resources, surface or subsurface strata, ambient air or indoor air.

"**Environmental Laws**" means any Applicable Laws relating to the protection of the Environment or public or workplace health or safety (as it pertains to exposure to hazardous or toxic substances or materials), or any Release, storage, use, treatment, transportation, management, handling, generation, production, manufacture, importation, exportation, sale, distribution, labeling or recycling of, or exposure to, any pollutant or contaminant or ignitable, corrosive, reactive or otherwise toxic, dangerous, deleterious, harmful, hazardous or otherwise regulated material, substance or waste.

"**Equity Commitment Letter**" has the meaning given to such term in Section 6.07(a).

"**Equity Financing**" has the meaning given to such term in Section 6.07(a).

"**Equity Financing Source**" has the meaning given to such term in Section 6.07(a).

10

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Escrow Agent**" means Citibank, N.A.

"**Escrow Agreement**" means the Escrow Agreement to be entered into among US Buyer, Seller and the Escrow Agent at the Closing, substantially in the form agreed by the Parties acting reasonably.

"**Estimated Acquired Entity Accrued Taxes**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Cash**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Indebtedness**" has the meaning set forth in Section 3.03.

"**Estimated Acquired Entity Net Figure**" means a dollar amount, which may be a positive or negative number, equal to the (a) Estimated Acquired Entity Cash, *minus* (b) Estimated Acquired Entity Indebtedness, and *minus* (c) Estimated Acquired Entity Accrued Taxes, in each case as included in the Estimated Closing Statement.

"**Estimated Closing Statement**" has the meaning set forth in Section 3.03.

"**Estimated Excess Cure Costs**" has the meaning set forth in Section 3.01(c).

"**Estimated Net Working Capital**" has the meaning set forth in Section 3.03.

"**Estimated Net Working Capital Adjustment**" has the meaning set forth in Section 3.03.

"**Estimated Purchase Price**" has the meaning set forth in Section 3.01(a).

"**ETA**" means the Excise Tax Act (Canada) R.S.C. 1985, c. E-15.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Business**" means the business of designing, manufacturing, marketing, distributing and selling consumer dinnerware, bakeware, cookware, cutlery, food storage, and other storage products lifestyle brands, including Pyrex®, Corelle®, Corningware®, Snapware®, Visions® and Chicago Cutlery®, in each case, as conducted by Seller and its Subsidiaries.

"**Excluded Contracts**" means all Contracts of each Selling Entity other than the Assigned Contracts.

"**Excluded Equity Securities**" has the meaning set forth in Section 2.02(b).

"**Excluded Intellectual Property**" means all Intellectual Property other than the Purchased Intellectual Property.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

11

"**Excluded Records**" means (i) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (ii) each Selling Entity's respective federal, state, provincial, local or non-U.S. income, franchise or margin tax files and records (not including, for the avoidance of doubt, any Tax files or records of any Acquired Entity), (iii) employee files (other than files of Transferred Employees that are permitted to be transferred pursuant to Applicable Law), (iv) records relating to the sale of the Assets pursuant to the Bidding Procedures, including competing bids, (v) proprietary data (including any engineering studies and forecasts and economic studies) solely to the extent relating to Excluded Assets, (vi) information and data that is subject to Third Party contractual restrictions on assignment or disclosure to the extent relating to Excluded Assets, or any privileged information to the extent the transfer pursuant hereto would jeopardize such privilege; *provided*, *however*, the Selling Entities shall use their commercially reasonable efforts to provide a summary of such privileged information to the extent Related to the Business which would not violate any such privilege, (vii) copies of records stored for archival or back up purposes solely to the extent relating to Excluded Assets or Excluded Liabilities, and (viii) any other files or records solely to the extent relating to any Excluded Assets or Excluded Liabilities.

"**Facilities**" has the meaning set forth in Section 2.01(b)(i).

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 257] and any supplemental and/or final order entered in connection therewith.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), and a judgment or Order of the CCAA Court (or any other Court of competent jurisdiction) issued and entered by the CCAA Court (or such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court, CCAA Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or the CCAA (as applicable); *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order as long as such motion has not been filed.

"**Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Financing**" has the meaning set forth in Section 6.07(a).

"**Financing Commitment Letters**" has the meaning set forth in Section 6.07(a).

"**Financing Cooperation Expenses**" has the meaning set forth in Section 7.09(b).

"**Financing Cooperation Indemnity**" has the meaning set forth in Section 7.09(b).

"**FTC**" has the meaning set forth in Section 7.04(a).

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any transnational, federal, tribal, state, territory, provincial, parish, county, municipal or other governmental or quasi-governmental, taxing, administrative, judicial, arbitral or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Government Contract**" means any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, letter agreement, purchase order, delivery order, task order, grant, cooperative agreement, change order or other commitment or funding vehicle that (i) exists between a Selling Entity and any Governmental Authority or (ii) is entered into by a Selling Entity as a subcontractor at any tier in connection with a Contract between another Person and a Governmental Authority.

"**Government Official**" means any officer or employee of a Governmental Authority or any department, agency or instrumentality thereof, including state-owned entities, or of a public organization or any person acting in an official capacity for or on behalf of any such government, department, agency or instrumentality or on behalf of any such public organization.

"**GST/HST**" means goods and services tax and harmonized sales tax imposed under Part IX of the ETA.

"**Hazardous Substance**" means any pollutant or contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, including petroleum, its derivatives, by-products and other hydrocarbons, asbestos or asbestos-containing materials, polychlorinated biphenyls, per-and polyfluoroalkyl substances, and any other substance, waste or material regulated or which could give rise to liability under any Environmental Laws.

"**Housewares APA**" means that certain Asset Purchase Agreement among the Selling Entities and the Housewares Buyer in respect of the acquisition of assets related to the Excluded Business, substantially on the terms last proposed by the Housewares Buyer at the Auction (including on the record established at the Auction), and as may be further revised thereafter as mutually agreed between the Housewares buyer and the Selling Entities.

NAI-1538022664v15

"**Housewares Buyer**" means the Successful Bidder or Alternate Bidder (in each case, as defined in the Bidding Procedures) (as applicable) for the Assets (as defined in the Housewares APA).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**HSR Second Request**" means delivery by the FTC or the United States Department of Justice of a "Request for Additional Information and Documentary Material" in connection with the Notification and Report Forms to be filed by the Parties with the FTC and the United States Department of Justice.

"**IB Holdings**" means Instant Brands Holdings Inc.

"**Information Officer**" means Ernst & Young Inc., in its capacity as information officer in the CCAA Recognition Proceedings.

"**Information Officer's Certificate**" means the certificate issued by the Information Officer, in substantially the form attached to the CCAA Sale Order, certifying that the Information Officer has received the Conditions Certificates.

"**Initial Allocation**" has the meaning set forth in Section 8.02(b).

"**Insurance Policies**" has the meaning set forth in Section 5.14.

"**Intellectual Property**" means any Copyrights, Patents, Trademarks, trade secrets, know-how, software, rights in data and databases or inventions (whether patentable or not), and all rights in the foregoing, and any other similar type of proprietary right or intellectual property right.

"**Intended Tax Treatment**" has the meaning set forth in Section 8.02(a).

"**Interim Financial Statements**" has the meaning set forth in Section 5.04(a).

"**Investment Canada Act**" means the Investment Canada Act (Canada), R.S.C. 1985, c.28 (1st Supp).

"**IP Assignment Agreements**" means the IP Assignment Agreement(s) in substantially the form attached hereto as <u>Exhibit A</u> to be entered into between US Buyer and the applicable Selling Entities.

"**IRS**" means the Internal Revenue Service of the United States.

"**Knowledge**" means, with respect to any matter in question, (i) in the case of each Selling Entity, the knowledge, after reasonable review and inquiry, of any of the individuals listed on Schedule 1.01(c)(1), and (ii) in the case of Buyer, the knowledge, after reasonable review and inquiry, of any of the individuals listed on Schedule 1.01(c)(2).

"**Leased Real Property**" has the meaning set forth in Section 5.12(a).

"**Leases**" has the meaning set forth in Section 5.12(a).

"**Liability**" means any and all Claims, debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Licenses**" has the meaning set forth in Section 5.09(a)(xv).

"**Local Transfer Agreements**" means the local share transfer agreements, forms, notarial deeds, instruments or other similar documents, dated as of the Closing, between IB Holdings and US Buyer with respect to the transfer of all of the issued and outstanding equity interests of each Acquired Entity, in each case in form and substance reasonably agreed to by the Parties. For the sake of clarity, (i) the Local Transfer Agreements shall not have any effect on the value being given or received by Seller or Buyer, including the allocation of the Assets and Liabilities as between them, all of which shall be determined solely in accordance with this Agreement, and (ii) in the event of any conflict whatsoever between any Local Transfer Agreement and this Agreement, the terms of this Agreement shall control in all respects.

"**Major Customer**" has the meaning set forth in Section 5.16(a).

"**Major Supplier**" has the meaning set forth in Section 5.16(b).

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry), or any other code having, or capable of performing or facilitating, any of the following functions (whether intentionally designed as such, or resulting from a design flaw, unpatched vulnerability, or otherwise): (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed or with which such code interoperates, communicates, or transacts, or (ii) compromising the privacy or data security of a user, system, or software, or accessing modifying, damaging or destroying any data, file, software, or system without the user's knowledge or consent.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance in substantially the form attached hereto as <u>Exhibit B</u> to be entered into among US Buyer, the Canadian Buyer and the Selling Entities at the Closing.

"**Material Adverse Effect**" means any event, condition, circumstance, development, change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or condition (financial or otherwise) of the Business or the Assets or Assumed Liabilities, considered as a whole or (b) would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated hereby on a timely basis; *provided* that, solely with respect to clause (a), no effect

arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect: (i) any change in the United States economy or foreign economies where the Selling Entities operate, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the industry in which the Business operates; (iii) any Proceeding by any Person by reason of, based upon, attributable to, resulting from or arising in connection with, the negotiation, entry into or consummation of the transactions contemplated by this Agreement, any other Transaction Document or the Confidentiality Agreement; (iv) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action after the date hereof; (v) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic (including COVID-19), other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (vi) any change in Applicable Law or accounting rules (or the interpretation or enforcement thereof), in each case after the date hereof; (vii) any effect resulting from the public announcement of this Agreement, the negotiation, execution, performance of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of the Business, including the effect of any of the foregoing on the relationships, contractual or otherwise, of the Business with clients, customers, employees, suppliers, vendors, service providers or Governmental Authorities (including the failure to obtain any consents in connection with the transactions contemplated hereby); (viii) any effect resulting from the filing or continuation of the Bankruptcy Cases, including the Debtor Selling Entities' inability to pay its obligations as a result of the filing of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Proceeding); (ix) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (x) any action taken (or omitted to be taken) at the express written request or with the express written consent of Buyer or any of its Affiliates; and (xi) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is expressly required to be taken (or not taken) pursuant to this Agreement; *provided however*, that, in the case of clauses (i), (ii), (iv), (v) and (vi), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such events, conditions, circumstances, developments, changes or effects have a disproportionate adverse effect on the Business, the Assets or the Assumed Liabilities, taken as a whole, as compared to other similarly situated participants in the industries in which the Business operates.

"**Material Contracts**" has the meaning set forth in Section 5.09(a).

"**Material Permit**" has the meaning set forth in Section 5.08(b).

"**Measurement Time**" has the meaning set forth in Section 4.01.

"**Necessary Consent**" has the meaning set forth in Section 2.06(i).

"**Net Working Capital**" means the aggregate value of the accounts receivable (excluding intracompany transactions) and inventory of the Business *minus* the aggregate value of trade accounts payable of the Business, in each case, determined on a consolidated basis as of the Measurement Time and determined in accordance with the Accounting Procedures. For the avoidance of doubt, "Net Working Capital" shall not include any item taken into account in the definition of (i) Acquired Entity Indebtedness or (ii) Acquired Entity Accrued Taxes.

"**Net Working Capital Adjustment**" means the amount, which may be a positive or negative number, equal to (i) the Estimated Net Working Capital or the Closing Net Working Capital, as applicable, *minus* (ii) the Net Working Capital Target.

"**Net Working Capital Target**" means $60,000,000.

"**No Action Letter**" means a communication in writing from the Commissioner of Competition advising that he does not, at that time, intend to make an application to the Competition Tribunal under Section 92 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**NWC Adjustment Amount**" means (i) the Net Working Capital Adjustment as finally determined pursuant to Section 3.04, *minus* (ii) the Estimated Net Working Capital Adjustment, which amount may be a positive or negative number.

"**NWC and Cure Decrease**" has the meaning set forth in Section 3.04(f).

"**NWC and Cure Increase**" has the meaning set forth in Section 3.04(e).

"**NWC and Cure Statement**" has the meaning set forth in Section 3.04(a).

"**Offer Employees**" has the meaning set forth in Section 8.04(a).

"**Omitted Contract**" has meaning set forth in Section 2.05(c)(ii).

"**Open Source License**" means a license meeting the definition of "Open Source" promulgated by the Open Source Initiative or any other license pursuant to which source code is made generally available on terms which allow for further redistribution with or without modification at no cost.

"**Order**" means any award, writ, injunction, consent, settlement, determination, assessment, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 12.01(b)(i).

"**Owned Intellectual Property**" means all Intellectual Property to the extent owned or exclusively Controlled or purported to be owned or exclusively Controlled by Seller or any of its Subsidiaries and Related to the Business.

17

"**Party**" and "**Parties**" each have the meaning set forth in the introductory paragraph.

"**Party Affiliate**" has the meaning set forth in Section 13.12(a).

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, registered industrial designs, applications for industrial designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisionals, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, Canadian Intellectual Property Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"**Payoff Amount**" has the meaning set forth in Section 7.09(a).

"**Payoff Letter**" has the meaning set forth in Section 7.09(a).

"**Permits**" means any approvals, authorizations, consents, exemptions, accreditations, qualifications, licenses, permits, registrations, certificates or similar documents or authority issued or granted by any Governmental Authority.

"**Permitted Encumbrances**" means (i) with respect to the Assets and the Acquired Entities, (a) zoning, entitlement and building regulations and land use restrictions imposed by Governmental Authorities which are not violated by the current use or occupancy of such real property or the operation of the Business as currently conducted, (b) covenants, conditions, restrictions, easements and other similar matters affecting title to real property that does not (or would not reasonably be expected to) materially impair the ownership or value of such property or the occupancy or use of such property for the purposes which it is currently used by the Business, (c) with respect to any Real Property Interest, all matters of public record, to the extent valid and subsisting, (d) non-exclusive licenses of Intellectual Property granted in the ordinary course of business, (e) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, (f) any Encumbrances that will be released by the Sale Order and (g) the Encumbrances set forth on Schedule 1.01(d), and (ii) with respect to the Acquired Entities, (a) statutory Encumbrances for Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, in each case, for which appropriate reserves have been established in accordance with GAAP, (b) mechanics', carriers', workers', repairers' and other similar Encumbrances arising or incurred in the ordinary course of business for amounts for obligations that are not material or overdue or the amount or validity of which are being contested in good faith by appropriate proceedings, (c) purchase money Encumbrances and Encumbrances securing rental payments under capital lease arrangements, (d) Encumbrances arising under leases of property or equipment in favor of the owner thereof and (e) deposits to secure the performance of bids, Contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and similar obligations incurred in the ordinary course of business.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means any information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, including a reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on and including the Closing Date.

"**Prepayment Amount**" has the meaning set forth in Section 7.09(a).

"**Prepayment Notice Confirmation**" has the meaning set forth in Section 7.09(a).

"**Proceeding**" means any Claim, action, charge, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts.

"**Property Tax Credit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (or portion thereof) that were paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Debit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Pre-Closing Tax Period (or portion thereof) that were not paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Purchase Price Adjustment**" means the excess of the Property Tax Credit Amount over the Property Tax Debit Amount, which amount may be a positive or negative number.

"**Purchase Price**" has the meaning set forth in Section 3.01.

"**Purchased Intellectual Property**" has the meaning set forth in Section 2.01(b)(xiii).

"**Qualifying Offer**" has the meaning set forth in Section 8.04(a).

"**R&W Insurance Policy**" has the meaning set forth in Section 13.12(c).

"**Real Property Interests**" has the meaning set forth in Section 2.01(b)(v).

"**Records**" has the meaning set forth in Section 2.01(b)(viii).

"**Registered Intellectual Property**" has the meaning set forth in Section 5.10(a).

"**Related to the Business**" means (i) primarily or exclusively used in, (ii) primarily or exclusively owned, leased, licensed or otherwise held for use in, or (iii) primarily or exclusively related to the operation or conduct of, in each case, the Business.

"**Release**" means any presence, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the Environment (including the abandonment or discarding of barrels, containers or other closed receptacles containing any Hazardous Substance).

"**Released Parties**" has the meaning set forth in Section 13.12(b).

"**Releasors**" has the meaning set forth in Section 13.12(b).

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants and financial advisors.

"**Round-Tripping Amount**" means (i) in the event that the Closing occurs after the Closing (as defined in the Housewares APA), the amount of the Payoff Amount (as set forth in the Payoff Letter with respect to the Term DIP Credit Facility) or (ii) in the event that the Closing occurs prior to the Closing (as defined in the Housewares APA), the Prepayment Amount set forth in the Prepayment Notice Confirmation, in each case, allocable to the outstanding obligations of the Debtor Selling Entities or any of their Affiliates owed to Buyer or any of its Affiliates (in the capacity as lenders with respect to the Term DIP Credit Facility) (each, a "**Buyer DIP Lender**") under the Term DIP Credit Facility.

"**Sale Order**" means an Order of the Bankruptcy Court approving the sale of the Assets to Buyer and assumption by Buyer of the Assumed Liabilities, in substantially the form reasonably acceptable to Buyer and Seller, with such changes thereto as are required by the Bankruptcy Court.

"**Sanctioned Person**" means any Person that is the subject of Sanctions Laws, including (i) any Person listed on any sanctions-related list of designated Persons, including OFAC's Specially Designated Nationals and Blocked Persons List and other applicable lists maintained by the United Nations or the governments of Canada, the United Kingdom, the European Union, any European Union member state, or any other applicable Governmental Authority, (ii) any Person located, organized or resident in Cuba, Iran, North Korea, Syria, or the Crimea, so-called Luhansk People's Republic, or so-called Donetsk People's Republic regions of Ukraine, or (iii) any entity that is, in the aggregate, 50% or greater owned, directly or indirectly, or otherwise Controlled by, or acting or purporting to act on behalf of, a Person or Persons described in clauses (i) or (ii).

"**Sanctioned Territory**" has the meaning set forth in Section 5.22(a).

"**Sanctions Laws**" means the Applicable Laws administered or enforced by the United States (including by the United States Department of the Treasury, Office of Foreign Assets Control ("**OFAC**") or the U.S. Department of State), the United Nations or the governments of Canada, the United Kingdom, the European Union, any European Union member state, or any other applicable Governmental Authority relating to economic or trade sanctions.

"**Seller**" has the meaning set forth in the introductory paragraph.

"**Seller Benefit Plans**" any (i) "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (ii) employment, consulting, termination, severance, salary continuation, termination protection, change in control, transaction bonus, retention or similar plan, program, policy or agreement  or (iii) other plan, agreement, policy, program, funds or arrangements of any kind (whether written or oral) providing for compensation, bonuses, profit-sharing, or other forms of incentive (whether equity-based or otherwise) or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits and any trust, escrow or similar agreement related thereto, whether or not funded, in each case (A) that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by any Selling Entity for the benefit of any current or former Company Employee or (B) with respect to which any Selling Entity has or could reasonably be expected to have any current or contingent Liability; provided, however, that in no event shall "**Seller Benefit Plan**" include any arrangement maintained by a Governmental Authority to which any Selling Entity is required to contribute under Applicable Law.

"**Seller Credit Obligations**" has the meaning set forth in Section 8.03(c).

"**Seller Intercompany Obligations**" means all intercompany obligations solely between or among Selling Entities.

"**Seller Related Party**" means Seller and its Subsidiaries and its and their respective stockholders, partners, members, Affiliates, directors, officers, employees, controlling Persons and agents.

"**Selling Entities**" has the meaning set forth in the introductory paragraph.

"**Shared Services Employees**" means the employees listed on Schedule 1.01(b), which includes all employees of the Selling Entities who provide services to both the Business and the Excluded Business, which such schedule shall be subject to update by Seller prior to the Closing consistent with Section 7.02 with such updates provided to Buyer within seven Business Days prior to the Closing.

"**Solvent**" has the meaning set forth in Section 6.09.

"**Specified Termination**" has the meaning set forth in Section 3.02(b).

"**Straddle Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) (i) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (ii) holds a majority of the equity interest.

"**Successful Bidder**" means the bidder with the highest or otherwise best bid for the Assets, as determined in accordance with the Bidding Procedures.

"**Superior Proposal**" means any bona fide proposal or offer to or from a Person other than Buyer or its Representatives with respect to (i) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (ii) any other direct or indirect acquisition involving the Assets, that, in each case, the Selling Entities have determined in good faith in their reasonable business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**", "**Taxation**" "**Taxing**") means all federal, state, provincial, territory, local or foreign taxes, including all net income, gross receipts, capital, sales, use, goods and services (including Canadian Sales Taxes), ad valorem, value added, custom duties, duties, registration, transfer, import, export, franchise, profits, premiums, inventory, capital stock, environmental, disability, recapture, levies, rates, license, withholding, payroll, employment, social security, worker's compensation, unemployment, government pension plan premiums and contributions, utility, excise, severance, stamp, occupation, real property, personal property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Tax Act**" means the Income Tax Act (Canada) and the regulations thereunder.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, estimate, information return, election, notice, designation and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"**Term DIP Agent**" has the meaning set forth in the Final DIP Order.

"**Term DIP Credit Facility**" has the meaning set forth in the definition of "DIP Credit Facilities".

"**Term DIP Secured Parties**" has the meaning set forth in the Final DIP Order.

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

NAI-1538022664v15

"**Trade Compliance Laws**" means any Applicable Laws relating to the regulation of imports, exports, re-exports, transfers, releases, shipments, transmissions or any other provision of goods, technology, software or services, including (i) the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120 et seq., (ii) the Export Administration Regulations (EAR), 15 C.F.R. Parts 730 et seq., (iii) Sanctions Laws, (iv) all Applicable Laws relating to customs and imports, including, without limitation, the customs regulations set forth in Title 19 of the Code of Federal Regulations, the Tariff Act of 1930, as amended, and the Applicable Laws, regulations and programs administered or enforced by the U.S. Department of Commerce, U.S. International Trade Commission, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement and their respective predecessor agencies, (v) the antiboycott laws administered by the U.S. Department of Commerce and U.S. Department of the Treasury's Internal Revenue Service and (vi) similar trade compliance laws in jurisdictions in which the Selling Entities operate or have operated.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, social media identifier or account, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, Canada or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction Documents**" means this Agreement, the Master Assignment, the IP Assignment Agreements, the Escrow Agreement, the Local Transfer Agreements, the Transition Services Agreement, the Equity Commitment Letter and any other agreements, instruments or documents (including any elections referred to in Article 8, if applicable) entered into pursuant to this Agreement or such other Transaction Documents.

"**Transfer Taxes**" has the meaning set forth in Section 8.01(a).

"**Transferred Employees**" means any (i) Offer Employee who accepts (or is deemed to accept) an offer of employment with Buyer or one of its Subsidiaries pursuant to Section 8.04 and (ii) individual who is employed by an Acquired Entity as of immediately prior to the Closing.

"**Transition Services Agreement**" means the Transition Services Agreement, in substantially the form attached hereto as Exhibit C (with such changes thereto as may be mutually agreed by Buyer and the Selling Entities pursuant to Section 2.12), entered into among Buyer and the Selling Entities at the Closing.

"**Trustee**" has the meaning set forth in Section 13.14.

"**Upward Acquired Entity Adjustment**" has the meaning set forth in Section 3.05(c).

"**US Buyer**" has the meaning set forth in the introductory paragraph.

"**WARN**" has the meaning set forth in Section 8.04(e)(v).

"**WK India**" means World Kitchen (India) Private Limited.

23

Section 1.02    *Other Definitions and Interpretive Matters.*

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    *Time*.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.  Any references to "days" in this Agreement means calendar days and not Business Days, unless Business Days are specified.

(ii)    *Dollars*.  Any reference in this Agreement to "Dollars" or "$" means United States dollars.

(iii)    *Exhibits; Schedules; Disclosure Schedules*.  All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)    *Gender and Number*.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

(v)    *Headings*.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    *Accounting Terms*.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.

(vii)    *Herein*.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)    *Or.*  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)    *Including*.  The word "including" or any variation thereof means "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    *Statute*.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the

24

representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi) *Contract*. References to a Contract (including this Agreement) mean such Contract as amended, restated, modified or supplemented from time to time.

(xii) *Subsidiaries of Seller*. All references to Subsidiaries of Seller are intended to include the Acquired Entities in addition to the Selling Entities, unless explicitly stated otherwise.

(xiii) *Made Available*. The phrase "made available" or "provided" to Buyer or similar phrases as used in this Agreement means that the subject documents were posted to the online data room hosted by Intralinks, titled "Project Inspire M&A" and maintained by the Selling Entities in connection with the transactions contemplated by this Agreement on or prior to the date of this Agreement.

(xiv) *Ordinary Course of Business*. The words "ordinary course of business" will be deemed immediately followed by the words "consistent with past practices" (if such words or words of similar effect do not already follow).

(b) *No Strict Construction*. Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

ARTICLE 2
PURCHASE AND SALE

Section 2.01 *Purchase and Sale.*

(a) Upon the terms and subject to the conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing in the sequence set out in Section 2.11, the Selling Entities will sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer will purchase, acquire and accept, the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b) The "**Assets**" means all right, title and interest of each Selling Entity in, to or under all of their respective assets, rights, claims and properties of every nature, kind and description and wherever located, whether real, personal or mixed, tangible and intangible (including goodwill) and whether now existing or hereafter acquired, to the extent Related to the Business, including the following, but excluding, for the avoidance of doubt, the Excluded Assets:

(i)　all plants, offices, and manufacturing, processing, distribution, storage, warehousing and other facilities of any Selling Entity to the extent Related to the Business (collectively, the "**Facilities**"), together with all equipment, machinery, vehicles, fixtures, supplies, furniture, leasehold improvements, and other personal, movable and mixed property of any Selling Entity that is located at or in the immediate vicinity of the Facilities or used (or held for use) in connection with the use, ownership or operation of the Facilities (or any portion thereof);

(ii)　to the extent not described in Section 2.01(b)(i), all items of tangible personal property or equipment owned or leased by any Selling Entity to the extent Related to the Business;

(iii)　all inventory and software Related to the Business (including maintenance, repair and operation inventory, spare parts, supplies, packaging, work-in-progress, raw materials, in-bound in-transit, plant consumables, plastic trays and accessories) owned or used (or held by any Selling Entity for use), whether in transit to or from any Selling Entity and whether in any Facilities, held by any third parties or otherwise and all open purchase orders with suppliers (but excluding any products shipped to third parties prior to the Closing Date);

(iv)　Reserved;

(v)　all Leased Real Property set forth on Disclosure Schedule 2.01(b)(v), together with the rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits, tenements, appurtenant rights and privileges relating thereto (in each case, excluding unexpired Leases that are 365 Contracts) (collectively, the "**Real Property Interests**");

(vi)　(x) all Contracts that constitute, as of the Closing, Desired 365 Contracts, and (y) all other Contracts that are not 365 Contracts and are Related to the Business as set forth on Disclosure Schedule 2.01(b)(vi)(y) (collectively, the "**Assigned Contracts**");

(vii)　subject to Section 2.06, all Permits and Orders (in each such case, whether preliminary or final) required of any Selling Entity for the ownership, operation or use (or held for use) of the Assets to the extent Related to the Business;

(viii)　all books, databases, files, records, Tax Returns (and associated workpapers), plans, advertising and promotional materials, information, data and other similar items (other than the Excluded Records) in any Selling Entity's possession, whether in written or electronic or any other format, including customer and supplier lists, mailing lists, sales and promotional literature, and other sales related materials to the extent Related to the Business (collectively, the "**Records**");

(ix)　all rights, claims, accounts and causes of action (including warranty and similar claims) of any Selling Entity against Persons (including any of Seller's Subsidiaries) other than any other Selling Entity (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of

26

recovery, including rights to insurance proceeds, possessed by any Selling Entity (regardless of whether such rights are currently exercisable) associated with the Assets;

(x)  the amount of and all rights to any proceeds received by any Selling Entity in respect of (x) the loss, destruction or condemnation of any Assets occurring prior to, on or after the Closing or (y) any Assumed Liabilities or the operation of such Assets;

(xi)  all warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, Related to the Business, or any products or services provided in connection therewith;

(xii)  all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, security and other deposits or the like (other than Taxes), in each case, Related to the Business and made by or on behalf of any Selling Entity before the Closing Date, to the extent related to the period after the Closing;

(xiii)  all Owned Intellectual Property, all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Owned Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Owned Intellectual Property, including the right to license and the right to file, prosecute and maintain the Owned Intellectual Property and the right to collect royalties or other payments with respect to the Owned Intellectual Property (the "**Purchased Intellectual Property**");

(xiv)  the Seller Benefit Plans listed on Disclosure Schedule 2.01(b)(xiv) (the "**Assumed Benefit Plans**") and all assets held with respect thereto;

(xv)  Reserved;

(xvi)  all goodwill and other intangible assets Related to the Business, including all customer relationships, all rights under any confidentiality agreements executed by any Third Party for the benefit of any Selling Entity to the extent relating to the Assets, and all information and documents related thereto (other than the Excluded Records);

(xvii)  to the extent Related to the Business, all rights of any Selling Entity under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any current or former employees, or current or former directors, consultants, independent contractors and agents of any Selling Entity or any of their Affiliates or with third parties in respect of the Business;

(xviii)  all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement, refunds or rights of set off to the extent Related to the Business;

(xix)  all rights to any refunds (or credits against Taxes otherwise due and payable in lieu of refunds) with respect to Taxes that are assessed on, or in respect of, or are attributable to, the Business or the Acquired Entities, except refunds or credits of any such Taxes that were paid by any Selling Entity prior to the Closing (other than any Taxes taken

into account in determining Property Tax Credit Amount or refunds or credits taken into account as a reduction to Acquired Entity Accrued Taxes) or were taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

(xx)    any rights, awards, defenses, claims, counterclaims or causes of action as of the Closing of any Selling Entity relating to any Proceeding or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interests, in each case, to the extent Related to the Business, whether arising by way of counterclaim or otherwise (but excluding for the avoidance of doubt, counterclaims and defenses related to Excluded Assets);

(xxi)    all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, the CCAA or the BIA, including any proceeds thereof, to the extent Related to the Business, other than those listed on Schedule 2.01(b)(xxi);

(xxii)    all shares of capital stock or other equity interests in the Acquired Entities (the "**Acquired Equity Securities**"), excluding, for the avoidance of doubt, the Excluded Equity Securities;

(xxiii)    all current assets of the Business, including those included in the calculation of the Net Working Capital;

(xxiv)    all computer systems, networks, hardware, computer software, databases and data collections, websites and other equipment used to process store, maintain and operate data, information and functions, in any form or by any method, used by any Selling Entity and Related to the Business;

(xxv)    subject to Section 7.14, all of the Acquired Entity Intercompany Obligations; and

(xxvi)    all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like, in each case, Related to the Business and made by or on behalf of any Selling Entity before the Closing Date, to the extent related to the period after the Closing.

No provision of this Section 2.01 shall be construed to limit the scope of the Assets acquired by Buyer indirectly through its acquisition of the Acquired Entities through the purchase of the Acquired Equity Securities hereunder, it being understood that Buyer shall indirectly acquire all such assets, properties, claims and rights except as otherwise expressly provided herein.

Section 2.02    *Excluded Assets.*

Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign, convey or deliver the Excluded Assets to Buyer, and the Selling Entities

NAI-1538022664v15

will retain all right, title and interest to, in and under the Excluded Assets. The term "**Excluded Assets**" means, and is limited to, the following assets, rights and properties of the Selling Entities:

(a)     any amounts (including the Purchase Price) paid or payable to any Selling Entity pursuant to this Agreement or any other Transaction Document;

(b)     any shares of capital stock or other equity interest of any Selling Entity or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Selling Entity (including with respect to (i) Instant Brands (Australia) Pty Ltd, (ii) Corelle Brands (Asia Pacific) Pte. Ltd., (iii) Corelle Brands (Korea) Co., Ltd., (iv) Corelle Brands (Hong Kong) Co. Limited and (v) WK India), in each case other than the Acquired Equity Securities, which are all included in the Assets (such excluded capital stock or equity interests, the "**Excluded Equity Securities**");

(c)     all minute books and other corporate books to the extent relating to any Selling Entity's organization or existence, and all stock ledgers, corporate seals and stock certificates of any Selling Entity (excluding, for the avoidance of doubt, any books, ledgers, seals and certificates relating to the Acquired Entities and the Acquired Equity Securities);

(d)     all Excluded Records;

(e)     all Excluded Contracts;

(f)     all Seller Intercompany Obligations;

(g)     all rights to any refunds (or credits against Taxes otherwise due and payable in lieu of refunds) with respect to Taxes that are assessed on, or in respect of, or are attributable to, the Assets or the Acquired Entities that were paid by any Selling Entity prior to the Closing (other than any Taxes taken into account in determining Property Tax Credit Amount or refunds or credits taken into account as a reduction to Acquired Entity Accrued Taxes) or were taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

(h)     (y) without limiting Section 8.08, all current and prior insurance policies of the Selling Entities, regardless of whether or not related to the Assets or the Assumed Liabilities, and all rights and benefits of any Seller Entity of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and (z) the assets set forth on Disclosure Schedule 2.02(h);

(i)     all cash and cash equivalents (including (w) any cash that (A) is collateralizing any letters of credit issued pursuant to any credit agreement or facility or (B) held in trust or any trust account for or on behalf of any Selling Entity, (x) marketable securities, (y) short-term investments and (z) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by any of Selling Entity), other than (I) any cash or other proceeds received or to which Buyer is or may be entitled under or pursuant to Section 2.01(b)(ix), Section 2.01(b)(xi), Section 2.01(b)(xii), Section 2.01(b)(xx) and Section 2.01(b)(xxvi) or (II) held by any Acquired Entity;

(j)     all rights, claims of any nature or causes of action by or in the right of Seller or any of its Subsidiaries, on the one hand, against any current or former director, officer, employee, partner, member, Representative or agent of Seller or any of its Subsidiaries (other than Transferred Employees), on the other hand, whether arising by counterclaim or otherwise, including those listed on Schedule 2.01(b)(xxi);

(k)     all bank accounts, safety deposit boxes, lock boxes and securities accounts of the Selling Entities and the contents thereof;

(l)     all outside of the ordinary course of business deposits made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases as set forth on Disclosure Schedule 2.02(l);

(m)     any rights, claims or causes of action of any Selling Entity under this Agreement, any other Transaction Document or the Confidentiality Agreement;

(n)     the proceeds of the sale of any Excluded Assets;

(o)     all Seller Benefit Plans that are not Assumed Benefit Plans and all assets held with respect to such Seller Benefit Plans;

(p)     all assets, rights and properties (i) primarily or exclusively used in, (ii) primarily or exclusively owned, leased, licensed or otherwise held for use in, or (iii) primarily or exclusively related to the operation or conduct of, in each case, the Excluded Business;

(q)     any agreement or other Contract between any Selling Entity with a labor union, works council, employee association or other labor organization;

(r)     all property reportable under any unclaimed property, escheat or similar Law where the dormancy period elapsed prior to the Closing Date;

(s)     all assets constituting "Assets" under the Housewares APA;

(t)     all Excluded Intellectual Property; and

(u)     those other properties and assets described on Disclosure Schedule 2.02(u).

