**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INSTANT BRANDS ACQUISITION | ) | Case No. 23-90716 (MI) |
| HOLDINGS INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**OBJECTING SUPPLIERS' REPLY (I) IN SUPPORT**
**OF THEIR OBJECTIONS TO THE DEBTORS' COMBINED**
**DISCLOSURE STATEMENT AND PLAN AND (II) IN RESPONSE TO THE**
**DEBTORS' OPPOSITION TO THE SUPPLIERS' PLAN OBJECTION**

Pursuant to the *Joint Stipulation and Agreed Order Regarding Discovery and Plan Objection Briefing* [Dkt. No. 976] (the "Stipulation"), GuangDong Midea Consumer Electric Manufacturing Company Limited, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, and Midea Electric Trading (Singapore) Co. Pte Ltd. (collectively, "Midea") and Zhejiang Tianxi Kitchen Appliance Co., Ltd. ("Tianxi," and together with Midea, the "Objecting Suppliers") submit this reply (i) in support of their preliminary objections to the Debtors' Combined DS and Plan[1] [Dkt. Nos. 870, 876] and (ii) in response to the Debtors' opposition to the Suppliers' Plan Objection [Dkt. No. 965] (the "Debtors' Opposition").

---

[1] Unless otherwise stated, capitalized terms have the meanings stated in the solicitation version of the Debtors' Combined DS and Plan. Dkt. No. 926-1.

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 5

ARGUMENT ..................................................................................................................... 8

    A. The Debtors Have No Accrued Pre-Assignment Indemnity Rights, Which
Means the Estate Has No Indemnity Rights at All ..................................................... 11

    B. The Supply Agreements Were Assigned In Toto to the Appliances Buyers
and No Indemnification Rights Remain with Debtors ................................................. 14

    C. It Would Be Inequitable to Allow the Debtors to Enforce Indemnity Rights
in the Future Under Contracts They Assigned ............................................................ 18

CONCLUSION ................................................................................................................. 20

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*In re Apex Long Term Acute Care—Katy, L.P.*, 465 B.R. 452, 464 (S.D. Tex.
 2011) ....................................................................................................................................4

*Callaway Manor Apartments, Ltd. v. U.S.*,
 940 F.3d 650 (Fed. Cir. 2019)....................................................................................8, 9, 10

*In re Cantu*,
 784 F.3d 253 (5th Cir. 2015) ....................................................................................12, 13, 14

*CECG, Inc. v. Magic Software Enterprises, Inc.*,
 51 Fed. App'x 359 (3d Cir. 2002).........................................................................................10

*Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland*,
 401 A.2d 101 (Del. Sup. Ct. 1979) .......................................................................................11

*Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*,
 1 F.3d 365 (5th Cir. 1993) ....................................................................................................14

*Hartford Accident and Indem. Co. v. Gulf Ins. Co.*,
 776 F.2d 1380 (7th Cir. 1985) ..............................................................................................14

*In re Hemingway Transport, Inc.*,
 954 F.2d 1 (1st Cir. 1992).....................................................................................................12

*In re J T Thorpe Co.*,
 308 B.R. 782 (S.D. Tex. 2003) ...............................................................................................8

*LaPoint v. Amerisource Bergen Corp.*,
 970 A.2d 185 (Del. 2009) ......................................................................................................11

*Laugelle v. Bell Helicopter Textron, Inc.*,
 C.A. No. 10C-12-054, 2014 WL 2699880 (Del. Sup. Ct. June 11, 2014)..............................11

*In re Manville Forest Prods. Corp.*,
 209 F.3d 125 (2d Cir. 2000)...................................................................................................13

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) .........................................7

*In re Old CarCo LLC*,
 529 B.R. 42 (Bankr. S.D.N.Y. 2015).................................................................................17, 18

*In re Ross*,
 548 B.R. 632 (Bankr. E.D.N.Y) .............................................................................................12

*Rottlund Homes of New Jersey, Inc. v. Saul Ewing, Remick & Saul, LLP*,
    243 F.Supp.2d 145 (D. Del. 2003) ........................................................................17

*In re Swift*,
    198 B.R. 927 (Bankr. S.D. Tex. 1996), *aff'd* 114 F.3d 1183 (5th Cir. 1997) ...................12, 13

*Matter of Thornhill Bros. Fitness, LLC*,
    85 F.4th 321 (5th Cir. 2023) ............................................................ *passim*

*Verde v. Stoneridge, Inc.*,
    No. 14-cv-225, 2016 WL 749389 (E.D. Tex. Jan. 26, 2016) ..................................18

**Statutes**

11 U.S.C. § 365(f) ....................................................................................................1

11 U.S.C. § 541(a)(1) .............................................................................................12

28 U.S.C. 1334 ........................................................................................................4

Bankruptcy Code § 101(5)(A) ...............................................................................12

Bankruptcy Code § 363 ............................................................................... *passim*

Bankruptcy Code § 365 ............................................................................... *passim*

Bankruptcy Code § 541 ............................................................................... *passim*

U.C.C. § 9-406(d) ..................................................................................................16

U.C.C. § 9-406(f) ...................................................................................................17

UCC 2-207 .............................................................................................................10

**Other Authorities**

6A C.J.S. Assignments § 105 (2022 update) ........................................................10

Restatement (Third) Restitution and Unjust Enrichment § 70, cmt. (f) ...............11

## INTRODUCTION

1.        With the concessions made in the Debtors' Opposition, the Court's decision has become straightforward.  The Debtors unambiguously concede that they assigned the Objecting Suppliers' Supply Agreements "*in toto*" to the Appliance Buyers.  Debtors' Opposition at ¶ 1. Of course, they must say this because both the Bankruptcy Code, 11 U.S.C. § 365(f), and *Matter of Thornhill Bros. Fitness, LLC*, 85 F.4th 321, 326 (5th Cir. 2023), dictate assignment of executory contracts *in toto*.  Thus, as of November 8, 2023, the Debtors lost any contractual relationship whatsoever with the Objecting Suppliers, the Debtors were supplanted instead by the assignees, the Appliances Buyers, and any indemnity claims that may accrue under the Supply Agreements as of that date would belong only to the Appliances Buyers.

