IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| INSTANT BRANDS ACQUISITION HOLDINGS INC., *et al.*, | § § § | Case No. 23-90716 (MI) |
| Debtors.[1] | § § § § | Jointly Administered |

**DEBTORS' REPLY IN FURTHER SUPPORT OF OPPOSITION TO ZHEJIANG TIANXI KITCHEN APPLIANCE CO., LTD.'S, GUANGDONG MIDEA CONSUMER ELECTRIC MANUFACTURING COMPANY LIMITED'S, FOSHAN SHUNDE MIDEA ELECTRICAL HEATING APPLIANCES MANUFACTURING COMPANY LIMITED'S, AND MIDEA ELECTRIC TRADING (SINGAPORE) CO. PTE LTD.'S <u>PLAN OBJECTION</u>**

Instant Brands Acquisition Holdings Inc. and certain of its affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this reply in further support of its *Opposition to Suppliers' Plan Objection* [Docket No. 966] (the "**Opposition**") and in response to the *Objecting Suppliers' Reply (I) In Support of Their Objections to the Debtors' Combined Disclosure Statement and Plan and (II) In Response to the Debtors' Opposition to the Suppliers' Plan Objection* [Docket No. 995] (the "**Suppliers' Response**" or "**Response**"), pursuant to the *Joint Stipulation and Agreed Order Regarding Discovery and Plan Objection Briefing* [Docket No. 976].

---

[1] The debtors and debtors in possession in the Chapter 11 Cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

i

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT ...................................................................................................1

I. The Retained Supply Agreement Claims Are Estate Property Under 11 U.S.C. § 541 ......2

II. The Objecting Suppliers' Case Law Is Distinguishable .......................................................6

III. The Objecting Suppliers' Position Is Inconsistent with Sale Transactions Approved in this Jurisdiction and Would Lead to Inequitable and Absurd Results ................................7

CONCLUSION ................................................................................................................................8

## TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>(<small>S</small>)

*In re AIC Indus., Inc.*,
  83 B.R. 774, 776 (Bankr. D. Colo. 1988) ................................................................................ 5

*In re Cantu*,
  784 F.3d 253 (5th Cir. 2015) ................................................................................................... 6

*Commonwealth Land Title Ins. Co. v. Funk*,
  No. N14C-04-199 PRW, 2014 WL 8623183 (Del. Super. Ct. Dec. 22, 2014) ........................ 4

*In re Dibiase*,
  270 B.R. 673 (Bankr. W.D. Tex. 2001) ................................................................................... 2

*Ga. Pac. Corp. v. Sigma Serv. Corp.*,
  712 F.2d 962 (5th Cir. 1983) ................................................................................................... 5

*LaPoint v. AmerisourceBergen Corp.*,
  970 A.2d 185 (Del. 2009) ........................................................................................................ 4

*Quereguan v. New Castle Cnty.*,
  No. 20298-NC, 2006 WL 2522214 (Del. Ch. Aug. 18, 2006) ................................................. 4

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
  762 F.3d 165 (2d Cir. 2014)) ................................................................................................... 3

*Matter of S. Coast Supply Co.*
  91 F.4th 376 (5th Cir. 2024) .................................................................................................... 3

*In re Swift ("Swift")*,
  198 B.R. 927 (Bankr. W.D. Tex. 1996), *aff'd* 129 F.3d 792 (5th Cir. 1997) ....................... 3, 6

*Matter of Thornhill Bros. Fitness, L.L.C. ("Thornhill")*,
  85 F.4th 321 (5th Cir. 2023) ................................................................................................ 1, 7

*United Syayes v. Whiting Pools, Inc.*,
  462 U.S. 198 (1983) ................................................................................................................ 2

S<small>TATUTES</small> & R<small>ULES</small>

11 U.S.C. § 365(f) .................................................................................................................... 1, 2

11 U.S.C. § 541 ..................................................................................................................... *passim*

11 U.S.C. § 541(a)(7) ..................................................................................................................... 7

OTHER AUTHORITIES

U.C.C. § 9-406(d) ............................................................................................................................ 6

U.C.C. § 9-406(f) ............................................................................................................................. 6

