**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 23-90716 (MI) |
| INSTANT BRANDS ACQUISITION | ) | |
| HOLDINGS INC., *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**<u>MIDEA'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS PLAN OBJECTION</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................................... 2

BACKGROUND .......................................................................................................... 4

ARGUMENT ............................................................................................................... 7

I.    The Purchase Orders Are Part Of, And Assigned Along With,
The Supply Agreement. ..................................................................................... 7

      A.    The Purchase Orders Are Not Divisible From the Supply Agreement......................... 8

      B.    Treating Purchase Orders as Separate Contracts Would
Violate Fundamental Principles of Contract Interpretation. ...................................... 13

      C.    Severing the Purchase Orders From the Supply Agreement
Would Violate *Thornhill*. ........................................................................................ 13

II.   Even Assuming They Are Separate Contracts, The Purchase Orders
Do Not Provide The Debtors Any Enforceable Indemnification Rights. ........................... 14

      A.    The Debtors Do Not Have Any Indemnification Rights Under
Purchase Orders Issued Before January 2, 2022.......................................................... 15

      B.    The Debtors Lack Indemnification Rights Under Purchase
Orders Issued After January 2, 2022............................................................................ 16

III.  The Court Does Not Should Not Decide the Merits of the Debtors'
Alleged Rights Under the Purchase Orders. ........................................................... 18

CONCLUSION................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A/S Dan-Bunkering Ltd. v. M/V Centrans Demeter*,
633 Fed. App'x 755 (11th Cir. 2015) ....................................................................19

*In re Apex Long Term Acute Care—Katy, L.P.*,
465 B.R. 452 (S.D. Tex. 2011) ............................................................................18

*Axelson v. McEvoy Willis, a Div. of Smith Int'l (North Sea), Ltd.*,
7 F.3d 1230 (5th Cir. 1993) ................................................................................17

*In re Buffets Holdings, Inc.*,
387 B.R. 115 ..................................................................................................8, 11

*Deuley v. DynCorp Int'l Inc.*,
8 A.3d 1156 (Del. 2010) ......................................................................................15

*In re Enron Corp Sec., Derivative & ERISA Litig.*,
284 F. Supp. 2d 511 (S.D. Tex. 2003) ...................................................................13

*EPLET, LLC v. DTE Pontiac North, LLC*,
984 F.3d 493 (6th Cir. 2021) ..................................................................................7

*In re Exide Techs.*,
340 B.R. 222 (Bankr. D. Del. 2006) .........................................................................8

*In re Ferguson*,
183 B.R. 122 (Bankr. N.D. Tex. 1995).............................................................8, 10, 11

*Fl. Mortg. Financing, Inc. v. Flagler Plaza Corp.*,
308 So.2d 571 (Fl. Ct. App. 1975).........................................................................10

*In re Hawker Beechcraft, Inc.*,
No. 12-11873 (SMB), 2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013) ....................8, 10

*Indemnity Ins. Co. of North America v. K-Line Am., Inc.*,
No. 06 Civ. 0615(BSJ), 2008 WL 4922327 (S.D.N.Y. Feb. 27, 2008)................................19

*Johnson-Lancaster & Assocs., Inc. v. H.M.C., Inc.*,
No. ADC-20-0992, 2021 WL 3549879 (D. Md. Aug. 11, 2021) ...........................................11

*Kutka v. Temporaries, Inc.*,
568 F. Supp. 1527 (S.D. Tex. 1983) ......................................................................12

*In re Mintze,*
    434 F.3d 222 (3d Cir. 2006) ........................................................................18

*Moulds v. James F. Proctor, D.D.S, P.A.,*
    1991 WL 137577 (Tenn. Ct. App. July 29, 1991) ......................................9

*Matter of Nat'l Gypsum Co.,*
    118 F.3d 1056 (5th Cir. 1997) ....................................................................18

*In re NewPage Corp.,*
    No. 11-12804(KG), 2017 WL 571478 (Bankr. D. Del. Feb. 13, 2017)........8, 10

*In re Philip Servs. (Del.), Inc.,*
    284 B.R. 541 (Bankr. D. Del. 2002) ............................................................9

*In re Progressive Restaurant Sys., Inc.,*
    No. 96-CV-0768E(F), 1997 WL 251508 (W.D.N.Y. May 8, 1997) .............9

*Reliable Automatic Sprinkler Co. Inc. v. Sunbelt Group L.P.,*
    472 F. Supp. 3d 64 (S.D.N.Y. 2020)..........................................................17

*Seven Investments, LLC v. AD Capital, LLC,*
    32 A.3d 391 (Del. Ch. 2011).......................................................................15

*Sompo Japan Ins. Co. of Am., Inc. v. I-Sheng Elec. Wire & Cable Co., Ltd.,*
    No. CV 07-5984-JFW, 2008 WL 1134625 (C.D. Cal. Oct. 28, 2008) .................18

