IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **INSTANT BRANDS ACQUISITION** | § | Case No. 23-90716 (MI) |
| **HOLDINGS INC.**, *et al.*, | § | |
| | § | |
| Debtors.[1] | § | Jointly Administered |
| | § | |

**DEBTORS' SUPPLEMENTAL MEMORANDUM IN RESPONSE TO GUANGDONG
MIDEA CONSUMER ELECTRIC MANUFACTURING COMPANY LIMITED'S,
FOSHAN SHUNDE MIDEA ELECTRICAL HEATING APPLIANCES
MANUFACTURING COMPANY LIMITED'S, AND MIDEA ELECTRIC
TRADING(SINGAPORE) CO. PTE LTD.'S SUPPLEMENTAL BRIEF
<u>IN SUPPORT OF ITS PLAN OBJECTION</u>**

Instant Brands Acquisition Holdings Inc. and certain of its affiliates (collectively, the

"**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11

cases (the "**Chapter 11 Cases**"), respectfully submit this memorandum in response to *GuangDong*

*Midea Consumer Electric Manufacturing Company Limited, FoShan ShunDe Midea Electrical*

*Heating Appliances Manufacturing Company Limited, and Midea Electric Trading (Singapore)*

*Co. Pte Ltd.'s Supplemental Brief in Support of Its Plan Objection* [Docket No. 1063] ("**Midea's**

**Supplemental Brief**"), pursuant to the Court's order at the February 9, 2024 hearing.

---

[1] The debtors and debtors in possession in the Chapter 11 Cases, along with the last four digits of
their respective employer identification numbers or registration numbers in the applicable
jurisdictions, are as follows:  Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition
Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant
Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-
2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167);
EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands
(Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272);
and Corelle Brands (GHC) LLC (9722).  The address of the debtors' corporate headquarters is
3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ........................................................................................1

ARGUMENT ............................................................................................4

I.     The Debtors Possess Claims for Indemnification Arising from the Supply Agreements....4

II.    The Debtors Possess Claims for Indemnification Under Non-Executory Purchase Orders..................................................................................................4

    A.     Midea Agreed to Indemnify the Debtors Under Each Purchase Order ..................4

    B.     Midea's Arguments to Avoid Obligations Under the Purchase Orders Are Meritless.........................................................................................6

        1.     The Terms and Conditions Applied to All of the Purchase Orders ............6

        2.     The Supply Agreements and Purchase Orders Are Separate Contracts ....10

        3.     The Purchase Orders Do Not Violate Fundamental Principles of Contract Law...............................................................................15

        4.     The 2022 Assignment Did Not Release Indemnification Claims.............16

III.   The Court Has Jurisdiction to Resolve Midea's Plan Objection and Declare that the Debtors' Possess Indemnification Rights Against Midea...................................18

CONCLUSION.........................................................................................20

*\* Unless otherwise stated, all emphasis is added, all internal citations and quotations are omitted, and all quotes are otherwise cleaned up.*

## PRELIMINARY STATEMENT

1.      If there were any lingering doubt that Midea seeks, through its Plan Objection, to avoid 100% of its responsibility to indemnify the Debtors for claims arising from products Midea manufactured, Midea's Supplemental Brief dispels it.  Despite having regularly accepted purchase orders containing a broadly applicable indemnification term, Midea asserts that the Debtors have *no* rights for indemnification against Midea under these completed, non-executory purchase orders *whatsoever*—regardless of whether the Supply Agreement was assigned during the Appliances Sale.  To be clear, Midea does *not* contend that purchase orders that were not before the Court at the February 9 hearing somehow altered Midea's obligations under the Supply Agreements.  A representative sample of purchase orders shows the opposite.  Midea instead simply wants the Court to disregard those purchase orders *entirely*.  That position is contrary to both the uncontested factual record and the law.

## BACKGROUND

2.      At the February 9 Hearing, the Court requested supplemental briefing to address the argument that the Debtors possess indemnification rights arising from non-executory purchase orders separate from the Supply Agreement itself.  (*See February 9 Emergency Motion Hearing Transcript* [Docket No. 1065] at 15:22-16:5 ("[T]he issue for confirmation that we need to decide is whether creditors can rely on that indemnity as a result of purchase orders.").)

3.      Following the Court's guidance at the February 9 Hearing, the parties then reached agreement on a stipulated record for purposes of resolving this issue.  (*See* Ex. 1 (*Parties' Joint Stipulation Regarding Exhibit Lists for Hearing Scheduled for February 15, 2024 at 8:00 A.M (Central Time)* [Docket No. 1062] (the "**Joint Exhibit Stipulation**")) ¶ 2.)  The parties agreed that the exhibits reflected in the Joint Exhibit Stipulation will constitute the *complete* record at the

February 15 Hearing, and no party would seek to introduce additional evidence at the hearing itself.

