## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALAN D. HALPERIN, as Litigation Trustee of the Instant Brands Litigation Trust, | Chapter 11 |
| Plaintiff, | Case No. 23-90716 (MI) |
| | Jointly Administered |
| v. | |
| CORNELL CAPITAL LLC, CORNELL CAPITAL PARTNERS LP, CC WK CO-INVEST LP, AGATE INFORMATICS CORP., 4060288 CANADA INC., 7326998 CANADA INC., HENRY CORNELL, JUSTINE CHENG, RODRIGO BRAVO, YOUNGHOON PARK, ROBERT WANG, YI QIN, CHRISTOPHER LAROCQUE, BENOIT GADBOIS, NICHOLAS HEWITT, JEFFREY KIST, WILLIAM HESS, CATHERINE LANDMAN, KENNETH WILKES, LAWRENCE MCRAE, and JOHN DUBEL, | Adv. Proceeding No. _____ |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Alan D. Halperin, as Litigation Trustee of The Instant Brands Litigation Trust, by and through his undersigned counsel, brings this complaint against Defendants Cornell Capital LLC, Cornell Capital Partners LP, CC WK Co-Invest LP, Agate Informatics Corp., 4060288 Canada Inc., 7326998 Canada Inc., Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Robert Wang, Yi Qin, Christopher (Chris) Larocque, Benoit (Ben) Gadbois, Nicholas (Nick) Hewitt, Jeffrey (Jeff) Kist, William (Bill) Hess, Catherine (Cathy) Landman, Kenneth (Ken) Wilkes, Lawrence (Larry) McRae, and John Dubel, and alleges as follows:

1

## NATURE OF THE ACTIONS

1.      This case is about how Henry Cornell, and his eponymous private equity fund Cornell Capital LLC ("Cornell Capital"), plundered their portfolio company Instant Brands, leaving it insolvent and unable to repay its creditors. After relying on misstated financials and overpaying for the acquisition of Instant Brands; after settling with the sellers of Instant Brands by reducing the purchase price; and after filing a representations and warranties claim with Cornell Capital's insurer asserting that the company was worth approximately $270 million less than advertised, Cornell Capital concealed those facts from its lenders in order to raise a $450 million term loan to fund a $345 million dividend for Cornell Capital's and its investors' benefit.

2.      Cornell Capital acquired World Kitchen (later renamed Corelle Brands) in May 2017, and after a couple of years of declining revenues, used Corelle Brands to acquire Instant Brands in March 2019. Robert Wang, the inventor of the Instant Pot, and his co-founders, Yi Qin and Dongjun Wang, were the sellers and main shareholders of Instant Brands at the time of the 2019 sale (the "Instant Brands Sellers"). Most of the purchase price consideration was non-cash equity in the combined entity, as well as notes issued by the parent entity to the Instant Brands Sellers (the "Seller Notes").

3.      Within months, Cornell Capital and the management of Corelle Brands realized that they overpaid for Instant Brands. Ken Wilkes, then CEO of Corelle Brands, referred to the "shit show at IB … poor accounting, control, etc.," and Henry Cornell stated that Instant Brands' "numbers were pure fluff" and that "this will end up with a fraud claim pursued by AIG, the [representations and warranties insurance] carrier." A subsequent re-statement of the financials showed that Instant Brands had overstated their 2018 EBITDA—a key driver of business value

2

and the basis for the acquisition price—by $39 million and thus that Cornell Capital had overpaid for Instant Brands by hundreds of millions of dollars.

4.    Cornell Capital told the Instant Brands Sellers that it overpaid for Instant Brands by $273 million and threatened to sue them. After a contentious negotiation, in February 2020, Cornell Capital and the Instant Brands Sellers entered into a restructuring agreement through which Cornell Capital released the Instant Brands Sellers for any breach of representations and warranties. In exchange, Cornell Capital obtained a reduction in the sellers' equity consideration, a cancellation of a significant portion of the Seller Notes, and a waiver of the sellers' pro rata share of the first $200 million of dividends issued by Instant Brands. In all, this amounted to a massive reduction of the purchase price. Corelle Brands subsequently filed a claim under their representations and warranties policy in May 2020, alleging a loss of $268 million due to the misstated financials at the time of the Instant Brands acquisition.

5.    Neither the representations and warranties claim, nor the restructuring agreement, were disclosed to the lenders in March 2021 when Instant Brands went to the market to borrow money for a dividend recapitalization. Cornell Capital and Instant Brands' management team concealed these facts, along with the misstated financials, in the marketing process. Instant Brands management knew there were "potential issues with integrity of financials" used in the marketing process. Jeff Kist, then Corporate Controller, even referred to the financials as a "[g]oddamn shit show[.]" Nevertheless, these facts were concealed from the lenders, as Cornell Capital and Instant Brands' management were focused on "making sure all our fake numbers tie out!"

6.    Certain potential investors that had a history with Instant Brands had questions about the marketing materials. For example, an investor from Ares Management asked Nick

Hewitt, the CFO, "why the historical #'s have changed so much." In response, Justine Cheng, a partner at Cornell Capital, told Jefferies to "group folks who we have marketed to in the past or are in our credit today in a sesh together" because "some of the legacy guys may have more interest in digging into the past than the guys who are new to the story." She wanted to "dazzle" new lenders and "try not to have the old guys taint the new ones."

7.     Cornell Capital and Instant Brands' management team also failed to disclose that the Consumer Product Safety Commission ("CPSC") had commenced an investigation into Instant Brands because of hundreds of reports of Instant Pots that "caught fire, melted, exploded and/or blew up, posing fire and burn hazards," posing significant potential recall and personal injury liabilities. Upon information and belief, had these and other material issues been disclosed, certain lenders would not have agreed to lend monies to Instant Brands to fund the dividend.

8.     Having successfully misled investors, Cornell Capital caused Instant Brands to take on a $450 million term loan on April 12, 2021 (the "Dividend Recap"). Using those funds and $100 million of Instant Brands' balance sheet cash, Cornell Capital caused Instant Brands to issue a $345 million dividend on April 21, 2021, almost all of which went to enrich Cornell Capital and its co-investors ($200 million), the Instant Brands Sellers ($101 million), and the management team ($4 million), leaving Instant Brands insolvent, and foisting Cornell Capital's losses on the lenders, who were significantly impaired.

9.     The dividend was unanimously approved on March 21, 2021 by all nine directors, eight of whom (or the entity they represented) directly received most of the $345 million. Instant Brands did not have an independent, third party advisor provide a fairness or solvency opinion; instead, *after* approving the dividend, Cornell Capital had the CFO manufacture support in the

4

form of a wholly inadequate and fatally flawed solvency memorandum (the "Solvency Memo"), which the directors purportedly relied on in a subsequent 17-minute scripted board meeting on April 14, 2021 to re-approve the dividend. The CFO, along with the rest of the management team, together received $2 million of cash bonuses on April 12, 2021 (in addition to the $4 million dividend proceeds earmarked for them), contingent on Cornell Capital receiving its dividend first. As Justine Cheng put it: "Obviously need to get our CC [Cornell Capital] dividend officially out before bonus payment made."  Ben Gadbois, the CEO, replied "Yep! Come hell or high water!"

10. The Solvency Memo was facially flawed, as was apparent at the time. Robert Wang sent multiple emails to management raising questions, requesting to see "a model" and "a sensitivity analysis." In response to those legitimate information requests, Justine Cheng told management "[d]on't waste oxygen on Robert", that Robert Wang's questions were "ridiculous", and "propose[d sending] no more emails or information" to him. Robert Wang was allowed 10 minutes to raise his concerns about the dividend in the April 14, 2021 board meeting, but his objections were promptly disregarded according to a script that Cornell Capital and management had prepared prior to the board meeting. Despite not receiving a real forum for his concerns or responses to his questions, Robert Wang eventually acquiesced and took his portion of the dividend proceeds.

11. In addition to being prepared by an interested CFO, with haste, and without appropriate rigor, the Solvency Memo had several other defects. The projections used in the Solvency Memo to support the cash flows necessary for Instant Brands to repay its debt were wildly unrealistic in comparison to the actual historical performance of the company. Management recognized that they were "deluding [them]selves" with these projections and the "mad growth

[they] ha[d] to deliver." By then, Instant Brands had significantly missed all of its previous projections over the past two years by a wide margin, but nevertheless the CFO and COO continued producing unrealistic, overly optimistic forecasts as requested. In addition to the COO's projection of "more than **900%** [] new product sales growth," those unrealistic forecasts showed a projected $69 million of free cash flow for debt service to be generated in 2021, which Instant Brands missed by *$157 million*, as it ended up burning $87 million of cash. While this was a monumental miss, it was far from unusual or unpredictable. In prior years, management missed its projections by nine figures as well. For example, in January 2020, when discussing the company's cash balance at the end of 2019, Justine Cheng told Ken Wilkes, then CEO, that it was "distressing to be off by 100mm from estimates" and that "I don't have patience any longer for us to bumble through this."

12. The Solvency Memo's balance sheet was similarly erroneous. Of the "headline" $615 million purchase price for Instant Brands, management booked $365 million as the value of the intangible assets (largely the Instant Pot brand name) and $242 million as goodwill. The combination of those two accounted for 99% of the "headline" purchase price. At that time, Jill Skordinski, then Corporate Controller, told the CFO that "$500M for Instant Pot tradename seems outrageous." Definitionally, goodwill is the difference between the purchase price and the assets acquired; yet, when the purchase price was subsequently reduced to reflect the alleged approximately $270 million overpayment, management did not correspondingly reduce goodwill and thereby formalize the implied reduction in enterprise value. In addition, the CPSC investigation and its potential for a product recall—with attendant implications on increased liabilities and revenue declines—was not taken into account for the balance sheet or the

projections. Nevertheless, with the token Solvency Memo in hand, the board of directors approved the imprudent and gratuitous dividend and other transfers, draining Instant Brands of needed liquidity.

13.     Less than 18 months after the $345 million dividend was issued and after a predictable decline in sales, Instant Brands was strapped for cash. At the September 29, 2022 board meeting, the CFO brought up the need for a "significant capital infusion […] in the near term […] to meet the company's cash flow needs." At a meeting with Cornell Capital on October 12, 2022, the CFO thought that they might "trigger cash dominion" (*i.e.*, default on their ABL loan) after Thanksgiving. At the November 10, 2022 board meeting, the CFO informed the board that "to manage working capital and debt service," Cornell Capital needs "to inject $50-$55m into the business […] in the near term." At another meeting with Cornell Capital on December 13, 2022, Henry Cornell was preparing the team for a "Pre-pack solution in DE" (*i.e.*, filing for bankruptcy in Delaware). By January 2023, less than 21 months after the $345 million dividend, Instant Brands had run out of money.

14.     On January 18, 2023, in breach of its credit agreement, Cornell Capital instructed Instant Brands to transfer substantially all of its tangible assets out of its creditors' collateral pool into unrestricted subsidiaries and to pledge those assets as collateral to Cornell Capital Partners LP in exchange for a $55 million liquidity infusion in the form of an unfavorable loan (the "UnSub Transaction"). The UnSub Transaction was entered into and structured that way because Cornell Capital did not want to provide an equity infusion to an insolvent company, nor did it want Instant Brands to file for bankruptcy less than two years after the $345 million dividend was issued, which would be voidable under the bankruptcy code's two year look-back period.

7

15.     The UnSub Transaction was the death knell of Instant Brands. As management put it, the "[n]egative media stories and ratings downgrades following the January refinancing caused suppliers at that time to start tightening terms," with the "severely tightening credit terms" further sapping Instant Brands' cash and liquidity. By February 15, 2023, the board of directors agreed that the UnSub Transaction merely "postpone[d] an inevitable comprehensive restructuring."  By June 1, 2023, Instant Brands had defaulted on its debt, and it filed for bankruptcy on June 12, 2023.[1]

16.     The bankruptcy court appointed plaintiff Alan Halperin as Litigation Trustee of the Instant Brands Litigation Trust to seek redress for creditors who were harmed by Defendants' wrongful conduct, including the fraudulent transfers and breaches of fiduciary duty resulting from entering into these transactions, which harmed the company and enriched interested directors and officers. The Instant Brands Litigation Trust is also the assignee of claims by certain lenders to Instant Brands who were defrauded by its material misstatements and omissions in connection with this dividend recapitalization transaction and harmed by defendants' tortious interference by removing the lenders' collateral in breach of the credit agreement.

---

[1] The debtors and debtors in possession in these chapter 11 cases (collectively, "Instant Brands" or "Debtors"), along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

17.     The following timeline provides the dates of certain key events as further described in this pleading:

| Date | Event |
|------|-------|
| May 1, 2017 | Cornell Capital acquired World Kitchen (later renamed Corelle Brands) |
| March 29, 2019 | Corelle Brands acquired Instant Brands (consolidated into Corelle Brands, which was later renamed Instant Brands) |
| October 10, 2019 | Grant Thornton told audit committee of the board of directors about material weaknesses and significant deficiencies with legacy financials |
| October 15, 2019 & November 26, 2019 | Instant Brands issued its restated audited financial statements for financial years 2018 and 2017, respectively |
| February 7, 2020 | Restructuring agreement signed; purchase price reduced in exchange for release of fraud claims against Instant Brands Sellers |
| April 28, 2020 | Instant Brands filed its audited financial statements for 2019, management did not identify any triggering event for goodwill impairment testing |
| May 7, 2020 | Representations and warranties claim filed, claiming a $268 million loss due to misstated financials resulting in an inflated purchase price |
| September 30, 2020 | The U.S. Consumer Product Safety Commission commenced investigation into the Instant Pot after receiving reports that it "caught fire, melted, exploded and/or blew up, posing fire and burn hazards" |
| March 8, 2021 | Instant Brands filed its financial statements for 2020; management identified a triggering event for goodwill impairment testing but determined that no goodwill impairment was required |
| March 10, 2021 | Instant Brands engaged Jefferies to market the dividend recapitalization |
| March 21, 2021 | Board of directors unanimously approved dividend recapitalization |
| March 24, 2021 | Nick Hewitt started working on the Solvency Memo |
| April 12, 2021 | Instant Brands entered into the $450 million term loan credit agreement |
| April 12, 2021 | Management given cash bonuses for dividend recapitalization; payment conditioned on successful issuance of dividend to Cornell Capital |
| April 14, 2021 | Nick Hewitt finalized and signed the Solvency Memo |
| April 14, 2021 | Board of directors re-approved issuance of the $345 million dividend |
| November 10, 2022 | Nick Hewitt told directors of the need for a near term cash injection |
| December 13, 2022 | Henry Cornell and management discussed filing for bankruptcy |

| January 18, 2023 | Unsub Transaction closed; assets transferred to unrestricted subsidiaries |
| June 12, 2023 | Instant Brands filed for bankruptcy |

## **THE PARTIES**

18.     Plaintiff Alan D. Halperin is Litigation Trustee of the Instant Brands Litigation Trust (the "Trustee" or "Plaintiff"). Pursuant to the Plan and Litigation Trust Agreement, the Trustee is fully authorized and empowered to pursue these claims. The Instant Brands Litigation Trust is also the assignee of claims of lenders who participated in the Dividend Recap (the "Assigned Lenders").