Section 2.03     *Assumed Liabilities.*

Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (collectively, the "**Assumed Liabilities**") and no other Liabilities:

(a)     *Generally.*  All Liabilities directly arising from the ownership or operation of the Business or the Assets by Buyer after the Closing, and with respect to Taxes, any Taxes that are assessed on, or in respect of, or are attributable to, the Assets or the Acquired Entities for any Post-Closing Tax Period (or portion thereof);

(b)     *Assigned Contract*s.  All of the Selling Entities' Liabilities under the Assigned Contracts, to the extent arising or attributable to any period after the Closing or arising on or prior to the Closing solely to the extent requiring performance after the Closing; *provided*, such Liability does not relate to any failure to perform, improper performance, breach of warranty or other breach, default or violation of such Assigned Contract by any Selling Entity on or prior to the Closing;

(c)     *Real Property Interests*.  All of the Selling Entities' Liabilities under the Real Property Interests, to the extent arising or attributable to any period after the Closing;

(d)     *Cure Costs*.  All Cure Costs;

(e)     *Intercompany Obligations*.  Subject to Section 7.14, all Liabilities relating to Acquired Entity Intercompany Obligations;

(f)     *Accounts Payable*.  All trade accounts payable of the Business, to the extent included in the calculation of the Net Working Capital;

(g)     *Taxes*.  100% of the Transfer Taxes and all Taxes taken into account in determining Property Tax Debit Amount or Acquired Entity Accrued Taxes;

(h)     *Transferred Employees; Assumed Benefit Plans*.  All Liabilities (i) arising out of, or relating to, the employment, or termination of employment with Buyer or any of its Affiliates, of any Transferred Employee, in each case, arising on or following the Closing, (ii) arising out of, or relating to, any Assumed Benefit Plans, in each case, whether arising before, on or following the Closing, or (iii) assumed by, or transferred to, Buyer or any of its Affiliates pursuant to Section 8.04;

(i)     *Environmental*.  All Liabilities arising from the ownership or operation of the Assets or the Business by the Buyer after the Closing concerning the violation of any Environmental Laws or the presence or Release of any Hazardous Substance at, on, under or migrating from any Assets; and

(j)     *WARN*.  The Liabilities and obligations assumed by Buyer pursuant to Section 8.04(e)(v).

Section 2.04     *Excluded Liabilities.*

Notwithstanding anything herein to the contrary, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any Liability of any Selling Entity other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**").

Section 2.05     *Cure Costs; Desired 365 Contracts.*

(a)     Schedule 2.05(a) sets forth a complete list as of the date hereof of all 365 Contracts that Buyer intends to assume at the Closing (the "**Desired 365 Contracts**").  Upon Closing, subject to the terms and conditions hereof, the Selling Entities, as applicable, will assign the Desired 365

31

Contracts to Buyer, and Buyer will (i) assume the applicable Liabilities in accordance with Section 2.03(b) and (ii) as promptly as reasonably practicable, pay or cause to be paid, pursuant to Section 365 of the Bankruptcy Code, the Sale Order and the CCAA Sale Order, all Cure Costs pursuant to Section 2.03(d) relating to the Desired 365 Contracts as and when finally determined by the Bankruptcy Court or the CCAA Court pursuant to the procedures set forth in the Sale Order and (as applicable) the CCAA Sale Order.

(b)     At any time prior to the Closing Date, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, Buyer will have the right to provide written notice to Seller of Buyer's election to:

(i)     designate a 365 Contract (including any 365 Contract that is a Desired 365 Contract immediately before such designation) as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)     designate a 365 Contract as a Desired 365 Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such 365 Contract is added to the Assigned Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract and, in the case of any Desired 365 Canadian Contact, prior to the service of the motion seeking the CCAA Sale Order, and (B) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order) and, in the case of Desired 365 Canadian Contracts, the CCAA Court (including through the CCAA Sale Order).

(c)     At any time within 60 days after the Closing Date, but only to the extent consistent with the Bidding Procedures Order, the Bidding Procedures, the Sale Order and CCAA Sale Order (as applicable), Buyer will have the right, in Buyer's sole discretion, to provide written notice to Seller of Buyer's election to:

(i)     designate a Desired 365 Contract as an Excluded Contract, and upon such designation such Desired 365 Contract will constitute an Excluded Contract and Excluded Asset, if after the Closing Date (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the Cure Costs listed on Disclosure Schedule 5.09(c) or (B) a timely filed or asserted objection to a Cure Cost or to Buyer's assumption and assignment of a Contract, in each case that was asserted prior to the Closing Date, remains unresolved or is resolved in a manner unsatisfactory to the Buyer, in each case as determined by the Buyer in its sole discretion; *provided* that if, at such time, such Contract had already been assumed pursuant to, in each case of this subclause (i), the Sale Order or the CCAA Sale Order, Buyer shall be responsible for, and shall promptly reimburse Seller for, any and all Cure Costs relating to such Contract that would be entitled to priority pursuant to Section 503(b) of the Bankruptcy Code; and

(ii)     designate any 365 Contract disclosed to Buyer for the first time after the Closing Date (any such contract, an "**Omitted Contract**") as a Desired 365 Contract.

NAI-1538022664v15

Seller shall, promptly following discovery of an Omitted Contract (but in no event later than three Business Days after such discovery), (x) notify Buyer in writing of such Omitted Contract and the corresponding estimated Cure Costs related thereto (if any) and (y) as requested by Buyer in writing (email to suffice), either file a Supplemental Assumption and Assignment Notice as set forth in the Bidding Procedures Order or file a motion (on an expedited basis, if requested by the Buyer) with the Bankruptcy Court and (if applicable) the CCAA Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.05; *provided* that Buyer shall be responsible for, and shall pay, all Liabilities related to such Omitted Contract. Such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) there is no objection to the Supplemental Assumption and Assignment Notice (if one is filed) and Buyer has accepted such Omitted Contract in writing (email to suffice) as an Assigned Contract or (B) to the extent a motion is filed to assume and assign such Omitted Contract, the assumption and assignment is approved by the Bankruptcy Court and (if applicable) the CCAA Court.

(d)     To the extent that Buyer makes a valid designation with respect to any 365 Contracts pursuant to clause (b) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(e)     If Buyer exercises its rights in clause (b) above to designate a 365 Contract as a Desired 365 Contract or as an Excluded Asset (as the case may be), then the Parties acknowledge and agree that (i) there will be no increase or reduction in the Cash Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing and (ii) notwithstanding anything in this Agreement to the contrary, the Cure Costs associated with such 365 Contract, which, in the case of any 365 Contract designated as a Desired 365 Contract pursuant to Section 2.05(b)(ii), shall be paid by Buyer and shall not be taken into account in determining any Estimated Excess Cure Costs or Closing Excess Cure Costs, as applicable. If Buyer exercises its rights in clause (c) above to designate a Desired 365 Contract as an Excluded Contract or to designate an Omitted Contract as a Desired 365 Contract, then the Cure Costs associated therewith shall not be taken into account in determining any Closing Excess Cure Costs.

Section 2.06     *Assignment of Assets Subject to Consent Requirements.*

Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any Third Party thereto (each such action, a "**Necessary Consent**"), would constitute a breach thereof or of any Applicable Law or Order or in any way adversely affect the rights of Buyer thereunder, (ii) such Necessary Consent has not been obtained or rendered moot (after giving effect to the Sale Order and the CCAA Sale Order and the Bankruptcy Code and the CCAA) and (iii) the Bankruptcy Court or the CCAA Court has not entered an Order providing that such Necessary Consent is not required. In such event, subject to the terms and conditions hereof, the Closing will proceed with

33

respect to the remaining Assets, and there will be no reduction in the Purchase Price as a result thereof. If, as of the Closing, any Necessary Consent has not been obtained, then (A) Seller and Buyer will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer; *provided* that Seller will not be obligated to pay any consideration or grant any accommodation therefor to any Third Party from whom such Necessary Consent is requested or to initiate any Proceedings to obtain any such Necessary Consent; and (B) Seller and Buyer will reasonably cooperate in a mutually agreeable arrangement, without the need for any Necessary Consent, under which Buyer would obtain the benefits and assume the obligations under such Asset in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which the Selling Entities would enforce their rights thereunder for the benefit of Buyer with Buyer assuming each applicable Selling Entities' obligations thereunder. To the extent permitted under Applicable Law, Seller shall hold in trust for and pay to Buyer promptly upon receipt thereof, such Asset and all income, proceeds and other monies received by any Selling Entity to the extent related to such Asset in connection with the arrangements under this Section 2.06.

Section 2.07    *Misallocated Assets.*

Subject to Section 2.06 and Section 2.12, at all times on or after the Closing Date, (i) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (ii) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities, Buyer, Seller or the applicable Subsidiary of Seller will promptly transfer (or cause to be transferred), for no additional consideration, such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party.

Section 2.08    *Further Assurances.*

From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.08 will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the earlier of the date (i) that the last remaining service of Seller or any of its Subsidiaries under the Transition Services Agreement has been fulfilled or expired and (ii) the effective date of a plan of reorganization or liquidation submitted by any of the Debtor Selling Entities to the Bankruptcy Court; *provided* that any liquidation trustee or trust (or person or entity acting in a similar capacity) shall continue to provide services under the Transition Services Agreement until the last remaining service of Seller or any of its Subsidiaries has been fulfilled or expired; *provided*, *further*, that any services provided by Buyer under the Transaction Services Agreement shall inure to the benefit of any liquidating trustee or trust (or any person or entity acting in a similar capacity) or (iii) any structured dismissal of any of the Bankruptcy Cases; *provided*, that any order approving

a structured dismissal shall provide for the provision of any remaining services under the Transition Services Agreement.

Section 2.09    *Allocation of Assets and Liabilities.*

Subject to Section 2.05(b)(ii), at least five Business Days prior to the Closing, Buyer shall provide a schedule to the Selling Entities setting forth in reasonable detail the contemplated allocation of the Assets and related Assumed Liabilities as between US Buyer and the Canadian Buyer.  Upon the reasonable request of Buyer, the Selling Entities shall in good faith cooperate with Buyer in identifying certain Assets and Assumed Liabilities that are Related to the Business as conducted in the United States of America or Canada for purposes of accurately allocating such Assets and Assumed Liabilities between US Buyer and the Canadian Buyer on the Closing Date. The Parties acknowledge and agree that the exhibits and schedules to the Master Assignment may be amended by Buyer in its sole discretion at any time prior to the Closing Date solely to reflect Buyer's intended allocation of such Assets and Assumed Liabilities.  Further, the Parties acknowledge and agree that is the intention of the Parties that the Canadian Buyer purchase and acquire substantially all of the Canadian Assets of the Business and assume all of the applicable related Assumed Liabilities directly from the applicable Canadian Seller, which shall be reflected on the allocation of Assets and Assumed Liabilities in the Master Assignment.

Section 2.10    *Withholding.*

Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Selling Entity or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. If Buyer determines that an amount is required to be deducted or withheld, Buyer shall (a) as promptly as reasonably practicable, provide written notice to Seller before the payment relevant to such deduction or withholding is to be made, (b) reasonably cooperate in good faith with Seller to reduce or eliminate the deduction or withholding of such amount to the extent possible under Applicable Law and (c) provide Seller a reasonable opportunity to provide forms or documentation that would exempt such payment from withholding. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

Section 2.11    *Sequencing.*

Notwithstanding anything herein to the contrary, the acquisition of the Acquired Equity Securities by the US Buyer shall be deemed to occur at the first moment in time immediately following the Closing and the acquisition of the Canadian Assets by the Canadian Buyer shall occur immediately thereafter at the second moment in time following the Closing.

Section 2.12    *Transition Services Agreement; Accounting Procedures.*

(a)    After the date hereof, to the extent applicable, Buyer and the Selling Entities shall use commercially reasonable efforts to negotiate and document such additional terms to the form of Transition Services Agreement attached hereto as <u>Exhibit C</u> as may be reasonably necessary and appropriate in the event that the Closing occurs before the consummation of the transactions

35

contemplated by the Housewares APA (or the consummation of the transactions contemplated by the Housewares APA otherwise fails to occur), including with respect to (a) the continuation of services to the Excluded Business by Shared Services Employees who are identified as Company Employees hereunder, (b) the continuation of participation by employees of the Excluded Business in any health and welfare Assumed Benefit Plans and (c) the continued provision of services to the Excluded Business by Company Employees who, prior to the Closing Date, provide services to the Excluded Business, in a manner consistent with historical levels, in each case, following the Closing. Notwithstanding anything herein to contrary, in no event shall (i) the failure of Buyer and the Selling Entities to agree on such additional terms be deemed to be a breach of this Section 2.12 or (ii) the agreement of Buyer and the Selling Entities to such additional terms be a condition to close or otherwise be a requirement of Buyer's obligations under this Agreement to close.

(b)     After the date hereof and prior to the Closing, Buyer and the Selling Entities shall use commercially reasonable efforts to negotiate and revise the Accounting Procedures set forth on Schedule 1.01(a) for specific principles and methodologies for apportioning between the Business, on the one hand, and the Excluded Business, on the other hand, balance sheet accounts of the Business that, in the ordinary course of business, are consolidated or aggregated with accounts receivable, and inventory or trade accounts payable attributable to the Excluded Business. Notwithstanding anything herein to the contrary, in no event shall (i) the failure of Buyer and the Selling Entities to agree to any revision to Schedule 1.01(a) be deemed to be a breach by the Selling Entities or Buyer of this Section 2.12(b) or (ii) the agreement of Buyer and the Selling Entities on any revision be a condition to close hereunder or otherwise be a requirement of Buyer's or the Selling Entities' obligations to close under this Agreement.

ARTICLE 3
PURCHASE PRICE

Section 3.01    *Purchase Price.*

The aggregate purchase price, as may be adjusted pursuant to Sections 3.04 and 3.05, for the purchase, sale, assignment and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets will consist of the following (collectively, the "**Purchase Price**"):

(a)     An amount in cash equal to $122,600,000.00 (the "**Cash Purchase Price**"), *plus* the Property Tax Purchase Price Adjustment, *plus* the Estimated Net Working Capital Adjustment, *minus* the Estimated Acquired Entity Accrued Taxes, *minus* the Estimated Excess Cure Costs, *minus* the Estimated Acquired Entity Indebtedness, *plus* the Estimated Acquired Entity Cash and *minus* the Round-Tripping Amount (collectively, the "**Estimated Purchase Price**");

(b)     the assumption of the Assumed Liabilities; and

(c)     Cure Costs (to the extent payable under Section 2.05); provided, however, to the extent the Cure Costs exceed the Cure Costs Cap (such excess, the "**Estimated Excess Cure Costs**"), the Cash Purchase Price will be reduced on a dollar-for-dollar basis by the Estimated Excess Cure Costs as set forth in Section 3.01(a).

The Estimated Purchase Price will be delivered by Buyer as set forth in Section 4.02.

36

Section 3.02    *Good Faith Deposit.*

Buyer has deposited into the Deposit Escrow Account with the Escrow Agent an amount equal to $12,260,000.00 (such amount, the "**Deposit Amount**") in cash.  The Deposit Amount will be released by the Escrow Agent and delivered to either Buyer or Seller, in accordance with this Section 3.02.  The Deposit Amount will be distributed out of the Deposit Escrow Account as follows (and Buyer and the Selling Entities agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the Estimated Purchase Price payable by Buyer as set forth in Section 4.02;

(b)    if this Agreement is terminated by Seller pursuant to Section 12.01(d) or 12.01(e) (or is terminated by either Party pursuant to Section 12.01(b)(i) and at the time of such termination this Agreement could have been terminated by Seller pursuant to Section 12.01(d) or Section 12.01(e)) (each, a "**Specified Termination**"), then the Deposit Amount will be delivered to Seller within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Seller; and

(c)    if this Agreement is terminated for any reason other than a Specified Termination, the Deposit Amount will be returned to Buyer within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Buyer; *provided*, *however*, if Buyer is chosen as the Alternate Bidder in accordance with the Bidding Procedures and Section 7.12 hereof, the Deposit Amount shall be released by the Escrow Agent and delivered to Buyer only upon, and within two Business Days of, the earlier of (A) the Selling Entities closing a transaction for the Assets with the Successful Bidder and (B) the Outside Date.

Section 3.03    *Estimated Purchase Price.*

No later than three Business Days prior to the Closing, Seller shall deliver to Buyer a written statement (the "**Estimated Closing Statement**") setting forth Seller's good faith estimates of the amount of (a) the Estimated Excess Cure Costs, (b) Property Tax Purchase Price Adjustment, including the Property Tax Credit Amount and the Property Tax Debit Amount, (c) Net Working Capital (the "**Estimated Net Working Capital**"), including the amount of the Net Working Capital Adjustment (the "**Estimated Net Working Capital Adjustment**"), (d) the Acquired Entity Accrued Taxes (the "**Estimated Acquired Entity Accrued Taxes**"), (e) the Acquired Entity Cash (the "**Estimated Acquired Entity Cash**"), (f) the Acquired Entity Indebtedness (the "**Estimated Acquired Entity Indebtedness**"), (g) the Round-Tripping Amount and (h) the Estimated Purchase Price based on the foregoing calculations in clauses (a)-(g).  Nothing in this Section 3.03 shall in any way limit, affect or impair the rights of Buyer in connection with the final determination of the Purchase Price in accordance with Section 3.04 and Section 3.05.  The Estimated Closing Statement and the estimates and calculations contained therein shall be prepared in accordance with the Accounting Procedures and the applicable definitions of this Agreement and include materials showing in reasonable detail Seller's support for such calculations.

Section 3.04    *NWC and Cure Adjustment.*

(a)      As soon as practicable, but no later than 90 days after the Closing Date, Buyer shall prepare and deliver to Seller its good faith calculations of the (a) Net Working Capital (the "**Closing Net Working Capital**"), including the amount of the Net Working Capital Adjustment, and (b) the Cure Costs in excess of the Cure Costs Cap (the "**Closing Excess Cure Costs**"), including the Cure Costs Adjustment (the "**NWC and Cure Statement**").   The NWC and Cure Statement shall be prepared in accordance with the Accounting Procedures and the applicable definitions of this Agreement and shall include materials showing in reasonable detail support for such calculations.   From and after the delivery of the NWC and Cure Statement by Buyer, Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates who were involved in the preparation of the NWC and Cure Statement solely for purposes of facilitating Seller's review of the NWC and Cure Statement.   Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business, (ii) Buyer's accountants shall not be obligated to make any work papers available, except in accordance with their disclosure procedures and then only after Seller and its Representatives have executed an agreement relating to access of such work papers in form and substance reasonably acceptable to such accountants and (iii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client or similar legal privilege with respect to such information; *provided*, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to provide a summary of such information that does not violate the applicable legal privilege.   If Buyer fails to timely deliver the NWC and Cure Statement, then Seller shall have the sole and exclusive right thereafter to either (x) prepare the NWC and Cure Statement or (y) deliver to Buyer a written notice that it does not propose any further adjustments to the Estimated Purchase Price in respect of the Net Working Capital Adjustment or the Cure Costs Adjustment pursuant to this Section 3.04.   In the case of the foregoing clause (x), Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates (subject to the conditions and restrictions described in the fourth sentence of this Section 3.04(a)) solely for purposes of facilitating Seller's preparation of the NWC and Cure Statement.

(b)      If Seller does not give written notice of any dispute (a "**Dispute Notice**"), identifying in reasonable detail each item in dispute and the dollar amount in dispute for each item (each, an "**Disputed Item**"), to Buyer within 45 days after receiving the NWC and Cure Statement, Buyer and Seller agree that the NWC and Cure Statement shall be deemed to set forth the final Closing Net Working Capital and final Closing Excess Cure Costs for purposes of calculating the final Net Working Capital Adjustment and final Cure Costs Adjustment and the NWC and Cure Statement shall be deemed final, binding and non-appealable by the Parties.   Prior to the end of such 45-day period, Seller may accept the NWC and Cure Statement by delivering written notice to that effect to Buyer, in which case the Net Working Capital Adjustment and Cure Costs Adjustment will be finally determined when such notice is given and the NWC and Cure Statement shall be deemed final, binding and non-appealable by the Parties.   If Seller delivers a Dispute Notice to Buyer within such 45-day period, Seller shall be deemed to have agreed with all items

38

and amounts in the NWC and Cure Statement not specifically referenced as a Disputed Item in the Dispute Notice, and such items and amounts shall be final, binding and non-appealable on the Parties. Buyer and Seller shall use commercially reasonable efforts to resolve in good faith any Disputed Items during the 15-day period commencing on the date Buyer timely receives the Dispute Notice from Seller. The Parties acknowledge and agree that the Federal Rules of Evidence Rule 408 shall apply to Buyer and Seller during such 15-day period of negotiations and any subsequent dispute arising therefrom. Any Disputed Item that is resolved during such 15-day period shall be deemed final, binding and non-appealable by the Parties. If Seller and Buyer do not agree upon a final resolution with respect to any Disputed Item within such 15-day period, any such remaining Disputed Items shall be submitted to a nationally-recognized independent accounting firm agreed upon in good faith by Buyer and Seller; provided, however, that if Buyer and Seller cannot agree on such a firm, Buyer and Seller shall each appoint a firm to elect a third such nationally-recognized independent accounting firm (such accounting firm, the "**Accounting Firm**"). In the event the NWC and Cure Statement is prepared by Seller rather than Buyer pursuant to the penultimate sentence of Section 3.04(a), then Buyer shall replace Seller and Seller shall replace Buyer in this Section 3.04(b).

(c)     The Accounting Firm shall be requested to render a written determination of the applicable dispute (acting as an expert and not as an arbitrator) within 20 days after referral of the matter to the Accounting Firm, which determination must be in writing and must set forth, in reasonable detail, the basis therefor and must be based solely on (i) the definitions and other applicable provisions of this Agreement (including the Accounting Procedures) and (ii) a single presentation (which presentations shall be limited to the remaining Disputed Items) submitted by each of Buyer and Seller to the Accounting Firm within 10 days after the engagement thereof (which the Accounting Firm shall forward to the other Party), and not on independent review, which such determination shall be final, binding and non-appealable on Buyer and Seller absent fraud or manifest error, and any Party may seek to enforce such decision in a court of competent jurisdiction. No ex parte conferences, oral examinations, testimony, depositions, discovery or other form of evidence gathering or hearings shall be conducted or allowed; provided, that at the Accounting Firm's request, or as mutually agreed by Seller and Buyer, Seller and Buyer may meet with the Accounting Firm so long as representatives of both Seller and Buyer are present. The Accounting Firm shall resolve each Disputed Item by choosing a value not in excess of, nor less than, the greatest or lowest value, respectively, set forth in the presentations delivered to the Accounting Firm pursuant to this Section 3.04(c).

(d)     The terms of appointment and engagement of the Accounting Firm shall be as reasonably agreed upon between Seller and Buyer, and any associated engagement fees shall be initially borne 50% by Seller and 50% by Buyer; provided, that such fees shall ultimately be borne as set forth below. All other costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Accounting Firm shall be borne by such Party incurring such cost and expense. The fees and disbursements of the Accounting Firm shall ultimately be allocated between Seller, on the one hand, and Buyer, on the other, in the same proportion that the aggregate amount of the Disputed Items submitted to the Accounting Firm that are unsuccessfully disputed by each such Party (as finally determined by the Accounting Firm) bears to the total amount of such Disputed Items so submitted. For example, should the Disputed Items total an aggregate amount equal to $1,000 and the Accounting Firm awards $600 in favor of Seller's position, 60% of the costs of the Accounting Firm's review would be borne by Buyer and 40% of

such costs would be borne by Seller. The NWC and Cure Statement shall be revised as appropriate to reflect the resolution of any objections thereto pursuant to this Section 3.04 and, as so revised, such NWC and Cure Statement shall be deemed to set forth the final Closing Net Working Capital and final Closing Excess Cure Costs for all purposes hereunder (including the determination of the final Net Working Capital Adjustment and final Cure Costs Adjustment).

(e)     If the final NWC Adjustment Amount *minus* the final Cure Costs Adjustment is a positive amount (the "**NWC and Cure Increase**"), then within three Business Days after the date on which the Net Working Capital Adjustment and Cure Costs Adjustment is finally determined pursuant to this Section 3.04, (i) Buyer shall pay the NWC and Cure Increase to Seller by wire transfer or delivery of immediately available funds; provided, however, that in no event shall the NWC and Cure Increase payable by Buyer pursuant to this Section 3.04(e) exceed an amount equal to the amount of the Adjustment Escrow Funds, and (ii) the Parties shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Seller the entirety of the Adjustment Escrow Funds.

(f)     If the final NWC Adjustment Amount *minus* the final Cure Costs Adjustment is a negative amount (the "**NWC and Cure Decrease**"), then within three Business Days after the date on which the Net Working Capital Adjustment and Cure Costs Adjustment is finally determined pursuant to this Section 3.04, (i) Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Buyer from the Adjustment Escrow Funds an amount equal to the absolute value of the NWC and Cure Decrease; provided, however, that in no event shall the NWC and Cure Decrease exceed the Adjustment Escrow Funds, and (ii) to the extent that any Adjustment Escrow Funds remain following the distribution in clause (i), Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Seller the remainder of the Adjustment Escrow Funds.

Section 3.05     *Acquired Entity Adjustment.*

(a)     Simultaneously with the delivery of the NWC and Cure Statement, but no later than 90 days after the Closing Date, Buyer shall prepare and deliver to Seller its good faith calculations of (i) the Acquired Entity Accrued Taxes (the "**Closing Acquired Entity Accrued Taxes**"), (ii) the Acquired Entity Indebtedness (the "**Closing Acquired Entity Indebtedness**"), (iii) the Acquired Entity Cash (the "**Closing Acquired Entity Cash**") and (iv) based on the foregoing calculations in clauses (i)-(iii), the Closing Acquired Entity Net Figure (the "**Acquired Entity Closing Statement**"). The Acquired Entity Closing Statement shall be prepared in accordance with the Accounting Procedures and the applicable definitions of this Agreement and shall include materials showing in reasonable detail support for such calculations. From and after the delivery of the Acquired Entity Closing Statement by Buyer, Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates who were involved in the preparation of the Acquired Entity Closing Statement solely for purposes of facilitating Seller's review of the Acquired Entity Closing Statement. Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business or the Acquired Entities, (ii) Buyer's accountants shall not be obligated to make any work papers available, except in accordance with their disclosure procedures and then only after Seller and its Representatives have executed an agreement relating to access of such work papers

in form and substance reasonably acceptable to such accountants and (iii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client or similar legal privilege with respect to such information; *provided*, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to provide a summary of such information that does not violate the applicable legal privilege. If Buyer fails to timely deliver the Acquired Entity Closing Statement, then Seller shall have the sole and exclusive right thereafter to either (x) prepare the Acquired Entity Closing Statement or (y) deliver to Buyer a written notice that it does not propose any further adjustments to the Estimated Purchase Price pursuant to this Section 3.05. In the case of the foregoing clause (x), Buyer shall provide Seller and its Representatives with reasonable access upon advance written notice during normal business hours to the books, records, employees and advisers of Buyer and its Affiliates (subject to the conditions and restrictions described in the fourth sentence of this Section 3.05(a)) solely for purposes of facilitating Seller's preparation of the Acquired Entity Closing Statement.

(b)     Buyer and Seller acknowledge and agree that procedures set forth in <u>Section 3.04(b)</u>, Section 3.04(c) and Section 3.04(d) shall apply to this Section 3.05, *mutatis mutandis*, with (i) "Closing Acquired Entity Accrued Taxes," "Closing Acquired Entity Indebtedness" and "Closing Acquired Entity Cash," as applicable, substituted for "Closing Net Working Capital" and "Closing Excess Cure Costs," (ii) "Acquired Entity Closing Statement" substituted for "NWC and Cure Statement" and (iii) "Closing Acquired Entity Net Figure" substituted for "Net Working Capital Adjustment" and "Cure Costs Adjustment".

(c)     If the final Closing Acquired Entity Net Figure exceeds the Estimated Acquired Entity Net Figure (the "**Upward Acquired Entity Adjustment**"), then within three Business Days after the date on which the Closing Acquired Entity Net Figure is finally determined pursuant to this Section 3.05, Buyer shall pay the amount of such Upward Acquired Entity Adjustment to Seller by wire transfer or delivery of immediately available funds; <u>provided</u>, <u>however</u>, that in no event shall the Upward Acquired Entity Adjustment payable by Buyer pursuant to this Section 3.05(c) exceed the amount of the Adjustment Escrow Funds.

(d)     If the Estimated Acquired Entity Net Figure exceeds the final Closing Acquired Entity Net Figure (the "**Downward Acquired Entity Adjustment**"), then within three Business Days after the date on which the Closing Acquired Entity Net Figure is finally determined pursuant to this Section 3.05, (i) Buyer and Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Buyer from any remaining portion of the Adjustment Escrow Funds, an amount equal to the absolute value of the Downward Acquired Entity Adjustment; <u>provided</u>, <u>however</u>, that in no event shall the Downward Acquired Entity Adjustment exceed the Adjustment Escrow Funds.

(e)     Notwithstanding anything to the foregoing in this Agreement, in the event that the Net Working Capital Adjustment and Cure Costs Adjustment are finally determined pursuant to Section 3.04 prior to the final determination of the Closing Acquired Entity Net Figure in accordance with this Section 3.05, the Parties acknowledge and agree that any then-remaining portion of the Adjustment Escrow Funds shall not be released to Seller until the Closing Acquired Entity Net Figure has been determined and the Upward Acquired Entity Adjustment or Downward

41

Acquired Entity Adjustment has been fully and finally settled pursuant to Sections 3.05(c) and 3.05(d).

Section 3.06    *Adjustments.*

The Parties and their Affiliates shall treat any payments made with respect to the NWC Adjustment Amount, the Cure Costs Adjustment and the Closing Acquired Entity Net Figure, in each case pursuant to Section 3.04 and Section 3.05, as applicable, as an adjustment to the Estimated Purchase Price for applicable Income Tax purposes except to the extent otherwise required by Applicable law.

ARTICLE 4<br>CLOSING

Section 4.01    *Closing Date.*

Subject to the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 hereof (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is three Business Days after the satisfaction or waiver of the conditions set forth in Article 9, Article 10 and Article 11 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by the Selling Entities and Buyer. The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date**." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Closing Date (the "**Measurement Time**").

Section 4.02    *Payments on the Closing Date.*

At the Closing, Buyer will pay an amount equal to (a) the Estimated Purchase Price, *minus* (i) the Deposit Amount delivered in accordance with Section 3.02 and (ii) the Adjustment Escrow Amount, in cash by wire transfer of immediately available funds to the accounts designated in writing by Seller at least three Business Days prior to the Closing Date and (b) the Adjustment Escrow Amount in cash by wire transfer of immediately available funds to the account set forth in the Escrow Agreement.

Section 4.03    *Buyer's Deliveries.*

At the Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)    the payments required to be made at the Closing pursuant to Section 4.02;

(b)    each Transaction Document to be delivered at the Closing to which Buyer is a party, duly executed (and acknowledged, where applicable) by such Buyer Entity; and

(c)    the Conditions Certificate of the Buyer Entities.

Section 4.04     *The Selling Entities' Deliveries.*

At the Closing, the Selling Entities will deliver, or cause to be delivered, to Buyer:

(a)      each Transaction Document to be delivered at the Closing to which any Selling Entity is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by the applicable Selling Entity;

(b)      the Conditions Certificate of the Selling Entities;

(c)      a copy of the Sale Order as entered by the Bankruptcy Court;

(d)      a copy of the CCAA Sale Order as entered by the CCAA Court;

(e)      a certificate of non-foreign status of each Selling Entity (or, if such Selling Entity is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), a certificate of non-foreign status from the entity that is treated as the transferor of property for U.S. federal income tax purposes) meeting the requirements of Treasury Regulation Section 1.1445-2(b)(2); and

(f)      (A) with respect to any Acquired Equity Security (other than an Acquired Equity Security owned by an Acquired Entity) that is not certificated, a written instrument of assignment evidencing the transfer of such Acquired Equity Security to Buyer, duly executed by such applicable Selling Entity, or (B) with respect to any Acquired Equity Security (other than an Acquired Equity Security owned by an Acquired Entity) that is certificated, the equity certificates evidencing all of such Acquired Equity Security, free and clear of all Encumbrances, accompanied by equity interest powers duly executed by such applicable Selling Entity, as applicable.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Except as set forth in the Disclosure Schedules (as interpreted in accordance with Section 13.13), each Selling Entity jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 5.01     *Organization and Good Standing.*

Seller and each Subsidiary of Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Subject to the limitations imposed on Seller or any such Subsidiary as a result of having filed a petition for relief under the Bankruptcy Code, Seller and each such Subsidiary has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Seller and each Subsidiary of Seller (including the Acquired Entities) is duly qualified, licensed or otherwise authorized to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification, licensing or authorization necessary, except for such failures to be so qualified, licensed, authorized or in good standing as would not, individually or in the aggregate, reasonably be expected to be material to Business, taken as a whole.

43

Section 5.02    *Authority; Validity.*

Subject to entry of the Sale Order, the CCAA Sale Order and such other authorization as is required by the Bankruptcy Court or the CCAA Court, as applicable, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is or will be a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling Entity and no other corporate proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at the Closing will be duly and validly executed and delivered by such Selling Entity at the Closing. Subject to entry of the Sale Order and the CCAA Sale Order and assuming the due authorization, execution and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity (the "**Bankruptcy and Equity Exception**").

Section 5.03    *Governmental Approvals; No Conflict.*

Except for (a) entry of the Sale Order, CCAA Sale Order, or the Bidding Procedures Order, (b) notices, filings and consents required in connection with the Bankruptcy Cases and the CCAA Recognition Proceedings, (c) any applicable notices, filings, waiting period terminations or expirations, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act, and (d) items listed on Disclosure Schedule 5.03, none of the Selling Entities is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.  When the consents and other actions described in the preceding sentence, including entry of the Sale Order and CCAA Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not (i) result in the breach or violation of any of the terms and provisions of, or

constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation under, (A) the certificate of incorporation, bylaws or other governing documents of such Selling Entity or Acquired Entity, (B) any Order applicable to such Selling Entity or any Acquired Entity or any of the Assets owned or held by it or on its behalf, (C) any Applicable Law with respect to such Selling Entity or any Acquired Entity, or (D) require any consent under, or give any Third Party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities or the Acquired Entities is a party as of the Closing and which constitutes an Asset or Assumed Liability, or (ii) result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Assets or any Acquired Entity, except, solely with respect to clauses (i)(B) through (D) and this clause (ii), to the extent that any such breach, violation, default under, conflict with, rights of termination, amendment, acceleration, suspension, revocation or cancellation would not (x) reasonably be expected, individually or in the aggregate, to be material to the Business, taken as a whole, or (y) be enforceable against such Acquired Entity, Asset or Assumed Liability following the Closing in accordance with the Sale Order and CCAA Sale Order.

Section 5.04    *Financial Statements.*

(a)    Attached to Disclosure Schedule 5.04(a) are copies of the (i) audited consolidated balance sheet as of December 31, 2020, December 31, 2021 and December 31, 2022 and the related audited consolidated statements of operations, stockholders' equity and cash flows for the fiscal years then ended (the "**Audited Financial Statements**") and (ii) the unaudited interim consolidated balance sheet as of July 31, 2023, and the related unaudited interim consolidated statements of operations, stockholders' equity and cash flows for the seven-months ended July 31, 2023 (the "**Interim Financial Statements**" and the date of such Interim Financial Statements, the "**Balance Sheet Date**"), in each case of Seller and its Subsidiaries (clauses (i) and (ii), collectively, the "**Financial Statements**").  The Financial Statements (A) fairly present, in all material respects, the consolidated financial position of Seller and its Subsidiaries as of the dates thereof and the consolidated results of operations, stockholder's equity and cash flows for the periods then ended (subject, in each case, to normal year-end adjustments in the case of the Interim Financial Statements, none of which will be, individually or in the aggregate, material to the Business, taken as a whole), (B) have been prepared in accordance with GAAP applied on a consistent basis in the ordinary course of business (except, solely with respect to the Audited Financial Statements, as may be indicated in the notes thereto) and (C) have been prepared and were derived from, and are in accordance with, the books and records of Seller and its Subsidiaries (which are correct and complete in all material respects).

(b)    The books of account and other financial records of the Business have been kept accurately in the ordinary course of business and in compliance with all Applicable Laws in all material respects, and Seller and its Subsidiaries make and keep books, records and accounts that, in reasonable detail, accurately reflect, in all material respects, their transactions and dispositions of assets.

(c)    Seller and its Subsidiaries maintain a system of internal controls over financial reporting that is designed to provide reasonable assurances regarding the reliability of financial

reporting, including that (i) transactions are executed in accordance with management's general or specific authorizations and recorded as necessary to permit preparation of the Financial Statements in accordance with GAAP and to maintain accountability for the Business' and the Acquired Entities' assets and (ii) access to the Business' and the Acquired Entities' assets is permitted only in accordance with management's general or specific authorization. Since January 1, 2020, no accountant of Seller or its Subsidiaries has notified Seller or any of its Subsidiaries of any weaknesses in internal accounting or other controls.

Section 5.05    *No Undisclosed Material Liabilities.*

There are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business or any Acquired Entity, other than (a) Liabilities specifically reflected or reserved for in the Financial Statements or disclosed in the notes thereto; (b) Liabilities incurred in the ordinary course of business since the Balance Sheet Date (other than Liabilities for default, breach of Contract, tort, infringement or violation of Applicable Law that, in each case, are not material to the Business, taken as a whole); (c) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.05; and (d) Liabilities that will constitute Excluded Liabilities.