2.        However, the Debtors' Opposition holds out hope that, notwithstanding the assignment of the Supply Agreements, the Debtors retain all *pre-assignment* "rights, claims and causes of action under each Supply Agreement based on facts and circumstances arising, or the extent attributable to, any Excluded Liabilities, including the rights of the [Debtors] in respect of any ████████ . . . or product liability." Debtors' Opposition at ¶ 24. Fatal to this contention, however, is the fact that — just like the so-called indemnity claim in *Thornhill* premised on pre-petition injury — these "claims" referenced by Debtors have never been fixed to judgment or settlement, and in any event require enforcement of the very Supply Agreements that they concede are held, *in toto*, by the Appliances Buyers.  The Debtors' attempt to affirmatively carve out indemnity rights from the assigned Supply Agreements by amending the form of assignment that the Court approved (without any prior notice to the Objecting Suppliers or this Court) would be a direct end-run around *Thornhill* and must fail.

3.      The Debtors assert that they have "accrued" property rights in said claims, should any such claim proceed to judgment or settlement in the future.  This is wrong.  The Debtors fail to appreciate the basic distinction between broadly defined concept of "claims" *against* the Debtors under Section 101(5), and the much narrower definition of when a claim *by*  (or more precisely, cause of action of) the Debtors is "property of the estate" under Section 541 of the Bankruptcy Code and state law.  A potential future claim that may at some later date be asserted by the Debtors becomes property of the estate only when the claim actually accrues under state law.  Even if the likelihood of a future claim by the Debtors is foreseeable, it is the actual accrual of the claim as a ripe cause of action that matters.  Claims for indemnity accrue only when the potential liability becomes a liquidated sum certain upon a judgment or settlement. If the Debtors have not yet suffered a loss, then there is no loss to indemnify, and no loss upon which to sue.

4.      It is as obvious and simple as that.  These "claims" as of November 8 were inchoate and did not exist under state law, which means they do not exist as property of the Debtors or their estates.  The only parties with the right to be reimbursed for an unaccrued claim that later turns into an accrued claim (i.e., it becomes an actual loss by virtue of final judgment or settlement) are the Appliances Buyers.

5.      The Debtors complain about the unfairness of not retaining contractual indemnity rights that they fully assigned, but in addition to being an obvious consequence of their complete assignment, this is exactly what the Debtors signed up for.  The Debtors chose to utilize the free and clear provisions of Section 363 of the Bankruptcy Code to maximize the value of the appliances business and the cash consideration the Debtors and their estates received.  In doing so, the Debtors elected to retain the Excluded Liabilities (versus assigning those liabilities to the Appliances Buyers, undoubtedly for significantly less cash consideration), but have failed to

adequately discharge these Excluded Liabilities through their Combined DS and Plan under Section 1141, instead relying on indemnity obligations of the Objecting Suppliers that ceased on the appliances sale closing date as a perpetual backstop for certain known and unknown unaccrued claims. The Debtors used Sections 363 and 365 to assign the existing Supply Agreements, thereby precluding the Objecting Suppliers from (i) renegotiating those contracts (including their indemnity provisions) with the Appliances Buyers or (ii) doing business with another company instead or (iii) even exiting the market entirely. Having monetized these avenues to maximize the cash return on sale of the appliances business, and by their own admission having been required by law to assign the Supply Agreements in their entireties, the Debtors cannot now claim to have contractual rights to enforce claims that never accrued before sale.

6.      By contrast, the Objecting Suppliers have lived up to their contractual obligations. Any claims that arose pre-sale *and had also accrued* — in other words, had been fixed to a right of payment by judgment or settlement triggering a right to indemnity  — were indeed due and owing separate and apart from enforcement of the Supply Agreements, and have apparently been satisfied or otherwise reimbursed.[2] As the Debtors also admit, the Objecting Suppliers maintained substantial product liability insurance that included the Debtors as additional insureds for products they sold.[3] Thus, the Debtors have no need for the Objecting Suppliers to connect allegedly-injured consumers with compensation. The contention that the Objecting Suppliers are "looking for a windfall" or trying to deny compensation to products liability plaintiffs thus misses the mark.

---

[2] Indeed, the Objecting Suppliers are not aware of *any* claims that accrued under applicable law prior to November 8, 2023, and have not been satisfied.

[3] The Objecting Suppliers take no position on whatever rights the Debtors still may assert under these insurance policies, which is not an issue before this Court for decision.

The Objecting Suppliers are merely asking for settled bankruptcy and indemnity law to be enforced, and for their resulting (lack of) obligations to the Debtors to be recognized and declared.

7.      At the suggestion of this Court, the Debtors have included in the current Plan a "toggle" that will automatically adjust its provisions should this Court agree that the Debtors have no accrued indemnity rights to claims that did not mature into fixed rights to payment before the sale of the appliances business.  Because that is indeed what the law says, this Court should confirm that no such rights were retained by the Debtors at all, and allow the proceedings to move forward without that incorrect assumption in force.