*Unless otherwise stated, all internal case citations and quotation marks are omitted, and all emphasis is added.*

**PRELIMINARY STATEMENT**[1]

1.      The Debtors' assignment of the Supply Agreements complied with section 365(f) of the Bankruptcy Code in all respects. Most of the critical legal points are not seriously contested. The Objecting Suppliers do not contend that any statutory prerequisites to assignment under section 365(f) were not satisfied. There is no dispute that the Debtors assigned the Supply Agreements *in toto* as of the date of the assignment, as *Thornhill* requires. And the Objecting Suppliers all but concede that section 365(f) does not require the transfer of *pre-assignment* claims arising from a debtor's *pre-assignment* contractual relationship.

2.      In fact, the Suppliers' Response confirms that this dispute is no longer a debate about *Thornhill* per se, but rather whether the estates possess a property right to indemnification claims related to pre-assignment conduct in the first place. (Resp. ¶¶ 19, 30 (arguing that the Debtors' claims for indemnification "simply do not and never have existed").) According to the Objecting Suppliers, indemnification claims do not "accrue" until judgment has been entered on the underlying claim or a settlement for a sum certain has been agreed to (which may take years); thus, because no pre-assignment claims have reached that stage, the Objecting Suppliers assert that the Debtors retain no cognizable property interest in indemnification under section 541 of the Bankruptcy Code. But this argument is just another thinly veiled attempt to avoid liability for pre-assignment conduct. The Objecting Suppliers misconstrue Fifth Circuit law and ignore critical provisions of the Supply Agreements themselves, which expressly provide that the indemnity provisions apply when a claim is tendered—not years later upon judgment or settlement of a claim. Indeed, the Objecting Suppliers concede that a debtor *can* retain discrete property interests arising

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Opposition, and all cited exhibits in this brief refer to the exhibits as filed along with the Opposition.

1

under a contract following an assignment, such as accounts receivable, which are directly analogous to the indemnification claims at issue here. Yet, under the Objecting Suppliers' theory, such claims would necessarily evaporate upon a section 365(f) assignment. None of the authorities cited in the Suppliers' Response requires that result, nor is that consistent with sale transactions frequently approved in this jurisdiction and elsewhere. Sustaining the Suppliers' Plan Objection would thus deprive personal injury claimants (and the estates) of a potential avenue of recovery and grant the Objecting Suppliers what would amount to a non-consensual third-party release for their pre-assignment conduct for no consideration. Moreover, contrary to the Objecting Suppliers' assertions that the Plan can be confirmed if their objection is sustained, the Debtors have no assurances that their other stakeholders will continue to support the Plan in that scenario. For all of the above reasons, the Objecting Suppliers' Plan Objection should be overruled.

## ARGUMENT

**I.     The Retained Supply Agreement Claims Are Estate Property Under 11 U.S.C. § 541**

3.     This dispute principally concerns two categories of claims. The first is product liability claims that were asserted against the Debtors and tendered to the Objecting Suppliers before the Debtors assigned the Supply Agreements to the Appliance Buyers. The second relates to potential liabilities ███████████████████████████████████████████████. The Objecting Suppliers' central contention is that the Debtors possess no Retained Supply Agreement Claims in the first place because such claims have not "accrued." This, however, relies on an unduly narrow reading of 11 U.S.C. § 541. As the Objecting Suppliers all but acknowledge, section 541 is a "generous provision [that] sweeps into the bankruptcy estate all interests held by the debtor—**_even future, non-possessory, contingent, speculative, and derivative interests_**." *In re Dibiase*, 270 B.R. 673, 676 (Bankr. W.D. Tex. 2001) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983), which discusses the

expansive reach of § 541); *see also Matter of S. Coast Supply Co.*, 91 F.4th 376, (5th Cir. 2024) ("[T]he scope of property rights and interests included in a bankruptcy estate is very broad: The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate.").