*Stern v. Marshall,*
    564 U.S. 462 (2011)......................................................................................3

*Texas v. American Tobacco Co.,*
    463 F.3d 399 (5th Cir. 2006) ......................................................................16

*Matter of Thornhill Bros. Fitness, LLC,*
    85 F.4th 321 (5th Cir. 2023) ...........................................................3, 8, 14

*Tierra Verde Escape, LLC v. Brittingham Group, LLC,*
    No. 1:16-CV-100, 2017 WL 3699554 (W.D. Mich. Aug. 28, 2017) ..........19

*Transitional Learning Community at Galveston, Inc. v. U.S. Office of Personal
Mgmt.,*
    220 F.3d 427 (5th Cir. 2000) ......................................................................13

*U.S. Fidelity & Guaranty Co. v. Ryder Truck Rental, Inc.,*
    405 F.2d 621 (5th Cir. 1969) ......................................................................16

*U.S. v. Tri-State Metal Prods, Inc.,*
    151 F. Supp. 455 (W.D. Pa. 1957)..............................................................16

**Statutes**

28 U.S.C. § 1334 ..................................................................................................................18

Bankruptcy Code § 365 ....................................................................................................8, 13

U.C.C. § 2-207 ....................................................................................................................18

U.C.C. § 2-209 ....................................................................................................................18

**Other Authorities**

Michael J. Fisher & Desmond G. Greenwood, *Contract Law in Hong Kong* 363
     (3d Ed. 2018) ..................................................................................................................8

James M. Zimmerman, *China Law Deskbook: A Legal Guide for Foreign-Invested
Enterprises* 135 (2d ed. 2005)…………………………………………………………20

## MIDEA'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS PLAN OBJECTION

GuangDong Midea Consumer Electric Manufacturing Company Limited, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, and Midea Electric Trading (Singapore) Co. Pte Ltd.) (collectively, "Midea") submit this supplemental brief in support of their objection to the Debtors' Plan.[1]

### PRELIMINARY STATEMENT

1.     At the February 9, 2024 hearing on Midea's Plan objection, the Court asked whether purchase orders issued pursuant to Midea's supply contract with the Debtors (the "Supply Agreement") constitute separate contracts that provide independent bases for the Debtors to claim contractual indemnification rights against Midea even after the Supply Agreement itself had been assigned by the Debtors to the Appliances Buyer.  The answer to the Court's question is "no" under the express terms of the Supply Agreement, the parties' course of dealings, and established rules of contract construction.

2.     The purchase orders were necessarily assigned along with the Supply Agreement because they are indivisible from the Supply Agreement.  Under applicable non-bankruptcy law, the critical inquiry is whether the parties intended the Supply Agreement and purchase orders to be treated as one contract.  Here, they undoubtedly did.  The Supply Agreement expressly provides that: (i) the purchase orders are incorporated into and made a part of the Supply Agreement; (ii) each purchase order is governed by the terms of the Supply Agreement, regardless of whether the purchase order references that contract; and (iii) the Supply Agreement and purchase orders are

---

[1] Unless otherwise defined, capitalized terms have the meanings stated in solicitation version of the Debtors' Combined DS and Plan. [Dkt. No. 926-1] or in the *Objecting Suppliers' Reply (I) In Support of their Objections to the Debtors' Combined Disclosure Statement and Plan and (II) In Response to the Debtors' Opposition to the Suppliers' Plan Objection* [Docket No. 994].

assignable together as a whole.  The parties' conduct also comported with this understanding, as shown by the manner in which the Debtors drafted a prior 2022 assignment of the Supply Agreement as between two Instant Brands affiliates, and by the manner in which the parties have requested and accepted tender of defense of product liability claims.

3.    Accordingly, to treat the purchase orders as separate contracts that nonetheless retain phantom indemnification rights under the now-assigned Supply Agreement, as argued by the Debtors, would violate the terms of parties' agreement, the Bankruptcy Code, and *Matter of Thornhill Bros. Fitness, LLC*, 85 F.4th 321 (5th Cir. 2023).

4.    Even if the Court were to conclude the purchase orders are separate contracts, the Debtors still would still lack any separate and distinct indemnification rights arising from those purchase orders.  Any claims against Midea arising from purchase orders issued before January 2, 2022 were expressly released under the Prior 2022 Assignment Agreement (as defined below) effective as of that date.  After the 2022 assignment, the Debtors ceased attaching to the purchase orders any terms and conditions in any shape or form.

5.    As part of this Court's core jurisdiction *in rem* to determine what is or is not property of the bankruptcy estate, this Court has jurisdiction to decide the narrow issue being briefed and set for further hearing on February 15 – do the Debtors retain, either under the Supply Agreement or under the purchase orders, the right to demand indemnity by Midea for product liability or regulatory claims? After deciding whether the purchase orders are severable from the Supply Agreement and whether they carry any seperate indemnification rights at all, the Court should then stop and should *not* decide the scope or substance of any such rights because that determination is a non-bankruptcy issue that requires application of non-bankruptcy law and thus raises constitutional concerns under *Stern v. Marshall*, 564 U.S. 462 (2011).  Indeed, disputes

arising from the Supply Agreement, including arguments regarding the terms of purchase orders issued pursuant to the Supply Agreement, must be arbitrated in Hong Kong under the express terms of the parties' Supply Agreement.