4.      Relevant here, Midea and the Debtors are parties to a Supply Agreement.  (Ex. 10 (the "**Supply Agreement**" or "**Midea SA**").).  The Supply Agreement sets forth the general terms on which Midea would, from time to time, sell products to the Debtors.  Section 1 of the Supply Agreement governs product ordering.  It states that, to order products, the "█████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████.  (*Id.* § 1.1.)  As further explained below, the Purchase Orders contain other provisions addressing the Parties' rights and obligations separate and apart from the Supply Agreement itself.  *See* Section II.A, *infra*.

5.      Over the course of many years, the Debtors placed numerous Purchase Orders for products with Midea.  The form of Purchase Order has generally remained unchanged.  Upon receipt of a Purchase Order, Midea regularly accepted the Purchase Order by email response confirming the date of delivery.  (*See* Exs. 5-8 (Representative Pre-April 2022 POs); Ex. 9 (Representative Post-April 2022 POs); Joint Ex. Stip. ¶¶ 2-3.)  The Purchase Orders are governed by Illinois law.  (*See, e.g.*, Ex. 5 (Representative Pre-April 2022 PO) at 4.)

6.      Importantly, every Purchase Order provided in bold face type at the bottom of *each* page of the Purchase Order:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

(*See id.*).  This language is representative and typical of every single Purchase Order placed with Midea.  (*See* Ex. 1 (Joint Ex. Stip.) ¶¶  2, 3 and referenced exhibits.)

7.      Moreover, all Purchase Orders dated prior to April 2022 actually attached a set of terms and conditions titled "Instant Brands Inc. Purchase Terms and Conditions" ("**Purchase Terms and Conditions**").  (*See* Exs. 5-8 (Representative Pre-April 2022 POs).)  Among other relevant terms, the Purchase Terms and Conditions contain the following provision:



(*See id.* at 3, 3, 4, 4.)

8.      The Purchase Terms and Conditions also set forth an indemnification obligation:



(*See id.* at 3, 3, 4, 4.)

9.      While all of the Purchase Orders dated on or before April 2022 attached the Purchase Terms and Conditions to the Purchase Orders itself (the "**Pre-April 2022 Purchase Orders**"), Purchase Orders dated from April 2022 through November 2023 (the "**Post-April 2022 Purchase Orders**") contained the same language obligating Midea to be bound to the Purchase Terms and Conditions but did not also attach them.  (*Compare e.g.*, Ex. 5 (Representative Pre-April 2022 PO) *with* Ex. 9 (Representative Post-April 2022 PO).)  There is otherwise no

substantive difference between the Pre- and Post-April 2022 Purchase Orders, and it is undisputed

that the Post-April 2022 Purchase Orders contains the same bold-faced language indicating that

██████████████████████████████████████████████████████████████

██████████. (*See* Ex. 9 (Representative Post-April 2022 PO) at 4, 6, 8, 10, 12, 14, 15.)

## ARGUMENT

### I.  The Debtors Possess Claims for Indemnification Arising from the Supply Agreements

10.     As an initial matter, as the Debtors established in their Opposition and Reply, the

Debtors have a cognizable property interest in rights to indemnification for liabilities *arising under*

*the Supply Agreement* relating to goods delivered before the Appliances Sale Transaction closed

and the Supply Agreement was assigned to the Appliances Buyer.[1]  Those Supply Agreement

rights—standing alone—are sufficient to overrule Midea's Plan Objection.  If the Court agrees,

the Court need not even reach the question of whether the Debtors have separate rights under the

Purchase Orders.

### II.  The Debtors Possess Claims for Indemnification Under Non-Executory Purchase Orders

#### A.  Midea Agreed to Indemnify the Debtors Under Each Purchase Order

11.     There can be no dispute that Midea agreed to a broad indemnification obligation

under the Purchase Terms and Conditions attached to Purchase Orders prior to April 2022.  Indeed,

---

[1] (*See Debtors' Opposition to Zhejiang Tianxi Kitchen Appliance Co., Ltd.'s, GuangDong Midea Consumer Electric Manufacturing Company Limited's, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited's, Midea Electric Trading (Singapore) Co. Pte Ltd.'s Plan Objection* [Docket No. 966] (the "**Opposition**") ¶¶ 55-63; *Debtors' Reply in Further Support of Opposition to Zhejiang Tianxi Kitchen Appliance Co., Ltd.'s, GuangDong Midea Consumer Electric Manufacturing Company Limited's, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited's, Midea Electric Trading (Singapore) Co. Pte Ltd.'s Plan Objection* [Docket No. 1007] (the "**Reply**") ¶¶ 3-11.)

Midea agreed to ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████ (*E.g.*, Ex. 5 (Representative Pre-April 2022

PO) at 4.)  This includes ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. That sweepingly broad

indemnification provision, therefore, plainly covers claims for personal injury arising from

products that Midea manufactured or any regulatory claims that might arise related to those

products.