19.     Corelle Brands Acquisition Holdings Inc. is a Delaware corporation that was formed on March 21, 2017, for the purpose of purchasing Corelle Brands. In 2021, Corelle Brands Acquisition Holdings Inc. became Debtor Instant Brands Acquisition Holdings Inc. Instant Brands Acquisition Holdings Inc. is a corporation formed under the laws of the State of Delaware and maintains its principal office at 3025 Highland Parkway, Suite 700, Downers Grove, Illinois 60515.

20.     Defendant Cornell Capital LLC is a corporation formed under the laws of the State of Delaware. Cornell Capital LLC maintains its principal office at 499 Park Ave, 21st Floor, New York, New York 10022. Cornell Capital LLC is an alter ego of Henry Cornell.

21.     Defendant CC WK Co-Invest LP is a special purpose vehicle controlled by Cornell Capital for the purposes of managing its stake, and its co-investors' stakes, in Instant Brands Acquisition Holdings Inc.

11

22.     Defendant Cornell Capital Partners LP is an entity controlled by Cornell Capital for the purposes of managing its stake, and its co-investors' stakes, in Instant Brands Acquisition Holdings Inc.

23.     Defendant Henry Cornell is the founder and Senior Partner of Cornell Capital LLC and was the Chairperson of the Board of Directors of Instant Brands Acquisition Holdings Inc. Cornell Capital LLC is under Henry Cornell's domination and control.

24.     Defendant Justine Cheng is a partner of Cornell Capital LLC and was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

25.      Defendant Rodrigo Bravo is a managing director of Cornell Capital LLC and was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

26.     Defendant Younghoon Park was a Senior Vice President of GS Retail, the parent company of GS Home Shopping, Inc., and was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

27.     Defendant Agate Informatics Corp. is a corporation formed under the laws of the province of Ontario, Canada, and controlled by Robert Wang. Agate Informatics Corp. maintains its principal office at 135 Michael Cowpland Drive, Kanata, Ontario K2M 2E9, Canada.

28.     Defendant Robert Wang was a co-founder and former shareholder of Instant Brands Inc. and was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

29.     Defendant 4060288 Canada Inc. is a corporation formed under the laws of the province of Ontario, Canada, and controlled by Yi Qin. 4060288 Canada Inc. maintains its principal office at 1083 Island View Drive, Ottawa, Ontario, K4M 1J8, Canada.

30.     Defendant Yi Qin was a co-founder and former shareholder of Instant Brands Inc. and was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

31.     Defendant 7326998 Canada Inc. is a corporation formed under the laws of the province of Ontario, Canada, and controlled by Dongjun Wang. 7326998 Canada Inc. maintains its principal office at 115 Beach Heights, Ottawa, Ontario, K2W 1G7, Canada.

32.     Defendant Christopher Larocque was a former shareholder of Instant Brands Inc.

33.     Defendant Benoit Gadbois was Chief Executive Officer of Instant Brands Acquisition Holdings Inc. and a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

34.     Defendant Nicholas Hewitt was Chief Financial Officer of Instant Brands Acquisition Holdings Inc.

35.     Defendant Jeffrey Kist was Corporate Controller of Instant Brands Acquisition Holdings Inc.

36.     Defendant William Hess was Chief Operating Officer of Instant Brands Acquisition Holdings Inc. and a member of the Board of Directors of Instant Brands Holdings Inc.

37.     Defendant Catherine Landman was Chief Legal Officer of Instant Brands Acquisition Holdings Inc. and a member of the Board of Directors of Instant Brands Holdings Inc.

38.     Defendant Kenneth Wilkes was Chief Executive Officer of Instant Brands Acquisition Holdings Inc. and a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

39.     Defendant Lawrence McRae was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

13

40.     Defendant John Dubel was a member of the Board of Directors of Instant Brands Acquisition Holdings Inc.

### JURISDICTION AND VENUE

41.     On June 12, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Bankruptcy Petitions") under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

42.     On June 13, 2023, the Court entered an order directing the joint administration of the Debtors' cases [Doc. No. 40].[2]

43.     Post-petition, the Debtors remained in possession of their property and continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

44.     By Order dated February 23, 2024 (the "Confirmation Order"), the Court confirmed the Debtors' Joint Chapter 11 Plan (the "Plan") [Doc. No. 1146]. The Effective Date (as defined in the Plan) was February 27, 2024 [Doc. No. 1161]. Pursuant to paragraph F of the Plan, the Plan was filed as a joint plan for each of the Debtors and did not provide for the substantive consolidation of any of the Debtors.

---

[2] Unless otherwise specified, citations to the docket refer to the consolidated Chapter 11 docket, No. 20-90716 (MI).

45.     Pursuant to section 12 of the Confirmation Order, on the occurrence of the Effective Date, the Bankruptcy Court approved the appointment of Plaintiff Alan Halperin to serve as the Litigation Trustee.

46.     Section 7(a) of the Confirmation Order preserved Causes of Action for the Litigation Trustee, including all causes of action relating to either or both of (a) Dividend Recap, including any dividends and other payments, fees, or transfers made in connection therewith; and (b) the UnSub Transaction and all transactions related thereto, in each case, except as to certain parties.

47.     In section B of the Confirmation Order, the Bankruptcy Court found it has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C § 157(b).

48.     In section D of the Confirmation Order, the Bankruptcy Court found venue of the Chapter 11 Cases and related proceedings were proper in the Southern District of Texas pursuant to 28 U.S.C. §§ 1408 and 1409.

49.     Pursuant to section 36 of the Confirmation Order and Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court retains jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan on and after the Effective date.

50.     This proceeding is considered core under 28 U.S.C. § 157(b) but includes the assertion of non-core claims, as well as core claims that carry a right to trial by jury before an Article III judge.

51.     The Litigation Trustee consents to the entry of final orders and judgment by the Bankruptcy Court pursuant to Fed. R. Bankr. P. 7008(a) but expressly demands a jury trial and does not consent to a jury trial by the Bankruptcy Court.

15

## FACTUAL BACKGROUND

**1.     Cornell Capital Acquires World Kitchen (Later Renamed Corelle Brands)**

52.     In May 2017, Cornell Capital acquired WKI Holding Company, Inc. ("World Kitchen"), for $435 million. World Kitchen sold household products under the following brands: Pyrex®, Corelle®, CorningWare®, Snapware®, Chicago Cutlery®, Visions®, Olfa®, Revere®, Ekco®, and Baker's Secret®. Cornell Capital subsequently renamed World Kitchen to Corelle Brands Holdings Inc. (along with its affiliates, referred to herein as "Corelle Brands").

53.     Cornell Capital failed to grow Corelle Brands; revenue declined in 2017 and declined further in 2018. Unable to achieve any organic growth, Cornell Capital sought to grow by acquisition, which led them to Instant Brands.

**2.     Corelle Brands Acquires Instant Brands**

54.     In March 2019, Cornell Capital acquired Instant Brands, Inc. (along with its pre-acquisition affiliates, collectively referred to herein as "Pre-Acquisition Instant Brands"), merging it with Corelle Brands, and subsequently naming the combined company "Instant Brands." Pre-Acquisition Instant Brands was co-founded by Robert Wang, Yi Qin, and Dongjun Wang, with its main product being the Instant Pot, an electric pressure cooker.

55.     Cornell Capital paid $615 million for Pre-Acquisition Instant Brands, with most of the purchase consideration comprised of non-cash equity in the combined entity, the Seller Notes, an earnout obligation, and a loan to one of the sellers which was later forgiven. Notably, as part of the acquisition, Cornell Capital procured a tower of representations and warranties ("R&W") insurance coverage from AIG and a consortium of other insurers (the "R&W Insurers"), which

16

would insure losses in the event the Instant Brands Sellers breached any of the representations or warranties they made as part of the share purchase agreement.

56.     Following the acquisition, Instant Brands Acquisition Holdings Inc. (also referred to herein as "TopCo") became the parent of the combined group of companies. TopCo fully owned and controlled the enterprise through an intermediate entity, Instant Brands Acquisition Intermediate Holdings Inc. (also referred to herein as "Intermediate HoldCo"). Intermediate HoldCo in turn owned Instant Brands Holdings Inc. (the operating company, also referred to herein as "OpCo") and indirectly the various other entities that constituted the combined group of companies. Cornell Capital received a majority share (64%) of TopCo and the Instant Brands Sellers received the remaining minority share. Two of the Instant Brands Sellers—Robert Wang and Yi Qin—joined TopCo's board of directors. The combined group of companies is referred to in this pleading as "Instant Brands." The corporate structure chart of Instant Brands is presented immediately below.



### 3. Cornell Capital Realizes It Overpaid for Instant Brands

57. Soon after the deal closed, Cornell Capital began to investigate the accuracy of Instant Brands' financial statements and realized that there was a problem. On April 12, 2019—just days after the purchase—Justine Cheng, a partner at Cornell Capital and board member of Instant Brands, wrote to the CEO Ken Wilkes:

> "Hi Ken. I know your alarms bells has been raised, but i dont understand what is happening here with the financials. We should not be losing money. This log jam of information and fact pattern with these guys is distressing and does not feel right. ***Is there fraud going on???*** I would suggest we get kpmg our diligence team to dissect analyze and recreate this. I am certainly vibrating and want swat team on figuring this out. We are flying blind and its really unacceptable." (emphasis added)

58. Justine Cheng sent another email to Ken Wilkes that same day warning him that neither "[y]ou nor I want to explain to Henry why we have nfc [no fucking clue] with what is going on". Wilkes responded that Instant Brands "may be the most poorly operated 'successful' business

on the planet. Don't expect it's going to improve overnight. We are shocked by lack of process, basic info, lack of control." As the realization sunk in, it became clear to both Cornell Capital and management that there were material misstatements in the financial statements of Pre-Acquisition Instant Brands.

59.    A presentation to the board of directors on June 5, 2019 sarcastically applied a "SURGEON GENERAL'S WARNING," cautioning that "[r]eviewing Instant Brands YTD results may be harmful to an accurate understanding of the business." Others at Instant Brands were more direct. Ken Wilkes wrote that it was a "shit show at IB...poor accounting, control, etc." Another employee admitted that the state of Instant Brands' financials left her "more overwhelmed and scared than I've ever been in 24 years of work." And Henry Cornell wrote that "the true reality [… is that] the numbers were pure fluff in '18, which is impacting '19 and beyond," and that "this will end with a fraud claim pursued by AIG."

60.    Grant Thornton was retained to re-audit the financial statements of Pre-Acquisition Instant Brands, which was done over the course of 2019. In October 2019, Grant Thornton presented to the audit committee of the board of directors several "material weaknesses" and "significant deficiencies" that it had identified in those financial statements in the re-audit, which resulted in the restatement of Pre-Acquisition Instant Brands' 2017 and 2018 financial statements.

61.    The restated financials showed an EBITDA for 2018 that was $39 million lower than the misstated financials. Since the purchase price negotiations were based on the misstated financials, Cornell Capital realized that it had overpaid for the acquisition and was facing a

significant loss on its investment.[3]  Cornell Capital started formulating a plan to recover all or substantially all of its investment by way of a dividend recapitalization, which would strip Instant Brands of most of its cash in order to pay a dividend to Cornell Capital, all at the expense of the company's creditors.

4.    **Cornell Capital Threatens to Sue the Instant Brands Sellers for Fraud, and Settles by Reducing Purchase Price**

62.    In September 2019, Cornell Capital informed Robert Wang that they "overpaid [for Instant Brands by] $39x7 = $273 [million]." That conversation precipitated a months-long negotiation during which Cornell Capital threatened to sue the Instant Brands Sellers for materially overstating the earnings of Pre-Acquisition Instant Brands, along with engaging in various forms of overselling including channel stuffing and heavy price discounting.

63.    During those negotiations, Henry Cornell unequivocally stated that he intended to take out a large dividend as early as 2019 and indicated that this would, in part, "provide for repayment […] of the Seller Note." Indeed, a key hold-up to the conclusion of negotiations was Cornell Capital's insistence that it "will not accept any limitations upon the capital structure of [Instant Brands], including any limitation on future [dividend] recapitalizations" because this would inhibit Cornell Capital's ability to issue the dividend it desired.

---

[3] Apart from the misstated financials, Cornell Capital also discovered that it had overvalued Pre-Acquisition Instant Brands in other ways. After the acquisition, Cornell Capital discovered that the Instant Brands Sellers had engaged in various maneuvers that inflated Pre-Acquisition Instant Brands' earnings in earlier periods, including channel stuffing (*i.e.*, selling products to distributors in excess of what they can sell to end customers) and heavy discounting of prices on its products, leading to an inventory overhang with distributors who had excess product on hand. These issues substantially reduced the value of the company—and impacted prospective financial performance—even apart from the accounting misstatements.

64.     The negotiations ultimately culminated in a settlement. Cornell Capital, the Instant Brands Sellers, and Instant Brands signed a restructuring agreement on February 7, 2020 (the "Restructuring Agreement"). The Restructuring Agreement reduced the purchase price by cancelling certain non-cash components of the consideration, namely (a) cancelling $139 million of the $239 million of Seller Notes, (b) cancelling 39,699 shares of TopCo that were issued to the Instant Brands Sellers, reducing the Instant Brands Sellers' shareholding from 36% to 27%, and (c) waiving the Instant Brands Sellers' entitlement to receive its pro rata share of the first $200 million of dividends. In exchange for the reduction in purchase price, Cornell Capital agreed to release the Instant Brands Sellers from any inaccuracies or misstatements relating to financial statements, financial projections, and any other financial information (albeit carving out the R&W Insurers' subrogation rights to sue for those inaccuracies or misstatements), and TopCo agreed to issue the Instant Brands Sellers ultimately worthless preferred shares.

65.     Tellingly for Cornell Capital's plans, the Restructuring Agreement gave Cornell Capital sole entitlement to the future $200 million dividend it planned on extracting from Instant Brands. Thereafter, to recoup its investment, Cornell Capital gutted the different-than-advertised Instant Brands of its remaining value through a massive dividend for Cornell Capital's benefit.

### 5.     Cornell Capital Files a $268 Million Loss Claim with R&W Insurers

66.     Cornell Capital sought to recoup its losses arising from Pre-Acquisition Instant Brands' misstated financials by filing insurance claims on the representations and warranties insurance policies. On May 7, 2020, TopCo sent a claim notice (the "Claim Notice") to the R&W Insurers notifying them that "a Specified Person has acquired Actual Knowledge that a Loss in the amount of $267,612,931 (USD) has occurred." The Claim Notice detailed how Pre-Acquisition

Instant Brands' misstated financials had overstated revenue, understated expenses, overstated assets, and understated liabilities—culminating in $39 million of overstated 2018 EBITDA. That overstated EBITDA led to Cornell Capital overpaying $268 million for Pre-Acquisition Instant Brands (the "R&W Claim"). Cornell Capital and the management team considered the claim "very strong."

67.    Notably, the Claim Notice did not make any mention of the Restructuring Agreement signed three months prior to the notice, by which the purchase price was reduced in exchange for Cornell Capital releasing the Instant Brands Sellers of fraud claims they were threatening to bring. Almost a year later, as part of their investigation into the claim, the R&W Insurers pieced together the purchase price reduction brought about by the Restructuring Agreement and accused Cornell Capital of hiding the ball. Through counsel, Cornell Capital argued that the Restructuring Agreement was compensating for, as Henry Cornell had told Robert Wang, "the value impact on the business from the incorrect financials *and the overselling in 2018*." That overselling related to channel stuffing and heavy price discounting, which both inflated 2018 sales and created an inventory overhang with distributors that detrimentally affected 2019 sales and beyond. Cornell Capital's counsel argued that the R&W Claim, on the other hand, solely related to the misstated financials. The R&W Insurers eventually settled Cornell Capital's claim for $55 million in 2022.