Section 5.06    *Absence of Certain Changes.*

From the Balance Sheet Date, (a) the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course of business and consistent in all material respects with past practices, (b) there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (c) none of the Selling Entities or the Acquired Entities have taken any action that, if undertaken after the date hereof, would constitute a violation of Section 7.02(a)(ii).

Section 5.07    *Legal Proceedings.*

Except for the Bankruptcy Cases, the CCAA Recognition Proceedings and any adversary Proceedings or contested motions commenced in connection therewith or disclosed in Disclosure Schedule 5.07, after giving effect to the Sale Order and CCAA Sale Order, there is no, and since January 1, 2020 there has been no, Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person, relating to the Acquired Entities, the Business, the Assets or Assumed Liabilities (a) that is material to the Business or the Acquired Entities or that would reasonably be expected to give rise to any material Liability of Buyer or any Acquired Entity or be materially adverse to the ownership or use by Buyer of the Assets after the Closing, as such Assets are presently owned and used (or held for use) by Seller or its Subsidiaries, as applicable, (b) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party or (c) that is against any Selling Entity or any Acquired Entity and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents. There is no Order enjoining any Selling Entity or Acquired Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity or Acquired Entity to take any material action, in

connection with the ownership, lease, possession, use or operation of any Acquired Entity or the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities.

Section 5.08    *Compliance with Laws; Permits.*

(a)    The ownership and operation of (i) the Business or the Assets by the Selling Entities and (ii) each Acquired Entity, in each case is, and since January 1, 2020 has been, in material compliance with all Applicable Laws.  Except as set forth in Disclosure Schedule 5.08(a), the Selling Entities and the Acquired Entities have not received any written or, to the Knowledge of each Selling Entity, oral notification or communication from any Governmental Authority or any other Person regarding any actual or alleged material violation of, or material failure to comply with, any Applicable Law.

(b)    (i)The Selling Entities and the Acquired Entities have obtained and maintained all necessary Permits with regard to the ownership or operation of the Assets and the conduct of the Business, (ii) no Selling Entity or Acquired Entity has received written or, to the Knowledge of each Selling Entity, oral notice of material default under any such Permit and (iii) no material violations exist in respect of Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been finally resolved with no ongoing obligation or liability to the Business or any Acquired Entity.  Disclosure Schedule 5.08(b) sets forth a true, correct and complete list and description of all necessary Permits  issued to or held by the Acquired Entities or the Selling Entities and used in the conduct of the Business or the Assets (each, a "**Material Permit**"). Each Material Permit is valid and in full force and effect.  There is no pending or, to the Knowledge of each Selling Entity, threatened termination, expiration, revocation or modification of any such Material Permit, and no event has occurred or circumstances exist that would give rise to or serve as a basis for such termination, expiration, revocation or modification.

Section 5.09    *Material Contracts; Cure Costs*

(a)    Disclosure Schedule 5.09(a) sets forth a true, correct and complete list of Contracts and 365 Contracts (or in the case of Disclosure Schedule 5.09(a)(ii)(A) and 5.09(a)(ii)(B), counterparties to Contracts and 365 Contracts) effective as of the date hereof to which Seller or any of its Subsidiaries (including any Acquired Entity) is a party or is bound and that fall within the following categories (each Contract set forth or required to be set forth on Disclosure Schedule 5.09, a "**Material Contract**", and collectively, the "**Material Contracts**"):

(i)    any material lease or sublease of real property included as an Asset (whether a Selling Entity or any Acquired Entity is lessor, sublessor, lessee or sublessee);

(ii)    other than purchase orders issued in the ordinary course of business, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $2,500,000 or more; or (B) annual receipts by the Business of more than $5,000,000 in any calendar year;

(iii)    any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement or any other similar

47

Contract involving a sharing of profits and losses, in each case, to the extent Related to the Business;

(iv)    any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Acquired Entities, the Business or the Assets following the date of this Agreement;

(v)    any Contract where the Business is, and Buyer or any Acquired Entity would be required to become, obligor or guarantor relating to indebtedness;

(vi)    any Contract containing covenants expressly limiting, individually or in the aggregate, the freedom of the Acquired Entities, the Business or Assets to compete with any Person in a product or line of business or operate in any jurisdiction;

(vii)    any Contract that contains (A) exclusivity requirements, "most-favored nation" or similar provisions binding on any Acquired Entity, the Business or the Assets, or (B) minimum commitment terms in favor of the counterparty with respect to the Business;

(viii)    any Government Contract applicable to the Business or the Assets;

(ix)    any Contract granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any Asset or any assets or properties of any Acquired Entity;

(x)    any Contract involving capital expenditures of more than $250,000, individually or in the aggregate, over any 12-month period by or on behalf of the Business or any Acquired Entity;

(xi)    any Contract which involves the sale, issuance, purchase or repurchase of any Acquired Equity Security;

(xii)    any Contract with a Major Customer or Major Supplier;

(xiii)    any Contracts for the settlement of any Proceeding (A) for which there are ongoing obligations or liabilities to the Business or any Acquired Entity, or (B) which, in the last three years, resulted in Liabilities to the Business or any Acquired Entity in excess of $500,000;

(xiv)    any Contract reflecting leases of personal property by or to the Business or any Acquired Entity which individually have a value in excess of $250,000 per year; or

(xv)    any Contract pursuant to which Seller or any of its Subsidiaries (A) licenses or is otherwise permitted by a Third Party or any other Selling Entity to use any Intellectual Property material to the conduct of the Business (other than any "shrink wrap," "commercially available software package" or "click through" license that is generally available on and actually licensed under standard terms) or (B) licenses or otherwise

48

granted or conveyed to any Third Party or any other Selling Entity any right, title or interest in or to any material Owned Intellectual Property (other than any non-exclusive licenses granted in the ordinary course of business) (clauses (A) and (B), collectively, the "**Licenses**").

(b)        Each Material Contract is a legal, valid and binding obligation of the Selling Entity or Acquired Entity party thereto and, to the Knowledge of each Selling Entity, the other parties thereto in accordance with its terms and conditions, and is enforceable against such Selling Entity or Acquired Entity, except as such legality, validity and enforceability may be limited by the Bankruptcy and Equity Exception or the obligation to pay Cure Costs. No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a material default under or a material violation of any Material Contract or would cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of any Encumbrance upon any Asset or any Acquired Entity. Except for payment defaults, neither Seller nor any of its Subsidiaries has received written or, to the Knowledge of each Selling Entity, oral notice that it has breached, violated or defaulted under any Material Contract or that the counterparty thereto intends to terminate or modify in any material respect any such Material Contract. A true, correct and complete copy of each Material Contract has been made available to Buyer.

(c)        Disclosure Schedule 5.09(c) sets forth a true, correct and complete list as of the date hereof of the Cure Costs.

Section 5.10    *Intellectual Property.*

(a)        Disclosure Schedule 5.10(a) sets forth a true, correct and complete list of all registrations and applications for registration of the Owned Intellectual Property as of the date hereof (collectively, "**Registered Intellectual Property**"), setting forth for each item (i) the record owner, and, if different, the legal owner and beneficial owner of such item, (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial, filing, application or identification number of such item; and (iv) the current status of such filing or application.

(b)        The Selling Entities and the Acquired Entities are the sole and exclusive owner of, or exclusively Control, the Owned Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances). The Registered Intellectual Property is subsisting and, to the Knowledge of each Selling Entity, valid and enforceable. Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code and Section 11.3(2) of the CCAA, the Selling Entities and Acquired Entities own or have a right to use, all Intellectual Property necessary for the operation of the Business as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances). To the extent that any Selling Entity or Acquired Entity has licensed any Trademarks to any Third Party, such Selling Entity and Acquired Entity has control over the character and quality of such licensed Trademarks.

(c)        No Proceedings are pending or, to the Knowledge of each Selling Entity, threatened against any Selling Entity or Acquired Entity before a Governmental Authority with regard to the ownership or use by any Selling Entity or Acquired Entity of any Owned Intellectual Property or

the validity, scope or enforceability of any Registered Intellectual Property, including any interference, reissue, reexamination, opposition or other Proceeding relating to any Registered Intellectual Property. The operation of the Business by the Selling Entities and the Acquired Entities does not infringe, misappropriate or otherwise violate, and, since January 1, 2020, has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Person. Since January 1, 2020, neither Seller nor any of its Subsidiaries has received any written notice from any Third Party alleging that the operation of the Business infringes, violates, or misappropriates the Intellectual Property of any Third Party, or offering to license any Intellectual Property to any Selling Entity or Acquired Entity in connection with the operation of the Business. To the Knowledge of each Selling Entity, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property and no such Proceedings are currently being asserted or threatened in writing against any Person by any Selling Entity or Acquired Entity. None of the Owned Intellectual Property is subject to any outstanding Order.

(d)     If any Selling Entity or Acquired Entity has acquired or purports to have acquired ownership of any Owned Intellectual Property from any Person, such Selling Entity or Acquired Entity has obtained a valid and enforceable written assignment sufficient to irrevocably transfer all rights in and to the Owned Intellectual Property acquired from such Person, and such Person has executed a valid and irrevocable waiver of moral rights in respect of such Owned Intellectual Property, where applicable. All inventions, discoveries, and works of authorship embodying any of the Owned Intellectual Property were created solely by either (i) employees of any Selling Entity or any Acquired Entity acting within the scope of their employment who have validly and irrevocably assigned all of their rights, including all Intellectual Property therein, to such Selling Entity or Acquired Entity, and who have validly and irrevocably waived all of their moral rights in such Intellectual Property, where appliable or (ii) a Third Party who has validly and irrevocably assigned all of its rights, including all Intellectual Property therein, to any Selling Entity or Acquired Entity, and who has validly and irrevocably waived all of its moral rights in such Intellectual Property, where applicable, and no such Third Party owns or has or has retained any rights to any such Intellectual Property.

(e)     No Selling Entity or Acquired Entity has transferred (or agreed to transfer) ownership of, or granted (or agreed to grant) any exclusive license of or exclusive right to use, or authorized the retention of any exclusive rights to use or joint ownership of any Intellectual Property that, but for such transfer or agreement to transfer, would have been Owned Intellectual Property.

(f)     Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code and Section 11.3(2) of the CCAA, following the Closing (i) Buyer will be permitted to exercise all of the Selling Entities' and the Acquired Entities' rights and receive all of the Selling Entities' and Acquired Entities' benefits (including payments) under all Licenses which are Assigned Contracts to the same extent that the Selling Entities and Acquired Entities would have been able to had the transactions contemplated by this Agreement not occurred and without the payment of any additional amounts or consideration other than the ongoing fees, royalties or other payments which the relevant Selling Entity or Acquired Entity would otherwise have been required to pay pursuant to the terms of such Licenses had the transactions contemplated by this Agreement not occurred, and (ii) Buyer will have and be permitted to exercise all of the Selling Entities' and Acquired Entities' rights under the Owned Intellectual Property to the same extent that the Selling Entities

50

and Acquired Entities would have been able to had the transactions contemplated by this Agreement not occurred.

(g)     The Selling Entities and Acquired Entities have taken commercially reasonable steps to protect and maintain any material trade secrets and know-how included in the Owned Intellectual Property, and, to the Knowledge of each Selling Entity, there are no unauthorized uses or disclosures of any such trade secrets or know-how.

(h)     No software included in the Owned Intellectual Property contain any Malicious Code. Seller and its Subsidiaries have adopted and enforce a written policy designed to ensure that the software included in the Owned Intellectual Property is free of Malicious Code, and to ensure the prompt identification, removal and remediation of any Malicious Code.  No event has occurred, and, to the Knowledge of each Selling Entity, no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license or disclosure of any source code owned or exclusively Controlled by the Acquired Entities or source code included in the Owned Intellectual Property to any Third Party, including  to or from any escrow agent. No software owned or exclusively Controlled by the Acquired Entities or software included in the Owned Intellectual Property or the use thereof by any Selling Entity or Acquired Entity are subject to any obligation under any Open Source License to be delivered or licensed under any Open Source License, or otherwise in source code form, for the purpose of making modifications or derivative works, or for little or no fee.  The Selling Entities and Acquired Entities are in material compliance with all Open Source Licenses to which they are bound.

(i)     To the Knowledge of each Selling Entity, the information technology systems owned or controlled by each Selling Entity and Acquired Entity in connection with the Business (the "**Business IT Assets**") (i) operate and perform, in each case, in all material respects in accordance with their documentation and; (ii) have not malfunctioned or failed in any material respect.  Each Selling Entity and each Acquired Entity has taken commercially reasonable steps in accordance with customary industry standards and practices to protect the confidentiality, integrity and security of Business IT Assets (and all information and transactions stored or contained therein or transmitted thereby) and Personal Information owned or controlled by any Selling Entity or any Acquired Entity from unauthorized use, access, interruption, modification or corruption. Since January 1, 2020, there have been no material unauthorized intrusions or breaches of security with respect to the Business IT Assets.

(j)     Since January 1, 2020, there has been no material unauthorized access, loss, damage, use, sharing, modification, or other misuse of any Personal Information owned or controlled by any Selling Entity or Acquired Entity. No Proceeding relating to any material improper use, unauthorized access or disclosure of, or a material breach in the security of, any Personal Information has been made since January 1, 2020.

(k)     The Selling Entities have implemented procedures designed to comply with the California Consumer Privacy Act (CCPA), as amended by the California Privacy Rights Act (CPRA) and the Virginia Consumer Data Protection Act (VCDPA).

NAI-1538022664v15

Section 5.11    *Environmental Compliance.*

(a)    The Acquired Entities and the Assets owned or held by the Selling Entities and their Business operations are and have been since January 1, 2020 in compliance in all material respects with applicable Environmental Laws.

(b)    Since January 1, 2020 or prior to that date if not fully resolved, no written notice, order, request for information, complaint or penalty has been received by the Selling Entities or the Acquired Entities, and (y) there has been no Proceeding pending or, to the Knowledge of each Selling Entity, threatened, in the case of each of clauses (x) and (y), which (A) alleges a violation of or liability under any Environmental Law, and (B) relates to the Acquired Entities, the Assets or the Business.

(c)    (i) There currently are effective all Permits required under any Environmental Law that are necessary for each Selling Entity's and Acquired Entity's activities and operations relating to the Assets and the Business, (ii) any applications for renewal of such Permits have been submitted on a timely basis and (iii) each Selling Entity and each Acquired Entity is and has been since January 1, 2020 in compliance in all material respects with the terms and conditions of such Permits.

(d)    There has been no Release or threat of Release of any Hazardous Substance at or in the vicinity of the Assets or any property formerly owned, leased, serviced or operated by any Selling Entity or Acquired Entity that requires or may require reporting, investigation, assessment, cleanup, remediation or any other type of response action under any Environmental Law or any Contract.

(e)    No Selling Entity or Acquired Entity has assumed, undertaken, agreed to provide indemnification for or otherwise become subject to any material Liability of any other Person relating to or arising from any Environmental Law.

(f)    Each Selling Entity's and Acquired Entity's services and operations in connection with the Assets and Business have not given rise to exposure of persons to Hazardous Substances in a manner that would reasonably be expected to give rise to liability under any Environmental Laws.

(g)    Seller has made available to the Buyer copies of all material documents, records and information in its possession or control concerning compliance with or potential Liability under Environmental Laws or the exposure of any Person to any Hazardous Substance in any way associated with the Assets, the Business or the Acquired Entities.

Section 5.12    *Title.*

(a)    Disclosure Schedule 5.12(a)(i) sets forth a true, correct and complete list of all Real Property Interests that are leased by Seller or any of its Subsidiaries (whether as a lessor, sublessor, lessee or sublessee) that are Related to the Business (the Real Property interests listed or required to be listed on Disclosure Schedule 5.12(a)(i), the "**Leased Real Property**"), and a description of the associated leases therefor (the "**Leases**"). Each of the Leases constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity or Acquired Entity and is in

52

full force and effect in accordance with its terms, except as enforceability may be limited by the Bankruptcy and Equity Exception. The applicable Selling Entity or Acquired Entity has good and valid leasehold title to all of the Leased Real Property free and clear of all Encumbrances, except for Permitted Encumbrances. Seller has made available to Buyer true, correct and complete copies of each Lease.

(b) No event has occurred and, to the Knowledge of each Selling Entity, no circumstances exist that, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination or modification of, or acceleration of rent under, any Lease. No Selling Entity or Acquired Entity has received written notice of any claim by any Person under any such Lease alleging that such Selling Entity or Acquired Entity has committed a breach of any such Lease, and has not provided or received any written notice of any intention to terminate any such Lease.

(c) The Leased Real Property constitute all of the real property rights necessary to own and conduct the Business in all material respects as currently owned, operated and conducted by Seller or any of its Subsidiaries.

(d) There are no condemnation, expropriation or other Proceedings with eminent domain pending or, to the Knowledge of each Selling Entity, threatened, with respect to any Real Property Interest.

Section 5.13 *Matters Related to Assets; Casualty Losses.*

(a) Seller and its Subsidiaries have good title to, or a valid leasehold interest in, all of the rights, personal properties, interests, equipment and other tangible and intangible assets shown to be owned, licensed or leased on the Financial Statements or otherwise used (or held for use) by the Business or the Acquired Entities, in each case are free and clear of all Encumbrances (other than Permitted Encumbrances).

(b) All of the equipment, machinery, vehicles and other tangible assets of the Acquired Entities or that constitute Assets are (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and usage, (ii) not in need of any repairs, which, if not made, would affect the integrity or safety of such Assets, (iii) suitable for use by the Acquired Entities or the Selling Entities to conduct the Business as currently conducted with respect to such Assets, and (iv) suitable and safe for use by consumers in each case in all material respects.

(c) The Assets owned or used (or held for use) by the Selling Entities and the Acquired Entities constitute all assets, properties, rights, privileges and interests of whatever kind or nature, real or personal or mixed, tangible or intangible, used or necessary, that are sufficient to conduct the Business as currently conducted by the Selling Entities and Acquired Entities, in all material respects, other than the operations and business conducted with respect to the Excluded Assets and Excluded Business.

(d) There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

53

Section 5.14   *Insurance.*

A true, correct and complete list of the insurance policies related to the Business currently conducted by Seller and its Subsidiaries (including the Acquired Entities) with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) is attached hereto as Disclosure Schedule 5.14 (collectively, the "**Insurance Policies**").   Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, all of the Insurance Policies are in full force and effect and neither Seller nor any of its Subsidiaries nor, to the Knowledge of each Selling Entity, any other party to such Insurance Policy is in breach, violation or default (including with respect to the payment of premiums or the giving of notices).   No event has occurred (with notice or the lapse of time or both), including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies.   Except as set forth in Disclosure Schedule 5.14, no material claim is outstanding under any of the Insurance Policies, and no carrier of any Insurance Policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim.   No notice of cancellation or termination has been received or, to the Knowledge of each Selling Entity, threatened with respect to any such Insurance Policy.

Section 5.15   *Security Arrangements.*

All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries (including the Acquired Entities) with Governmental Authorities or Third Parties and relating to the Assets owned or held by Seller or any such Subsidiary as of the date hereof are described on Disclosure Schedule 5.15.

Section 5.16   *Customers and Suppliers.*

(a)      Disclosure Schedule 5.16(a) contains a true, correct and complete list of the 20 largest customers, including distributors, of the Business, taken as a whole, for (i) the 12-month period ended December 31, 2022 and (ii) the seven-month period ended on the Balance Sheet Date (as determined on the basis of the total dollar amount of sales in respect of goods and services sold, in each case, a "**Major Customer**"), showing the total dollar amount of gross sales to each such Major Customer during such period.

(b)      Disclosure Schedule 5.16(b) contains a true, correct and complete list of the 20 largest suppliers of the Business, taken as a whole, for (i) the 12-month period ended December 31, 2022 and (ii) the seven-month period ended on the Balance Sheet Date (as determined on the basis of the total dollar amount of purchases made by Seller and its Subsidiaries, in each case, a "**Major Supplier**"), showing the total dollar amount of purchases by the Business from each such Major Supplier during such period.   The only supplier of the Business of the Canadian Sellers is Instant Brands LLC.

(c)      Except as set forth on Disclosure Schedule 5.16(c), (i) there has not been an actual termination, cancellation, non-renewal or material reduction in volume with respect to the Business between the Business, on the one hand, and any Major Customer or Major Supplier (as

measured by 2023 gross sales or 2023 total purchases), on the other hand, and (ii) no Major Customer or Major Supplier has given Seller or any of its Subsidiaries written notice that such Major Customer or Major Supplier, as applicable, intends to, or to the Knowledge of each Selling Entity, has otherwise threatened to, terminate its business with Seller or any of its Subsidiaries, or reduce or become unable for any reason to maintain the volume of business transacted with the Business in any material respect (as measured by 2023 gross sales or 2023 total purchases) (other than reductions in volume as contemplated by any Material Contract with such Major Customer or Major Supplier).

Section 5.17  *Anti-Corruption.*

(a)  No Seller, its Subsidiaries, nor any of their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, has in the three years prior to the Closing Date, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2020, or any other applicable anti-bribery law (collectively, the "**Anti-Corruption Laws**"). Seller and its Subsidiaries have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws. To the Knowledge of each Selling Entity, none of the current officers, directors or employees of Seller or any of its Subsidiaries is a Government Official.

(b)  In the three years prior to the Closing Date, the Business has been conducted and the Assets have been operated in material compliance with all Applicable Laws relating to anti-money laundering and financial record-keeping and reporting. Seller and its Subsidiaries have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of any Applicable Laws relating to anti-money laundering or financial record-keeping and reporting , and in the three years prior to the Closing Date, there has been no such Proceeding.

Section 5.18  *Brokers or Finders.*

Except for fees and expenses payable to Guggenheim Securities, LLC, no Selling Entity nor Acquired Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.19   *Employee Benefit Plans; Labor and Employment Matters.*

(a)      Disclosure Schedule 5.19(a) contains a true, correct and complete list of each material Seller Benefit Plan, and identifies the Assumed Benefit Plans.  Seller has made available to Buyer a true, correct and complete copy of each material Seller Benefit Plan (or, in the case of an unwritten Seller Benefit Plan, a summary description thereof) and, to the extent applicable, (i) each trust related thereto, (ii) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (iii) the most recent summary plan descriptions and summaries of material modifications with respect thereto, (iv) the most recent determination, advisory or opinion letters received from the IRS with respect to each Seller Benefit Plan that is intended to be tax qualified, (v) all insurance contracts and other documents relating to the funding or payment of benefits under any Assumed Benefit Plan, (vi) all material, non-routine correspondence relating to any Seller Benefit Plan between any Selling Entity or their representatives and any Governmental Authority within three years prior to the date hereof or the Closing Date, and (vii) all material data necessary to administer each Assumed Benefit Plan in a form which is sufficient for the proper administration of the Assumed Benefit Plan in accordance with its terms and all Applicable Laws and, to the Knowledge of each Selling Entity, such data is complete and correct in all material respects.

(b)      Since January 1, 2020, each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in material compliance with Applicable Laws (including ERISA and the Code) and with the terms of such Assumed Benefit Plan.  There are no pending or, to the Knowledge of each Selling Entity, threatened claims, suits or proceedings (except routine claims for benefits payable in the ordinary course of business) against any Assumed Benefit Plan before any Governmental Authority, nor, to the Knowledge of each Selling Entity, is there any basis for one.

(c)      Except as set forth on Disclosure Schedule 5.19(c), none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event) will (i) entitle any Company Employee to any material compensation or benefit under any Seller Benefit Plan, (ii) accelerate the timing of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any Company Employee or trigger any other material obligation under any Seller Benefit Plan, (iii) result in any loss of tax deduction under Section 280G or the imposition of any excise tax under Section 4999 of the Code on any Transferred Employee, or (iv) result in any forgiveness of indebtedness with respect to any Company Employee (or dependents of such Company Employee), trigger any funding obligation under any Assumed Benefit Plan or impose any restrictions or limitations on the rights of any Selling Entity to administer, amend or terminate any Assumed Benefit Plan on or following the Closing Date other than as imposed by Applicable Law.

(d)      Except as set forth on Disclosure Schedule 5.19(d), no Seller Benefit Plan (i) is a (A) plan subject to Title IV of ERISA, (B) "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code or (C) "multiple employer plan" within the meaning of Section 210(a) of ERISA or Section 413(c) of the Code or (ii) provides any post-retirement medical, dental or life insurance benefits to any Company Employees (other than coverage mandated by Applicable Law, including COBRA).

(e)     Each Assumed Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable IRS determination letter or is based on a protype plan which has received a favorable opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired, and, to the Knowledge of each Selling Entity, nothing has occurred since the date of any such determination that could reasonably be expected to give the IRS grounds to revoke such letter.

(f)     With respect to each group health plan benefiting any current or former Company Employee or any member of the Controlled Group that is subject to Section 4980B of the Code, the Selling Entities and, to the Knowledge of each Selling Entity, each member of the Controlled Group (to the extent that could reasonably be expected to result in a material liability to Buyer following the Closing) have complied in all material respects with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA.

(g)     With respect to each Seller Benefit Plan subject to Title IV of ERISA: (i) a notice of intent to terminate any such Seller Benefit Plan has not been filed; and (ii) the Pension Benefit Guaranty Corporation has not notified any Selling Entity that it has instituted or, to the Knowledge of each Selling Entity, threatened in writing to institute proceedings to terminate any such Seller Benefit Plan. Each Seller Benefit Plan to which Section 412 of the Code or Section 302 of ERISA applies has satisfied the requirements of Sections 412, 430 and 436 of the Code and Sections 302 and 303 of ERISA.  Disclosure Schedule 5.19(g) identifies the "funding shortfall" within the meaning of Section 430(c) of the Code or Section 303(c) of ERISA for each such Seller Benefit Plan as of January 1, 2023, and no event has occurred which would be reasonably expected to materially change any such funding shortfall.  No Seller Benefit Plan is in "at-risk status" within the meaning of Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA or subject to the limitations of Section 436 of the Code. Except as set forth on Disclosure Schedule 5.19(g)-1, no Seller Benefit Plan has or has incurred an accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, nor has any waiver of the minimum funding standards of Section 302 of ERISA and Section 412 of the Code been requested of or granted by the IRS with respect to any Seller Benefit Plan, nor has any lien in favor of any Seller Benefit Plan arisen under Section 430(k) of the Code or Section 303(k) of ERISA. Except as set forth on Disclosure Schedule 5.19(g)-2, no Selling Entity or any member of the Controlled Group has been required to provide security to any defined benefit pension plan by the Pension Benefit Guaranty Corporation or pursuant to Section 412(c)(4) or 436 of the Code or Section 302 of ERISA, and there have been no "installment acceleration amounts" as that term is defined in Section 430(c)(7)(C) of the Code. There has been no "reportable event" within the meaning of Section 4043 of ERISA and the regulations and interpretations thereunder which has not been fully and accurately reported in a timely fashion, as required, or which, whether or not reported, would constitute grounds for the Pension Benefit Guaranty Corporation to institute termination proceedings with respect to any Seller Benefit Plan.

(h)     No Transferred Employee has a right to any gross up or indemnification from any Selling Entity with respect to any such Assumed Benefit Plan, payment or arrangement subject to Section 409A of the Code.

(i)     All material (i) insurance premiums required to be paid with respect to, (ii) benefits, expenses and other amounts due and payable under, and (iii) contributions, transfers or payments

required to be made to, any Assumed Benefit Plan, in each case, on or prior to the Closing Date, will have been paid, made or accrued on or prior to the Closing Date.

(j)      Except as set forth in Disclosure Schedule 5.19(j), neither the Selling Entities nor Acquired Entities is party to or otherwise bound by any collective bargaining, works council or other agreement with a labor representative with respect to Company Employees.

(k)      There are no strikes, slowdowns, other concerted work stoppages or any other material labor disputes involving any Company Employee pending or, to the Knowledge of each Selling Entity, threatened nor have there been any such disputes, strikes, slowdowns or concerted work stoppages or other material labor disputes in the past five years, and there are no unfair labor practice charges pending against any of the Selling Entities before the National Labor Relations Board or any other Governmental Authority with respect to any Company Employee.

(l)      The Selling Entities are, and since January 1, 2020 have been, in material compliance with all Applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, employment standards, pay equity, hours, employee classification as exempt/non-exempt or eligible or ineligible for overtime, independent contractor classification, employee leave, collective bargaining and labor relations, health and safety, immigration, child labor, discrimination, harassment, human rights, accessibility, retaliation, disability rights or benefits, affirmative action, and workers' compensation.

(m)      Disclosure Schedule 5.19(m) sets forth a true, correct and complete list of all Company Employees as of the date hereof, and includes the following information, as applicable: name (or anonymized by employee number where required by Applicable Law); title or position; status (part-time, full-time, exempt, non-exempt, etc.); work location (including U.S. city and state or Canadian city and province); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; union affiliation; visa or work permit status; and an indication of whether or not such employee is on leave of absence and anticipated return date. Disclosure Schedule 5.19(m) shall be updated upon reasonable request and within seven Business Days of the anticipated Closing Date.

(n)      Since January 1, 2020, there have been no material Proceedings against any of the Selling Entities filed or, to the Knowledge of each Selling Entity, threatened to be brought or filed, by or on behalf of any current or former employee or other service provider of, or applicant for employment with, any of the Selling Entities.

(o)      Since January 1, 2020, (i) to the Knowledge of each Selling Entity, there have been no written allegations of sexual harassment, sexual abuse, or other sexual misconduct against any officer, director or executive of any of the Selling Entities, (ii) there have been no Proceedings pending or, to the Knowledge of each Selling Entity, threatened in writing related to any allegations of sexual harassment, sexual abuse, or other sexual misconduct by any officer, director or executive of any of the Selling Entities and (iii) none of the Selling Entities have entered into any settlement agreements related to allegations of sexual harassment, sexual abuse, or other sexual misconduct by any officer, director or executive of a Selling Entity.

(p)     The consent or rendering of formal advice by, or the conclusion of any legally required consultation process with, any labor or trade union, works council or other employee representative body is not required for the Selling Entities to enter into this Agreement or to consummate any of the transactions contemplated hereby.

(q)     None of the Assumed Benefit Plans, or any insurance contract relating thereto, require or permit a material retroactive increase in premiums or payments.

(r)     All contributions, premiums or Taxes required to be made or paid by the Selling Entities to or under each Assumed Benefit Plan have been made or paid in a timely fashion in accordance with Applicable Law, and the terms of the applicable Assumed Benefit Plan.

(s)     To the Knowledge of each Selling Entity, none of the Selling Entities has made any commitment or representations to any employee, director, or independent contractors or consultant to materially adopt, amend, modify or terminate any Assumed Benefit Plan, in connection with the consummation of the transactions contemplated hereby.

(t)     Except as set forth on Disclosure Schedule 5.19(t), none of the Selling Entities have, in the past three years, sponsored, administered, maintained, contributed to, or been required to contribute to (i) a registered pension plan within the meaning of that term in subsection 248(l) of the Tax Act, (ii) a "multi-employer pension plan" within the meaning of that term as set out in the Pension Benefits Act (Ontario), or an equivalent plan under pension standards legislation of another applicable Canadian jurisdiction, (iii) a "multi-employer plan" within the meaning of that term in subsection 8500(l) of the Income Tax Regulations (Canada) or (iv) a Seller Benefit Plan with two (2) or more contributing employers who are not "affiliates" within the meaning of the Business Corporations Act (Ontario).

Section 5.20   *Taxes.*

(a)     Each Selling Entity and Acquired Entity has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed.  All such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by any Selling Entity or Acquired Entity (whether or not shown on any Tax Return) have been paid.  No material claim has ever been made (and remains unsolved) by an authority in a jurisdiction in which a Selling Entity or Acquired Entity does not file Tax Returns that such Selling Entity or Acquired Entity is or may be subject to Taxation by that jurisdiction.

(b)     There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any liability for any material Taxes of any Selling Entity or Acquired Entity.  No Selling Entity or Acquired Entity has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)     Each Selling Entity has withheld from each payment made to any Person, including any of its present or former employees, all amounts required by Applicable Law to be withheld, and has remitted such withheld amounts within the prescribed periods to the appropriate Governmental Authority. Each Selling Entity has remitted all Canada Pension Plan contributions,

provincial pension plan contributions, employment insurance premiums, employer health taxes and other Taxes payable by it in respect of the employees to the proper Governmental Authority within the time required under Applicable Law.

(d)     There are no Encumbrances with respect to Taxes (other than Permitted Encumbrances) upon the Assets or any assets owned by any of the Acquired Entities.

(e)     No Selling Entity or Acquired Entity has any material obligations under any unclaimed property, escheat or similar Applicable Law.

(f)     Each Canadian Seller is not a non-resident of Canada within the meaning of the Tax Act and none of the Assets of any other Seller are "taxable Canadian property" for the purposes of the Tax Act.

(g)     Except for Instant Brands (Canada) Holding Inc., each of the Canadian Sellers is registered for GST/HST purposes under Part IX of the ETA and its registration number is set forth in Disclosure Schedule 5.20(g).

(h)     Each Selling Entity has duly and timely collected all material amounts on account of all Transfer Taxes, including Canadian Sales Taxes required by Applicable Law to be remitted by it where the failure to do so would be capable of forming or resulting in an Encumbrance on or other claim (i) against any Buyer Entity, or (ii) against or seizure of all or any part of the Assets.

(i)     Except as set forth on Disclosure Schedule 5.20(i), none of the Selling Entities have maintained, contributed to or have any Liability or obligation to contribute to any "registered pension plan" as that term is defined in the Tax Act.

(j)     None of the Selling Entities or Acquired Entities have been a party to a transaction that is or is substantially similar to a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(2), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

(k)     No Acquired Entity is a party to any Tax indemnity, Tax allocation or Tax sharing agreement that will remain in effect after the Closing, other than any such agreement entered into in the ordinary course of business the principal purpose of which is not related to Tax.

(l)     There are no requests for rulings pending between any Selling Entity or any Acquired Entity and any Tax Authority.

(m)     None of the Acquired Entities (i) is or has been a member of a consolidated, combined, unitary, or affiliated Tax group (other than a group exclusively consisting of other Acquired Entities), or (ii) has any liability for Taxes of any other Person (other than members of a group exclusively consisting of other Acquired Entities), as a transferee or successor, by Contract or otherwise.

(n)     No Acquired Entity has (or has had) a permanent establishment or taxable presence in any country other than the country where such Acquired Entity is organized.

(o)     None of the Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Post-Closing Tax Period (or portion thereof) as a result of (i) a change in any method of accounting made on or prior to the Closing; (ii) a closing agreement (or similar agreement under any corresponding or similar provision of Applicable Law) executed on or prior to the Closing; (iii) an installment sale or open transaction disposition made on or prior to the Closing Date; (iv) any prepaid amount received or deferred revenue accrued on or prior to the Closing Date; (v) the application of Section 951 or Section 951A of the Code with respect to income earned or recognized or payments received on or prior to the Closing Date (regardless of when such income is taken into account for Tax purposes) or (vi) an election under Section 965(h) of the Code.

(p)     None of Corelle Brands (Canada) Inc., Instant Brands (Canada) Holding Inc., or Instant Brands Inc. is transferring any "United States real property interest" (as defined in Section 897(c)(1) of the Code) pursuant to this Agreement.

(q)     No Liability to Tax of Instant Brands (EMEA) Limited will arise as a result of or in connection with this Agreement or the Closing.

Section 5.21     *Investment Canada Act.*

Neither the Canadian Sellers nor any entity they control carries on a "cultural business" within the meaning of the Investment Canada Act.

Section 5.22     *International Trade.*

(a)     No Selling Entity, Acquired Entity nor any of their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, is currently, or during the three years prior to the date hereof or the Closing Date has been, (i) a Sanctioned Person, (ii) located, organized or resident in a country or territory that is the subject of comprehensive sanctions administered by the United States Treasury Department's Office of Foreign Assets Control (including Cuba, Iran, North Korea, Syria or the Crimea, so-called Luhansk People's Republic, or so-called Donetsk People's Republic regions of Ukraine) (a "**Sanctioned Territory**"), (iii) engaged in any dealings or transactions with, involving or for the benefit of any Sanctioned Person or in or with any Sanctioned Territory or (iv) otherwise in violation of applicable Sanctions Laws.