8.      The Objecting Suppliers' objections should be sustained, and the Court should declare that (i) the Supply Agreements were assigned to the Appliances Buyers *in toto*; (ii) that the Debtors did not retain, assert, and/or assign any contractual indemnification rights and/or unaccrued claims under the Supply Agreements; (iii), and that any contractual claims the Debtors may have held against the Objecting Suppliers are contingent, inchoate, unaccrued, and therefore either did not survive the sale to Appliances Buyers or are otherwise unenforceable by the Debtors.

9.      In requesting that the foregoing declarations relating to the Debtors and their estates be made by this Court, the Objecting Suppliers are not consenting in any way to jurisdiction in any other forum where the Debtors (or Reorganized Debtors) might otherwise be named in any action or proceeding. The law in this District is clear that a bankruptcy court's jurisdiction under 28 U.S.C. 1334 is premised on in rem jurisdiction and therefore only encompasses the property of the debtor's estate.  *See, e.g.*, *In re Apex Long Term Acute Care—Katy, L.P.*, 465 B.R. 452, 464 (S.D. Tex. 2011) ("Because the bankruptcy courts' in rem jurisdiction applies only to property of the estate, the preferentially transferred property must actually be property of the estate.").  Once this

Court determines that the inchoate "claims" asserted by the Debtors are not even property of the estate, there is nothing further for this Court to adjudicate.

## BACKGROUND

10.     The Objecting Suppliers are parties to the Supply Agreements with the Debtors. See Declaration of Elliot Moskowitz [Dkt. No. 967], Exs. 1-2.

11.     In connection with the Debtors' sale of their appliances business to the Appliances Buyers, as approved by the Court pursuant to the Sale Order, the Debtors assumed and assigned the Supply Agreements to the Appliances Buyers.  Id., Ex. 4.

12.     Under the Appliances APA approved by the Court in its Sale Order, the Debtors sold the following "Assets" to the Appliances Buyers:

> [A]ll right, title and interest of each Selling Entity in, to or under all of their respective assets, rights, claims and properties of every nature, kind and description and wherever located, whether real, personal or mixed, tangible and intangible (including goodwill) and whether now existing or hereafter acquired, to the extent Related to the Business, including the following, but excluding, for the avoidance of doubt, the Excluded Assets;

> [A]ll Contracts that constitute, as of the Closing, Desired 365 Contracts, and [] all other Contracts that are not 365 Contracts and are Related to the Business;

> [A]ll rights, claims, accounts and causes of action (including warranty and similar claims) of any Selling Entity against Persons (including any of Seller's Subsidiaries) other than any other Selling Entity (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by any Selling Entity (regardless of whether such rights are currently exercisable) associated with the Assets;

> [A]ll warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, Related to the Business, or any products or services provided in connection therewith; and

> [A]ny rights, awards, defenses, claims, counterclaims or causes of action as of the Closing of any Selling Entity relating to any Proceeding or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to

licenses, and counterparties to any Assigned Contracts or Real Property Interests, in each case, to the extent Related to the Business, whether arising by way of counterclaim or otherwise.

Sale Order, Ex. B at § 2.01(b).

13.     In the two days before the sale closed, counsel for the Debtors and Citadel realized that upon assigning the Supply Agreements, the Debtors and the Reorganized Debtors would lose all contractual rights to indemnification.[4]   They scrambled to amend the form of *Master Assignment Agreement, Bill of Sale, Deed, and Conveyance* ("Form MAA") annexed to the Sale Order to attempt to retain contractual indemnification rights despite the Supply Agreements having been assumed and assigned.   *See* Declaration of James Britton, Ex. 1 at DPW_Suppliers_00000254; Ex. 2 at DPW_Suppliers_00000232.   This meant that their revised version of Form MAA ("MAA 2.0") ██████████████████████████████████
████████████ but the hope was that as a result ███████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████ *Id.*, Ex. 3 at DPW_Suppliers_00000135, Ex. 4 at DPW_Suppliers_00000139.

14.     Specifically, MAA 2.0 now included the following additional language not found in the approved Form MAA (and contrary to the Appliances APA and Sale Order):

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

---

[4] The Debtors' sudden concern about future, unaccrued claims for indemnification appears to have been prompted, at least in part, by the circumstances raised in the email chain attached as Exhibit 2 to the Declaration of James Britton.  Whether that information is properly under seal is beyond the scope of this brief, and if the Court finds that the Debtors' purported right to assert future indemnification claims has been extinguished, the Objecting Suppliers do not anticipate the need to appear again before this Court.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████   Moskowitz Decl., Ex. 4.

15.     The sale transaction proceeded to close on November 8, 2023.[5]

16.     During this process, the Objecting Suppliers and the Court were never informed that the Form MAA would be amended, much less the material and prejudicial contents of the amendments.  Midea's Supply Agreement, for example, contains an anti-assignment provision that, among other things, forbids partial assignments without its consent.  *E.g.*, Midea Supply Agreement § 17.2.  The Objecting Suppliers were denied notice and an opportunity to object to the provisions of MAA 2.0 that contravene Fifth Circuit law and Sections 363, 365, and 541 of the Bankruptcy Code, among others.  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("A fundamental requisite of due process of law is the opportunity to be heard.").

17.     Midea did not find out about the existence of MAA 2.0 until November 27, 2023, when it received a redacted version of that document that redacted any mention to, among other things, retained regulatory indemnity rights.  Dkt. No. 876-2.  It took over a month for the Debtors to provide Midea's counsel with the unredacted version of MAA 2.0, and even then it was only

---

[5] Although the Appliances Sale Transaction closed on November 8, 2023, the Debtors and the Housewares Buyers were unable to obtain the requisite regulatory approvals for the Housewares Sale Transaction and the Debtors terminated the Housewares APA. The Debtors and the Ad Hoc Group of Crossover Lenders, in consultation with the Creditors' Committee, then pivoted to the current Plan involving a reorganization around the housewares business through an equitization of the Class 3 Prepetition Term Loan Claims. In light of the assignment of the Supply Agreements and proposed reorganization, the Debtors sought to incorporate the impermissible protections and indemnity carve-outs in MAA 2.0 into their proposed Plan.

provided when requested.[6]

18.    To date, the Debtors have refused to provide a specific list of the alleged claims to which they assert a right to ongoing indemnification.