4. Accordingly, contrary to the Objecting Suppliers' suggestions, the estates' property interests under section 541 encompass more than just "accrued" causes of action under state law. As the court in *Swift* noted, "[s]tate law recognizes as valid interests in property such interests as contingent remainders, future interests in contract rights, executory springing interests, and many other contingent property interests." 198 B.R. 927, 935 (Bankr. W.D. Tex. 1996), *aff'd* 129 F.3d 792 (5th Cir. 1997). The *Swift* articulation of the legal test under section 541 likewise confirms that section 541 reaches beyond "accrued" claims. Per *Swift*, determining whether a claim belongs to a debtor under section 541 involves consideration of two questions: (1) did "the [claim] accrue[] under [state] law as of the commencement of the bankruptcy case," and (2) "**_even if unaccrued_**, did the [d]ebtor have a sufficient property interest in the [claims], such that they became estate property as of the commencement of the case?" *Id.* at 930. "If the court finds that the answer to **_either_** of the foregoing questions is 'yes,'" then the property interest belongs to the estate. *Id.*

5. Here, there can be little doubt that the Debtors have a cognizable property interest in rights to indemnification for liabilities relating to goods delivered pre-assignment. This conclusion is compelled by the language of the Supply Agreements themselves—the text of which the Objecting Suppliers largely ignore in their Response. *See, e.g.*, *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 188 (2d Cir. 2014) ("[B]ecause an express contract for indemnity remains a contract, it is ultimately a question of contract interpretation whether the indemnitee is required to make a payment prior to seeking indemnification."); *LaPoint v.*

3

*AmerisourceBergen Corp.*, 970 A.2d 185, 197 (Del. 2009) ("The parties agree that the question of when a claim for contractual indemnification accrues depends on the contractual language.").[2]

6. For example, in addition to a broad commitment to indemnify for any losses that the Debtors may incur as a result of selling their products (e.g., Midea SA § 6.2), the Supply Agreements set forth detailed procedures by which the Debtors *tendered* product liability claims to the Objecting Suppliers. (*See* Ex. A (Midea SA) § 6.1; Ex. B (Tianxi SA) § 13.2.) These provisions make clear that, upon tender, the Objecting Suppliers became fully responsible for the defense of these claims and for covering any losses as a result of a judgment or settlement that they may authorize. (*Id.*; *see also* Ex. A (Midea SA) § 6.3 ("Midea shall have control of the defense of any action brought above.").) The Objecting Suppliers do not—and cannot—dispute that the Debtors have tendered product liability claims to them for years consistent with the Supply Agreements, and that, at least up to the Petition Date, the Objecting Suppliers have accepted tender of these claims. The Objecting Suppliers do not cite a single authority suggesting that the Debtors' assignment of the Supply Agreements on a go-forward basis eviscerates the Objecting Suppliers' obligations with respect to claims concerning pre-assignment conduct.[3] Likewise, the Midea Supply Agreement provides for indemnification where ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] As many courts have recognized, and contrary to the Objecting Suppliers' assertions (Resp. ¶ 25), there is a well-established distinction between indemnity claims sounding in common law and sounding in contract. *See, e.g.*, *Quereguan v. New Castle Cnty.*, No. 20298-NC, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006) ("[A] cause of action for common law indemnification does not accrue until after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded. **There is no such requirement for a contractual indemnity claim**."); *Commonwealth Land Title Ins. Co. v. Funk*, No. N14C-04-199 PRW, 2014 WL 8623183, at *5 (Del. Super. Ct. Dec. 22, 2014) (quoting *Quereguan* and noting that the "distinction between common-law and contractual indemnification accrual is well taken"). As the above authorities demonstrate, in a *contractual* indemnity scenario, the bounds of the parties' property rights are governed by the terms of the contract.

[3] Although relegating it to a footnote (Resp. ¶ 30 n.8), the Objecting Suppliers contend that the tender provisions are irrelevant because there is a distinction between a duty to defend and a duty to indemnify. But the Objecting Suppliers fail to explain why that distinction matters for purpures of section 541. Moreover, the Objecting Suppliers have even disclaimed the duty to defend, further belying any purported distinction.

4

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████.