## BACKGROUND AND STATEMENT OF FACTS[2]

6.      The Debtors and Midea have submitted an agreed set of exhibits to be submitted into evidence as the factual record before the Court.  *See Joint Witness and Exhibit List for Hearing Scheduled for February 15, 2024 at 8:00 a.m. (Central Time)* (the "Stipulated Exhibit List") [Docket No. 1061].

7.      Attached to the Stipulated Exhibit List as Exhibits 2, 3, and 4 are certain emails and attachments sent by the Debtors to Midea during the period from April 2023 through June 2023 tendering product liability claims (the "Representative Tender Letters").  Midea, the Debtors and the Lenders stipulate and agree that the Representative Tender Letters represent typical examples of the Debtors' tenders of product liability claims to Midea for defense.  *See Parties' Joint Stipulation Regarding Exhibit Lists for Hearing Scheduled for February 15, 2024 at 8:00 a.m. (Central Time)* [Docket No. 1059] (the "Exhibit Stipulation") at ¶ 1.

8.      In each of the Representative Tender Letters, the Debtors' representative states that



Those conditions include an express reservation of rights to cease defending the claim and to deny

---

[2] To avoid redundancy, Midea incorporates the factual and procedural background discussed in its prior briefs.  *See* Dkt. Nos. 876, 995, 1027, 1028.  This background section focuses on the purchase orders and related matters that are the subject matter of the supplemental briefing that the Court ordered.

indemnity under certain circumstances. These same conditions are set forth in the Supply Agreement but appear nowhere in the "Purchase Terms and Conditions" attached to some of Instant Brands' purchase orders. *See* Representative Pre-April 2022 POs (as defined below). The parties have stipulated that tender was made "pursuant to the terms of the Supply Agreement[.]" Exhibits Stipulation at ¶ 1.

9. Attached to the Stipulated Exhibit List as Exhibits 5, 6, 7, and 8 are certain emails and attachments sent by the Debtors to Midea during the period of October 21, 2020 through March 29, 2022 (the "Representative Pre-April 2022 POs"). Midea, the Debtors, and the Lenders stipulate and agree that the Representative Pre-April 2022 POs represent typical examples of the Debtors' submission of purchase orders to Midea from at least October 2020 through March 2022. *See* Exhibits Stipulation at ¶ 2.

10. The Representative Pre-April 2022 POs comprise purchase orders issued by Instant Brands Inc. to Midea. Those purchase orders attach terms and conditions that materially differ from what the Supply Agreement provides.

11. For example, section 13 of the Supply Agreement provides ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

By contrast, the terms and conditions attached to the Representative Pre-April 2022 POs ████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

12. ██████████████████████████████████████████████████████

██████████████████████████████████████████ By contrast, the terms and

conditions attached to the Representative Pre-April 2022 POs are ███████████████████████████

███████████████████████████

    13.    ███████████████████████████████████████████████

███████████████████████████████████████ In particular, the Supply

Agreement provides for ███████████████████████████████████████████

███████████████████████████ By contrast, the terms and conditions

attached to the Representative Pre-April 2022 POs ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

    14.    Section 6.1 of the Supply Agreement ███████████████████████

████████████████████████████████████████████████

███████████████████████████████████ By contrast, the terms

and conditions attached to the Representative Pre-April 2022 POs ███████████████████

████████████████████

    15.    Further, the terms and conditions attached to the Representative Pre-April 2022

Purchase Orders ████████████████████████████████████████████

█████████████ In fact, section 14 of those terms and conditions provides that ██████████

████████████████████████████████████████████████

██████████████████████████████

    16.    Attached to the Stipulated Exhibit List as Exhibit 9 are certain emails and

attachments sent from the Debtors to Midea on March 30, 2023 (the "<u>Representative Post-April</u>

<u>2022 POs</u>").  Midea, the Debtors and Lenders stipulated and agreed that the Representative Post-

April 2022 POs represent typical examples of the Debtors' submission of purchase orders to Midea from April 2022 through and including November 2023.  *See* Exhibits Stipulation at ¶ 3.

17.    The Representative Post-April 2022 POs were in all material respects identical to the purchase orders the Debtors previously submitted for the February 9, 2024 hearing on Midea's Plan objections, with one notable exception.  Those purchase orders reference, but do not attach, any terms and conditions. Nor do the emails from the Debtors' representatives transmitting those purchase orders to Midea attach any separate terms and conditions.[3]

18.    Attached to the Stipulated Exhibit List as Exhibit 11 is a copy of the Assignment and Assumption Agreement with Novation effective January 2, 2022 (the "Prior 2022 Assignment Agreement") pursuant to which Double Insight Inc. (now known as Instant Brands Inc.) assigned the Supply Agreement to Instant Brands LLC (formerly known as Corelle Brands LLC).