12.     Moreover, Midea does not claim that the completed Purchase Orders are executory

contracts. (*See Midea's Supplemental Brief in Support of Its Plan Objection* [Docket No. 1064]

("**Midea's Supplemental Brief**") ¶¶ 33-34.)  Nor could it.  The products were manufactured,

delivered, and paid for long ago.  The Parties have thus substantially completed their performance,

and section 365 of the Bankruptcy Code—including section 365(f)'s prohibition against partial

assignment—simply does not apply.  *See, e.g.*, *Matter of Falcon V, L.L.C.*, 44 F.4th, 348, 352 (5th

Cir. 2022) ("A contract is executory if performance remains due to some extent on both sides' and

if at the time of the bankruptcy filing, the failure of either party to complete performance would

constitute a material breach of the contract, thereby excusing the performance of the other party.").

Accordingly, the Purchase Orders, including any claims for indemnification against Midea arising

from the Purchase Orders, remain assets of the Debtors' estates under 11 U.S.C. § 541.  *See, e.g.*,

*In re Swift*, 129 F.3d 792, 795 (5th Cir. 1997) (noting that section 541 is very broad, and includes

causes of action belonging to the debtor. . . .").

**B.** **Midea's Arguments to Avoid Obligations Under the Purchase Orders Are Meritless**

**1.** **The Terms and Conditions Applied to All of the Purchase Orders**

13.     Midea makes much of the fact that Purchase Orders dated after April 2022 "referenced but [did] not attach" the standard terms and conditions.  (*See* Midea's Suppl. Br. ¶¶ 40-45.)  Midea's argument appears to be that the Debtors' failure to attach the "Purchase Terms and Conditions" to Purchase Orders after April 2022 somehow operated to change the parties' core bargain with respect to each Purchase Order and strip the Debtors of an indemnification right with respect to products in each order.  This argument runs afoul of both logic and basic principles of contract law, and should be rejected.

14.     It bears noting at the outset that, although having an opportunity to supplement the record with additional evidence, Midea has not cited a shred of evidence suggesting that the parties, by omitting the "Purchase Terms and Conditions" after April 2022, sought to modify the parties' rights under the Purchase Orders.  Moreover, just as in the Pre-April 2022 Purchase Orders, each one of the Post-April 2022 Purchase Orders is clear on its face that the parties intended to be bound to the Debtors' standard terms; in bold typeface at the bottom of each Post-April 2022 Purchase Order, Midea "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (*See e.g.*, Ex. 9 (Representative Post-April 2022 PO) at 4.)  Thus, the *sole* question is what the parties intended when they agreed that Midea would be bound by "█████████████████████████████████████." (*See id.*)  The uncontested record compels the conclusion that this referred to and incorporated the Purchase Terms and Conditions that had been attached to dozens of Purchase Orders prior to April 2022.

15.     *First*, the Parties' prior course of dealing establishes that the Purchase Terms and Conditions apply.  Under the Uniform Commercial Code (both generally, and as adopted by Illinois, the governing law for the Purchase Orders), the prior course of dealing between contracting parties "is relevant in ascertaining the meaning of [their] agreement," and can be used to "supplement or qualify the terms of [their] agreement."  810 Ill. Comp. Stat. Ann. § 5/1-303(d). A course of dealing is demonstrated by reference to the "previous transactions between the parties."  *Id.* § 5/103(b).  Here, the Parties stipulated that "from at least October 2020 through March 2022," the Purchase Orders that the Debtors submitted and that Midea accepted attached the Purchase Terms and Conditions.  (*See* Ex. 1 (Joint Ex. Stip.) ¶ 2; *see also* Exs. 5-8 (Representative Pre-April 2022 POs).)  The parties had an established course of dealing whereby the Debtors' Purchase Orders attached the Purchase Terms and Conditions and Midea invariably accepted those attached terms.  Indeed, the only document in the record to which the "Instant Brands Inc Purchase Terms and Conditions" could refer is the identically titled terms attached to the Pre-April 2022 Purchase Orders.  (*See* Exs. 5-8 (Representative Pre-April 2022 POs).) Accordingly, the prior course of dealing between the Debtors and Midea "establish[ed] a common basis of understanding" that the Purchase Terms and Conditions were part and parcel to the Purchase Orders.  *See* Ill. Comp. Stat. Ann. § 5/1-303(b).

16.     Numerous courts, including courts applying Illinois law, have reached the same conclusion in virtually identical factual circumstances.  *See, e.g.*, *Indep. Mach., Inc. v. Kuehne & Nagel, Inc.*, 867 F.Supp. 752, 762-65 (N.D. Ill. 1994) (finding that term limiting the liability of carrier was part of the course of dealing between the parties and therefore incorporated into a subsequent shipping agreement, where shipper and carrier had entered five separate transactions in the previous year that had included the term, the liability-limiting clauses had appeared in red

print on all of the five separate invoices, and the shipper did not contend that it was unaware of limitation clause in earlier invoices); *Cap. Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir. 1992) (holding that carrier was entitled to limit its breach of contract liability to $150 in light of a provision on the back of its invoices because other party had received numerous invoices from carrier with limitation term before entering into contract at issue and should have been amply aware of the condition).  Cases in other jurisdictions are in accord.[2]  Notably, Midea does not cite a *single* factually analogous case to the contrary.