68.    In short, the restructuring and purchase price reduction, the nine-figure insurance claim, and the recognition of channel stuffing and heavy price discounting prior to Defendants' projections for 2019 and beyond, evidenced that they knew that the company was not worth the nearly $1.2 billion that they would later claim to justify the $345 million dividend.

6.  **Instant Brands' Financial Condition Deteriorates in 2019 and 2020**

69.     Starting from its lower-than-advertised post-merger value, Instant Brands' business further declined heading into the Dividend Recap, with management's financial projections consistently missing by a wide margin and proving to be utterly unreliable.

70.     For management's "2019 Year in Review," the 2019 performance was described as "The Ugly" in the slide below:



71.     As stated on the slide, there was "[n]o cash generated at either company" in 2019. In contrast to the $143 million of free cash flow forecasted to be generated, Instant Brands ended the year with $9 million of negative operating cash outflow, missing its free cash flow projections by *$152 million*. The company also missed its Adjusted EBITDA projections by a wide margin, with the actual $83 million achieved being 75% lower than the $327 million forecasted. The

company also missed its revenue forecast of $1.3 billion by 30%, or $308 million. Jeff Kist, the Corporate Controller, aptly summed it up: "2019 is a goddamn train wreck."

72.     Management noted that "inventories worth tens of millions were not sold last year," that "[h]undreds of millions of shareholder value was wiped out," that there was "[c]omplete nonsense going on."  They provided the following assessment of the year: "2019 In Summary – We did a lot but don't have a lot to show for it." Joanna Reiss, a partner at Cornell Capital, noted that "[e]ven with significant resources from legacy CB we are barely getting by." Justine Cheng wrote that it was "distressing to be off by 100mm from estimates," that "[t]hese surprises cannot continue in 2020," and that "I don't have patience any longer for us to bumble through this."  Henry Cornell stated that the company was "[f]ighting for our life."

73.     In the wake of the disastrous 2019, management emphasized that they "[n]eed to get back on track quickly." Management put together best, base, and worst case scenarios and emphasized, as shown in the below slide, that if they "don't address our issues," the "[w]orst case scenario is what [would] happen,", and that was "NOT AN OPTION":

## Combined - FY20  Best, Base, and Worst Case

Corelle Brands

| Combined Company | Best | Y-Y Gth | Base | Y-Y Gth | Worst | Y-Y Gth | Fcst |
|---|---|---|---|---|---|---|---|
| Net Sales | 1,193,482 | 14.0% | 1,185,890 | 13.3% | 1,120,159 | 7.0% | 1,046,591 |
| STD COGS | (750,688) | | (749,014) | | (707,673) | | (695,333) |
| Standard Gross Profit | 442,794 | 26.1% | 436,885 | 24.4% | 412,486 | 17.4% | 351,259 |
| % of Net Sales | 37.1% | | 36.8% | | 36.8% | | 33.6% |
| Total F&D | (61,569) | | (61,742) | | (62,840) | | (71,530) |
| % of Net Sales | 5.2% | | 5.2% | | 5.6% | | 6.8% |
| Local Variances | (15,471) | | (15,220) | | (12,904) | | 1,702 |
| % of Net Sales | 1.3% | | 1.3% | | 1.2% | | 0.0% |
| Commercial Gross Profit | 365,754 | 30.7% | 359,913 | 28.6% | 337,583 | 20.6% | 279,880 |
| % of Net Sales | 31.1% | | 31.1% | | 31.1% | | 26.7% |
| Total A&P / NPD | (44,068) | 1.2% | (44,093) | 1.2% | (46,317) | 6.3% | (43,582) |
| % of Net Sales | 3.7% | | 3.7% | | 4.1% | | 4.2% |
| SG&A | (68,279) | 5.1% | (68,535) | 5.5% | (70,343) | 8.3% | (64,975) |
| % of Net Sales | 5.7% | | 5.8% | | 6.3% | | 6.2% |
| Store Expense | (10,935) | -2.7% | (10,884) | -3.2% | (10,901) | -3.0% | (11,230) |
| % of Net Sales | 0.9% | | 0.9% | | 1.0% | | 1.1% |
| Other Income/Expense | (114) | | (534) | | (114) | | 366 |
| BU Contribution EBIT | 242,359 | 51.0% | 235,868 | 47.0% | 210,978 | 30.8% | 160,470 |
| % Margin | 20.3% | | 19.9% | | 18.7% | | 15.3% |
| GPS Efficiencies | 5,249 | | 4,749 | | 2,374 | | 0 |
| GPS Variances | (19,970) | | (19,633) | | (19,633) | | (9,779) |
| GPS SG&A | (5,782) | | (5,782) | | (5,782) | | (6,268) |
| GPS Expense | (9,946) | | (9,946) | | (9,946) | | (10,121) |
| CorpHQ SG&A | (17,436) | | (17,701) | | (15,701) | | (18,669) |
| Corp SG&A Addback | (1,781) | | (1,781) | | (1,781) | | (42,774) |
| Asia HQ SG&A | (4,159) | | (4,159) | | (4,159) | | (2,083) |
| Other Corp OH | (1,940) | | (1,940) | | (1,940) | | (698) |
| Amortization of Intang | (7,536) | | (7,536) | | (7,536) | | (14,212) |
| Other Inc/Exp | 0 | | 0 | | | | 1,915 |
| D&A addback | 36,951 | | 36,951 | | 36,951 | | 41,927 |
| Corp Adjustments | 7,751 | | 7,751 | | 7,751 | | 45,806 |
| Management EBITDA | 223,784 | 53.8% | 216,839 | 49.0% | 190,472 | 30.9% | 148,818 |
| % Margin | 18.7% | | 18.3% | | 17.0% | | 13.9% |
| A/R | 252,560 | | 262,560 | | 260,687 | | 214,772 |
| Inv | 250,535 | | 262,529 | | 298,529 | | 295,455 |
| A/P | (168,364) | | (168,364) | | (168,364) | | (145,015) |
| NWC | 334,731 | | 356,726 | | 390,852 | | 365,212 |
| % Net Sales | 28.0% | | 30.1% | | 34.9% | | 34.9% |
| Source/(Use) | 30,482 | | 8,488 | | (25,640) | | |

2020 Scenarios

**Worst case scenario is what we happen if we don't address our issues**

**NOT AN OPTION**

18

74.     Instant Brands' financial performance in 2020 turned out to be significantly worse than management's "[w]orst case scenario." In their "worst case scenario," revenue would be $1.1 billion. The company missed this worst case scenario by $155 million, with only $965 million of revenue actually achieved. Similarly, management forecast EBITDA to be $190 million in the worst case scenario, which was more than double the actual $90 million of Adjusted EBITDA achieved. The "worst case scenario" that was "not an option" at the start of the year became a hopelessly optimistic option by the end of the year. By the end of 2020, Cornell Capital knew that Instant Brands was a significantly worse business than they thought when they had acquired it and had since—and was continuing to—decline precipitously.

75.     In addition to the reasons discussed in the preceding paragraphs, another reason for Instant Brands' financial deterioration was that their key product, the Instant Pot, had saturated the market. A 2022 presentation summarized the issue well: "Instant Pot was a huge fad […] people

who want to buy them already have them." Cornell Capital knew of this risk before the acquisition. Several of Cornell Capital's investment professionals wrote in January 2019 that Pre-Acquisition Instant Brands was a "very risky business to bet on" and that they were "really concerned" about the unrealistic sales forecasts. As they put it, "[c]urrently Instant Pot penetrates ~20% of the household in NA [North America]. If the sales is to stay flat, penetration will reach closer to ~50% in 5 years. Can this really be sustained?" Cognizant of this risk, Cornell Capital nevertheless consummated the acquisition; by the end of 2020 the risk had materialized and the Instant Pot was worth much less than advertised.

76.     A further reason was that in January 2020, the Olfa Corporation—a Japanese manufacturer of utility knives—decided to end its 25-year relationship with Corelle Brands and refused to renew its distribution agreement. Olfa products had previously contributed approximately $40 million annually to the revenue of World Kitchen and Corelle Brands post-acquisition. Ken Wilkes' "expectation [was] to grow the business to $50 MM." After being informed of this, Henry Cornell told Joanna Reiss that he was "[s]hocked at this news."

77.     The combination of the financial misstatements, channel stuffing and overselling, revenue declines, financial deterioration, Instant Pot saturation, and Olfa business termination—all of which contributed to negative cash generation and significant underperformance of even management's "worst case" scenario—should have caused management to stop making their habitually unrealistic financial projections and start managing the business to preserve liquidity.

**7.     Consumer Product Safety Commission Commences Investigation into the Instant Pot**

78.     Further evidence of the Instant Pot's demise arrived in September 2020, when the Consumer Product Safety Commission commenced a Section 15 investigation into the Instant Pot

26

after receiving reports that the Instant Pot "caught fire, melted, exploded and/or blew up, posing fire and burn hazards." Both Cornell Capital and Instant Brands' management knew about the product safety issues surrounding the Instant Pot since they had received numerous complaints from consumers of exploding Instant Pots causing burns and other injuries, and Instant Brands had settled numerous lawsuits for 6-digit sums—including one where a 9-year-old girl sustained burns to her face, shoulder, arm, chest, and torso, and another where a mother suffered permanent disfigurement and lost the ability to breastfeed her child after sustaining serious burns to her chest and abdomen.

79.     Pre-Acquisition Instant Brands had been subject to a product recall before, resulting from a prior CPSC investigation, involving numerous incidents of personal injury that were reported by consumers to the CPSC, culminating in a recall of approximately 140,000 Gem 65 units of the Instant Pot in March 2018 (the "2018 Product Recall"). This new CPSC investigation was much more serious than the 2018 Product Recall, since it related to two of the most popular models of the Instant Pot, the Duo 60 and Duo 80. By 2021, Instant Brands had sold over 14 million of these units combined. Several retail distributors, such as Target, sent over 1,000 individual consumer reported incidents involving these products to the CPSC; many of these reports included claims of second- and third-degree burns resulting from the expulsion of boiling contents from the pressure cookers. A recall of Duo 60 and Duo 80 would be devastating to Instant Brands. If just two in ten purchasers participated in a recall, the cost to refund those purchases would exceed $200 million.

80.     Cornell Capital knew about these risks. In February 2020, Joyce Hsu (a partner at Cornell Capital) expressed concern and circulated the below picture—illustrating an instance of a consumer's Instant Pot combusting—to other partners at Cornell Capital:



81.     At the board meeting in January 2021, management informed the board of directors of the CPSC's Section 15 investigation. Despite knowing of these problems, Cornell Capital did not deviate from their plan to overstate the value and financial projections of Instant Brands to effectuate the Dividend Recap, which allowed Cornell Capital to extract a massive dividend for Cornell Capital's benefit.

**8.      Instant Brands Overstates Goodwill and Instant Pot Brand Value**

82.     At nearly the same time that it was re-auditing Pre-Acquisition Instant Brands' financials, re-negotiating the terms of the acquisition, and preparing to file insurance claims to recoup a $268 million overpayment, the company was desperately seeking to maintain the aura of Instant Brands' value to the outside world. This included fending off suggestions from its auditors

and consultants that it needed to restate its balance sheet assets to reflect the overpayment for Pre-Acquisition Instant Brands.

83.     As a result of the merger, Instant Brands' purchase accounting valued $365 million of "Intangible Assets" and $242 million of "Goodwill," the latter of which reflected the surplus between the value of Pre-Acquisition Instant Brands' assets at the time of the merger and what was paid for it. Goodwill and intangible assets combined made up 99% of the $615 million headline purchase price. The truth was that—as Cornell Capital and Instant Brands' management repeatedly acknowledged—misstatements in Instant Brands' financials meant it was worth hundreds of millions of dollars less than was paid for it and thus that goodwill was materially overstated.

| *(USD in Thousands)* | Audited Financial Statements | Adjusted for Overpayment |
|---|---|---|
| Total Purchase Price | 614,866 | 614,866 |
| Less Overpayment Adjustment | - | (267,613) |
| **Net Purchase Price** | **614,866** | **347,253** |
| | | |
| Cash | 28,801 | 28,801 |
| Trade Receivables | 88,368 | 88,368 |
| Inventories | 113,835 | 113,835 |
| Prepaid Expense and Other Assets | 2,545 | 2,545 |
| Property, Plant, and Equipment | 1,917 | 1,917 |
| Goodwill and Intangible Assets | 607,754 | 340,141 |
| **Total Assets Acquired** | **843,220** | **575,607** |
| | | |
| Account Payable and Accrued Expenses | 39,455 | 39,455 |
| Accrued Expenses | 17,219 | 17,219 |
| Long-Term Debt, Including Current Maturities | 31,576 | 31,576 |
| Trade Allowances and Deductions | 45,167 | 45,167 |
| Non-Current Deferred Tax Liabilities | 80,365 | 80,365 |
| VIE Noncontrolling Interest | 14,572 | 14,572 |
| **Net Assets Acquired** | **614,866** | **347,253** |

84.     Jeff Kist acknowledged that Instant Brands' goodwill was overstated, stating that an "adjustment to Goodwill [could be made on the basis] that had we known then what we know now, that the assumptions at the acquisition date were wrong because of terrible financials, then it would be an adjustment to purchase price." But despite declaring to their R&W Insurers that the purchase price was inflated by $268 million, Instant Brands did not adjust its goodwill valuation, keeping inflated values that supported a higher overall Company value and later the Dividend Recap.

85.     In March 2020, as Instant Brands was in the process of its yearly audit for financial year 2019, multiple parties raised serious challenges to the valuation of both goodwill and intangible assets, as well as its financial projections. The company's audit partner at Grant Thornton warned that the company may need to update its calculation of goodwill, namely by updating its accounting treatment of the purchase price to reflect the revised purchase price. Similarly, another third-party advisor, Valuation Research Corporation ("VRC"), which was retained to value the acquisition assets, raised concerns with Instant Brands' purported goodwill, noting that "the projections," which Instant Brands relied on to justify its purported valuation of the goodwill, "feel a bit lofty in context of these other data points."

86.     Similar worries were expressed internally. After reviewing VRC's work, Jill Skordinski, then Corporate Controller, commented that "$500M for Instant Pot tradename seems outrageous," that she was "not sure how IB's customer relationships are worth more than 2x ($34M) that of [Corelle Brand's] ($15M)," and that she thought the "[t]echnology piece also seems high given lack of patents, etc." She concluded that "[t]his just all feels way too high to me." And Michael Cwiertniak, Vice President of Global Taxation and Treasury, noted that VRC's valuation work had "NOT accounted for a purchase price reduction." Nick Hewitt, the CFO, brushed these concerns off.

87.     Perhaps sensing that their advice was not being heeded, VRC reiterated its earlier warning, stating that "[t]he value of the shares with the development of the purchase price were overstated and thus the question I posed in the prior draft is even more pronounced." Instant Brands failed to act on these warnings.