(b)     Each Selling Entity, Acquired Entity and their respective Representatives or other Persons that act for or on behalf of Seller or any of its Subsidiaries, is in compliance, and has been in compliance during the three years prior to the date hereof or the Closing Date, with all Trade Compliance Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(c)     During the three years prior to the date hereof or the Closing Date, neither any Selling Entity or any Acquired Entity has made any voluntary disclosure to any Governmental Authority under the Trade Compliance Laws, and there have been no actual or threatened inquiries, investigations or enforcement actions regarding compliance by any Selling Entity or any Acquired Entity with Trade Compliance Laws, and no Governmental Authority has assessed any fine or

61

penalty against, or issued any warning letter to, any Selling Entity or any Acquired Entity with regard to compliance with Trade Compliance Laws.

(d)     During the three years prior to the date hereof or the Closing Date, none of the products or materials imported by, for or on behalf of each Selling Entity and each Acquired Entity for which final liquidation has not yet occurred is subject to or otherwise covered by an antidumping duty order or countervailing duty order that remains in effect or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by any Governmental Authority. During the three years prior to the date hereof or the Closing Date, none of the products or materials imported by, for or on behalf of any Selling Entity or any Acquired Entity are subject to, or meet the criteria to be subject to, any Withhold Release Order administered by U.S. Customs and Border Protection or any equivalent Order outside the United States, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(e)     No Selling Entity or Acquired Entity is importing, nor in the three years prior to the date hereof or the Closing Date has imported, products or materials mined, produced, or manufactured wholly or in part with the use of forced labor or mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region or by an entity on the Uyghur Forced Labor Prevention Act Entity List.

Section 5.23    *Warranties; Product Liability.*

Except as specifically reflected, reserved against or otherwise disclosed in the Financial Statements or incurred since the date of the Interim Financial Statements and except as would not be reasonably be expected to be material to the Business, the Assets or the Assumed Liabilities, taken as a whole, (a) there is no Proceeding relating to any product of the Business, including the packaging and advertising related thereto, designed, formulated, manufactured, processed, sold or placed in the stream of commerce by Seller or any of its Subsidiaries or any services provided by the Business, or Proceeding involving a product which is pending or, to the Knowledge of each Selling Entity, threatened, by any Person, and (b) there has neither been, nor is there under consideration by the Business, any product recall or post-sale warning of a material nature conducted by or on behalf of the Business concerning any product.  Since January 1, 2020, (a) all products materially complied with and currently comply with all Orders and Applicable Laws, (b) all products are safe for use by consumers, and (c) there have not been and there are no material defects or deficiencies in such products of the Business.

Section 5.24    *Accounts Receivable; Inventory.*

(a)     Since the Balance Sheet Date, the Business has not adversely modified payment terms for Accounts Receivable in such a manner as would reasonably be expected to result in an Accounts Receivable portfolio that, in amount or character, is materially and adversely different than that maintained by the Business in the ordinary course of business.  To the Knowledge of each Selling Entity, the Accounts Receivable of Seller and its Subsidiaries in connection with the Business is, in the aggregate, collectible in full, net of any reserve therefor, in the ordinary course of business.  No material counter claims, defenses, offsetting claims or adjustments with respect to the Accounts Receivable are pending or threatened.

62

(b)     The inventory of the Business is, in all material respects, of a quality and quantity useable and saleable in the ordinary course of business and is merchantable and fit for its intended use, subject to appropriate and adequate allowances reflected on the Interim Financial Statements. The inventory of the Business is not excessive in kind or amount in any material respect in light of the ordinary and normal course of conduct and reasonably anticipated needs of the Business in a normal operating cycle.  The inventory is not held on consignment, or otherwise, by any Person (other than Seller or any of its Subsidiaries).

Section 5.25    *Related Party Transactions.*

Except as set forth on Disclosure Schedule 5.25, none of Seller nor any of its Subsidiaries (including the Acquired Entities), nor any current or former officer, employee, director, manager or Affiliate of Seller or any of its Subsidiaries (or any individual in such Person's immediate family), (a) is a party to any material Contract, commitment or transaction or involved in any material business arrangement or relationship with the Business, other than in the case of Company Employees or employees of the Acquired Entities, salaries and employee benefits and other transactions pursuant to any Seller Benefit Plan in the ordinary course of business or any transaction bonus payable to Company Employees or employees of the Acquired Entities in connection with the transactions contemplated by this Agreement, or (b) to the Knowledge of each Selling Entity, has any interest in (i) any material property, asset or right used or held for use by the Business or (ii) any Person that is a customer, distributor or supplier of, or other material commercial counterparty to or competitor of the Business.

Section 5.26    *Acquired Entities.*

(a)     The Selling Entities directly or indirectly own all of the issued and outstanding equity securities of the Acquired Entities.  No Third Party has the right, directly or indirectly, to acquire any equity interest of the Acquired Entities.  Disclosure Schedule 5.26(a) accurately sets forth a true, correct and complete list of (i) each Acquired Entity, (ii) the issued and outstanding shares and other equity securities of such Acquired Entity, and (iii) the holder(s) of such shares and other equity securities of such Acquired Entity.  All of the issued and outstanding equity interests of the Acquired Entities have been duly authorized, are validly allotted and issued, are fully paid up, and are owned legally and beneficially by the applicable Selling Entity (or another Acquired Entity) set forth on Disclosure Schedule 5.26(a)(iii), free and clear of all Encumbrances. None of the authorized and outstanding equity interests of each Acquired Entity was issued in violation of any preemptive or similar rights and all issuances, sales and repurchases by each Acquired Entity of their respective equity interests has been effected in compliance with all Applicable Law.

(b)     Except as set forth on Disclosure Schedule 5.26(b), there are no outstanding equity securities, options, warrants, rights, contracts, pledges, calls, puts, rights to subscribe, rights of first refusal, repurchase rights, exchange rights, conversion rights, preemptive rights, or other agreements or commitments to which any Acquired Entity is a party or which is binding upon any Acquired Entity providing for the issuance, disposition or acquisition of any of its equity, capital or profits or any rights or interests exercisable therefor.  There are no outstanding or authorized stock options, equity appreciation, phantom shares, profit participation or similar rights with respect to the Acquired Entities.

63

(c)     Except as set forth on Disclosure Schedule 5.26(c), none of the Acquired Entities have outstanding bonds, debentures, notes or other similar obligations, the holders of which have the right to vote (or which are convertible into or exercisable for shares or equity securities having the right to vote) with the equityholders of any of the Acquired Entities on any matter.  There are no voting trusts or other agreements or understandings to which any Acquired Entity is a party with respect to the voting of any equity interests of such Acquired Entity.

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Each Buyer Entity, severally and not jointly, represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01     *Organization and Good Standing.*

Each Buyer Entity is a duly incorporated or organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization.  Each Buyer Entity has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Each Buyer Entity is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and each Buyer Entity or its Affiliates will be duly qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s) where the Assets are located, in each case other than where failure to be so qualified would not have a material and adverse effect on the ability of such Buyer Entity to consummate the transactions contemplated by this Agreement.  Buyer has made available to Seller true and correct copies of each Buyer Entity's governing documents as in effect as of the date hereof and as of the Closing, as applicable.

Section 6.02     *Authority; Validity; Consents.*

Each Buyer Entity has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is or will be a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by each Buyer Entity and such other Transaction Documents to which such Buyer Entity is or will be a party and the consummation by such Buyer Entity of the transactions contemplated herein and therein have been duly, validly authorized and approved by the applicable governing body of such Buyer Entity and no other corporate or other proceedings on the part of such Buyer Entity are necessary to authorize the execution and delivery by such Buyer Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by each Buyer Entity and each other Transaction Document to which such Buyer Entity will be a party that is required to be executed and delivered by such Buyer Entity at the Closing will be duly and validly executed and delivered by such Buyer Entity, as applicable, at the Closing. Subject to entry of the Sale Order and the CCAA Sale Order and assuming the due authorization, execution and delivery by the other Parties to this Agreement and such other Transaction Documents, no other action on the part of such Buyer Entity or its Affiliates is necessary to authorize this Agreement or the other Transaction Documents to which such Buyer Entity is or

64

will be a party and this Agreement and the other Transaction Documents to which such Buyer Entity is or will be a party constitutes or will constitute as of the Closing the legal, valid, and binding obligation of Buyer, enforceable against such Buyer Entity in accordance with their respective terms, except in each case as such enforceability may be limited by the Bankruptcy and Equity Exception.

Section 6.03   *No Conflict.*

Except for (a) any applicable notices, filing, waiting period terminations or expirations, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act, and (b) items listed on Disclosure Schedule 6.03, each Buyer Entity is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to affect such Buyer Entity's ability to perform its obligations under this Agreement or any other Transaction Document to which it is or will be party or to consummate the transactions contemplated hereby or thereby. When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer Entity under (i) any Contract to which it or its assets is bound, (ii) its certificate of incorporation, bylaws or other governing documents (as applicable), (iii) any Order applicable to such Buyer Entity or its assets or (iv) any Applicable Law, except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect such Buyer Entity's ability to perform its obligations under this Agreement or any other Transaction Documents to which it is or will be a party or to consummate the transactions contemplated hereby or thereby.

Section 6.04   *Legal Proceedings.*

There are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to delay the Closing or have a material and adverse effect on any Buyer Entity's performance of any of its obligations and covenants under this Agreement and the other Transaction Documents to which it is or will be a party.

Section 6.05   *Bankruptcy.*

There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against any Buyer Entity.

NAI-1538022664v15

Section 6.06    *Brokers or Finders.*

Neither any Buyer Entity nor any Person acting on behalf of such Buyer Entity has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Selling Entity is or will become liable.

Section 6.07    *Financing.*

(a)    Buyer has delivered to Seller on or prior to the date hereof true, complete and fully executed copies of (i) the commitment letter (including all related exhibits, schedules, annexes, supplements and term sheets thereto, and including any related redacted fee letters as described below, as each of the foregoing may be amended, supplemented, replaced, substituted, terminated or otherwise modified or waived from time to time after the date hereof in compliance with Section 7.08(b), the "**Debt Commitment Letter**") from the Debt Financing Sources party thereto confirming their respective commitments to provide Buyer with debt financing in connection with the transactions contemplated hereby in the amounts set forth therein (the "**Debt Financing**") and (ii) a commitment letter (the "**Equity Commitment Letter**" and together with the Debt Commitment Letter, the "**Financing Commitment Letters**") from Centre Lane Partners V, L.P. (the "**Equity Financing Source**") confirming its commitment to provide Buyer with equity financing in connection with the transactions contemplated hereby in the amount set forth therein (the "**Equity Financing**" and together with the Debt Financing, the "**Financing**").

(b)    Each Financing Commitment Letter is in full force and effect and is a valid and binding obligation of Buyer and the other parties thereto, enforceable against Buyer and the other parties thereto in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).  As of the date of this Agreement, none of the Financing Commitment Letters have been amended or modified, and the respective commitments contained in the Financing Commitment Letters have not been withdrawn, rescinded or otherwise modified, and no such amendment, modification, withdrawal or rescission of any of the Financing Commitment Letters is contemplated or the subject of current discussions.  As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default or breach on the part of Buyer or any of its Affiliates or any other Person, under any of the Financing Commitment Letters. All fees (if any) required to be paid under the Financing Commitment Letters on or prior to the date hereof have been paid in full. There are no conditions precedent directly or indirectly related to the funding of the full amount of the Financing other than as expressly set forth in the Financing Commitment Letters.  Other than the Financing Commitment Letters, there are no other contracts, arrangements or understandings entered into by Buyer or any Affiliate thereof related to the funding or investing, as applicable, of the Financing (except as set forth in the customary fee letter relating to the commitments in respect of the Debt Financing, a true, complete and fully executed copy of each of which has been provided to Seller, with only the fee amounts, "market flex", pricing terms, pricing caps and other commercially sensitive terms redacted; *provided that* such redacted provisions do not permit the imposition of any new conditions (or the modification or expansion of any existing conditions)). As of the date of this Agreement, Buyer has no reason to believe that

66

any of the conditions to the Financing will not be satisfied or that the full amount of the Financing will not be available in full to Buyer on the Closing Date.

(c)     The aggregate proceeds of the Financing (after giving effect to any market flex provisions) will be in an amount sufficient to make full payment in cash of the Estimated Purchase Price and any other amounts to be paid by Buyer hereunder and under the other Transaction Documents.  For the avoidance of doubt, Buyer acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, the consummation of the Financing shall not be a condition to any obligations of Buyer hereunder, including the obligation to consummate the Closing or other transactions contemplated hereby or by the other Transaction Documents.

Section 6.08     *Independent Evaluation.*

Buyer (a) is experienced in the evaluation, purchase, ownership and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and is aware of the risks associated with the purchase, ownership and operation of such assets and interests related thereto, (b) is capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (c) is able to bear the economic risks associated with the Assets, ownership and operation thereof and its obligations hereunder.  In entering into this Agreement and except for the representations and warranties expressly set forth in this Agreement or in any other Transaction Document, no Selling Entity, its Affiliates and its and their respective Representatives or any Person acting on their behalf is making or has made any other express or any implied representations or warranties to Buyer, and Buyer disclaims reliance upon any other representations and warranties (including as to the accuracy and completeness thereof), with respect to any Selling Entity or any of its or their respective Affiliates, any of their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects or any other matter relating to any Selling Entity or any of its or their respective Affiliates.   Buyer acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and the Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of the transactions contemplated by this Agreement.

Section 6.09     *Solvency.*

After giving effect to the transactions contemplated by this Agreement (including receipt of the proceeds of the Financing in connection with the Closing) and assuming the accuracy of the representations and warranties set forth in this Agreement and each other Transaction Document, Buyer and its Subsidiaries, taken as a whole, will be Solvent.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer, Seller or their respective Subsidiaries. For purposes of this Agreement, "**Solvent**" when used with respect to any Person, means that such Person (a) will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) has property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured

67

liability), (c) has assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute, matured and payable, (d) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as they become absolute, matured and payable and (e) are not engaged in business or a transaction for which they have unreasonably small capital.

Section 6.10  *Canadian Sales Tax Matters*

The Canadian Buyer is or will be registered for GST/HST purposes under Part IX of the ETA effective on or before the Closing Date, and shall provide its registration number to Seller forthwith upon receipt of the same from the relevant Governmental Authority, in any case before the Closing Date.

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01  *Access and Reports.*

(a)  From the date hereof through Closing, subject to Applicable Laws, upon the receipt of reasonable written request from Buyer of any such activities, Seller and its Subsidiaries (including the Acquired Entities) will afford Buyer's officers and other authorized Representatives reasonable access, during normal business hours, ((i) to those of its officers, employees, consultants and authorized Representatives (including its legal advisors and accountants) possessing information relating to the Assets or the Business, (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Assets, the Assumed Liabilities or the Acquired Entities, (iii) to any reasonably available financial and operating data and other information in connection with the Assets (including the Acquired Entities) and (iv) to all offices, plants, buildings, facilities and other physical locations and properties included in the Assets or owned, leased or licensed by the Acquired Entities, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's authorized Representatives will (i) abide by any reasonable safety rules, regulations and operating policies provided in writing by Seller or its Representatives and (ii) at Seller's option, be accompanied by at least one (1) Representative of Seller.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the Business or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities; provided that the Selling Entities use reasonable efforts to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation or providing a summary of such information which would not result in a waiver of privilege).  Seller acknowledges and agrees that following the date hereof, Seller shall use commercially reasonable efforts to coordinate calls on behalf of Buyer and its authorized Representatives with at least five Major Customers and at least three Major Suppliers, in each case as Buyer may reasonably request in advance in writing.

68

(b)     Buyer acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.01(a), and is subject to the terms of the confidentiality agreement, dated June 26, 2023, between Seller and Centre Lane Partners V, L.P. (the "**Confidentiality Agreement**"), the terms of each of which are incorporated herein by reference. Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and the CCAA Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

Section 7.02     *Operations Prior to the Closing Date.*

(a)     Except (i) as otherwise expressly contemplated by this Agreement, (ii) as disclosed in Schedule 7.02, (iii) with the prior written consent (electronic consent being sufficient) of Buyer or the approval of the Bankruptcy Court and, if required, the CCAA Court, (iv) as otherwise required by Applicable Laws or any Contract to which Seller or any of its Subsidiaries are bound, or as requested or required by any Governmental Authority, or (v) as required or prohibited pursuant to a Bankruptcy Court Order, the Bankruptcy Cases or the CCAA Recognition Proceedings or limited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors, including (x) the exercise by the board of directors of Seller of its fiduciary duties to maximize the value of Seller's estate and (y) limitations on Seller's or its Subsidiaries' ability to pay amounts relating to the period prior to the Petition Date and the impact of Seller filing for bankruptcy with respect to any Contract to which it or any of its Subsidiaries is a party, from the date hereof until the Closing Date:

(i)     Seller will use its commercially reasonable efforts to (A) operate the Assets operated by Seller and its Subsidiaries in the ordinary course of business in all material respects, (B) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, (C) preserve intact, in all material respects, the business organizations and relationships with Third Parties of the Assets and keep available the services of Company Employees, employees of the Acquired Entities and consultants and agents of the Selling Entities and the Acquired Entities in connection with the services such Persons provided in respect of the Assets in the ordinary course of business, and (D) comply, in all material respects, with all Applicable Laws and Orders applicable to the Assets (*provided*, *however*, that no action by any Selling Entity with respect to any of the matters addressed by Section 7.02(a)(ii) shall be deemed a breach of any of clauses (A) through (D) unless such action would constitute a breach of such Section 7.02(a)(ii)); and

(ii)     Seller will not, and will cause its Subsidiaries (including the Acquired Entities) not to, solely with respect to the Assets:

(A)     liquidate, dissolve, recapitalize or otherwise wind up its operations of the Business or the Acquired Entities;

(B)     terminate, cancel, materially amend or modify, grant a material waiver or consent with respect to or extend any Material Contract, or enter in to any Contract that would be a Material Contract, in each case other than in the ordinary course of business;

(C)     sell, lease, transfer, abandon, terminate, permit to lapse, fail to maintain, exclusively license, assign or otherwise dispose of any of the Assigned Contracts or other material Assets, in each case other than in the ordinary course of business;

(D)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any material assets, securities, properties, interests or businesses for the conduct of the Business, in each case other than purchases of inventory in the ordinary course of business;

(E)     other than as permitted by Section 7.02(a)(ii)(D), make any material loans, advances or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller) with respect to the Business, other than advances to employees in the ordinary course of business;

(F)     subject any of the Assets or any assets or properties of any Acquired Entity to any Encumbrances, except for Permitted Encumbrances;

(G)     enter into any agreement or arrangement that materially limits or otherwise restricts in any material respect the conduct of the Business or the use or salability of the Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect the Business or Buyer's use of the Assets;

(H)     change its accounting methods, policies or practices, in each case as they relate to the Assets;

(I)     commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Assets or any assets of the Acquired Entities or impair title thereto;

(J)     other than as required by Applicable Law or by the terms of any Seller Benefit Plan as in effect on the date hereof, (1) increase or materially decrease the compensation, bonus or other benefits of any Company Employee or any employee of any Acquired Entity or (2) establish, adopt or amend any Seller Benefit Plan (other than as contemplated under this Agreement);

(K)     (1) involuntarily terminate the employment (other than for cause) of any Company Employee or any employee of an Acquired Entity with a base salary of $125,000 or more, or (2) hire any employee to become a Company Employee or any employee of an Acquired Entity with a base salary of $125,000 or more;

70

(L)     cancel or modify any Insurance Policy, except where replaced with a substantially similar policy;

(M)     amend any Tax Returns, settle or compromise any audit with respect to Taxes, make or change any Tax election, change or adopt any method of Tax accounting, or take any other action that could reasonably be expected to affect Taxes with respect to the Assets or the Acquired Entities for any Post-Closing Tax Period (or portion thereof);

(N)     adopt any amendments to the governing documents of the Acquired Entities;

(O)     (1) authorize for issuance, grant, issue, deliver or sell, or agree or commit to grant, issue, deliver or sell (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), or accelerate the vesting of any stock or equity interest of any class or any other securities or equity equivalents (including any options) of the Acquired Entities, (2) enter into any Contract with respect to the foregoing, or (3) grant, or agree or commit to grant, restricted stock, restricted stock units, profits interests, options, phantom units or any other similar equity-based rights in the Acquired Entities;

(P)     take any action (other than any actions required by the Bankruptcy Court or Applicable Law) in breach of the Bidding Procedures Order, the Sale Order or the CCAA Sale Order or any Order made in the Bankruptcy Cases and CCAA Recognition Proceedings;

(Q)     (1) reject, terminate or disclaim (other than by expiration in accordance with its terms) any Desired 365 Contract or Material Contract or seek the approval of the Bankruptcy Court or CCAA Court to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a Third Party to so terminate (including any action by a Third Party to obtain Bankruptcy Court approval to terminate) any such Contract, except in each case, to the extent Buyer has indicated in writing that it wishes the Selling Entities to terminate or reject such Contract;

(R)     with respect to any Asset (1) agree to allow relief from the stay of proceedings in the Bankruptcy Cases or the CCAA Recognition Proceedings without the prior written consent of Buyer; or (2) fail to use commercially reasonable efforts to oppose any action by a Third Party to obtain relief from the stay of proceedings in the Bankruptcy Cases or the CCAA Recognition Proceedings;

(S)     voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any Third Party in pursuing or seeking, a dismissal of or abstention of the Bankruptcy Court from any of the Bankruptcy Cases, conversion of any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code or

71

the appointment of an examiner with expanded powers in any of the Bankruptcy Cases or any trustee, receiver or monitor is appointed in the CCAA Recognition Proceedings or in any Canadian bankruptcy, proposal or CCAA proceedings in respect of any Seller; or

(T)     agree or commit to do any of the foregoing.

Section 7.03     *Commercially Reasonable Efforts.*

Subject to Section 7.04, Seller, on the one hand, and Buyer, on the other hand, will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent to the other party's obligations to consummate the Closing set forth in Article 9, Article 10 and Article 11 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Nothing in this Section 7.03 will require Buyer, Seller or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to waive any right under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

Section 7.04     *Regulatory Approvals.*

(a)     Buyer and Seller will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other applicable Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within five Business Days after the date of this Agreement in the case of all filings required under the HSR Act or any other applicable Antitrust Laws, with the exception of the Competition Act Clearance, in respect of which (1) the Canadian Buyer shall, with the assistance of and, in consultation with Seller, as promptly as practicable, file a submission with the Commissioner of Competition requesting an ARC in respect of the transactions contemplated by this Agreement and, in lieu thereof, request a No Action Letter in furtherance of obtaining the Competition Act Clearance; and (2) unless otherwise agreed to by the Parties, the Canadian Buyer and Canadian Sellers shall concurrently file a pre-merger notification form with the Commissioner of Competition pursuant to section 114(1) of the Competition Act, in each case of clauses (1) and (2), within five Business Days after the date of this Agreement, (ii) comply at the earliest practicable date with any request under the HSR Act or other Applicable Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from the Federal Trade Commission ("**FTC**") , the Antitrust Division of the United States Department of Justice (the "**Antitrust Division**") or any other Governmental Authority in respect of such filings or such transactions, and (iii) cooperate with each other in connection with (A) any such

filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith), (B) resolving any investigation or other inquiry of any the FTC, the Antitrust Division or other Governmental Authority under any Applicable Laws with respect to any such filing or any such transaction, and (C) updating, transferring, replacing, cancelling or obtaining the Permits set forth in Schedule 7.04. Each such Party will use reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated by this Agreement. Each such Party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. No Party hereto will independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend or participate. Subject to Applicable Law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to Proceedings under the HSR Act or other Applicable Laws. Seller and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.04 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Buyer, as the case may be). Notwithstanding the foregoing or anything to the contrary in this Agreement, no Party shall (or shall permit any of its Affiliates to) commit to or agree with any Governmental Authority to stay, toll, or extend, any applicable waiting period or enter into any similar timing agreement or agree to withdraw its filing under the HSR Act or any other antitrust Applicable Laws, without the prior written consent of the other Parties (not to be unreasonably withheld, conditioned or delayed); provided, however, that, upon the reasonable request of Seller, Buyer shall promptly withdraw its filing pursuant to the HSR Act or the Competition Act and shall refile such filing pursuant to the HSR Act or the Competition Act, as applicable, within two Business Days of such withdrawal.

(b)     Buyer understands and agrees that Buyer will use its reasonable best efforts to take, and will cause its Affiliates to take, all actions necessary to obtain all Governmental Authorizations and to avoid or eliminate each and every impediment under any Applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to occur as soon as possible (and in any event prior to the Outside Date), including not effecting any transaction or entering into any agreement to effect any transaction (including any merger or acquisition) that might materially increase the risk of any Governmental Authority seeking or entering any injunction or other order or decree prohibiting the consummation of the transactions contemplated by this Agreement; provided that the Parties hereto understand and agree that the reasonable best efforts of Buyer, solely for purposes of this Section 7.04(b), will not be deemed to require: (i) entering into any settlement, undertaking, consent decree, stipulation or agreement with or required by any Governmental Authority in connection with the transactions contemplated hereby; (ii) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of businesses, product lines or assets, including the assets of Buyer or any of its Affiliates or the Assets; (iii) terminating existing

73

relationships, contractual rights or obligations of Buyer or its Affiliates (including those relating to the Assets); or (iv) otherwise taking or committing to take actions that after the Closing would limit Buyer's or its Affiliates' freedom of action with respect to, or its ability to retain or exercise rights of ownership or control with respect to, one or more of the businesses, product lines or assets of Buyer or its Affiliates (including the Assets).

Section 7.05   *Bankruptcy Court Approval.*

(a)      Each of the Selling Entities and Buyer acknowledges that this Agreement and the sale of the Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court and CCAA Court approval.  Buyer acknowledges that (i) to obtain such approval, the Debtor Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court or required by the CCAA Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code and CCAA, as applicable, with respect to each Desired 365 Contract.

(b)      If this Agreement and the sale of the Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, (i) Buyer agrees that it will promptly take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and a CCAA Sale Order and a finding of adequate assurance of future performance by Buyer of the Desired 365 Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court and CCAA Court, as applicable, for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (ii) Buyer and the Selling Entities agree to use commercially reasonable efforts to cause (A) the Bankruptcy Court to enter the Sale Order with such changes or modifications as may be requested by Buyer or Seller that are consented to in the sole discretion of the Buyer, and (B) the CCAA Court to enter the CCAA Sale Order.  In the event the entry of the Sale Order or CCAA Sale Order is appealed, each of the Debtor Selling Entities and Buyer will use their commercially reasonable efforts to defend such appeal(s).

(c)      The Debtor Selling Entities will give Buyer reasonable advance notice and proposed drafts of (i) all pleadings, motions, affidavits, Orders, applications, schedules, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court or the CCAA Court, as applicable, unless such advance notice is impossible or impracticable under the circumstances, in which case the Debtor Selling Entities will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court or the CCAA Court, as applicable, and (ii) the proposed service lists in connection with any motion seeking entry of the CCAA Sale Order prior to service of materials in connection therewith and, in each case of foregoing clause (i) and (ii), consult in advance and in good faith with Buyer regarding the form and substance of any such proposed filing and any such service list, as applicable.

(d)     The Debtor Selling Entities covenant and agree that if the Sale Order is entered, the terms of any plan of reorganization or liquidation, or any structured dismissal, of any of the Bankruptcy Cases or the CCAA Recognition Proceedings, submitted by the Debtor Selling Entities to the Bankruptcy Court and (as applicable) the CCAA Court for confirmation, sanction or recognition (as applicable) will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated hereby, including any transaction that is contemplated by or approved pursuant to the Sale Order and the CCAA Sale Order.

Section 7.06     *Alternative Proposals.*

Buyer agrees and acknowledges that the Selling Entities, including through their respective Representatives, are and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Assets, and are and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Bidding Procedures.

Section 7.07     *Damage or Destruction.*

Until the Closing, the Assets shall remain at the risk of the Selling Entities.  In the event of any material damage to or destruction of any of the Assets after the date hereof and prior to the Closing (in any such case, a "**Damage or Destruction Loss**"), Seller shall give prompt written notice thereof to Buyer.  If any such Damage or Destruction Loss is covered by insurance policies and, if such damage or destruction is to a Facility, is not repaired or replaced by a similar facility in reasonable proximity to such damaged Facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing in accordance with Section 2.01(b)(xi).

Section 7.08     *Buyer Efforts to Obtain Financing.*

(a)     Buyer shall use (and shall cause each of its Affiliates and Representatives to use) its reasonable best efforts to arrange and obtain the Financing on terms and conditions not less favorable than those described in the Financing Commitment Letters (including any flex provisions)), including to take all actions that are necessary, proper or advisable to as promptly as practicable obtain the Financing in a quantum sufficient to consummate the transactions contemplated hereby and to pay all applicable amounts hereunder, including taking all actions that are necessary, proper or advisable to: (i) maintain in effect the Financing Commitment Letters and to obtain and maintain in effect such other definitive documentation as necessary to effectuate the Debt Financing at or prior to Closing (the "**Debt Financing Agreements**"); (ii) negotiate and enter into the Debt Financing Agreements on the terms and conditions in the Financing Commitment Letters (including any flex provisions); (iii) satisfy, or obtain a waiver thereof, on a timely basis all conditions to funding under the Financing Commitment Letters and such definitive agreements thereto, (iv) consummate the Financing at or prior to the Closing and (v) enforce their rights under the Financing Commitment Letters. Buyer shall not amend, supplement or otherwise modify or waive its rights under the Equity Commitment Letter if such amendment, supplement,

modification or waiver would (1) impose new or additional conditions precedent or expand upon the conditions precedent to the Equity Financing as set forth in the existing Equity Commitment Letters, (2) reduce the aggregate amount of available Equity Financing to less than the amount required to consummate the transactions contemplated by this Agreement or (3) otherwise reasonably be expected to delay or prevent the Closing. Buyer shall furnish true and complete copies of the Debt Financing Agreements and any fully executed commitment letter, fee letter, annexes, exhibits, schedule and other attachment associated therewith to Seller promptly upon their execution.

(b)     Buyer shall from time to time keep Seller reasonably informed with respect to all material activity concerning the status of the Financing contemplated by the Financing Commitment Letters and shall give Seller notice of any material adverse change with respect to the Debt Financing as promptly as practicable. Without limiting the generality of the foregoing, Buyer shall, as promptly as reasonably practicable after obtaining Knowledge thereof, give Seller notice of: (w) the termination, repudiation, rescission, cancellation or expiration of the Financing Commitment Letters and the Debt Financing Agreements, (x) any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach or default) by any party to any of the Financing Commitment Letters or the Debt Financing Agreements in each case of which Buyer becomes aware, (y) the receipt of any written notice or other written communication, in each case received from any Debt Financing Source or Equity Financing Source with respect to any (1) breach of Buyer's obligations under the Financing Commitment Letters or the Debt Financing Agreements, or actual or potential default, termination or repudiation by any party to any of the Financing Commitment Letters or the Debt Financing Agreements (including any proposal by any Debt Financing Source or Equity Financing Source or other Person to withdraw, terminate, repudiate, rescind or make a material change in the terms of (including the amount of Financing contemplated) any Financing Commitment Letters) or (2) material dispute between or among any parties to the Financing Commitment Letters or the Debt Financing Agreements or any provisions of any of the Financing Commitment Letters, in each case, with respect to the obligation to fund the Debt Financing or the amount of the Financing to be funded at Closing and (z) of the receipt of any written notice or other written communication on the basis of which Buyer reasonably expects that a party to the Financing Commitment Letters will fail to fund the relevant Financing or is reducing the amount of the Financing.  As soon as reasonably practicable, but in any event within two Business Days of the date of Seller's written request to Buyer, Buyer shall provide any information reasonably requested by Seller relating to any circumstance referred to in clauses (w)-(z) of the immediately preceding sentence.

(c)     Buyer shall have the right from time to time to amend, supplement or otherwise modify the Debt Commitment Letter to add and appoint additional arrangers, bookrunners, underwriters, agents, lenders and similar entities, to provide for the assignment and reallocation of a portion of the financing commitments contained therein and to grant customary approval rights to such additional arrangers and other entities in connection with such appointments; *provided* that, no such amendment, supplement or other modification shall (i) reduce (or have the effect of reducing) the aggregate amount of available Debt Financing (including by increasing the amount of fees to be paid or original issue discount (except as set forth in any "market flex" provisions existing on the date of this Agreement)) to less than the amount required to consummate the transactions contemplated by this Agreement, unless there is a corresponding increase in the Equity Financing, (ii) impose new or additional conditions precedent or expand upon the

76

conditions precedent to the Debt Financing as set forth in the existing Debt Commitment Letter in a manner that could be expected to (A) make the timely funding of the Debt Financing, or the satisfaction of the conditions to obtaining the Financing less likely to occur when required pursuant to the terms hereof or (B) adversely impact the ability of either Buyer or Seller to enforce its rights against other parties to the Debt Commitment Letter, (iii) adversely change the timing of the funding of the Debt Financing thereunder, (iv) be reasonably expected to impair, delay or prevent the availability of all or a portion of the Debt Financing or the consummation of the transactions contemplated by this Agreement, or (v) otherwise materially adversely affect the ability of Buyer to enforce its rights under the Debt Commitment Letter or to consummate the transactions contemplated by this Agreement or the timing of the Closing, including by making the funding of the Financing less likely to occur. Buyer shall furnish to Seller a copy of any executed written amendment, supplement, replacement, substitution, termination, modification or waiver of the Debt Commitment Letter. Buyer shall not permit or consent to or agree to any amendment, restatement, replacement, supplement, termination or other modification or waiver of any provision or remedy under, the Equity Commitment Letter (other than to increase the amount of Equity Financing available thereunder). Buyer shall furnish to Seller a copy of any executed written amendment, restatement, replacement, supplement, modification, waiver or consent of or relating to the Equity Commitment Letter promptly upon execution of definitive agreements related to the Equity Financing thereof. For purposes of this Agreement, references to the "Debt Commitment Letter", the "Equity Commitment Letter" and the "Financing Commitment Letters" shall include any such document as permitted or required by this Section 7.08(c) to be amended, supplemented, replaced, supplemented or otherwise modified or waived, in each case from and after such amendment, supplement, replacement, supplement or other modification or waiver and, for the avoidance of doubt, references to "Equity Financing" and "Debt Financing" shall include, in whole or in part (as applicable), any supplemental, replacement or substitute financing provided for thereunder.

(d)     In the event that any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated by the Debt Commitment Letter (including the flex provisions), and such portion is required to consummate the transactions contemplated by this Agreement on or prior to the Closing Date, (i) Buyer shall promptly notify Seller and (ii) Buyer shall use (and shall cause each of its Affiliates and Representatives to use) its reasonable best efforts to (A) arrange and obtain, as promptly as practicable following the occurrence of such event, any such portion from alternative sources, on terms, taken as whole, that are no more adverse to Buyer (including after giving effect to the market flex provisions) ("**Alternative Financing**") and (B) provide Seller with a copy of the new financing commitment that provides for such Alternative Financing (including all related exhibits, schedules, annexes, supplements and term sheets thereto, and including any related fee letter, which may be redacted in a manner consistent with debt commitment fee letter delivered to Seller on or about the date hereof) (the "**Alternative Financing Commitment Letter**"); *provided* that the terms of such Alternative Financing shall not (A) impose additional conditions precedent or materially expand upon the conditions precedent to the Debt Financing as set forth in the existing Debt Commitment Letter, (B) reduce the aggregate amount of available Debt Financing to less than the amount required to consummate the transactions contemplated by this Agreement or (C) otherwise reasonably be expected to delay or prevent the Closing. As applicable, references in this Agreement to (x) the Debt Financing shall include such Alternative Financing and (y) the Debt Commitment Letter shall include the Alternative Financing Commitment Letter.