**ARGUMENT**

19.    In the Debtors' Opposition, the Debtors admit that, despite the language of MAA 2.0 purporting to retain contractual indemnity rights, the Supply Agreements were in fact assigned *in toto*. Of course, Debtors must admit this because *Thornhill* removes any doubt about the Fifth Circuit's position on the matter: executory contracts must be assigned in their entirety, full stop. *Thornhill*, 85 F.4th at 325-26. To avoid the inevitable consequences of that admission, the Debtors resort to legal gymnastics, arguing that they can somehow separate unaccrued claims that necessarily require the enforcement of a contract from the contract itself, and assign the latter while retaining the former. This violates well established law. As Plan proponents, the Debtors bear the burden of proving their Plan complies with applicable law and is thus confirmable. *See In re J T Thorpe Co.*, 308 B.R. 782, 785 (S.D. Tex. 2003). They cannot do so with respect to the indemnification provisions of the Supply Agreements because the rights they claim to have previously accrued simply do not and never have existed.

20.    The Debtors principally rely on *Callaway Manor Apartments, Ltd. v. U.S.*, 940 F.3d 650 (Fed. Cir. 2019), which provides that "uniform and long-standing legal authority dictates that ***accrued*** claims are not transferred with an assignment unless expressly stated." *Id.* at 657

---

[6] The Debtors' contention that "Midea did not object to the Appliances Sale or the assumption and assignment of the Supply Agreements to the Appliances Buyer" is disingenuous as neither Midea, this Court, nor the public were on notice of MAA 2.0 or any attempt to amend or modify the sale and assignment of the Supply Agreements to retain indemnification and contribution rights thereunder before the applicable deadlines. Furthermore, the Objecting Suppliers had no reason to object to the final Form MAA that the Court approved given that the Bankruptcy Code allows Debtors to assign executory contracts in their entirety in harmony with *Thornhill*.

(emphasis added). However, *Callaway* does not help Debtors because they had no pre-assignment *accrued* claims under the Supply Agreements with fixed rights to payment to retain. Uniform and longstanding legal authority dictates that no claim for indemnity accrues until (1) judgment has been rendered against the indemnitee or (2) the indemnitee has settled a previously-unaccrued claim thereby creating an indemnifiable loss. The Debtors point to no such judgments or settlements that they entered, relying entirely on the assertion that they have received contingent claims against the Debtors that may (or may not) be resolved by judgment or settlement in the future, if they are ever resolved at all.

21.     For example, a tort claimant may assert there was a defect in a product, but a jury may find there is no such defect, meaning there is never any judgment against Debtors to satisfy. That person's contingent claim never accrues into an indemnifiable claim because there was no loss, and there was no previous way to know the outcome, which is why it is ***unaccrued***. Likewise, a potential regulatory financial obligation could arise, but the issue might later be settled in a manner that does not require payment. Again, there is nothing to indemnify. If the Debtors had filed suit for indemnity on any of these "claims" before resolution was achieved, the suit would be dismissed, because there is no accrued loss or obligation Debtors could point to for which they need to be made whole. These claims are contingent and inchoate. They are not property of the estate.

22.     While the Debtors vaguely reference "rights," "claims," and "contingent causes of action" for indemnity, these all necessarily mean the same thing — contingent and unaccrued claims for indemnity under the Supply Agreements, which require enforcement of the Supply Agreements to translate them into accrued claims, should they resolve at some point in the future. This is clearly different from the *Callaway* accrued claims that stood "independently" from, and

no longer incidental to and requiring enforcement of, the contract.  *Callaway Manor*, 940 F.3d at 657 (citations omitted) (discussing rationale of assignee accrued claims being independent from, and not incidental to, the contract).

23.     Under Fifth Circuit precedent, an unaccrued claim under state law is not property of a debtor's estate as of the petition date, nor is it a debtor's property if it has not accrued at any point prior to the assignment.  The only right to contractual indemnity that the Debtors could assert would arise from contract.  The right to have an unaccrued, hypothetical loss mature into an actually-accrued, and thus indemnifiable, loss under a contract exists only through enforcement of — not independently from — the contract, and Debtors admit they are no longer parties to the Supply Contracts necessary for such enforcement. *See* 6A C.J.S. Assignments § 105 (2022 update) ("[F]ollowing an assignment of a contract the assignee stands in the shoes of the assignor and the assignor retains no rights to enforce the contract at all.").[7]

---

[7] The Debtors also claim in passing that they are parties to allegedly non-executory purchase orders that allegedly contain their own indemnity provisions.  In support of this allegation, the Debtors attach what they represent is a copy of their standard terms and conditions as of *2023*, which are not executed or agreed to by either of the Objecting Suppliers.  The Debtors have never disclosed the existence of any of these purported purchase orders anywhere in their bankruptcy Schedules, which reference only the Supply Agreements.  The terms of the Supply Agreements likewise include integration clauses.  *See* Midea Supply Agreement at p. 1 & § 17.7; Tianxi Supply Agreement at § 17.7.  The Objecting Suppliers certainly object to being sandbagged with new evidence or theories concerning these allegedly-important purchase orders for the first time at this late date, particularly as they no longer have the right to respond if essential details are later supplied.  Debtors have waived any such argument by failing to substantively and timely support it.