7.  For these reasons—and as the Court itself suggested at the Combined Disclosure Statement hearing—the Debtors' rights against the Objecting Suppliers relating to pre-assignment conduct are analogous to accounts receivable, which the Objecting Suppliers all but admit are valid property interests that a debtor may retain notwithstanding assignment of the underlying agreement.  (*See* Resp. ¶ 34.)  It is black letter law in the Fifth Circuit that accounts receivable are estate property.  *See, e.g.*, *Ga. Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962 (5th Cir. 1983) (recognizing sums due by a general contractor to a sub-contractor constitute property of the estate under section 541); *In re AIC Indus., Inc.*, 83 B.R. 774, 776 (Bankr. D. Colo. 1988) ("There are numerous cases that support the Debtor's assertion that the accounts receivable are property of the estate.").  Just like an account receivable, where a debtor performs by selling a good or service, thereby generating a right to payment, the Debtors here performed by tendering product liability claims (████████████████████████████████████████████), thereby generating a discrete right to the performance of the Supply Agreements' product liability provisions as to those tendered claims, including the duty to defend and cover losses.

8.  The Objecting Suppliers' only response to this analogy is that accounts receivable are somehow different from indemnification claims because the Uniform Commercial Code "authorizes the severing of accounts receivable from the underlying contract." (Resp. ¶ 34.)  But neither of the two U.C.C. provisions they cite *create* a property interest under state law; those provisions merely render ineffective any legal restrictions on assignment in the contracts between

5

the debtor and its customer/account debtor. (*See id.* (citing U.C.C. § 9-406(d), (f).) The Objecting Suppliers also distinguish accounts receivable because accounts receivable, they claim, are a "fixed right to payment." (*Id.*) The Objecting Suppliers' rule requires absolutely certainty on amount for a right to accrue in order for a contingent claim to materialize. But accounts receivable are often subject to lengthy reconciliation between debtors and contract parties to agree on a cure account, and they are cognizable rights under section 541. So too an indemnification claim does not require years of litigation and judgement or settlement to prevent forfeiture after assignment.

**II.     The Objecting Suppliers' Case Law Is Distinguishable**

9.      In their Response, the Objecting Suppliers principally rely on *Swift* and *Cantu*, but those cases are inapposite. In *Swift*, the court concluded that the debtors did not have a sufficiently concrete interest in an unaccrued tort cause of action for legal malpractice because an element of the cause of action (injury) had not yet occurred. 198 B.R. at 932, 936 (acknowledging that "[t]here is no question that section 541 encompasses contingent interests held by a debtor" but rejecting argument that a partially accrued, "inchoate," tort claim was "contingent"). Here, by contrast, there is nothing "inchoate" about the Objecting Suppliers' responsibility to defend and indemnify the Debtors in connection with personal injury claims that the Debtors have already tendered or about a ███████████████████ under the terms of the Supply Agreements. Similarly, in *Cantu*, the court considered when a malpractice claim accrued for purposes of determining whether the claim belonged to the debtors' estates under 11 U.S.C. § 1115(a), ultimately concluding that the claim there did because it accrued during the chapter 11 case. 784 F.3d 253, 260-63 (5th Cir. 2015).[4] But, as demonstrated above, the Debtors retained cognizable rights under the Supply Agreements that arose *before* assignment.

---

[4] The Objecting Suppliers incorrectly assert that because the Debtors are not individual debtors subject to section 1115(a), no cause of action accruing post-petition or post-assignment will become property of the estate. (Resp. ¶

6

10. Moreover, although the legal holding of *Thornhill* does not appear to be disputed, the Objecting Suppliers are wrong that this case bears any factual resemblance to *Thornhill*. Unlike in *Thornhill*, the assignment here was not a partial assignment of only a specific provision of a contract; rather, it was the complete assignment of the full Supply Agreements to the Appliances Buyers. (*Compare Thornhill*, 85 F.4th 321, 323-24 (5th Cir. 2023), *with* Ex. D (MAA) § 1.) In no way did the Debtors "otherwise retain[] the [Supply Agreements]" as the debtor in *Thornhill* did. 85 F.4th at 324. Further, the assignment here did not involve granting a specific tort plaintiff the right to revive a previously dismissed cause of action against the indemnifying party. *Id.* at 323. The Debtors merely retained claims and rights under the Supply Agreements, neither broadening their rights nor the rights of any third parties. *Thornhill* is thus inapposite.