19.    Schedule 1 to the Prior 2022 Assignment Agreement identifies the Supply Agreement as the only contract being assigned.  Neither the agreement nor its attached schedule identifies any purchase order being assigned.

## ARGUMENT

**I.    The Purchase Orders Are Part Of, And Assigned Along With, The Supply Agreement.**

20.    The Debtors cannot rely on purchase orders issued to Midea to provide them with separate indemnification rights because those purchase orders are inseparable from the assigned Supply Agreement.  *See EPLET, LLC v. DTE Pontiac North, LLC*, 984 F.3d 493, 504 (6th Cir. 2021) ("When agreements are integrated, a party may not assume one agreement without also

---

[3] The Debtors previously offered a 2023 "Standard Terms and Conditions."  After conferring to reach agreement on the Exhibits Stipulation and the Stipulated Exhibit List, the Debtors are no longer offering this document to be include in the evidentiary record on this hearing.

assuming all other integrated agreements.") (internal quotations omitted); *In re Exide Techs.*, 340 B.R. 222, 228 (Bankr. D. Del. 2006) ("[A]ll of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract.").  Accordingly, any attempt to sever the purchase orders from the Supply Agreement would violate *Thornhill*.

### A.    The Purchase Orders Are Not Divisible From the Supply Agreement.

21.    The purchase orders are not separate contracts that can be severed from the assigned Supply Agreement.  A divisible contract is one "which is in its nature and purposes susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent on each other nor intended by the parties to be."  *In re Ferguson*, 183 B.R. 122, 124 (Bankr. N.D. Tex. 1995) (citing Black's Law Dictionary 479 (6th Ed. 1990)).  "State law governs the question of whether an agreement is divisible or indivisible for purposes of assumption and rejection under Bankruptcy Code § 365." *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB), 2013 WL 2663193, at *3 (Bankr. S.D.N.Y. June 13, 2013); *accord In re NewPage Corp.*, No. 11-12804(KG), 2017 WL 571478, at *4 (Bankr. D. Del. Feb. 13, 2017).

22.    "Most courts find the intent of the parties as shown by the contract terms to be the most determinative factor in deciding whether the contract is divisible."[4]  *Ferguson*, 183 B.R. at 125 (applying Texas law); *accord NewPage*, 2017 WL 571478, at *4 (applying same analysis under Michigan and Wisconsin law); *Hawker Beechcraft*, 2013 WL 2663193 at *3 (applying same analysis under Kansas law); *In re Buffets Holdings, Inc.*, 387 B.R. 115, 120-21 (Bankr. D. Del. 2008 (applying same analysis under Illinois law).

---

[4] The Supply Agreement is governed by Hong Kong law.  Supply Agreement § 15.1.  That law appears to square with U.S. state laws.  *See* Michael J. Fisher & Desmond G. Greenwood, *Contract Law in Hong Kong* 363 (3d Ed. 2018) ("The courts, though, are somewhat reluctant to divide a contract unless such is clearly seen to be intended[.]").

23.     Here, the plain language of the Supply Agreement makes clear that the parties intended the Supply Agreement and all resulting purchase orders to be a single, integrated agreement.  The Supply Agreement expressly provides that purchase orders are incorporated into and a part of the entire agreement:



Supply Agreement § 17.7.  The Supply Agreement also ████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████     *Id.* § 1.3.  *See, e.g.*, *In re Philip Servs. (Del.), Inc.*, 284 B.R. 541, 546 (Bankr. D. Del. 2002) (note and merger agreement were indivisible where merger agreement contained integration clause that provided all schedules (of which the note was one) and ancillary documents delivered or given pursuant to the merger agreement constitute the entire agreement of the parties); *In re Progressive Restaurant Sys., Inc.*, No. 96-CV-0768E(F), 1997 WL 251508, at *3 (W.D.N.Y. May 8, 1997) (franchise agreements, leases, notes, and restructuring agreement were indivisible where restructuring agreement integrated and incorporated all of them); *Moulds v. James F. Proctor, D.D.S, P.A.*, 1991 WL 137577, at *10 (Tenn. Ct. App. July 29, 1991) (asset purchase agreement and independent contractor agreement were indivisible where asset purchase agreement contained integration clause providing that all exhibits to and papers delivered in connection with that contract embodied the entire agreement of the parties).

24.     The Supply Agreement's assignment provision further mandates that the contract and purchase orders be assigned together:





*Id.* § 17.2 (emphasis added).  Critically, the assignment provision contains a carve out that provides



*Id.*  This language shows that the parties knew how to create severable rights with respect to the Supply Agreement but opted not to do so with respect to the purchase orders.