17.     Indeed, the argument against Midea is even *stronger* than in these cases where the subsequent contract did not include the challenged term at all.  Here, the post-April 2022 Purchase

---

[2] *See also, e.g.*, *K.K.D. Imps., Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition*, 36 F. Supp. 2d 200, 201-03 (S.D.N.Y. 1999) (finding that forum selection clause included on shipper's invoices was binding on receiving party despite its arguments that it did not receive certain invoices until after delivery had been made, and therefore could not assent to those terms, because it had previously received forty-one invoices that did contain the forum selection clause); *Well Luck Co., Inc. v. F.C. Gerlach & Co., Inc.*, 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005) (stating that "the prior course of dealing doctrine extends beyond prior dealings involving actual disputes to include evidence that a party has ratified terms by failing to object" and that "terms repeated in a number of written confirmations may, over time, become part of later contracts," and holding that, despite uncertainty over whether the shipper ever received the receiving party's main terms and conditions, it was still bound by them in light of the fact that the "parties conducted over 150 transactions" where a limited, but similar, set of terms and conditions was attached); *Kay-Bee Toys Corp. v. Winston Sports Corp.*, 625 N.Y.S.2d 208, 209-10 (App. Div. 1995) (finding that hold harmless and indemnity provisions contained in purchase orders were enforceable against defendant, despite its "contention[] that the purchase orders" it received from plaintiff "were faxed to [it] without the pertinent terms and conditions on the reverse side" because "[t]he record reveals a prior course of dealing between the parties as well as the defendant's actions in purchasing insurance on plaintiff's behalf, and thus established that defendant was aware of and had assented to the terms of the hold harmless, indemnity and insurance provisions in the purchase order"); *United B. Int'l Corp. v. UTI U.S., Inc.*, No. 34561/02, 2004 WL 2563795, at *1-3 (N.Y. Sup. Ct. Nov. 4, 2004) (holding that despite plaintiff's argument "that the terms of the subject invoices limiting liability were never communicated to [its] agents," those terms still applied because "it is undisputed that there existed a prior course of dealings between [defendant] and [plaintiff] involving hundreds of transactions over more than ten years" and "[plaintiff] fail[ed] to dispute that" the standard invoice attached to defendant's representative's affidavit "represents a true and accurate copy of the invoices presented to it over the course of its relationship with [plaintiff]").

Orders did reference the Purchase Terms and Conditions, but merely failed to physically attach them—a step that courts have found to be inconsequential.  For example, in *GMAC Com. Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 211-12, 219 (S.D.N.Y. 2001), an arbitration clause was included in terms attached to a purchaser's first two purchase orders, but referenced and not attached to its next four purchase orders.  The *GMAC* court held that the arbitration clause was binding with respect to all six purchase orders because, among other reasons, the parties' prior course of conduct established that disputes arising under the purchase orders were subject to arbitration.

18.      *Second*, the Parties' course of performance in the post-April 2022 timeframe further underscores that the Debtors and Midea understood and believed that the Purchase Terms and Conditions were still applicable.  The Uniform Commercial Code (again, both generally and as adopted by Illinois) provides that the parties' course of performance is relevant to determining the meaning of their agreement and can be used to "supplement or qualify the terms of [their] agreement."  810 Ill. Comp. Stat. Ann. § 5/1-303(d).  Here, the record before the court is crystal clear that Midea never remarked on, much less objected to, the transmission of Purchase Orders that only referenced the standard terms without attaching them.  Rather, the record demonstrates that Midea accepted Purchase Orders attached to Exhibit 9 with no terms attached without reservation or objection.  (*See* Ex. 9 (Representative Post-April 2022 POs) at 1; Ex. 1 ¶ 3 (stipulating that such acceptance was "typical").)  That is hardly surprising, given that the Debtors attached the same standard terms for years prior to that.  Moreover, the stipulated record shows that Midea was actively and repeatedly accepting the Debtors' tender of claims and indemnifying the Debtors during this time period.  (*See* Exs. 2-4 (Representative Tender Examples).)  This

uncontested course of performance evidence likewise shows that the Parties were acting as if they were still bound by the indemnification term contained in the earlier Purchase Orders.  (*See id.*)

19.     *Third*, in addition to course of dealing and course of performance evidence, the plain language of the Purchase Orders themselves makes clear the Parties intended to rely on the prior terms.  As noted above, the Post-April 2022 Purchase Orders refer specifically to "Instant Brands' Inc. Purchase Terms and Conditions.  (Ex. 9 (Representative Post-April 2022 POs).)  If Midea were correct that there was some change in intentions, surely the Purchase Orders would not reference the terms and conditions the parties had agreed to for years.  *See BCSP 330 N. Wabash Prop. LLC v. 401 NSS, LLC*, No. 1-23-0542, 2024 WL 229093, at *6 (Ill. App. Ct. Jan. 22, 2024) ("Where the language of a contract is plain, it provides the best evidence of the parties' intent and will be enforced as written.").