88.     Despite knowing that Instant Brands had been massively overvalued for the acquisition, that the purchase price was subsequently reduced, that the financial performance had significantly declined in 2019, and that actual financial results were substantially below projections, neither Cornell Capital nor management sought to reduce (*i.e.*, "impair") the book value of goodwill in the 2019 financial statements. When preparing its 2020 financial statements, after Instant Brands materially underperformed its worst case scenario, and after the CPSC initiated a Section 15 investigation (which had adverse implications for Instant Pot's sales projections and brand value, along with posing significant contingent liabilities), management finally determined that there was a triggering event for impairment testing but, in order to maintain its plan for a dividend, did not impair either goodwill or the intangible assets relating to the Instant Pot brand value in the 2020 financial statements. Those 2020 financial statements were issued in March 2021, the same month that the Dividend Recap was being marketed to potential lenders.

### 9.    Instant Brands Issues the Illegal Dividend

89.     As previously described above, Cornell Capital had planned to take out a "massive dividend" as early as 2019, which was justified as just "getting CC's [Cornell Capital's] money back out." The Restructuring Agreement, which required that the first $200 million of the dividend go to Cornell Capital, laid the groundwork towards that end.

90.     As early as July 2019, Instant Brands management mapped out various dividend recapitalization scenarios. A draft schedule showed a potential dividend recap closing in December 2019. However, there was an obvious problem with Cornell Capital's plan to extract a dividend from Instant Brands—the company was generating "ZERO net cash," and its finances were in shambles. Management knew it would need to increase its cash flow to justify a dividend, stating

in early 2020 that, "[i]n order to deliver a dividend to our shareholders, cash flow is required to cover added interest expense."

91.    In December 2020, knowing Cornell Capital's plan to extract a massive dividend from the company, Nick Hewitt projected that Instant Brands would generate $185 million in cash flow for 2020, thereby providing Cornell Capital with the pretextual justification it needed for the dividend. That forecast ended up being: (i) off by more than $50 million, despite being made just _two weeks_ before the end of 2020, and (ii) misleading because a significant portion of that cash flow was generated by a change in net working capital substantially related to a prior overbuild in inventory. Nevertheless, Cornell Capital was ecstatic, with Justine Cheng, responding "Amazing […] Woohoo!!" With the manufactured projections in hand, Cornell Capital pressed ahead with its plans to "max out on leverage [and] pull out a massive dividend" from Instant Brands.

92.    In February 2021, Cornell Capital invited several investment banks to pitch for the mandate to advise on the Dividend Recap transaction. Cornell Capital then engaged Jefferies as lead arranger for the "a near term dividend recap." Jefferies dubbed the transaction "Project Iron Man," which Cornell Capital was eager to effectuate. Justine Cheng wrote:

> "As Ben knows, i personally prefer Captain America 😊
> But, Iron Man is awesome too as long as i get a cool $250 in dividend….
> GO TEAM GOOOOOO!!! 👊👍👊"

Cornell Capital, Instant Brands' management, and Jefferies spent much of March 2021 marketing to potential lenders, and successfully concealed the misstated financials, purchase price reduction, R&W insurance claim, and CPSC investigation from most of the potential lenders in the marketing process. Their deceit worked, and they raised a $450 million secured term loan that closed on April 12, 2021 (the "Prepetition Term Loan"). As illustrated in the diagram below, the Prepetition Term

33

Loan had OpCo as a borrower and Intermediate HoldCo as a guarantor. Notably, neither OpCo nor Intermediate HoldCo were obligors of the Seller Notes and had no obligation to repay the Seller Note. Notwithstanding this, the funds that TopCo (which was the sole obligor of the Sellers Notes) used to satisfy the Seller Notes were received by way of dividend from OpCo to Intermediate HoldCo to TopCo.



93.     On April 21, 2021, after a series of corporate governance failings and self-dealing, Henry Cornell and the rest of the board of directors (along with William Hess and Cathy Landman) caused the OpCo to use the proceeds of the Prepetition Term Loan and another $100 million of balance sheet cash to pay off OpCo's existing debt and pay a $345 million dividend to Intermediate HoldCo, without receiving anything in return (the "Parent Transfer"). This significantly decreased

OpCo's cash balance, rendered OpCo insolvent and over-leveraged, was done for the purpose of avoiding obligations to OpCo's creditors, and was solely for the benefit of Cornell Capital, Instant Brands' management, and the Instant Brands Sellers. Intermediate HoldCo paid the $345 million it received as a dividend up to TopCo without receiving anything in return, causing those funds to leave the lender group of the Prepetition Term Loan (and also leaving Intermediate HoldCo insolvent).

94.     Once the funds left the obligors to the lender group (OpCo and Intermediate HoldCo), TopCo paid out most of that $345 million dividend to three separate groups. First, $200 million was distributed as a dividend to Cornell Capital, its affiliates, and its co-investors. Second, approximately $100 million was transferred to pay off the Seller Notes which were issued by TopCo to the Instant Brands Sellers as consideration for the 2019 acquisition (the "Seller Notes Transfer"), and a further $2 million was distributed to the same group of Instant Brands Sellers as a dividend. Third, $4 million was distributed as a dividend to Instant Brands' management team, and a further $2 million was paid as cash bonuses to the management team.

95.     These acts of self-dealing were undertaken in violation of the directors' and officers' fiduciary duties to Instant Brands and were unsupported by any independent analysis.

        **a.**  **Cornell Capital and Instant Brands' Management Conceal the (1) R&W Claim, (2) Purchase Price Reduction, and (3) Materially Misstated and Subsequently Restated Financials, from the Lenders in the Marketing Process**

96.     Cornell Capital and Instant Brands were only able to secure financing for the Dividend Recap by making repeated misstatements and omissions to the Assigned Lenders regarding the value of the company. The misrepresentations and omissions include the failure to disclose that (a) the initial purchase price of Instant Brands by Corelle Brands was greatly inflated,

(b) Cornell Capital and Instant Brands represented to their R&W Insurers that they had lost $268 million due to the misstated value of the company, (c) Cornell Capital had threatened to sue the Instant Brands Sellers by way of a restructuring agreement which significantly reduced the purchase price, and (d) Pre-Acquisition Instant Brands' financial statements for 2017 and 2018 had been materially misstated and were subsequently re-audited and re-stated. Upon information and belief, without these misrepresentations and omissions, the Assigned Lenders never would have agreed to lend $450 million to Instant Brands and the Dividend Recap would not have occurred.

97.     Cornell Capital knew that the misstated financials would be concerning for potential investors. In September 2019, as the re-audit was wrapping up, Joanna Reiss at Cornell Capital wrote that the "sheer number as well as the nature of the accounting errors […] has caused us great concern," that "restatement has major ramifications for our capital markets activity" (i.e., the planned dividend recapitalization), and that a "[r]estatement of this magnitude is a major black eye for the business, with reputational effects that will linger."

98.     Grant Thornton completed the re-audit in October 2019, which the management team initially tried to hide from their lenders. In December 2019, Curtis Roffers, then CFO, told Joanna Reiss that they did not share the re-audit with the then lender group or Citi (their agent) because "we don't have a requirement to share any of the details of the 2018 IB audit with them […] we took all reference out of the deck showing the revised 2018 EBITDA after the audit." In response, Joanna Reiss disclosed the re-audit to Citi herself, and told Curtis Roffers, "I gave citi the full open kimono presentation. They're the agent on our credit facility. Seems crazy to me that

they wouldn't have audit." Joanna Reiss separately told Henry Cornell and Justine Cheng that they

had an obligation to disclose the re-audit to underwriters and rating agencies, writing:

> "Does [the re-audit] need to be disclosed to underwriters? Agencies?
> - Underwriters need to disclose but will be ok
> - Agencies absolutely need to disclosure
> - Takeaway – full open kimono with all"

99.    And despite disclosing the financial misstatements and purchase price reduction to

the rating agencies, management took measures to keep those rating agencies from disclosing these

misstatements to the outside world. In April 2020, when S&P Global Ratings ("S&P") circulated

a draft report describing the "accounting misstatements", and corresponding "purchase price

adjustment," management sent comments to S&P with a strike-through the below sentences and

persuaded S&P to omit that section from its ratings report:

Corelle will preserve some cash due to the contingent earn-out payment expiration at Instant Brands because the company did not meet the earnings hurdles. However, Instant Brands had accounting misstatements that overstated 2018 earnings, leading to a purchase price adjustment. The $243 million remaining Instant Brands seller notes will partially convert to a payment-in-kind preferred equity instrument after June 30, 2020. Upon this conversion, we would still view the entire instrument as a 100% debt-like obligation.

100.    Joanna Reiss eventually resigned from Instant Brands' board of directors in

November 2020, and the re-audit of the misstated financial statements—which led to the $268

million loss described in the R&W Claim and the purchase price reduction pursuant to the

Restructuring Agreement—was never disclosed to the Assigned Lenders in the March 2021

marketing process.

101.    Jefferies, Cornell Capital (including Justine Cheng and Rodrigo Bravo), and Instant

Brands management put together a set of marketing materials, including a confidential information

memorandum, a lender presentation, a private supplement, and a projection model (together, the "Marketing Materials"), which repeated the same misstatements and omissions. The Marketing Materials were distributed to prospective lenders in March 2021, as Jefferies kicked off the marketing process and started to coordinate meetings for the prospective lenders to meet with Cornell Capital and Instant Brands' management.

102.    The prospective lenders, especially lenders which had participated in Instant Brands' prior attempts to raise financing for a dividend recapitalization, had serious questions about these Marketing Materials. For example, an investor from Ares Management had difficulty "understanding why the historical #'s have changed so much." Similarly, an investor from Anchorage Capital Group was left "struggling to understand the driver of sales declines in the instant brand segment since purchase as well as the margin erosion [….] [I]t *seems strange to me that sales have consistently fallen since acquisition*." And another potential investor from Soundpoint sought to have management "reconcile the declines on both an Instant Brands and legacy Corelle Brands basis" given that "EBITDA was down considerably in 2020." In response, Cornell Capital and Instant Brands' management did everything in their power to obfuscate. Instead of disclosing the financial misstatements and losses as described in the R&W Claim, Nick Hewitt blamed the differences in historical numbers on nebulous references to "prior management": that "2019 was a difficult year for the business mostly due to the merger but as Cornell became aware of these issues they quickly made the mgmt. changes and as you can seen [sic] we have pretty much revamped the entire leadership team and the results are showing."

103.    Justine Cheng worried about the investors that were focused on the past, and who were trying to reconcile changes in historical numbers and declines from previously misstated

numbers. She told Jefferies that "some of the legacy guys may have more interest in digging into the past than the guys who are new to the story" and instructed Jefferies to "group folks who we have marketed to in the past or are in our credit today in a sesh together." Justine Cheng did not want those legacy lenders whom Cornell Capital had previously marketed to and who were skeptical about the financials presented in the Marketing Materials to be in the same sessions or management meetings as the new prospective lenders who were fresh to the story and unaware of any historical issues. She wanted to avoid having the "old guys taint the new ones," especially if they asked questions in these management meetings that the new prospective lenders would not think to ask. Jefferies agreed to separate the "legacy guys" from the new prospective lenders, allowing Cornell Capital and Instant Brands' management to "reintroduce the story" to the new lenders and—as Justine Cheng had instructed— "dazzle" the new lenders.

104.    Cornell Capital's strategy was to avoid putting information in writing and crafting responses that did not reveal the magnitude of its losses and the results of the re-audited 2017 and 2018 financial statements. Indeed, in response to queries from lenders about the 2019 merger, Cornell Capital and management repeatedly represented to lenders that the purchase price of Pre-Acquisition Instant Brands was about $615 million. Crucially, that entirely failed to account for the purchase price reduction brought about by the Restructuring Agreement and that Cornell Capital was simultaneously pursuing a claim to recoup a loss of $268 million for overpaying for Pre-Acquisition Instant Brands.

105.    Similarly, when faced with questions about differences in the historical financial statements, Cornell Capital and management crafted responses with half-truths and omissions like the following obfuscation:

"Prior to [the acquisition, Pre-Acquisition Instant Brands] was using Quickbooks as their accounting software. Post-acquisition […] it became clear that a lot of accounting clean up was required. […] The quarterly GAAP accounts that were filed were not restated as these issues were identified."

This obfuscation, which blamed the issues on "accounting clean up" due to previously "using Quickbooks," was designed to hide the fact that there were material misstatements caused by overstated revenue, understated expenses, overstated assets, and understated liabilities as detailed in the R&W Claim, which led to the $268 million loss and purchase price reduction.

106.    Further, Instant Brands' management knew it was inflating its numbers. After Cornell Capital's Rodrigo Bravo noted that a lender presentation revealed Instant Brands' leverage ratio was in excess of its financial covenants, Nick Hewitt agreed to remove that information from the presentation. Further, in discussions preparing management's responses to lender questions, Jeff Kist pointed out that "Q1 2019 cash flow is grossed up […] so it's terribly misleading […] I think it's just flat wrong." Despite the "potential issues with integrity of financials" members of the finance team were busy "making sure all our fake numbers tie out."

107.    These misrepresentations, omissions, obfuscation, and half-truths eventually succeeded in achieving Cornell Capital's plan to "dazzle" and deceive the Assigned Lenders, and—in breach of the representations in the credit agreement that memorialized the loan—the $450 million term loan financing closed on April 12, 2021.

### b.  Interested Directors Approve the Illegal Dividend

108.    On March 21, 2021, while the marketing process for the Dividend Recap was underway, Instant Brands' board of directors signed a Unanimous Written Consent of the Board of Directors in Lieu of a Meeting (the "March Resolution"), which authorized Instant Brands to

"refinance its existing indebtedness" and "pay a dividend to common equity shareholders" as described in Exhibit A attached thereto, which exhibit included the following transaction overview:

| Transaction Overview |
| --- |
| The Company is planning to raise a new 7-year $450 million Senior Secured First Lien Term Loan (the "Transaction") |
| Net proceeds, in combination with cash from the Company's balance sheet, will be used to refinance its existing debt and pay a dividend to common equity shareholders |
| Pro forma for the transaction the Company will have Net Leverage and Interest Coverage of 3.1x and 6.5x, respectively based on Pro Forma 2020 Adjusted EBITDA of $133 million |

The 3.1x of net leverage on the $133 million of Pro Forma Adjusted EBITDA implied $412 million of net debt and $38 million of cash on balance sheet post-dividend. That meant that $100 million of the $138 million of balance sheet cash would be used for the dividend, and the amount of the dividend would be $345 million.

109.    The March Resolution was signed by all nine of Instant Brands' directors, eight of whom (or the entities they represented) would together directly receive the vast majority of the $345 million dividend. Henry Cornell, Justine Cheng, and Rodrigo Bravo represented Cornell Capital. Younghoon Park represented GS Home Shopping, one of Cornell Capital's co-investors. Robert Wang and Yi Qin received the lion's share of the proceeds of the Seller Notes Transfer. And both Ben Gadbois and Ken Wilkes received a portion of the dividend distributed to the management team. Each of these individuals breached their fiduciary duties by willfully and fraudulently approving a conflicted transaction that enriched themselves as insiders, was not entirely fair to Instant Brands, was not in the best interest of the company, harmed creditors with an interest in the residual value of the company, and was based on inadequate investigation and information.