NAI-1538022664v15

Section 7.09 *Seller Obligations in Respect of the Debt Financing.*

(a)     Prior to the Closing, Seller shall use its reasonable efforts to provide to Buyer and shall use its reasonable efforts to cause its Representatives to provide to Buyer, such assistance and cooperation as is customary for debt financings of the type contemplated by the Debt Commitment Letter and as is reasonably requested by Buyer and that is necessary in connection with arranging and obtaining the Debt Financing, including (i) participation in a reasonable number of virtual meetings, presentations, road shows, drafting sessions and due diligence sessions that are customary for financings of a type similar to the Debt Financing, (ii) as promptly as reasonably practicable, furnishing Buyer, its Affiliates and its financing sources with financial and other pertinent materials and information regarding Seller within Seller's possession as may be reasonably requested by Buyer and necessary to satisfy the conditions set forth in the Debt Commitment Letter, (iii) assisting Buyer in a commercially reasonable manner with the preparation of customary marketing materials, including lender and investor presentations, and similar documents and materials reasonably requested by Buyer in connection with the Debt Financings, (iv) facilitating the pledging of collateral to the extent reasonably requested by Buyer (which shall only be effective at Closing), including delivering possessory collateral (such as certificated equity and promissory notes) within its possession to Buyer (or its designee), (v) promptly, and in any event no later than three Business Days prior to the Closing Date, provide documentation and other information reasonably requested by Buyer at least ten Business Days prior to the Closing Date and requested to satisfy an express condition precedent to the funding of the Debt Financing pursuant to the Debt Commitment and otherwise required to evidence compliance with the Patriot Act of 2001, antiterrorism legislation, "know-your-customer" and anti-money-laundering rules and regulations, (vi) executing and delivering customary authorization letters relating to the Debt Financing, (vii) executing and delivering customary prepayment notices with respect to the DIP Credit Facilities relating to the prepayment of the indebtedness thereunder to be prepaid or repaid at the Closing, and (viii)(A) to the extent the Closing of the transactions contemplated by this Agreement occurs prior to the consummation of the transactions contemplated by the Housewares APA, arranging for the delivery to Buyer of an executed prepayment notice confirmation (each, a "**Prepayment Notice Confirmation**") from the applicable administrative agent or other similar agent under each of the DIP Credit Facilities (and, in the case of the Term DIP Credit Facility, executed and delivered by each Buyer DIP Lender), which Prepayment Notice Confirmations shall (x) indicate (1) the total amount to be paid in respect of the applicable DIP Credit Facility as of the anticipated Closing Date (such total amount with respect to each DIP Credit Facility, the "**Prepayment Amount**") and (2) solely in the case of the Term DIP Credit Facility, the Round-Tripping Amount (which shall constitute a portion of, and not an addition to, the Prepayment Amount in respect of the Term DIP Credit Facility), (y) provide wire instructions to make the applicable Prepayment Amount and state that each Buyer DIP Lender agrees that pursuant to the transactions contemplated by this Agreement, the Round-Tripping Amount of the applicable Prepayment Amount shall be deemed automatically and irrevocably satisfied on a cashless basis upon the occurrence of the Closing and (z) state that all Encumbrances, guaranties and security interests relating to the Assets and securing obligations under the applicable DIP Credit Facility shall be, upon the payment of such Prepayment Amount, automatically released and terminated (<u>provided</u>, that this Section 7.09 shall not require any Selling Entity or any of its Subsidiaries to cause such prepayment, release and termination unless the Closing shall occur substantially concurrently therewith); and (B) to the extent the Closing of the transactions contemplated by this Agreement occurs after the consummation of the transactions

78

contemplated by the Housewares APA, arranging for the delivery to Buyer of executed pay-off letters (each, a "**Payoff Letter**") in customary form and substance from the applicable administrative agent or other similar agent under each of the DIP Credit Facilities (and, in the case of the Term DIP Credit Facility, executed and delivered by each Buyer DIP Lender), which Payoff Letters shall (x) indicate (1) the total amount required to be paid to fully satisfy all principal, interest, prepayment premiums, penalties or similar obligations under the applicable DIP Credit Facility as of the anticipated Closing Date (and the daily accrual thereafter) (such total amount with respect to each DIP Credit Facility, the "**Payoff Amount**") and (2) solely in the case of the Payoff Letter for the Term DIP Credit Facility, the Round-Tripping Amount (which shall constitute a portion of, and not an addition to, the Payoff Amount in respect of the Term DIP Credit Facility), (y) provide wire instructions to make the applicable Payoff Amount and state that upon receipt of the applicable Payoff Amount in accordance with such wire instructions, the applicable DIP Credit Facility and related instruments evidencing such DIP Credit Facility shall be automatically terminated (except for provisions in such DIP Credit Facility that, by their express terms, survive such termination) (*provided* that, solely with respect to the Term DIP Credit Facility, the applicable Payoff Letter shall also state that each Buyer DIP Lender agrees that pursuant to the transactions contemplated by this Agreement, the Round-Tripping Amount of the applicable Payoff Amount shall be deemed automatically and irrevocably satisfied on a cashless basis upon the occurrence of the Closing), and (z) state that all Encumbrances, guaranties, security interests, collateral and agreements to subordinate in connection therewith relating to the assets and properties of the Selling Entities and any of their respective Subsidiaries securing such obligations thereunder shall be, upon the payment of such Payoff Amount, automatically released and terminated (underlined; provided, that this Section 7.09 shall not require any Selling Entity or any of its Subsidiaries to cause such repayment, release and termination unless the Closing shall occur substantially concurrently therewith); provided, however, that nothing herein shall require Seller to (1) take any action that would be effective prior to the Closing to the extent it would, in Seller's reasonable judgment, interfere unreasonably with the business or operations of Seller, (2) furnish any information not customarily required for completion of debt financings similar to the Debt Financing, (3) prepare any financial information in compliance with Regulation S-X or (4) cause its officers, employees or advisors to take any action in person if Seller reasonably determines that it would compromise the health or safety of any employee of Seller or any Subsidiary in light of COVID-19.

(b)     Neither Seller nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or make any other payment or incur any other liability or provide or agree to provide any indemnity in connection with the Financings or any of the foregoing that would be effective prior to the Closing.  None of Seller, the Subsidiaries of Seller or their respective Affiliates or Representatives shall be required to execute or enter into or perform any agreement with respect to the financings contemplated by the Financing Letters that is not contingent upon the Closing or that would be effective prior to the Closing.  Notwithstanding anything to the contrary contained herein, nothing in this Section 7.09 shall require any cooperation or assistance to the extent it would: (i) require Seller to amend any terms of this Agreement; (ii) require Seller or any of its Affiliates to take any action that would (A) subject any director, manager, officer or employee of Seller or any of its Affiliates or other respective Representatives to any actual or potential personal liability, (B) conflict with, violate or result in a breach of or a default under any organizational documents of Seller or any of its Affiliates, any Contract or Applicable Law, (C) require providing access to or disclose information that Seller reasonably determines could

jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Seller or any of its Affiliates; *provided* that, Seller or any of its Affiliates shall use their commercially reasonable efforts to disclose such information to Buyer without disclosing such privileged or confidential information (for example, by redacting such information as reasonably necessary (in the good faith determination of Seller) to avoid such disclosure or providing a summary of such information which would not result in a waiver of privilege) or (D) require any such entity to change any fiscal period; or (iii) require any director or manager of Seller or any Subsidiary to pass resolutions or consents to approve or authorize the execution of the Debt Financing. Buyer shall indemnify and hold harmless Seller, its Affiliates and their respective Representatives from and against any and all losses, costs, damages, claims, fines, fees, penalties, liabilities, deficiencies, demands, judgments, actions, obligations, settlement payments or expenses (including reasonable and documented out-of-pocket fees and expenses of outside attorneys) suffered or incurred by any of them of any type in connection with the arrangement of any Financing and any information used in connection therewith (collectively, the "**Financing Cooperation Indemnity**"). Whether or not the Closing occurs, Buyer shall, promptly upon request by Seller, reimburse Seller for all out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) incurred by Seller or any of its Affiliates or Representatives in connection with this Section 7.09 (collectively, the "**Financing Cooperation Expenses**") and the foregoing obligations shall survive termination of this Agreement; provided that the Financing Cooperation Expenses shall not include general legal or other expenses Seller or any of its Affiliates or Representatives would have incurred regardless of whether cooperation was requested pursuant to this Section 7.09. All information provided by Seller or any of its Affiliates or any of their respective Representatives pursuant to this Section 7.09 shall be kept confidential in accordance with the Confidentiality Agreement, except that Buyer shall be permitted to disclose such information to the Debt Financing Sources, rating agencies and prospective lenders during primary syndication of the Debt Financing subject to such Persons entering into customary confidentiality undertakings reasonably satisfactory to Seller with respect to such information. Notwithstanding anything to the contrary, the condition set forth in Section 9.02(a), as it applies to Seller's obligations under this Section 7.09, shall be deemed satisfied unless (A) Seller has materially breached its obligations under this Section 7.09, (B) Buyer has notified Seller of such material breach in writing with a reasonably sufficient amount of time prior to the Closing to afford Seller with a reasonable opportunity to cure such material breach and (C) such material breach was a proximate cause of Buyer's failure to receive any portion of the proceeds of the Debt Financing.

(c)     Buyer and Seller agree that, if in connection with Buyer's (i) amendment, supplement, replacement, or modification of any Debt Commitment Letter not prohibited by Section 7.08 or (ii) execution of an Alternative Financing Commitment Letter or Alternative Financing, the scope of the assistance required under this Section 7.09 as compared to the assistance that would be required or reasonably expected to be required in connection with the Debt Commitment Letter in effect on the date of this Agreement and the related Debt Financing is changed or expanded, Seller shall be deemed to have complied with this Section 7.09 for purposes of Section 9.02(a) if Seller has provided Buyer with the assistance that would otherwise be required under this Section 7.09 with respect to the Debt Commitment Letter in effect on the date of this Agreement and the related Debt Financing (but applied to the financing contemplated by such amended, supplemented, replaced, or modified Debt Commitment Letter or such Alternative Financing, as applicable), in each case without giving effect to any such amendment, supplement,

replacement, or modification or Alternative Financing Commitment Letter or Alternative Financing, as applicable, to the extent that it provides for such additional or different requirements.

(d)     Seller and its Subsidiaries hereby consent to the use of their respective logos in marketing materials for the Debt Financing; *provided, however*, that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage Seller or any of its Subsidiaries or the reputation or goodwill of Seller or any of its Subsidiaries.

Section 7.10     *Additional Selling Entities.*

If, at any time after the date of this Agreement either Party discovers that any of the rights, interests, properties, or other assets constituting the Assets is owned by a Subsidiary of Seller who is not a Selling Entity, Seller shall promptly cause such Subsidiary to become a Selling Entity hereunder as if an original party hereto, to deliver a joinder in form and substance reasonably acceptable to Buyer and, subject to Section 2.06, to promptly transfer (or cause to be transferred) such Assets to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA.  Prior to any such transfer, the applicable Subsidiary of Seller possessing any such Asset will hold it in trust for the benefit of Buyer.

Section 7.11     *Public Announcements; Filings.*

No Party nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby, without the prior written approval of the other Parties, not to be unreasonably withheld, delayed or conditioned.  Notwithstanding the immediately preceding sentence, in the event any Party reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court, the CCAA Court or otherwise under Applicable Law, such Party shall give the other Parties advance written notice of, and a meaningful opportunity (as reasonably practicable under the circumstances) to review and comment on, the proposed timing, manner, form and substance of any such filing, but prior written approval shall not be required.  The Party whose proposed filing is the subject of review shall reasonably consider carefully and in good faith all comments timely received from the other Parties.  Nothing herein shall prevent any Party or any Affiliate thereof which is a private equity or other investment fund from making customary disclosures on a confidential basis to its existing or prospective investors, managers, members, directors, officers, financing sources, direct and indirect partners and agents in connection with fundraising, marketing informational or reporting activities.  The Parties and any of their respective Affiliates or successors may also issue press releases or make web postings or other public announcements that include only such information that was previously included in any press release or announcement made in accordance with the first sentence of this Section 7.11.

Section 7.12     *Alternate Bidder.*

If an Auction is conducted, and the Selling Entities do not choose Buyer as the Successful Bidder, but instead choose Buyer as the Alternate Bidder in accordance with the Bidding Procedures, Buyer will serve as the Alternate Bidder.  If Buyer is chosen as the Alternate Bidder,

Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of the closing of the sale of the Assets to the Successful Bidder and the Outside Date. If the Superior Proposal with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

Section 7.13    *Sale Free and Clear*

The Selling Entities acknowledge and agree, and the Sale Order and CCAA Sale Order shall be drafted to provide, without limitation, that, except as expressly provided in this Agreement, (a) on the Closing Date and concurrently with the Closing, all then-existing Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) against or created by Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA, shall be fully released from and with respect to the Assets and (b) Buyer is not a successor to any Selling Entity or the bankruptcy estate by reason of any theory of law or equity, and Buyer shall not assume or in any way be responsible for any Liability of the Selling Entities or any of their Affiliates (other than, for the avoidance of doubt, indirectly by means of the acquisition of the Acquired Entities) or the bankruptcy estate. Notwithstanding the foregoing, on the Closing Date, the Assets shall be transferred to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) to the fullest extent permitted by Section 363 of the Bankruptcy Code and the CCAA.

Section 7.14    *Acquired Entity Intercompany Obligations*.

Following the date hereof through the Closing (or the earlier termination of this Agreement pursuant to Article 12), Seller and its Representatives shall reasonably cooperate with Buyer and its Representatives to identify any Acquired Entity Intercompany Obligations that are reasonably likely to result in material and adverse Tax consequences to Buyer or any Acquired Entity at or following the Closing in connection the assignment and assumption of such Acquired Entity Intercompany Obligation to Buyer and, upon the written request of Buyer, Seller shall use its commercially reasonable efforts to settle or terminate such Acquired Entity Intercompany Obligation prior to the Closing, in each case, unless otherwise mutually agreed to by Seller and Buyer, solely to the extent such settlement or termination would not be reasonably expected to have any material and adverse Tax consequences to any Acquired Entity for any Pre-Closing Tax Period or any Seller Entity (including any Tax costs that would be incurred by any Seller Entity or Acquired Entity in connection with such settlement or termination) as reasonably determined in good faith by Seller; *provided, however*, in no event shall Seller's failure to cause such Acquired Entity Intercompany Obligation to be settled or terminated result in the breach of this Section 7.14 or in the failure of the condition set forth in Section 9.02 to be satisfied and, in such event, Buyer will assume such Acquired Entity Intercompany Obligation effective upon the Closing.

Section 7.15   *Resignations.*

Prior to the Closing, Seller shall use commercially reasonable efforts to obtain the resignation, effective as of the Closing, of each director, officer and manager of the Acquired Entities reasonably requested by Buyer at least five Business Days prior to the Closing.

ARTICLE 8
ADDITIONAL AGREEMENTS

Section 8.01   *Taxes.*

(a)   *Transfer Taxes.*  Buyer shall be responsible for all documentary, stamp, transaction, transfer (including real property transfer), registration, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes, including Canadian Sales Taxes, and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes.  Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes, including using commercially reasonable efforts to avail themselves of any available Tax elections to reduce or eliminate any such Transfer Taxes.  To the extent Seller or any of its Subsidiaries is required by Applicable Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Buyer will remit an amount equal to such Transfer Taxes to Seller not less than five Business Days prior to the due date for such payment.

(b)   The Canadian Buyer and each Canadian Seller shall, to the extent applicable, jointly make election(s) under subsection 167(1) of the ETA (and any Canadian provincial equivalent) in respect of the sale of the Canadian Assets, in the prescribed form, such that no GST/HST (or any Canadian provincial equivalent) is payable in respect of such sale.  The Canadian Buyer shall timely file such election forms with the appropriate Governmental Authority in the prescribed manner.  Notwithstanding such joint elections, in the event it is determined that any Canadian Seller is liable to collect and remit GST/HST (or any Canadian provincial equivalent) in respect of the sale of the Canadian Assets, the Canadian Buyer shall pay the GST/HST (or any Canadian provincial equivalent), plus all applicable interest and penalties, to such Canadian Seller for remittance to the appropriate Governmental Authority, and the Canadian Buyer shall indemnify such Canadian Seller and its directors, employees and shareholders harmless with respect to any such GST/HST (or any Canadian provincial equivalent), interest, penalties or other damages, losses and expenses arising therefrom.

(c)   At the request of the Canadian Buyer, the Canadian Buyer and the Canadian Sellers shall, to the extent applicable, jointly make an election pursuant to section 22 of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of the Canadian Sellers transferring their Accounts Receivable (excluding, for certainty, any Excluded Assets) to the Canadian Buyer as part of the Canadian Assets.  The Canadian Buyer and

83

the Canadian Sellers agree to jointly make the necessary election(s) and to execute and file within the prescribed time the prescribed election form(s) required to give effect to the foregoing.

(d)     At the request of the Canadian Buyer, the Canadian Buyer and the Canadian Sellers shall, to the extent applicable, jointly make an election under Section 20(24) of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of amounts for future obligations and shall timely file such election(s) with the appropriate Governmental Authority. To the extent applicable for Canadian Tax purposes, Canadian Sellers and the Canadian Buyer acknowledge that a portion of the Canadian Assets was transferred to the Canadian Buyer as payment by such applicable Canadian Seller to the Canadian Buyer for the assumption by the Canadian Buyer of any such future obligations of such applicable Canadian Seller.

(e)     *Straddle Periods*.  In the case of any Straddle Period, (i) all Property Taxes for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis and (ii) all other Taxes shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period as if the Pre-Closing Tax Period ended at the close of business on the Closing Date.

(f)     *Cooperation and Audits*.  Buyer and its Affiliates, and Seller and its Affiliates will cooperate on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement and the filing of Tax Returns until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

(g)     *Section 338 Election or Check-the-Box Election*. Buyer and Seller shall cooperate in good faith to determine whether to make an election under Section 338(g) or Section 338(e) of the Code (or any similar provision of any state or local Law) with respect to any Acquired Entity or to make a check-the-box election in respect of any Acquired Entity on or prior to the Closing Date, in each case, taking into account the benefit and detriment of making such election to each Party.

(h)     *Section 245A Election*.  If Buyer requests (in its sole discretion), the Selling Entities shall make (or shall cause their relevant Affiliates to make) an election pursuant to Treasury Regulations Section 1.245A-5(e)(3)(i) (and any corresponding elections under applicable state or local law) with respect to any Acquired Entity for which such an election is available.

Section 8.02     *Allocation of Purchase Price.*

(a)     The Parties agree and intend to treat, for applicable Tax purposes, the Round-Tripping Amount as additional consideration for the Assets paid by Buyer to Seller pursuant to this Agreement, and then deemed utilized to repay outstanding obligations of the Debtor Selling Entities or any of their Affiliates owed to the Buyer DIP Lenders (the "**Intended Tax Treatment**"), unless required by a "determination" as defined under section 1313(a) of the Code.

(b)     The Purchase Price (including the amount of any Assumed Liabilities) and the Round-Tripping Amount (plus any other amounts properly taken into account under the Code or

the Tax Act) shall be allocated among the Assets in accordance with Applicable Law (including Section 1060 of the Code and the Treasury regulations promulgated thereunder) and the principles set forth on Schedule 8.02(b)(i) (the "**Allocation**"); *provided, that* the Parties hereby acknowledge and agree that the Estimated Purchase Price shall be initially allocated in accordance with a preliminary allocation among certain of the Assets prepared to the extent necessary to calculate Transfer Taxes and delivered by Buyer to Seller at least two days prior to the Closing Date, which preliminary allocation shall be used for purposes of calculating any Transfer Taxes due and payable prior to the determination of the final Allocation (the "**Initial Allocation**"). The Allocation (which shall be prepared consistent with the Initial Allocation, except as otherwise required by Applicable Law) shall be delivered by Buyer to Seller within 60 days following the final determination of the NWC Adjustment Amount, the Cure Costs Adjustment and the Closing Acquired Entity Net Figure in accordance with Section 3.04 and Section 3.05, for Seller's review and comment. If, within 30 days after the delivery of the Allocation, Seller notifies Buyer in writing that Seller objects to any allocation set forth thereon, Buyer and Seller shall negotiate in good faith to resolve such objection. In the event that Buyer and Seller are unable to resolve such dispute within 30 days following Seller's notification of such objection, Buyer and Seller shall jointly retain a referee chosen and mutually acceptable to both Buyer and Seller to resolve the disputed items. Upon resolution of the disputed items, the Allocation shall be adjusted to reflect such resolution. The costs, fees and expenses of the referee shall be borne equally by Buyer and Seller.

(c)     (i) Seller and Buyer will report, act and file (and will cause their respective Affiliates to report, act and file) all applicable Tax Returns (including IRS Form 8594 and any Canadian Tax Returns) in all respects and for all purposes consistent with the Allocation and the Intended Tax Treatment and (ii) neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation or the Intended Tax Treatment, except, in each case, to the extent otherwise required by a "determination" as defined under section 1313(a) of the Code.

Section 8.03    *Assigned Contracts; Adequate Assurance and Performance.*

(a)     With respect to each Desired 365 Contract, Buyer will deliver with this Agreement, or as soon as reasonably practicable thereafter, information Buyer reasonably believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Desired 365 Contract as required under Section 365 of the Bankruptcy Code, which information the Selling Entities will be permitted to disseminate to any Third Party that is a party to any Desired 365 Contract upon Seller's determination that this Agreement constitutes a Qualified Bid (as defined in the Bidding Procedures Order). In the event Buyer cannot demonstrate adequate assurance of future performance with respect to a Desired 365 Contract, at Buyer's election, such Desired 365 Contract shall become an Excluded Contract.

(b)     From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)     Without limiting the provisions of Section 8.03(a), Buyer acknowledges that no Selling Entity will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits

or insurance in effect as of the date hereof to secure performance or payment under any Assigned Contracts, in each case as set forth on Schedule 8.03(c) (collectively, "**Seller Credit Obligations**") after the Closing or otherwise with respect to the Business.  On or before the Closing, Buyer will use its commercially reasonable efforts to obtain from the creditor or other counterparty (or, in the case of letters of credit, bonds or other similar Seller Credit Obligations, the issuing bank (or similar entity) thereof) a full release (in a form and substance reasonably satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or issuing bank (or similar entity), as applicable, or fulfillment of other obligations to a counterparty or issuing bank (or similar entity), as applicable, under the Seller Credit Obligations (including any lenders or other financing parties participating in such letters of credit, bonds or similar Seller Credit Obligations). If any Seller Credit Obligation remains outstanding as of the Closing Date, Buyer will indemnify Seller and its Subsidiaries and hold them harmless against any Liabilities that Seller or any such Subsidiary may incur under any such Seller Credit Obligations attributable to periods from and after the Closing.

(d)     Notwithstanding anything to the contrary contained herein, Buyer will not (i) enter into any transactions after the Closing in the name of Seller or any of its Affiliates or that would be covered by Seller Credit Obligations or (ii) amend, modify, extend or renegotiate any material term of any obligation that is covered by a Seller Credit Obligations in any manner that increases or extends the potential exposure of Seller, any Subsidiary of Seller, or any of its or their respective Affiliates under any Seller Credit Obligations.

Section 8.04     *Employee Matters.*

(a)     *Offers of Employment*.  Buyer shall (or shall cause its Affiliates or its or their designee to), within a reasonable period of time (but not fewer than five Business Days) prior to the Closing, make an offer of employment with the Business (on an "at will" basis, to the extent allowed by Applicable Law), subject to Buyer's standard onboarding processes as applied in the ordinary course of business, to all of the Company Employees who are employed by a Selling Entity, other than the employees set forth on Schedule 8.04(a) (such employees who are required to receive an offer hereunder, the "**Offer Employees**"), which such offers of employment made to any Offer Employees shall (i) provide for a primary work location that is no more than 40 miles from the applicable employee's primary work location immediately prior to the Closing, (ii) satisfy the requirements of this Section 8.04 (including by providing for compensation and benefits as set forth in Section 8.04(b)) and (iii) provide for employment with Buyer or its applicable Affiliate commencing effective as of the Closing, subject to the occurrence of the Closing (an offer of employment made in accordance with this Section 8.04(a), a "**Qualifying Offer**").  Subject to Applicable Law, any Offer Employee who has received an offer of employment pursuant to this Section 8.04(a) shall be deemed to have accepted such offer if they continue to perform services following the Closing, unless such Offer Employee expressly rejects such offer of employment. Any Offer Employee who does not become a Transferred Employee will be terminated by Selling Entities and their respective Affiliates. In the event an Offer Employee does not become a Transferred Employee as a result of such employee's rejection of a Qualifying Offer made by Buyer or its applicable Affiliate (or its or their designee), then the applicable Selling Entity shall be responsible for, and shall indemnify Buyer and its respective Affiliates (or it or their designee) against, any and all damages and Liabilities associated with the termination of employment of any such Offer Employee, as applicable, whether incurred prior to, on or after the Closing, including

any employment-related legal claims brought by, and any severance benefits provided to, such Offer Employee.

(b) *Maintenance of Terms and Conditions*.  For a period of 12 months following the Closing Date, Buyer shall provide, or shall cause its Affiliates (or its or their designee) to provide, each Transferred Employee with (a) a base salary or wage rate that is at least equal to the base salary or wage rate provided to such Transferred Employee immediately prior to the Closing, (b) target short-term cash incentive compensation opportunities (including annual bonus and commission opportunities) that are at least equal to the target short-term cash incentive compensation opportunities (including annual bonus and commission opportunities) provided to such Transferred Employee immediately prior to the Closing and (c) employee benefits (including severance benefits) that are no less favorable in the aggregate than the employee benefits (including severance benefits) provided to such Transferred Employee immediately prior to the Closing.

(c) *Service Credit*.  From and after the Closing, with respect to any "employee benefit plan" (as defined in Section 3(3) of ERISA) or other benefit plan or arrangement maintained by Buyer or its Affiliates (or its or their designee) in which any Transferred Employee is eligible to participate, each Transferred Employee's service with any of the Selling Entities (as well as service with any predecessor employer) prior to the Closing shall be treated as service with Buyer and its Affiliates (or its or their designee) from and after the Closing for all purposes, including for purposes of determining eligibility to participate, level of benefits, vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan); *provided* that the foregoing shall not apply to the extent that it would result in any duplication of benefits for the same period of service.

(d) *Pre-Existing Conditions and Co-Payments*.  Buyer shall use commercially reasonable efforts to waive, or shall cause its Affiliates (or its or their designee) to use commercially reasonable efforts to waive, any preexisting conditions, limitations, exclusions, actively at work requirements and waiting periods under any health or welfare benefit plan maintained by Buyer or any of its Affiliates (or its or their designee) in which Transferred Employees (and his or her eligible dependents) will be eligible to participate from and after the Closing, except to the extent that such items would not have been satisfied or waived under the comparable Seller Benefit Plan immediately prior to the Closing.  Buyer shall use commercially reasonable efforts to recognize, or shall cause its Affiliates (or its or their designee) to use commercially reasonable efforts to recognize, all co-payments, deductibles and similar expenses and out-of-pocket maximums incurred by each Transferred Employee (and his or her eligible dependents) prior to the Closing during the plan year in which the Closing occurs for purposes of satisfying any comparable deductible and co-payment limitations and out-of-pocket requirements under the relevant welfare benefit plans in which such Transferred Employee (and his or her eligible dependents) will be eligible to participate from and after the Closing during the plan year in which Closing occurs.

(e) *WARN*.  Buyer shall assume all Liabilities and obligations for the provision of notice or payment in lieu of notice and any applicable penalties under the Worker Adjustment and Retraining Notification Act, as amended, and any similar foreign, state or local law ("**WARN**") arising as a result of or in connection with the transactions contemplated by the Transaction

Documents. Buyer hereby indemnifies the Selling Entities and their respective Affiliates against and agrees to hold each of them harmless from any and all damages incurred or suffered by Seller or any of its Affiliates with respect to WARN arising as a result of any post-Closing employment actions taken by Buyer in connection with the transactions contemplated by the Transaction Documents or in connection with Buyer's failure to make an offer of employment to any Company Employees consistent with Buyer's obligations under this Section 8.04; *provided, however,* that no such indemnification shall be required in the event that WARN is triggered as a result of Seller's or its Affiliates' breach of any of their obligations set forth in Section 7.02 or Seller's failure to disclose any "employment losses" (within the meaning of WARN) that could result in WARN liability (when aggregated together with any post-Closing "employee losses" undertaken by Buyer).

(f)  *Actions Regarding Assumed Benefit Plans.* Effective as of the Closing, Buyer shall assume sponsorship and administration of and have all responsibility and liability for all Assumed Benefit Plans, including for all benefits payable thereunder. Seller and Buyer shall take all actions necessary to effectuate a transfer of such Assumed Benefit Plan sponsorship and administration from the applicable Selling Entity to Buyer, including the adoption of appropriate board resolutions, adoption of plan amendments, notifying Assumed Benefit Plan participants, providing all required summary plan descriptions and summaries of material modification, filing any required IRS Forms 5310-A and notices to the Pension Benefit Guaranty Corporation of the United States, reporting such transfers on Forms 5500 due with respect to such Assumed Benefit Plans, assignment of third-party service agreements, subject to the consent of the applicable respective third-party providers, providing contact information to Buyer for third-party providers, and providing copies of all files in Seller's possession (including electronic files) related to such Assumed Benefit Plans.

(g)  *Cooperation; Employee Communications.*

(i)  Each of Buyer and Seller recognize it to be in the best interests of the Parties and their respective employees that the transactions in this Section 8.04 be effected in an orderly manner and agree to devote their respective reasonable best efforts and to cooperate fully in complying with the provisions of this Section 8.04. Without limiting the generality of the foregoing, each Party agrees to execute, deliver and file all documents and to take all such actions as are deemed necessary or desirable in order to carry out and perform the purpose of this Section 8.04 and to facilitate the transactions referred to in this Section 8.04.

(ii)  Seller and Buyer shall promptly cooperate in good faith (1) in communications with Company Employees with respect to employee benefit plans maintained by the Selling Entities or Buyer or their respective Affiliates and with respect to other matters arising in connection with the transactions contemplated by the Transaction Documents and (2) if applicable, to satisfy, or cause to be satisfied, any information and consultation requirements (including promptly responding to information requests from labor unions) to the extent that they apply to the transactions contemplated by the Transaction Documents.

(h)    *Shared Services Employees.* Prior to the Closing Date, Buyer and Seller shall mutually cooperate in good faith to identify no later than fourteen Business Days prior to the anticipated Closing Date the Shared Services Employees that are allocable to the Business and who will thereby constitute Company Employees for purposes of this Agreement (including, for the avoidance of doubt, for purposes of determining who Buyer will make an offer of employment to under Section 8.04(a)) and the Shared Services Employees that are allocable to the Excluded Business and who will thereby constitute "Company Employees" for purposes of the Housewares APA (including, for the avoidance of doubt, for purposes of determining who Appliances Buyer will make an offer of employment to under Section 8.04(a) of the Housewares APA). In connection with the foregoing, Buyer and Seller intend and agree that all Shared Services Employees shall be made an offer of employment by Buyer or its applicable Affiliate (or its or their designee) either (i) to be employed by Buyer or one of its Affiliates (or its or their designee) in the Business pursuant to the terms of Section 8.04(a) or (ii) to be employed by Buyer or one of its Affiliates (or its or their designee) in the Excluded Business pursuant to Section 8.04(a) of the Housewares APA, in each case subject to such Shared Services Employee's continued employment through the date such offer is made.

(i)    *No Third-Party Beneficiaries.* Nothing in this Section 8.04, express or implied, (1) is intended to or shall confer upon any Person other than the parties hereto, including any Company Employee (or Company Employee representative), any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, (2) shall establish, or constitute an amendment, termination or modification of, or an undertaking to amend, establish, terminate or modify, any benefit plan, program, agreement or arrangement or (3) shall create any obligation on the part of any Selling Entity, Buyer or any of their respective Affiliates to employ any Company Employee for any period following the Closing.

Section 8.05    *Post-Closing Books and Records.*

Until the earlier of the closure of the Bankruptcy Cases and seven years after the Closing Date, (a) Buyer will use commercially reasonable efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer will allow such Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any Records included in the Assets solely for purposes relating to the Bankruptcy Cases, the performance of obligations under the other Transaction Documents, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, officers, employees, counsel, accountants and auditors will have the right to make copies of any such Records for such purposes. Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records. Notwithstanding the foregoing, (i) any such access rights will be exercised in such manner as not to interfere unreasonably with the conduct of the Business, and (ii) Buyer and its Affiliates may withhold any document (or portions thereof) or information to the extent that (A) it may not be disclosed pursuant to the terms of a non-disclosure agreement with a Third Party or (B) the disclosure that would result in Buyer or any of its Affiliates waiving its attorney-client privilege with respect to such information; provided, that, in the event information is not provided pursuant to this clause (B), Buyer will use commercially reasonable efforts to

89

provide a summary of such information that does not violate the applicable legal privilege. Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will keep confidential and not disclose or use the Records that would have been included in the Records but for the failure to obtain a material Third Party consent or any Records to which it has access under this Section 8.05, except for the use thereof as expressly permissible hereunder.

Section 8.06   *Intellectual Property Matters.*

(a)      On or prior to the date that is 30 days after the Closing Date, Seller shall (and shall cause each Selling Entity to) use its commercially reasonable efforts to change their respective legal and corporate names to such other names that do not include any of the Trademarks included in the Purchased Intellectual Property (or any portion thereof) and seek an Order of the Bankruptcy Court and the CCAA Court (as applicable) to make corresponding changes to the case caption for the Bankruptcy Cases and style of case for the CCAA Recognition Proceedings, pursuant to the terms of the Sale Order and the CCAA Sale Order (as applicable) or such further Order of the Bankruptcy Court and the CCAA Court (as applicable).

(b)      Effective as of the Closing, Seller hereby grants, and shall cause the Selling Entities and its and their respective Affiliates to grant, to Buyer and its Affiliates an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to continue to use any and all Trademarks that are included in the Excluded Intellectual Property and used in the Business as of the Closing Date as such Trademarks are used as of the Closing Date (and natural evolutions and expansions thereof) for a transitional period of six months following the Closing. As soon as reasonably practicable after the Closing, but in any event within six months after the Closing Date, Buyer shall dispose of, destroy, remove, strike over or delete all of the Trademarks included in the Excluded Intellectual Property. All goodwill associated with the usage of the Trademarks included in the Excluded Intellectual Property shall inure to the benefit of the applicable Selling Entity.

(c)      Effective as of the Closing, Buyer hereby grants, and shall cause its Affiliates to grant, to the Selling Entities and their respective Affiliates an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to continue to use any and all Trademarks that are included in the Purchased Intellectual Property and used in the Excluded Business as of the Closing Date as such Trademarks are used as of the Closing Date (and natural evolutions and expansions thereof) for a transitional period of six months following the Closing. As soon as reasonably practicable after the Closing, but in any event within six months after the Closing Date, the Selling Entities shall dispose of, destroy, remove, strike over or delete all of the Trademarks included in the Purchased Intellectual Property. All goodwill associated with the usage of the Trademarks included in the Purchased Intellectual Property shall inure to the benefit of the Buyer.

(d)      Effective as of the Closing, Seller hereby grants, and shall cause the Selling Entities and its and their respective Affiliates to grant, to Buyer and its Affiliates an irrevocable, perpetual worldwide, non-exclusive, fully paid-up, royalty-free, non-sublicensable (except, through multiple tiers, to Buyer's and its Affiliates' customers, end users, vendors, suppliers, distributors, contractors, and service providers) right and license to continue to use the Excluded Intellectual Property (other than Trademarks) that is used in the Business as of the Closing Date as such

90

Intellectual Property is used in the Business as of the Closing Date (and natural evolutions and expansions thereof).

(e)     Effective as of the Closing, Buyer hereby grants, and shall cause its Affiliates to grant, to Seller, the Selling Entities and its and their respective Affiliates, an irrevocable, perpetual worldwide, non-exclusive, fully paid-up, royalty-free, non-sublicensable (except, through multiple tiers, to Seller's, the Selling Entities' and its and their Affiliates' customers, end users, vendors, suppliers, distributors, contractors, and service providers) right and license to continue to use the Purchased Intellectual Property (other than Trademarks) that is used in the Excluded Business as of the Closing Date as such Intellectual Property is used in the Excluded Business as of the Closing Date (and natural evolutions and expansions thereof).

(f)     Notwithstanding Section 13.05, the licenses set forth in this Section 8.06 are non-transferable; *provided* that such licenses may be assigned in whole or in part to an Affiliate or to any Person in connection with the sale of all or any portion of the Business or the Excluded Business, as applicable (including any line of business, product or service), whether by merger, consolidation, acquisition, restructuring, stock or asset sale or similar transaction or series of related transactions.

(g)     The licenses granted in Section 8.06(d) and 8.06(e) are, and will otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, a license of rights to "intellectual property" (as defined under Section 101 of the Bankruptcy Code), and Seller and Buyer will retain and may fully exercise all of its rights and elections under the Bankruptcy Code (or any similar foreign law) with respect thereto.

(h)     For the avoidance of doubt, Sections 8.06(d), (e), (f), (g) and (h) shall survive in perpetuity.