To the extent that the terms of the Supply Agreements differ from the terms of the purchase orders thereunder, UCC 2-207 provides that any different or additional terms do not constitute a meeting of the minds and do not become part of the parties' agreement.  See, e.g., *CECG, Inc. v. Magic Software Enterprises, Inc.*, 51 Fed. App'x 359 (3d Cir. 2002) (additional terms in purchase order issued under master license agreement did not constitute offer and acceptance under 2-207 despite language claiming that performance under purchase agreement constituted acceptance). The Objecting Suppliers' relationship with the Debtors was at all times governed solely by the Supply Agreements.

24.     In short, no claim for indemnification or property interest in any such claim accrued to the Debtors before the sale close, and no cause of action under the Supply Agreements can accrue to the Debtors after that sale closed.

**A.     The Debtors Have No Accrued Pre-Assignment Indemnity Rights, Which Means the Estate Has No Indemnity Rights at All.**

25.     A cause of action for indemnity does not accrue until the indemnitee's liability has actually incurred some loss or liability, which occurs — **at the earliest** — upon the entry of a final judgment or entry into a settlement agreement fixing the amount of loss.  "[T]he claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged.  The determining factor is the point at which the indemnitee suffers loss through payment of a claim after judgment or settlement."  *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland*, 401 A.2d 101, 102 (Del. Sup. Ct. 1979) (citing 57 A.L.R.3d 867 (1974)); *see also Laugelle v. Bell Helicopter Textron, Inc.*, C.A. No. 10C-12-054, 2014 WL 2699880 at *5 (Del. Sup. Ct. June 11, 2014) ("The cause of action for failure to indemnify has not yet ripened, as [plaintiff] has yet to make payment . . . through a judgment or settlement, and ultimately my never do so.") (citing *Chesapeake*); *LaPoint v. Amerisource Bergen Corp.*, 970 A.2d 185, 195 (Del. 2009) ("Indemnification claims do not accrue until the underlying claim is finally decided."); Restatement (Third) Restitution and Unjust Enrichment § 70, cmt. (f) ("[N]umerous decisions reiterate that a claim for indemnity or contribution accrues at the time of payment by the claimant").

---

Objecting Suppliers certainly would dispute any assertion that these supposedly-critical purchase orders, which (1) Debtors do not specifically identify, with (2) alleged indemnity rights that Debtors do not delineate, and that (3) apparently would not apply to pre-2023 product anyway, are anything other than executory and/or were not assumed and assigned along with the Supply Agreements.

26.     When a debtor's cause of action has not accrued pre-petition, it does not become a part of the debtor's bankruptcy estate post-petition.  Nor would a debtor or its estate obtain any post-petition interest in a cause of action that fails to accrue between the petition date and the date on which the contractual rights relating to such unaccrued claim have been assigned.  *See* 11 U.S.C. § 541(a)(1), (7); *In re Swift,* 198 B.R. 927, 935 (Bankr. S.D. Tex. 1996) ("[S]tate law does not recognize as a legitimate interest in property an inchoate interest in a cause of action that is yet to accrue.  Until a cause of action accrues, it simply does not exist under state law.  And if state law does not recognize it as an interest in property, neither does the Bankruptcy Code make it property of the estate."); *aff'd* 114 F.3d 1183 (5th Cir. 1997) ("We also agree that the debtor's interest in the unaccrued cause of action at the time of the petition's filing was not a contingent property interest under Texas law, and thus was not property of the bankruptcy estate under [plaintiff's] alternative theory of a contingent or inchoate interest.").

27.     The Fifth Circuit reaffirmed the accrual approach to claims and causes of action in *In re Cantu*, 784 F.3d 253 (5th Cir. 2015).  There, the Fifth Circuit addressed the distinction between the Bankruptcy Code's broad definition of "claim," which applies only to claims asserted *against* the debtors, with its definition of "property of the estate," which is defined by state law and includes claims asserted *by* the debtors.  *Id.* at 259 ("The former situation turns on the scope of a 'claim' subject to discharge, a term defined in section 101(5)(A) of the Bankruptcy Code as a 'right to payment' from a debtor, not the definitions of property belonging to the estate set out in sections 541 and 1115.").  The Fifth Circuit was both careful and explicit to instruct that "claims," for purposes of determining whether they belong *to* the debtor as property of the estate, only exist insofar as they exist under state law—and that state law only recognizes their existence when they have accrued.  *Id.*; *see also In re Ross*, 548 B.R. 632, 638-39 (Bankr. E.D.N.Y) (holding that an

unaccrued cause of action was not property of bankruptcy estate because "courts examine whether, as of the petition date, a cause of action had accrued under applicable state law" and explaining that "[i]f any element of a cause of action accrued post-petition, courts reason, the cause of action is not property of the estate, even if all of the *conduct* giving rise to the cause of action occurred pre-petition").  The fact that a claim may have sufficiently accrued for the purposes of some third party to file a first-party claim does not automatically mean the claim has accrued for indemnity purposes, which requires the claim to have proceeded to judgment or settlement.  The two concepts are distinct.

28.    The out-of-circuit case law cited by the Debtors is consistent with *Cantu* because each case considered when a claim existed *against the debtors* within the meaning of section 101(5), not whether the debtors *held their own* cognizable property interest under section 541.  *See In re Manville Forest Prods. Corp.*, 209 F.3d 125, 128 (2d Cir. 2000) ("In order for Olin's indemnification rights to have been discharged by the bankruptcy confirmation, they must constitute claims under the Bankruptcy Code."); *In re Hemingway Transport, Inc.*, 954 F.2d 1, 9 (1st Cir. 1992) ("Given the breadth of the term 'claim' as defined under the Bankruptcy Code, we conclude that Woburn held a prepetition claim against Hemingway at the time of the chapter 11 petition in 1982, *albeit* a right to payment contingent on future occurrence reasonably within the contemplation of the parties as evidenced by the terms of the indemnification agreement.").