### III. The Objecting Suppliers' Position Is Inconsistent with Sale Transactions Approved in this Jurisdiction and Would Lead to Inequitable and Absurd Results

11. Courts in this jurisdiction and elsewhere have approved sale transactions in which debtor/sellers retained pre-closing rights (including indemnification rights), claims, or causes of actions against contract counterparties.[5] The Objecting Suppliers also misread *Agilon Energy and Basic Energy*. In *Agilon Energy,* Section 2.02(f) of the asset purchase agreement provided that "all rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller except to the extent related to the Assets with

---

30.) This is contrary to section 541(a)(7) of the Bankruptcy Code, which explicitly states that property of the estate includes "[a]ny interest in property the estate acquires after the commencement of the case."

[5] *See* Order [Docket No. 422], No. 23-10718 (CTG) (Bankr. D. Del. Aug. 25, 2023); Order [Docket No. 423], No. 23-10718 (CTG) (Bankr. D. Del. Aug. 25, 2023); Order [Docket No. 582], No. 22-11292 (JKS) (Bankr. D. Del. Apr. 12, 2023); Order [Docket No. 860], No. 22-10943 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2023); Order [Docket No. 511], No. 21-32156 (MI) (Bankr. S.D.Tex. Feb. 9, 2022); Order [Docket No. 437], No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 23, 2021); Order [Docket No. 436], No. 21-90002 (DJR) (Bankr. S.D. Tex. Sept. 23, 2021); Order [Docket No. 438], No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 23, 2021); Order [Docket No. 613], No. 20-33274 (MI) (Bankr. S.D. Tex. Nov. 13, 2020); Order [Docket No. 452], No. 20-33627 (MI) (Bankr. S.D. Tex. Aug. 24, 2020).

respect to any period of time on or after the Closing Date or any Assumed Liability" were retained by the sellers, and the buyer's assumed liabilities relating to the assets were limited to those "arising out of the operation and/or ownership of the Assets from and after the Closing Date."[6] Similarly, *Basic Energy* had verbatim language providing for the sellers' retention of rights and claims relating to the pre-closing period in its three asset purchase agreements.[7] This only serves to underscore that the Debtors' retention of the Retained Supply Agreement Claims is not unusual.

12. Finally, it bears particular emphasis that compelling chapter 11 debtors to forfeit their contingent pre-assignment contractual protections could cripple debtors' ability to assume and assign contracts during bankruptcy, deprive their constituencies of a valuable source of recovery and dampen debtors' reorganization prospects. A debtor considering whether to assume and assign contracts would need to assess the risk that post-petition pre-assignment liabilities would materialize into administrative expense claims—which must be paid in full in order to confirm a chapter 11 plan—and weigh such risks against the value that could be realized from assuming and assigning such contracts. This risk is particularly acute for debtors who commence chapter 11 cases to spin off a subsidiary, or who attempt to sell substantially all of their assets but are only able to sell a subset and pursue reorganization with respect to their remaining assets. This would reduce the frequency and utility of sales under section 363 and impair debtors' ability to monetize their assets in bankruptcy, to the detriment of would-be purchasers and the estates.

## CONCLUSION

The Debtors respectfully request that the Court overrule the Suppliers' Plan Objection.

---

[6] Order [Docket No. 511] No. 21-32156 (MI) (Bankr. S.D. Tex. Feb. 9, 2022).

[7] Order [Docket No. 437] No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 23, 2021); Order [Docket No. 436] No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 23, 2021); Order [Docket No. 438] No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 23, 2021).

Dated: February 7, 2024
Houston, Texas

HAYNES AND BOONE, LLP /

*s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.:   (713) 547-2000
Email: charles.beckham@haynesboone.com
          arsalan.muhammad@haynesboone.com
          david.trausch@haynesboone.com

-and-

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Elliot Moskowitz (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Joanna McDonald (admitted *pro hac vice*)
Garrett L. Cardillo (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.:   (212) 450-4000
Email:  brian.resnick@davispolk.com
           elliot.moskowitz@davispolk.com
           steven.szanzer@davispolk.com
           joanna.mcdonald@davispolk.com
           garrett.cardillo@davispolk.com

*Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

      I certify that, on February 7, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

      */s/ Charles A. Beckham, Jr.*
      Charles A. Beckham, Jr.
      (TX Bar No. 02016600)