25.     Taken together, these contractual provisions provide dispositive indications that the parties did not intend the purchase orders to be divisible from the Supply Agreement.  *Cf. Hawker Beechcraft*, 2013 WL 2663193, at *6-*7 (purchase orders were not part of master plastics agreement where that agreement's integration clause omitted any reference to purchase orders and other provisions drew distinctions between performance, termination, and assignment under the agreement versus any purchase order); *NewPage*, 2017 WL 571478, at *4–5 (purchase orders were not part of master agreement where the agreement expressly stated that purchase orders "shall constitute separate contracts").

26.     The subject matter of the agreement also points to the purchase orders being indivisible from the Supply Agreement.  *Ferguson*, 183 B.R. at 125.  The preamble to the Supply Agreement makes clear that the parties intended an ongoing relationship whereby Midea ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ and that the terms of the Supply Agreement apply so long as the Debtors are buying products

---

[5] The Debtors have argued that the indemnification rights are analogous to accounts receivable. *See Debtors' Reply in Further Support of Opposition to Objecting Suppliers' Plan Objection* [Docket No. 1005] at ¶¶ 7-8.   Here, however, the parties' own Supply Agreement expressly distinguished between accounts receivable and other rights arising under the Supply Agreement and purchase orders.

from Midea.  Supply Agreement at 2.  *See Fl. Mortg. Financing, Inc. v. Flagler Plaza Corp.*, 308 So.2d 571, 572 (Fl. Ct. App. 1975) ("[A] contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement.").  Indeed, the Supply Agreement would be wholly unnecessary if the parties simply wished to be separately governed by distinct purchase orders for distinct products.  *Ferguson*, 183 B.R. at 125 ("If there is a single assent to a whole transaction involving several things, a contract is entire."); *see also In re Buffets Holdings, Inc.*, 387 B.R. at 125 (master leases for different properties were indivisible where the debtors intentionally bundled them for purposes of monetizing them); *Johnson-Lancaster & Assocs., Inc. v. H.M.C., Inc.*, No. ADC-20-0992, 2021 WL 3549879, at *4 (D. Md. Aug. 11, 2021) (purchase orders for multiple deliveries in connection with construction contract were not divisible contracts because the project was not complete until the last delivery was made).

27.     The parties' conduct also demonstrates the purchase orders are indivisible from the Supply Agreement.  *Ferguson*, 183 B.R. at 125.  In 2022, the year before Debtors commenced this case, the original Debtor counterparty to the Supply Agreement assigned that contract to another of the Debtors pursuant to the Prior 2022 Assignment Agreement in a three-party agreement among Midea and the two Instant Brand entities.  *See* Prior 2022 Assignment Agreement at p. 1. Critically, the Prior 2022 Assignment Agreement's schedule of assigned contracts listed only the Supply Agreement and not any purchase orders.  This precisely parallels the Debtors' 2023 assignment of the Supply Agreement to the Appliances Buyers, which assignment also does not reference any separate purchase orders.

28.     The parties' conduct with respect to tendering claims for defense and indemnification also demonstrates that they did not intend the purchase orders to provide the Debtors with separate indemnification rights.  As shown in the Representative Tender Letters,

11

when the Debtors tendered claims, they did so in all cases ███████████████████████

█████    *See* Representative Tender Letters.  The Debtors made no reference to indemnification

under any purchase orders or any separate terms and conditions.  And when Midea accepted those

tenders, it likewise did so ██████████████████████████ and certain conditions

based on rights provided under the Supply Agreement.  *See* Representative Tender Letters.

29.     Further, if Debtors truly believed they had separate indemnification rights under

the purchase orders and did not need the Supply Agreement to enforce those rights, then they could

not have needed to amend the form of Master Assignment, Bill of Sale, Deed and Conveyance that

the Court approved to carve out so-called "Retained Supply Agreement Claims."  Instead, as the

Debtors' counsel admitted, they did so because they ██████████████████████████

████████████████████████████████████████████████████

████████    Dkt. No. 1006-2.

30.     Accordingly, both the plain terms of the Supply Agreement itself, as well as the

parties' own conduct with respect to the Supply Agreement and the purchase orders, show that the

purchase orders were not and were never intended or understood to be separate contracts from the

Supply Agreement.  The purchase orders, which were never even executed by either party, were

merely an administrative mechanism for the actual ordering and shipping of product under the

Supply Agreement, not mini-contracts unto themselves.[6]  They cannot be severed from the Supply

Agreement and must have been assumed and assigned to the Appliances Buyers along with the

Supply Agreement.

---

[6] As further evidence of this fact, ████████████████████████████████████████
████████████████████████████████████████████████████    *See* Supply
Agreement at § 2.