### 2.     The Supply Agreements and Purchase Orders Are Separate Contracts

20.     Perhaps aware that the Parties' course of dealing is irrefutable, much of Midea's brief is devoted to the misplaced argument that the Purchase Orders and Supply Agreement are a single, integrated contract, such that, under section 365(f) of the Bankruptcy Code and the Fifth Circuit's decision in *Thornhill*, these agreements were transferred to the Appliance Buyer.  (*See* Midea's Suppl. Br. ¶¶ 20-35.)  That argument fails.

21.     As a threshold matter, although divisibility, like any contract interpretation issue, turns on the intent of the parties, Midea neglects to recite the key factors that courts review when assessing whether the parties intended for their agreements to be divisible.  As a general matter, under black letter law, "[a] divisible contract is one in which both parties have divided up their performance into units or installments in such a way that each past performance is the rough compensation for a corresponding past performance by the other party." *Kimco Corp. v. Murdoch, Coll & Lillibridge*, Inc., 313 Ill. App. 3d 768, 773 (App. Ct. 2000) (applying Illinois law); *Trapkus*

*v. Edstrom's Inc.*, 140 Ill. App. 3d 720, 727 (App. Ct. 1986) ("A contract is said to be divisible if both (1) performance by each party is divided into two or more parts and (2) performance of each part by one party is the agreed exchange for a corresponding part by the other party."); *Dresdner Bank AG. (N.Y. Branch) v. Morse/Diesel, Inc.*, 115 A.D.2d 64, 69 (N.Y. App. Div. 1986) (applying New York law) (same); *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 389 (Bankr. N.D. Tex. 2003) ("A severable or divisible contract is one that includes two or more promises each of which can be enforced separately, so that failure to perform one of the promises does not necessarily put the promisor in breach of the entire contract.").

22.     Put differently, the key question "is whether, had the parties thought of it, they would be willing to exchange the part performance irrespective of what transpired subsequently or whether the divisions made are merely for the purpose of requiring periodic payments as the work progresses." *Trapkus*, 140 Ill. App. 3d at 727; *see also In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB), 2013 WL 2663193, at *3 (same). "Whether it is proper to regard the parts of each pair as agreed equivalents will usually depend on considerations of fairness." *Trapkus*, 140 Ill. App. 3d at 727.

23.     Here, viewed in their entirety, the terms of the Supply Agreement are crystal clear that purchase and sale obligations that arose under each Purchase Orders are divisible from each other and from the Supply Agreement itself under the above test. To cite just a few examples, the Supply Agreement states that:

- ████████████████████████████████████████████

- ████████████████████████████████████████████

- ████████████████████████████████████████████



and

.

As the above terms reflect, the Parties' performance was divided into matching parts corresponding to the purchase and sale commitments created by each Purchase Order. The payment of the purchase price was the consideration for the delivery of the products. That, by definition, renders the Purchase Orders divisible from the Supply Agreement. Indeed, if the Purchase Orders and the Supply Agreement were a single, indivisible contract, the Parties would not have needed to make any of the above distinctions between the Supply Agreement and the Purchase Orders.

24.    This conclusion is bolstered by cases holding that purchase orders are divisible from similar agreements establishing relationships but requiring purchase orders to effectuate future sales of goods. *See e.g.*, *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 705 (7th Cir. 1995) ("[W]e have held under Illinois law that distributorship agreements and the purchase orders that arise under them are different contracts."); *S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp .2d

1074, 1086 (N.D.Ill.1999) (same); *To–Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift Am.*, 913 F. Supp. 1148, 1155 (N.D.Ill. 1995) (applying the same rule to a franchise agreement); *In re Hawker Beechcraft, Inc.*, 2013 WL 2663193, at *3-8 (applying the same rule to a Master Plastics Agreement); *Carlisle Corp. v. Uresco Constr. Materials, Inc.*, 823 F. Supp. 271, 273-75 (M.D.Pa. 1993) (holding purchase orders were separate from distributorship agreement); *GFSI, Inc. v. J-Loong Trading, Ltd.*, No. 05-2302-KHV, 2006 WL 3523782, at *3 (D. Kan. Dec. 6, 2006) (holding that purchase orders issued pursuant to a Requirements Manual were separate contracts where the Requirements Manual set forth general terms but omitted specific price and quantity terms and contemplated that future purchase orders would constitute the contract).

25.     Midea largely ignores the numerous provisions in the Supply Agreements quoted above.  Instead, it principally relies on section 17.7 of the Supply Agreement, which provides:



(Midea's Suppl. Br. ¶ 23 (citing Ex. 10 § 17.7).)  But far from saying that the Supply Agreement and Purchase Orders are indivisible, this boilerplate provision merely sets forth a standard "merger" or "integration" clause whose purpose is to supersede prior agreements and eliminate parol evidence as to the meaning of the agreement's terms.  If anything, the *italicized* clause contemplates that the Purchase Orders are separate contracts because the Parties believed the Purchase Orders' terms should be incorporated into the Supply Agreement by reference.