41

### c. **CFO Starts Preparing Flawed Solvency Memo After Approval of Illegal Dividend**

110.    On March 24, 2021, three days *after* the board unanimously approved the Dividend Recap, Cornell Capital's legal counsel circulated an initial draft of the Solvency Memo to Instant Brands' management and Cornell Capital, "outlining the solvency analysis under Delaware law as Exhibit A and a placeholder for the financial analysis demonstrating solvency to be attached as Exhibit B." Upon receipt of this initial draft, Nick Hewitt started preparing the financial analysis for the Solvency Memo, which was flawed, facially unreliable, and was not—and could not have been—intended to inform the board of directors' decision to approve the Dividend Recap. The Solvency memo was a pretext for the decision that Cornell Capital and the directors had already previously made and formally approved.

111.    Notably, Instant Brands did not engage the assistance of any independent third party financial advisor, as is customary, to provide a fairness or solvency opinion. Instead, Nick Hewitt, the CFO who was due to personally receive a portion of the dividend, prepared the financial analysis for the Solvency Memo. In addition to a portion of the dividend, Cornell Capital caused Instant Brands to give out $2 million of cash bonuses to the management team—including to Nick Hewitt. Those bonuses were conditioned on Cornell Capital receiving their dividend, as Justine Cheng told the management team: "Obviously need to get our CC [Cornell Capital] dividend

officially out before bonus payment made, but i know that will get done. 🍻 " To that, Ben Gadbois

responded: "Yep! Come hell or high water!"[4]

112.    Nick Hewitt took the projections for 2021 to 2024, which were included in the

Marketing Materials, and extrapolated them to 2028 (when the Prepetition Term Loan was due to

mature). Nick Hewitt did his extrapolation by assuming that the free cash flow projected to be

generated for 2025, 2026, 2027, and 2028 would be ***exactly the same*** as 2024. Nick Hewitt did not

bother to try to forecast revenue, expenses, or any other line item for 2025 to 2028, which made

up more than half of the projection period in the Solvency Memo. Nick Hewitt further produced a

similarly sloppy and unrealistic stress test (the "Stress Test").

113.    On April 8, 2021, Cathy Landman distributed a draft of the Solvency Memo that

included Hewitt's financial analysis to the board of directors. Robert Wang reviewed the Solvency

Memo and—noting its lack of detail—requested to see "a model […] that includes all the

obligations of the business" and "a sensitivity analysis, e.g., how do we stand on covenants and

ratios if revenues are off 5%, 10%, 15% etc., or expenses are greater by 5%, 10%, 15%." Robert

Wang asked to see the lender presentation used in the Marketing Materials and was skeptical about

the leverage post-dividend, stating his "worry that Moody's states the debt/EBITDA ratio being

3.9 whereas Justine told me 3." In response, Cathy Landman told Robert Wang that "leverage is

2.46," with which Robert Wang did not agree. Robert Wang also raised concerns that the "dividend

---

[4] The bonuses were distributed as follows: Gadbois received $650,000, Hewitt received $400,000, Hess received $300,000, Landman received $300,000, Kist received $125,000, and others received $225,000.

takes a large chunk out of the company's working capital" and that the "growth plan and new categories will demand more working capital."

114.    In response to Robert Wang's questions about the Solvency Memo, on April 11, 2021, Justine Cheng told the management team "[d]ont waste oxygen on [R]obert" and that Robert Wang's questions were "getting to be ridiculous" and "propose[d sending] no more emails or information" to him. Robert Wang tried to schedule a call on April 13, 2021, with Justine Cheng to discuss his concerns about the Solvency Memo, but Justine Cheng deflected and refused to speak to Robert Wang before the board meeting scheduled for April 14, 2021.

115.    Contemporaneously, Cornell Capital's legal counsel and Cathy Landman started drafting a script for the April 14, 2021 board meeting. The script began with Ben Gadbois notifying the board of directors that "Robert and Yi have raised several concerns that they would like to present to the board. We will start with Robert and Yi's 10 minute presentation." The script provided that "[i]f presentation goes beyond 10 minutes," Ben Gadbois would say: "Robert and Yi, are you close to wrapping up? In consideration of everyone's time for this unscheduled meeting, I ask that you wrap up in 2 minutes so we can move forward with the Special Dividend topic." Thereafter, Ben Gadbois would say: "[t]hank you, Robert and Yi" and "[n]ow, let's open the floor for discussion. Does anyone have any questions or comments?" Justine Cheng would respond, "[o]n behalf of CC [Cornell Capital], I want to go on the record stating that there are factual inaccuracies in Robert and Yi's presentation." Ben Gadbois would then turn to the approval of the Special Dividend, and Justine Cheng would say: "I want to let you all know that I have discussed the Special Dividend at length with Henry Cornell and he and I are highly supportive of

the Special Dividend." Thereafter, the script provided that Cathy Landman would move to voting and adjourn the meeting thereafter.

### d.  Instant Brands Holds Subsequent Board Meeting to Re-Approve the Illegal Dividend with the Support of Flawed Solvency Memo

116.    On April 14, 2021, the board of directors gathered for the ad-hoc board meeting to re-approve the Special Dividend, purportedly "in reliance upon [the] Solvency Memorandum" (the "April Board Meeting"). In truth, by the time of the April Board Meeting, the decision to issue to the Special Dividend was a *fait accompli*. It had already been unanimously approved by the March Resolution, and the prepared script further underscored that the April Board Meeting was a farce and mockery of corporate governance.

117.    Shortly after the April Board Meeting, Cornell Capital's legal counsel asked Cathy Landman "[h]ow did the meeting go?" To which, Cathy Landman responded: "Ended in 17 minutes. Short and to the point. All as expected and planned for."

### e.  CFO's Solvency Memo was Flawed and Facially Unreliable

118.    Special Dividend rendered Instant Brands insolvent, with unreasonably small capital, and resulted in Instant Brands unable to pay its debts as they became due. The Solvency Memo, which resembles a true solvency analysis only through the use of the word "solvency," underscores this fact. Besides the procedural defects of the Solvency Memo, namely being drafted after the March Resolution as a pretextual justification for the farcical April Board Meeting, in addition to being prepared by an interested CFO who was due to receive a cash bonus and a dividend distribution once the Special Dividend was issued, the Solvency Memo was also substantially flawed and facially unreliable. In truth, if the Solvency Memo was premised on even

close to reasonable projections, it would have demonstrated that the Special Dividend rendered Instant Brands insolvent.

119.     The Solvency Memo contained an "Assets/Liabilities Analysis" which included a balance sheet and a representation that "[n]o material contingent off balance sheet liabilities exist." Seven months before the Solvency Memo was issued, the CPSC had launched an investigation into the Instant Pot's best-selling models, the Duo 60 and Duo 80. As demonstrated by the previous product recall of the Instant Pot, the CPSC's investigation could result in another product recall. Product liability lawsuits from the numerous consumers who sustained burns and other physical injuries, along with the cost of refunding consumers in a product recall, resulted in contingent liabilities, which could be worth hundreds of millions of dollars. These are not included in the Solvency Memo. On the assets side, a significant portion of the assets on the balance sheet included goodwill and intangible assets largely representing Instant Pot's brand value which did not account for the overpayment and purchase price reduction as provided for by the R&W Claim and Restructuring Agreement.

120.     The Solvency Memo also contained a "Positive Cash Flow Analysis," which included one line item titled "FCF for Debt Service" showing positive free cash flow each and every year through 2028, along with a representation that "management concluded it is reasonable to expect to be able to meet its operating and financing obligations over the period of time that they will mature." As detailed below, those hopelessly optimistic projections were but one in a series of fantastical forecasts that the management team habitually produced, forecasting growth that the company had never experienced. The fact that the management team continually missed

prior projections by massive margins did not stop them from putting together subsequent outlandish and extraordinarily rosy estimates.

### i. **Revenue**

121.    Since 2018, Instant Brands' actual revenue trended in only one direction—down. Despite *actual* revenue declining each and every year, management's *projections* only ever trended in one direction—up. Refusing to face reality, each year, after missing their lofty forecasts by hundreds of millions of dollars, management would take their same upward sloping line and move it slightly lower.



Source:
1.  Actual from annual audited financial statements, quarterly unaudited financial statements for YTD Q3 2023, and monthly operating reports filed on the bankruptcy docket for October 2023, November 2023, and December 2023
2.  Feb 2019 Projections from presentation for the 2/27/19 special board meeting to approve the Instant Brands acquisition
3.  Feb 2020 Projections from private supplement and financial model sent to prospective lenders on 2/25/20
4.  Apr 2021 Projections from the CFO's Solvency Memo and financial model dated 4/14/21 and presented to the board

122.   From 2017 to 2018, Pre-Acquisition Instant Brands' revenue more than doubled (from $250 million to $534 million), which Henry Cornell later attributed to overselling in 2018 comprised of channel stuffing and extensive price discounting. Revenue for 2018 was the highest the combined business had ever attained.

48

123.     The acquisition closed in early-2019, and by the end of 2019 the combined Instant Brands missed its revenue projections from February of that year by more than $300 million.[5] The next year, 2020, Instant Brands missed its revenue projections from February of that year by more than $200 million. The following year, 2021, Instant Brands missed its revenue projections from April of that year by more than $150 million. These significant misses, in the same year those projections were done, demonstrate that management's projections were never tethered to reality.[6]

124.     Immediately after the Dividend Recap, after Cornell Capital plundered the company and left it insolvent, Instant Brands' revenue declined year-on-year for *every single quarter* starting in Q3'2021. By 2023, after almost 5 years of Cornell Capital's ownership, revenue had declined to less than half of the 2018 amount, and Instant Brands was just a shell of what it once was.

### ii.  Adjusted EBITDA

125.     Instant Brands' actual Adjusted EBITDA had the same downward trend as its revenue. Besides 2018, which was inflated by channel stuffing and overselling, Instant Brands' annual Adjusted EBITDA never exceeded $90 million. Every single management projection, on the other hand, was well into the hundreds of millions of dollars.

---

[5] As the acquisition of Instant Brands occurred in March 2019, the company's 2019 audited financials only include results starting from March 29, 2019.

[6] Put another way, 2021 revenue would have to increase by 10% from the actual revenue of $965 million in 2020 to the $1,067 million projected for 2021, despite the company experiencing a year-over-year revenue _decline_ in 2020 from $1,035 million in 2019 to $965 million, which represented a decline of almost 7%.



**Adj. EBITDA (USD in Millions)**

Source:
1. Actual from annual audited financial statements, and quarterly unaudited financial statements for YTD Q3 2023; Adj. EBITDA calculated as net income plus interest expense, taxes, depreciation and amortization, and impairment loss
2. Feb 2019 Projections from presentation for the 2/27/19 special board meeting to approve the Instant Brands acquisition
3. Feb 2020 Projections from private supplement and financial model sent to prospective lenders on 2/25/20
4. Apr 2021 Projections from the CFO's Solvency Memo and financial model dated 4/14/21 and presented to the board

126.    In 2019, Instant Brands missed its Adjusted EBITDA forecast from earlier that year by more than $200 million—actual Adjusted EBITDA was approximately a quarter of the forecast. Despite Adjusted EBITDA declining by more than half in 2019 from 2018, similarly hopelessly optimistic projections prepared in February 2020 led to a similarly huge miss. And in 2021, from the projections done in April, three-and-a-half months into the year and the basis for the Dividend Recap, actual Adjusted EBITDA missed by almost $100 million.

127.    Those April 2021 projections were hopelessly optimistic; management improperly projected an almost 80% Adjusted EBITDA growth in 2021 alone, based on unheard of optimism unmoored from historic performance or market prediction. $50 million of that Adjusted EBITDA growth was going to come from new products which had never been sold. And management had by then identified several pandemic-related headwinds that they presented to the board in January 2021—including labor issues, chip supply constraints, tariffs, and ocean freight congestion— which management described as risks to Adjusted EBITDA in that board meeting but was not reflected in their projections.

128.    Management knew that their projections were unrealistic. Certain projections included synergies which management admitted were "significantly overestimated," and "will either take longer to achieve, will not be achieved in full or are not achievable." Immediately after the Dividend Recap, Adjusted EBITDA declined year-on-year for ***every single quarter*** starting in Q3'2021, further widening the gulf between those unrealistic projections and reality.

### iii.  Free Cash Flow

129.    Instant Brands' actual free cash flow for debt service had the same downward trend as its revenue and Adjusted EBITDA. Besides 2020, which was inflated by a one-off change in net working capital, Instant Brands barely generated any free cash flow. Every single management projection, on the other hand, showed Instant Brands generating hundreds of millions of dollars of free cash flow.



**Free Cash Flow for Debt Service (USD in Millions)**

Source:
1. Actual from annual audited financial statements, and quarterly unaudited financial statements for YTD Q3 2023;
   Free cash flow for debt service calculated as cash flow from operating activities less capital expenditures
2. Feb 2019 Projections from materials for the 2/27/19 special board meeting to approve the Instant Brands acquisition
3. Feb 2020 Projections from private supplement and financial model sent to prospective lenders on 2/25/20
4. Apr 2021 Projections from the CFO's Solvency Memo and financial model dated 4/14/21 and presented to the board

130.    At the start of 2019, management projected that they would generate $143 million of free cash flow for debt service that year. Not only did they not generate any free cash flow that year, they ended up with a cash *outflow* of negative $9 million, missing their forecast by $152 million.

131.    In 2020, Instant Brands generated $132 million of free cash flow for debt service. $104 million of the $132 million came from a one-off change in net working capital, mostly driven by a $113 million reduction in Instant Brands' inventory balance, which had previously swelled

due to unrealistic demand forecasting in prior years. Without that one-off cash generation, free cash flow for 2020 was $27 million. Cash inflow from a reduction in working capital is not a source of long-term cash generation. A growing business (as suggested by management's flawed forecasts) typically has increasing working capital balances, which would produce a consistent cash outflow. Conversely, the significant cash inflow driven by the change in working capital was consistent with—and further evidence of—Instant Brands' precipitously declining sales.

132.    At the start of 2020, management projected that they would generate $116 million of free cash flow for debt service that year inclusive of an $11 million cash inflow from change in net working capital (for a net $105 million cash inflow excluding working capital), which was a $78 million miss from the actual $27 million of free cash flow for debt service. On December 15, 2020, Nick Hewitt estimated that Instant Brands would generate $185 million of cash flow in 2020 – that estimate, with a couple weeks left to go in the year, turned out to be $53 million higher than the eventual $132 million of cash flow actually generated in 2020. As previously noted, that $185 million estimate elicited Justine Cheng's response of "Woohoo!!" as she and Cornell Capital were focused on the Dividend Recap.

133.    In April 2021, management projected that they would generate $69 million of free cash flow for debt service that year. That forecast, despite being made three-and-a-half months into the year and used to justify the Dividend Recap, turned out to be $157 million off the mark, with Instant Brands ending that year with a cash *outflow* of negative $87 million. All of the management projections turned out to be wildly off the mark, even for the exact same year that management made those projections, with the $157 million miss in 2021 being the biggest miss of the lot.