Section 8.07     *Cooperation Relating to Litigation and Other Proceedings.*

(a)     From and after the Closing, Seller and its Subsidiaries, on the one hand, and Buyer, on the other hand, shall cooperate in all reasonable respects in connection with the defense or prosecution of any Proceeding by or against any Person or compliance with any audit, investigation or other regulatory review by any Governmental Authority, in each case, relating to or arising out of the conduct of the Business or the Excluded Business prior to or after the Closing Date (other than any Proceeding between Buyer or its Affiliates or assignees, on the one hand, and any Selling Entity or any of its Affiliates or related entities or assignees, on the other hand, arising out of the transactions contemplated hereby). The Party requesting such cooperation will pay the out-of-pocket expenses (including reasonable legal fees and disbursements) of the other Party providing such cooperation and of its Affiliates and their respective officers, directors, employees and agents reasonably incurred in connection with providing such cooperation, but such Party will not be responsible to reimburse the Party providing such cooperation for such Party's time spent in such cooperation or the salaries or costs of fringe benefits or other similar expenses paid by the Party providing such cooperation to its Affiliates or their respective officers, directors, employees and agents while assisting in the defense or prosecution of any such Proceeding.

(b)     From and after the Closing Date, Buyer agrees not to (i) bring any avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, the CCAA or the BIA or (ii) sell, transfer, pledge, encumber, hypothecate, assign or otherwise dispose of any such causes of action.

Section 8.08     *Insurance Access.*

Following the Closing Date, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets prior to the Closing Date, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' non-transferable third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to the Closing (each such policy, an "**Available Insurance Policy**"); *provided*, that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)     Buyer shall report any potentially insured pre-Closing Date claim to Seller, as promptly as practicable and in any event in sufficient time so that such claim may be made in accordance with Seller's claim reporting procedures in effect immediately prior to the Closing;

(b)     Premiums and premium increases, fees and expenses incurred by Seller or any of its Subsidiaries to the extent resulting from any access to, or any claims made by Buyer or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives, will, in each case, be promptly reimbursed to Seller by Buyer;

(c)     Any recovery under any Available Insurance Policy shall be net of all uninsured, uncovered, unavailable or uncollectible amounts of all such claims made by Buyer or any of its Affiliates under the policies as provided for under the Available Insurance Policies (including any deductible, retention or other similar amounts);

(d)     Claims made by Buyer pursuant to this Section 8.08 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Available Insurance Policies. With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a payment by Seller or any of its Subsidiaries, Buyer shall reimburse Seller or such Subsidiary for such payment. It is understood that Buyer will not have access to or coverage under any non-transferable insurance policy retained by Seller or any of its Subsidiaries that is not "occurrence based"; and

(e)     Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.08 after such entity's Bankruptcy Case has been closed.

Section 8.09    *Disclaimers.*

(a)    *General Disclaimer*.  To the extent required by Applicable Laws to be operative, the disclaimers of certain warranties contained in this Section 8.09 are "conspicuous disclaimers" for purposes of any Applicable Laws.

(b)    **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) OR IN ANY OTHER TRANSACTION DOCUMENT, (I) NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED OR OTHERWISE, WITH RESPECT TO, OR IN RELATION TO, ANY OF THE ASSETS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND BUYER EXPRESSLY WAIVES AND ACKNOWLEDGES THAT NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY SUCH WARRANTY OR REPRESENTATION, AND BUYER IS NOT RELYING ON ANY SUCH WARRANTY OR REPRESENTATION, (II) SELLER, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY, IN WRITING OR OTHERWISE) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY STATEMENT, OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF EACH SELLER OR ANY OF ITS RESPECTIVE AFFILIATES) AND (III) ALL PROPERTIES INCLUDED IN THE ASSETS WILL BE CONVEYED BY SELLER OR ITS APPLICABLE SUBSIDIARIES AND ACCEPTED BY BUYER ON AN AS IS, WHERE IS BASIS WITH ALL DEFECTS AND FAULTS WITHOUT RECOURSE AND WITHOUT WARRANTY (INCLUDING ANY WARRANTY OF TITLE).**

(c)    **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN) OR IN ANY OTHER TRANSACTION DOCUMENT, BUYER ACKNOWLEDGES AND AGREES THAT SELLER AND SELLER'S SUBSIDIARIES ARE CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (III) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (IV) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (V) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE ASSETS (SURFACE AND SUBSURFACE), (VI) COMPLIANCE WITH APPLICABLE LAWS, (VII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (VIII) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IX)**

**CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER OR ANY SUBSIDIARY OF SELLER ASSOCIATED WITH SAME EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT OR IN ANY OTHER TRANSACTION DOCUMENT. NOTWITHSTANDING THE FOREGOING OR ANY PROVISION TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NOTHING IN THIS SECTION 8.09 SHALL LIMIT ANY RIGHT OR REMEDY OF BUYER WITH RESPECT TO ACTUAL FRAUD.**

Section 8.10    *Collection of Accounts Receivable.*

(a)    As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable or accounts receivable, in each case, included in the Assets and relating to work performed or products sold by the Business prior to, on or after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for Buyer's own account.

(b)    As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to Accounts Receivable or accounts receivable, in each case, included in the Assets and relating to work performed or products sold by Buyer or the Business prior to, on or after the Closing, as the case may be, shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable included in the Assets and relating to work performed or products sold by the Business prior to, on or following the Closing Date.

Section 8.11     *Data Transfer.*

As required under Data Protection Laws (including, for the avoidance of doubt, Section 7.2 of the Canadian Personal Information Protection and Electronic Documents Act), the Parties confirm that the Personal Information disclosed in connection with the transactions contemplated by this Agreement ("**Disclosed Personal Information**") is necessary for the purposes of determining whether to proceed with the transactions contemplated by this Agreement and, if the determination is made to proceed with the transactions, to complete them. At all times, each Buyer Entity shall protect all Disclosed Personal Information using security safeguards appropriate to the sensitivity of the information. Prior to Closing, each Buyer Entity shall not use or disclose the Disclosed Personal Information for any purposes other than those related to determining if it shall proceed with the transactions contemplated by this Agreement, the performance of this Agreement, or the consummation of the transactions contemplated by this Agreement. Following the consummation of the transactions contemplated by this Agreement, the Parties agree that each Buyer Entity (a) shall not use or disclose the Disclosed Personal Information for any purposes other than those for which the information was initially collected, unless additional consent is obtained, or as otherwise permitted or required by Applicable Laws, (b) shall protect the confidentiality of all Disclosed Personal Information with security safeguards appropriate to the sensitivity of such information, and (c) shall give effect to any withdrawal of consent with respect to the Disclosed Personal Information. If the transactions contemplated by this Agreement do not proceed, each Buyer Entity shall return to the Selling Entities or, at the Selling Entities' written request, securely destroy the Disclosed Personal Information within a reasonable period of time.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

Section 9.01     *Accuracy of Representations.*     (a) (i) The representations and warranties of the Selling Entities contained in Sections 5.01 (solely the first two sentences thereof), 5.02, 5.03(i)(A), 5.26(a) (solely the first two sentences thereof) and 5.26(b) (solely the last sentence thereof) will be true and correct in all respects, except for *de minimis* inaccuracies, as of the Closing, as if made at and as of the Closing, (ii) the representations and warranties of the Selling Entities contained in Sections 5.13(a), 5.26(a) (except the first and second sentences of Section 5.26(a)) and 5.26(b) (except the last sentence of Section 5.26(b)) will be true and correct in all material respects as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, (iii) the representations and warranties of the Selling Entities contained in Section 5.06(b) will be true and correct in all respects as of the Closing, as if made at and as of the Closing and (iv) the other representations and warranties of Seller contained in this Agreement (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth

therein) will be true and correct as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, except in the case of clause (iv) for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) Buyer will have received a certificate on behalf of each Selling Entity to such effect signed by a duly authorized officer of Seller.

Section 9.02  *Selling Entities' Performance*.  (a) Each Selling Entity will have performed or caused to be performed in all material respects each of the covenants that such Selling Entity is required to perform pursuant to this Agreement at or prior to the Closing (or will have cured any such breach to the extent necessary to satisfy this condition), and (b) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 9.03  *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred and Buyer will have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

Section 9.04  *Seller's Deliveries*.  Each of the deliveries required to be made to Buyer pursuant to Section 4.04 will have been delivered (or the applicable Selling Entity will make such deliveries at the Closing).

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate the Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to the Closing, of each of the following conditions:

Section 10.01  *No Order*.  There will not be in effect any Order (whether temporary, preliminary or permanent) or Applicable Law restraining, enjoining or otherwise prohibiting, preventing or making illegal the consummation of the Closing.

Section 10.02  *Sale Order*.  The Bankruptcy Court will have entered the Sale Order, and such order will be a Final Order in full force and effect and will not have been stayed or vacated.  The CCAA Court shall have entered the CCAA Sale Order, in form and substance acceptable to the Buyers, and such order will be a Final Order in full force and effect and will not have been stayed or vacated.

Section 10.03  *HSR Act*.  The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act will have expired or been terminated.

Section 10.04  *Competition Act Clearance*.  Competition Act Clearance shall have been obtained.

Section 10.05 *Information Officer's Certificate.*

(a)     When the conditions to Closing set out in Article 9, Article 10 (other than this Section 10.05) and Article 11 have been satisfied or waived by the Selling Entities and Buyer, as applicable, the Selling Entities and Buyer will each deliver to the Information Officer the applicable Conditions Certificate.  Upon receipt of each of the Conditions Certificates, the Information Officer shall (i) issue forthwith its Information Officer's Certificate concurrently to the Selling Entities and Buyer, at which time the Closing will be deemed to have occurred; and (ii) file as soon as practicable a copy of the Information Officer's Certificate with the CCAA Court (and shall provide a true copy of such filed certificate to the Selling Entities and Buyer).

(b)     The parties hereto acknowledge and agree that the Information Officer shall be entitled to file the Information Officer's Certificate with the CCAA Court without independent investigation upon receiving the Conditions Certificates, and the Information Officer will be relying exclusively on the basis of the Conditions Certificates and without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions and shall have no liability to the Selling Entities or Buyer or any other Person as a result of filing the Information Officer's Certificate upon receiving such Conditions Certificates.

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Closing, of each of the following conditions:

Section 11.01 *Accuracy of Representations.*  (a) The representations and warranties of Buyer contained in Article 6 of this Agreement will be true and correct in all material respects as of the Closing, as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties will be true and correct as of such earlier date, except for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a material and adverse effect on Buyer's ability to consummate the contemplated transactions and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.02 *Buyer's Performance.*  (a) Buyer will have performed or caused to be performed in all material respects each of the covenants that Buyer is required to perform pursuant to this Agreement prior to or at the Closing (or will have cured any such breach to the extent necessary to satisfy such condition) and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.03 *Buyer's Deliveries.*  Each of the deliveries required to be made to Seller pursuant to Section 4.03 will have been delivered (or Buyer will make such deliveries at the Closing).

ARTICLE 12
TERMINATION

Section 12.01  *Termination Events.*

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)       by mutual written agreement of Seller and Buyer;

(b)       by written notice of either Seller or Buyer to such other Party if:

(i)       the Closing has not occurred by the close of business on November 13, 2023 (the "**Outside Date**"); *provided*, that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(i) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein which has prevented the consummation of the Closing;

(ii)       there is in effect a Final Order by any court of competent jurisdiction in the United States or Canada enjoining, restraining or otherwise prohibiting the Closing; *provided* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(ii) if such party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach has been the cause of, or resulted in, the occurrence of such Final Order;

(iii)       any of the Selling Entities enter into a definitive agreement providing for a Superior Proposal and the closing of the sale of the relevant Assets to the applicable acquirer pursuant to such Superior Proposal has occurred;

(iv)       if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect;

(v)       if, with, or without Seller's consent, (i) the Bankruptcy Cases are converted into cases under Chapter 7 of the Bankruptcy Code or dismissed, (ii) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Cases, or (iii) any trustee, interim receiver, receiver or monitor or similar official is appointed in the CCAA Recognition Proceedings or in any Canadian bankruptcy, proposal or CCAA proceedings in respect of any Seller.

(c)       so long as Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, by Buyer by written notice to Seller if (i) any Selling Entity materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such material breach would result in a failure of a condition set forth in Article 9 or Article 10 and (iii) such material breach has not been waived or cured by the earlier of (1) 10 Business Days after the giving of written notice by Buyer to Seller of such material breach and (2) the Outside Date;

(d)      so long as no Selling Entity is in material breach of any of its representations, warranties, covenants or agreements contained herein, by Seller by written notice to Buyer if (i) Buyer materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such material breach would result in a failure of a condition set forth in Article 10 or Article 11 and such material breach has not been waived or cured by the earlier of (1) 10 Business Days after the giving of written notice by Seller to Buyer of such material breach and (2) the Outside Date;

(e)      by Seller by written notice to Buyer if (i) all of the conditions set forth in Article 9 and Article 10 have been satisfied or validly waived by Buyer (other than those conditions which by their terms or nature are to be satisfied at the Closing), (ii) Seller has provided notice on behalf of all the Selling Entities to Buyer that the Selling Entities are prepared to consummate the Closing and (iii) Buyer fails to consummate the transactions contemplated hereby, including payment of the Estimated Purchase Price, as and when required by Section 4.01; or

(f)      by written notice of Seller or Buyer to such other Party at any time following the third Business Day after the date on which an HSR Second Request has been issued in respect of the transactions contemplated by this Agreement.

Section 12.02  *Effect of Termination.*

(a)      In the event of a valid termination of this Agreement by Buyer or Seller pursuant to this Article 12, all rights and obligations under this Agreement will terminate without any Liability of any Party or Person to any other Party or Person; *provided* that, nothing herein will relieve any Party from Liability for any willful and material breach of this Agreement or Actual Fraud prior to such termination (subject, in each case, to the last sentence of Section 12.02(b)); and *provided*, *further*, that the provisions of this Section 12.02, Section 12.03, Section 3.02, Section 7.01(b), Section 7.09(b), Section 8.09 and Section 13.07 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 13) will survive the termination of this Agreement.

(b)      Buyer and Seller acknowledge and agree that in the event of a Specified Termination, the Deposit Amount will be delivered to Seller in accordance with Section 3.02(b). The Parties acknowledge and agree that the amount of losses that would be incurred by the Selling Entities as a result of a Specified Termination is difficult to estimate, and that the Deposit Amount represents a reasonable estimate of such losses.  Notwithstanding anything to the contrary in this Agreement, (i) Seller's right to receive the Deposit Amount pursuant to this Section 12.02(b), (ii) any amounts owing pursuant to Section 7.09(b) and Section 13.07, (iii) Seller's right to enforce the Confidentiality Agreement and (iv) the rights and remedies of Seller available under the Equity Commitment Letter shall, collectively, be the sole and exclusive remedies (except for specific performance pursuant to Section 13.08(b) and potential monetary damages pursuant to claims for a willful and material breach of this Agreement or Actual Fraud, in each case prior to the valid termination of this Agreement, subject to the last sentence of this Section 12.02(b)) of the Selling Entities against Buyer, any Party Affiliate or any Debt Financing Source (and any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents) for any losses suffered as a result of the failure of the Closing to occur, any breach of any covenant in this Agreement (whether willfully, knowingly,

99

intentionally, unintentionally or otherwise) or the failure of the transactions contemplated by this Agreement to be consummated, and upon receipt in full by Seller of the Deposit Amount (together with any amounts owed pursuant to Section 7.09(b) and Section 13.07), none of Buyer, any Party Affiliate or any Debt Financing Source, or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or Representatives, shall have any further Liability relating to or arising out of this Agreement, the Financing or the transactions contemplated by this Agreement or in respect of any other document or theory of Applicable Law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in tort or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any Applicable Law or otherwise. Notwithstanding any other provision hereof, in no event will Buyer be subject to, and no Selling Entity will be entitled to receive (or attempt to receive), monetary damages if this Agreement is terminated in circumstances in which Seller is entitled to the Deposit Amount or to the extent such monetary damages would exceed the amount of the Deposit Amount (plus any amounts owed pursuant to Section 7.09(b) and Section 13.07).

Section 12.03 *Procedure Upon Termination.*

In the event of termination pursuant to Section 12.01, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to Section 12.02) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller. If this Agreement is terminated as provided herein, Seller will be deemed to have delivered notice to Buyer that it must return or destroy all Confidential Information (as defined in the Confidentiality Agreement) pursuant to Section 5 of the Confidentiality Agreement and Buyer will redeliver to the Selling Entities or destroy all documents, work papers and other materials of Buyer and its Representatives relating to the transactions contemplated hereby, in accordance with the terms of the Confidentiality Agreement, including the requirement to confirm any such destruction in writing to the Selling Entities.

## ARTICLE 13
## GENERAL PROVISIONS

Section 13.01 *No Survival of Representations and Warranties.*

The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof, except in the event of Actual Fraud. Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, 90 days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-

NAI-1538022664v15

Closing Covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable Order of a court of competent jurisdiction or settlement.

Section 13.02  *Notices.*

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand, (b) when sent by email (except that if notice is received after 5:00 p.m. local time at the place of receipt, it shall be effective the following Business Day) or (c) one Business Day following the day sent by overnight courier, in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

(i)    If to any Selling Entity, then to:

Instant Brands Acquisition Holdings Inc.
3025 Highland Parkway, Suite 700 Downers Grove, Illinois 60515
Attn: Catherine R. Landman
E-mail:  cathy.landman@instantbrands.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
Attn:   William J. Chudd
        Brian Resnick
450 Lexington Avenue
New York, NY 10017
E-mail:  william.chudd@davispolk.com
         brian.resnick@davispolk.com

(ii)   If to Buyer:

IB Appliances US Holdings, LLC
c/o Centre Lane Partners, LLC
Attn: Quinn Morgan; Mayank Singh, Timothy Chiodo
60 E 42nd Street, Suite 2220
New York, NY 10165
E-mail: qmorgan@centrelanepartners.com;
msingh@centrelanepartners.com; tchiodo@centrelanepartners.com

with a copy (which will not constitute notice) to:

Jones Day
Attn: Jason Grove; Thomas Wearsch; Genna Ghaul; William T. Sinchuk
250 Vesey Street,
New York, NY 10281
E-mail: jrgrove@jonesday.com; twearsch@jonesday.com;
gghaul@jonesday.com; wsinchuk@jonesday.com

Section 13.03  *Waiver.*

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Applicable Laws, (i) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (ii) no notice to or demand on one Party will be deemed to be a waiver of any right of the party hereto that gives such notice or demand to take further action without notice or demand.

Section 13.04  *Entire Agreement; Amendment.*

This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof.  Except as permitted under Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties; provided, that any such amendment, modification or supplementation of this Agreement or waiver of any rights or obligations by the Selling Entities, in each case in any material respect, shall require the prior written consent of the Term DIP Agent acting at the instruction of Required Lenders (as defined in the Term DIP Credit Facility) (not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, this Section 13.04, Section 13.09, Section 13.11, Section 13.12 and Section 13.16, in each case to the extent the proposed amendment to any such Section is adverse to any Debt Financing Source (or any other provision of this Agreement to the extent a modification, waiver of termination of such provision would modify the substance of any of the foregoing provisions), may not be amended without the prior written consent of such Debt Financing Source.

Section 13.05  *Assignment.*

This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided,* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer (A) prior to the Closing, without the prior written consent of any Selling Entity, to one or more of Buyer's Affiliates, so long as (x) such Affiliate is designated in writing by Buyer to Seller, (y) Buyer continues to remain obligated in full hereunder, and (z) any such assignment would not reasonably be expected to impede or delay the Closing and (B) following the Closing, without the prior written consent of any Selling Entity, to (x) its Affiliates or (y) the Debt Financing Sources as collateral security for its obligations under any of Debt Financing Agreements (except that (i) no such assignment shall relieve Buyer of any of its obligations hereunder and (ii) in no event shall any Debt Financing Source be required or deemed to assume any obligation of Buyer hereunder); *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization

102

confirmed by the Bankruptcy Court and the CCAA Court (if applicable). Any attempted or purported assignment in violation of this Section 13.05 will be deemed void *ab initio*. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 13.06 *Severability*.

The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 13.07 *Expenses*.

Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; *provided* that (a) Buyer shall pay all filing fees and expense of the Parties required in connection with any HSR Act filing or any other filing in connection with any Antitrust Laws and (b) Seller will pay all fees or expenses required to be paid to the Escrow Agent in connection with the Deposit Escrow Account and the Escrow Agreement.

Section 13.08 *Specific Performance*.

(a) Subject to Section 13.08(b), the Parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with the terms hereof, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, subject to Section 13.08(b), each Party will be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which they are entitled at law or in equity.

(b) It is explicitly agreed that Seller shall be entitled to specific performance of Buyer's obligation to cause the Equity Financing to be funded and to consummate the transactions contemplated by this Agreement if and only if (i) all conditions in Article 9 and Article 10 have been satisfied (other than those conditions that by their terms or nature are to be satisfied at the Closing), (ii) Buyer fails to consummate the Closing on the date on which the Closing was required to occur pursuant to Section 4.01, (iii) Seller has irrevocably confirmed by written notice that if specific performance is granted, then the Closing shall occur and (iv) the Debt Financing (or the

Alternative Financing, as applicable, in accordance with Section 7.08(d)) has been funded or will be funded at the Closing if the Equity Financing is funded at the Closing. The foregoing sentence shall not limit the right of any Party to seek an injunction or injunctions, specific performance or other equitable relief under this Agreement for any other reason or in any circumstances other than those reasons or circumstances explicitly set forth in the foregoing sentence.

(c)        Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity. The right of specific performance and other equitable relief in this Section 13.08 is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

Section 13.09 *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.*

(a)        Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto; provided, however, that the adjudication of any claim, suit, action or other proceeding of any kind or nature, whether at law or equity, in contract, in tort or otherwise, against the Debt Financing Sources in connection with this Agreement, the Debt Financing, the Debt Commitment Letter or the transactions contemplated by the Debt Financing shall be governed by and in accordance with the laws of the State of New York (without regard to its choice of law rules) except as otherwise set forth in the Debt Commitment Letter.

(b)        Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with Section 13.02) or any other manner permitted by law. Notwithstanding the foregoing, no party hereto, nor any of its Affiliates, shall bring, or support, any suit, action or other proceeding, whether at law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way relating to this Agreement or any

104

of the transactions contemplated hereby, including any dispute arising out of or relating in any way to the Debt Commitment Letter, the Debt Financing or the definitive agreements executed in connection therewith or the transactions contemplated thereby, anywhere other than in: (a) any New York State court sitting in the Borough of Manhattan; or (b) if under Applicable Law, exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York, and each party hereto agrees (on behalf of itself and its Affiliates) that the laws of the State of New York shall govern any such suit, action or other proceeding and submits for itself and its property with respect to any such suit, action or other proceeding to the exclusive jurisdiction of the aforementioned courts in this Section 13.09.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF, IN EACH CASE, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE DEBT COMMITMENT LETTER OR IN CONNECTION WITH THE DEBT FINANCING.

Section 13.10  *Counterparts.*

This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 13.11  *Parties in Interest; No Third Party Beneficiaries.*

This Agreement will inure to the benefit of and be binding upon Buyer, Seller and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that (a) Section 13.12(a) is intended for the benefit of and is enforceable by the Party Affiliates, (b) Section 13.12(b) is intended for the benefit of and is enforceable by the Released Parties and (c) Section 13.04 and Schedule 2.01(b)(xxi) are intended for the benefit of and is enforceable by the Term DIP Secured Parties; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a Party hereunder; *provided, further*, that the Debt Financing Sources are intended third party beneficiaries of the provisions of Section 13.04, Section 13.09, this Section 13.11 and Section 13.16, in each case, to the extent contemplated thereby.

Section 13.12  *No Recourse.*

(a)     Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (each, other than, for the avoidance of doubt, a Party itself a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, Contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party hereunder or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith, or for any claim (whether in tort, Contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

(b)     Effective as of the Closing (but only if the Closing actually occurs), except for any (i) rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, (ii) rights or obligations under the Housewares APA and the other Transaction Documents (as defined in the Housewares APA) contemplated by the Housewares APA, (iii) claims of Actual Fraud and (iv) claims by employees under Seller Benefit Plans or rights to earned but unpaid wages or compensation, unpaid vacation and unreimbursed business expenses, in each case, to the extent constituting an Assumed Liability, each Selling Entity, on behalf of itself and each of its Affiliates (other than the Acquired Entities) and each of its and their respective past, present or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Releasors**"), hereby irrevocably and unconditionally releases and forever discharges Buyer (with respect to the Business), each Acquired Entity, their respective Affiliates and each of the foregoing's respective past, present or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Released Parties**") of and from any and all Proceedings, executions, Orders, duties, debts, dues, accounts, bonds, Liabilities, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon contract, tort or otherwise), which any of the Releasors may have against any of the Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to the ownership or operation of the Acquired Entities or the Business or any action taken or failed to be taken by any of the Released Parties in respect thereof.  From and after the Closing and notwithstanding any applicable statute of limitations, each Selling Entity

shall not and shall cause each of the other Releasors not to, bring any Proceeding against Buyer (with respect to the Business), the Acquired Entities or any of the other Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by such Selling Entity on behalf of itself and the other Releasors hereunder.

(c)     Buyer agrees that if Buyer or any of its Affiliates obtains or binds a representations and warranties insurance policy with respect to any of the representations or warranties set forth in Article 5 (each, a "**R&W Insurance Policy**"), each such R&W Insurance Policy will at all times provide that: (i) the insurer will have no, and will waive any and all, subrogation rights against Seller, any of its Subsidiaries or any of its or their respective Affiliates (except in the event of Actual Fraud); and (ii) Seller is third party beneficiary of such waiver.

(d)     The Seller Related Parties acknowledge and agree that the Debt Financing Sources shall not be subject to any liability or claims to the Seller Related Parties in connection with the Debt Financing or in any way relating to this Agreement or any of the transactions contemplated hereby or thereby, or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law, in equity, in contract, in tort or otherwise. Notwithstanding the foregoing, nothing in this Section 13.12 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Commitment Letter.

Section 13.13 *Disclosure Schedules; Materiality.*

The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other Disclosure Schedules is reasonably apparent on its face without further investigation. The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.14 *Liquidating Trustee.*

If at any time Seller liquidates, its estate is converted to Chapter 7, or a bankruptcy proceeding under the BIA, or otherwise has a trustee, receiver or other Representative or similar official appointed by the Bankruptcy Court, the CCAA Court or any other Court of competent jurisdiction (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes performing Seller's obligations under Section 2.06 with respect to such abandoned assets. Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable. Further, such power of attorney will also be granted to Buyer for purposes of performing Seller's obligations under Section 2.06 with respect

to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 13.15  *Conflicts; Privileges.*

(a)  It is acknowledged by each of the parties that Seller has retained Davis Polk & Wardwell LLP ("**Davis Polk**") to act as its counsel in connection with the negotiation, execution and performance of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby (the "**Current Representation**"), and that no other party has the status of a client of Davis Polk for conflict of interest or any other purposes as a result thereof.  Buyer hereby agrees that after the Closing, Davis Polk may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any Transaction Document, and, for the avoidance of doubt, any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Davis Polk may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters.  Buyer hereby waives and agrees not to assert (1) any claim that Davis Polk has a conflict of interest in any representation described in this Section 13.15 or (2) any confidentiality obligation with respect to any communication between Davis Polk and any Designated Person occurring during the Current Representation.

(b)  Buyer hereby agrees that all communications (whether before, at or after the Closing) between Davis Polk and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives and Buyer hereby agrees that it will not intentionally seek to compel disclosure to Buyer or any of its Representatives of any Deal Communication or any other evidentiary privilege (*provided*, *however*, that Buyer shall not be restricted from seeking access thereto pursuant to a discovery request or similar means in connection with any dispute between or among the Parties pursuant to any legal process permitted in connection therewith).

(c)  Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a Third Party, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such Third Party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of Seller on behalf of the Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed).  Without limiting the last sentence of Section 13.15(b), in the event that Buyer or any of its respective directors, officers, employees or other representatives is legally required by Order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (x) as soon as reasonably practicable notify the Selling Entities in writing (including by making specific reference to this Section 13.15(c)), (y) agree that the

NAI-1538022664v15

Selling Entities may seek a protective order and (z) use, at the Selling Entities' sole cost and expense, commercially reasonable efforts to assist therewith.

Section 13.16 *Liability of Financing Sources.*

No Seller Related Party shall have any rights or claims against any Debt Financing Source in connection with this Agreement, the Debt Financing or the transactions contemplated hereby or thereby, or in respect of any oral representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financing contemplated thereby, whether at law or equity, in contract, in tort or otherwise; *provided* that, notwithstanding the foregoing, nothing in this Section 13.16 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Financing or any financing commitment in respect thereof.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____

Name: Nicholas Hewitt
Title: Chief Financial Officer

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____

Name: Nicholas Hewitt
Title: Chief Financial Officer

**INSTANT BRANDS (TEXAS) INC.**

By: _____

Name: Nicholas Hewitt
Title: Chief Financial Officer

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____

Name: Nicholas Hewitt
Title: Chief Financial Officer

*[Signature Page to Asset Purchase Agreement]*

**INSTANT BRANDS LLC**

By:

Name: Nicholas Hewitt
Title:   Chief Financial Officer

**URS-1 (CHARLEROI) LLC**

By:

Name: Nicholas Hewitt
Title:   Chief Financial Officer

**EKCO GROUP, LLC**

By:

Name: Nicholas Hewitt
Title:   Chief Financial Officer

**CORELLE BRANDS (GHC) LLC**

By:

Name: Nicholas Hewitt
Title:   Chief Financial Officer

**URS-2 (CORNING) LLC**

By:

Name: Nicholas Hewitt
Title:   Chief Financial Officer

[*Signature Page to Asset Purchase Agreement*]

**CORELLE BRANDS (LATIN AMERICA)
LLC**


By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer


**EKCO HOUSEWARES, INC.**


By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer


**EKCO MANUFACTURING OF OHIO,
INC.**


By: _____
Name: Nicholas Hewitt
Title:   Chief Financial Officer

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

**INSTANT BRANDS (CANADA) HOLDING INC.**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

**INSTANT BRANDS INC.**

By: _____
Name: Nicholas Hewitt
Title: Chief Financial Officer

[*Signature Page to Asset Purchase Agreement*]

**BUYER**


**IB APPLIANCES US HOLDINGS, LLC**


By: _____
Name:   Quinn Morgan
Title:     President


**IB APPLIANCES CANADA HOLDINGS, INC.**


By: _____
Name:   Quinn Morgan
Title:     President


*[Signature Page to Asset Purchase Agreement]*

**Exhibit A**

Form of IP Assignment Agreements

[See Attached]

CONFIDENTIAL

**EXHIBIT A**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of [●] (the "Effective Date"), is by and among Instant Brands Acquisition Holdings Inc., a Delaware company ("Assignor"), each of the Subsidiaries of Seller listed on the signature pages hereto (together with Assignor, the "Assignor Entities") and IB Appliances US Holdings, LLC, a Delaware limited liability company ("Assignee").

**WITNESSETH:**

WHEREAS, pursuant to the terms and conditions of the Asset Purchase Agreement dated September 27, 2023 among Assignee and the Assignor Entities (the "Asset Purchase Agreement"), the Assignor Entities desire to sell, convey, transfer, assign and deliver to Assignee all of the Assignor Entities' right, title and interest in, to and under the Owned Intellectual Property, including the Intellectual Property set forth on Exhibit I hereto (the "Assigned IP"), and Assignee desires to acquire and accept all of the Assignor Entities' entire right, title and interest in, to and under such Assigned IP.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      The Assignor Entities hereby sell, convey, transfer, assign and deliver to Assignee, and Assignee does hereby acquire and accept, all of the Assignor Entities' right, title and interest in, to and under the Assigned IP throughout the world and all rights corresponding thereto, together with all goodwill associated therewith and all income, royalties or payments now or hereafter due or payable in relation to the Assigned IP, and all benefits, privileges, causes of action, common law rights, and remedies relating thereto throughout the world.

3.      The parties hereto acknowledge and agree that the representations, warranties, covenants, indemnities, limitations and other terms contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the fullest extent provided therein.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4.      Upon the reasonable written request by Assignee, the Assignor Entities shall execute all documents and take all actions as may be necessary to enable Assignee to perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation from, but at the sole expense of, Assignee.

5.      The Assignor Entities hereby authorize and request the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of entire right, title and interest in, to and under the Assigned IP.

6.      Section 13.09 (*Governing Law; Consent to Jurisdiction; Jury Trial Waiver*) of the Asset Purchase Agreement is hereby incorporated herein by reference, *mutatis mutandis*, as if set forth in full herein.

7.      This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns.  No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

[SIGNATURE PAGE FOLLOWS]

       IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR ENTITIES:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS LLC**

By: _____
Name: _____
Title: _____

**URS-1 (CHARLEROI) LLC**

By: _____
Name: _____
Title: _____

**EKCO GROUP, LLC**

By: _____
Name: _____
Title: _____

**CORELLE BRANDS (GHC) LLC**

By: _____
Name: _____
Title: _____

**URS-2 (CORNING) LLC**

By: _____
Name: _____
Title: _____

*Signature Page to IP Assignment*

**CORELLE BRANDS (LATIN AMERICA) LLC**


By: _____
Name: _____
Title: _____

**EKCO HOUSEWARES, INC.**


By: _____
Name: _____
Title: _____


**EKCO MANUFACTURING OF OHIO, INC.**


By: _____
Name: _____
Title: _____

**AS ASSIGNEE:**

**IB APPLIANCES US HOLDINGS, LLC**


By: _____
Name:   Quinn Morgan
Title:      President

*Signature Page to IP Assignment*

**EXHIBIT I[1]**

**ASSIGNED IP**

**Patents**

| Title | Patent No.<br>(Application No.) | Issue Date<br>(Filing Date) |
|---|---|---|
| | | |

---

[1] The Assignor Entities and Assignee will use their respective commercially reasonable efforts during the interim period to accurately populate this Exhibit I.

## **Trademarks**

| Trademark | Registration No. (Application No.) | Registration Date (Application Date) |
|-----------|-----------------------------------|--------------------------------------|
|           |                                   |                                      |

## <u>Copyrights</u>

| <u>Title</u> | <u>Registration No.</u> | <u>Registration Date</u> |
|---|---|---|

## **Domain Names**

| Domain Name |
|---|

**Exhibit B**

Form of Master Assignment

[See Attached]

CONFIDENTIAL
*Final Form*

## EXHIBIT B[1]

## FORM OF MASTER ASSIGNMENT, BILL OF SALE, DEED, AND CONVEYANCE

This Master Assignment, Bill of Sale, Deed, and Conveyance (this "Agreement") is entered into as of [●], by and among IB Appliances US Holdings, LLC, a Delaware limited liability company ("US Buyer"), IB Appliances Canada Holdings, Inc., a corporation incorporated under the laws of the Province of Ontario (the "Canadian Buyer", together with US Buyer, each a "Buyer Entity" and collectively, "Buyer"), Instant Brands Acquisition Holdings Inc., a company organized under the laws of the State of Delaware ("Seller"), and each of the Subsidiaries of Seller listed on the signature pages hereto (together with Seller, the "Selling Entities").

WHEREAS, Buyer and the Selling Entities have entered into the Asset Purchase Agreement, dated as of September 27, 2023 (the "Purchase Agreement"), pursuant to which, among other things, Buyer has agreed to purchase from the Selling Entities, and the Selling Entities have agreed to sell to Buyer, all of the Assets, and Buyer has agreed to assume all of the Assumed Liabilities, upon the terms and subject to the conditions set forth in the Purchase Agreement (collectively, the "Transaction");

WHEREAS, the execution, delivery and performance of this Agreement is an integral part of the transactions contemplated by the Purchase Agreement; and

WHEREAS, Buyer and the Selling Entities now desire to consummate the Transaction in part by the execution and delivery of this Agreement in order to give immediate effect thereto.

NOW, THEREFORE, pursuant to the Purchase Agreement and in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Asset Transfer.  As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, each Selling Entity hereby irrevocably sells, assigns, transfers, conveys and delivers to Buyer, and Buyer hereby purchases, acquires and accepts from the Selling Entities, all of the Selling Entities' respective right, title and interest in, to and under all of the Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances).

2.      Assumed Liabilities.  As of the date hereof, upon the terms and subject to the conditions set forth in the Purchase Agreement, Buyer hereby assumes and agrees to pay, perform and otherwise discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), all of the Assumed Liabilities.

3.      Excluded Liabilities and Excluded Assets.  The Selling Entities shall retain and remain solely responsible for, and Buyer is not hereby assuming and shall not otherwise be obligated to pay,

---

[1] This Exhibit B may be separated out during the interim period in order to make clear that the Canadian Sellers will sell, assign, transfer, convey and deliver all of the Assets (other than the Owned Intellectual Property) to the Canadian Buyer.

perform, discharge or in any way become responsible for, any of the Excluded Liabilities. The Selling Entities shall retain all, and Buyer is not hereby acquiring any, right, title or interest in, to or under the Excluded Assets.