29.    The Debtors' remaining case law about other kinds of contingent property interests is distinguishable for the reasons articulated in *Swift,* where the court explained that while state law can recognize other types of inchoate property interests, that does not apply to *unaccrued claims or causes of action.  See Swift*, 198 B.R. 933-35 ("[T]o this court's knowledge, state law does not recognize as a legitimate interest in property an inchoate interest in a cause of action that

13

is yet to accrue."). The Debtors are just wrong about when the law recognizes a debtor's right to indemnity as a property interest in bankruptcy, and when such rights accrue.

30. No outstanding indemnity obligation was accrued and still unpaid pre-petition. Indemnity does not accrue until judgment has been entered or a settlement to a sum certain has been agreed to, and the Debtors cannot point to any judgment or settlement agreement resolving a claim that has been entered and remains unpaid by Objecting Suppliers.[8] The Debtors and their estates therefore did not have any right or cause of action for indemnity recognized by law as of the Petition Date or at a point prior to the assignment.[9] The Debtors therefore have no legal basis for asserting the existence of any right to indemnity arising before the assignment of the Supply Agreements.

      **B.**      **The Supply Agreements Were Assigned *In Toto* to the Appliances Buyers and No Indemnification Rights Remain with Debtors.**

31. Regardless of the Debtors' attempt to modify MAA 2.0 in contravention of the Appliances APA and Sale Order, the sole source of the Debtors' indemnification rights or causes of action against the Objecting Suppliers are the Supply Agreements that were assigned to the

---

[8] While the Debtors assert that they have tendered certain claims to the Objecting Suppliers for defense pre-assignment, such tender does not give rise to any right or claim for indemnification. "[T]he duty to defend and duty to indemnify are distinct and separate duties creating distinct and separate causes of action." *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th Cir. 1993); *accord Hartford Accident and Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1382 (7th Cir. 1985) (same). "[A]n insurer may be contractually bound to defend even though it may not ultimately be bound to pay." *Gulf Chem.*, 1 F.3d at 369 (quoting *Fitzpatrick v. American Honda Motor Co., 78 N.Y.2d 61, 571 N.Y.S.2d 672, 674, 575 N.E.2d 90, 92 (1991)*). Nothing in the Supply Agreements or any applicable law makes the Objecting Suppliers' acceptance of a duty to defend also trigger a concurrent obligation to indemnify the Debtors for any ultimate loss. Further, because the Supply Agreements were assigned *in toto*, any contractual duty to defend traveled with the Supply Agreements and now resides with the Appliances Buyers.

[9] Because the Debtors are corporate debtors and not individual debtors subject to section 1115, no cause of action accruing post-petition or post-assignment will become property of the estate either, as was the case in *Cantu*, where an individual debtor's cause of action accrued post-petition and became property of that debtor's estate.

Appliances Buyers, and post-assignment, those rights and causes of action cease to exist for the Debtors with respect to any unaccrued claims.  Any effort to extract those unaccrued rights from contracts being assigned is prohibited.  "[A] debtor assuming an executory contract cannot separate the wheat from the chaff.  And we make clear that, when a trustee relies on Section 365(f) to assign an executory contract in bankruptcy, it must assign the contract in whole, not in part."  *Matter of Thornhill Bros. Fitness, LLC*, 85 F.4th 321, 326 (5th Cir. 2023).  Since Debtors now concede that the assignments of the Supply Agreements were in fact *in toto*, *Thornhill* applies regardless, but because Debtors try to distinguish it, Objecting Suppliers will respond.

32.     The Debtors attempt to distinguish *Thornhill* on the grounds that it involved the attempted resuscitation of a previously-dismissed cause of action against a third party by way of an assignment of the bankruptcy debtor's indemnity rights to a third party.  But this fails, as these immaterial details had no effect on the Court's decision.  Identical to the facts here, the *Thornhill* debtor unsuccessfully sought to separate indemnity rights under an executory contract allegedly arising from a pre-petition personal injury claim from the contract itself.  Nowhere in the *Thornhill* decision does the Fifth Circuit distinguish between carving out a right from the balance of the assigned contract and retaining the balance of a contract but assigning a single right.  The Fifth Circuit clearly and directly states that assignment of anything less than the entirety of the contract is prohibited.

33.     The Debtors also cannot circumvent *Thornhill* by attempting to draw a distinction between the "assignment of a contract" from the "assignment of rights under a contract."[10]  The

---

[10] The Debtors string cite cases that purportedly allow the retention of pre-assignment rights under executory contracts.  The Objecting Suppliers' review of the *Agilon Energy* and *Basic Energy* cases, which all appear to use the same form of sale order, does not reveal that the court anywhere approved a debtor's retention of "pre-assignment rights under assigned executory contracts," much less anything concerning indemnity rights under assigned executory contracts, and the Debtors

Fifth Circuit held that an assignment of "any rights arising from the indemnity agreement contained in the Franchise Agreement" was an impermissible violation of section 365(f) unless the entire executory contract was assumed and assigned along with those rights.  *Id.*, 85 F.4th at 323-24.  Identical to our case, *Thornhill* squarely centered on indemnity rights purportedly arising from a pre-petition injury that occurred before the contract assumption that could not be separated from the assumed contract; so too here, any indemnity rights purportedly arising from pre-petition injury simply cannot be severed from the assumed contract.  In other words, when, as here, a contract is executory, rights under a contract cannot be assigned separately from the contract itself.  The Bankruptcy Code dictates that it is "all or nothing." *Id.* at 325.