**B.     Treating Purchase Orders as Separate Contracts Would Violate Fundamental Principles of Contract Interpretation.**

31.     To treat the purchase orders as separately enforceable contracts would violate the several fundamental principles of contract interpretation.  First, "the Court cannot rewrite the contract for the parties." *Kutka v. Temporaries, Inc.*, 568 F. Supp. 1527, 1535 (S.D. Tex. 1983). As explained above, the Debtors expressly and repeatedly agreed in multiple provisions of the Supply Agreement to treat the purchase orders and Supply Agreement as one integrated contract; they cannot belatedly ask the Court to rewrite those terms.  Second, "a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and none are deemed superfluous." *Transitional Learning Community at Galveston, Inc. v. U.S. Office of Personal Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000).  Treating the purchase orders as separate contracts would render the operative language in the integration and assignment provisions of the Supply Agreement discussed above entirely superfluous.  Third, "one part of a writing should not be construed to nullify another; a contract should be interpreted as a whole, and its provisions should be read to give effect to and harmonize all where possible." *In re Enron Corp Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 660 (S.D. Tex. 2003).  It is impossible to reconcile the purchase orders, which are expressly governed by and subject to the terms of the Supply Agreement, with attached terms and conditions that are materially different, as is the case for the Representative Pre-April 2022 Purchase Orders.[7]

32.     In short, if the Debtors' argument were accepted, it would be entirely unclear which contract's terms are applicable because very material terms are in direct conflict.  By contrast, application of established principles of contract formation and interpretation, as well as the parties'

---

[7] None of the Representative Post-April 2022 Purchase Orders attached any terms and conditions whatsoever.

own course of dealing and treatment of the Supply Agreement, point to the Supply Agreement as being the only operative contract.

      **C.**      **Severing the Purchase Orders From the Supply Agreement Would Violate** *Thornhill.*

33.      Because the Supply Agreement and the purchase orders are indivisible, the purchase orders cannot be cleaved off and retained by the Debtors.  As the Fifth Circuit explained, "[i]f a debtor could strategically divide up its executory contracts via partial § 365(f) assignments, then the debtor could both change the nature of the contracts' obligations and evade our requirement that it take any retain executory contracts '*cum onere*,' with all their benefits and burdens." *Thornhill*, 85 F.4th at 326.  The parties agreed in the Supply Agreement that all purchase orders executed in connection with that contract are integrated into and form part of that contract. "A debtor cannot use § 365 to create a different deal than the one it had originally."  *Id.*  Thus, when the Debtors assumed and assigned the Supply Agreement, they also assumed and assigned all purchase orders and the rights under those purchase orders.

34.      Nor can the purchase orders somehow be left behind but nonetheless retain phantom indemnification rights by virtue of their incorporating the terms of the assigned Supply Agreement, including its indemnification provisions.  This too would violate *Thornhill's* prohibition on partial assignments.  Indeed, no amount of creative lawyering can circumvent *Thornhill's* mandate of assignment *in toto*, as applied to the indivisible and integrated Supply Agreement and purchase orders.

**II.**      **Even Assuming They Are Separate Contracts, The Purchase Orders Do Not Provide The Debtors Any Enforceable Indemnification Rights.**

35.      Assuming for the sake of argument that the purchase orders issued pursuant to the Supply Agreement can be separated from it and represent distinct, stand-alone agreements, those

purchase orders nonetheless do not provide the Debtors with any corresponding indemnification rights.

### A. The Debtors Do Not Have Any Indemnification Rights Under Purchase Orders Issued Before January 2, 2022.

36.    Even if the Court accepts the argument that the Debtors' purchase orders are separate contracts from the Supply Agreement, the Debtors still lack any rights under purchase orders issued before the January 2, 2022 effective date of the Assumption Agreement for two reasons.

37.    First, pursuant to that agreement, the only contract identified as being assigned was the Supply Agreement, not any separate purchase orders.  Thus, if the purchase orders are separate contracts, then to the extent the purchase orders are separate contracts, they were retained by the assignor Debtor.

38.    Second, the assignor Debtor under the Prior 2022 Assignment Agreement released Midea from any and all pre-assignment claims:



Prior 2022 Assignment Agreement § 2.1(b).  This broad release, by its terms, covers all indemnification obligations and claims, whether accrued or unaccrued, under any retained purchase orders because every purchase order necessarily arises out of and is connected to performance under the Supply Agreement.  *See Deuley v. DynCorp Int'l Inc.*, 8 A.3d 1156, 1163 (Del. 2010) ("Delaware courts recognize the validity of general releases" and "the intent of the parties is controlling as to the scope and effect of the release"); *Seven Investments, LLC v. AD*

*Capital, LLC*, 32 A.3d 391, 396-97 (Del. Ch. 2011) ("If the claim falls within the plain language of the release, then the claim should be dismissed."); *see also* Assumption Agreement § 5.11 (Delaware law applies in construing the Assumption Agreement).

39.     Accordingly, Debtor Instant Brands, LLC, as the assignee under the Prior 2022 Assignment Agreement, would be the only party with any remaining rights against Midea, and could, at most, assert only any rights under purchase orders issued *after* January 2, 2022.