26.     *ECHO, Inc.* is directly on point.  There, the Seventh Circuit considered whether purchase orders were divisible from an overarching distributorship agreement containing an integration clause virtually identical to section 17.7 of the Supply Agreement.  52 F.3d at 703-04. The Court found that this "boilerplate merger or integration clause" is designed to "prevent either

party from introducing parol evidence to prove that an agreement other than the distributorship agreement and its supplements existed." *Id.* at 707.  But it held that "this does not mean they are one contract." *Id.*  "It merely means that the enumerated articles compose all of the dealings between the parties that may be used to prove the content of those dealings." *Id.*  Accordingly, the Court rejected the argument, advanced by Midea here, that an integration clause akin to section 17.7 "unifie[d] the purchase orders with the distributorship agreement." *Id.*[3]

27.     Facing an utter lack of evidence in the text of the Supply Agreement itself, Midea's argument that the Parties' intended the Purchase Orders to be divisible boils down to cherry-picked examples of instances where the Debtors referenced the Supply Agreement but not individual Purchase Orders when asserting or referencing their indemnification rights, for example when tendering claims.  (*E.g.*, Suppl. Br. ¶¶ 27-30 (citing Exs. 2-4 (Representative Tender Examples) and Ex. 10 (Midea SA).)  But nothing in any of the examples cited by Midea remotely suggests that the Debtors agreed to waive or otherwise denied the existence of separate rights under the Purchase Orders.  Indeed, as Midea well knows, when tendering claims, it is impossible for the Debtors to identify which Purchase Orders are implicated by a personal injury claimant's product until the Debtors are able to inspect the product itself, which occurs, if at all, well after tender.  The purpose and the text of the Supply Agreement makes crystal clear that Purchase Orders are divisible contracts under prevailing principals of contract law.

28.     Finally, Midea's case authorities are not to the contrary; if anything, they support the Debtors.  For example, *Fl. Mortg. Fin., Inc. v. Flagler Plaza Corp.*, 308 So.2d 571, 572 (Fl.

---

[3] For substantially similar reasons, ████████████████████████████████████████, (Midea's Suppl. Br. ¶ 24 (citing Mex. 10 ¶ 17.2)), ████████████████████████████████████████, is unavailing.  Again, that provision ████████████████████████████████████████, which is why the parties apparently believed it was necessary to state separately that purchase orders may not be assigned without consent.

Ct. App. 1975) (Midea's Suppl. Br. ¶ 26) involved a unique fulfilment contract that contemplated fulfilment of the entirety of the sale over time.  *In re Ferguson*, 183 B.R. 122, 125 (Bankr. N.D. Tex. 1995) (Midea's Suppl. Br. ¶ 26) involved a construction contract for a single project.  The singular nature of the performance to be rendered in those contracts led the courts there to conclude the contracts were not divisible. By contrast, here, the Supply Agreement is a master contract for a period of years where the quantities and prices are not specified.  Moreover, as the court in *In re Ferguson* recognized, "[i]f there is a separate assent to each of the several things involved, it is divisible."  183 B.R. at 125.  That is precisely the situation here:  each time Midea accepted a Purchase Order, it provided assent to a divisible agreement.  (*See* Exs. 2-4 (Representative Tender Examples); Exs. 5-8 (Representative Pre-April 2022 POs).)  Midea's remaining cases are even further afield.[4]

### 3. The Purchase Orders Do Not Violate Fundamental Principles of Contract Law

29.     Midea next argues that treating the Purchase Orders as separate contracts would violate fundamental principles of contract interpretation because it would render the Supply Agreement's merger clause "superfluous."  (Midea's Suppl. Br. ¶ 31.)  But, as explained above, the merger clause is entirely consistent with the conclusion that the Purchase Orders are divisible because it addresses an entirely different problem—that of parol evidence and contract interpretation.

---

[4] *See, e.g.*, *Johnson-Lancaster & Assocs., Inc. v. H.M.C., Inc.*, No. CV ADC-20-0992, 2021 WL 3549879, at *3 (D. Md. Aug. 11, 2021) (another single construction project, where the court's ruling turned on interpretation of Maryland's Little Miller Act regarding bond requirements for government contracts and the factual dispute concerned whether the project was complete upon delivery of an espresso machine) (Midea's Suppl. Br. ¶ 26).