134.    Further, Instant Brands' principal debt service obligations were entirely predictable and laid out in the credit agreement of the Prepetition Term Loan, as $8.4 million each quarter from Q3'2021 to Q2'2023, and $5.6 million each quarter from Q3'2023 to the 2028 maturity. Including these principal debt service obligations, immediately after the Dividend Recap, Instant Brands incinerated more than $300 million of cash between Q2'2021 and Q3'2023, in stark contrast to the hundreds of millions of dollars of forecasted cash generation.

### f.    The CFO's Erroneous and Over-Simplistic Stress Test

135.    On April 12, 2021—one day after Robert Wang's request for a sensitivity analysis and two days before the April Board Meeting—Nick Hewitt sent Robert Wang the Stress Test with the following explanation:

> [The Stress Test] shows how our financial position would look in a "worst case scenario" of EBITDA of only $100m of EBITDA for this year and the next. Note that we currently expect to be at $60m of EBITDA by the end of Q2 this year so it really is an extreme downside.

That estimate of $60 million of EBITDA by the end Q2 of 2021—included in Nick Hewitt's email explaining the Stress Test—was itself absurd and 82% more than the actual $33 million of EBITDA generated in the first six months of 2021 (with EBITDA for the full year 2021 of $66 million, being barely more than Nick Hewitt's estimate for the first half of the year).

136.    The Stress Test was as flawed and erroneous as the rest of the financial analysis in the Solvency Memo. To create the Stress Test, Nick Hewitt took the baseline projections for the Solvency Memo—including the over-simplistic extrapolation for 2025 to 2028—and changed the projected EBITDA for 2021 and 2022, and only those two numbers, to $100 million. Leaving the rest of the projections unchanged meant that Nick Hewitt expected that even in this "worst case scenario," that EBITDA would grow 120% between 2022 and 2023. Furthermore, $100 million is

54

higher than any Adjusted EBITDA that Instant Brands had ever achieved in the history of its commercial existence other than 2018 (which management recognized was inflated by channel stuffing, heavy price discounting, and overselling) and higher than both of the two years preceding the Solvency Memo projections—a bizarre and outlandish forecast for a "worst case scenario."



137.    Nick Hewitt designed the Stress Test scenario to be just high enough to show that Instant Brands would be solvent. Nick Hewitt had his finance team run stress scenarios "to see what it takes to break the model," and they summarized their conclusions as such: "Quick takeaway (and no surprise), we can afford 4-5 quarters of poorly run business but run into trouble in quarter

6/7." Seven quarters took them to the end of 2022, when the Stress Test adjustments stopped—because continuing them would have shown Instant Brands running out of cash.

138.    Even in the overly optimistic $100 million Stress Test scenario, Instant Brands would generate very little free cash flow for debt service in 2021 and 2022, and after making its principal debt service obligations required under the Prepetition Term Loan, Instant Brands would lose $8 million in 2021 and $23 million in 2022; and without the unrealistic 120% EBITDA growth projected in 2023, Instant Brands would run out of liquidity by early 2023. In other words, if Nick Hewitt were to use a number smaller than $100 million of EBITDA (itself a record number) for his Stress Test, or if Nick Hewitt used $100 million of EBITDA for three years instead of two years, the Stress Test would show that Instant Brands would be insolvent, without adequate capital, and unable to pay its debts in less than two years after the issuance of the Special Dividend.

139.    In truth, the Stress Test was put together by the CFO purely to placate Robert Wang and his questions about the Solvency Memo, which itself was put together by the CFO purely to provide pretextual support for the April Board Meeting, which itself was a scripted charade meant to divert attention away from the fact that the Special Dividend was unanimously approved by the almost entirely interested group of directors in the March Resolution and was a *fait accompli* before the CFO even started work on the Solvency Memo or the Stress Test. Any disinterested director or officer complying with his or her fiduciary duties would have seen through this shroud of deceit.

**10.    <u>Cornell Capital Regularly Siphons Away Much Needed Cash from Instant Brands Through Various "Fees"</u>**

140.    In addition to the Special Dividend, Cornell Capital separately siphoned away a total of $16 million from Instant Brands, causing Instant Brands to pay regular fees for

management and other undefined services. Cornell Capital received $4.5 million in 2017 as a "management fee," $3.6 million in 2020 as an "acquisition fee," $3.8 million in 2020 as a "management fee […] related to 2019 services," and $3.8 million in 2021 as a "management fee […] related to 2020 services." On information and belief, Cornell Capital did not provide services of reasonably equivalent value in exchange for these fees; most of these fees were paid while Cornell Capital was plotting to plunder the company and leave it insolvent.

**11.** **Instant Brands Ran out of Money in Less than 21 Months of the Illegal Dividend**

141.     Consumer goods companies typically have visibility of their orders through sales channel with reasonable certainty for at least the next six to nine months, allowing them to reliably forecast their inventory, sales, and earnings projections in the near term. This is foundational to running their business. The fact that, right after the Dividend Recap, Instant Brands immediately failed to hit their flawed projections in *every single quarter*, including in the very same quarter that the Special Dividend was issued, evidences management's knowing malfeasance.

142.     Revenue missed projections every single quarter from Q2'2021 to Q4'2022 and declined year-on-year for every single quarter from Q3'2021 and Q4'2022.



143.    Adjusted EBITDA similarly missed projections every single quarter from Q2'2021 to Q4'2022 and declined year-on-year for every single quarter from Q3'2021 and Q4'2022.



144.    Cumulative free cash flow for debt service missed projections by $275 million for the seven quarters from Q2'2021 to the end of 2022.



**Cumulative Free Cash Flow for Debt Service (USD in Millions)**

Missed cumulative free cash flow projections by $275 million in less than two years

Source:
1. Actual from quarterly and annual financial statements; free cash flow for debt service calculated as cash flow from operating activities less capital expenditures
2. CFO's Solvency Memo and financial model dated 4/14/21 and presented to the board

145.    Towards the end of 2022, at the November 10, 2022 board meeting, Nick Hewitt informed the board that "to manage working capital and debt service," Cornell Capital needs "to inject $50-$55m into the business […] in the near term." At a December 13, 2022, meeting with Cornell Capital and Instant Brands' management team, Cornell Capital expressed reticence in providing an equity injection so soon after the Dividend Recap, questioning "[c]an we push to Feb or March – [Henry] doesn't want to put in money for 45-60 days as it weakens his negotiating position." Henry Cornell also brought up the option of a "Pre-pack solution in DE" (*i.e.*, filing for

60

bankruptcy in Delaware). However, Cornell Capital delayed taking action, with the hope that Instant Brands' creditors would be pressured to make concessions, with Henry Cornell justifying this decision because important "never to waste a crisis."

146.    By January of 2023, less than 21 months after Dividend Recap was issued, Instant Brands ran out of money.

### 12.    Instant Brands Breaches the Credit Agreement, Transfers All of Instant Brands Tangible Assets Out of Creditors' Collateral Pool and pledges it to Cornell Capital Partners LP

147.    In December 2022, as Instant Brands was struggling with its insolvency and deteriorating financial condition, Cornell Capital contrived a scheme to strip Instant Brands of its remaining assets and delay bankruptcy until after the Bankruptcy Code's two-year look-back period passed with respect to the Special Dividend. The scheme entailed having Instant Brands transfer essentially all of its tangible assets, estimated to be worth approximately $200 million (the "UnSub Assets") to newly formed unrestricted subsidiaries, which would serve as collateral for a $55 million loan from Cornell Capital Partners LP that provided neither Instant Brands nor its creditors with any tangible benefits. Instead, the UnSub Transaction facilitated delay and further business deterioration to the detriment of Instant Brands and its creditors, with the UnSub Assets losing an estimated $150 million in value by the time they eventually reverted to the lender group in bankruptcy.

148.    On January 10, 2023, a special meeting of the board of directors was held, where Nick Hewitt "advised the Board that the Company will need $20m by January 17" to pay suppliers and fulfil obligations to retailers, and "will need an additional $35m by mid-February" to pay down the company's asset-based revolver and avoid a default. Cornell Capital's legal counsel then

"proceeded to describe in detail a proposed transaction to secure financing in the immediate term"—with the proposal having essentially the same terms and structure as the eventual UnSub Transaction. They "identified several practical suggestions for the Board, including the *establishment of a Special Committee that could* review, evaluate, and potentially *approve a potential debt financing transaction*." John Dubel was welcomed to the board of directors at that same meeting. On January 11, 2023, Cornell Capital circulated the below engagement letter, which stipulated that Cornell Capital would retain Kroll LLC ("Kroll") for valuation services:

> **Re: Engagement Letter for Kroll Professional Services**
>
> Dear Ms. Cheng:
>
> This letter confirms that we, Kroll, LLC, ("Kroll") have been retained by you, Justine Chang (the "Company") on behalf of Cornell Capital (the "Client"), to provide the services (the "Services") set out in connection with the valuation of certain real estate, machinery and equipment, and precious metals assets owned by the Client.

At Cornell Capital's urging, Instant Brands executed the engagement letter with Kroll.

149.    As advised by Cornell Capital's legal counsel, on January 12, 2023, the board of directors approved the appointment of John Dubel and Lawrence McRae to a special committee of the board (the "Special Committee") to "review, evaluate and authorize a Potential Transaction," with the "dissolution of the Special Committee [...] 90 days after the consummation of that Potential Transaction." On January 13, 2023, the Special Committee had their first meeting, where the Special Committee appointed Cornell Capital's legal counsel as Instant Brands' legal counsel, and where Cornell Capital's (and now Instant Brands') legal counsel presented the UnSub Transaction to the Special Committee. Shortly after the Special Committee meeting ended, on the same morning of January 13, 2023, the board of directors met "for the special committee [...] to

provide an update," where John Dubel told the board that the "[Special] Committee was inclined to approve the Potential Transaction." On the afternoon of January 13, 2023, Kroll sent a draft valuation report (the "Kroll Valuation Report") to the Special Committee and to Cornell Capital, valuing the UnSub Assets at approximately $200 million:

| Subject Assets | Exhibit | Fair Market Value (Rounded): Charleroi | Fair Market Value (Rounded): Corning | Fair Market Value (Rounded): Total (1) (2) |
|---|---|---|---|---|
| Real Property | 2.1, 2.2, and 2.3 | $ 23,800,000 | $ 13,300,000 | $ 37,100,000 |
| Personal Property | 2.1 | 40,785,000 | 72,966,000 | 113,751,000 |
| Precious Metals | 3.0 | 9,618,000 | 39,005,000 | 48,623,000 |
| *Total* | | $ 74,203,000 | $ 125,271,000 | $ 199,474,000 |

150.    On January 14, 2023, the Special Committee—after having been established two days ago and having met for the first time the day before—met to "approve and ratify the retention of Kroll as valuation advisor" and "approve entry into the Cornell [f]acility."

151.    The Special Committee was not an independent fiduciary, having been appointed solely for the purpose of approving the already pre-decided UnSub Transaction which Cornell Capital had planned and executed. The board of directors did not include any disinterested fiduciaries, and neither they nor the Special Committee properly exercised its fiduciary duties in getting the UnSub Transaction approved. Neither Cornell Capital, the board of directors, Instant Brands, nor the Special Committee had the benefit of separate counsel or independent professional advice; all were jointly advised by the same set of professionals beholden to Cornell Capital.

152.    Moreover, they knew the UnSub Transaction would violate the express terms of the credit agreement governing the Prepetition Term Loan (the "Credit Agreement") and did not vet whether it was in Instant Brands' best interest to transfer and impair the UnSub Assets. They did not vet the work performed by Kroll, including the methodology Kroll used to determine the fair

market value of the assets; the material Kroll reviewed; the time Kroll took to provide the report; and the terms of Kroll's engagement. Instant Brands never conducted a fairness analysis to support the UnSub Transaction.

153.    Most egregiously, the board of directors and the Special Committee allowed Instant Brands to retain no material assets following the UnSub Transaction other than intellectual property and deteriorating working capital, which violated the Credit Agreement. At the time of the UnSub Transaction, Instant Brands was insolvent by a substantial margin, yet the directors failed to consider the interests of creditors.

154.    On January 18, 2023—in breach of Instant Brands' Credit Agreement—the UnSub Transaction was consummated and the approximately $200 million of UnSub Assets were transferred out of the Assigned Lenders' reach.

155.    Section 7.04 of the Credit Agreement, entered into between Instant Brands and certain lenders, barred Instant Brands from transferring "all or substantially all its assets to, any Person."  By directing the UnSub Transaction, Cornell Capital caused Instant Brands to breach the Credit Agreement.

**13.    The UnSub Transaction Causes Further Business Deterioration Before Inevitable Bankruptcy**

156.    The UnSub Transaction exacerbated Instant Brands' business deterioration. The transaction was viewed negatively by the financial markets and financial press, with the prices on the Prepetition Term Loan declining precipitously after the transaction closed. Bloomberg reported on the "controversial debt move," and Moody's downgraded Instant Brands' credit rating due to the "elevated risk of default." As management subsequently put it, the "[n]egative media stories and ratings downgrades following the January refinancing caused suppliers at that time to start

tightening terms." And as Instant Brands later told the bankruptcy court, the "severely tightening credit terms" imposed by creditors eventually drained Instant Brands' remaining liquidity and precipitated the bankruptcy filing.

157.    Cornell Capital knew that Instant Brands' financial condition was collapsing and that it had been rendered insolvent by the Dividend Recap. The UnSub Transaction exacerbated Instant Brands' financial condition and did nothing to benefit the company or to avoid Instant Brands' inevitable bankruptcy. The $55 million liquidity injection was simply wasteful.

158.    On February 15, 2023, the board of directors convened a special meeting to discuss the problems facing the business, including the "market's perception of the Company's [in]ability to repay its debts, as informed by debt-trading prices."  As part of those discussions, the directors agreed that the UnSub Transaction merely "postpone[d] an inevitable comprehensive restructuring."

159.    In effect, Cornell Capital and/or Cornell Capital Partners LP misappropriated an estimated $200 million of assets (which otherwise would have been available to the Assigned Lenders) in order to delay an inevitable bankruptcy filing until after the two-year bankruptcy code look-back period. When the Assigned Lenders subsequently tried to take the UnSub Assets back, Cornell Capital and/or Cornell Capital Partners LP required that they—by way of financing provided to the debtor-in-possession—pay Cornell Capital and/or Cornell Capital Partners LP multiple layers of interest and fees levied in addition to the $55 million. And after the UnSub Assets were unencumbered during the bankruptcy process, the assets were valued at $54 million, $146 million less than the $200 million valuation prior to the UnSub Transaction.

160.    The UnSub Transaction was effectuated with the actual intent to defraud the Assigned Lenders: Instant Brands' essential assets were transferred to other entities that were not subject to the existing liens for the benefit of insiders. The UnSub Transaction transferred and placed a lien on all of the company's material assets. Instant Brands was insolvent before the UnSub Transaction, and the transaction deepened that insolvency. Instant Brands received less than reasonably equivalent value as part of the UnSub Transaction—merely a $55 million *loan* that only temporarily staved-off bankruptcy. Cornell Capital and/or Cornell Capital Partners LP retained possession or control of the property transferred. Under Cornell Capital and/or Cornell Capital Partners LP's control, the value of the assets was diminished by millions of dollars. And the UnSub Transaction occurred less than two years after Instant Brands incurred unreasonably massive new debt to fund a Special Dividend to various insiders.