4.    <u>Purchase Agreement</u>.  This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement.  This Agreement is given to further evidence (and give immediate effect to) the transfers and assignments of the interests in the Assets contemplated by the Purchase Agreement upon the terms and conditions specified therein.  Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, reduce, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, and any of the obligations, of Buyer or the Selling Entities set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement will govern.

5.    <u>Notices</u>.  All notices and other communications to be given under the terms of this Agreement or which any of the parties hereto desire to give hereunder shall be in writing and shall be made in accordance with Section 13.02 (*Notices*) of the Purchase Agreement.

6.    <u>Governing Law; Jurisdiction</u>.  The parties hereto hereby agree that the provisions of Section 13.09 (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*) of the Purchase Agreement are hereby made part of this Agreement as if they were contained herein, *mutatis mutandis*.

7.    <u>Headings</u>.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

8.    <u>Defined Terms</u>.  All capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

9.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original of this Agreement and all of which, when taken together, will constitute one and the same instrument.  Notwithstanding anything to the contrary in Section 13.02 of the Purchase Agreement, delivery of an executed counterpart of a signature page to this Agreement by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

10.    <u>Miscellaneous</u>.  The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and assigns, and nothing in this Agreement is intended or shall be construed to give any other Person any legal or equitable right, remedy or claim under, or in respect of, this Agreement or any provision contained herein.  This Agreement will inure to the benefit of and bind the respective successors and assigns of the parties hereto.  This Agreement may be terminated, amended or modified, and any of the terms, covenants or conditions hereof may be waived, only by a writing signed by each of the parties hereto or, in the case of a waiver, by the party or parties waiving compliance.  Each item and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever that term or

provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby. Each of the parties hereto has been represented by its own counsel and acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in connection with the construction or interpretation of this Agreement.

*[Remainder of this page is intentionally left blank]*

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties herein have executed this Master Assignment, Bill of Sale, Deed, and Conveyance as of the date set forth in the first paragraph hereof.

**BUYER**:

**IB APPLIANCES US HOLDINGS, LLC**

By: _____
Name:  Quinn Morgan
Title:    President

**IB APPLIANCES CANADA HOLDINGS, INC.**

By: _____
Name:  Quinn Morgan
Title:    President

**SELLER:**

**INSTANT BRANDS ACQUISITION
HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS ACQUISITION
INTERMEDIATE HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS LLC**

*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

By: _____
Name: _____
Title: _____


## URS-1 (CHARLEROI) LLC

By: _____
Name: _____
Title: _____


## EKCO GROUP, LLC

By: _____
Name: _____
Title: _____


## CORELLE BRANDS (GHC) LLC

By: _____
Name: _____
Title: _____


## URS-2 (CORNING) LLC

By: _____
Name: _____
Title: _____


*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**CORELLE BRANDS (LATIN AMERICA) LLC**

By: _____

Name: _____

Title: _____

**EKCO HOUSEWARES, INC.**

By: _____

Name: _____

Title: _____

**EKCO MANUFACTURING OF OHIO, INC.**

By: _____

Name: _____

Title: _____

*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**CANADIAN SELLERS:**

**CORELLE BRANDS (CANADA) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (CANADA)
HOLDING INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS INC.**

By: _____
Name: _____
Title: _____

*Signature Page to Master Assignment, Bill of Sale, Deed, and Conveyance*

**Exhibit C**

Form of Transition Services Agreement

[See Attached]

**CONFIDENTIAL**

**FORM OF**

**TRANSITION SERVICES AGREEMENT**

dated as of [●], 2023

by and among

**INSTANT BRANDS ACQUISITION HOLDINGS INC.,**

**EACH OF THE SUBSIDIARIES OF**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

**SET FORTH ON THE SIGNATURE PAGES HERETO,**

**IB APPLIANCES US HOLDINGS, LLC,**

**IB APPLIANCES CANADA HOLDINGS, INC.,**

**IB HOUSEWARES US HOLDINGS, LLC,**

and

**IB HOUSEWARES CANADA HOLDINGS, INC.**

**TABLE OF CONTENTS**

PAGE

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions.* ........................................................................................................2
Section 1.02. *Other Definitional and Interpretative Provisions.* ...........................................2

ARTICLE 2
PURCHASE AND SALE OF SERVICES

Section 2.01. *Purchase and Sale of Services.* ........................................................................3
Section 2.02. *Discontinuation of Services.* .............................................................................4
Section 2.03. *Recipient and Provider.* ....................................................................................5
Section 2.04. *Third-Party Licenses and Consents* .................................................................6
Section 2.05. *Third-Party Service Providers.* ........................................................................6

ARTICLE 3
SERVICE COSTS; OTHER CHARGES

Section 3.01. *Service Costs Generally* ...................................................................................6
Section 3.02. *Right to Offset* ...................................................................................................6
Section 3.03. *Taxes.* .................................................................................................................7
Section 3.04. *Invoicing and Settlement of Service Costs.* ......................................................7

ARTICLE 4
THE SERVICES

Section 4.01. *Standards of Service* ..........................................................................................9
Section 4.02. *Suspension of Services* .......................................................................................9
Section 4.03. *Management of Services* .....................................................................................9
Section 4.04. *Policies and Procedures.* ..................................................................................10
Section 4.05. *Limitations.* ......................................................................................................10

ARTICLE 5
DISCLAIMER, LIABILITY AND INDEMNIFICATION

Section 5.01. *Indemnification of Provider by Recipient* ........................................................10
Section 5.02. *Indemnification of Recipient by Provider* ........................................................11
Section 5.03. *Indemnification as Exclusive Remedy* ..............................................................11
Section 5.04. *Liability for Payment Obligations* ...................................................................11
Section 5.05. *Indemnification Procedures.* ............................................................................11
Section 5.06. *Exclusion of Warranties.* ..................................................................................11
Section 5.07. *Limitation of Liability* ......................................................................................11

ARTICLE 6
TERM AND TERMINATION

i

Section 6.01.  *Term.* ............................................................................................................. 12
Section 6.02.  *Termination.* ................................................................................................... 13
Section 6.03.  *Effect of Termination* .................................................................................. 13

ARTICLE 7

ADDITIONAL AGREEMENTS

Section 7.01.  *Confidential Information.* ............................................................................ 13
Section 7.02.  *Intellectual Property.* ................................................................................... 15
Section 7.03.  *Access to Information.* .................................................................................. 16
Section 7.04.  *Employment and Labor Matters* ................................................................. 16
Section 7.05.  *The Transfer of Undertakings* ..................................................................... 16

ARTICLE 8

MISCELLANEOUS

Section 8.01.  *No Agency; Independent Contractor Status* ................................................ 17
Section 8.02.  *Subcontractors* ............................................................................................. 17
Section 8.03.  *Force Majeure* .............................................................................................. 17
Section 8.04.  *Entire Agreement* ......................................................................................... 18
Section 8.05.  *Information* .................................................................................................... 18
Section 8.06.  *Notices.* ......................................................................................................... 18
Section 8.07.  *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver* ..... 19
Section 8.08.  *Severability.* .................................................................................................. 20
Section 8.09.  *Amendments and Waivers* ........................................................................... 20
Section 8.10.  *Successors and Assigns* ............................................................................... 20
Section 8.11.  *Specific Performance* ................................................................................... 21
Section 8.12.  *Third Party Rights* ....................................................................................... 21
Section 8.13.  *Counterparts* ................................................................................................ 21

Schedule A       Seller Services
Schedule B       Buyer Services
Schedule C       Excluded Services
Schedule D       Data Processing Addendum

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "**Agreement**"), dated as of [●], 2023 (the "**Effective Date**"),[1] is by and among Instant Brands Acquisition Holdings Inc., a Delaware corporation ("**Seller**"), each of the Subsidiaries of Seller set forth on the signature pages hereto (together with Seller, the "**Selling Entities**"), [●], LLC, a Delaware limited liability company ("**US [●] Buyer**"), and [●], Inc., a corporation incorporated under the laws of the Province of Ontario ("**Canadian [●] Buyer**" and together with US [●] Buyer, the "[●] **Buyer**"); *provided, however*, that solely upon the Closing of the [●][2] Purchase Agreement, [●], LLC, a Delaware limited liability company ("**US [●] Buyer**"), and [●], Inc., a corporation incorporated under the laws of the Province of Ontario ("**Canadian [●] Buyer**" and together with US [●] Buyer, the "[●] **Buyer**" and [●] Buyer together with [●] Buyer, severally but not jointly, each a "**Buyer Entity**" and collectively, "**Buyer**"), shall each execute and deliver a countersigned page to this Agreement and be joined as parties hereto.  The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**."[3]

## RECITALS

WHEREAS, the Selling Entities and Appliances Buyer entered into the Asset Purchase Agreement, dated as of September 27, 2023 (as such agreement may be amended from time to time, the "**Appliances Purchase Agreement**"), pursuant to which Appliances Buyer agreed to purchase from the Selling Entities all of the Assets (as defined in the Appliances Purchase Agreement), on the terms and subject to the conditions set forth in the Appliances Purchase Agreement;

WHEREAS, the Selling Entities and Housewares Buyer entered into the Asset Purchase Agreement, dated as of September 27, 2023 (as such agreement may be amended from time to time, the "**Housewares Purchase Agreement**" and, together with the Appliances Purchase Agreement, the "**Purchase Agreements**" and each, a "**Purchase Agreement**"), pursuant to which Housewares Buyer agreed to purchase from the Selling Entities all of the Assets (as defined in the Housewares Purchase Agreement), on the terms and subject to the conditions set forth in the Housewares Purchase Agreement; and

WHEREAS, each Purchase Agreement contemplates that the Selling Entities and Buyer will enter into this Agreement, pursuant to which (a) the Selling Entities will provide to Buyer and its Affiliates certain transitional services with respect to the applicable Business in order to facilitate an orderly transition of the applicable Assets to such Buyer and to enable Buyer to conduct the applicable Business in substantially the same manner as conducted immediately prior to the applicable Closing and (b) Buyer will provide, or will cause its Affiliates to provide, to the Selling Entities certain transitional services with respect to their respective operations of the Excluded Assets or any business now, previously or hereafter conducted by the Selling Entities other than the Business (the "**Retained**

---

[1] **Note to Draft**:  Buyer will require Seller Services immediately upon the first Closing (regardless of whether the Appliances APA or the Housewares APA closes first).

[2] **Note to Draft**:  To be the APA that will close last.

[3] **Note to Draft**:  To be populated with the applicable names depending on which transaction closes first and upon the Closing of the second transaction such buyer entities will join this Agreement as parties thereto.

**Business**"), in each case, after the Effective Date and each in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  *Definitions.*  Any capitalized term that is used, but not defined, herein shall have the meaning assigned to such term in the applicable Purchase Agreement.  In addition, for the purpose of this Agreement, the following terms shall have the meanings set forth below.

"**Provider**" means (a) the applicable Selling Entity in its capacity as the Person providing or causing to be provided the Seller Services or (b) Buyer in its capacity as the Person providing or causing to be provided the Buyer Services, as the case may be.

"**Recipient**" means (a) the applicable Selling Entity in its capacity as the recipient, directly or indirectly through one or more of its controlled Affiliates, of the Buyer Services or (b) Buyer in its capacity as the recipient, directly or indirectly through one or more of its controlled Affiliates, of the Seller Services, as the case may be.

"**Service End Date**" means, with respect to any Service, the service end date for such Service as set forth on <u>Schedule A</u> or <u>Schedule B</u>, as applicable.

"**Service Period**" means, with respect to any Service, the period commencing on the Effective Date and ending at the close of business on the earlier of (a) the date such Service is terminated in accordance with Section 2.02 or 4.02, (b) the Service End Date for such Service, and (c) the date this Agreement is terminated in accordance with Section 6.01, 6.02 or **Error! Reference source not found.**.

"**Services**" means the Seller Services, the Buyer Services, or both, as the context requires.

Section 1.02.  *Other Definitional and Interpretive Provisions.*  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits, Annexes and Schedules are to Articles, Sections, Exhibits, Annexes and Schedules of this Agreement unless otherwise specified.  All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  Where there is any inconsistency between the definitions set out in Section 1.01 and the definitions set out in any other Section or any Schedule, Exhibit or Annex, then, for the purposes of construing such Section, Schedule, Exhibit or Annex, the definitions set out in such Section, Schedule, Exhibit or Annex shall prevail.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if".  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without

2

limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute, law or other Applicable Law shall be deemed to refer to such statute, law or other Applicable Law as amended from time to time and, if applicable, to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms thereof. References to any Person include the successors and permitted assigns of that Person. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including". References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The word "or" shall not be exclusive (i.e., "or" shall mean "and/or"). The word "shall" shall have the same meaning as "will" and vice versa. All references to any time herein shall refer to Eastern Time. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Except where the context otherwise requires, references to "a party" or "the parties" will be deemed to refer to a party or the parties to this Agreement, respectively.

## ARTICLE 2
### PURCHASE AND SALE OF SERVICES

Section 2.01. *Purchase and Sale of Services.*

(a)     On the terms and subject to the conditions of this Agreement, from and after the Effective Date, and for the applicable Service Period, the Selling Entities shall use commercially reasonable efforts to provide (or cause to be provided) to Buyer (or any Affiliate thereof designated by Buyer) the services set forth on <u>Schedule A</u>. Each of the services set forth on <u>Schedule A</u>, as such Schedule may be amended from time to time in accordance with this Agreement, are referred to individually as a "**Seller Service**" and collectively as the "**Seller Services**."

(b)     On the terms and subject to the conditions of this Agreement, from and after the Effective Date, and for the applicable Service Period, Buyer shall use its commercially reasonable efforts to provide (or cause to be provided) to the applicable Selling Entities (or an Affiliate thereof designated by the Selling Entities) the services set forth on <u>Schedule B</u>. Each of the services set forth on <u>Schedule B</u>, as such Schedule may be amended from time to time in accordance with this Agreement, are referred to individually as a "**Buyer Service**" and collectively as the "**Buyer Services**."

(c)     Except for the Services expressly contemplated to be provided in accordance with the provisions of this Agreement (including Section 2.01(d)) or another Transaction Document, neither Provider, nor any of its Affiliates, shall have any obligation under this Agreement to provide any services to Recipient or its Affiliates. Notwithstanding anything herein to the contrary, in no event shall Provider be required to provide any legal, financial, accounting or tax advice or any of the other services identified in <u>Schedule C</u> (the "**Excluded Services**"). The provision to the Business of any Excluded Services shall be discontinued as of the Effective Date.

3

(d)     If, during the Term, a Party identifies a service that (i) (A) the Selling Entities provided to the applicable Business during the Baseline Period in connection with the ordinary course operation of the Business or (B) the applicable Business provided to the Retained Business during the Baseline Period in connection with the ordinary course operation of the Retained Business, (ii) was omitted from Schedule A or Schedule B, as applicable, (iii) (A) Buyer reasonably determines that it needs in order to continue to operate the applicable Business in substantially the same manner in which the Business operated during the Baseline Period or (B) the Selling Entities reasonably determine is needed in order to continue to operate the Retained Business in substantially the same manner in which the Retained Business operated during the Baseline Period, and (iv) is not an Excluded Service (each, an "**Additional Service**"), then upon written request of the Party that identifies or desires to receive such Additional Services, the Parties shall negotiate in good faith to provide (or cause to be provided) such Additional Service to Recipient; *provided* that, the Selling Entities shall not be obligated to provide any Additional Service to the extent the activities comprising such Additional Service were, during the Baseline Period, performed for the Business by positions held by Transferred Employees.  To the extent that the Parties reach an agreement with respect to providing such Additional Services, the Parties shall cooperate and act in good faith to add such services to Schedule A or Schedule B, as applicable, and mutually agree to a description of the Additional Service, the Service Period during which the Additional Service will be provided, the Service Costs for the Additional Service and any other terms applicable thereto.  The provision of any Additional Services shall be deemed part of the "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement.

(e)     Provider and Recipient shall each nominate a representative to act as the primary contact person with respect to the provision of the Services (the "**Service Coordinators**").  Each Party may change its Service Coordinator from time to time at its sole discretion by providing prior written notice to the other Party (including contact information for such Service Coordinator).  Unless otherwise agreed to in writing by the Parties, all communications relating to the day-to-day provision of the Services shall be directed to the Service Coordinators.  The Service Coordinators shall work in good faith and use commercially reasonable efforts to effectuate a smooth transition of the Services from the Provider to the Recipient (or its designee) on the terms and subject to the conditions set forth in this Agreement.

Section 2.02.  *Discontinuation of Services*.

(a)     Any Service (or portion thereof) may be discontinued as of a date that is earlier than the Service End Date upon the mutual written consent of the Parties, and, in such case, Schedule A or Schedule B, as applicable, shall be deemed amended to delete such Service as of such date, and this Agreement shall be of no further force and effect with respect to such Service, except as to obligations or liabilities accrued pursuant to this Agreement through the date of discontinuation of such Service, or in connection with such termination.

(b)     Recipient may discontinue all or any portion of a Service, so long as any non-terminated Service is not dependent on such portion of a Service proposed to be discontinued, by providing no less than 30 days' advance written notice to Provider ("**Termination Notice**") at any time, and, in such case, the applicable Service (or portion thereof) shall terminate on the termination date specified in the Termination Notice (or such other date mutually agreed in writing by Recipient and Provider), and Schedule A or Schedule B, as applicable, shall be deemed amended to delete such Service (or portion thereof) as of the termination date, and this Agreement shall be of no further force and effect with respect to such Service (or portion thereof), except as to obligations or liabilities accrued pursuant to this Agreement prior to the date of termination of such Service (or portion thereof), or in connection with such

4

termination; *provided* that, to the extent set forth on <u>Schedule A</u> or <u>Schedule B</u>, certain Services (or portions thereof) may not be terminated prior to the Service End Date.

(c)     Any Service (or portion thereof) may be terminated without the termination of any other Service (or portion thereof); *provided* that, if, in the reasonable determination of the Provider, it is technically infeasible or commercially impracticable to terminate one Service (or portion thereof) without terminating one or more other Services (or portions thereof), Recipient shall be required to concurrently terminate all such Services (or portions thereof) for which separate termination would be technically infeasible or commercially impracticable (such required termination, an "**Interdependency Termination**"). Within a reasonable period of time following receipt of any Termination Notice (but in no event more than 15 Business Days following receipt of any Termination Notice), Provider may provide Recipient with written notice ("**Provider Notice**") of (i) any reasonable and documented out-of-pocket costs that Provider has incurred, or reasonably expects to incur, solely as a result of early termination of the applicable Service (or portion thereof), including for commitments made to, or in respect of, personnel or third-party service providers (including subcontractors), to provide the Services (or portions thereof) through the applicable Service End Date, costs related to terminating such commitments or prepaid expenses related to the applicable Services (or portions thereof) that cannot or will not be reimbursed (collectively, the "**Early Termination Costs**"), and (ii) whether early termination of the applicable Service (or portion thereof) will require an Interdependency Termination. The Provider Notice shall set forth an estimate (to the extent then known by Provider) of the amount of the Early Termination Costs. Recipient may withdraw its Termination Notice by delivering a withdrawal notice within five Business Days following the receipt of such Provider Notice from Provider. If Recipient does not withdraw the Termination Notice within such period, such Termination Notice will be final and irrevocable, and Recipient shall reimburse Provider for all Early Termination Costs reasonably incurred by Provider as a result of such early termination; *provided* that, Provider shall use commercially reasonable efforts to mitigate such costs. Such reimbursement shall be made by Recipient to Provider in accordance with Section 3.04.

Section 2.03.  *Recipient and Provider.*

(a)     It is understood and agreed that (i) the Services to be provided to Recipient under this Agreement shall, at such Recipient's request be provided to any Person that is a controlled Affiliate of Recipient (in which case, such controlled Affiliate shall be included in the definition of "Recipient" for all purposes hereof in respect of such Service), which controlled Affiliates it may change at its discretion from time to time, and (ii) Provider may satisfy its obligation to provide or procure Services hereunder by causing one or more of its Affiliates to provide or procure such Services (in which case, such Affiliates shall be included in the definition of "Provider" for all purposes hereof in respect of such Service), which Affiliates it may change at its discretion from time to time, *provided* that, Provider shall remain responsible for the performance of such Affiliates.

(b)     Without limiting or expanding any other provision of this Agreement, Recipient shall, and shall cause its Affiliates to, reasonably cooperate with Provider to the extent necessary for Provider to fulfill its obligations with respect to the provision of the applicable Services. Such cooperation shall include, subject to Section 7.01, (i) providing information reasonably requested by Provider or one of its Affiliates or Third-Party Service Providers and (ii) making available, as reasonably requested by Provider or one of its Affiliates or Third-Party Service Providers, timely decisions, authorizations and consents, in each case as and to the extent necessary for Provider to perform, or cause its applicable Affiliates or Third-Party Service Providers to perform, its obligations hereunder in a timely and efficient manner.

5

Provider shall not be liable for any impairment of any Service caused by Recipient's failure to provide information of the type described in the immediately preceding sentence such that it renders performance by Provider of such Service unlawful or impracticable.

Section 2.04. *Third-Party Licenses and Consents*. Each Party shall use its commercially reasonable efforts to obtain, and to keep and maintain in effect, all governmental or third party licenses and consents required for the provision of any Service, including with respect to access and use of any third party software, by Provider in accordance with the terms of this Agreement; *provided* that, if the Parties are unable to obtain any such license or consent, Provider shall notify Recipient in writing and shall, and shall cause its controlled Affiliates to, use commercially reasonable efforts to implement an appropriate alternative arrangement to provide such Services. Any costs relating to obtaining any such licenses or consents or incurred as a result of such alternative arrangement shall be split equally between Provider and Recipient; *provided* that, Provider shall not incur any such costs without the prior written consent of Recipient, which consent shall not be unreasonably withheld.

Section 2.05. *Third-Party Service Providers*. If and to the extent Provider proposes to provide all or any portion of the Services hereunder through a subcontractor or other third party, Provider and Recipient shall mutually agree as to the selection of such subcontractor or other third party (each such subcontractor or other third party, a "**Third-Party Service Provider**"); *provided*, that each Third-Party Service Provider will be subject to, and Provider will use commercially reasonable efforts to ensure that each Third-Party Service Provider engaged by it complies with, service standards and confidentiality provisions at least equivalent to those set forth herein. If Provider receives written notice from any Third-Party Service Provider that such Third-Party Service Provider intends to terminate a service pursuant to which Provider provides a Service to Recipient, then Provider shall use commercially reasonable efforts to secure the continued provision of that Service from such Third-Party Service Provider or an alternative Third-Party Service Provider. Each Party agrees that if Provider engages a Third-Party Service Provider to provide a Service, then Provider will retain responsibility for the provision of such Service to be performed by such Third-Party Service Provider.

## ARTICLE 3
### SERVICE COSTS; OTHER CHARGES

Section 3.01. *Service Costs Generally*. The fee to be paid by Recipient to Provider for each Service to be provided under this Agreement shall be as set forth opposite such Service on Schedule A or Schedule B, as applicable (any such costs being referred to herein as "**Service Costs**"). If at any time after the Effective Date Provider believes that the Service Costs are materially insufficient to compensate it for the cost of providing the Services it is obligated to provide hereunder, Provider shall notify Recipient and the Parties will commence good faith negotiations toward an agreement as to the appropriate course of action with respect to pricing of such Services for future periods, and if the Parties agree to an adjustment, Schedule A or Schedule B, as applicable, will be amended to reflect any agreed changes to the Services and any updated Service Costs. For the avoidance of doubt, except as expressly set forth herein (including **Error! Reference source not found.**) or Schedule A or Schedule B, (i) the Service Costs for each Service shall commence on the Effective Date and (ii) the Service Costs for each Service are fixed and are not subject to adjustment if all or a portion of such Service is not utilized by Recipient.

Section 3.02. *Right to Offset*. Recipient hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment or similar right that Recipient has or may have with respect to

6

the payment of the Service Costs or any other payments to be made by Recipient pursuant to this Agreement.

Section 3.03. *Taxes.* (a) Recipient (or its applicable Affiliate) shall be responsible for and shall pay all applicable goods and services sales, use or similar taxes, levies and charges, together with any interest, penalties and additions thereto ("**Service Taxes**") imposed by applicable taxing authorities on the provision of the Services to Recipient (or such Affiliate) or on any payment hereunder, whether or not such Service Taxes are shown on any invoices (provided that, if the omission of such Service Taxes from an invoice results in the imposition of additional Service Taxes, Recipient (or such Affiliate) shall not be responsible for such additional Service Taxes). Service Taxes shall be incremental to other payments or charges identified in this Agreement. If Provider or any of its Affiliates is required to pay any portion of such Service Taxes, Provider shall provide Recipient with evidence that such Service Taxes have been paid, and Recipient (or its applicable Affiliate) shall reimburse Provider (or its applicable Affiliate) for such Service Taxes. Each party shall, and shall cause its Affiliates to, use commercially reasonable efforts to avail itself of any available exemptions from such Service Taxes and to cooperate with the other party in providing any information or documentation that may be necessary to obtain such exemptions.

(b) All sums payable under this Agreement shall be paid free and clear of all deductions or withholdings in respect of any taxes, levies or charges unless the deduction or withholding is required by Applicable Law, in which event the Recipient shall promptly notify the Provider of such required withholding. The Recipient shall withhold (or cause to be withheld) such taxes, levies or charges and pay (or cause to be paid) such withheld amounts over to the applicable taxing authority in accordance with the requirements of the Applicable Law and provide the Provider with an official receipt confirming payment. Such amounts deducted or withheld, and paid to the appropriate taxing authority, shall be treated as paid to the Provider for all purposes of this Agreement. The Parties agree to use commercially reasonable efforts to reduce or eliminate taxes, levies or charges (including pursuant to any applicable double taxation or similar treaty) or receive a refund of, or to claim a tax credit for, such taxes, for which deductions or withholdings would be required under this clause (b).

(c) If anything done by the Provider under this Agreement is a supply on which VAT is chargeable, the Recipient shall pay to the Provider (in addition to any other amounts payable under this Agreement) an amount equal to any VAT so chargeable, provided that the Provider has provided the Recipient with a valid VAT invoice in respect of such VAT. Where the Recipient is obligated under this Agreement to reimburse the Provider for any fee, cost, charge or expense, the amount which the Recipient is required to pay in respect of such matter shall include any VAT incurred by the Provider (or any member of a group to which the Provider belongs for VAT purposes), except to the extent the Provider (or any member of a group to which the Provider belongs for VAT purposes) determines it is able to recover such VAT by way of repayment or credit. "**VAT**" shall mean value added tax as levied in accordance with (but subject to derogation from) Council Directive 2006/112/EC or any similar tax outside the European Union.

Section 3.04. *Invoicing and Settlement of Service Costs.*

(a) Unless Schedule A or Schedule B, as applicable, provides otherwise or the Parties agree in writing to a different arrangement, (i) the applicable Buyer Entity, if Provider is Buyer or any Affiliate thereof, or (ii) the applicable Selling Entity, if Provider is a Selling Entity or any Affiliate thereof, shall invoice the applicable Selling Entity or Buyer, respectively, on a monthly basis for all Service Costs incurred hereunder in respect of the prior month to the extent such Service Costs are reasonably

7

determinable during such month, and to the extent any such amounts are not reasonably determinable, Provider shall continue to invoice such amounts (including after the termination of this Agreement) as promptly as practicable after such amounts are determined until all amounts are invoiced and paid (the date of delivery of such invoice or notification, the "**Invoice Date**"); *provided* that, Provider will use commercially reasonable efforts to provide Recipient with notice of the existence of amounts that are not reasonably determinable with respect to any calendar month and when such amounts are expected to be invoiced.  For the avoidance of doubt, all such invoices and payments shall be made in U.S. dollars.

(b)      Recipient agrees to pay, on or before the date that is 30 days after the Invoice Date (such date, the "**Payment Date**"), by wire transfer of immediately available funds payable to the order of (i) the applicable Buyer Entity, if Provider is Buyer or any Affiliate thereof, or (ii) the applicable Selling Entity, if Provider is a Selling Entity or any Affiliate thereof, of or to such account or accounts designated by Provider, all amounts specified in the invoice or notification delivered pursuant to the preceding clause (a).

(c)      If Recipient fails to make payment of any Service Costs in accordance with this Section 3.04, it shall be required to pay, in addition to the amount of such unpaid Service Costs, interest on such amount at a rate per annum equal to 5% per annum compounded quarterly, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "**Interest Rate**"), in each case compounded monthly from, and including, the relevant Payment Date through, but excluding, the actual date of payment.

(d)      If there is a good faith dispute (an "**Invoice Dispute**") between Provider and Recipient regarding any amount set forth in any invoice, the disputing party shall promptly notify the other party in writing (each such notice, an "**Invoice Dispute Notice**") of each amount that is the subject of the Invoice Dispute and the basis therefor, and such amount shall be excluded from the amount due pursuant to Section 3.04(b) until resolution of the Invoice Dispute in accordance with the procedures set forth below in this Section 3.04(d); *provided* that, any undisputed portion of such amount shall be included in the calculation of the amount due pursuant to Section 3.04(b) and paid in accordance with Section 3.04(b). Provider and Recipient shall cooperate and use their commercially reasonable efforts to resolve such Invoice Dispute.  If Provider and Recipient are unable to resolve the Invoice Dispute within 20 days after the applicable party's receipt of the Invoice Dispute Notice, then either Provider or Recipient may refer the Invoice Dispute for resolution to an independent accounting firm agreed upon in good faith by Provider and Recipient; *provided*, *however*, in the event such parties are unable to mutually agree on such Person, Seller, on the one hand, and Buyer, on the other hand, will each select an independent accounting firm of recognized national standing and each such selected accounting firm will select a third independent accounting firm of recognized national standing to be deemed to be the independent accounting firm selected by the parties for purposes of this Section 3.04(d), which firm may not be the regular auditing firm of either such party (the "**Invoice Accounting Referee**"), which shall determine the disputed amounts. The determinations of the Invoice Accounting Referee shall be final and binding on Provider and Recipient.  The fees and expenses of the Invoice Accounting Referee shall be borne by Provider and Recipient in the same proportion that the aggregate amount of the disputed items submitted to the Accounting Referee that are unsuccessfully disputed by each such party (as finally determined by the Accounting Referee) bears to the total amount of such disputed items so submitted.  If based on the determinations of the Invoice Accounting Referee any amount is owed by one party to the other party, then the applicable party shall promptly pay such amount with interest, from the date that such amount was required to be paid pursuant to Section 3.04(b) to (but excluding) the date of payment by the applicable party of such excess, at the Interest Rate.

8

ARTICLE 4
THE SERVICES

Section 4.01.  *Standards of Service*.  (a) Unless Schedule A or Schedule B, as applicable, indicates otherwise or the Parties agree in writing to a different arrangement, the level or volume of any specific Service required to be provided to Recipient hereunder shall be at a level or volume consistent in all material respects with the level or volume, as the case may be, of such specific Service as utilized by the Business, or the Retained Business, as applicable, during the 12-month period prior to the applicable Closing (the "**Baseline Period**") provided (i) by the Selling Entities or their Affiliates to the Business or (ii) by the Business to the Retained Business, as applicable (such level or volume, the "**Anticipated Volume**").

(b)      Unless Schedule A or Schedule B, as applicable, indicates otherwise or the Parties agree in writing to a different arrangement, each Party shall, and shall cause its applicable Affiliates and/or Third-Party Service Providers to, use its commercially reasonable efforts to perform the Services exercising the same general and reasonable degree of care, responsiveness, completeness and quality and in any event no less than such Party has historically exercised (including during the Baseline Period) in performing the same or similar services for such Party's own account in the ordinary course of business and in accordance with any additional services standards for such Services set forth on Schedule A or Schedule B, as applicable (the "**Services Standard**").

(c)      The Parties shall comply with their respective data protection obligations as set out in Schedule D (the "**Data Processing Addendum**").

(d)      Where necessary or appropriate, as mutually determined by the Parties, for Recipient to receive the Services in a particular country or region, the Parties or their local Affiliates shall enter into an additional, ancillary agreement setting forth such additional terms and conditions applicable to such country or region (each, a "**Local Agreement**").  The Local Agreements may address as necessary any specific legal, regulatory, human resource or procedural requirements necessary for compliance with applicable local Law (e.g., tax or employment) or due to variations in practices or as otherwise agreed to by the Parties.  All Local Agreements shall be subject to the terms of this Agreement.  In the event of any conflict between a Local Agreement and this Agreement, this Agreement controls.  No Local Agreement shall be effective or enforceable unless and until executed by both Parties.

Section 4.02.  *Suspension of Services*.  Provider will not be obligated to perform any Service to the extent that the provision of such Service (i) would violate any Applicable Law to which Provider is subject or (ii) would require Provider to breach any Contract to which it is party; *provided*, that in the case of the foregoing clauses (i) and (ii), Provider will use commercially reasonable efforts to provide the applicable Service in a manner according with the standards set forth in Section 4.01 as closely as possible and that avoids any such violation or breach.  If Provider determines that it is unable to provide any Service in accordance with the terms of this Agreement as a result of the circumstances set forth in this Section 4.02, Provider shall as promptly as commercially practicable and permitted by Applicable Law provide Recipient written notice of such fact and the Parties will cooperate in good faith to determine the best alternative approach.

Section 4.03.  *Management of Services*.  Except as may otherwise be expressly provided in this Agreement, the management of and control over the provision of the Services by Provider shall reside solely with Provider and notwithstanding anything to the contrary, Provider shall be permitted to choose

9

the methodology, systems and applications it utilizes in the provision of such Services; *provided* that, Provider shall remain responsible for the performance of the Services in accordance with this Agreement. The provision, use of and access to the Services shall be subject to (i) any technical and operational changes that may be required to manage any reasonable restrictions imposed by Provider in respect of data access, (ii) any third-party services, resources or dependencies, (iii) any Applicable Law, and (iv) the terms of this Agreement.

Section 4.04. *Policies and Procedures*.

(a) Except to the extent inconsistent with this Agreement, Recipient shall (and shall cause its respective Representatives and any subcontractors to) comply with the internal policies, procedures, rules and regulations of Provider (as may be updated from time to time in the ordinary course of business) applicable to (i) the use of Provider's computers, networks, telephone systems, software, data, equipment or other facilities in connection with the Services or (ii) Recipient's conduct while on Provider's premises or utilizing Provider's facilities in connection with the Services.

(b) Recipient shall (i) not attempt to obtain access to, use or interfere with any information technology systems of Provider or its Affiliates, or any data owned, used or processed by Provider or its Affiliates, except access to the extent required to do so to receive the Services, (ii) maintain reasonable security measures to protect the systems of Provider and its Affiliates to which it has access pursuant to this Agreement from access by unauthorized third parties, and any "back door," "time bomb," "Trojan Horse," "worm," "drop dead device," "virus" or other computer software routine intended or designed to disrupt, disable, harm or otherwise impede in any manner the operation of such systems, (iii) not permit access or use of information technology systems of Provider or its Affiliates by a third party other than as authorized by prior written consent of Provider or its Affiliates, (iv) not disable, damage, erase, disrupt or impair the normal operation of the information technology systems of Provider or its Affiliates, and (v) comply with the security policies and procedures of Provider and its Affiliates (as may be updated from time to time in the ordinary course of business) that Provider has provided to the Recipient.

Section 4.05. *Limitations*.

(a) It is understood that the Services to be provided to Recipient under this Agreement shall only be provided for the purposes of conducting the Business or the Retained Business, as applicable, substantially as conducted during the Baseline Period and facilitating an orderly transition of the operation of the Business or the Retained Business, as applicable, following the Closing. Neither Recipient, nor any of its Affiliates, may resell, license the use of or otherwise permit the use by others of any Services, except with the prior written consent of Provider.

(b) In providing the Services, Provider shall not be obligated to (i) maintain the employment of any specific employee or (ii) pay any costs related to the transfer or conversion of Recipient's data to Recipient or any alternate supplier of Services, all of which shall be paid by Recipient.

ARTICLE 5
DISCLAIMER, LIABILITY AND INDEMNIFICATION

Section 5.01. *Indemnification of Provider by Recipient*. Each Party, in its capacity as Recipient hereunder, agrees to indemnify and hold harmless the other Party, in its capacity as Provider hereunder, its Affiliates and their respective directors, officers, partners, members, agents, employees,

10

representatives and their respective successors and assigns (each, a "**Provider Indemnified Person**") from and against any and all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any Action, as defined below, whether involving a Third-Party Claim or a claim solely between the parties) ("**Damages**"), and to reimburse each Provider Indemnified Person for all reasonable expenses (including reasonable attorneys' fees) as they are incurred in investigating, preparing, pursuing or defending any action, suit, investigation or Proceeding, in each case by or before any arbitrator or Governmental Authority (collectively, "**Actions**"), whether or not in connection with pending or threatened litigation and whether or not any Provider Indemnified Person is a party, in each case arising out of the Services rendered or to be rendered by or on behalf of any Provider Indemnified Person pursuant to this Agreement or any actions or inactions by or on behalf of any Provider Indemnified Person in connection with any such Services; *provided*, that Recipient shall not be responsible for any Damages of such Provider Indemnified Person to the extent such Damages have resulted from a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services.