34.     During the January 8 hearing, this Court inquired about whether the rights Debtors claim to have retained could be considered akin to an account receivable arising from a contract, a right that has clearly accrued and remains behind unless explicitly transferred as part of the assignment.  The answer is - No.  An account receivable is a fixed right to payment — the liability is for an amount of money known, accrued, and previously owed as of the Petition Date or the closing date of any sale during a chapter 11 case.  It therefore exists as property of the debtor's estate under Section 541 of the Bankruptcy Code, and the right to collect that amount when due can be assigned separate and apart from a contract because the contract is not required to enforce it.  Separately, the Uniform Commercial Code *statutorily* authorizes the severing of an accounts receivable from the underlying contract through assignment of such accrued obligations.  *See* U.C.C. § 9-406(d) (any contractual provision that attempts to prohibit or restrict the creation of a

---

have not indicated how or where they believe these cases support their argument.  In any event, the Debtors' citations are unavailing because each cited sale order was entered prior to the Fifth Circuit's *Thornhill* decision.

16

security interest in accounts receivable is ineffective); U.C.C. § 9-406(f) (same with respect to applicable laws).  No such statutory exception applies to unaccrued indemnification claims.

35.     As for the Debtors' arguments about having inchoate but nonetheless cognizable property rights under the Supply Agreements, the Debtors' arguments are unsupported by applicable law or common sense.  The only source of contractual indemnity rights here arises under and pursuant to the terms of the Supply Agreements just as the only source of contractual indemnity rights for the alleged pre-petition personal injury claim in *Thornhill* arose under the franchise agreement, and, just like *Thornhill*, no accrued right to payment existed prior to the Debtors' assignment of the Supply Agreements to the Appliances Buyers.[11]

36.     The Debtors find themselves in a similar position to debtors in *In re Old CarCo LLC*, 529 B.R. 42 (Bankr. S.D.N.Y. 2015), where the court ruled that the debtors could not subsequently assign any retained indemnity rights under supply agreements to a personal injury plaintiff after the debtor had assigned those same supply agreements to a purchaser under Sections 363 and 365.[12]  This also further underscores black letter law, namely, the Debtors cannot get a better deal in bankruptcy as they would outside of bankruptcy.  The "nominal" nature of the

---

[11] The illogic of the Debtors' position is further underscored by the question of *how* they could assert any right to indemnity when they are no longer parties to the Supply Agreements.  If, at some indeterminate future time, a cause of action for indemnity were to hypothetically accrue, the Debtors and/or Reorganized Debtors would, in Debtors' hypothesized world, no doubt demand indemnification from the Objecting Suppliers.  When the Objecting Suppliers refuse, what will the Debtors' cause of action be?  Breach of contract?  The Debtors lack contractual privity with the Objecting Suppliers and thus have no basis for enforcing the Supply Agreements.  ("As a general matter, only a party to a contract has standing to enforce a contract and sue for breach of that contract."  *Rottlund Homes of New Jersey, Inc. v. Saul Ewing, Remick & Saul, LLP*, 243 F.Supp.2d 145, 153 (D. Del. 2003) (collecting cases)).

[12] Nor can *Old CarCo* be distinguished on the basis that it involved the interpretation of a cure agreement, whereas this case does not.  The court there ruled that the claims at issue were *not* those settled by the cure agreement, and because they were not settled, the court ruled that they must have been assigned along with the supply agreements, instead of retained by the debtors.  *Id.* at 56.

Debtors proposed in their Plan to enforce contractual indemnity rights under contracts they no longer own and under which they no longer perform, only punctuates that point: the Debtors have no further business dealing or incentive to do anything further with appliances, whereas parties to an ongoing supply relationship maintain those business incentives when they choose to enforce their contracts. *Old CarCo* is entirely in accord with *Thornhill* and both prohibit what the Debtors are trying to do in this case.[13]

      **C.**      **It Would Be Inequitable to Allow the Debtors to Enforce Indemnity Rights in the Future Under Contracts They Assigned.**

     37.     Finally, the Debtors cannot appeal to equitable considerations by claiming it is the Objecting Suppliers who are attempting to subvert their contractual obligations. That is backwards. The Objecting Suppliers did not assign the Supply Agreements to the Appliances Buyers; the Debtors did. It was the Debtors' choice to seek chapter 11 protection, to market and monetize the Supply Agreements as part of the Appliances APA (and take advantage of Sections 363 and 365 of the Bankruptcy Code), and to sell the Appliances Business free and clear of the Excluded Liabilities to maximize their return in cash, not the Objecting Suppliers. The Debtors agreed to retain those liabilities to get their deal done, and Debtors would have had nothing to sell without turnkey supplier agreements to assign that were entirely protected from renegotiation. The

---

[13] Another case spun off from the same transaction at issue in *Old Carco*, *Verde v. Stoneridge, Inc.*, No. 14-cv-225, 2016 WL 749389 (E.D. Tex. Jan. 26, 2016), further bolsters this conclusion. Referencing the *Old CarCo* decision in dismissing a cause of action brought by a personal injury plaintiff on a theory of assigned indemnity rights, the court held that "[t]he net effect of these provisions is that New Chrysler purchased all claims, including defenses, counterclaims, rights of recovery and rights of setoff and recoupment related to the Assumed Contracts with a supplier. Therefore, the terms of the Sale Order and the MTA show that all [manufacturer's] supply contracts, both executory and nonexecutory, and thus the obligations within those agreements, were assigned to New Chrysler during the bankruptcy proceeding. This means that the indemnification obligations that arose from those agreements were also assigned to New Chrysler. As such, [manufacturer] owes no indemnification obligation to Old CarCo because that right belongs to New Chrysler." *Id.* at * 5 (citations and quotations omitted).