**B.     The Debtors Lack Indemnification Rights Under Purchase Orders Issued After January 2, 2022.**

40.     Even for purchase orders issued after January 2, 2022, the Debtors have not proven that those orders carry any enforceable indemnification rights separate and apart from what the Supply Agreement provides.

41.     For some of the post-January 2022 purchase orders, as exemplified by the Representative Post-April 2022 POs, terms and conditions are referenced but not attached.  The only specified terms in Representative Post-April 2022 POs are for price, quantity, delivery, and timing.  They do not contain any other language incorporating by reference any other specified set of terms and conditions beyond the unattached ones.  The terms of those agreements depend on what is contained within their four corners, *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006), and absent evidence of what terms and conditions referenced by not attached to the purchase orders actually provide, the Debtors have no basis to seek indemnification under any Representative Post-April 2022 POs.  Obviously, there could not have been a meeting of the minds as to indefinite terms and conditions that Midea never saw, much less agreed to.  *See, e.g.*, *U.S. Fidelity & Guaranty Co. v. Ryder Truck Rental, Inc.*, 405 F.2d 621, 622 (5th Cir. 1969) (no agreement to provide insurance was formed where driver did not see agreement before the accident and signed it after the accident); *U.S. v. Tri-State Metal Prods, Inc.*, 151 F. Supp. 455, 458 (W.D.

Pa. 1957) (no contract was formed where corporation agreed to supply metal shelving to government specifications but its agent never even saw the specifications).

42.     For other post-January 2022 purchase orders, as exemplified by the Representative Pre-April 2022 POs, terms and conditions are attached but nonetheless do not provide any enforceable indemnification rights for two reasons.

43.     First, all of the Representative Pre-April 2022 POs that the Debtors have provided were issued by Instant Brands Inc. and the attached terms and conditions expressly govern only purchases made by that particular entity. Section 14 of the terms and conditions also provide those terms and conditions are ███████████████████████████████████ ████████ and ███████████████████████████████████ Instant Brands Inc., however, released all claims against Midea under the Prior 2022 Assignment Agreement, as discussed above. The Debtors have not submitted any purchase order issued by the assignee under the Prior 2022 Assignment Agreement, Instant Brands LLC, much less one with terms and conditions that provide an indemnification right to that particular entity.

44.     Second, even assuming the Debtors that are non-parties to and non-beneficiaries of the terms and conditions can enforce them (which they cannot), those terms and conditions materially differ from what the parties agreed to in the Supply Agreement such that there was no meeting of the minds as to the new, materially different terms. *See, e.g., Axelson v. McEvoy Willis, a Div. of Smith Int'l (North Sea), Ltd.*, 7 F.3d 1230, 1233 (5th Cir. 1993) ("Because the parties had a meeting of the minds months before, the additional terms on the June form purchase order never became part of the contract."); *Reliable Automatic Sprinkler Co. Inc. v. Sunbelt Group L.P.*, 472 F. Supp. 3d 64, 73-76 (S.D.N.Y. 2020) (where counterparty sent new terms under existing vendor

agreement that were not explicitly accepted, no contract was formed under U.C.C. § 2-207 or modified under U.C.C. § 2-209).

45.     Thus, regardless of the different ways the Debtors come at the issue, the result is still the same—they have no indemnification rights under the purchase orders.

## III.   The Court Does Not Should Not Decide the Merits of the Debtors' Alleged Rights Under the Purchase Orders.

46.     Although the above arguments demonstrate that Midea should prevail on the question of whether the Debtors have any separate indemnification rights under the purchase orders, Court should stop with that question and should not proceed further to address the substance of whatever indemnification rights or defenses to indemnification might be asserted on the merits of the underlying contract dispute.

47.     The Debtors and Midea agreed in the Supply Agreement that any disputes arising from that contract ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████[8] Supply Agreement § 16.2.  "Where an otherwise applicable arbitration clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement[.]"  *In re Mintze*, 434 F.3d 222, 231 (3d Cir. 2006); *accord Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1069 (5th Cir. 1997) (a bankruptcy court "possesse[s] discretion to refuse to enforce an otherwise applicable arbitration provision only insofar as enforcement would conflict with the purpose of provisions of the Bankruptcy Code"); *see also Sompo Japan Ins. Co. of Am., Inc. v. I-Sheng Elec.*

---

[8] Midea's participation in this case should not be construed as its consent to jurisdiction in any other forum where the Debtors (or Reorganized Debtors) might otherwise be named in any action or proceeding.  The law in this District is clear that a bankruptcy court's jurisdiction under 28 U.S.C. § 1334 is premised on *in rem* jurisdiction and therefore encompasses only the property of the Debtors' estate.  *See In re Apex Long Term Acute Care—Katy, L.P.*, 465 B.R. 452, 464 (S.D. Tex. 2011).