30.     Likewise, Midea's prognostication that it would be "entirely unclear which contract's terms are applicable" if the Debtors' argument were accepted is a red herring.  Contrary to Midea's assertions, there are no "material terms" that are in "direct conflict."  (Midea's Suppl. Br. ¶ 32.)  As set forth above, the indemnification provision in the Purchase Orders is equally as broad as that under the Supply Agreement.  (*Compare e.g.*, Ex. 5 (Representative Pre-April 2022 PO) at 3 *with* Ex. 10 (Midea SA) § 6.2.)  Whether other terms are "in conflict" is irrelevant.  But even if any were, that would only *underscore* that the Parties understood the Purchase Orders to be divisible, and separately enforceable agreements.  If anything, it is Midea's argument that the contracts are indivisible runs afoul of fundamental contract principles.[5]

### 4.     The 2022 Assignment Did Not Release Indemnification Claims

31.     Finally, Midea points to a January 2, 2022 assignment agreement among Instant Brands Inc, Instant Brands LLC, and Midea ("**2022 Assignment Agreement**") as somehow releasing the Debtors' indemnification rights.  (Midea's Suppl. Br. ¶¶ 36-39.)  Midea concedes that any claims for indemnification under the Purchase Order arising after January 2, 2022 were unaffected by the 2022 Assignment Agreement.  (*See id.* ¶ 39 ████████████████

████████████████████████████████████████████████████

---

[5]  To the extent that Midea argues that the introduction of the additional terms of the indemnity clauses contained in the Purchase Orders creates ambiguity as to the terms of the indemnity, an argument that is entirely unfounded, this is a conflict that the law of contracts is well-positioned to address.  Courts frequently resolve disputes between ambiguous and conflicting contract terms. *See, e.g., Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002) ("It is a fundamental axiom of contract interpretation that specific provisions control general provisions.").  Midea is incorrect in its assertion that under established principles of contract formation and interpretation, the Supply Agreement is the only operative contract. *See, e.g.*, U.C.C. § 2-207 ("[A]dditional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract.")  Although Midea may dispute what terms of indemnity govern, what is undeniable is the existence of a right to indemnification created by the Purchase Orders.

██████████████████████████████████████████████████

████████████████ .").)  Midea nevertheless argues that Instant Brands Inc., the assigning party under the 2022 Assignment Agreement, lacks any rights under the Purchase Orders issued *before* January 2, 2022 because such claims were released under that agreement (*Id.* ¶¶ 36-39.)  That is wrong for two reasons.

32.     *First*, this argument presumes (incorrectly) that the Purchase Orders are part of a single contract with the Supply Agreement.  As established above, the Purchase Orders are separate and divisible contracts.  *See* Section B.2., *supra*.  Indeed, as Midea itself acknowledges, the January 2, 2022 Assignment Agreement did not purport to assign any contracts other than the Supply Agreement itself. (Midea's Suppl. Br. ¶ 37.)  Accordingly, Instant Brands Inc.—which is a debtor in these Chapter 11 Cases—retained Purchase Orders that were entered into prior to the 2022 Assignment, and thus those contracts and any associated claims or rights, qualify as estate property under 11 U.S.C. § 541.  Midea responds that Instant Brands Inc. released Midea from such pre-assignment claims.  (*See id.* ¶ 38.)  But the language of the release simply does not apply to claims arising from the Purchase Orders.  (*See* Ex. 11 (2022 Assignment and Assumption Agreement with Novation) § 2.1(b) (███████████████████████████████

██████████████████████████████████████████████████

████████████ )

33.     *Second*, the Parties' subsequent course of performance confirms the release did not apply to indemnification claims.  It is black letter law under the Uniform Commercial Code that a party's course of performance is relevant to determining the meaning of a written agreement.  *See See, e.g.*, *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill. App. 3d 224, 232 (App. Ct. 1992) (noting that U.C.C. § 2-208(1) "allows the course of performance of the parties to be considered

in determining the meaning of the agreement when there have been repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other.").  Here, notwithstanding Midea's argument, seemingly invented for purpose of this litigation, that the Parties agreed to release *all* claims for indemnification arising before January 2022, Midea regularly accepted tender of claims for injury arising before January 2022, as the stipulated record evidence of their tender acceptance demonstrates.  (*See* Ex. 4 (Representative Tender Example 3) at 1, 4 (reflecting that Midea accepted tender of claim for injury arising on November 21, 2021 on June 15, 2023); *see* Ex. 1 (Joint Ex. Stip.) ¶ 1 (representing that such responses were typical for tender acceptance).)

III.     **The Court Has Jurisdiction to Resolve Midea's Plan Objection and Declare that the Debtors' Possess Indemnification Rights Against Midea**

34.     Finally, the Court has subject matter jurisdiction and authority to enter a final order resolving Midea's Plan Objection and to declare whether the Debtors possess rights under the Supply Agreements and Purchase Orders pursuant to 11 U.S.C. § 541.  *See* 28 U.S.C. § 1334 (providing subject matter jurisdiction for all civil proceeding "arising under title 11" or "arising in cases under title 11"); 28 U.S.C. § 157(b)(2)(b)(A), (L) (allocating final adjudicatory authority to bankruptcy courts for "core" matters, which include "matters concerning the administration of the estate" and "confirmations of plans"); *In re Dernick*, 624 B.R. 799, 807 (Bankr. S.D. Tex. 2020) (creditor's plan objection is a core proceeding).