**14.    Instant Brands Files for Bankruptcy, Lenders Significantly Impaired**

161.    On June 12, 2023, slightly more than two years after the Dividend Recap left Instant Brands insolvent, Instant Brands filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

162.    At the time of bankruptcy filing, $391 million remained outstanding on the Prepetition Term Loan. At emergence, those lenders recovered only 7% to 9% of the value of their claims, resulting in a collective loss of approximately $360 million.

## <u>FIRST CAUSE OF ACTION</u>

**Actual Fraudulent Transfer – Special Dividend (Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, Agate Informatics Corp., 4060288 Canada Inc., and 7326998 Canada Inc., Ben Gadbois, Kenneth Wilkes, William Hess, Nicholas Hewitt, Cathy Landman)**

163.    The Trustee reincorporates and realleges the allegations in paragraphs 1-162 above.

164.    In the face of Instant Brands' struggling financial position and known material risks, Cornell Capital recognized Instant Brands could not service its debts and was insolvent or would be rendered insolvent.

165.    Cornell Capital caused Instant Brands and Corelle Brands to enter into the Restructuring Agreement to earmark $200 million to Cornell Capital and then caused Instant Brand to enter into the Dividend Recap that paid the earmarked $200 million in dividends to Cornell Capital.

166.    The Special Dividend resulted in transfers of approximately $206 million, including the initial transfer of $200,258,112.34 to Cornell Capital by way of its vehicle CC WK Co-Invest LP. The bulk of that money was subsequently transferred to Cornell Capital Partners LP, with other amounts going to its co-investors. Upon information and belief, Cornell Capital Partners LP subsequently transferred all or part of the funds to Cornell Capital.

167.    The Special Dividend also included the following amounts transferred to Instant Brands' management:

      a.    $ 1,804,451.05 to Ben Gadbois;

      b.    $ 550,361.25 to Kenneth Wilkes;

      c.    $ 344,893.05 to William Hess;

      d.    $ 293,526.00 to Cathy Landman; and

  e. $ 275,914.44 to Nicholas Hewitt.

168. The Special Dividend also included the following transfers to the former shareholders of Pre-Acquisition Instant Brands:

  a. $ 923,814.20 to Agate Informatics Corp. (controlled by Pre-Acquisition Instant Brands shareholder Robert Wang);

  b. $ 308,278.85 to 4060288 Canada Inc. (controlled by Pre-Acquisition Instant Brands shareholder Yi Qin); and

  c. $ 308,278.85 to 7326998 Canada Inc. (controlled by Pre-Acquisition Instant Brands shareholder Dongjun Wang).

169. The Special Dividend was made with actual intent to defraud the lenders. Such intent is directly shown by Cornell Capital's earmark of the Special Dividend in the Restructuring Agreement and can be inferred from, among other things, the traditional badges of fraud surrounding the Special Dividend, including that it was paid out entirely to insiders, occurred almost simultaneously with the incursion of a massive new debt, involved a substantial portion of Instant Brands' assets, rendered Instant Brands insolvent, and Instant Brands was left with nothing to show for it. Moreover, it can further be inferred from the fact that Instant Brands' management and Board of Directors used a facially flawed Solvency Memo to justify the Special Dividend and ignored critical headwinds to Instant Brands' business known at the time of the Special Dividend.

170. The Special Dividend is avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code, NY DCL §§ 273–75, and any other applicable state law.

171.     Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law, including NY DCL §§ 273-75, by any creditor holding an unsecured, allowable claim.

172.     Creditors of Instant Brands exist who could avoid the Special Dividend under applicable non-bankruptcy law, including NY DCL §§ 273-75.

173.     Under Section 550 of the Bankruptcy Code, the Trustee may recover the avoided transfer from the initial transferee or any subsequent transferee.

174.     Defendants Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, Agate Informatics Corp., 4060288 Canada Inc., and 7326998 Canada Inc., Ben Gadbois, Kenneth Wilkes, William Hess, Nicholas Hewitt, Cathy Landman ("Special Dividend Recipients") as initial or subsequent transferees of the Special Dividend, are liable to repay the fraudulent transfers they received.[7]

### SECOND CAUSE OF ACTION

**Actual Fraudulent Transfer – Parent Transfer, OpCo Seller Notes Transfer, and Special Dividend (Agate Informatics Corp., 4060288 Canada Inc., 7326998 Canada Inc., Chris Larocque, Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, Ben Gadbois, Kenneth Wilkes, William Hess, Nicholas Hewitt, Cathy Landman)**

175.     The Trustee reincorporates and realleges the allegations in paragraphs 1-174 above.

---

[7] Additional individuals and entities also received transfers as part of the Special Dividend, including Anthony Carfagno, Trenna Fulle, Peter Chan, John Inabnit, Wade Kellems, Patrick Kim, Sameer Garg, Louise Occasion, Andrew Warburton, Jon Hartman, Pushpa Gopalan, Bryan Margner, Elliot Molk, Jason Kravik, Julie Wool, Valerie Longs, Terry Troutman, Raul Ruiz, George Chavel, Charles Koppleman, Alexandra Wilson, Qing Wen Guan, and Chris Stevens. The Trustee reserves the right to pursue funds disbursed to these individuals.

176.     OpCo transferred the Parent Transfer, a gratuitous $345 million dividend, to Intermediate HoldCo, which then transferred it to TopCo, without receiving any consideration in return.

177.     The Parent Transfer is avoidable as an actual fraudulent transfer under Sections 544(b) and 550 of the Bankruptcy Code, NY DCL §§ 273-75, and any other applicable state law.

178.     The Parent Transfer was made with actual intent to defraud lenders. Such intent is directly shown by Cornell Capital's earmarks in the Restructuring Agreement and can be inferred from, among other things, the traditional badges of fraud surrounding the Special Dividend and Seller Notes, including that it was paid out entirely to insiders, occurred almost simultaneously with the incurring by Instant Brands of a massive new debt, involved a substantial portion of Instant Brands' assets, rendered Instant Brands insolvent, Instant Brands was left with nothing to show for it, and OpCo and Intermediate HoldCo had not been a debtor on the Seller Notes. Moreover, fraudulent intent can further be inferred from the fact that Instant Brands' management and Board of Directors used a facially flawed Solvency Memo, did not obtain third-party opinions, did not review the transaction from the point-of-view of OpCo, and ignored critical headwinds to Instant Brands' business known at the time of the Parent Transfer.

179.     Creditors of Instant Brands exist who could avoid the Special Dividend under applicable non-bankruptcy law, including NY DCL §§ 273-75.

180.     In addition to the Special Dividend transfers (incorporated herein), TopCo subsequently transferred approximately $101 million to Agate Informatics Corp. (received $65,496,759.41), 4060288 Canada Inc. (received $16,296,275.10), 7326998 Canada Inc. (received $16,296,275.10), and Chris Larocque (received $3,037,495.89) (the "Seller Note Recipients") in

repayment of the Seller Notes. These transfers can be recovered under Section 550 because Seller Note Recipients were immediate or mediate transferees of the initial transferee.

181.    Furthermore, although the Trustee need not plead around the affirmative defense, Seller Note Recipients and Special Dividend Recipients took with knowledge of the voidability of the transfer. Namely, the recipients were represented on the Board of Directors by Henry Cornell, Yi Qin, and Robert Wang and had knowledge of the voidability of the Parent Transfer.

182.    The Seller Note Recipients and Special Dividend Recipients, as direct recipients or subsequent transferees of the $345 million Parent Transfer, are liable to repay the fraudulent transfers they received.

## THIRD CAUSE OF ACTION

### Actual Fraudulent Transfer – UnSub Transaction (Cornell Capital and Cornell Capital Partners LP)

183.    The Trustee reincorporates and realleges the allegations in paragraphs 1-182 above.

184.    The UnSub Transaction resulted in the transfer of an estimated $200 million in assets from Instant Brands to Charleroi URS and Corning URS, along with substantial fees, and $55 million in liens which were reimbursed to Cornell Capital and/or Cornell Capital Partners LP during the bankruptcy proceedings.

185.    The UnSub Transaction also resulted in the substantial deterioration of the transferred assets. When the value of the assets was assessed in bankruptcy, it was found that the transferred assets were worth barely more than $50 million, cents on the dollar of their estimated pre-UnSub Transaction valuation.

186.    Instant Brands entered into the UnSub Transaction for the benefit of Cornell Capital and/or Cornell Capital Partners LP.

187.    The UnSub Transaction was effectuated with the actual intent to hinder, delay, and/or defraud Instant Brands and/or its creditors. Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the UnSub Transaction, including that Instant Brands' assets were transferred to other entities for the benefit of insiders, the "highly confidential" Unsub Transaction occurred less than two years after Instant Brands incurred massive new debt to fund a Special Dividend to various insiders, the UnSub Transaction involved a transfer of and placement of a lien on all of the company's material assets, Instant Brands was insolvent before the Unsub Transaction, Instant Brands received less than reasonably equivalent value as part of the UnSub Transaction—merely a $55 million *loan* that only temporarily staved-off bankruptcy, Cornell Capital and/or Cornell Capital Partners LP retained possession or control of the property transferred after the transfer, and Instant Brands transferred the essential assets of the business to a lienor that was also an insider of the debtor. And the UnSub Transaction was intended by Cornell Capital and/or Cornell Capital Partners LP to delay Instant Brands' bankruptcy until after the two-year look-back period passed with respect to the Special Dividend.

188.    As a result of the UnSub Transaction, Instant Brands and its creditors have been harmed by the diminished value of the UnSub Assets and the $55 million reimbursement to Cornell Capital and/or Cornell Capital Partners LP.

189.    The UnSub Transaction is avoidable as an actual fraudulent transfer under Sections 544, 548, and 550 of the Bankruptcy Code, NY DCL §§ 273-75, and any other applicable state law.

190.     Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law, including NY DCL §§ 273-75, by any creditor holding an unsecured, allowable claim.

191.     Creditors of Instant Brands exist who could avoid the UnSub Transaction under applicable non-bankruptcy law, including NY DCL §§ 273-75.

192.     Under Section 548 of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property made actual intent to hinder, delay, or defraud a creditor.

193.     Under Section 550 of the Bankruptcy Code, the Trustee may recover the avoided transfer from the initial transferee or any subsequent transferee.

194.     Defendant Cornell Capital and/or Cornell Capital Partners LP, as transferees of the fraudulent transfer, are liable to repay the value of the fraudulent transfer they received, no less than $55 million.

### FOURTH CAUSE OF ACTION

**Constructive Fraudulent Transfer – Special Dividend (Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, Agate Informatics Corp., 4060288 Canada Inc., and 7326998 Canada Inc., William Hess, Nicholas Hewitt, Cathy Landman)**

195.     The Trustee reincorporates and realleges the allegations in paragraphs 1-194 above.

196.     In particular, the Trustee incorporates the Special Dividend transfers detailed in paragraphs 163-173.The Special Dividend was not made for any consideration.

197.     At the time with Special Dividend was made, (i) Instant Brands was insolvent or the Special Dividend rendered Instant Brands insolvent, (ii) the Special Dividend left Instant Brands with unreasonably small capital, or (iii) that the Special Dividend left Instant Brands with debts beyond its ability to pay as they matured and became absolute.

73

198.     The Special Dividend is avoidable as a constructive fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code, NY DCL §§ 273–275, and any other applicable state law.

199.     Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law, including NY DCL §§ 273–275, by any creditor holding an unsecured, allowable claim.

200.     Creditors of Instant Brands exist who could avoid the Special Dividend under applicable non-bankruptcy law, including NY DCL §§ 273-275.

201.     Under Section 550 of the Bankruptcy Code, the Trustee may recover the avoided transfer from the initial transferee or any subsequent transferee.

202.     Defendants Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, Agate Informatics Corp., 4060288 Canada Inc., and 7326998 Canada Inc., William Hess, Nicholas Hewitt, and Cathy Landman, as direct recipients or subsequent transferees of the fraudulent transfer, are liable to repay the fraudulent transfers they received.

## FIFTH CAUSE OF ACTION

**Constructive Fraudulent Transfer – Parent Transfer, OpCo Seller Notes Transfer, and Special Dividend (Agate Informatics Corp., 4060288 Canada Inc., 7326998 Canada Inc., Chris Larocque, Cornell Capital, Cornell Capital Partners LP, CC WK Co-Invest LP, William Hess, Nicholas Hewitt, Cathy Landman)**

203.     The Trustee reincorporates and realleges the allegations in paragraphs 1-202 above.

204.     OpCo transferred the Parent Transfer, a gratuitous $345 million dividend, to TopCo without receiving any consideration in return.

205.    The dividend from OpCo to TopCo is an avoidable as a constructive fraudulent transfer under Sections 544(b) and 550 of the Bankruptcy Code, NY DCL §§ 273-75, and any other applicable state law.

206.    To start, the transfer was not for reasonably equivalent value, as OpCo received nothing in return and was not an obligor on the existing or new debt. Furthermore, as described herein, the incurrence of $450 million in debt and disposition of $100 million in cash rendered OpCo insolvent. At the time the Parent Transfer was made, (i) OpCo was insolvent or the Parent Transfer rendered Instant Brands insolvent, (ii) the Parent Transfer left OpCo with unreasonably small capital, or (iii) that the Parent Transfer left OpCo with debts beyond its ability to pay as they matured and became absolute.

207.    Creditors of Instant Brands exist who could avoid the Parent Transfer under applicable non-bankruptcy law, including NY DCL §§ 273-75.

208.    In addition to the Special Dividend transfers (incorporated herein), TopCo subsequently transferred approximately $101 million to Agate Informatics Corp., 4060288 Canada Inc., 7326998 Canada Inc., and Chris Larocque (the "Seller Note Recipients") in repayment of the Seller Notes. These transfers can be recovered under Section 550 because Seller Note Recipients were immediate or mediate transferees of the initial transferee.

209.    Furthermore, although the Trustee need not plead around the affirmative defense, Seller Note Recipients and Special Dividend Recipients took with knowledge of the voidability of the transfer. Namely, the recipients were represented on the Board of Directors by Henry Cornell, Yi Qin, and Robert Wang and had knowledge of the voidability of the Parent Transfer.

210.    The Seller Note Recipients and Special Dividend Recipients, as direct recipients or subsequent transferees of the $345 million fraudulent transfer, are liable to repay the fraudulent transfers they received.

## SIXTH CAUSE OF ACTION

### Constructive Fraudulent Transfer – UnSub Transaction (Cornell Capital and Cornell Capital Partners LP)

211.    The Trustee reincorporates and realleges the allegations in paragraphs 1-210 above.

212.    The UnSub Transaction resulted in the transfer of an estimated $200 million in assets from Instant Brands to Charleroi URS and Corning URS, and $55 million in liens which were reimbursed to Cornell Capital and/or Cornell Capital Partners LP during the bankruptcy proceedings to the detriment of Instant Brands' creditors.

213.    The UnSub Transaction also resulted in the substantial deterioration of the transferred assets. When the value of the assets was assessed in bankruptcy, it was found that the transferred assets were worth barely more than $50 million, cents on the dollar of their pre-UnSub Transaction valuation.

214.    Instant Brands entered into the UnSub Transaction for the benefit of Cornell Capital and/or Cornell Capital Partners LP.

215.    At the time of the UnSub Transaction, (i) Instant Brands was insolvent (ii) the UnSub Transaction left Instant Brands with unreasonably small capital, and (iii) it incurred debts beyond its ability to pay as they matured and became absolute.