Section 5.02. *Indemnification of Recipient by Provider*. Each Party, in its capacity as Provider hereunder, agrees to indemnify and hold harmless the other Party, in its capacity as Recipient hereunder, its Affiliates, and their directors, officers, partners, members, agents and employees and their respective successors and assigns (each, a "**Recipient Indemnified Person**") from and against any Damages, and to reimburse each Recipient Indemnified Person for all reasonable expenses (including reasonable attorneys' fees), as they are incurred in investigating, preparing, pursuing or defending any Action, whether or not in connection with pending or threatened litigation and whether or not any Recipient Indemnified Person is a party, in each case solely to the extent such Damages have resulted from  a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services.

Section 5.03. *Indemnification as Exclusive Remedy*. Except for the termination provisions of Section 6.02, the indemnification provisions of this Article 5 shall be the exclusive remedy for breach of the Agreement.  For the avoidance of doubt, the limitations on liability set forth herein shall apply to all Actions between the Parties as well as any Third-Party Claims.

Section 5.04. *Liability for Payment Obligations*. Nothing in this Article 5 shall be deemed to eliminate or limit, in any respect, a Party's express obligation to pay Service Costs, Service Taxes, VAT (or amounts in respect of VAT) or Early Termination Costs for Services to be rendered pursuant to this Agreement.

Section 5.05. *EXCLUSION OF WARRANTIES*. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE SCHEDULES, THE SELLER SERVICES, BUYER SERVICES AND RIGHTS GRANTED HEREUNDER ARE PROVIDED AND GRANTED "AS-IS" WITH NO WARRANTIES, AND PROVIDER AND RECIPIENT EACH EXPRESSLY EXCLUDES AND DISCLAIMS AND WAIVES ANY WARRANTIES UNDER OR ARISING AS A RESULT OF THIS AGREEMENT, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TIMELINESS, TITLE, NON-INFRINGEMENT OR ANY OTHER WARRANTY WHATSOEVER.

Section 5.06. *Limitation of Liability*. (a) Each Party agrees that (i) in its capacity as Recipient, each Provider Indemnified Person shall not have any liability, whether direct or indirect, in contract or tort or otherwise, to any Recipient Indemnified Person or any other Person for or in connection with the

11

Services rendered or to be rendered by or on behalf of any Provider Indemnified Person pursuant to this Agreement, the transactions contemplated hereby or any actions or inactions by or on behalf of any Provider Indemnified Person in connection with any such Services or transactions except to the extent any Damages have resulted from a Provider Indemnified Person's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with any such Services, (ii) in the case of Provider's gross negligence, willful misconduct, bad faith, intentional breach or fraud in connection with providing any Services hereunder, the aggregate liability of Provider with respect thereto shall not exceed two times the aggregate amount of such Service Costs paid hereunder with respect thereto to Provider and (iii) except as otherwise provided in the foregoing clause (ii), the aggregate liability of Provider with respect to this Agreement shall not exceed the aggregate amount of such Service Costs paid hereunder to Provider.

(b) Notwithstanding the provisions of Section 5.06(a), neither Provider nor Recipient shall be liable for any (i) consequential, indirect, incidental, special or other speculative form of damages or any damages based on lost profits, diminution in value, a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) or of any other financial metric (in each case, whether trailing, forward or otherwise), (ii) punitive or exemplary damages (except to the extent actually paid by a Recipient Indemnified Person or Provider Indemnified Person, respectively, to a third party pursuant to a Third-Party Claim) or (iii) Damages that would not exist if not for, or to the extent aggravated by, any act or wrongful omission of the Recipient Indemnified Person or Provider Indemnified Person, respectively.

(c) In addition to the foregoing, each Party agrees that it shall, in all circumstances, use commercially reasonable efforts to mitigate and otherwise minimize its Damages and those of any of its Affiliates, whether direct or indirect, due to, resulting from or arising in connection with any failure by the other party to comply fully with its obligations under this Agreement.

ARTICLE 6
TERM AND TERMINATION

Section 6.01. *Term.*

(a) The term of this Agreement (the "**Term**") shall commence immediately upon the Effective Date and, unless earlier terminated pursuant to Section 6.02 or **Error! Reference source not found.**, shall terminate (i) with respect to each Service upon the expiration of the Service Period set forth on Schedule A or Schedule B, as applicable, and (ii) in its entirety upon the earliest to occur of (A) the 12-month anniversary of the Effective Date, (B) expiration or termination of the Service Periods of all Services (subject to extensions thereof pursuant to Section 6.01(b)), and (C) the mutual written consent of the Parties to terminate this Agreement; *provided* that, the provisions of Sections **Error! Reference source not found.**, 3.03, 3.04, 7.01 and 7.02 and Articles 5, 6 and 8 shall survive any such termination indefinitely.

(b) With respect to any Service Period, the applicable Recipient shall have the right to extend such Service Period for up to two additional three-month periods following the stated expiration of the applicable Service Period (each such period, a "**Renewal Period**"), by providing written notice of such election to the applicable Provider at least 30 days prior to the expiration of the Service Period or then-applicable Renewal Period. The Service Cost for any Service during any Renewal Period shall be the Service Cost of such Service during the original Service Period, *plus* 3%. All of the terms and conditions of this Agreement shall be extended and remain in force for the duration of any such Renewal Period.

Section 6.02.  *Termination.*

(a)    Except as otherwise provided in <u>Schedule A</u> or <u>Schedule B</u>, and subject to Section 2.02, this Agreement may be terminated as follows:

(i)    by the mutual written agreement of the Parties;

(ii)    by Recipient, at any time with respect to all or certain of the Services (or portion thereof) that it receives, if (i) Provider shall have failed to perform any of its material obligations under this Agreement relating to any such Service, (ii) Recipient shall have notified Provider in writing of such failure, and (iii) such failure (A) shall have continued uncured for a period of 15 days or more after receipt by Provider of such written notice thereof or (B) is incapable of remedy; or

(iii)    by Provider, at any time with respect to all or part of the Services (or portion thereof) that it provides, if (i) Recipient shall have failed to perform any of its material obligations under this Agreement relating to any such Service, (ii) Provider shall have notified Recipient in writing of such failure, and (iii) such failure (A) shall have continued uncured for a period of 15 days or more after receipt by Recipient of such written notice thereof or (B) is incapable of remedy; *provided*, *however*, that if a Party challenges or contests in good faith any invoice delivered for Services rendered pursuant to the procedures in Section 3.04(d), such challenge or contest shall not be deemed a breach of a material obligation hereunder.

Section 6.03.  *Effect of Termination.*  (a) Other than as required by Applicable Law, upon termination of any Service (or portion thereof) pursuant to Section 2.02, Section 4.02 or Section 6.02, Provider shall have no further obligation to provide the terminated Service and Recipient shall have no obligation to pay any Service Costs relating to such Services; *provided* that, notwithstanding such termination, Recipient shall remain liable to Provider for (i) all Service Costs owed and payable in respect of Services provided prior to the effective date of the termination and (ii) in the case of a termination under Section 6.02(a)(iii), any costs incurred by Provider between the time of such termination and the time the provision of the relevant Service(s) would have terminated absent such early termination.

(b)    Termination of this Agreement as provided for herein shall not prejudice or affect any rights or remedies which shall have accrued or shall thereafter accrue to either Party.

## ARTICLE 7
### ADDITIONAL AGREEMENTS

Section 7.01.  *Confidential Information.*

(a)    The Parties hereby covenant and agree to maintain confidential all Confidential Information relating to the other Party or any of such other Party's Affiliates.  Without limiting the generality of the foregoing, each Party shall cause its Affiliates, employees, agents and other Representatives to exercise the same level of care with respect to Confidential Information relating to the other Party or any of its Affiliates as it would with respect to proprietary information, materials and processes relating to itself or any of its Affiliates.  "**Confidential Information**" shall mean all information, materials and processes relating to a Party or any Affiliate of such Party obtained by the other Party or any Affiliate thereof at any time (whether prior to or after the date hereof) in any format

13

whatsoever (whether orally, visually, in writing, electronically or in any other form) relating to, arising out of or in connection with the Services rendered or to be rendered hereunder and shall include, economic and business information or data, business plans, computer software and information relating to employees, vendors, customers, products, financial performance and projections, processes, strategies and systems but shall not include (i) information which becomes generally available to the public other than by release in violation of the provisions of this Section 7.01(a), (ii) information which becomes available on a non-confidential basis to a Party from a source lawfully in possession of the information other than the other Party to this Agreement, *provided* that, the Party in question reasonably believes that such source is not or was not bound to hold such information confidential, and (iii) information acquired or developed independently by a Party without violating this Section 7.01(a) or any other confidentiality agreement with the other Party. Except with the prior written consent of the other Party, each Party will use the other Party's Confidential Information only in connection with the performance of its obligations hereunder and each Party shall use commercially reasonable efforts to restrict access to the other Party's Confidential Information to those employees of such party and its Affiliates and its and their Representatives requiring access for the purpose of performing their obligations hereunder. Notwithstanding any provision of this Section 7.01(a) to the contrary, a Party may disclose such portion of the Confidential Information relating to the other Party to the extent, but only to the extent, the disclosing Party reasonably believes that such disclosure is required by judicial or administrative process or by other requirements of Applicable Law or pursuant to any listing agreement with any national securities exchange to which a Party is subject; *provided* that, if permissible under Applicable Law, the disclosing Party will as promptly as commercially practicable notify the other Party of such requirement and allows such Party a reasonable opportunity to seek a protective order or other appropriate remedy to prevent such disclosure or waive compliance with this Article 7. To the extent no such protective order or other remedy is obtained, or the furnishing Party does not waive compliance with the terms of this Article 7, the receiving Party will, and will instruct its Representatives to, disclose only that portion of such Confidential Information which it is advised in writing by its legal counsel is legally required to be disclosed pursuant to such external request and will use its reasonable best efforts to obtain assurances that confidential treatment will be accorded such Confidential Information. The Parties acknowledge that money damages may not be a sufficient remedy for any breach of the provisions of this Section 7.01(a) and that the non-breaching Party shall be entitled to seek equitable relief in a court of law, including injunction and specific performance, in the event of, or to prevent, a breach or threatened breach of this Section 7.01(a).

(b)     To the extent disclosure of Confidential Information by a Party to another Party may cause the waiver of any applicable privilege protecting disclosure in any proceeding against a Governmental Authority, the Parties shall take commercially reasonable efforts to effect an agreement regarding common legal interest to protect disclosure of such privileged Confidential Information.

(c)     Upon the termination of this Agreement, except to the extent otherwise required by Applicable Law and/or its internal policies and procedures, each Party shall, at its election, promptly return to the other party or destroy all Confidential Information of the other received under or pursuant to the performance of this Agreement (including, to the extent practicable, all copies (in any and all media) and summaries thereof) that is within such Party's or its Affiliates' or its or their Representatives' possession, power, custody or control; *provided* that, no Party or any such Party's Affiliates or its or their Representatives shall be required to delete Confidential Information from back-up, archival electronic storage; *provided*, *further*, that, any Confidential Information retained by such Party or its Affiliates shall continue to be subject to Section 7.01(a). Promptly upon the request of a Party, the other Party shall confirm in writing to such first Party that it has complied with this Section 7.01(c). Notwithstanding

14

anything in this Section 7.01, to the extent information is required to be held in confidence under both this Section 7.01 and any provision of the applicable Purchase Agreement, the provisions of the applicable Purchase Agreement shall control.

(d)    Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by the Selling Entities to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement, the Clean Team Agreement or otherwise.

Section 7.02.  *Intellectual Property.*

(a)    Subject to the terms and conditions of this Agreement, with respect to each Service, Provider hereby grants to Recipient a limited, non-exclusive and royalty-free license on an "as is," warranty-free basis, solely during the Service Period of such Service, to use any Intellectual Property both (i) owned or licensable (without the consent of or payment to any third party) by Provider and (ii) provided or otherwise made available by Provider to Recipient as part of such Service, but in each case solely to the extent necessary for: (A) where Buyer is Recipient, Buyer to receive and use such Service as provided for and in accordance with this Agreement and to otherwise conduct the Business on an irrevocable, perpetual, sublicensable and assignable basis; or (B) where a Selling Entity is Recipient, such Selling Entity to liquidate and wind up such Selling Entity's estate on a non-sublicensable and non-assignable (except as expressly provided in Section 8.10) basis.  For clarity, where a Selling Entity is Provider, the foregoing license to Buyer applies to Intellectual Property not considered an Asset under Section 7.02(c).

(b)    Subject to the terms and conditions of this Agreement, with respect to each Service, Recipient hereby grants to Provider a limited, non-exclusive, royalty-free, non-sublicensable (except to any third-party service provider as expressly set forth herein), non-assignable (except as expressly provided for in Section 8.10) license on an "as is," warranty-free basis, solely during the Service Period of such Service, to use any Intellectual Property owned or licensable (without the consent of or payment to any third party) by Recipient, but in each case solely to the extent necessary for Provider, its Affiliates and any Third-Party Service Provider to perform such Service as provided for and in accordance with this Agreement (it being understood that Provider shall have the right to grant a sublicense under the foregoing license to any of its Affiliates, subcontractors or third-party service providers), *provided* that where the Buyer or its Affiliate is Recipient, this license to such Selling Entity only applies to Intellectual Property that is embodied in documentation, materials, information or technology that are made available to the applicable Selling Entities by Buyer or that the applicable Selling Entity has authorized access to for the sole purpose of providing the Seller Services to Buyer or its Affiliate.

(c)    As between the Parties: (A) where Buyer is the Provider, subject to the license granted under (a), any and all Intellectual Property developed or acquired by or for Buyer or any of its Affiliates or any Third-Party Service Provider, whether alone or jointly with any other Person, in connection with providing or making available any Buyer Services, shall be owned solely and exclusively by Buyer and, to the extent that any Selling Entity or any of its Affiliates acquires any right, title or interest in or to any such Intellectual Property, Recipient, on behalf of itself and its Affiliates, hereby irrevocably assigns to Buyer or its designee all such right, title and interest.  The applicable Selling Entity shall take or cause to be taken such further actions, including the execution and delivery of such further documents and instruments, as may be reasonably required to effectuate fully this Section 7.02(c), or (B) where a Selling

15

Entity is the Provider, any and all documentation, materials, information, technology or other deliverables, in any form, provided or made available by such Selling Entity or any of its Affiliates or any Selling Entity Third-Party Service Provider to Buyer or its Affiliate, in connection with the Services, and all Intellectual Property related thereto and shall constitute part of the Assets under the applicable Purchase Agreement.

(d)     EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 7.02, NO LICENSES OR ANY OTHER RIGHT, TITLE OR INTEREST IN OR TO ANY INTELLECTUAL PROPERTY OR OTHER ASSETS ARE GRANTED TO EITHER PARTY OR ANY OF ITS AFFILIATES UNDER THIS AGREEMENT, WHETHER BY IMPLICATION, ESTOPPEL, EXHAUSTION OR OTHERWISE, AND EACH PARTY RETAINS AND RESERVES ANY AND ALL RIGHT, TITLE AND INTEREST NOT EXPRESSLY GRANTED UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY, NOTHING IN THIS Section 7.02 IS INTENDED DILUTE OR DIMINISH ANY REPRESENTATIONS, WARRANTIES, INDEMNITIES OR OTHER REMEDIES WITH RESPECT TO INTELLECTUAL PROPERTY IN THE APPLICABLE PURCHASE AGREEMENT OR OTHERWISE MODIFY THE APPLICABLE PURCHASE AGREEMENT.

Section 7.03.  *Access to Information.*  Subject to Applicable Law and the confidentiality provisions of Section 7.01, with respect to any Service during the term of such Service, each Party shall, and shall cause its Affiliates to, upon reasonable advance notice, afford the other Party and its Affiliates and Representatives reasonable access, during normal business hours, to the employees, properties, systems, books and records and other documents that are reasonably requested in connection with the provision and receipt of such Service hereunder*; provided* that, any such access shall not unreasonably interfere with the conduct of the business of the Party providing such access; and *provided*, *further*, that, in the event any Party reasonably determines that affording any such access to the other Party would be commercially detrimental in any material respect or violate any Applicable Law or agreement to which such Party or any Affiliate thereof is a party, or waive any attorney-client privilege applicable to such Party or any Affiliate thereof, the Parties shall use commercially reasonable efforts to permit the compliance with such request in a manner that avoids any such harm or consequence.

Section 7.04.  *Employment and Labor Matters.*  All employment and labor matters relating to employees of Provider (including, without limitation, employees involved in the provision of Services to Recipient) shall be within the exclusive control of Provider, and Recipient shall not take any action affecting such matters.  Nothing in this Agreement is intended to transfer the employment of employees engaged in the provision of any Service from Provider to Recipient.  All employees and Representatives of Provider and any of its Affiliates will be deemed for all compensation, employee benefits, tax and social security contribution purposes to be employees or Representatives of Provider or its Affiliates (or their subcontractors) and not employees or Representatives of Recipient or any of its Affiliates.  In providing the Services, such employees and Representatives of Provider and its Affiliates (or their subcontractors) will be under the direction, control and supervision of Provider or its Affiliates (or their subcontractors) and not of Recipient or its Affiliates.

Section 7.05.  *The Transfer of Undertakings*.  For purposes of this Section 7.05, "**TUPE**" means the Transfer of Undertakings (Protection of Employment) Regulations 2006 as amended from time to time or other national legislation implementing the Acquired Rights Directive.  Further to Section 7.04, it is the understanding of the Parties that the termination of this Agreement or the arrangements envisaged under it (whether in whole or part) will not result in the transfer of any employees pursuant to TUPE.  If

by virtue of TUPE and the termination or expiry of this Agreement (whether in whole or in part) for whatever reason, any employment or any contract of employment or any liability regarding the employment of any person employed by Provider or any of Provider's Affiliates, agents, sub-contractors, suppliers or associates involved in the provision of the Services (a "**Provider Employer**") shall transfer to (or be alleged to transfer to) the Recipient or any of Recipient's Affiliates, agents, sub-contractors, suppliers or associates (a "**Recipient Employer**"), such person being a "**Transferred Employee**": (i) Recipient Employer may terminate the employment of any such Transferred Employee; and (ii) Provider shall indemnify Recipient in full for and against all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any Action) incurred or suffered by Recipient Employer arising out of (x) the termination of any such Transferred Employee, (y) any obligations the Recipient Employer may have with respect to the Transferred Employee under TUPE, and (z) any other act or omission of Provider Employer, or any other event or occurrence, in respect of such Transferred Employee, in either case whether before, on or after the termination or expiry of this Agreement (whether in whole or in part).

ARTICLE 8

MISCELLANEOUS

Section 8.01. *No Agency; Independent Contractor Status*. Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between the Parties or constitute or be deemed to constitute any Party the agent or employee of any other Party for any purpose whatsoever and no Party shall have authority or power to bind any other Party or to contract in the name of, or create a liability against, any other Party in any way or for any purpose. The Parties acknowledge and agree that Provider is an independent contractor in the performance of each and every part of this Agreement and nothing herein shall be construed to be inconsistent with this status. Provider shall have the authority to select the means, methods and manner by which any Service is performed.

Section 8.02. *Subcontractors*. Provider may hire or engage one or more subcontractors to perform all or any of its obligations under this Agreement; *provided* that, Provider shall (i) use the same degree of care in selecting any subcontractors as it would if such subcontractor was being retained to provide similar services to Provider, (ii) ensure that such subcontractor is responsible for the provisions of Section 4.01 and (iii) in all cases, remain responsible for ensuring that obligations hereunder with respect to the scope of the Services, the Services Standard and the content of the Services provided to Recipient.

Section 8.03. *Force Majeure*. (a) For purposes of this Section 8.03, "**force majeure**" means an event beyond the reasonable control of either Party, which by its nature could not have been foreseen by such Party, or, if it could have been foreseen, was unavoidable, and includes without limitation, acts of God, storms, floods, riots, fires, sabotage, civil commotion or civil unrest, interference by civil or military authorities, threat, declaration, continuation, escalation or acts of war (declared or undeclared) or acts of terrorism, cyber-attacks, embargo, pandemics, failure or shortage of energy sources, raw materials or components, strike, walkout, lockout or other labor trouble or shortage, delays by unaffiliated suppliers or carriers, and acts, omissions or delays in acting by any Governmental Authority or the other Party.

(b) Without limiting the generality of Section 5.06(a), Provider shall not be liable to Recipient or any other Person for interruption of service, any delays or failure to fulfill any obligations under this Agreement, so long as and to the extent the interruption, delay or fulfillment of such obligation is prevented, frustrated, hindered, or delayed as a consequence of circumstances of force majeure; *provided* that, Provider shall have used commercially reasonable efforts to minimize to the extent practicable the

17

effect of force majeure on its obligations hereunder; *provided*, *however*, that in no event shall Provider be required to pay any money or other consideration (unless Recipient agrees to reimburse Provider therefor) or grant any material accommodation to any Person (including any material amendment to any contract) or to initiate any claim or proceeding against any Person; *provided*, *further*, that, nothing in this Section 8.03 shall be construed to require the settlement of any strike, walkout, lockout or other labor dispute on terms which, in the reasonable judgment of Provider, are contrary to its interests. It is understood that the settlement of a strike, walkout, lockout or other labor dispute will be entirely within the discretion of Provider.  Provider shall use commercially reasonable efforts to promptly notify Recipient upon learning of the occurrence of such event.

Section 8.04.  *Entire Agreement*.  This Agreement (including the Schedules), any other writing signed by the parties that specifically references this Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 8.05.  *Information*.  Subject to Applicable Law and privileges, each Party covenants and agrees to provide the other Party with all information regarding itself and transactions under this Agreement that the other Party reasonably believes are required to comply with all applicable federal, state, county and local laws, ordinances, regulations and codes, including, but not limited to, securities laws and regulations.

Section 8.06.  *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission, so long as a receipt of such email is requested and received) (whether or not expressly required herein) and shall be given,

if to Buyer (as applicable), to:

IB Housewares US Holdings, LLC
c/o Anchor Hocking Holdings, Inc.
Attn: Mark Eichhorn
519 Pierce Avenue
Lancaster, OH 43130
E-mail:  Mark.Eichhorn@AnchorHocking.com

or

IB Appliances US Holdings, LLC
Centre Lane Partners, LLC
Attn: Quinn Morgan; Mayank Singh, Timothy Chiodo
60 E 42nd Street, Suite 2220
New York, NY 10165
E-mail: qmorgan@centrelanepartners.com; msingh@centrelanepartners.com; tchiodo@centrelanepartners.com

with a copy (which shall not constitute notice) to:

18

Jones Day
250 Vesey Street
New York, NY 10281
Attention:      Jason R. Grove; William T. Sinchuk
Email:          jrgrove@JonesDay.com; wsinchuk@jonesday.com

if to Seller, to:

Instant Brands Acquisition Holdings Inc.
3025 Highland Parkway, Suite 700
Downers Grove, Illinois 60515
Attention:      Catherine R. Landman
Email:          cathy.landman@instantbrands.com

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:      William J. Chudd
               Brian Resnick
Facsimile No.:  (212) 701-5800
E-mail:        william.chudd@davispolk.com
               brian.resnick@davispolk.com

or such other address, facsimile number or email as such Party may hereafter specify for the purpose by notice to the other Parties. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

Section 8.07. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.*

(a)      Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy

19

Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with Section 8.06.) or any other manner permitted by law.

(c)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08. *Severability*. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.09. *Amendments and Waivers*. (a) Except as otherwise provided in this Agreement, any provision of this Agreement (including the Schedules) may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)    The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 8.10. *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns (including, for the avoidance of doubt, any liquidating trustee or trust (or any person or entity acting in a similar capacity)); *provided* that, (x) this Agreement and the rights and obligations of Seller may be assigned, in whole or in part, by Seller to one or more third parties that purchase all or a portion of the Retained Business, (y) other than as set forth in the preceding clause (x), no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party, except that either Party may assign any or all of its rights and obligations under this Agreement to any of its Affiliates; *provided* that no such assignment shall release such Party from any liability or obligation under this Agreement.

20

Section 8.11.  *Specific Performance*.  The parties agree that irreparable damage would occur, and that the Parties would not have any adequate remedy at law, if any provision of this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated hereby) were not performed in accordance with the terms hereof.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, or to enforce specifically the performance of the terms and provisions hereof or thereof in the courts referenced in Section 8.07(b).  In furtherance of the foregoing, the Parties hereby waive, to the fullest extent permitted by Applicable Law, (a) any and all defenses to any action for specific performance hereunder, including any defense based on the claim that a remedy at law would be adequate and (b) any requirement to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.12.  *Third Party Rights*.  Except as otherwise provided herein, no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person, other than the Parties and their respective successors and assigns.

Section 8.13.  *Counterparts*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLER:**

**INSTANT BRANDS ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**SELLING ENTITIES:**

**INSTANT BRANDS HOLDINGS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS (TEXAS) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.**

By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**INSTANT BRANDS LLC**

By: _____
Name: _____
Title: _____


**URS-1 (CHARLEROI) LLC**

By: _____
Name: _____
Title: _____


**EKCO GROUP, LLC**

By: _____
Name: _____
Title: _____


**CORELLE BRANDS (GHC) LLC**

By: _____
Name: _____
Title: _____


**URS-2 (CORNING) LLC**

By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**CORELLE BRANDS (LATIN AMERICA) LLC**


By: _____
Name: _____
Title: _____

**EKCO HOUSEWARES, INC.**


By: _____
Name: _____
Title: _____


**EKCO MANUFACTURING OF OHIO, INC.**


By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**<u>CANADIAN SELLERS:</u>**

**CORELLE BRANDS
(CANADA) INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS
(CANADA)
HOLDING INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS INC.**

By: _____
Name: _____
Title: _____

**INSTANT BRANDS
ACQUISITION HOLDINGS INC.**

By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**<u>BUYER</u>**

**IB APPLIANCES US
HOLDINGS, LLC**

By: _____
Name:  Quinn Morgan
Title:    President

**IB APPLIANCES CANADA
HOLDINGS, INC.**

By: _____
Name:  Quinn Morgan
Title:   President

**IB HOUSEWARES US
HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

**IB HOUSEWARES CANADA
HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

*[Signature Page to Transition Services Agreement]*

**Schedule A**
**Seller Services**

| | Function | Service Name | Description | Duration | Monthly charge | Basis for charge |
|---|---|---|---|---|---|---|
| 1 | Operations | Customs Bond | • Reasonable access to the Selling Entities' customs bonds for Business imports. | 60 days | $0 | N/A |
| | | Leases | • Access to the leased real property located at:<br>  ○ 3025 Highland Parkway, Downers Grove, IL pursuant to the Office Lease, dated September 30, 2020 (as amended).<br>  ○ 1200 South Antrim Way, Greencastle, PA, dated December 16, 2012 (as amended) | 9 weeks | To include all applicable real estate costs as required to be paid under such applicable lease (e.g., rent, common area maintenance, utilities and insurance) | N/A |
| 2 | HR | Management Access | • Access to certain Non-Offer Employees to be agreed for Business consultation purposes and ongoing support. | 9 weeks | TBD | N/A |

**Schedule B**
**Buyer Services[4]**

| | Function | Service Name | Description | Duration | Hourly Charge | Monthly Estimate | Basis for charge |
|---|---|---|---|---|---|---|---|
| 1 | Finance | Account Wind Down | • Supervise the cessation of activity and close all appropriate accounts and obligations with financial institutions | 9 weeks | $115 | $100,000 | 2.5 FTE Salaries |
| | | Audit | • Engage external professionals, support, supervise, and disseminate final audits for the estate | | | | |
| | | Claims Reconciliation | • Assist Legal team members in the termination of payment for contracts | | | | |
| | | Control | • Manage payment and processing of accounts payable and receivable throughout the Wind Down<br>• Supervise and monitor adherence to Wind Down budget<br>• Forecast cash flows and liquidity for term of Wind Down | | | | |
| | | Payroll | • Manage cessation of payroll for transferred employees and obligations, and fulfill payroll obligations for Wind Down team | | | | |
| | | Tax | • Engage external professionals, support, supervise, and submit final tax documents to appropriate authorities | | | | |
| 2 | HR | Benefit Termination | • Terminate benefit programs held by estate<br>• Notify authorities of benefit terminations<br>• Engage external professionals, support, supervise, and submit benefit audits or other statutory requirements to effect benefit plan closures | 9 weeks | $90 | $16,000 | 1 FTE Salary |
| | | Personnel Reduction | • Manage the reduction in staffing of personnel not transferred to include design, implementation, and statutory reporting of said reduction<br>• Manage retention and attendant benefit administration for Wind Down team members<br>• Close all accounts for employment statistic recording and taxation with appropriate agencies | | | | |
| 3 | IT | Data Migration | • Identify data for retention<br>• Create archive for retention<br>• House data in reliable, sustainable format | 9 weeks | $120 | $20,000 | 0.5 FTE Salary |

---

[4] Notwithstanding anything set forth in this Agreement, Buyer is under no obligation to engage a Third-Party Service Provider at its sole cost and expense to perform any Service.

| | Function | Service Name | Description | Duration | Hourly Charge | Monthly Estimate | Basis for charge |
|---|---|---|---|---|---|---|---|
| | | | • Develop access protocols for retained data | | | | |
| | | Operations Wind Down | • Coordinate termination of IT-related accounts, services and attendant contracts<br>• Coordinate sanitation of orphaned data and non-transferred hardware<br>• Coordinate liquidation of orphaned hardware | | | | |
| 4 | Legal | Contract Termination | • Assist other Wind Down team members in the negotiation, cure, and termination of outstanding contracts held by the estate post-close | 9 weeks | $120 | $50,000 | 1.5 FTE Salaries |
| | | Entity Wind Down | • Monitor and execute the termination of all estate entities with respective authorities for all aspects of the estate's activities<br>• Notice through applicable channels the Wind Down of the estate as required by appropriate authorities<br>• Monitor and execute the closing of all accounts with regulatory authorities as appropriate | | | | |
| | | Liability Termination | • Monitor and execute the cessation of all non-contractual obligations of the estate as appropriate | | | | |
| 5 | Sourcing | Contract Support | • Assist Legal team members in identification of retained contracts<br>• Assist in identification and negotiation of termination cures where applicable<br>• Execute termination of applicable contracts | 9 weeks | $120 | $27,000 | 0.75 FTE Salary |
| | | Facilities Wind Down | • Identify facilities not subject to transition<br>• Execute shut down of remaining facilities, to include leasehold termination, utilities termination, asset liquidation, and custody forfeiture | | | | |

*[Signature Page to Transition Services Agreement]*

**Schedule C**
**Excluded Services**

None.

**Schedule D**
**Data Processing Addendum**

In this <u>Schedule D</u>: (i) references to "controller", "processor", "processing", "personal data" and "personal data breach" shall have the same meaning as defined in the Data Protection Laws; and (ii) "<u>Data Protection Laws</u>" shall mean (a) EC Regulation 2016/679 (the "<u>GDPR</u>") on the protection of natural persons with regard to the processing of personal data and on the free movement of such data or the UK GDPR (as defined in section 3(10) of the Data Protection Act 2018) in respect of the United Kingdom; (b) Directive 2002/58/EC of the European Parliament and of the Council of 12 July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications); and (c) all other binding applicable data protection, data privacy and data security laws.

1.      The Parties agree that Provider will act as a processor with respect to the personal data that it processes on behalf of Recipient in the course of it providing the Services.  This <u>Schedule D</u> sets out the obligations of the Parties with respect to such processing. The categories of personal data and data subjects are set out in Clause 8.

2.      Provider shall not engage any sub-processors to process any personal data without the prior specific or general written authorization of Recipient (in respect of Recipient's personal data) and without ensuring that the sub-processors are subject to the same data protection obligations as set out in this Schedule D. Provider shall at all times remain fully liable for the acts and omissions of the sub-processors as regards the processing of the personal data. In the case of general written authorization, Provider shall inform Recipient of any intended changes concerning the addition or replacement of any sub-processor(s), thereby giving Recipient the opportunity to object to such changes.

3.      Recipient (as applicable) shall comply with the obligations imposed on controllers under the Data Protection Laws, including ensuring that there is a lawful basis for processing any personal data that is processed on its behalf by Provider.

4.      Provider shall (and shall procure that its sub-processors shall) comply with Data Protection Laws as applicable to data processors and shall also:

(a)      process the personal data only on documented instructions of Recipient (in respect of Recipient's personal data) and in accordance with the terms of this Agreement;

(b)      keep the personal data confidential and ensure that any person it authorizes to process Recipient's personal data (including its staff, agents and subcontractors) shall be subject to such duty of confidentiality (whether a contractual or a statutory duty);

(c)      take all appropriate technical and organizational measures necessary to ensure that personal data are protected against loss, destruction and damage, unauthorized access, use, modification, disclosure or other misuse;

(d)      use the personal data obtained as a result of this Agreement only for the purposes of providing the Services and for no other purposes;

*[Signature Page to Transition Services Agreement]*

(e)     ensure that only persons authorized by Provider have access to personal data and ensure the reliability of the persons who will be approved by Provider to have access to personal data and who otherwise process the personal data;

(f)     notify Recipient without undue delay, and in any event within thirty six (36) hours after becoming aware of any personal data breach;

(g)     assist Recipient in ensuring compliance with its obligations under Articles 32 to 36 of the GDPR, taking into account the nature of processing and the information available to Provider;

(h)     provide reasonable assistance to Recipient to enable Recipient to comply with its obligations to respond to requests for exercising the data subject's rights under the Data Protection Laws; and

(i)     on reasonable notice and during normal working hours of Provider, allow for and contribute to audits to audit Provider's processing operations, systems and/or facilities where reasonably required to assess Provider's compliance with this Schedule D and , co-operate with all requests of Recipient for information and make available information to Recipient to demonstrate Provider's compliance with this Schedule D.

5.     Where, by operation of this Schedule D, Clause 4(g)-(i), Provider is obliged to provide assistance to Recipient, or to third parties at the request of Recipient (including submission to an audit or inspection and/or the provision of information), the costs and expenses that are reasonably incurred by Provider will be payable by Recipient in accordance with the fees set forth on Schedule A and Schedule B.

6.     On the termination of this Agreement, howsoever arising, Provider shall return all copies of the personal data to Recipient (in respect of Recipient's personal data) or, at Recipient's (in respect of Recipient's personal data) specific and written request, delete all copies of the personal data subject to applicable legal obligations on Provider to retain any such documents containing personal data (in which event Provider shall restrict the access to and processing of such personal data to the extent necessary to meet the requirements of such legally required obligations and continue to hold such personal data in accordance with the terms of this Schedule D).

7.     Provider shall not transfer personal data outside the United Kingdom (other than to the European Economic Area) or the European Economic Area without the prior written consent of Recipient (in respect of Recipient's personal data) and, where such written consent is provided by Recipient, only following the execution (and any required regulatory approval) of standard contractual clauses in the form approved by the UK government or the European Commission from time to time or such equivalent data transfer agreements or arrangements (including the EU-US Data Privacy Framework or binding corporate rules) in compliance with the applicable provisions of the Data Protection Laws.

8.     The particulars of the processing undertaken by Provider on behalf of Recipient are as follows:[5]

---

[5] **Note to Draft**: These particulars will need to be reviewed/confirmed in conjunction with the populated Service Schedule once available.

*[Signature Page to Transition Services Agreement]*

| Subject matter and duration of processing | The subject matter of the processing under this Agreement is personal data processed by Provider in performance of the Services.<br>The duration of the processing under this Agreement is determined in accordance with <u>Schedule A</u> and <u>Schedule B</u> (Services). |
|---|---|
| Nature and purpose of processing | The purpose of the processing under this Agreement is Provider's performance of the Services. |
| Types of personal data | Types of personal data processed are:<br>• Name;<br>• Title;<br>• Position; and<br>• Contact information (company, email, phone, physical business address). |
| Categories of data subjects | Data subjects are:<br>• Prospects, customers, business partners and vendors of Recipient (who are natural persons);<br>• Employees or contact persons of Recipient's prospects, customers, business partners and vendors; and<br>• Employees, agents, advisors, freelancers of Recipient (who are natural persons). |

*[Signature Page to Transition Services Agreement]*