resulting disconnect between liability and indemnity is not any fault of the Objecting Suppliers or the Supply Agreements, but the result of the Debtors' own bargain.  Debtors derived critical benefits from the assignment that allowed the appliances business to even be sold; they cannot take all the benefits of that assignment process and then use their proposed Plan to rewrite well-established bankruptcy and indemnity law to cover the Excluded Liabilities the Debtors expressly retained.[14]

38.     In sum, the Objecting Suppliers' contractual indemnity obligations now run to one party only — the Appliances Buyers, on a going-forward basis, and only when claims arising from product sold by Appliance Buyers have matured to judgment or settlement such that an indemnity claim can first come into existence.  Applicable law is clear that no separate or accrued indemnity right existed for the Debtors as of the Petition Date separate from the Supply Agreements, except for claims that had previously matured to judgment or settlement no later than the sale closing date.  *Thornhill* is also clear that any portion of an executory contract, including the right to assert indemnity thereunder, is transferred *in toto* under section 365, and no amount of creative drafting can contravene that black letter law.  The terms of the Supply Agreements themselves prevent any

---

[14] Under the Debtors' proposed Plan, the Debtors seek to reorganize around their housewares business.  Certain unidentified Retained Causes of Action for indemnification and/or contribution against the Objecting Suppliers will vest in the Reorganized Debtors on the Effective Date (*See* Combined DS and Plan, at Art. X(G)(2)) and be pursued against the Objecting Suppliers.  In addition, under the Plan, Holders of Product Liability Claims are given the right to name a Reorganized Debtor as a nominal defendant in an action with respect to such claim solely to the extent required to enable the Reorganized Debtor to tender that claim the applicable Third Party Indemnitor (including the Objecting Suppliers) (Combined DS and Plan, at Art. VII(L)).  "To the extent that a Product Liability Claim is not satisfied by an Insurer or Third-Party Indemnitor, the Holder will be permitted to assert such Excess Product Liability Claim as a General Unsecured Claim (subject to prior compliance with the Bar Date Order)." *Id.*   Accordingly, under the Plan the Debtors and Reorganized Debtors do not propose to make any Distributions to the Holders of these claims.  If indemnity or insurance is not available, those Claims are converted to Class 4 General Unsecured Claims for which they will receive a Pro Rate share of 15% of the Litigation Trust Interests, which may be zero (Combined DS and Plan, at Art. VI(A)(4)).

transfer of rights back to the Debtors post-assignment.  The fact that through MAA 2.0, the Debtors and the Appliances Buyers attempted to reserve some claims for the Debtors in contravention of the terms of the Supply Agreements and *Thornhill*, does not change that unavoidable reality.

## CONCLUSION

For these reasons, the Court should sustain the Objecting Suppliers' objections to the Combined DS and Plan and hold that: (i) the Supply Agreements were assigned to the Appliances Buyers *in toto*; (ii) that the Debtors did not retain any indemnification rights and/or claims under the Supply Agreements; and (iii) that any claims the Debtors may have held against the Objecting Suppliers are contingent, inchoate, unaccrued, and therefore did not survive the sale to Appliances Buyers.

*[The remainder of this page has been intentionally left blank]*

Dated: February 5, 2024

Respectfully submitted,

**ARENTFOX SCHIFF LLP**

**VORYS, SATER, SEYMOUR AND PEASE LLP**

By:   */s/ Brett D. Goodman*
     Brett D. Goodman (*Pro Hac Vice*)
     1301 Avenue of the Americas, 42nd FL
     New York, NY 10019
     Telephone: (212) 484-3900
     Facsimile: (212) 484-3990
     brett.goodman@afslaw.com

     - and -

     James E. Britton (*Pro Hac Vice*)
     800 Boylston Street, 32nd FL
     Boston, MA 02199
     Telephone: (617) 973-6100
     Facsimile: (617) 367-2315
     james.britton@afslaw.com

     - and –

     Matthew F. Prewitt  (*Pro Hac Pending*)
     233 South Wacker Drive, Suite 7100
     Chicago, IL 60606
     Telephone: (312) 258-5583
     Facsimile: (312) 258-5600
     matthew.prewitt@afslaw.com

     - and -

**HOWLEY LAW PLLC**

     Tom A. Howley
     Texas Bar No. 24010115
     Eric Terry
     Texas Bar No. 00794729
     Pennzoil Place – South Tower
     711 Louisiana St., Suite 1850
     Houston, TX 77002
     Telephone: (713) 333-9125
     tom@howley-law.com
     eric@howley-law.com

*Counsel for Midea*

By:   */s/ Tiffany Strelow Cobb*
     Tiffany Strelow Cobb (*Pro Hac Vice*)
     Thomas J. Loeb (P*ro Hac Vice*)
     52 East Gay Street
     Columbus, OH 43215
     Telephone:  (614) 464-6400
     tscobb@vorys.com
     tjloeb@vorys.com

     - and -

     Kari B. Coniglio  (*Pro Hac Vice*)
     200 Public Square, Suite 1400
     Cleveland, OH 44114-2327
     Telephone: (216) 479-6100
     kbconiglio@vorys.com

*Counsel for Tianxi*

**<u>Certificate of Service</u>**

I certify that, on February 5, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Brett D. Goodman*

Brett D. Goodman (*Pro Hac Vice*)