*Wire & Cable Co., Ltd.*, No. CV 07-5984-JFW (PJWx), 2008 WL 1134625, at *5 (C.D. Cal. Oct. 28, 2008) (staying proceeding and compelling arbitration in Hong Kong pursuant to arbitration clause in contract); *Tierra Verde Escape, LLC v. Brittingham Group, LLC*, No. 1:16-CV-100, 2017 WL 3699554, at *4 (W.D. Mich. Aug. 28, 2017) (same).  Here, the rights at issue are pre-petition contract rights not created by the Bankruptcy Code.  Forcing Midea to litigate the issue in this forum could unfairly prejudice its ability to seek arbitration.[9]  Further, even if the issue of whether the purchase orders are severable and contain indemnification provisions is a "core" matter, the precise scope of the rights provided under those purchase orders are non-bankruptcy issues requiring application of non-bankruptcy law and Midea does not consent to entry of final judgment by this Court on those substantive issues, which are outside the scope of the supplemental briefing requested by the Court.

48.     Furthermore, these are the exact sort of issues that require arbitration because they require granular inquiry into the parties' course of dealings over a several years, as viewed through the lens of applicable Hong Kong law.  *See A/S Dan-Bunkering Ltd. v. M/V Centrans Demeter*, 633 Fed. App'x 755, 759 (11th Cir. 2015) (affirming dismissal of case on *forum non conveniens* grounds where the district court would have been required to apply Hong Kong law to issues concerning contract formation and validity); *Indemnity Ins. Co. of North America v. K-Line Am., Inc.*, No. 06 Civ. 0615(BSJ), 2008 WL 4922327, at *10 (S.D.N.Y. Feb. 27, 2008) (dismissing action and enforcing forum selection clause where contract was governed by Hong Kong law and provided for dispute resolution in Hong Kong).  Hong Kong law, particularly with respect to corporate law, is fundamentally different from U.S. law in several material respects, including but

---

[9] Midea disputes any argument that it waived the right to arbitrate due to the circumstances under which this dispute arose, as detailed below.

not limited to the central prominence of the "company chop," or seal, being affixed to documents in order to bind the company to any agreement.[10]  Midea's company "chop" is affixed to the Supply Agreement, but not to any purchase order, further underscoring that Midea never acknowledged or consented to any additional terms proposed through any purchase order.  The plain terms of the Supply Agreement afford Midea the right to have issues of Hong Kong-specific contract law such as these decided by parties sophisticated in Hong Kong law through the bargained-for and agreed-to arbitration provision.

## CONCLUSION

For the foregoing reasons,  the Court should find and hold that: (i) Midea's Supply Agreement was assigned to the Appliances Buyers *in toto*, including any purchase orders; (ii) that the Debtors did not retain any indemnification rights and/or claims against Midea either under the Supply Agreement or any related purchase orders; and (iii) that any claims the Debtors may have held against Midea were contingent, inchoate, unaccrued, and therefore did not survive the sale and assignment to the Appliances Buyers.

Dated: February 13, 2024

Respectfully submitted,

ARENTFOX SCHIFF LLP

By:  */s/ Brett D. Goodman*
Brett D. Goodman (*Pro Hac Vice*)
1301 Avenue of the Americas

---

[10] *See* James M. Zimmerman, *China Law Deskbook: A Legal Guide for Foreign-Invested Enterprises* 135 (2d ed. 2005) ("After a company is established [in China], it is required to obtain several sets of 'chops' or 'seals,' which are issued by an engraving entity approved by the Ministry of Public Security (MPS) or local branch thereof.  The usual practice is for a company to obtain separate chops for purposes of customs, banking, receipts (for issuance of tax receipts), and general business correspondence.  The company will also be issued an 'enterprise' seal, which is usually held by a legal representative and is used for executing contracts and other obligations.  Given that a chop imprint – and especially the imprint of the enterprise seal – is a substitute for a signature, due care must be exercised to ensure that the chops are maintained in a safe location and are not subject to misuse by persons without authority").

42nd Floor
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
brett.goodman@afslaw.com

- and -

Matthew F. Prewitt (*Pro Hac Vice*)
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5583
matthew.prewitt@afslaw.com

- and -

James E. Britton (*Pro Hac Vice*)
800 Boylston Street
32nd Floor
Boston, MA 02199
Telephone: (617) 973-6100
Facsimile: (617) 367-2315
james.britton@afslaw.com

- and -

**HOWLEY LAW PLLC**

Tom A. Howley
Texas Bar No. 24010115
Eric Terry
Texas Bar No. 00794729
Pennzoil Place – South Tower
711 Louisiana St., Suite 1850
Houston, TX 77002
Telephone: (713) 333-9125
tom@howley-law.com
eric@howley-law.com

*Counsel for Midea*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 13, 2024, a copy of this document was served via electronic mail on all counsel of record via the Court's CM/ECF system.

*/s/ Brett D. Goodman*
Brett D. Goodman