35.     Although in agreement that "the Court has jurisdiction to address whether the Debtors have any separate indemnification rights under the Purchase Orders" (Midea's Suppl. Br. ¶ 46), Midea argues that the "Court should stop with that question and should not proceed further to address the substance of whatever indemnification rights or defenses to indemnification might be asserted on the merits of the underlying contract dispute," seemingly because doing so would

run afoul of *Stern v. Marshall*, 564 U.S. 462 (2011) (*see id.* ( ¶¶ 5, 46)).  Precisely what Midea intends to limit the Court from adjudicating is not clear.  To the extent Midea is now seeking to somehow limit the ability of the Court to declare the Debtors' rights—or worse, reserve for itself a second bite at the apple on the issues it has raised before an arbitral body in Hong Kong—that should be rejected.

36.     Midea filed an Adversary Complaint in this Court.[6]   Among other things, the Adversary Complaint seeks broad declaratory relief from this Court that "Plaintiffs . . . owe no indemnity obligations to Defendants . . pursuant to the Supply Agreements."  (Adversary Compl. ¶ 2; Compl., Count Three.)   Midea seeks essentially the same declaratory relief in its Plan Objection.  (Midea's Suppl. Br. ¶ 20 (asking the Court to hold that "debtors did not retain any indemnification rights and/or claims against Midea. . . .").)  In other words, Midea requested the very relief it seems to now believe the Court lacks the authority to adjudicate with finality, and in its Adversary Complaint, it consented not only to this Court's jurisdiction, but to entry of a final order under section 157 of Title 28.  (*See* Adversary Compl. ¶ 31 (averring that "subject matter jurisdiction exists pursuant to 28 U.S.C. § 157(b) as a case under the Bankruptcy Code and a core proceeding under the Bankruptcy Code or arising in a case under the Bankruptcy Code").   That consent is fatal to its *Stern* challenge.  *See, e.g.*, *In re Seatco, Inc.*, 259 B.R. 279, 283 (Bankr. N.D. Tex. 2001) ("An admission that a proceeding is core accords irrevocable consent to a bankruptcy

---

[6] (*See Guangdong Midea Consumer Electric Manufacturing Company Limited, Foshan Shunde Midea Electrical Heating Appliances Manufacturing Company Limited, Midea Electric Trading (Singapore) Co. Pte Ltd., and Zhejiang Tianxi Kitchen Appliance Co., Ltd., v. Instant Brands (Texas) Inc., Instant Brands Acquisition Holdings Inc., Instant Brands Acquisition Intermediate Holdings Inc., Instant Brands Holdings Inc., URS-1 (Charleroi) LLC, Instant Brands LLC, URS-2 (Corning) LLC, Corelle Brands (Latin America) LLC, EKCO Group, LLC, EKCO Housewares, Inc., Instant Brands Inc., and Corelle Brands (GHC) LLC*, Case No. Adv. Pro. No. 24-03007 (Bankr. S.D. Tex.) [Docket No. 1] (the "**Adversary Complaint**").)

court to determine the proceedings, even if it is non-core"); *cf. Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 655 (2015) (recognizing parties can consent to entry of final orders, and "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express").

37.     In fact, Midea went even further to ensure that this Court has complete authority to issue a final order with respect its dispute with the Debtors.  In the *Joint Stipulation and Agreed Order Regarding Discovery and Plan Objection Briefing* [Docket No. 976] that the parties filed in the main case, the parties agreed to the following language:   "This Court's orders resolving the Suppliers' Plan Objection: (i) *shall be final orders upon which final judgment shall enter*, in whole or in part, and thereby be immediately appealable upon entry of complete or partial final judgment by the Court; (ii) *each Party waives any argument contesting the finality* or appealability of any order resolving the Suppliers' Plan Objection . . . ." (*Id.* at  ¶ 4).  To the extent Midea is, at the eleventh hour, attempting to escape these binding provisions, it cannot do so.[7]

## CONCLUSION

The Debtors respectfully request that the Court overrule the Midea's Plan Objection, and such other and further relief as the Court deems just and proper.

---

[7] Even if Midea has somehow not consented to entry of a final order, there is no *Stern* issue.  In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  564 U.S. 462, 503 (2011).  The pending disputes before this Court are core proceedings pursuant to § 157(b)(2)(A) and (L) and are based on, among other things, 11 U.S.C. §§ 365 and 1129, which do not exist under state law.

Dated: February 14, 2024
      Houston, Texas

HAYNES AND BOONE, LLP

*/s/ Charles A. Beckham, Jr.*

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.:   (713) 547-2000
Email: charles.beckham@haynesboone.com
       arsalan.muhammad@haynesboone.com
       david.trausch@haynesboone.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Elliot Moskowitz (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Joanna McDonald (admitted *pro hac vice*)
Garrett L. Cardillo (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.:   (212) 450-4000
Email: brian.resnick@davispolk.com
       elliot.moskowitz@davispolk.com
       steven.szanzer@davispolk.com
       joanna.mcdonald@davispolk.com
       garrett.cardillo@davispolk.com

*Counsel to the Debtors and Debtors in Possession*

## <u>Certificate of Service</u>

I certify that, on February 14, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.