216.    As a result of the UnSub Transaction, Instant Brands and its creditors have been harmed.

217.    The UnSub Transaction is avoidable as a constructive fraudulent transfer under Sections 544, 548 and 550 of the Bankruptcy Code, NY DCL §§ 273–275, and any other applicable state law.

218.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law, including NY DCL §§ 273–275, by any creditor holding an unsecured, allowable claim.

219.    Creditors of Instant Brands exist who could avoid the UnSub Transaction under applicable non-bankruptcy law, including NY DCL §§ 273–275.

220.    Under Section 548 of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property for which the debtors received less than reasonably equivalent value and was insolvent or became insolvent due to the transfer, had unreasonably small capital, or gave rise to debts beyond the debtor's ability to pay as they matured.

221.    Under Section 550 of the Bankruptcy Code, the Trustee may recover the avoided transfer from the initial transferee or any subsequent transferee.

222.    Defendant Cornell Capital and/or Cornell Capital Partners LP, as transferees of the fraudulent transfer, are liable to repay the value of the fraudulent transfer they received: any diminished value of the UnSub Assets, and the $55 million reimbursement to Cornell Capital and/or Cornell Capital Partners LP.

### SEVENTH CAUSE OF ACTION

**Illegal Dividend (Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Yi Qin, Robert Wang, Cathy Landman, William Hess)**

223.    The Trustee reincorporates and realleges the allegations in paragraphs 1-222 above.

224.    Instant Brands' Board of Directors approved and directed payment of the Special Dividend. The value of the Special Dividend was approximately $206 million.

225.    When the Special Dividend was declared, Instant Brands was insolvent.

226.    Alternatively, the Special Dividend rendered Instant Brands insolvent.

227.    Alternatively and in addition, Instant Brands' liabilities exceeded its assets, so that Instant Brands did not have any capital surplus. Instant Brands' net profits were insufficient to fund the Special Dividend.

228.    Accordingly, the Special Dividend was not a lawful dividend under New York Business Corporation Law §§ 510, 719(a) and 720 or the Delaware General Corporation Law.

229.    Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Yi Qin, Cathy Landman, William Hess, and Robert Wang were Directors of Instant Brands and orchestrated the Special Dividend and are therefore jointly and severally liable for the amount of the Special Dividend.

### EIGHTH CAUSE OF ACTION

**Breach of Fiduciary Duty – Special Dividend and UnSub Transaction (Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Yi Qin, Ben Gadbois, Kenneth Wilkes, William Hess, Nicholas Hewitt, Cathy Landman, Lawrence McRae, John Dubel, Jeff Kist, and Robert Wang)**

230.    The Trustee reincorporates and realleges the allegations in paragraphs 1-229 above.

231.    As Directors and Officers of Instant Brands, Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Yi Qin, Ben Gadbois, Kenneth Wilkes, William Hess, Lawrence McRae, John Dubel, Nicholas Hewitt, Cathy Landman, Jeff Kist, and Robert Wang ("Director and Officer Defendants") each owed a duty of care and duty of loyalty to Instant Brands Acquisition Holdings, Inc. and Instant Brands Holdings, Inc. Cathy Landman and William Hess further owed a duty of

78

care and duty of loyalty to Instant Brands Intermediate Holdings, Inc. and Instant Brands Holdings, Inc., as directors of those entities. Those duties extended, upon insolvency, to the creditors as residual owners of Instant Brands.

232.    These duties required the Director and Officer Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of Instant Brands.

233.    When the Special Dividend was declared and the UnSub Transaction was approved, Instant Brands was insolvent.

234.    The Director and Officer Defendants acted with gross negligence, lack of good faith, and in conscious disregard of their fiduciary duties, including by, without limitation:

    a.   Approving the Prepetition Term Loan and Special Dividend when they were aware that Instant Brands was insolvent, would be rendered insolvent, would be left with unreasonably small capital, and in doing so believed that it would incur or intended to incur debts beyond its ability to pay as they matured.

    b.   Approving and not dissenting from the Prepetition Term Loan and Special Dividend when they were aware that Instant Brands was insolvent, would be rendered insolvent, would be left with unreasonably small capital, and in doing so believed that it would incur or intended to incur debts beyond its ability to pay as they matured.

    c.   Approving the Prepetition Term Loan and Special Dividend based on a facially—and what they knew to be—critically flawed solvency analysis.

    d.   Accumulating debt for the sole purpose of issuing a dividend.

    e.   Approving and not dissenting from the UnSub Transaction when they were aware that Instant Brands was insolvent, would be rendered insolvent, would be left with unreasonably small capital, and in doing so believed that it would incur or intended to incur debts beyond its ability to pay as they matured.

f.   Approving the UnSub Transaction knowing that the UnSub Transaction disposed of effectively all of Instant Brands Holdings, Inc.'s remaining assets.

g.   Sapping the UnSub Assets of their value by removing, liquidating and/or mismanaging the UnSub Assets and related assets and personal property.

h.   Accumulating additional debt to Cornell Capital to be repaid by Instant Brands, to the detriment of creditors, upon bankruptcy in exchange for no or meaningless consideration.

235.   The Director and Officer Defendants each stood to personally benefit from the Special Dividend separate and apart from the benefit received by other shareholders, and none were disinterested in the Prepetition Term Loan, the Special Dividend, or the UnSub Transaction.[8]

236.   The Director and Officer Defendants each violated their duty of care by failing to exercise reasonable care when approving and/or orchestrating the Prepetition Term Loan, the Special Dividend, and the UnSub Transaction.

237.   In addition and in the alternative, the Director and Officer Defendants violated their duty of loyalty by failing to act in the best interest of Instant Brands when approving and/or orchestrating the Prepetition Term Loan, Special Dividend, and the UnSub Transaction.

238.   The breaches are actionable under N.Y. Bus. Corp. Law § 717 and New York Common Law.

---

[8] The Trustee alleges that Kenneth Wilkes and Jeff Kist breached their duties with respect to the Dividend Recap only, John Dubel breached his duties with respect to the UnSub Transactions only, and Henry Cornell, Justine Cheng, Rodrigo Bravo, Younghoon Park, Yi Qin, Ben Gadbois, William Hess, Nicholas Hewitt, Cathy Landman, Lawrence McRae, and Robert Wang breached their duties with respect to both.

239.     As a result of these breaches, the Director and Officer Defendants received monetary and other benefits at the expense of Instant Brands and its creditors.

240.     As a direct a proximate result of these breaches, Instant Brands and its creditors were injured. The Director and Officer Defendants are liable to the company to compensate for these and other results of their breaches of fiduciary duties.

## NINTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty (Cornell Capital)

241.     The Trustee reincorporates and realleges the allegations in paragraphs 1-240 above.

242.     The Director and Officer Defendants owed a fiduciary duty to Instant Brands as directors of Instant Brands. These fiduciary duties included the duties of care and loyalty.

243.     These duties required the Director and Officer Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of Instant Brands.

244.     Cornell Capital was aware the Director and Officer Defendants owed these fiduciary duties to Instant Brands.

245.     At all times, Cornell Capital controlled Instant Brands through its control of Instant Brands' Board of Directors. Cornell Capital controlled the Director and Officer Defendants through (i) its employment of certain Director and Officer Defendants; (ii) its ability to replace any director that did not adhere with Cornell Capital's demands; and (iii) offering financial incentives to the Director and Officer Defendants in exchange for pursuing courses of action in

breach of their fiduciary duties. Cornell Capital exercised this control over Instant Brands' board of directors to orchestrate the Special Dividend and UnSub Transaction.

246.    Cornell Capital orchestrated, participated in, and knew of the Director and Officer Defendants breaches of fiduciary duties to Instant Brands and provided substantial assistance to those breaches. It did so through various agents, including:

      a.   Henry Cornell, the senior partner at Cornell Capital and Chair of Instant Brands' Board of Directors;

      b.   Justine Cheng, a partner at Cornell Capital and a member of Instant Brands' Board of Directors;

      c.   Rodrigo Bravo, a managing director at Cornell Capital and a member of Instant Brands' Board of Directors;

      d.   Joanna Reiss, a former partner at Cornell Capital and a member of Instant Brands' Board of Directors until 2020; and

      e.   Richard Drucker, a partner and General Counsel at Cornell Capital, who played a substantial role in orchestrating the UnSub Transaction.

247.    The Director and Officer Defendants orchestrated the Special Dividend and UnSub Transaction that drained Instant Brands of its resources for the benefit of Cornell Capital. Cornell Capital's substantial assistance and/or encouragement of the wrongdoing by the Director and Officer Defendants included, without limitation, (i) arranging the Special Dividend; (ii) directing the creation of a flawed Solvency Memo in connection with the Special Dividend; (iii) failing to undergo a solvency analysis prior to the UnSub Transaction; (iv) arranging and directing the accumulation of debt for the purpose of issuing the Special Dividend and entering into the UnSub

Transaction; (v) sapping the UnSub Assets of their value by removing, liquidating and/or mismanaging the UnSub Assets and their personal property and other related assets; (vi) causing Instant Brands to pay millions in fees to Cornell Capital; and (vii) devising the structure and plan for the Prepetition Term Loan, Special Dividend, and UnSub Transaction.

248.    Instant Brands and its creditors suffered damages as a result of Cornell Capital's aiding and abetting of such breaches of fiduciary duties.

## **TENTH CAUSE OF ACTION**

### **Tortious Interference with a Contract (Credit Agreement) (Cornell Capital)**

249.    The Trustee reincorporates and realleges the allegations in paragraphs 1-248 above.

250.    In Section 5.14 of the Credit Agreement, Instant Brands represented as follows:

> As of the Closing Date, the reports, financial statements, certificates and other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole, are true and correct in all material respects as the date such information was furnished and do not, taken as a whole, contain any untrue statement of a material fact as of such date or omit to state any material fact necessary to make the statements therein, taken as a whole and in the light of the circumstances under which such statements were made not materially misleading; provided that, with respect to *pro forma* and projected financial information, the Borrower and Holdings represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered in light of the circumstances when made and, if such *pro forma* and projected financial information was delivered prior to the Closing Date, as of the Closing Date.

251.    In connection with the Prepetition Term Loan, Instant Brands failed to disclose that Corelle Brands' acquisition of Pre-Acquisition Instant Brands had been premised on misstated

financials, that insurance claims had been filed that were premised on that fact, and that the combined company's value post-acquisition value was consequently materially overstated.

252.    Because of that failure to disclose, Instant Brands "omit[ed] to state a[] material fact necessary to make the statements therein, taken as a whole and in the light of the circumstances under which such statements were made not materially misleading."

253.    In Section 5.15 of the Credit Agreement, Instant Brands further represented that "[i]mmediately after the consummation of the Transactions to occur on the Closing Date, Holdings and its Subsidiaries, on a consolidated basis, will be Solvent."

254.    This representation, at the time that the Prepetition Term Loan was consummated, was untrue.

255.    As part of the UnSub Transaction, Instant Brands transferred assets valued at over $200 million to certain "unrestricted" subsidiaries.

256.    Section 7.04 of the Credit Agreement, entered into between Instant Brands and certain lenders, barred Instant Brands from transferring "all or substantially all its assets to, any Person."

257.    Section 7.13 of the Credit Agreement barred Instant Brands or any of its "Restricted Subsidiaries" from "mak[ing] Investments other than" specified "Permitted Investments."

258.    The transfer of Instant Brands' assets pursuant to the UnSub Transaction constituted "Investments" under the Credit Agreement and not specified "Permitted Investments."

259.    In transferring substantially all of the company's assets as part of the UnSub Transaction, Instant Brands breached Sections 7.03 and 7.14 of the Credit Agreement.

260.    Cornell Capital knew of the Credit Agreement and its terms.

84

261.    Cornell Capital intentionally procured Instant Brands' breaches of the Credit Agreement.

262.    The Trustee has standing to pursue claims founded on breaches of the Credit Agreement pursuant to an assignment of said claims by certain parties to the Credit Agreement who were beneficiaries of Instant Brands' representations.

263.    The Assigned Lenders suffered damages as a result of Instant Brands' breaches of the Credit Agreement.

## ELEVENTH CAUSE OF ACTION

**Fraudulent Inducement/Negligent Misrepresentation (including aiding and abetting) (Credit Agreement) (Cornell Capital, Ben Gadbois, Nicholas Hewitt, Jeff Kist, Cathy Landman)**

264.    The Trustee reincorporates and realleges the allegations in paragraphs 1-263 above.

265.    In connection with the Dividend Recap, Cornell Capital and members of Instant Brands' management made or aided the making of representations to lenders that they knew to be false, and knowingly failed to disclose that Corelle Brands' acquisition of Pre-Acquisition Instant Brands had been premised on misstated financials, that insurance claims had been filed that were premised on that fact, and that the combined company's value post-acquisition value was consequently materially overstated.

266.    Because of its failure to disclose, Cornell Capital and Instant Brands' management omitted material facts necessary to make its other representations, taken as a whole and in the light of the circumstances under which such statements were made, not materially misleading.

267.   Upon information and belief, had Cornell Capital and/or Instant Brands' management disclosed the truth, the Assigned Lenders would not have participated in the Dividend Recap.

268.   Cornell Capital and Instant Brands' management made the aforementioned materially false statements, and failed to disclose the aforementioned material information, with the intention of inducing the Assigned Lenders to participate in the Dividend Recap.

269.   In addition and in the alternative, the false statements and failure to disclose were negligent.

270.   The Trustee has standing to pursue these claims pursuant to an assignment of said claims by the Assigned Lenders.

271.   The Assigned Lenders suffered damages as a result of Cornell Capital's fraudulent inducement and/or negligent misrepresentations.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee prays for the following relief:

a.   Avoidance of the Special Dividend, the Seller Notes Transfer, Unsub Transaction, and other payments to Defendants, in the amounts described above;

b.   Recovery of the value of those transfers, in the amounts described above;

c.   An award in an amount to be proven at trial, but not less than $400 million, including;

    i.   The value of the Prepetition Term Loan;

    ii.   The value of the Special Dividend;

    iii.   The value of the Seller Notes Transfers;

    iv.   The value of the Parent Transfer;

v.      The value of the management bonuses;

vi.     The value of liens provided to Cornell Capital as a result of the UnSub Transaction;

vii.    Any diminution of value of the assets transferred as part of the UnSub Transaction as a result of the UnSub Transaction;

viii.   Damages resulting from Cornell Capital's tortious interference with the Credit Agreement;

ix.    Damages resulting from Cornell Capital's (and other Defendants') fraudulent inducement and/or negligent misrepresentations in connection with the Prepetition Term Loan;

d.    Punitive damages;

e.    Attorneys' fees;

f.    Pre-judgment and post-judgment interest; and

g.    Such other and further relief as the Court may deem just and proper.

DATED: November 13, 2024            Respectfully submitted,

**MCKOOL SMITH, P.C.**

By:   */s/ Joshua J. Newcomer*
Joshua J. Newcomer (SBN 24060329)
600 Travis St. Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344
Email: jnewcomer@mckoolsmith.com

and

Kyle A. Lonergan (*pro hac vice* forthcoming)
James H. Smith (*pro hac vice* forthcoming)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444
Email: klonergan@mckoolsmith.com
        jsmith@mckoolsmith.com

*Attorneys for Plaintiff*